# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARIALICE BATHRUS WILLIAMS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:05cv01483** |
| ) | |
| **FEDERAL NATIONAL MORTGAGE** ) | **Judge John D. Bates** |
| **ASSOCIATION, a/k/a "FANNIE MAE",** ) | |
| ) | |
| **RICHARD LAWCH,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **GRACE  HUEBSCHER,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## AMENDED COMPLAINT

*(Violations of the Civil Rights laws of the United States and the Common Law of the District of Columbia, to wit:  Unlawful Discrimination Based Upon Plaintiff's Race (African-American) and Sex (Female) through the Unlawful Denial of Opportunity to Make and Enforce Contracts; Unlawful Retaliation for the Prior Exercise of Plaintiff's Protected Civil Rights and EEO Activities through the Unlawful Denial off Opportunity to Make and Enforce Contracts; Conspiracy to Interfere with the Lawful Opportunity to Make and Enforce Contracts Based Upon Race, Sex and the Prior Exercise of Protected Civil Rights and EEO Activities; Tortious Interference with Business Relationships, Including Tortious Interference with the Reasonable Expectation of Prospective Economic Advantage; and Intentional Infliction of Emotional Distress)*

COMES NOW Marialice Bathrus Williams, the Plaintiff in this action, by and

through counsel, and pursuant to Fed. R. Civ. P. 15(a), hereby files an Amended

Complaint in this proceeding, and in support thereof states as follows:

## PARTIES

1.      Plaintiff Marialice Bathrus Williams (hereinafter "Plaintiff" or "Ms. Williams") is an African-American woman, who is and was a resident of the District of Columbia at all times relevant to this proceeding.  Plaintiff was employed in the Multifamily Division of Defendant Federal National Mortgage Association, commonly known as "Fannie Mae," in various positions, including as an attorney from 1989 to 1990, as Assistant Director from 1990 to 1993, and as Director of Capital Markets from 1993 to 1998.

2.      Defendant Federal National Mortgage Association ("Fannie Mae") is an instrumentality of the Federal Government, with its primary place of business located at 3900 Wisconsin Avenue, N. W., Washington, D. C. 20016-2892.

3.      Defendant Richard Lawch (hereinafter "Defendant Lawch") is a white male, who on information and belief is and was a resident of the State of Maryland at all times relevant to this proceeding, currently residing at 8316 Snug Hill Lane, Potomac, Maryland  20854.  Defendant Lawch was Vice-President of the Multifamily Division of Fannie Mae during the relevant time periods of this proceeding, and served as the direct supervisor of Plaintiff during the relevant period of her employment at Fannie Mae.  Defendant Lawch currently serves as Senior Vice-President, Multifamily Business and Customer Solutions, at Fannie Mae.  Defendant Lawch is sued in his personal capacity in this lawsuit for reasons hereinbelow set forth.

4.      Defendant Grace Huebscher (hereinafter "Defendant Huebscher") is a white female, who on information and belief is residing at 8805 Jones Mill Road, Chevy Chase, Maryland  20815-4726.  Defendant Huebscher served as a Vice-President in the

Multifamily Division at Fannie Mae during periods relevant to this litigation, and assumed many of the duties and responsibilities of Plaintiff Williams following the departure of Plaintiff from employment at Fannie Mae.  Defendant Huebscher currently serves as Vice President, Multifamily Complex Solutions, at Fannie Mae.  Defendant Huebscher is sued in her personal capacity in this lawsuit for reasons hereinbelow set forth.

## JURISDICTION

5.    This matter is brought before this Court, <u>inter alia</u>, pursuant to Sections 1981 and 1983 of the Civil Rights Act of 1964, as amended.  The bases of the Civil Rights claims raised herein against the named Defendants include alleged violations of Title 42, United States Code, Section 1981(a), to wit:  "All persons ... shall have the same right ... to make and enforce contracts ... as are enjoyed by white citizens ...."  To "make and enforce contracts" "includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," as applied through Title 42, United States Code, Section 1983.

6.    Additional jurisdiction of the Court for various conspiratorial acts alleged against Defendants Fannie Mae, Lawch and Huebscher is based upon Title 42, United States Code, Section 1985(3), which prohibits unlawful conspiracies to deprive persons of the "equal protection of the laws."

7.    Additional jurisdiction of the Court is based upon Title 28, United States Code, Section 1331 (providing for questions arising under Federal law), as directed against Defendant Fannie Mae, "an instrumentality of the Federal Government."

