**EXHIBIT A**

**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUL 2 8 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| MARIALICE BATHRUS WILLIAMS,<br>1922 First Street, N. W.<br>Washington, D. C. 20001 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil Action No. _____<br>) |
| FANNIE MAE,<br>An Instrumentality of the United States,<br>3900 Wisconsin Avenue, N. W.<br>Washington, D. C. 20016-2892 | )<br>)<br>)<br>) |

CASE NUMBER  1:05CV01483

JUDGE: John D. Bates

DECK TYPE: Civil Rights (non-employment)

DATE STAMP: 07/28/2005

| | |
|---|---|
| **SERVE:**<br>Hon. Alberto R. Gonzales<br>Attorney General of the United States<br>United States Department of Justice<br>950 Pennsylvania Avenue, N. W.<br>Washington, D. C. 20530-0001 | )<br>)<br>)<br>)<br>)<br>) |
| **ALSO SERVE:**<br>U. S. Attorney for the District of Columbia<br>555 4th Street, N. W.<br>Washington, D. C. 20001-2733 | )<br>)<br>)<br>)<br>) |
| and | )<br>) |
| RICHARD LAWCH,<br>7700 Wisconsin Avenue<br>Bethesda, Maryland  20814 | )<br>)<br>) |
| and | )<br>) |
| GRACE  HUEBSCHER,<br>7700 Wisconsin Avenue<br>Bethesda, Maryland  20814 | )<br>)<br>) |
| Defendants. | )<br>) |

JURY ACTION

1

## COMPLAINT

*(Violations of the Civil Rights laws of the United States, to wit:*
*Unlawful Discrimination Based Upon Plaintiff's Race (African-American) and Sex*
*(Female); Unlawful Retaliation for the Prior Exercise of Plaintiff's Protected Civil*
*Rights and EEO Activities; Unlawful Interference with Contractual Relationships*
*Based Upon Race, Sex and the Prior Exercise of Protected Civil Rights and EEO*
*Activities; Conspiracy to Interfere with Contractual Relationships Based Upon*
*Race, Sex and the Prior Exercise of Protected Civil Rights and EEO Activities;*
*Breach of Contract; Tortious Interference with Business Relationships; Intentional*
*Infliction of Emotional Distress; Defamation of Character and Business Reputation)*

COMES NOW Marialice Bathrus Williams, the Plaintiff in this action, by and

through counsel, to state the following in support of the Complaint in this proceeding:

## PARTIES

1.      Plaintiff Marialice Bathrus Williams (hereinafter "Plaintiff" or "Ms.

Williams") is an African-American woman, who is and was a resident of the District of

Columbia at all times relevant to this proceeding.  Plaintiff was employed in the

Multifamily Division of Defendant Fannie Mae in various positions, including as an

attorney from 1989 to 1990, as Assistant Director from 1990 to 1993, and as Director of

Capital Markets from 1993 to 1998.

2.      Defendant Fannie Mae is an instrumentality of the Federal Government,

with its primary place of business located at 3900 Wisconsin Avenue, N. W.,

Washington, D. C. 20016-2892.

3.      Defendant Richard Lawch (hereinafter "Defendant Lawch") is a white

male, who on information and belief is and was a resident of the State of Maryland at all

times relevant to this proceeding, currently residing at 8316 Snug Hill Lane, Potomac,

Maryland  20854.  Defendant Lawch was Vice-President of the Multifamily Division of

Fannie Mae during the relevant time periods of this proceeding, and served as the direct

2

supervisor of Plaintiff during the relevant period of her employment at Fannie Mae.

Defendant Lawch currently serves as Senior Vice-President, Multifamily Business and

Customer Solutions, at Fannie Mae.  Defendant Lawch is sued in his personal capacity in

this lawsuit for reasons hereinbelow set forth.

