**EXHIBIT C**

# Marialice B. Williams, Esquire
**5722 First Street, NW**
**Washington, DC 20011**
**(202) 722-1968; cell (202) 487-6845**
**fax – (202) – 882-4049**
Marialice@starpower.net

August 29, 2004

Mr. Franklin Raines
3006 Albemarle Street, NW
Washington, DC 20008-2101

Dear Frank:

By this letter, out of respect for your position, I want to give you an opportunity to open a dialogue in which to permit prompt settlement of the egregious matter described below. I believe that it is in both our best interests to discuss this matter prior to my filing in The United States District Court for the District of Columbia, the attached civil complaint with supporting documentation. The complaint seeks $150,000,000 in compensatory and punitive damages from Fannie Mae for actions and injuries by Fannie Mae and senior officers against me:

- ***Denial of Contract Rights Based on Race;***
- ***Tortious Interference with Prospective Economic Advantage; and***
- ***Intentional Infliction of Emotional Harm.***

I believe that you owe it to yourself and Fannie Mae to take just a few minutes to read the complaint and to address seriously the matters therein. I do not believe that you would condone the actions carried out willfully against me, or that these actions are consistent with Fannie Mae's reputation and tradition.

While at Fannie Mae from 1990 through June 1998, I was responsible for bringing Fannie Mae more fully into the commercial secondary market through a series of activities, including:

- Establishing a reputation on Wall Street through aggressive marketing;

- Establishing the first database that: 1) captured data consistently on the mortgage pools delivered to Fannie Mae for securitization; and 2) provided reports that permitted Fannie Mae to generate professional prospectus

supplements disclosing the details of the underlying mortgages in multifamily MBS issued by Fannie Mae for the first time;

- But most important, developing new financial structures and insurance tools for the mortgage backed securities market through which Fannie Mae was able to achieve and retain a substantial market share of the commercial mortgage backed securities market and outpace its competitor, Freddie Mac.

Further, I personally conceived of and oversaw the development of the ACES program, and developed completely on my own the insurance-based risk transfer products. Without tools such as these, Fannie Mae would have lost its substantial multifamily MBS market share – and been limited in its access to the secondary market because of credit risk issues that derived from a changing accounting and regulatory environment (FASB and FIRREA).

The last financial tool I developed, the insurance-based product, transfers the risk of loss on portfolios of whole loans and mortgage-backed securities to a third-party insurer. That market covered small to medium multifamily housing (five to fifty units in urban and rural centers). While my efforts were always motivated by the desire to bring a wider and more diverse group of lender markets to Fannie Mae, these tools were often used to meet the needs of Fannie Mae's "premium lenders".

In short, Frank, I was and am uniquely and exceptionally well qualified to provide Fannie Mae with valuable business services from the private sector. It is vital that you understand and accept this fact as a starting point.

With the knowledge, approval and promise of business by senior officers of the multifamily division, and, their knowledge that I was leaving Fannie Mae to work with an insurance broker that had toiled three long years to develop the insurance-based financial products for Fannie Mae under an exclusive agreement, I left Fannie Mae in June of 1998 and established my own private sector firm. My purpose was to expand and develop new products using the tools I had developed at Fannie Mae so that Fannie Mae could maintain its dominance in the mortgage-backed securities market. I entered into a joint venture with CAM Financial to facilitate my business plan.

My business plan was not a pipedream, but a well thought out plan based upon the promises of Fannie Mae and my relationship with major segments of the investment banking and commercial lending community. However, subsequent unlawful actions by Fannie Mae denied me that opportunity, and Fannie Mae blackballed me.

2

Prior to my leaving Fannie Mae, Lou Hoyes, Senior Vice President of Fannie Mae's Multifamily Division, enthusiastically gave his word that Fannie Mae would do business with me. In fact, Mr. Hoyes promised in writing that Fannie Mae would do at least $1 billion of insurance-based business in the next year through me, as a broker, and the years following of an approximately $10 billion yearly market. Standard brokerage rates would have yielded commissions on that business to me on the order of $7 million annually, totaling $42 million to date. (See Exhibit C)

When I resigned in 1998 to work with the insurance brokerage firm that provided the insurance coverage for these transactions under an exclusive agreement with Fannie Mae, I rented space at the Watergate complex and began working with Fannie Mae customers to serve as broker for transactions with Fannie Mae.

