26.  Fannie Mae thereby deprived Ms. Williams from earning commissions through its co-brokerage agreement with CAM Financial.  Their actions are continuing and ongoing to the present while Fannie Mae is continuing to do business in the small multifamily housing market using mortgage backed securities' products  developed by Ms. Williams, as stated previously above.

27.   Defendants blacklisted and blackballed Ms. Williams. These actions drove Ms. Williams into bankruptcy.

28.   Ms. Williams has been damaged as approximate cause of Fannie Mae's illegal and tortious actions in an amount in excess of $35,000,000 as a result of lost co-brokerage commissions with CAM financial commissions attributable to placing insurance for her own insurance commission account and insurance consulting fees with the above referenced customers and prospective customers.

29.  This damage is continuing and growing.

30.  Defendants' conduct and actions as set forth induced the breach of prospective business relationships, contracts and economic expectancies between Ms. Williams, an African American, and its customers and prospective customers, and encouraged and promoted the establishment of business relationships, contracts and economic expectancies with white persons, contrary to the protection offered by 42 USC 1981.


## COUNT II   TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

31.     The allegations set forth in Paragraphs 1-30 are repeated and expressly incorporated here.

32.     Defendants' conduct and actions as set forth constitute a tortious interference with a business or prospective business relationship or economic

9

advantage with Ms. Williams's customers and potential customers, CAM Financial, and its co-brokerage, commission-sharing relationship with CAM Financial. Defendants, with knowledge of Ms. Williams's co-brokerage and joint marketing and sales arrangement with CAM Financial and its efforts to market and sell its insurance products, insurance consulting and general consulting services to Defendant Fannie Mae's lenders and customers, has intentionally and without justification or privilege interfered with such relationships with CAM Financial and Ms. Williams's customers and potential customers by inducing or causing a breach or termination of such relationships and expectancy and resultant damage.

### COUNT III   INTENTIONAL INFLICTION OF EMOTIONAL HARM/OUTRAGEOUS CONDUCT

33.  The allegations set forth in Paragraphs 1-30 are repeated and expressly incorporated here.

34.  Defendants blacklisted and blackballed Ms. Williams.  Those actions caused her to file bankruptcy, to leave her office at the Watergate in disgrace and to leave her home at the Watergate despondent and nearly unable to function.  Ms. Williams was devastated by the shabby and disingenuous way she was treated. All these years Ms. Williams worked in good faith to attempt to fashion a business relationship with Fannie Mae based on what she brought to the table.   These actions caused her shock and humiliation when they revealed all her work to have been in vain. Defendants crushed her in a way that has cost her untold millions in lost business. Those actions caused her worst nightmare to come true.

35.  Those actions were intentional/and or were carried out with reckless disregard for her as a person and as an African-American. Those actions are outrageous, and

inflicted on her great emotional distress, namely, fright, horror, grief, shame,

humiliation, embarrassment, anger, disappointment and nausea.

**COUNT IV - REQUEST FOR INJUCTIVE RELIEF TO ORDER DEFENDANTS TO CONTRACT WITH MS. WILLIAMS ON THE SAME GROUNDS AS WHITE CITIZENS, AND TO AFFORD HER THE ECONOMIC OPPORTUNITIES PREVIOUSLY DENIED.**

36.  The allegations set forth in Paragraphs 1-30 are repeated and expressly

incorporated here.

**JURY DEMAND**

Ms. Williams requests a trial by jury on all issues allowable by law.

**REQUEST FOR RELIEF**

1. DAMAGES: Based on Counts One, Two, and Three, Ms. Williams demands actual

damages in the amount of $50,000,000, which includes compensatory damages, lost

commissions, damage to credit due to bankruptcy, emotional distress and suffering.

Ms. Williams also demands punitive damages in the amount of $100,000,000 for the

malicious, wanton, outrageous conduct of Fannie Mae and its employees.

2. INJUNCTIVE RELIEF: Plaintiff requests this Court to enter injunctive relief

enjoining Fannie Mae and its officers from further interfering with Ms. Williams

business opportunities.