8.      Allegations of tortuous interference with Plaintiff's prospective economic advantage as based upon the common law of the District of Columbia, brought forth herein as attendant to the causes of actions pursuant to Title 42, United States Code, Sections 1981 and 1983.  Allegations of intentional infliction of emotional distress are similarly based upon the common law of the District of Columbia and pursuant to Title 28, United States Code, Section 1331.

9.      Recovery of attorneys' fees and costs, as demanded herein, is authorized pursuant to Title 42, United States Code, Section 1988, providing for recovery of attorney fees by successful plaintiffs in cases involving violations of Title 42, United States Code, Sections 1981 and 1983.

## **<u>VENUE</u>**

10.      Venue in this case is based upon the fact that the unlawful discriminatory and retaliatory matters giving rise to this litigation (42 USC Sections 1981, 1983 and 1985) were at all times located and conducted within the District of Columbia. Moreover, venue regarding the Federal Question matters alleged against Defendant Fannie Mae (Breach of Contract and Defamation of Character and Business Reputation) occurred within the District of Columbia.  Finally, the actions claimed under District of Columbia common law, to wit:  Allegations of tortuous interference with Plaintiff's prospective economic advantage, and allegations of intentional infliction of emotional distress, are predicated upon actions the majority of which took place within the District of Columbia.

## BACKGROUND

11.     Plaintiff Marialice Williams performed employment services continuously with the Multifamily Division of Defendant Fannie Mae from January 1990 to June 1998.

12.     Specifically, Plaintiff Williams was responsible for the development of products for Defendant Fannie Mae's customers that could provide cheaper and more cost-effective structures for selling or securitizing pools of multifamily mortgage loans. Plaintiff established a particularly high level expertise in these products; a detailed knowledge of the financial institutions which handled business in the secondary mortgage market; and great capacity to work within Fannie Mae and with its clients in successful product development.

13.     While at Fannie Mae, Plaintiff Williams developed and put into place products that opened up the secondary market for Fannie Mae's multifamily mortgage-backed securities.  This occurred at a critical time when changes in lending rules prospectively would have cost Fannie Mae that market, or a substantial portion thereof. A particular product line, named ACESsm, was solely developed by Plaintiff Williams and is now the benchmark on Wall Street for similar asset-backed securities.

14.     Plaintiff Williams also had developed products which would have mitigated or eliminated risks to Fannie Mae regarding assisted living programs, an issue of particular interest to Fannie Mae's financial viability.

15.     Plaintiff Williams also addressed the effectiveness of her insurance products with single family housing loans, and determined that such products would have made sub-prime single family housing loans reasonable for purchase by Fannie Mae; this was another issue of strong interest to Fannie Mae's ongoing financial viability.

16.    In 1997, utilizing products and processes which she had solely created and developed, Plaintiff Williams closed the first mortgage-backed securities transaction in the United States, whereby Fannie Mae was able to transfer all of the risk of loss, as opposed to merely insuring the loss, to a third party insurer -- AIG. This process enabled Fannie Mae and the customer selling the mortgage loans to move certain risks of loss from the portfolio and financial books of Fannie Mae and the customer, and to stay in compliance with newly-developed risk-based capital rules.

17.    No one involved with Defendant Fannie Mae, except to a very limited extent Plaintiff Williams' immediate supervisor, Defendant Richard Lawch, assisted Plaintiff Williams in the development of the cited risk transfer mechanism. The entire multifamily division of Fannie Mae, however, was well aware of Plaintiff Williams' special talents, unique skills, depth of experience, exceptional marketing abilities, extraordinary relationships with potential customers, and great effectiveness in developing the appropriate products and tools for the closing of mortgage backed securities for Fannie Mae. These efforts of Plaintiff Williams effectively transferred risk from Fannie Mae and the customers' portfolio and facilitated, in particular, Fannie Mae remaining in the small multifamily market – a market valued at approximately $10 billion per year.

18.    In approximately 1997 and 1998, Plaintiff Williams began to realize that certain officials within Fannie Mae, particularly Defendants Lawch and Huebscher, did not understand and were not willing to facilitate the extremely critical products and processes which she was developing for the Fannie Mae multifamily mortgage market, and clearly did not appreciate the true importance or value of Plaintiff's generation of

methods to mitigate or eliminate Fannie Mae's risk exposure in other product lines within the multifamily division of Fannie Mae. This was particularly true with respect to Fannie Mae's Delegated Underwriting and Servicing ("DUS") program, which represented approximately $64 billion of Fannie Mae's multifamily portfolio.

19.     In June 1998, Plaintiff Williams left the employment of Fannie Mae, pursuant to a negotiated settlement agreement which ostensibly resolved issues of alleged unlawful discrimination and retaliation on the bases of race and sex; charges which had been stated by Plaintiff Williams prior to her departure from Fannie Mae employment and which constituted protected activities as defined by the Civil Rights laws of the United States.