    4.      Defendant Grace Huebscher (hereinafter "Defendant Huebscher") is a

white female, who on information and belief is residing at 8805 Jones Mill Road, Chevy

Chase, Maryland  20815-4726.  Defendant Huebscher served as a Vice-President in the

Multifamily Division at Fannie Mae during periods relevant to this litigation, and

assumed many of the duties and responsibilities of Plaintiff Williams following the

departure of Plaintiff from employment at Fannie Mae.  Defendant Huebscher currently

serves as Vice President, Multifamily Complex Solutions, at Fannie Mae.  Defendant

Huebscher is sued in her personal capacity in this lawsuit for reasons hereinbelow set

forth.

### JURISDICTION

    5.      This matter is brought before this Court, <u>inter</u> <u>alia</u>, pursuant to Sections

1981 and 1983 of the Civil Rights Act of 1964, as amended.  The bases of the Civil

Rights claims raised herein against the named Defendants include alleged violations of

Title 42, United States Code, Section 1981(a), to wit:  "All persons ... shall have the same

right ... to make and enforce contracts ... as are enjoyed by white citizens ...."  To "make

and enforce contracts" "includes the making, performance, modification and termination

of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

contractual relationship," as applied through Title 42, United States Code, Section 1983.

3

6.     Additional jurisdiction of the Court for various conspiratorial acts alleged against Defendants Fannie Mae, Lawch and Huebscher is based upon Title 42, United States Code, Section 1985(3), which prohibits unlawful conspiracies to deprive persons of the "equal protection of the laws."

7.     Additional jurisdiction of the Court is based upon Title 28, United States Code, Section 1331 (providing for questions arising under Federal law), as directed against Defendant Fannie Mae, "an instrumentality of the Federal Government."

8.     Recovery of attorneys' fees and costs, as demanded herein, is authorized pursuant to Title 42, United States Code, Section 1988, providing for recovery of attorney fees by successful plaintiffs in cases involving violations of Title 42, United States Code, Sections 1981 and 1983.

9.     Allegations of Breach of Contract and Defamation of Character and Business Reputation are alleged only against Defendant Fannie Mae, and are based upon the common law of the District of Columbia and pursuant to Title 28, United States Code, Section 1331.

## VENUE

10.     Venue in this case is based upon the fact that the unlawful discriminatory and retaliatory matters giving rise to this litigation (42 USC Sections 1981, 1983 and 1985) were at all times located and conducted within the District of Columbia. Moreover, venue regarding the Federal Question matters alleged against Defendant Fannie Mae (Breach of Contract and Defamation of Character and Business Reputation) occurred within the District of Columbia.

4

## BACKGROUND

11.    Plaintiff Marialice Williams performed employment services with the Multifamily Division of Defendant Fannie Mae from January 1990 to June 1998.

12.    Specifically, Plaintiff Williams was responsible for the development of products for Defendant Fannie Mae's customers that could provide cheaper and more cost-effective structures for selling or securitizing pools of multifamily mortgage loans. Plaintiff established a particularly high level expertise in these products; a detailed knowledge of the financial institutions which handled business in the secondary mortgage market; and great capacity to work within Fannie Mae and with its clients in successful product development.

13.    While at Fannie Mae, Plaintiff Williams developed and put into place products that opened up the secondary market for Fannie Mae's multifamily mortgage-backed securities. This occurred at a critical time when changes in lending rules prospectively would have cost Fannie Mae that market, or a substantial portion thereof. A particular product line, named ACESsm, was solely developed by Plaintiff Williams and is now the benchmark on Wall Street for similar asset-backed securities.

14.    Plaintiff Williams also had developed products which would have mitigated or eliminated risks to Fannie Mae regarding assisted living programs, an issue of particular interest to Fannie Mae's financial viability.

15.    Plaintiff Williams also addressed the effectiveness of her insurance products with single family housing loans, and determined that such products would have made sub-prime single family housing loans reasonable for purchase by Fannie Mae; this was another issue of strong interest to Fannie Mae's ongoing financial viability.