Despite many efforts to establish a business relationship with Fannie Mae regarding the insurance product that I developed, and Fannie Mae's written and oral promises, I received no business from Fannie Mae. Once I obtained a written confidentiality agreement from Fannie Mae, I brought to Fannie Mae DUS lenders such as Lend Lease and Red Mortgage Capital as customers; top flight insurance companies through Marsh Mac, the mega insurance brokerage firm; and business persons with significant product development experience such as Kate Westover, the top captive insurance expert in the country. Still no business was forthcoming from Fannie Mae.

By the summer of 2001, I had encountered a number of situations where I began to suspect that Fannie Mae was leading me on with *no* intention of doing business with me. For example, I was asked by Grace Huebscher to provide a letter stating that CAM Financial would not be involved in *any* transaction that Fannie Mae would do with me. (See Exhibit D) And, though I complied with this request, no business was forthcoming.

Three years after my departure, the following written exchange between Vice-President Grace Huebscher, Multifamily Division, and Senior Vice-President Richard Lawch, Multifamily Division, occurred. I was not included in the communication, as they continued to lead me on. Frank, judge for yourself what this means and what they were doing to me. This is just the tip of the iceberg.

On May 31, 2001, after I had spent years developing the viability of insurance as a vehicle to provide credit enhancement and other tools in structuring sophisticated asset-backed securities transactions, Grace Huebscher wrote Senior Vice-president Richard Lawch by e-mail:

3

"Richard, Marialice wants to pursue the credit risk insurance for DUS risk. Do you want to pursue with her? MY GUT IS NO but if you think it is worth continuing discussions, I will focus on her questions?"

Richard S. Lawch wrote back by e-mail:

"If OFHEO comes back with bad RBC rules we may be interested. Are these different players than Craig [Ott] is showing us?"

Grace Huebscher replied:

"Probably not so if we want to engage Craig [Ott] on this project, that might be a better choice. If you like that plan then let's discuss what we want to ask Craig to find for us…" (See Exhibit A)

Frank, I did not discover the existence of that written exchange (Exhibit A) until June of 2001. Even then, Fannie Mae continued to deny in public what it was doing in private. And I, despite the knowledge of this e-mail message, continued to attempt to do business with Fannie Mae.

"Craig" is a white male. The line of business for which I was uniquely qualified was given to Craig Ott with credentials and experience inferior to mine. In fact, he was released from his prior employer, General Star/General Re under suspicious circumstances. Fannie Mae had this man structuring and closing transactions based upon the business concepts that I had developed at Fannie Mae. What little he did know he had learned under my tutelage.

It is all too clear, now, that Fannie Mae intentionally, improperly, and willfully refused to do business with me and had no intention of ever doing any business with me. Fannie Mae, through its senior officials, engaged in an intentional and malicious plan to deprive me of my right to contract based on my African-American identity, on the same terms as are afforded "whites citizens." As officers and directors of Fannie Mae, they further engaged in a persistent course of conduct designed to interfere with my prospective economic opportunities. I have been blackballed and locked out by Fannie Mae.

Frank, I did not hesitate to leave Fannie Mae when the opportunity arose to further the concept that I had envisioned and developed. From years of marketing on Fannie Mae's behalf, I developed many relationships in the banking and lending community in general, but I was I unable to bring Fannie Mae to the table for my clients – as promised by Lou Hoyes.

4

Before leaving Fannie Mae, I had extensive discussions with other parties in the multifamily division regarding ways in which insurance could be used as a credit enhancement tool, as well as discussions about other insurance products, e.g. a product that would eliminate the need for the heinous rep and warranty regarding environmental issues that resided with the lender and often made the transactions impossible to close. And, I was constantly bugging the Multifamily Division to pursue the proposal that I had offered prior to my departure – a way to insure the risk of loss on the DUS portfolio – risk that is shared on a *pari passu* basis, up to 20%, with the DUS lender. The "third party risk" issue had always seemed to pose a problem for Fannie Mae's balance sheet, and I had worked diligently to solve this problem through yet another alternative risk transfer strategy.  (See Exhibit B)

Sadly, after four years of diligent effort to work with Fannie Mae, its DUS lenders and its bank customers, I was driven into bankruptcy as a direct result of Fannie Mae's reprehensible actions. I was forced to vacate my office at the Watergate in disgrace, and to vacate my home at the Watergate, where my brother and elderly and ailing mother lived. I was utterly despondent and nearly unable to function.  I was devastated by the shabby and deceitful way I have been treated.