Respectfully submitted,


Harley J. Daniels, Esq.
Brian Lederer, Esq.
Michael W. Beasley, Esq.
Law Offices
3003 Van Ness St., NW, Suite #W228
Washington, D. C. 20008
(202) 244-1715

<u>Verification</u>

**Subscribed and sworn before a Notary Public in Washington, District of Columbia, I, Marialice Bathrus Williams, Plaintiff, state that I believe that the facts stated in the Complaint for Damages and for Injunctive Relief are true, to the best of my knowledge and information.**

_____
**Marialice Bathrus Williams**


_____
Notary Public

**My Commission expires:**_____

# EXHIBIT A

**Main Identity**

| | |
|---|---|
| **From:** | "Betty Dance" <betty_dance@fanniemae.com> |
| **To:** | <marialice@worldnet.att.net> |
| **Sent:** | Monday, June 04, 2001 10:41 AM |
| **Subject:** | [Fwd: Re: [Fwd: Fw: A few questions and an update from RMS]] |

-------- Original Message --------
      **Subject:** Re: [Fwd: Fw: A few questions and an update from RMS]
         **Date:** Thu, 31 May 2001 18:41:50 -0400
       **From:** "Grace Huebscher" <grace_huebscher@fanniemae.com>
**Organization:** Fannie Mac
           **To:** Richard S Lawch <richard_s_lawch@fanniemae.com>
  **References:** <3B163DD7.269B580B@fanniemae.com> <3B16C81B.7DBE3608@fanniemae.com>

Probably not so if we want to engage Craig on this project, that might be a better choice. If you like that plan then let's discuss what we want to ask Craig to find for us...may be you and I can discuss or put on Agenda for our Team's Weekly Strategic Meeting.

Richard S Lawch wrote:

> If Ofheo comes back with bad RBC rules we may be interested. Are these different players than Craig is showing us?

Grace Huebscher wrote:

> Richard, Marialice wants to pursue the credit risk insurance for DUS risk. Do we want to pursue with her? My gut is no but if you think it is worth continuing discussions, I will focus on her questions.
>
> -------- Original Message --------
>       **Subject:** Fw: A few questions and an update from RMS
>          **Date:** Wed, 30 May 2001 10:05:36 -0400
>        **From:** "Marialice Williams" <marialice@worldnet.att.net>
>   **Reply-To:** "Marialice Williams" <marialice@worldnet.att.net>
>            **To:** rhoda_e_newman@fanniemae.com,
>                grace_huebscher@fanniemae.com
>
> I sent this message literally a week ago and for some reason my computer did not send out several messages. Then I checked the message and it had an incorrect e-mail address for Rhoda. I hope I am not sending this to Grace twice! Marialice
> ----- Original Message -----
> **From:** Marialice Williams
> **To:** rhoda_s_newman@fanniemae.com ;
> grace_huebscher@fanniemae.com **Cc:** hhartsfield@risk-mitigation.com **Sent:** Wednesday, May 23, 2001 10:16 AM **Subject:** A few questions and an update from RMS
>   Update from RMS-- First the good news--we have the interest of three insurance companies, two of whom are domestic. All are rated A+ and above. However, we need to know a couple of things to facilitate our discussions with them: 1. Is there any interest on Fannie Mae's part in

# EXHIBIT B

**Subject: Re: Fannie Mae**
    **Date:** Wed, 9 May 2001 17:42:37 -0400
  **From:** Chris.Tawa@lendleaserei.com
      **To:** "Marialice Williams" <marialice@worldnet.att.net>
     **CC:** "Bob Jones" <bobjones@cam-financial.com>, "Harvey Hartsfield" <hhartsfield@msn.com>

Yes, we're still interested in insuring our DUS mezz risk. Pls send me the agent
of record form. Also, what kind of portfolio data are you looking for?

**Subject: Fannie Mae DUS Lender Preliminary Information**
   **Date:** Tue, 15 May 2001 13:25:18 -0500
   **From:** Bob Jones <bobjones@cam-financial.com>
   **To:** jeff.webb@aig.com, marialice@worldnet.att.net

Bob Jones wrote:

Jeff, to follow up my earlier email,  I have attached a copy of Risk
Mitigation's write up Opportunity to Provide Insurance Coverage for the
Mezzanine Tranche of Risk Associated With Fannie Mae's Delegated
Underwriting and Servicing Program.   I have also included CAM's proposed
Mezzanine Risk Premium Pricing Grid for your review.

Fannie Mae has not made a decision yet ( they are meeting later this
week) regarding covering their 7.5% portion of the the mezzanine risk.
Remember the mezzanine risk is split 50 -50 with Fannie Mae on any loss
above 5% through 20%.  This is why I ran the premium grid out to 15%.

Marialice and I hope to be able to share actual DUS Lender performance
and Lender portfolio information shortly for the first potential
transaction.

I will be out of my office until Monday, May 21st.  Should you have any
questions, Kerry Palmer will know how to reach me and will be checking
my email   Thanks very much for your interest in this coverage.