20.     Both prior to and at the time of her departure, and with recognition of the continuing value of the products and skills of Plaintiff Williams to the financial viability of Fannie Mae, particularly in the multifamily market, Plaintiff Williams had sought and received prospective and unconditional approval to continue to do business with Fannie Mae on a contract basis, with the focus of such contact(s) being transactions and programs she had developed while with Fannie Mae.

21.     Assurances of continuing business relationships between Fannie Mae and Plaintiff Williams were communicated by both written and oral promises extended by Fannie Mae and its senior officials. Particularly, Mr. Lou Hoyes, Senior Vice President of Defendant Fannie Mae's Multifamily Division where Ms. Williams had been assigned, promised orally and in writing that Fannie Mae would conduct business with Plaintiff Williams following her departure from Fannie Mae employment.

22.    In fact, Mr. Hoyes reasonably assured in writing to Plaintiff Williams that Fannie Mae would do at least $1 billion of insurance-based business in the next year through her, as a broker, and would utilize her services in the years following in addressing components of a yearly total market of approximately $10 billion.

23.    Specifically, on May 26, 1998, Mr. Hoyes had observed the business opportunities opened by the programs developed by Plaintiff Williams in association with CAM Financial, stating that "Fannie Mae currently has several pending transactions totaling nearly $1 billion where multifamily credit risk transfer insurance is the keystone to closing these transactions."

24.    The practice of a former employee of Fannie Mae continuing a business relationship with the organization following departure from employment was a common business practice at Fannie Mae, largely because of the unique skills and knowledge of such employees in the highly complex and specialized areas of business practice in which Fannie Mae specializes.

25.    Particularly, when Plaintiff Williams ended her employment with Fannie Mae, Defendant Fannie Mae (through Mr. Hoyes), and Defendants Lawch and Huebscher, were each aware of significant prospective business and economic opportunities available to Plaintiff Williams, based upon her unique expertise and experience with multifamily mortgage programs and secondary mortgage markets.  Such significant prospective business and economic opportunities carried considerable prospective economic advantage for Plaintiff Williams.

26.    Communications made to Plaintiff Williams were intended to cause, and did cause, Plaintiff Williams to believe that she would be permitted to participate fairly

and without discrimination or unlawful retaliation in these business opportunities, as such opportunities were normally and customarily afforded by Fannie Mae to former officials who are white males, and to former officials who had not participated in the assertion and exercise of their lawful equal employment opportunity rights.

27.    Following Plaintiff Williams' departure from Fannie Mae employment, and in significant reliance upon promises and assurances made to her by senior officials of Defendant Fannie Mae, including Defendants Lawch and Huebscher, Plaintiff Williams established her own business enterprise, studied for and passed the insurance broker examination in Washington, D. C., and took other material steps to enable her to broker and provide services for a portion of the mortgage-backed securities market of Fannie Mae that she had herself developed.

28.    Plaintiff Williams' business plan included the use of risk transfer products that she had developed during her employment tenure with Fannie Mae.  Defendants Lawch and Huebscher knew of, and had expressed approval to Plaintiff Williams, of that business plan.  Such arrangements are normal and customary for former white and male employees who are former officials of Fannie Mae, and who depart from Fannie Mae and continue to conduct business within the area of their former employment following their departure from Fannie Mae, and their transition into the private sector.

29.    Such services are provided to Fannie Mae on the bases of customary payments, fees and commissions.  There was no reason for Plaintiff Williams to expect any different contractual and business opportunities to be realized by her, an African-American female, especially given her recognized talent, extensive experience and demonstrated track record of success at Fannie Mae in product development.

30.     On July 1, 1998, in reasonable reliance upon the future performance of significant business with Fannie Mae, Plaintiff Williams opened an office at Suite 402, 2600 Virginia Avenue, N. W., Washington, D. C.  20037.

31.     Relying significantly and reasonably on the promises and assurances of Fannie Mae senior officials, Plaintiff Williams invested and expended significant personal funds in furtherance of establishing her broker business, with total financial obligations in excess of $500,000.

32.     As an initial business prospect upon creation of her new business, Plaintiff Williams entered into a joint venture with CAM Financial to implement and facilitate her business plan of assisting Fannie Mae, utilizing products and concepts which she had developed.  Such a relationship had, indeed, been contemplated in the previously cited written communication of Fannie Mae Senior Vice President Hoyes in his memorandum of May 26, 1998.