16.    In 1997, utilizing products and processes which she had solely created and developed, Plaintiff Williams closed the first mortgage-backed securities transaction in the United States, whereby Fannie Mae was able to transfer all of the risk of loss, as opposed to merely insuring the loss, to a third party insurer -- AIG.  This process enabled Fannie Mae and the customer selling the mortgage loans to move certain risks of loss from the portfolio and financial books of Fannie Mae and the customer, and to stay in compliance with newly-developed risk-based capital rules.

17.    No one involved with Defendant Fannie Mae, except to a very limited extent Plaintiff Williams' immediate supervisor, Defendant Richard Lawch, assisted Plaintiff Williams in the development of the cited risk transfer mechanism.  The entire multifamily division of Fannie Mae, however, was well aware of Plaintiff Williams' special talents, unique skills, depth of experience, exceptional marketing abilities, extraordinary relationships with potential customers, and great effectiveness in developing the appropriate products and tools for the closing of mortgage backed securities for Fannie Mae.  These efforts of Plaintiff Williams effectively transferred risk from Fannie Mae and the customers' portfolio and facilitated, in particular, Fannie Mae remaining in the small multifamily market – a market valued at approximately $10 billion per year.

18.    In approximately 1997 and 1998, Plaintiff Williams began to realize that certain officials within Fannie Mae, particularly Defendants Lawch and Huebscher, did not understand and were not willing to facilitate the extremely critical products and processes which she was developing for the Fannie Mae multifamily mortgage market, and clearly did not appreciate the true importance or value of Plaintiff's generation of

methods to mitigate or eliminate Fannie Mae's risk exposure in other product lines within the multifamily division of Fannie Mae. This was particularly true with respect to Fannie Mae's Delegated Underwriting and Servicing ("DUS") program, which represented approximately $64 billion of Fannie Mae's multifamily portfolio.

19.    In June 1998, Plaintiff Williams left the employment of Fannie Mae, pursuant to a settlement agreement which ostensibly resolved issues of alleged unlawful discrimination and retaliation on the bases of race and sex; charges which had been stated by Plaintiff Williams prior to her departure from Fannie Mae employment.

20.    Both prior to and at the time of her departure, and with recognition of the continuing value of the products and skills of Plaintiff Williams to the financial viability of Fannie Mae, particularly in the multifamily market, Plaintiff Williams had sought and received approval to continue to do business with Fannie Mae on a contract basis regarding transactions and programs she had developed while with Fannie Mae.

21.    Assurances of continuing a business relationship between Fannie Mae and Plaintiff Williams were communicated by both written and oral promises extended by Fannie Mae and its senior officials. Particularly, Mr. Lou Hoyes, Senior Vice President of Defendant Fannie Mae's Multifamily Division where Ms. Williams had been assigned, promised orally and in writing that Fannie Mae would conduct business with Plaintiff Williams following her departure from Fannie Mae employment.

22.    In fact, Mr. Hoyes reasonably assured in writing to Plaintiff Williams that Fannie Mae would do at least $1 billion of insurance-based business in the next year through her, as a broker, and would utilize her services in the years following in addressing a yearly market of approximately $10 billion.

23.     Specifically, on May 26, 1998, Mr. Hoyes had observed the business opportunities opened by the programs developed by Plaintiff Williams in association with CAM Financial, stating that "Fannie Mae currently has several pending transactions totaling nearly $1 billion where multifamily credit risk transfer insurance is the keystone to closing these transactions."

24.     The practice of a former employee of Fannie Mae continuing a business relationship with the organization following departure from employment was a common business practice at Fannie Mae, largely because of the unique skills and knowledge of such employees in the highly complex and specialized areas of business practice in which Fannie Mae specializes.

25.     Particularly, when Plaintiff Williams ended her employment with Fannie Mae, Defendant Fannie Mae (through Mr. Hoyes), and Defendants Lawch and Huebscher, were each aware of significant prospective business and economic opportunities available to Plaintiff Williams, based upon her unique expertise and experience with multifamily mortgage programs and secondary mortgage markets.