After nine years of exceptional product development performance at Fannie Mae and after all of these past 6 years, I worked in good faith to attempt to fashion a business relationship with Fannie Mae based on what I could and did bring to the table. You can't imagine the shock and humiliation I felt when I discovered that all my work was in vain – crushed by your company in a way that has cost both me and Fannie Mae untold millions in lost business. My worst nightmare came true.

Frank, I want to be compensated for Fannie Mae's failure to live up to its responsibilities under law to me. Every white person I know who left Fannie Mae's Multifamily Division who asked, even those who did not go on to work for other firms, were given an opportunity to obtain consulting or other work from Fannie Mae.  I was not.

I want to be compensated for the money that I would have received in commissions for the business that I would have produced for Fannie Mae if given the opportunity.  I calculate that Fannie Mae probably does at least $1 billion of business annually utilizing my insurance products and products derived from them.  I calculate that this amounts to $42,000,000, (at 6 years times 10 basis points).

Now, I want to put this matter behind me, as you should. If Fannie Mae shares this desire, please contact my Attorney, Brian Lederer at: 202-244-1715, no later than September 9, 2004.   We will only entertain serious and substantial offers of settlement.

Sincerely,

Marialice B. Williams, Esq.

CC:    H. Patrick Swygert
       Karen Hastie Williams, Esq.
       Rev. Walter E. Fauntroy

# COMPLAINT TO BE FILED IN FEDERAL DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARIALICE BATHRUS WILLIAMS,<br>        Plaintiff<br><br>v.<br><br>FANNIE MAE,<br><br>and<br><br>RICHARD LAWCH,<br><br>and<br><br>GRACE  HUEBSCHER<br>        Defendants | )<br>)<br>)<br>)<br>)    Civil Action No. _____<br>)    Judge _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT FOR DAMAGES AND
## FOR INJUNCTIVE RELIEF

### JURISDICTION

The jurisdiction of this Court is founded on Title 28, Section 1331 of the United States Code (question arising under Federal law). Defendant Fannie Mae is "an instrumentality of the Federal Government"; and on Sec. 42 U.S.C. 1981(a) denial of right to contract based on race.

### PARTIES

Plaintiff, Williams, Marialice Bathrus Williams (hereafter "Ms. Williams"), an African-American woman, is a resident of the District of Columbia and was employed as an attorney from 1989 to 1990, Assistant Director from 1990 to 1993 and then Director of Capital Markets from 1993 to 1998 in the Multifamily Division of Defendant Fannie Mae.

Defendant Fannie Mae is an instrumentality of the Federal Government and its main place of operations is Washington, D.C.

Defendant Richard Lawch (hereafter "Mr. Lawch"), a white male, was Vice-President for Multifamily and her direct supervisor at Fannie Mae.  Mr. Lawch is now a Senior Vice-President at Fannie Mae in the Multifamily Division.

Defendant Grace Huebscher, a white female, is a Vice-President in the Multifamily Division at Fannie Mae.

## COUNT I  DENIAL OF RIGHT TO CONTRACT BASED ON RACE

42 USC 1981(a) "All persons... shall have the same right ... to make and enforce contracts... as enjoyed by white citizens...."; (b) "make and enforce" defined "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

1.     Ms. Williams worked in the Multifamily Division at Fannie Mae from January of 1990 to June 1998. In June 1998, she left Fannie Mae with the written and oral promise of doing business with Fannie Mae on transactions for which she had developed the tools that permitted Fannie Mae to carry out those transactions.

2.     Ms. Williams was responsible for the development of products for Defendant Fannie Mae's customers that could provide cheaper and more cost-effective structures for selling or securitizing pools of mortgage loans.  She established a high level of expertise in these products, a detailed knowledge of the financial institutions which did business in the secondary mortgage market, and great capacity to work within Fannie Mae and without with its clients in successful product development.

3.     Ms. Williams, while at Fannie Mae, developed and put into place products that opened up the secondary market for Fannie Mae's multifamily mortgage-backed securities at a moment when change in lending rules *would have cost Fannie Mae that market, or a substantial portion thereof.*  That product line was named ACES<sup>sm</sup> and is now the benchmark on Wall Street for similar asset-backed securities.