**Subject: DUS Mezzanine Risk Insurance**
  **Date:** Mon, 21 May 2001 09:54:33 -0500
  **From:** Bob Jones <bobjones@cam-financial.com>
    **To:** jane.harrison@thearbornet.com, marialice@worldnet.att.net

Bob Jones wrote:

Hi Jane. Marialice and I wanted to give you a heads up regarding potential insurance coverage of DUS Lender mezzanine 15% level of risk shared equally with Fannie Mae. This should not be mistaken for the 5% first loss coverage. Fannie Mae is not interested in the DUS Lender obtaining coverage on the first 5%.

Marialice and I wanted you to hear this from us first, not that Fannie Mae would put this information up on its radar screen. Sometimes news does travel through the grapevine. Marialice has been working with several DUS Lenders interested in insuring their secondary risk based capital exposure on their DUS portfolios. We are co-brokering this coverage with several insurers.

She has received a verbal approval from Fannie Mae to proceed forward with two DUS Lenders. Fannie Mae has not decided yet if they want to cover their portion of the 50-50 risk exposure. We will keep you informed as this moves along.

**Subject: Fannie Mae DUS Lender Mezzanine Risk Coverage**
 **Date:** Mon, 21 May 2001 15:55:49 -0500
 **From:** Bob Jones <bobjones@cam-financial.com>
   **To:** jeff.webb@aig.com, marialice@worldnet.att.net

Bob Jones wrote:

Jeff, I assume you received the Fannie Mae DUS write up, our proposed
Grid Pricing Matrix last week and have an interest in this coverage.

Marialice Williams is waiting on preliminary portfolio information from
two DUS Lenders and a response by Fannie Mae regarding coverage of her
portion of mezzanine risk exposure.  In the mean time, I was hoping you
could give us some feedback on our proposed pricing grid and coverage
structure using our MCRI Policy (with certain modifications) previously
used by AIG on the Aggregation transaction .

I don't want to muddy the water, but I wish there was a way to offer the
DUS Lender the mezzanine secondary loss coverage packaged with some type
of wrap on the 5% first loss exposure for balance sheet purposes.
However,  Fannie Mae would have to have full knowledge of this and the
DUS Lender must remain responsible (off balance sheet) for all first
loss risk exposure.   The risk vehicle would have to qualify the DUS
Lender on risk based capital transfer of first loss and mezzanine risk.

I would appreciate any thoughts you might have on this.   Thanks    Bob
Jones

**Subject: Fannie Mae DUS Lender Mezzanine Risk Coverage**
**Date:** Mon, 21 May 2001 16:13:06 -0500
**From:** Bob Jones <bobjones@cam-financial.com>
**To:** stephen.noble@zurichus.com, marialice@worldnet.att.net, dwgroves@bellsouth.net

Bob Jones wrote:

Steve, I assume you received the Fannie Mae DUS write up and our
proposed Grid Pricing Matrix last week and have an interest in this
coverage.

Marialice is waiting on preliminary portfolio information from two DUS
Lenders and a response by Fannie Mae regarding coverage of her portion
of the mezzanine risk exposure.  In the mean time, I was hoping you
could give us some feedback on our proposed pricing grid and coverage
structure, using our Asset Deficiency Policy with certain modifications
for this coverage.

I don't want to muddy the water, but I wish there was a way to offer the
DUS Lender the mezzanine secondary loss coverage packaged with some type
of wrap on the 5% first loss exposure for balance sheet purposes.
Fannie Mae would have to have full knowledge of this and the DUS Lender
must remain responsible (off
balance sheet) for all first loss exposure.  The risk vehicle would have
to qualify the DUS Lender on risk based capital transfer of first loss
and mezzanine risk.

I would appreciate any thoughts you might have on this.  Thanks    Bob
Jones

**Subject: A few questions and an update from RMS**
   **Date:** Wed, 23 May 2001 10:16:10 -0400
  **From:** "Marialice Williams" <marialice@worldnet.att.net>
     **To:** <rhoda_s_newman@fanniemae.com>, <grace_huebscher@fanniemae.com
     **CC:** <hhartsfield@risk-mitigation.com>

Update from RMS--

First the good news--we have the interest of three insurance companies, two of whom are domestic. All are rated A+ and above. However, we need to know a couple of things to facilitate our discussions with them:

1. Is there any interest on Fannie Mae's part in insuring her portion of the 5-20% mezzanine level of risk on the DUS portfolio? (This could lead to a lower premium for the lenders).

2. Does Fannie Mae have any objection to the DUS lenders laying off all or part of their first loss obligation on the DUS loans to a "AA" or better rated credit enhancer?

3. Is there any possibility of obtaining data from Fannie Mae regarding the underwriting and performance of the DUS portfolio? The keen interest is in what percentage of the mortgage loans originated meet the various tiers of the DUS program and has there been a distinction in the performance based upon those tiers of l loans?