33.     On October 19, 1998, in further efforts to realize her aforestated business plan, Plaintiff Williams organized a District of Columbia limited liability company named Risk Mitigation Strategists, LLC ("RMS"), wholly owned by Plaintiff Williams.

34.     On November 1, 1998, as an additional action in furtherance of her business plan, Plaintiff Williams obtained an insurance broker's license from the District of Columbia Department of Insurance and Securities Regulation.  The purpose of obtaining this broker's license was to permit Plaintiff Williams, individually and through RMS, to provide brokerage services and receive brokers' fees generated by her efforts with Fannie Mae in producing insurance products.

35.     Such brokerage services were to be provided to, on behalf of, or for the benefit of Defendant Fannie Mae and its multifamily lenders, including its DUS and Aggregation Program lenders.  Based upon reasonable reliance and former practice, Plaintiff Williams anticipated the receipt of significant income to herself and her company through the provision of such services.

36.     For a considerable period of time following Plaintiff Williams' departure from Fannie Mae, up to and including through October 2003, and with the approval and sanction of senior officials of Defendant Fannie Mae, including Defendants Lawch and Huebscher, Plaintiff Williams proceeded to develop Fannie Mae-related business.  Such business development efforts were based upon a continuing reasonable reliance by Plaintiff Williams of an ongoing beneficial business relationship with Fannie Mae, and involved arranging meetings, attending conferences, and participating in the formulation and communication of specific business proposals.  Throughout this period, Plaintiff Williams worked diligently and in good faith to consummate business with Defendants, including entering into a confidentiality agreement with Fannie Mae so that the proprietary nature of Plaintiff Williams' business initiatives and product development concepts could not be improperly utilized.

37.     During the period following her establishment of a private enterprise, and in furtherance of her reliance on the promises by Defendant Fannie Mae and its officers of a continuing business relationship, Plaintiff Williams marketed to Fannie Mae and its lender customers a variety of important insurance products.  Such marketing efforts worked to the direct benefit of Fannie Mae and its lender customers.

38.    More specifically, Plaintiff Williams attended conferences such as the Mortgage Bankers Association, where Plaintiff Williams made presentations to Fannie Mae customers regarding pertinent insurance strategies concerning Fannie Mae and its business interests.

39.    The various strategies communicated to Fannie Mae customers were designed to facilitate and to address the following: a) To make it easier and less costly for lenders using the then-existing Fannie Mae executions to swap mortgages for mortgage-backed securities, or to sell various loans and mortgages to Defendant Fannie Mae; b) to minimize Defendant Fannie Mae's exposure to real estate, credit, and market risks associated with its portfolios of mortgages, financial instruments, derivatives and hedging activities; and, c) to shorten transaction times through the elimination of a number of documents and the substitution of an insurance policy, and, d) to facilitate the execution of follow-up transactions.

40.    Defendant Fannie Mae had representatives at meetings in Chicago, San Francisco and Orlando, Florida, where Plaintiff Williams made presentations to Fannie Mae customers, attended social functions with Fannie Mae customers, and attended Fannie Mae-sponsored social functions to discuss marketing results of the various conferences.

41.    Plaintiff Williams actively continued to rely on alleged good faith efforts and explicit and implied promises of Defendant Fannie Mae and its officials to conduct business with her through the period of 1999 and 2000, and as stated hereunder, beyond 2000, committing substantial further time and additional significant financial investments in furtherance of ongoing business efforts with Fannie Mae.

42.    In May 2001, another specific proposal was discussed between Plaintiff Williams and Defendant Fannie Mae, reflecting the ongoing and exhaustive work by Plaintiff Williams in refining the business products cited herein.  Plaintiff Williams, in association with CAM Financial, secured the interest of several A-plus rated insurance companies and brought an additional and significant proposal to Fannie Mae for doing specific mortgage-related business.  Again, however, Defendant Fannie Mae refused to consummate formally a business relationship with Plaintiff Williams, despite continuing statements and actions reflecting its intent to do so.

43.    While Defendant Fannie Mae continued to discuss with Plaintiff Williams various business opportunities and intended business relationships during the 2001 through 2002 time frame, it subsequently become apparent that privately and secretly officials of Defendant Fannie Mae had instituted and were continuing a process of "blackballing" Plaintiff Williams from any and all business opportunities with the organization.  Working primarily through Defendants Lawch and Huebscher, Fannie Mae purposefully and deliberately continued to deny to Plaintiff Williams closure and financial remuneration for any and all business opportunities available through Fannie Mae.  This was despite the clear and uncontested value and expertise Plaintiff Williams had to improve the organization's capabilities within multifamily housing projects and the secondary mortgage market.