26.     Communications made to Plaintiff Williams were intended to cause, and did cause, Plaintiff Williams to believe that she would be permitted to participate fairly and without discrimination or unlawful retaliation in these business opportunities, as such opportunities were normally and customarily afforded by Fannie Mae to former officials who are white males, and to former officials who had not participated in the assertion and exercise of their lawful equal employment opportunity rights.

27.     Following Plaintiff Williams' departure from Fannie Mae employment, and in significant reliance upon promises and assurances made to her by senior officials

of Defendant Fannie Mae, including Defendants Lawch and Huebscher, Plaintiff
Williams established her own business enterprise, studied for and passed the insurance
broker examination in Washington, D. C., and took other material steps to enable her to
broker and provide services for a portion of the mortgage-backed securities market of
Fannie Mae that she had herself developed.

28.    Plaintiff Williams' business plan included the use of risk transfer products
that she had developed during her employment tenure with Fannie Mae.  Defendants
Lawch and Huebscher knew of, and had expressed approval to Plaintiff Williams, of that
business plan.  Such arrangements are normal and customary for former white and male
employees who are former officials of Fannie Mae, and who depart from Fannie Mae and
continue to conduct business within the area of their former employment following their
departure from Fannie Mae, and their transition into the private sector.

29.    Such services are provided to Fannie Mae on the bases of customary
payments, fees and commissions.  There was no reason for Plaintiff Williams to expect
any different contractual and business opportunities to be realized by her, an African-
American female, especially given her recognized talent, extensive experience and
demonstrated track record of success at Fannie Mae in product development.

30.    On July 1, 1998, in reasonable reliance upon the future performance of
significant business with Fannie Mae, Plaintiff Williams opened an office at Suite 402,
2600 Virginia Avenue, N. W., Washington, D. C.  20037.

31.    Relying significantly and reasonably on the promises and assurances of
Fannie Mae senior officials, Plaintiff Williams invested and expended significant

9

personal funds in furtherance of establishing her broker business, with total financial obligations in excess of $500,000.

32.    As an initial business prospect upon creation of her new business, Plaintiff Williams entered into a joint venture with CAM Financial to implement and facilitate her business plan of assisting Fannie Mae, utilizing products and concepts which she had developed.  Such a relationship had, indeed, been contemplated in the previously cited written communication of Fannie Mae Senior Vice President Hoyes in his memorandum of May 26, 1998.

33.    On October 19, 1998, in further efforts to realize her aforestated business plan, Plaintiff Williams organized a District of Columbia limited liability company named Risk Mitigation Strategists, LLC ("RMS"), wholly owned by Plaintiff Williams.

34.    On November 1, 1998, as an additional action in furtherance of her business plan, Plaintiff Williams obtained an insurance broker's license from the District of Columbia Department of Insurance and Securities Regulation.  The purpose of obtaining this broker's license was to permit Plaintiff Williams, individually and through RMS, to provide brokerage services and receive brokers' fees generated by her efforts with Fannie Mae in producing insurance products.

35.    Such brokerage services were to be provided to, on behalf of, or for the benefit of Defendant Fannie Mae and its multifamily lenders, including its DUS and Aggregation Program lenders.  Based upon reasonable reliance and former practice, Plaintiff Williams anticipated the receipt of significant income to herself and her company through the provision of such services.

36.    For a considerable period of time following Plaintiff Williams' departure from Fannie Mae, and with the approval and sanction of senior officials of Defendant Fannie Mae, including Defendants Lawch and Huebscher, Plaintiff Williams proceeded to develop Fannie Mae-related business. Such business development efforts were based upon a reasonable reliance by Plaintiff Williams of an ongoing beneficial business relationship with Fannie Mae, and involved arranging meetings, attending conferences, and participating in the formulation and communication of specific business proposals. Throughout this period, Plaintiff Williams worked diligently and in good faith to consummate business with Defendants, including entering into a confidentiality agreement with Fannie Mae so that the proprietary nature of Plaintiff Williams' business initiatives and product development concepts could not be improperly utilized.