4.     In 1997, Ms. Williams closed the first mortgage-backed securities transaction in the country whereby Fannie Mae was able, for the first time, to transfer all of the risk of loss (as opposed to insuring the loss) to a third party insurer, AIG, and thus to

move that risk from the portfolio and financials of Fannie Mae and to stay in compliance with the new lending rules.

5. Fannie Mae, Richard Lawch, (her immediate supervisor), and Grace Huebscher all participated with Ms. Williams in the development of the risk transfer mechanism and intimately knew of her talent, her skills, her experience and effectiveness in developing the tools and in closing mortgage backed securities for Fannie Mae, which effectively transferred risk off its portfolio and facilitated, in particular, its remaining in the small multifamily market, a market of the order of $10 billion a year.

6. On June 30 of 1998, Ms. Williams ended her employment with Fannie Mae. Defendants Fannie Mae, Richard Lawch, and Grace Huebscher all were aware of significant prospective opportunities available to Ms. Williams, by reason of her expertise and experience, and in fact led Ms. Williams to believe that she would be permitted to participate in these business opportunities, as such opportunities were normally and customarily afforded by Fannie Mae to former officials who are white citizens.

7. Ms. Williams, after leaving Fannie Mae, established her own firm to broker and provide services for a portion of that mortgage backed securities market of Fannie Mae that she had developed. She entered into a joint venture with CAM Financial to facilitate her business plan.

8. Lou Hoyes, Senior Vice President of Defendant Fannie Mae's Multifamily Division where Ms. Williams was employed, prior to her leaving Fannie Mae, gave his word orally and in writing that Fannie Mae would do business with Ms. Williams. In fact, Mr. Hoyes assured in writing that Fannie Mae would do at least $1 billion of

insurance-based business in the next year through her, as a broker, and the years following of an approximately $10 billion yearly market. Standard brokerage rates would yield commissions to Ms. Williams on that business of the order of $7 million annually, totaling $35 million over the five years of injury to date.

9.  On May 26, 1998, Louis W. Hoyes, Fannie Mae's Senior Vice-President for Multi-Family Lending and Investment, explained the business opportunities opened by the programs developed by Ms. Williams in association with CAM Financial:

> Fannie Mae currently has several pending transactions totaling nearly $1 billion where multifamily credit risk transfer insurance is the keystone to closing these transactions.

10.  Ms. Williams' business plan was to use the risk transfer products that she had developed during her tenure with Fannie Mae. Richard Lawch and Grace Huebscher knew and approved of that business plan. Such arrangements are normal and customary for white citizens who are former high-level officers of Fannie Mae and who depart from Fannie Mae and continue to conduct business in the area of their employment but on a private sector basis with customary payments, fees and commissions. There was no reason to expect any different contractual and business opportunity for Ms. Williams, an African-American citizen, especially given her talent, experience and demonstrated track record of success at Fannie Mae in product development.

11.  On July 1, 1998, Ms. Williams opened an office at 2600 Virginia Avenue, NW; Washington, DC 20037, Suite 402. On October 19, 1998, Ms. Williams organized a District of Columbia limited liability company named, Risk Mitigation Strategists, LLC (RMS), wholly owned by Ms. Williams.

12.     On November 1, 1998, Ms. Williams obtained an insurance broker's license from the District of Columbia Department of Insurance and Securities Regulation in order that Ms. Williams, individually, as well as through RMS, could provide brokerage services and receive brokers' fees generated by her efforts with Fannie Mae in producing insurance products bought by, on behalf of or for the benefit of Defendant Fannie Mae and its multifamily lenders, including its DUS and Aggregation Program lenders.

13.    Following her departure from Fannie Mae, with the sanction of Fannie Mae, Richard Lawch and Grace Huebscher, Ms Williams proceeded to develop the business – arranging meetings, attending conferences, and making proposals. She worked diligently and in good faith to consummate business with Defendants. Ms. Williams marketed to Fannie Mae and its lender customers a variety of insurance products.

14.    Ms. Williams attended conferences such as those sponsored by the Mortgage Bankers Association where Ms. Williams made presentations to Fannie Mae customers regarding pertinent insurance strategies concerning Fannie Mae and its business.