Sorry that we were unable to get Kate Westover in to see you in June. We only need about and hour and a half. Is there a time in July that will work? Also if you find that there is room because of a cancellation in June we would be happy to fill in.

We don't need all of the answers to our questions at one time. As soon as you have some idea about each question, let us know. Thanks. Marialice

**Subject: Fw: Laying off DUS risk**
   **Date:** Wed, 30 May 2001 15:43:26 -0400
  **From:** "Marialice Williams" <marialice@worldnet.att.net>
     **To:** <JKLarson@lendleaserei.com>
     **CC:** <hhartsfield@risk-mitigation.com>, "Bob Jones" <bobjones@cam-financial.com>

I am forwarding this "sent" message to you because last Wednesday when I sent out e-mail, some people did not get the message.
Looking forward to discussing this program with you.  Marialice Williams
----- Original Message -----
From: Marialice Williams
To: JKLarson@lendleaserei.com
Cc: Bob Jones ; hhartsfield@risk-mitigation.com
Sent: Wednesday, May 23, 2001 5:48 PM
Subject: Laying off DUS risk

Hi--I can't believe that after spending 9 years at Fannie Mae that I continue to work with ex-Fannie Maers like you and Chris
Tawa.  Chris indicated that you would be handling the issue of laying off Lend Lease REI's mezzanine risk obligation on its DUS
loans.

Fannie Mae has given us the go ahead (Richard Lawch and Grace Huebscher) to work with the DUS lenders.  They are in the
process of determining whether or not to join the lenders in laying off their obligation on the mezzanine tranche of risk as well.

We have also queried them as to the possibility of DUS lenders laying off the first 5% of risk on these loans through a risk
transfer or a captive insurance vehicle utilizing the current reserves on the DUS loans as the first loss reserve.

Could you give us some idea as to the timing that Lend Lease REI has in mind?  We hate to lose the attention of the insurers now
that we have it.

Also, can you let me know if you need us to modify the agent of record agreement in any way?  Marialice

**Subject: Mark Beisler**
    **Date:** Thu, 24 May 2001 16:48:15 -0400
    **From:** "Marialice Williams" <marialice@worldnet.att.net>
      **To:** "Bob Jones" <bobjones@cam-financial.com>

I got a message that he is marking up the agent of record agreement and sending it by fax. Great news. Hope you had a great learning session. I had to put your DUS program commission piece under my pillow and sleep on it!

I forgot to tell you to let Linda know that I have something for her for winning the tournament! I will send next week.

marialice

**Subject: Update On Fannie Mae DUS Lender Mezzanine Coverage**
**Date:** Tue, 29 May 2001 10:41:29 -0500
**From:** Bob Jones <bobjones@cam-financial.com>
**To:** jeff.webb@aig.com, marialice@worldnet.att.net

Bob Jones wrote:

Hi Jeff.   Hope you had a good holiday.  Just a quick update on the
mezzanine coverage for two Fannie Mae DUS Lenders (Red Capital and Lend
Lease).

RMS's Marialice Williams, CAM's associate broker, should have executed
broker agreements in place with both  Fannie Mae DUS Lenders soon.    I
believe you are aware that Fannie Mae has given RMS the okay to pursue
this coverage for both Lenders.

Each Lender has approximately 10 billion of seasoned Fannie Mae
Multifamily DUS product.    At this time we do not know how much of  the
portfolio each Lender will seek coverage for.  We do anticipate it to be
significant for risk based capital purposes.    Don't forget, this is a
secondary loss cover with each DUS Lender remaining responsible for the
first 5 % of any UPB deficiency loss upon sale of any asset that
defaulted.   (The current Fannie Mae Aggregation coverage with AIG is
primary cover at 39 bpts per annum and has yet to experience any claim
loss exposure or loan defaults.)  Once we have executed broker
agreements in place we should have preliminary portfolio information
available to share with you.

The pricing grid that I previously  furnished may be a little rich in
consideration of  DUS Lender spread executions, secondary loss exposure,
nationwide diversified portfolio risk and CAM/RMS built in commission
rate of 10 percent.    I may do some additional work on the pricing grid
this week.

I will keep you informed of additional progress.