44.    During approximately 2001 through 2002, Defendant Fannie Mae and Defendants Lawch and Huebscher had created a scheme and conspiracy to deny to Plaintiff Williams any actual current or future contracting relationships with Fannie Mae; had further determined to keep such scheme and conspiracy secret from third parties

outside of Defendant Fannie Mae, and most particularly to keep information of the

purposes of the scheme and conspiracy secret from Plaintiff Williams; and had

determined further to continue to take actions which would reasonably appear to Plaintiff

Williams that the Defendants were actually willing and eager to engage in contractual

relationships with Plaintiff Williams, thus diluting and wasting Plaintiff Williams' time,

professional efforts, and financial resources.

     45.    At the same time as Defendant Fannie Mae and Defendants Lawch and

Huebscher were continuing to refuse to perform, or allow to be performed, any business

by and between Fannie Mae and Plaintiff Williams, these same Defendants directed all

such business and accompanying financial remuneration to a less qualified white male

contractor, Mr. Craig Ott.  Mr. Ott also had no history of protected equal opportunity

activities involving Defendant Fannie Mae, as had Plaintiff Williams.

     46.    An initial clue as to the ongoing and continuing scheme and conspiracy of

the Defendants to deny contractual relationships with Fannie Mae to Plaintiff Williams is

reflected to a limited extent in the following e-mail, which was forwarded by Defendant

Huebscher to Defendant Lawch on May 31, 2001:

> "Richard, Marialice [Williams] wants to pursue the credit
> risk insurance for DUS risk.  Do you want to pursue with
> her?  MY GUT IS NO but if you think it is worth
> continuing discussions, I will focus on her questions?"

Defendant Lawch then responded by e-mail:

> "If Ofheo comes back with bad RBC rules we may be
> interested.  Are these different players than Craig [Ott] is
> showing us?"

Defendant Huebscher then further replied:

"Probably not so if we want to engage Craig [Ott] on this project, that might be a better choice. If you like that plan then let's discuss what we want to ask Craig to find for us …."

47.   The existence and content of this e-mail was unknown to Plaintiff until it was forwarded to Plaintiff by a former colleague in June 2001.  Moreover, the full meaning and intentions behind the conduct reflected in this e-mail were unknown to Plaintiff until additional and substantial actions of the Defendants occurred commencing in October 2003.

48.   Because the content of this particular e-mail, addressing the limited business of one project involving credit risk insurance for DUS risk, appeared to directly contradict the statements and actions of the various Defendants, and because Plaintiff Williams was eager to continue the valuable business relationships which were being promised to her by Fannie Mae and its senior officers, Plaintiff Williams continued to work assiduously on developing the ongoing business relationships with Fannie Mae and continued to communicate frequently with Defendants Lawch and Huebscher regarding such prospective business relationships.

49.   Instead of communicating or revealing to Plaintiff Williams that they would not contract in the future with Plaintiff Williams, however, Defendants Fannie Mae, Lawch and Huebscher never presented or revealed to Plaintiff Williams, in 2001 or subsequently, any direct or indirect communications stating their true intentions of not permitting Plaintiff Williams to do any private enterprise business with Fannie Mae. Instead, the Defendants communicated frequently and positively with Plaintiff in continuing encouragement and promises of work, while apparently continuing to conspire in secret to withhold any and all such work.

50.    The constant and recurring efforts of Plaintiff Williams to obtain a contract with Fannie Mae, and to receive the economic advantages attendant to such contractual relationship, continued unabated and uninterrupted through early October 2003. Through this time, while no contracts had been achieved, Plaintiff Williams had been led to believe by the Defendants that such contracts would occur, and that she had a fair and equal opportunity to achieve and make such contracts with Fannie Mae regardless of her minority status as an African-American woman, and regardless of her prior protected Civil Rights activities while serving as an employee of Fannie Mae.

51.    On October 8, 2003, and following the continuing pattern of actions in furtherance of Defendants' expressed interests to engage in contracts with Plaintiff Williams, Plaintiff Williams participated in a meeting in Washington, D. C., with certain officials of Fannie Mae, including an attorney whose first name, on information and belief, was Carol, Ms. Rhoda Newman, and Defendant Huebscher. The subject of the meeting, which Plaintiff Williams had prepared for extensively, was the use of Captive Insurance Companies by Fannie Mae's Multifamily Division. Accompanying Plaintiff Williams at this meeting were Plaintiff Williams' associate, Mr. Harvey Hartsfield, and Ms. Kate Westover, an expert on captive insurance companies.