37.    During the period following her establishment of a private enterprise, and in furtherance of her reliance on the promises by Defendant Fannie Mae and its officers of a continuing business relationship, Plaintiff Williams marketed to Fannie Mae and its lender customers a variety of important insurance products.

38.    More specifically, Plaintiff Williams attended conferences such as the Mortgage Bankers Association, where Plaintiff Williams made presentations to Fannie Mae customers regarding pertinent insurance strategies concerning Fannie Mae and its business interests.

39.    The various strategies communicated to Fannie Mae customers were designed to facilitate and to address the following:  a) To make it easier and less costly for lenders using the then-existing Fannie Mae executions to swap mortgages for mortgage-backed securities, or to sell various loans and mortgages to Defendant Fannie

11

Mae; b) to minimize Defendant Fannie Mae's exposure to real estate, credit, and market risks associated with its portfolios of mortgages, financial instruments, derivatives and hedging activities; and, c) to shorten transaction times through the elimination of a number of documents and the substitution of an insurance policy, and, d) to facilitate the execution of follow-up transactions.

40.     Defendant Fannie Mae had representatives at meetings in Chicago, San Francisco and Orlando, Florida, where Plaintiff Williams made presentations to Fannie Mae customers, attended social functions with Fannie Mae customers, and attended Fannie Mae-sponsored social functions to discuss marketing results of the various conferences.

41.     Plaintiff Williams continued to rely on alleged good faith efforts and explicit and implied promises of Defendant Fannie Mae and its officials to conduct business with her through the period of 1999 and 2000, committing substantial further time and additional significant financial investments in furtherance of ongoing business efforts with Fannie Mae.

42.     In May 2001, another specific proposal was discussed between Plaintiff Williams and Defendant Fannie Mae, reflecting the ongoing and exhaustive work by Plaintiff Williams in refining the business products cited herein. Plaintiff Williams, in association with CAM Financial, secured the interest of several A-plus rated insurance companies and brought an additional and significant proposal to Fannie Mae for doing specific mortgage-related business. Again, however, Defendant Fannie Mae refused to consummate formally a business relationship with Plaintiff Williams, despite continuing actions reflecting its intent to do so.

43.     While Defendant Fannie Mae continued to discuss with Plaintiff Williams various business opportunities and intended business relationships during the 2001 through 2002 time frame, it has now become apparent that privately and secretly officials of Defendant Fannie Mae were continuing a process of "blackballing" Plaintiff Williams from any and all business opportunities with the organization.  Working primarily through Defendants Lawch and Huebscher, Fannie Mae purposefully and deliberately continued to deny to Plaintiff Williams closure and financial remuneration for any and all business opportunities available through Fannie Mae.  This was despite the clear and uncontested value and expertise Plaintiff Williams had to improve the organization's capabilities within multifamily housing projects and the secondary mortgage market.

44.     At the same time as Defendant Fannie Mae and Defendants Lawch and Huebscher were continuing to refuse to perform, or allow to be performed, any business by and between Fannie Mae and Plaintiff Williams, these same Defendants directed all such business and accompanying financial remuneration to a less qualified white male contractor, Mr. Craig Ott.  Mr. Ott also had no history of protected equal opportunity activities involving Defendant Fannie Mae, as had Plaintiff Williams.

45.     Further evidence of the ongoing and inexplicable blackballing of Plaintiff Williams from all Fannie Mae business by the Defendants, the following e-mail was forwarded by Defendant Huebscher to Defendant Lawch on May 31, 2001:

> "Richard, Marialice [Williams]wants to pursue the credit risk insurance for DUS risk.  Do you want to pursue with her?  MY GUT IS NO but if you think it is worth continuing discussions, I will focus on her questions?"