15.  The strategies were designed to facilitate and to address the following:

a.) make it easier and less costly for lenders using the then existing Fannie Mae executions to swap mortgages for mortgage-backed securities or sell various loans and mortgages to Defendant Fannie Mae;

b.) .) minimize Defendant Fannie Mae's exposure to real estate, credit, and market risks associated with its portfolios of mortgages, financial instruments, derivatives and hedging activities; and

c.) .) shorten transaction time through eliminating a number of documents and substituting an insurance policy and making follow up transactions virtually a snap.

16.  Defendant Fannie Mae had representatives at meetings in Chicago, San Francisco, and Orlando, Florida where Ms. Williams made presentations to Fannie Mae customers, attended parties with Fannie Mae customers, and attended Fannie Mae parties to discuss marketing results of the conference.

17.  In May 2001, another specific proposal was discussed, reflecting the exhaustive work in refining the product. Ms. Williams, in association with CAM Financial, having secured the interest of several A+ rated insurance companies, brought the proposal to Fannie Mae for doing business, relying again on the written and oral assurances, by Fannie Mae, its officers and agents.  18.   While Fannie Mae's public discussion continued as stated, privately and secretly, Fannie Mae, was proceeding to blackball, to deny Ms. Williams business opportunities, and to refuse to do business with Ms. Williams, an African-American, in favor of a white male, Mr. Craig Ott.

19.  Please note that in response to an email dated May 30, 2001 from Ms. Williams, Defendant Grace Huebscher and Defendant Richard Lawch on May 31, 2001 had the following private, written discussion by e-mail:

> Richard, Marialice wants to pursue the credit risk insurance for DUS risk. Do you want to pursue with her? MY GUT IS NO but if you think it is worth continuing discussions, I will focus on her questions?

Richard S. Lawch wrote back by e-mail:

> If Ofheo [OFFICE OF FEDERAL HOUSING
> ENTERPRISE OVERSIGHT] comes back with bad
> RBC [Risk Based Capital] rules we may be interested.
> Are these different players than Craig [Ott] is showing
> us?

Grace Huebscher replied:

> Probably not so if we want to engage Craig [Ott] on this
> project, that might be a better choice. If you like that
> plan then let's discuss what we want to ask Craig to find
> for us…

Fannie Mae, Richard Lawch and Grace Huebscher never presented Ms. Williams

with their true decision, motive and intention, giving one face in public and another

in secret, in private. Ms. Williams did not discover the existence of Exhibit A until

the spring of 2002, which then made the blackball clear.

20.  At all times, from 1998 to the present, Fannie Mae has intentionally, improperly,

and willfully refused to do business with Ms. Williams, and had no intention of ever

doing any business with Ms. Williams. Fannie Mae through its Vice-President

Richard Lawch (now Senior Vice-President) and Vice-President Grace Huebscher of

the Multifamily Division engaged in an intentional and malicious plan to deprive Ms.

Williams of her right to contract based on her Afro-American identity, on the same

terms as are afforded "white citizens." As officers and directors of Fannie Mae, they

further engaged in a persistent course of conduct designed to interfere with her

prospective economic opportunities. Ms. Williams was blackballed and locked out

by Fannie Mae.

21.    This plan and scheme was made manifest by the May 31, 2001 e-mail from Huebscher to Lawch, which summarily and explicitly denied Ms. Williams an opportunity to participate in a pending business opportunity.

22.    Further, the line of business for which Ms. Williams was uniquely qualified was given to a white male citizen — one Craig Ott, with credentials and experience inferior to that of Ms. Williams. In fact, he was structuring and closing transactions based upon the business concepts that Ms. Williams had developed at Fannie Mae and *that he had learned under the tutelage of Ms. Williams.*

23.    During the above mentioned period, Ms. Williams engaged in such marketing efforts and made presentations to Defendant Fannie Mae through many of its employees, officers and agents in such a manner that Defendant, by and through these employees, officers and agents, had actual knowledge of Ms. Williams's expectancy of business opportunities.

24.    Defendant Fannie Mae, through its agents and officers Defendants Richard Lawch and Grace Huebscher, discouraged others and its lenders and customers from doing business with Ms. Williams.

25.    Defendants and other agents, employees and officers of Fannie Mae discouraged consultants, brokers, lenders and customers and their representatives from dealing with Ms. Williams—and companies associated with her, such as CAM Financial-- in securing insurance products. They knew, for example, that Ms. Williams, as part of her business plan, intended to work with CAM Financial, the insurance brokerage firm that provided insurance coverage for these transactions under an exclusive agreement with Fannie Mae.