# EXHIBIT C



Louis W. Hoyes

Senior Vice President
Multifamily Lending and
Investment

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892
phone 202 752-4324

May 26, 1998

Mr. Bob Jones
President & Chairman
CAM Financial Services
1542 East Beach Blvd.
Gulfport, MS  39501

Dear Bob:

I wanted to take this opportunity to once again congratulate you on
the Metropolitan Savings Bank transaction of $92 million, that
received the Multifamily Deal of the Year Award for 1997.  As you
know, this achievement was a direct result of CAM Financial
Service's hard work and your alliance with AIG and Fannie Mae. Your
placement of the multifamily risk transfer insurance policy for
this transaction was a "first time event" for a MBS structured
transaction in our industry.  As a result of your successful
efforts, CAM, Fannie Mae and AIG anticipate enjoying an exclusive
agreement working on several pending transactions.

Fannie Mae currently has several pending transactions totalling
nearly $1 billion where multifamily credit risk transfer insurance
is the keystone to closing these transactions.  As you are well
aware, these transactions take months to structure as Fannie Mae
must conduct extensive underwriting due diligence in determining
pool risk and preparation of loan document delivery prior to Fannie
Mae completing the transaction and issuance of Fannie Mae's AAA
rated mortgage back securities.  Nonetheless, the first of these
transactions should close in late July or mid August.

Moreover, according to what I have been told, the recent marketing
reception at our Midwest Regional Office in Chicago was a huge
success.  Therefore, both Fannie Mae and CAM should anticipate new
transactions later this year, with some of the Fannie Mae customers
that attended that event, and I hope we can expand this type of
marketing activity to other Fannie Mae regions.

You have informed me that in order to pursue this business CAM has
had to obtain additional operating capital via an established
credit line with Hancock Bank, and that you consider the Bank, like

Mr. Bob Jones
May 26, 1998
Page 2

Fannie Mae, to be a good business partner.  As such, it would be helpful if senior management of Hancock Bank could assist you with your immediate short term cash flow needs over the next ninety days.  We reasonably assume that this should be sufficient time to permit Fannie Mae to close several more transactions facilitated by multifamily credit risk insurance arranged through CAM, which will generate insurance premium income to CAM.

Should any of your loan officers at Hancock Bank wish to speak with me regarding the commitment and confidence Fannie Mae has in CAM, I would be glad to talk with them.  Bob, keep up the good work  and I hope we have a great business year together!

Respectfully,

LWH/sc

cc:  J. Robert Favre
     Sid Rice

# EXHIBIT D

# RISK MITIGATION STRATEGISTS, LLC.
## The Watergate Office Building
2600 Virginia Ave., N.W., Suite 701
Washington, D.C. 20037

Ms. Grace Huebscher
Vice President, Fannie Mae
Multifamily Capital Markets
3939 Wisconsin Avenue, N.W.
Washington, D.C. 20016

Dear Grace:

First, I want to thank you and Rhoda for the delightful lunch last week.  It was good catching up with you two.  Second, I want to thank you for the opportunity to pursue a solution for our clients to obtain relief from their mezzanine loss coverage obligation under the DUS program.  Therefore, I welcome the opportunity to clearly define the relationship between my company, Risk Mitigation Strategists, LLC ("RMS") and CAM Financial Services, Inc. ("CAM").

I was in Atlanta yesterday and had lunch with Bob Jones, President of CAM. Bob indicated that he had transmitted an e-mail to you and Rhoda indicating that AIG may have an interest in providing insurance coverage for mezzanine levels of risk.

My company, RMS, is licensed to do business in Washington, D.C.  CAM and RMS do not have any connection with respect to ownership and no one from CAM or RMS has an interest in the other's business ventures.  However, CAM and RMS have a broker agreement that is common in the insurance business. The agreement indicates that when CAM locates an insurance company for a project that RMS is working on, RMS agrees to compensate CAM through some form of split commission.  However, it does not mean that CAM plays any role in the development of the program or project that RMS is working on nor does CAM interface with RMS' customers.

My company has relationships with numerous insurance brokers and carriers with whom we have signed confidentiality agreements.  Due to the innovative and unique ways that our customers utilize insurance to solve their problems of covering different types of risk, we plan to continue to use our network of resources to assist our customers, many of whom are DUS lenders, in obtaining the best and lowest cost insurance available to meet their needs.

Before I left Fannie Mae, I assisted in negotiating an agreement between CAM and Fannie Mae that provided CAM with the opportunity to seek insurance-based solutions for risk coverage in the securitization program of the Negotiated

Transaction's department.  I do not believe that the agreement between Fannie Mae and CAM contemplated extending CAM's authority to work on any aspect of risk coverage for Fannie Mae's DUS program.

Therefore, unless otherwise instructed by you, RMS will continue to work on behalf of its clients to obtain insurance that will cover the 5-20% risk coverage obligation or mezzanine level or risk coverage as required by Fannie Mae under its DUS program.


Sincerely,


Marialice Williams