52.    There was no suggestion or statement by Defendant Fannie Mae and Defendant Huebscher at this meeting of October 8, 2003, that Fannie Mae and its officers did not intend to engage in any business with Plaintiff Williams, and to all appearances to Plaintiff Williams the Defendants were progressing on active consideration of utilizing her contract services.

53.     Following the meeting of October 8, 2003, however, Defendant Huebscher and other officials of Fannie Mae stopped responding to Plaintiff Williams' correspondence and telephone calls.  This refusal to communicate had never before happened during the entire period of time following Plaintiff Williams end of employment at Fannie Mae, and it became clear for the first time to Plaintiff Williams that Defendants had been engaging in a deceitful and secretive "black-ball" of Plaintiff and her business entities and interests for an extended period of time.

54.     During and throughout the period of July 1, 1998, through at least October 8, 2003, Plaintiff Williams had engaged in extensive and active marketing efforts and made presentations to Defendant Fannie Mae through many of its employees, officers and agents.  These presentations and attendant communications conveyed to Defendant Fannie Mae, by and through these employees, officers and agents, actual knowledge of Plaintiff Williams' reasonable and continuing expectations of business opportunities and prospective financial gain for her efforts.

55.     At all times from July 1, 1998, to the present, Defendant Fannie Mae and Defendants Lawch and Huebscher have purposefully, intentionally, improperly, and willfully refused to do business with Plaintiff Williams, and have further precluded in any manner other officials of Fannie Mae from conducting business relations with Plaintiff Williams.

56.     Indeed, following Plaintiff's discovery and subsequent determination during and after October 2003 that the Defendants were absolutely unwilling to do business with her, there was every reason for Plaintiff Williams to believe that Defendants Fannie Mae, Lawch and Huebscher never had any intention of doing any

business with Plaintiff Williams, and that comments made to Plaintiff prior to her resignation from Fannie Mae employment were made with ill motives and in an effort to induce her resignation from such employment.

57.     The actions of Defendants Fannie Mae, Lawch and Huebscher by engaging in an intentional and malicious plan to deprive Plaintiff Williams of her right to contract, including effective efforts to "black-ball" Plaintiff Williams from doing contract work involving Fannie Mae, were based on her status as an African-American female, and her prior protected EEO activities while employed by Defendant Fannie Mae.  No such conduct is evident by the Defendants regarding any white or male prospective contractors or sub-contractors.

58.     As a result of its malicious and biased actions towards Plaintiff Williams, Defendant Fannie Mae assumed greater costs, a greater level of business risks, and less effective management and efficiencies regarding Fannie Mae's secondary mortgage market and multifamily mortgages, all at significant detriment to the Fannie Mae organization, its financial viability, and the United States Government.

59.     Moreover, the types of business opportunities for which Plaintiff Williams was superbly and uniquely qualified through skill, experience and expertise were presented to a white male, Mr. Craig Ott, whose credentials, expertise and experience is these business areas was demonstrably inferior to that of Plaintiff Williams. In fact, as was well known to Defendants, Mr. Ott was structuring and closing mortgage transactions loosely based upon the very same business concepts that Ms. Williams had developed at Fannie Mae, but was doing so in a manner far inferior to that which would have been accomplished by Plaintiff Williams.

60.     In addition to its direct, unlawful and self-destructive refusals to permit Plaintiff Williams from fairly doing business with Fannie Mae within her areas of knowledge and expertise, on knowledge, information and belief, Defendant Fannie Mae, through its agents and officers, including Defendants Lawch and Huebscher, discouraged others, including various lenders and customers of Fannie Mae, from conducting business with Plaintiff Williams.  Such conduct, in direct violation of the civil rights laws of the United States, continued at least through 2003, and possibly has continued to the date of the filing of this Complaint.

61.     On information and belief, for the period July 1, 1998, through at least 2003, Defendants and agents, employees and officers of Fannie Mae actively discouraged Fannie Mae consultants, brokers, lenders and customers and their representatives from dealing with Plaintiff Williams, and companies associated with her such as CAM Financial, for the securing of Fannie Mae-related insurance products.  They knew, for example, that Ms. Williams, as part of her business plan, intended to work with CAM Financial, the insurance brokerage firm that provided insurance coverage for these transactions under an exclusive agreement with Fannie Mae, and purposefully discouraged CAM Financial officials from doing business with Plaintiff Williams.

62.     Moreover, on information and belief such communications may have included the expression of knowingly false and defamatory information against Plaintiff Williams, and her business acumen and capabilities, by the various Defendants.  This occurred when such communications were known by Defendants to be false and likely to defame and harm her character and business reputation; to result in serious adverse financial consequences to Plaintiff Williams and her business interests.