Defendant Lawch then responded by e-mail:

13

"If Ofheo comes back with bad RBC rules we may be interested.  Are these different players than Craig [Ott] is showing us?"

Defendant Huebscher then further replied:

"Probably not so if we want to engage Craig [Ott] on this project, that might be a better choice. If you like that plan then let's discuss what we want to ask Craig to find for us ...."

46.     Defendants Fannie Mae, Lawch and Huebscher never presented or revealed to Plaintiff Williams, in 2001 or subsequently, any direct or indirect communications stating their true intentions of not permitting Plaintiff Williams to do any private enterprise business with Fannie Mae.  Instead, they communicated frequently and positively with Plaintiff in continuing encouragement and promises of work, while conspiring in secret to withhold any and all such work.  Plaintiff Williams did not discover the existence of evidence regarding these secret and conspiratorial communications until much later.

47.     During and throughout the period of July 1, 1998, through at least the end of 2003, Plaintiff Williams engaged in extensive marketing efforts and made presentations to Defendant Fannie Mae through many of its employees, officers and agents.  These presentations and attendant communications conveyed to Defendant Fannie Mae, by and through these employees, officers and agents, actual knowledge of Plaintiff Williams' reasonable and continuing expectations of business opportunities and prospective financial gain for her efforts.

48.     At all times from July 1, 1998, to the present, Defendant Fannie Mae and Defendants Lawch and Huebscher have purposefully, intentionally, improperly, and willfully refused to do business with Plaintiff Williams, and have further precluded in any

14

manner other officials of Fannie Mae from conducting business relations with Plaintiff
Williams. Indeed, there is every reason to believe that Defendants Fannie Mae, Lawch
and Huebscher never had any intention of doing any business with Plaintiff Williams, and
that comments made to Plaintiff prior to her resignation from Fannie Mae employment
were made with ill motives and in an effort to induce her resignation from such
employment.

49.     The actions of Defendants Fannie Mae, Lawch and Huebscher by
engaging in an intentional and malicious plan to deprive Plaintiff Williams of her right to
contract, including effective efforts to "blackball" Plaintiff Williams from doing contract
work involving Fannie Mae, were based on her status as an African-American female,
and her prior protected EEO activities while employed by Defendant Fannie Mae. No
such conduct is evident by the Defendants regarding any white or male prospective
contractors or sub-contractors. As a result, Defendant Fannie Mae assumed greater costs,
a greater level of business risks, and less effective management and efficiencies regarding
Fannie Mae's secondary mortgage market and multifamily mortgages, all at significant
detriment to the Fannie Mae organization, its financial viability, and the United States
Government.

50.     Moreover, the types of business opportunities for which Plaintiff
Williams was superbly and uniquely qualified through skill, experience and expertise
were presented to a white male, Mr. Craig Ott, whose credentials, expertise and
experience is these business areas was demonstrably inferior to that of Plaintiff Williams.
In fact, as was well known to Defendants, Mr. Ott was structuring and closing mortgage
transactions loosely based upon the very same business concepts that Ms. Williams had

developed at Fannie Mae, but was doing so in a manner far inferior to that which would have been accomplished by Plaintiff Williams.

51.     In addition to its direct, unlawful and self-destructive refusals to permit Plaintiff Williams from fairly doing business with Fannie Mae within her areas of knowledge and expertise, on knowledge, information and belief, Defendant Fannie Mae, through its agents and officers, including Defendants Lawch and Huebscher, discouraged others, including various lenders and customers of Fannie Mae, from conducting business with Plaintiff Williams. Such conduct, in direct violation of the civil rights laws of the United States, continued at least through 2003, and possibly has continued to the date of the filing of this Complaint.

52.     On information and belief, for the period July 1, 1998, through at least 2003, Defendants and agents, employees and officers of Fannie Mae actively discouraged Fannie Mae consultants, brokers, lenders and customers and their representatives from dealing with Plaintiff Williams, and companies associated with her such as CAM Financial, for the securing of Fannie Mae-related insurance products. They knew, for example, that Ms. Williams, as part of her business plan, intended to work with CAM Financial, the insurance brokerage firm that provided insurance coverage for these transactions under an exclusive agreement with Fannie Mae, and purposefully discouraged CAM Financial officials from doing business with Plaintiff Williams.