63.     All of these cited intentional, discriminatory, and biased actions by the Defendants, individually and collectively, caused and induced Plaintiff Williams to suffer severe emotional distress, pain and suffering.

64.     As a result of its illegal and conspiratorial actions, based in substantial part on ongoing discrimination based upon race and sex, and unlawful retaliation for her prior protected EEO activities while at Fannie Mae, Defendant Fannie Mae and Defendants Lawch and Huebscher thereby deprived Plaintiff Williams from fair and reasonable business and economic opportunities, and from earning commissions through its co-brokerage agreement with CAM Financial and other organizations and business entities. The overall financial and economic damages suffered by Plaintiff Williams are in excess of $30,000,000.00.

65.     The Defendants' unlawful and conspiratorial actions are continuing and ongoing to the present day, while Defendant Fannie Mae is continuing to do business in the small multifamily housing market using mortgage backed securities products developed by Plaintiff Williams.

66.     Among other injuries suffered by Plaintiff Williams because of the Defendants' unlawful and conspiratorial actions and conduct cited herein, Plaintiff Williams was forced to declare and be placed into bankruptcy.

67.     Plaintiff Williams has further been damaged, as a reasonable result and proximately caused by Fannie Mae's illegal and tortuous actions, in an amount in excess of $35,000,000 as a direct result of lost co-brokerage commissions with CAM Financial. Such  commissions would have been attributable to Plaintiff Williams placing insurance

for her own insurance commission account, and insurance consulting fees with the above referenced customers and prospective customers.

68.    Economic damages cited herein are continuing and growing.

69.    In addition to economic damages, Plaintiff Williams has suffered and will continue to suffer from severe stress and adverse mental and physical health affects because of the purposeful and malicious efforts by the Defendants to deny to her the opportunity to make and enforce contracts in violation of the Civil Rights laws of the United States; because of the unlawful conspiracy engaged in by the Defendants to deny to Plaintiff Williams the opportunity to make and enforce contracts in violation of the Civil Rights laws of the United States; and because of he actions of the Defendants to tortiously interfere with Plaintiff's business relationships, including the Plaintiff's reasonable expectation of prospective economic advantage.

### COUNT I
(Unlawful Discrimination Based Upon Race and Sex)

70.    Paragraphs 1 through 69 are herein incorporated by reference.

71.    The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes unlawful discrimination against Plaintiff Williams based upon Plaintiff's race (African-American) and sex (female), pursuant to 42 U.S.C. Section 1981(a), to wit:  By conduct up to and through October 2003, and continuing to the time of this lawsuit, Defendants have denied to Plaintiff Williams the "same right … to make and enforce contracts … as enjoyed by white citizens …."  To "make and enforce contracts" "includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," as applied through Title 42, United States Code, Section 1983.

72      This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

## COUNT II
(Unlawful Retaliation for the Prior Exercise of Protected Civil Rights)

73.     Paragraphs 1 through 72 are herein incorporated by reference.

74.     The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes unlawful retaliation against Plaintiff Williams based upon Plaintiff's prior exercise of protected civil rights and EEO activities, to wit:  By conduct up to and through October 2003, and continuing to this day, Defendants have engaged in a course of action constituting unlawful retaliation against Plaintiff Williams for having engaged in protected civil rights and EEO activities, and specifically through the failure and refusal of Defendants to permit Plaintiff Williams to avail herself of the fair and unbiased equal opportunity to engage in business contracting with Defendant Fannie Mae.

75.     This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

## COUNT III
(Unlawful Conspiracy to Deny Plaintiff the Opportunity to
Make Contracts Based Upon Race and Sex)

76.     Paragraphs 1 through 75 are herein incorporated by reference.

77.     The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein and specifically including the conspiracy and agreement by and among the Defendants, and their aforestated actions in furtherance of the conspiracy and agreement, to wit:  The Defendants' concerted and organized plans, efforts and actions to refuse to permit Plaintiff Williams to make and enforce contracts pursuant to the civil

rights identified by 42 U.S.C. Section 1981, as applied by 42 U.S.C. Section 1983,

constitute an unlawful conspiracy to discriminate against Plaintiff based upon Plaintiff's

race (African-American) and sex (female), all in violation of 42 U.S.C. Section 1985.

78.    This unlawful conduct has caused past and ongoing economic, physical

and mental injury to Plaintiff Williams.