53.     Moreover, on information and belief such communications included the expression of knowingly false and defamatory information against Plaintiff Williams, and her business acumen and capabilities, by the various Defendants. This occurred when such communications were known by Defendants to be false and likely to defame and

16

harm her character and business reputation; to result in serious adverse financial consequences to Plaintiff Williams, and her business interests; and to cause and induce to Plaintiff Williams severe emotional distress, pain and suffering.

54.    As a result of its illegal and conspiratorial actions, based in substantial part on ongoing discrimination based upon race and sex, and unlawful retaliation for her prior protected EEO activities while at Fannie Mae, Defendant Fannie Mae and Defendants Lawch and Huebscher thereby deprived Plaintiff Williams from fair and reasonable business opportunities, and from earning commissions through its co-brokerage agreement with CAM Financial and other organizations and business entities.  The overall financial and economic damages suffered by Plaintiff Williams are in excess of $30,000,000.00.

55.    The Defendants' unlawful and conspiratorial actions are continuing and ongoing to the present day, while Defendant Fannie Mae is continuing to do business in the small multifamily housing market using mortgage backed securities products developed by Plaintiff Williams.

56.    Among other injuries suffered by Plaintiff Williams because of the Defendants' unlawful and conspiratorial actions and conduct cited herein, Plaintiff Williams was forced to declare and be placed into bankruptcy.

57.    Plaintiff Williams has further been damaged, as a reasonable result and proximately caused by Fannie Mae's illegal and tortuous actions, in an amount in excess of $35,000,000 as a direct result of lost co-brokerage commissions with CAM Financial. Such commissions would have been attributable to Plaintiff Williams placing insurance

for her own insurance commission account, and insurance consulting fees with the above referenced customers and prospective customers.

58.    Economic damages cited herein are continuing and growing.

59.    In addition to economic damages, Plaintiff Williams has suffered and will continue to suffer from stress and adverse mental and physical health affects because of the purposeful and malicious efforts by the Defendants to slander and defame her and her business reputation within the District of Columbia and National business communities.

<u>COUNT I</u>
(Unlawful Discrimination Based Upon Race and Sex)

60.    Paragraphs 1 through 59 are herein incorporated by reference.

61.    The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes unlawful discrimination against Plaintiff Williams based upon Plaintiff's race (African-American) and sex (female), pursuant to 42 U.S.C. Section 1981.

62.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

<u>COUNT II</u>
(Unlawful Retaliation for the Prior Exercise of Protected Civil Rights)

63.    Paragraphs 1 through 62 are herein incorporated by reference.

64.    The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes retaliation against Plaintiff Williams based upon Plaintiff's prior exercise of protected civil rights and EEO activities.

65.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

## COUNT III
### (Unlawful Interference with Contractual Relationships Based Upon Race, Sex and the Prior Exercise of Protected Civil Rights and EEO Activities)

66.     Paragraphs 1 through 65 are herein incorporated by reference.

67.     The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes unlawful interference with contractual relationships established by or intended for establishment by Plaintiff Williams with Defendant Fannie Mae and others, based upon Plaintiff's race (African-American), sex (female), and her prior exercise of protected civil rights and EEO activities.

68.     This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

## COUNT IV
### (Conspiracy to Interfere with Contractual Relationships Based Upon Race, Sex and the Prior Exercise of Protected Civil Rights and EEO Activities)

69.     Paragraphs 1 through 68 are herein incorporated by reference.

70.     The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, and including the conspiracy and agreement by and among the Defendants, and their aforementioned actions in furtherance of the conspiracy and agreement to harm the business interests of Plaintiff Williams, constitutes an unlawful conspiracy to discriminate against Plaintiff based upon Plaintiff's race (African-American) and sex (female), and further constitutes an unlawful conspiracy to retaliate against Plaintiff Williams based upon Plaintiff's prior exercise of protected civil rights and EEO activities, all in violation of 42 U.S.C. Section 1985.