### COUNT IV

(Tortious Interference with Business Relationships, Specifically
Including Plaintiff's Expectation of Prospective Economic Advantage)

79.    Paragraphs 1 through 78 are herein incorporated by reference.

80.    The conduct of Defendants Fannie Mae, Lawch and Huebscher,

individually and collectively, as described herein, constitutes a tortious violation of the

common law rights of Plaintiff Williams under the laws of the District of Columbia, to

wit:  Plaintiff Williams was denied by Defendants her lawful right to fairly, and without

bias, prejudice and tortious interference, engage in the right to make contracts and

establish business relationships intended and expected to result in prospective economic

advantage to Plaintiff Williams.  *Ulico Cas. Co.. v. Prof. 1 Indem. Agency, Inc.,* 1999

U.S. Dis. LEXIS 8591 (D.D.C. 1999) (TFH).  As set forth by this Court in the *Ulico* case,

*supra* at 4, the components of the cited tort are as follows:

> "Under District of Columbia law, Ulico [Plaintiff] must allege (1) the
> existence of a valid business relationship or expectancy; (2) knowledge of
> the relationship or expectancy on the part of PIA [Defendant]; (3)
> intentional interference inducing or causing a breach or termination of the
> relationship or expectancy, and (4) resultant damage.  *See Bennett Enter.,
> Inc. v. Domino's Pizza, Inc.,* 310 U.S. App. D.C. 192, 45 F.3d 493, 499
> (D.C. Cir. 1995)."

As established herein, all required elements of the tort of tortious interference with Plaintiff's reasonable expectation of prospective economic advantage have been incorporated into this Amended Complaint.

81.    This unlawful conduct has caused past and ongoing economic injury to Plaintiff Williams.

## COUNT V
(Intentional Infliction of Emotional Distress)

82.    Paragraphs 1 through 81 are herein incorporated by reference.

83.    The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes common law intentional infliction of emotional distress against Plaintiff Williams, aggravated through the Defendants' active, conspiratorial, malicious and secretive attempts to curtail or terminate Plaintiff Williams' prospective and ongoing business relationships with Defendant Fannie Mae and its customers; by Defendants' interference with and elimination of Plaintiff Williams' reasonable opportunities to realize prospective economic advantage from such business relationships; and by Defendants' collective efforts to damage Plaintiff Williams' personal and business reputation; all of which occurred while Defendants were generating active inducements through a conspiratorial ruse and false appearance of having an ongoing and continuing willingness to engage in such reasonably expected business relationships with Plaintiff Williams.

84.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

## PRAYER FOR RELIEF

85.    Paragraphs 1 through 84 are herein incorporated by reference.

86.    As a result of the injuries described herein, Plaintiff Williams respectfully prays for the following relief from this Honorable Court:

a.  Judgment against the Defendants, jointly and severally, for Counts I through V, in the following amounts:

(1)  Actual damages in the amount of $1,000,000 for each and every Count identified herein.

(2)  Additional damages in the amount of $30,000,000 for the loss of prospective business opportunities for each and every Count identified herein.

(3)  Punitive damages in the amount of $50,000,000 for each and every Count identified herein for the malicious, wanton, outrageous and reckless conduct therein set forth.

(4)  Additional compensatory damages of $5,000,000 for Plaintiff's physical and mental injuries, including pain and suffering, as a result of the Defendants' conduct as identified in Counts I through V, and for each and every Count so specified.

b.  Injunctive relief against Defendant Fannie Mae, its officers, employees and agents, regarding any further recurrence of the unlawful conduct against Plaintiff Williams as set forth in Counts I through V herein.

## JURY DEMAND

Plaintiff Williams respectfully requests a trial by jury on all issues herein set forth, as allowable by law.

Respectfully submitted,


_____/S/_____
Michael W. Beasley, Esq.
D. C. Bar No. 248930
411 East Broad Street
Falls Church, Virginia  22046
Phone:  (703) 241-2909
Fax:  (703) 241-5885


_____/S/_____
Brian Lederer, Esq.
D. C. Bar No. 184184
3003 Van Ness St., NW, Suite #W228
Washington, D. C.  20008
Phone:   (202) 244-1715

Members of the District Court Bar for the
 United States District Court for the
 District of Columbia
Attorneys for Plaintiff
 Marialice Bathrus Williams

October 31, 2005

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that three copies of the foregoing "Amended Complaint,"

one copy for each named Defendant, were provided by first-class mail, postage

prepaid, this 31st day of October 2005, to the following named counsel for

Defendants:

Evelyn L. Becker, Esquire
Sarah Alexander Goldfrank, Esquire
O'Melveny & Myers, LLP
1625 Eye Street, N. W.
Washington, D. C.  20006-4001

Counsel for Defendants Fannie Mae,
  Lawch and Huebscher

_____/S/_____

Michael W. Beasley, Esq.
D. C. Bar No. 248930

Counsel for Plaintiff