71.     This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

19

## COUNT V
### (Breach of Contract)

72.    Paragraphs 1 through 71 are herein incorporated by reference.

73.    The conduct of Defendant Fannie Mae, as described herein, constitutes a breach of implied and actual contract with respect to Plaintiff Williams' detrimental reliance upon promises and assertions made by Defendant Fannie Mae and its officers and officials to conduct future and ongoing business relations with Plaintiff Williams.

74.    This unlawful conduct has caused past and ongoing economic injury to Plaintiff Williams.

## COUNT VI
### (Tortious Interference with Business Relationships)

75.    Paragraphs 1 through 74 are herein incorporated by reference.

76.    The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes common law tortious interference with ongoing and potential business relationships against Plaintiff Williams through the Defendants' active, conspiratorial and malicious attempts to curtail or terminate such business relationships.

77.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

## COUNT VII
### (Intentional Infliction of Emotional Distress)

78.    Paragraphs 1 through 77 are herein incorporated by reference.

79.    The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes common law intentional infliction of emotional distress against Plaintiff Williams through the Defendants' active, conspiratorial and malicious

attempts to curtail or terminate her ongoing business relationships, and to damage her personal and business reputation.

80.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

## COUNT VIII
### (Defamation of Character and Business Reputation)

81.    Paragraphs 1 through 80 are herein incorporated by reference.

82.    The conduct of Defendants Fannie Mae, Lawch and Huebscher, as described herein, constitutes common law defamation of Plaintiff Williams' character and business reputation through adverse, conspiratorial and malicious attempts to curtail or terminate her ongoing business relationships, and to damage her ongoing personal and business reputation, through communications to third parties as herein set forth.

83.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Williams.

## PRAYER FOR RELIEF

84.    Paragraphs 1 through 83 are herein incorporated by reference.

85.    As a result of the injuries described herein, Plaintiff Williams respectfully prays for the following relief from this Honorable Court:

a. Judgment against the Defendants, jointly and severally, for Counts I through IV, and VI through VIII, in the following amounts:

(1)  Actual damages in the amount of $1,000,000 for each and every Count identified herein.

(2)  Additional damages in the amount of $30,000,000 for the loss of prospective business opportunities for each and every Count identied herein.

21

(3)  Punitive damages in the amount of $50,000,000 for each and every Count identified herein for the malicious, wanton, outrageous and reckless conduct therein set forth.

(4)  Additional compensatory damages of $5,000,000 for Plaintiff's physical and mental injuries, including pain and suffering, as a result of the Defendants' conduct as identified in Counts I through IV and VI through VIII, and for each and every Count so specified.

b.  Judgment against Defendant Fannie Mae for Count V in the amount of $2,000,000.

c.  Injunctive relief against Defendant Fannie Mae, its officers, employees and agents, regarding any further recurrence of the unlawful conduct against Plaintiff Williams as set forth in Counts I through VIII herein.

## **JURY DEMAND**

Plaintiff Williams respectfully requests a trial by jury on all issues herein set forth, as allowable by law.

22

Respectfully submitted,

*Michael W. Beasley*

Michael W. Beasley, Esq.
D. C. Bar No. 248930
411 East Broad Street
Falls Church, Virginia  22046
Phone:  (703) 241-2909
Fax:  (703) 241-5885


*Brian Lederer*

Brian Lederer, Esq.
D. C. Bar No. 184184
3003 Van Ness St., NW, Suite #W228
Washington, D. C.  20008
Phone:   (202) 244-1715

Members of the District Court Bar for the
United States District Court for the
District of Columbia

Attorneys for Plaintiff
 Marialice Bathrus Williams

July 28, 2005

23