Marialice Williams                                                    March 17, 2003
                        Washington, DC

---

**70**

1  set. Now the fact is that we are here and Friday and
2  Monday have been arranged with Ms. Williams and her
3  counsel, that happens to be convenient times' and I
4  have got to say it's taken a long time to get
5  everybody squared away to be here then.
6      Now, whether or not there needs to be more
7  time, that's a separate issue to me, Your Honor. The
8  last thing we should do is upset the schedule we got.
9  We are all here. Everybody is going to be here for
10 two weeks. And Ms. Williams and her counsel have
11 said that they are willing to talk about later
12 settings. I understand she has got some concerns
13 about the time it entails. We can work out later
14 sessions if necessary, and hence that's the letter
15 that they got from Gen Star saying look, don't be
16 surprised if we come in and we ask for more time.
17     In any event, everybody is okay, or was
18 until a few minutes ago with today three hours,
19 Friday seven, Monday seven. And I'm going to do my
20 best to finish by noon on Monday which closes the
21 Fannie Mae part of it. And we had, just lastly, Your
22 Honor, this stuff was set in last November and we
23 worked out this minute entry, so we are now in
24 another postponement. I frankly have thought the
25 witness was entitled to a little settlement to start

---

**71**

1  getting this thing knocked out, because she is a key
2  witness in the case. We are going to have to take
3  her deposition eventually anyway. Let's start
4  getting it done.
5      MR. WISER: Judge Roper, this is Nick
6  Wiser. If I could make one more brief comment.
7  Mr. Wimberly refers to the minute entry as though it
8  was something that was worked out. It was not. It
9  was in response to a motion for protective order that
10 Your Honor ruled on it.
11     When I agreed to conduct Mrs. Marialice
12 Williams' deposition the representation was made to
13 me that she had specifically been asked if she would
14 waive the seven-hour, one-day rule. And the
15 representation was made to me that she had waived the
16 seven-hour-one-day rule. I now find out in
17 consultation with her counsel that she has never been
18 asked to waive the seven-day rule, and I was also
19 represented that this was the only time that she was
20 available.
21     What we have been fighting about since the
22 inception of this is we want to conduct the entire
23 Fannie Mae 30(b)(6) deposition which is set with
24 Richard Lawch for Tuesday, Wednesday, Thursday of
25 this week and for Grace Huebscher Tuesday, Wednesday

---

**72**

1  Thursday of next week, before they conduct the
2  general depositions of Marialice Williams -- because
3  we don't want her to be able, we don't want her to
4  clue them in on how they need to testify.
5      We want them to testify and then we think
6  Ms. Williams will have some very interesting rebuttal
7  to that. So that is the reason that Your Honor had
8  entered a very limited deposition to be taken here
9  for three hours. And that's all that we are asking
10 is that we get those three hours; then we do all of
11 the 30(b)(6)'s of Fannie Mae and then at a time when
12 we can take care of all of Miss Williams' deposition
13 requirements at once so she doesn't have to piecemeal
14 this; then we can take hers and see what she has got
15 to say.
16     MR. REEVES: That's only fair to her, to
17 keep her from having to come back --
18     MR. WIMBERLY: Your Honor, but Nick is not
19 fair to me. Let me say this. I have given him three
20 days of 30(b)(6)'s and he had noticed three days of
21 individual witnesses next week and now he is trying
22 to ambush me. His own notices originally said
23 30(b)(6)'s this week and on Thursday, open up a new
24 door in the scheduling. That's Williams Friday,
25 Monday and then my individuals.

---

**73**

1      It so happens that the same individuals
2  are up for my 30(b)(6) representatives so that
3  doesn't make any sense. So I have said to the
4  plaintiffs, have six days, we are all in D.C., but
5  to, but to bootstrap that, and to try and knock out
6  the Friday and Monday, I found -- I don't want to say
7  outrageous but I'm a bit surprised, that that would
8  create an incredible inefficiency and would be in
9  effect trapping me. And I was trying to accommodate
10 him.
11     And I know he doesn't intend that to be
12 the case. But that is -- on the seven-hour rule,
13 there is no motion to quash. My subpoena was clear
14 and we are three hours today. So it would be absurd
15 to think we only got four hours left -- what are we
16 going to -- two hours on Friday and two hours on
17 Monday? Everybody is okay with this schedule.
18     MS. WILLIAMS: My client, this is Julia
19 Williams. My client is not okay with this. She has
20 an objection. She has not waived the seven-hour
21 rule.
22     MR. WIMBERLY: Well, her objection that is
23 to be filed in the court. That's a motion to quash.
24     MR. REEVES: Well, judge, by the way,
25 everybody agreed to the dates that he is talking

---

19 (Pages 70 to 73)

Marialice Williams                                                                     March 17, 2003

Washington, DC

---

74

1  about. Gerry and I talked about this just last week
2  because he represented to me that Miss Williams had
3  told him that she wasn't available at any other time.
4  She is telling us right now that she will make her
5  witness available without a subpoena, as I understand
6  it for a time when her client can come up and in one
7  series of depositions be through with her
8  participation in this case without having to come
9  back two or three times to D.C.
10     MR. LEECH: Your Honor, this is Bill
11  Leech. I think there is a fact that needs to be
12  emphasized here. One, Miss Williams lives here in
13  D.C. So when we hear a lot about she's got to come
14  back and back and back, we are talking about driving
15  here, as opposed to flying here from, from
16  Mississippi, which all these lawyers have done. We
17  are all here, and we are going to be sitting around
18  twiddling our thumbs Friday and Monday if we don't go
19  forward with the schedule that we have all previously
20  agreed to.
21     It would be just an enormous waste of time
22  and expense to now change the schedule now that
23  everybody has made it, put it on their calendar and
24  we are all here.
25     MR. REEVES: Judge, they have essentially

---

75

1  circumvented your order. When you said we depose
2  them and get through with them before they are
3  deposing Miss Williams, by noticing the deposition in
4  the middle and representing to us that the reason for
5  that was because she wasn't available any other days.
6     MR. WIMBERLY: Well, let's go back to it.
7  You've got three days 30(b)(6)'s, Tuesday, Wednesday
8  and Thursday, and then we have got our witnesses for
9  individuals next week. All we got to do is say that.
10  That was the original set-up, Jim. And let's do it.
11     You get six days of deposition time with
12  Fannie Mae people, three days this week 30(b)(6) and
13  individuals next week. You know, I talked to both
14  you guys about making it easy on the witnesses and
15  all of us so we wouldn't draw a distinction. We
16  don't have to, but let's do it. You are going to get
17  the same witnesses, the same amount of time, and it
18  eliminates that issue you are raising, which I think
19  is just technical and I thought we had worked around
20  it. But let's go back to the original.
21     MR. WISER: The bottom line is that they
22  want to hear what she has got to say before they have
23  to testify, and that's not right. That's not what
24  your order said.
25     MR. WIMBERLY: And we don't want to.

---

76

1  Let's just finish our 30(b)(6)'s this week and it's
2  individual witnesses opening up next week, and you
3  can start out with ours. And she is --
4     MR. REEVES: And postpone Marialice
5  Williams? Is that what you're saying?
6     MR. WIMBERLY: No. That makes her proper
7  under anybody's interpretation of the order for
8  Friday and Monday. And the last thing -- just to
9  address this. Let's not misunderstand.
10     I have had several conversations with
11  Julia Williams and I don't think she is going to deny
12  that, talking about timing. Because I went to her on
13  several occasions out of concern that other parties
14  were not going to have enough time, and I wanted
15  Ms. Williams to know we have, because -- and let me,
16  and this is the big problem that's driving this, Your
17  Honor, in terms of the urgency.
18     The plaintiffs took an ex parte under oath
19  statement of this witness just a month before they
20  filed this lawsuit, and nobody was there on any other
21  side to cross-examine her, and she says stuff in
22  there that everybody has got an interest in probing,
23  and there is a lot of stuff in there. And nobody, no
24  reasonable person is going to look at that and say
25  that you can get done with that in just seven hours

---

77

1  and we all know that. So that's just a straw issue
2  and the witness, and Counsel, correct me if I'm
3  wrong, you and I worked it out at least on Friday and
4  Monday that you were going to be here.
5     MS. WILLIAMS: Well you harassed -- well,
6  I'm here today. My point is, is that you harassed
7  me. You kept calling and harassing me about the
8  time. You never asked may -- my client has
9  waived the seven-hour rule. And I think it's
10  unreasonable for me to get a letter March 5th from
11  counsel in New York talking about they are not going
12  to be prepared for this deposition with my client,
13  and they need more time at some later date. My
14  client will be available at a later date for
15  everyone.
16     MR. WIMBERLY: But you know what, Julia,
17  and I don't mean to, but you left me a message on my
18  voicemail the other day saying you have had an
19  additional day. Now, I want to know where that
20  voicemail came from.
21     Frankly, Counselor, I -- you -- you
22  wanted -- you were telling me there was an additional
23  day than what we have already got scheduled. And I
24  appreciated that. But we couldn't work it out
25  because we got these other depos.

---

20 (Pages 74 to 77)

Marialice Williams

March 17, 2003

Washington, DC

**78**

1    MS. WILLIAMS:  Well, we never worked it
2    out.  We never had a conversation about it.
3    MR. WIMBERLY:  Well, I tried to call you
4    back but you don't deny that you left me that
5    voicemail.  I thought, well, great.  We'll have an
6    extra day.
7    MS. WILLIAMS:  I was actually trying to
8    change the day.
9    JUDGE ROPER:  All of you, stop.  This is
10   turning into a free-all up there.  I think maybe
11   I better send the FBI over there.
12   (Laughter.)
13   MR. WIMBERLY:  Your Honor, we are really
14   friendlier than it sounds, I'll tell you.
15   JUDGE ROPER:  This is what, it's clear to
16   me that this deposition is not going to be completed
17   even if I let it go in through until Monday.
18   I'm going to do this.  You can depose her
19   the rest of this day and you can depose her tomorrow
20   and then find another date, go forward from there,
21   okay?
22   MR. WIMBERLY:  Your Honor, can we
23   respectfully ask for that tomorrow to be Friday
24   because we got, in fact, plaintiffs have got --
25   JUDGE ROPER:  I meant Friday.  Yes.

**79**

1    MR. WIMBERLY:  Thank you, Your Honor.
2    JUDGE ROPER:  Yeah.  The two days this
3    week, we'll let that be it.
4    MR. WIMBERLY:  Okay.
5    JUDGE ROPER:  And we'll find another date
6    convenient to Ms. Williams, convenient to everybody
7    else when you can come back up there and finish up
8    her deposition, as well as the other parties
9    involved.
10   MR. WIMBERLY:  Thank you, Your Honor.
11   JUDGE ROPER:  All right.
12   MR. WISER:  Thank you, judge.
13   MS. WILLIAMS:  That's fine.
14   MR. WISER:  Let's go off the record for
15   just a minute.
16   (Discussion off the record.)
17   THE VIDEOGRAPHER:  The time is 3:21:10.
18   We are back on the record.
19   BY MR. WIMBERLY:
20   Q.  Ms. Williams, I'm going to, I'm going to
21   hand you a document that we will mark as Exhibit 4.
22   And another document that we are going to mark as
23   Exhibit 5, which your counsel saw earlier.
24   (Exhibit Nos. 4-5 were
25   marked for identification.)

**80**

1    BY MR. WIMBERLY:
2    Q.  Exhibit 4 bears CAM Bates numbers 1625 and
3    1626.  I'll give it to your counsel first as a
4    courtesy so she can --
5    MS. WILLIAMS:  Thank you.
6    MR. WIMBERLY:  Please take a moment to
7    review that, Ms. Williams, and let me know when you
8    are finished.
9    MR. WISER:  I'd like to take a look at it
10   before you ask her a question about it.
11   MR. WIMBERLY:  I have a copy for you.
12   MR. WISER:  Oh, wonderful, thank you.
13   MR. WIMBERLY:  Okay.  I'm going to use
14   what we just got.
15   I'm about to give you 5.  I apologize for
16   the delay.  We -- this is a copy -- the reason for
17   the delay is this is a copy of the original document
18   and its envelope that Mr. Wiser showed to your
19   counsel, Ms. Williams, about an hour ago, he having
20   brought it to us.  The -- a copy of that is in the
21   record already at CAM 9692.  Now, I'll give this
22   Exhibit 5 to your counsel and you for review, please.
23   MR. WISER:  1625 is exhibit what?
24   MR. WIMBERLY:  4.
25   BY MR. WIMBERLY:

**81**

1    Q.  Let me know when you are finished.
2    A.  I'm finished.
3    Q.  Okay.  Let's look first at Exhibit 4.
4    Have you seen that document before today?
5    A.  Which one?
6    MS. WILLIAMS:  Exhibit 4.  This one.
7    MR. WIMBERLY:  Exhibit 4.
8    THE WITNESS:  This one?  No.
9    BY MR. WIMBERLY:
10   Q.  Okay.  There is a reference to Marialice
11   Williams on page 1.  Do you see that?
12   A.  Yes, I do.
13   Q.  Is that you?
14   A.  Yes.
15   Q.  There is also a reference in here to a
16   confidential source?
17   A.  Right.
18   Q.  Who is the confidential source?
19   A.  Betty Dance.
20   Q.  Who is Betty Dance?
21   A.  She was my secretary and is Richard
22   Lawcher's secretary.
23   Q.  And why is she being referred to as a
24   confidential source?
25   MR. WISER:  I'll object to the form of the

21 (Pages 78 to 81)

Marialice Williams

Washington, DC

March 17, 2003

---

**82**

1  question.
2      BY MR. WIMBERLY:
3  Q.  Ms. Williams?
4  A.  I don't know what you mean by that.
5  Q.  Let me rephrase the question. Betty Dance
6  is currently employed by Fannie Mae?
7  A.  Yes, she is.
8  Q.  And you mentioned Mr. Lawch?
9  A.  Yes, he is.
10  Q.  How long have you known Betty Dance?
11  A.  Since 1990.
12  Q.  And did you know her as a result of your
13  work at Fannie Mae?
14  A.  She was a temporary person in Fannie Mae
15  working as a secretary in our office and then became
16  a permanent full-time employee.
17  Q.  How would you characterize your
18  relationship with her? Is she a friend?
19  A.  She is an extremely close friend. I saw
20  her grandchild be born.
21  Q.  And how long has she been an extremely
22  close friend?
23  A.  All of the time she's been there.
24  Q.  So since 1990, is that your testimony?
25  A.  That's correct.

---

**83**

1  Q.  This document says that you received
2  copies from a confidential source regarding some
3  Fannie Mae e-mail. Do you see that?
4  A.  Yes, I do.
5  Q.  And that that occurred on Friday, January
6  1, 2001. Do you see that?
7  A.  Yes, I do.
8  Q.  Is that true?
9  A.  Yes, I did.
10  Q.  Is the document that we have marked
11  Exhibit 5 the Fannie Mae e-mail, quote, unquote,
12  that's referred to in Exhibit 4?
13  A.  I don't know.
14  Q.  And why don't you know?
15  A.  Because I didn't know anything about this
16  memo in number 4. I never saw this.
17  Q.  I know. But just look at memo 5?
18  A.  I know about memo 5. I know about this
19  e-mail.
20  Q.  The exhibit?
21  A.  Yes.
22  Q.  All right. Did you get this e-mail, did
23  you get this memo from Betty Dance?
24  A.  I got that message, yes, forwarded to me.
25  Q.  You got this memo?

---

**84**

1  A.  It's not a memo. It's an e-mail.
2  Q.  Okay, an e-mail. And it was forwarded to
3  you by who?
4  A.  Betty Dance.
5  Q.  When?
6  A.  On the date on here, June 4th, 2001, 10:41
7  a.m.
8  Q.  And did you provide this to Mr. Bob Jones?
9  A.  I sent a copy to Bob Jones's home.
10  Q.  And when did you do that?
11  A.  I don't recall.
12  Q.  On the second page of Exhibit 4, there is
13  a copy of an envelope. I have the original envelope
14  if you would like to look at that. Let me know if
15  you need to look at the original. This is a copy.
16  A.  No, I don't need to look at it.
17  Q.  Okay. Is that your handwriting?
18  A.  Yes, it is.
19  Q.  And is that his home address?
20  A.  I believe it is.
21  Q.  Does this look like the envelope --
22  A.  There isn't any, on Exhibit 4, there is
23  none, by the way. You are talking about Exhibit 5.
24  Q.  I'm on 5. I'm sorry. I misspoke. I'm
25  talking about page 2 of Exhibit 5.

---

**85**

1  A.  Right.
2  Q.  And that is a copy of an envelope,
3  correct?
4  A.  Correct.
5  Q.  Is this the envelope that you used to send
6  that e-mail to Mr. Jones?
7  A.  Yes, it is.
8  Q.  And would you look at the date stamp on
9  this?
10  A.  Yes, I did.
11  Q.  And what is that?
12      MR. WISER: Exhibit 5?
13      BY MR. WIMBERLY:
14  Q.  Exhibit 5.
15  A.  The date stamp is 22nd February, 2002.
16  Q.  Is that approximately when you posted this
17  to Mr. Jones?
18  A.  I believe so. That's what the postmark
19  says.
20  Q.  Do you have any reason to believe that
21  that's not the day?
22  A.  I -- no. I don't know.
23  Q.  Does that seem about right in terms of the
24  time, that it would be in February 2002?
25  A.  I think so. I'm just not certain.

---

22 (Pages 82 to 85)

Marialice Williams

Washington, DC

March 17, 2003

---

**86**

1    Q. Ms. Williams, what is the date of the
2    e-mail from Jones? Look at Exhibit 4. And what is
3    that date?
4    A. That date is Wednesday, June 6th, 2001.
5    Q. And why is it that you are sending the
6    e-mail, this is the Fannie Mae e-mail that's referred
7    to the June 6th e-mail, correct?
8    MR. WISER: I object to the form of the
9    question.
10    THE WITNESS: What is your question?
11    BY MR. WIMBERLY:
12    Q. If you know, you can answer?
13    A. I'm really not sure what your question is.
14    Q. Well, it's just a question of dating.
15    They mentioned, on June 6th, 2001, this e-mail
16    mentions that you have received copies from a
17    confidential source regarding some Fannie Mae e-mail
18    between several Fannie Mae corporate officers?
19    A. I understand.
20    Q. -- recommending giving this project to
21    Craig Ott and so forth? That's --
22    A. Are you trying to ask me why I didn't send
23    it until 2002? Is that what you are trying to ask
24    me.
25    Q. I will ask you that. Did you send it, did

---

**87**

1    you wait until 2002 to send it?
2    A. It appears from this that I waited until
3    2002.
4    Q. Okay. What was the reason you sent it to
5    Mr. Jones?
6    A. I don't even, I don't, I couldn't recall
7    why. I know I sent it.
8    Q. Well, do you have a general recollection
9    as to why you sent him this Fannie Mae e-mail?
10    MR. WISER: I object to the form of the
11    question.
12    BY MR. WIMBERLY:
13    Q. I'll rephrase it. Do you have a general
14    recollection as to why you sent him the e-mail that's
15    represented on page 1 of Exhibit 5?
16    MR. WISER: I object to the form of the
17    question.
18    BY MR. WIMBERLY:
19    Q. Ms. Williams, I would just caution you
20    that when a question is pending that you not confer
21    with counsel.
22    MS. WILLIAMS: Answer it.
23    THE WITNESS: I sent the e-mail to Bob
24    Jones because we had spent a considerable amount of
25    effort and dollars working in what we thought was an

---

**88**

1    honest effort on Fannie Mae's part to do business
2    with me, since I had actually come up with the
3    concept and closed the first transactions that
4    involved credit risk insurance.
5    Every person that I know who has left
6    Fannie Mae who has done something of that nature has
7    always been rewarded with an opportunity to work with
8    Fannie Mae when they were not fired from their
9    position.
10    Therefore, my thought it was very
11    important --
12    BY MR. WIMBERLY:
13    Q. Ms. Williams, I'm going to object to your
14    answer as nonresponsive to the question.
15    A. You asked me why I sent it and I am
16    telling you why I sent it. Because I spent
17    considerable amount of money and time trying to
18    honestly do business with Fannie Mae and it was clear
19    from this message that they were not doing anything
20    but taking my time and attention and using that with
21    other people.
22    That's why I sent it to Bob. Because I
23    knew that Craig Ott, the person who was referred to
24    in this letter, in this e-mail, was a person that I
25    had introduced to Fannie Mae through CAM Financial

---

**89**

1    under a confidentiality agreement.
2    Q. Did you believe that this document was
3    confidential information to Fannie Mae at the time
4    you sent it to Bob Jones?
5    A. I did not think it was confidential.
6    Q. Did you think it was confidential when you
7    got it from Betty Dance?
8    A. No. I didn't.
9    Q. Why not?
10    A. Because Betty Dance and I have been
11    friends for a very long time and we share a great
12    deal of e-mail, and when it was sent to me, I never
13    even thought about it. I just simply read it, never
14    questioned whether or not it was confidential or not.
15    Q. In your severance agreement with the
16    company, Ms. Williams, did you not undertake the
17    follow the company's code of conduct after your
18    employment?
19    MR. WISER: Object to the form of the
20    question.
21    THE WITNESS: I don't recall anything
22    about that in my, in my agreement with Fannie Mae,
23    which was not negotiated well.
24    BY MR. WIMBERLY:
25    Q. But do you recall, do you recall your

---

23 (Pages 86 to 89)

Marialice Williams

Washington, DC

March 17, 2003

---

**90**

1  severance agreement with Fannie Mae?
2  A.  Yes, I do recall that severance agreement.
3  Q.  And do you recall that it had provisions
4  about the code of conduct?
5  A.  No. I recall that it had provisions about
6  not suing Fannie Mae?
7  Q.  Do you recall that it had provisions
8  requiring you to observe the confidentiality of
9  Fannie Mae confidential information?
10  A.  Yes, I and I did that.
11  MR. WISER:  Object to the form of the
12  question.
13  THE WITNESS:  Yes, I have always held
14  Fannie Mae information confidential except when it
15  was disclosed to me. And once it was disclosed to me
16  then I assumed it was no longer confidential.
17  BY MR. WIMBERLY:
18  Q.  And did you have an understanding of what
19  Fannie Mae confidential information was at the time
20  you left Fannie Mae?
21  A.  No.
22  Q.  None?
23  A.  No.
24  Q.  Did you ask Betty Dance for this document?
25  A.  No. I did not.

---

**91**

1  Q.  Then why did she send it to you?
2  A.  Because she recognized that I had spent a
3  great deal of time and effort at Fannie Mae.
4  Including signing a confidentiality agreement with
5  them, and had provided them with the great deal of
6  information, had a consultant fly in from Canada to
7  meet with them, had customers of Fannie Mae, DUS
8  customers, you name them, they were my customers,
9  wanting me to do business with Fannie Mae.
10  Betty knew about the confidential
11  relationship, I mean knew about the confidentiality
12  agreements with all of the people that Bob Jones
13  brought into Fannie Mae, and I'm certain she was as
14  shocked as I was when I read it. And I, I doubt
15  seriously that there is anybody in this room who
16  wouldn't have done the same thing under the
17  circumstances.
18  Q.  Did she send you any other documents from
19  Fannie Mae after you left Fannie Mae in July 1998?
20  A.  Betty has never sent me anything related
21  to her work whatsoever. We share prayers. We share
22  jokes. We do not share information about Fannie Mae
23  because after this, it was clear that Fannie Mae was
24  not going to do business with me and I had to find
25  work. This was no reason for her to send anything

---

**92**

1  else to me.
2  Q.  After you left Fannie Mae, did you have
3  any business-related conversations with Betty Dance?
4  A.  No. I did not.
5  Q.  None?
6  A.  My personal relationship with Betty Mae,
7  with Betty Dance is one of a close friend and
8  confidant.
9  Q.  And so up to, let me, please take a look
10  at Exhibit 5. What's the date stamp on this e-mail
11  from Betty Dance to you?
12  A.  For the third time, it is June 4th, 2001,
13  10:41 a.m.
14  Q.  And you didn't talk to her about anything
15  related to business prior to your receipt of this
16  e-mail?
17  A.  No. I did not.
18  Q.  Did you talk to her after you got the
19  e-mail?
20  A.  No. I did not. It's pretty
21  self-explanatory.
22  Q.  Why would she send this to you if you
23  hadn't talked to her about it?
24  A.  Because Betty was aware of the
25  appointments I had had at Fannie Mae. She was aware

---

**93**

1  of the expenses I was accruing trying to do business
2  at Fannie Mae. She was aware that I had flown down
3  to Dallas, Texas to meet with one of the DUS lenders.
4  She was aware that I had gone through a great deal of
5  difficulty to try to maintain a relationship with
6  Fannie Mae about a product that I created and wished
7  to use as an outside broker.
8  And therefore, because she knew all of
9  that, she knew that I was using my retirement from a
10  company to run a business, she knew what my financial
11  situation was, and I'm sure as a good friend she
12  simply said you don't want to bark up that tree or
13  this dog won't hunt, or whatever expression Betty
14  would use to describe this particular kind of action.
15  Q.  So you, it's your testimony, Ms. Williams,
16  you didn't have any conversation with her whatsoever
17  after you got this e-mail? About the e-mail?
18  A.  Absolutely none.
19  Q.  How about business?
20  A.  Why would I have a question? Well no.
21  Q.  I'm not assuming you would. That's a
22  question?
23  A.  But I have answered this question three
24  times now and I have said no. I have not had any
25  business conversations with Betty Dance. This is the

---

24 (Pages 90 to 93)

Marialice Williams                                                    March 17, 2003
Washington, DC

---

94

1   one and only e-mail I ever received from her that had
2   anything to do with business and she sent me this one
3   because it's pretty clear from this e-mail that I was
4   not going to be given the same opportunity as
5   everyone else was being given to do this.
6       Q.   Did you talk to anyone about this e-mail
7   after you got it?
8       A.   Yes, I did.  I talked to Bob Jones and
9   said forget all the stuff I'm trying to do with
10  Fannie Mae because it's obvious they are not going to
11  give me any business so maybe you might want to try
12  to get some from them.
13      Q.   When did you talk to Bob Jones?
14      A.   I don't recall.  As soon as probably I got
15  this e-mail.  It's pretty shocking when you spent
16  almost two hundred and some thousand dollars building
17  a business to suddenly one day walk in the door and
18  no you don't have ding, after lies and lies and lies
19  and confidentiality and being asked if you wanted to
20  do it, and then being crapped on in the midst of all
21  of it.
22      Q.   And what did Mr. Jones say to you when you
23  told him about this?
24      A.   He said I'm not surprised.
25      Q.   Tell me everything he said to you about

---

95

1   this.
2       A.   I'm sure that's all he said.  It's very
3   explanatory of itself.  Read the words.
4           If -- "Richard, Marialice wants to pursue
5   credit risk insurance for DUS risk.  Do we want to
6   pursue with her?  My gut is no."
7           Now, I have put this program together that
8   they are running, but they don't want me involved in
9   it.  "But if you think it's worth continuing -- if
10  you think it's worth continuing the discussion, I'll
11  focus on her questions."
12          And then, Richard much to my shock, says
13  well, you know we may in fact have a credit risk
14  problem here at Fannie Mae because look at all the
15  outstanding risk.  $92 billion worth of risk, against
16  some DUS lenders who don't have that as a net worth.
17          So he is concerned about Ofheo coming back
18  and crapping on him so he even has the intelligence
19  to say well, let's wait until the RBC rules come
20  back, and when those come back then we'll know
21  whether or not we are going to need more than Craig
22  Ott to do this.
23          And I don't think that needs any
24  interpretation.  I think that's clear on its face.
25      Q.   Well, Ms. Williams, Lawch writes in here,

---

96

1   does he not, if Ofheo -- who is Ofheo?
2       A.   Oh my God, you don't know who OFHEO is?
3       Q.   Who is Ofheo?
4       A.   It's the Office of Fair Housing Oversight
5   that's lodged at HUD that is responsible for
6   determining or for setting the regulatory
7   requirements for Fannie Mae and Freddie Mac.
8       Q.   Well, thank you.  Thank you for that.  If,
9   why does, he says if OFHEO comes back with bad RBC
10  rules, we may be interested.  What are the RBC rules?
11      A.   Risk-based capital rules.  Are you not
12  familiar with the secondary market?
13      Q.   And --
14          MR. WISER:  I want to object.  Again, I
15  think you are now going outside the confidential
16  source.  You are asking her about the substance of
17  this.  I think you are perfectly within your rights
18  to talk about any information that relates to what a
19  confidential source is or what confidential
20  information is being disseminated.  But now you are
21  asking her about the substance of this particular
22  letter.  And I think that that is outside the scope
23  of Judge Roper's ruling.
24          BY MR. WIMBERLY:
25      Q.   You can answer the question, Ms. Williams.

---

97

1       A.   I'm sorry.  I don't remember the question.
2           MR. LEECH:  Is the deposition not limited
3   to the confidential source?
4           MR. WISER:  Regarding the release of
5   confidential information.
6           MR. WIMBERLY:  I want the question
7   answered, please, Counselor.
8           MS. WILLIAMS:  Ask him to repeat it again.
9           MR. WISER:  Let me, let me --
10          MR. WIMBERLY:  The pending question.
11          MR. WISER:  Let me make this point, then.
12  If you go this route again I'm going to get the judge
13  back on the phone.
14          MR. CLARK:  Rick, you cannot be serious
15  that this is outside the scope.
16          MR. WISER:  I am.
17          MR. CLARK:  This is ridiculous.  This is
18  so --
19          MR. WISER:  The release of confidential
20  information --
21          MR. LEECH:  He asking questions about the
22  confidential information that was released.
23          MR. WISER:  That's not what the order
24  says.  It says, "the release."
25          MR. WIMBERLY:  Let us read the order for

---

25 (Pages 94 to 97)

Marialice Williams                                                    March 17, 2003
Washington, DC

---

**98**

1  you, Mr. Wiser.
2      MR. LEECH: Yes. It says limited to
3  information regarding the release of confidential
4  information. That is the confidential information.
5  Now why can't he ask questions about it?
6      MR. WISER: He can ask questions about the
7  release. The operative word is the release, not the
8  information.
9      I don't mind him going into it. To a --
10  you know, to limited extent, is it confidential
11  information? Now he wants to know who OFHEO is and
12  who RBC is.
13      THE WITNESS: Well, he should know that.
14  But let's just ignore that. I will answer the
15  question if you'll ask it again.
16      MR. WIMBERLY: I think your objection is
17  duly noted. Please answer the question.
18      THE WITNESS: I don't know what the
19  question is now.
20      MR. WIMBERLY: Well, let's read it to you,
21  please. Let me go back. Ms. Court Reporter, would
22  you read the pending question back?
23      MR. LEECH: It was what are RBC rules?
24      THE REPORTER: Yes.
25      BY MR. WIMBERLY:

---

**99**

1      Q.  Yes. I think I already asked you what are
2  RBC rules? I think you answered that.
3      A.  No, I didn't.
4      Q.  Risk-based capital.
5      A.  Risk-based capital.
6      MR. WISER: No. She said you should know
7  what that is.
8      THE WITNESS: No. I mean it's hard to
9  represent something if you don't know the substance
10  of what the matter's about.
11      BY MR. WIMBERLY:
12      Q.  Thank you, Ms. Williams.
13      A.  I'm an attorney. I do think it's hard.
14      Q.  Just listen to the questions and answer
15  them if you will.
16      A.  I will just answer it if you will ask it.
17      Q.  Let me know if you don't understand one.
18  That doesn't strike me as saying no, categorically.
19  Does it strike you that way?
20      MR. WISER: Object to the form of the
21  question.
22      THE WITNESS: It does when you read this
23  next sentence, when it says are these different
24  players than Craig is showing us?
25      BY MR. WIMBERLY:

---

**100**

1      Q.  Well, what does that mean?
2      A.  That means that obviously they are only
3  going to work with Craig.
4      Q.  I'm sorry, Ms. Williams, I don't see how
5  we get there.
6      A.  "Probably not if we want to engage Craig
7  on this project, that might be a better choice." He
8  doesn't know what RBC is either, so he probably is a
9  better choice. He doesn't know what OFHEO is either.
10      "If you like that plan then let's discuss
11  -- we want to ask Craig to find for us."
12      Q.  It's still in the conditional, is it not?
13  It's the "if Ofheo comes back," and somebody
14  saying -- and then he asks the question of these
15  different players and Miss Huebscher, does she not
16  respond, "probably not, so if we want" -- there is
17  still, there is no categorical absolute.
18      MS. WILLIAMS: Are you --
19      THE WITNESS: Are you trying to discuss,
20  are you trying to figure out from this whether or not
21  Fannie Mae screwed me?
22      MS. WILLIAMS: Marialice, Marialice, wait
23  a minute.
24      THE WITNESS: Are you kidding? You go
25  back to them and they say no. No is no.

---

**101**

1      MS. WILLIAMS: Marialice -- I'm going to
2  object to the form.
3      MR. WISER: Object to the form of the
4  question.
5      MR. WIMBERLY: This is not a -- pardon me.
6  Sorry. This is not a panel discussion. Ms. Williams,
7  I'll defer to you because you are her counsel.
8      MS. WILLIAMS: I'm going to object to the
9  form of the question. I'm going to object the form
10  --
11      MR. WIMBERLY: Okay. That's enough.
12  Under the federal rules --
13      THE WITNESS: Oh, now he is going to tell
14  you what's enough.
15      MS. WILLIAMS: I understand. I mean it's,
16  he went on and on. But it's --
17      (Witness laughs.)
18      MS. WILLIAMS: -- I agree.
19      MR. WIMBERLY: As she'll tell you it is
20  the rule that she can object to form and only form
21  unless she wants to instruct you not to answer on the
22  basis of privilege.
23      THE WITNESS: But she can't instruct me
24  not to answer if I can't ask her whether or not I can
25  answer.

---

26 (Pages 98 to 101)

---

**102**

1        MS. WILLIAMS: Marialice, that's all
2    right. Do you have a question outstanding?
3        BY MR. WIMBERLY:
4    Q.   Let me check.
5        (Witness laughing.)
6        THE WITNESS: I can tell you you don't.
7        MR. WIMBERLY: Well, then let me -- oh,
8    no, I do. There is no -- I do have a question. No.
9    No. I do have a question pending. And that is, is
10   it not correct to say there is no, there is no
11   absolute decision here to reject your proposal?
12       MR. WISER: Object to the form of the
13   question.
14       THE WITNESS: That is incorrect. You are
15   incorrect.
16       BY MR. WIMBERLY:
17   Q.   And why am I incorrect?
18   A.   Because you cannot read.
19   Q.   Well, please help me read. Where is it
20   categorically decided that Fannie Mae is rejecting
21   your proposal?
22       MR. WISER: Object to the form of the
23   question.
24       THE WITNESS: In the context of this
25   e-mail. That is open to obviously a different

---

**103**

1    interpretation.
2        But having experienced beyond this e-mail,
3    the answer was -- no.
4        BY MR. WIMBERLY:
5    Q.   Let's get back to your conversations with
6    Mr. Jones about this e-mail. Did he tell you what he
7    was going to do with the e-mail?
8    A.   No. He did not.
9    Q.   What did he tell you?
10   A.   He didn't tell me anything. I sent it to
11   Mr. Jones.
12   Q.   You sent it to him. And did he call you
13   up?
14       MR. WISER: Object to the form of the
15   question.
16       THE WITNESS: No. We talked before I sent
17   it.
18       BY MR. WIMBERLY:
19   Q.   You talked to him before you sent it. So
20   when you sent, you sent it on, as I believe you
21   testified earlier on or about February 22, 2002.
22   Correct?
23   A.   That's what it says on Exhibit number 5 on
24   the second page in an envelope that has my addressing
25   on it.

---

**104**

1    Q.   Okay. Okay. And can -- did he call you?
2    Or did you call him?
3    A.   For?
4    Q.   To tell him about this e-mail?
5    A.   I forwarded it to Bob Jones much earlier.
6    Q.   Oh. You had already given it to him? You
7    had forwarded it to him before February 2002?
8    A.   I believe so.
9    Q.   When?
10   A.   I don't recall. It should say here
11   somewhere, I guess. I don't remember when I told
12   him, frankly.
13   Q.   You don't disagree there is nothing in
14   this document that's Exhibit 5 that indicates that
15   you forwarded it to Mr. Jones at this time, so your
16   testimony is that you forwarded it to him at some
17   other time?
18       MR. WISER: Object to the form of the
19   question.
20       THE WITNESS: I thought -- I could be
21   incorrect. I, I don't remember.
22       BY MR. WIMBERLY:
23   Q.   Do you have a general recollection?
24       MR. WISER: Object to the form of the
25   question.

---

**105**

1        THE WITNESS: No.
2        BY MR. WIMBERLY:
3    Q.   Would it have been shortly after you got
4    it from Betty Dance?
5        MR. WISER: I object to the form of the
6    question.
7        THE WITNESS: I don't recall. I believe I
8    informed him that I knew about it immediately. I
9    just don't remember.
10       BY MR. WIMBERLY:
11   Q.   Okay. That's fair enough. And did you
12   inform him in a phone call?
13   A.   I don't recall.
14       MR. WISER: Object to the form of the
15   question.
16       BY MR. WIMBERLY:
17   Q.   Do you remember what you told him?
18       MR. WISER: Object to the form of the
19   question.
20       THE WITNESS: I don't recall.
21       BY MR. WIMBERLY:
22   Q.   Did you tell him that you had an e-mail
23   from, some e-mails through Betty Dance that indicated
24   that a decision had been made that you disagreed
25   with?

---

27 (Pages 102 to 105)

Marialice Williams                                                                    March 17, 2003
Washington, DC

---

**106**

1    MR. WISER: Object to the form of the
2  question.
3    THE WITNESS: No.
4    BY MR. WIMBERLY:
5    Q. Did you tell him that you had received
6  copies from a confidential source?
7    MR. WISER: Object to the form of the
8  question.
9    THE WITNESS: No.
10    BY MR. WIMBERLY:
11    Q. Did you tell him that the e-mail concerned
12  several Fannie Mae corporate officers recommending
13  giving this project to Craig Ott and not you?
14    A. I had a conversation with Bob Jones
15  approximately -- I don't recall the exact time. I
16  perhaps could reconstruct it, of after I went to
17  Fannie Mae on a particular occasion to discuss with
18  Fannie Mae the possibility of utilizing a new form of
19  credit enhancement, which I created.
20    While I was standing in Richard Lawch's
21  office, and Betty Dance and Harry Hartsfield, my
22  partner, and other people were present, Richard Lawch
23  said to me, "Ooohhh, we have an international broker
24  now," and I said, "Oh, that's surprising. I guess
25  you are still doing insurance business." And he

---

**107**

1  said: "Yes, we're trying to."
2    Q. When did that occur?
3    A. That occurred, and Fannie Mae I'm sure
4  will know in their records from when I had an
5  appointment with them, when I went in to speak with
6  Richard, about doing this business.
7    Q. But in your own recollection, when did it
8  occur?
9    MR. WISER: I object to the form of the
10  question.
11    THE WITNESS: Sometime between 1998 and
12  1994.
13    MS. WILLIAMS: 1998 and -- .
14    THE WITNESS: 1998 and -- 1998 and -- when
15  did I leave there, I can't even remember now. Was it
16  '98, and 2001.
17    BY MR. WIMBERLY:
18    Q. Was it before June 4, 2001?
19    MR. WISER: Object to the form of the
20  question.
21    THE WITNESS: I believe it was.
22    BY MR. WIMBERLY:
23    Q. Was it shortly before?
24    A. It was before this memo was written
25  because if I had already have known this memo was

---

**108**

1  written I certainly would not have taken more trouble
2  to do more work for free for Fannie Mae for nothing.
3    Q. Why did you resend it then to Mr. Jones in
4  February 2002?
5    A. I don't know, don't recall.
6    MR. WISER: Object to the form of the
7  question.
8    BY MR. WIMBERLY:
9    Q. Did somebody ask you to do that?
10    A. I don't recall.
11    Q. You are familiar with Mr. Nick Wiser?
12    A. Yes, I am.
13    Q. Who has been relatively vocal today?
14    A. Am I familiar with Mr. Wiser?
15    Q. Yes, ma'am?
16    A. Yes, I am.
17    Q. And how are you familiar with Mr. Wiser?
18    A. I'm familiar with Mr. Wiser because he
19  represents Bob Jones.
20    Q. How long have you known Mr. Wiser?
21    A. I don't recall exactly.
22    Q. You have a general recollection?
23    A. After 1998 and before today.
24    Q. Ms. Williams, I appreciate that it's
25  difficult to be sitting here answering questions, but

---

**109**

1  if you could think --
2    A. I just don't recall.
3    Q. -- try to help --
4    A. If you had an approximate date that you
5  might want to throw out there.
6    Q. I do, I do.
7    A. That would be great. And then I can
8  respond to it.
9    Q. Okay, let me -- I'll go there. Did you,
10  did you first meet Mr. Wiser before or after August
11  2001?
12    MR. WISER: I'm going to object to that
13  question and I want to find out where you are going
14  on this in terms of the scope of the order. Is it
15  your contention that the statement that I took of
16  Miss Williams constitutes the, where was the language
17  on that? The release of confidential information?
18  Because that was never, ever represented to the judge
19  as grounds for wanting to conduct her deposition
20  earlier. And I'm not saying that you are, I'm just
21  asking because that sounds like the direction you are
22  going.
23    MR. WIMBERLY: Do you want me to tell you
24  what my contention is, Mr. Wiser? I can do it now or
25  later.

---

28 (Pages 106 to 109)

Marialice Williams                                                      March 17, 2003
                          Washington, DC

110

1    MR. WISER: If you want. Well, go ahead.
2  Tell me what your contention is and let me see if I
3  think it comes under the order.
4    MR. WIMBERLY: My contention is that the
5  e-mail that's the subject of the order, which is
6  Exhibit 4, regarding the confidential source, is
7  addressed to you, Nick. That's the "Nick." And there
8  is a CC to you. I assume there is no controversy
9  that you are the Nick referred to there, correct?
10    MR. WISER: I don't think there is any
11  dispute about that.
12    MR. WIMBERLY: And Bob Jones is the author
13  of this, correct?
14    MR. WISER: Okay.
15    MR. WIMBERLY: And it says "Bob Jones
16  wrote: Nick," so it's a memo to you. And that's
17  where the confidential source comment is.
18    MR. WISER: Right.
19    MR. WIMBERLY: And it's got a date and
20  that's what we are discussing. And you just
21  unfortunately are in the middle of this because the
22  e-mail is addressed to you. I don't know how else to
23  say it. Maybe -- I think I used the word contention
24  because you did. That is certainly the foundation
25  for the question; it's perfectly within that scope of

112

1    A.  No.
2    Q.  And the statement was given when? August
3  2001?
4    A.  If you show me the statement and I can say
5  yes, I know that's when it was. You really --
6    Q.  Did you talk to Mr. Wiser between June 6th
7  and the time you gave your statement, Ms. Williams?
8  I appreciate your --
9    A.  No. I did not. I did not talk to him. I
10  never met him until the statement.
11    Q.  You did not talk to him at all?
12    A.  No. I did not. Not to my knowledge.
13    Q.  For the record, the statement is dated
14  August 8, 2001. Is that --
15    A.  That's when I met Mr. Wiser.
16    Q.  For the first time?
17    A.  For the first time.
18    Q.  Had you talked to him before then?
19    A.  I do not believe that I did.
20    Q.  Well then how did you get arrangements
21  made to take the statement?
22    A.  Bob Jones called me and asked me if I
23  would do it and I said I would.
24    Q.  And after the statement, that's August
25  8th, 2001. Let's just mark that in time,

111

1  this order. Somebody's phone is ringing.
2    MR. WISER: Oh, it's mine. Could we go
3  off the record?
4    MR. WIMBERLY: Can we go off the record?
5    THE VIDEOGRAPHER: Time is 3:55. We are
6  going off the record.
7    (Discussion off the record.)
8    THE VIDEOGRAPHER: The time is 3:56:05.
9  We are back on the record.
10    BY MR. WIMBERLY:
11    Q.  Okay, Ms. Williams. There is a question
12  pending as to when you first met Mr. Wiser. And I
13  just gave you a time frame. Just mark in August
14  2001, the magic of that is that's when the original
15  complaint was filed by Mr. Wiser on behalf of his
16  client.
17    A.  I believe I spoke to Mr. Wiser for the
18  first time before the suit was filed.
19    Q.  And that, would that not have been when
20  you gave your statement that had a court reporter?
21    A.  I gave a statement. Yes. Fannie Mae was
22  not a party to, contemplated to be a party to that
23  suit as I understood it.
24    Q.  And they were not present in any form at
25  the statement, right?

113

1  Ms. Williams. Between then and June 6, 2001, did you
2  have any occasion to talk to Nick Wiser?
3    A.  I believe he sent me a copy of --
4    Q.  I'm sorry. I messed this up. I meant to
5  go in the other direction. I misspoke. It's getting
6  late.
7    A.  That's okay. I'm going both ways --
8    Q.  It's getting late. After August 8th,
9  2001, did you have occasion to talk to Mr. Wiser?
10    A.  We, we may have had some discussion about
11  my statement because I did read my statement over.
12  But I don't, we had no other conversation other than
13  that that I can recall.
14    Q.  But you had a conversation concerning your
15  statement?
16    A.  Yes. He sent me my statement and just --
17    Q.  When did he send you the statement?
18    A.  Shortly after it was taken. The
19  statement.
20    Q.  So would that have been in August or
21  September? What do you mean as shortly?
22    MR. WISER: I object to the form of the
23  question.
24    THE WITNESS: I don't recall the exact
25  time, but it was shortly, it was not too long after

29 (Pages 110 to 113)

Marialice Williams                                                      March 17, 2003
Washington, DC

114

1  the statement was taken.
2       BY MR. WIMBERLY:
3       Q.   And what did you discuss?
4       MR. WISER:  Object to the form of the
5  question.
6       THE WITNESS:  Where I may have misspoken
7  and wanted some words changed and I don't believe
8  this was very much of that at all.  Maybe one or two
9  places.  And I don't remember that they were
10  particularly substantive issues.
11      BY MR. WIMBERLY:
12      Q.   You don't remember what they were?
13      A.   I really don't.
14      Q.   How long was the conversation?
15      MR. WISER:  Object to the form of the
16  question.
17      THE WITNESS:  Five minutes maybe if that
18  long.
19      BY MR. WIMBERLY:
20      Q.   Did you have any subsequent conversations
21  with Mr. Wiser?
22      A.   I don't believe I did.
23      Q.   Did you have any conversation with
24  Mr. Jones after you gave your statement?
25      A.   Yes.  I believe I spoke with -- let's see;

116

1       BY MR. WIMBERLY:
2       Q.   Did you know he was going to do that?
3       A.   No.  And if I had, I would have told him
4  not to.
5       Q.   And why is that?
6       MR. WISER:  Object to the form of the
7  question.
8       THE WITNESS:  Because Betty Dance is my
9  friend and close personal confidant.  And the last
10  thing on this earth I would want to do is harm my
11  friend.
12      BY MR. WIMBERLY:
13      Q.   And what do you think would have happened
14  to Betty Dance?
15      MR. WISER:  Object to the form of the
16  question.
17      MR. WIMBERLY:  Counselor, not only is it
18  outrageous that you continue to object to the form of
19  the question when you are not her lawyer, but
20  objecting in the middle of my questions is -- a
21  speaking objective in a most offensive form.  Okay?
22  It's signaling the witness.
23      MR. WISER:  That is absolutely absurd, and
24  if you would not pause for 30 seconds at a time I
25  might be able to tell that you had finished a

115

1  that was August of 2001?
2       Q.   That's right.  August 8th, 2001 is the
3  date of the statement.
4       A.   I do not recall having any discussions
5  with Mr. Jones after the statement about -- and we
6  may have talked about, remember, I was trying to
7  still run a business, and from time to time because
8  Bob is an expert in a field that only he and I are
9  experts in, sometimes I had to call and ask him a
10  question related to something totally unrelated to
11  Fannie Mae.  I did have other business.
12      Q.   Did you talk to him about Fannie Mae after
13  August 8, 2001?
14      A.   Prob -- not much.  No.  Only about if it
15  was about Fannie Mae, it was only because a DUS
16  lender would have called me and asked me to do
17  something, and I've called Bob and asked him if maybe
18  if some insurance company might have an interest.  I
19  just, we just didn't have much, you know, discussion
20  together.
21      Q.   Did you know that prior to the date of
22  this, let's say, prior to June 6th, 2001, that Jones
23  was going to send this e-mail to Mr. Wiser?
24      MR. WISER:  Object to the form of the
25  question.

117

1  question.  I thought you were through with it.  I can
2  object to any question that I want to regardless of
3  whether the witness is my client or not, I think and
4  I'm very, very liberal about the fact that you are
5  way outside the scope of the order.
6       BY MR. WIMBERLY:
7       Q.   Let's get back.  Because I think the
8  witness is entitled to answer the question that is
9  pending about Betty Dance.  And my question is what
10  do you think would happen to Betty Dance with this
11  kind of communication?
12      MR. WISER:  Object to the form of the
13  question.
14      THE WITNESS:  I was afraid she would get
15  into difficulty for sending it to me.
16      BY MR. WIMBERLY:
17      Q.   Why were you afraid she would get into
18  difficulty for sending it?
19      A.   Because she sent it to me knowing that I
20  needed to know that answer and I should not have sent
21  it to Bob Jones.
22      Q.   Well, isn't it a fact that she sent it to
23  you knowing that she was violating her code of
24  conduct?
25      A.   I don't know what Betty knows.

30 (Pages 114 to 117)

Marialice Williams

Washington, DC

March 17, 2003

---

**118**

1    MR. WISER: Object to the form of the
2  question.
3    THE REPORTER: Sorry, I didn't hear the
4  answer.
5    THE WITNESS: I said I don't know what
6  Betty knows. I just know that she is my friend and
7  she knew my pain. And she knew who caused it and she
8  wanted to see it stop.
9    BY MR. WIMBERLY:
10   Q.  You said that, you said: "I should not
11  have sent it to Bob Jones."  Why do you say that?
12   A.  Because if I had known it was going to
13  wind up in your hands I certainly wouldn't have sent
14  it to him.
15   Q.  And why is that?
16   A.  Because now a perfectly innocent party who
17  was doing something she thought was her Christian
18  duty to do is going to wind up possibly paying a
19  price for me. And none of us have anything to gain
20  from this.
21   Q.  Ms. Williams, I appreciate that answer.
22   A.  Well, then take that look off your face.
23  Yours is offensive to me as mine may be to you.
24   Q.  I know it's heartfelt. But let me, let me
25  explain something. CAM Financial has sued my client

---

**119**

1  for $300 million, and they have also sued some of the
2  other parties you see here at this table.  We are
3  here because of a very significant lawsuit, and
4  Ms. Williams, you gave an ex parte statement --
5    A.  When your client was not a party to the
6  action.
7    Q.  Miss Williams, let me finish. I want to
8  explain my position --
9    A.  I understand your position.
10   Q.  Help you understand where I am coming
11  from?
12   A.  Please don't condescend to me. I am an
13  adult, I am 57 years old and I'm licensed to practice
14  law. Please address me in that manner.
15   Q.  Then you under -- fine. Then you -- I'm
16  sorry if you think -- I didn't mean to condescend to
17  you, Ms. Williams.
18     The problem that I face and the problem my
19  client faces and what the other parties in this
20  lawsuit face is that we have got an e-mail here that
21  I didn't know existed until I got it from CAM through
22  their production, and that's why it's got their
23  number on it, that -- that says that you have
24  received copies from a "confidential source," quote,
25  unquote, regarding some Fannie Mae e-mail between

---

**120**

1  several Fannie Mae corporate officers recommending
2  giving this project to Craig Ott, and not through
3  her.
4    And then it goes on to say we are
5  proceeding with her clients as if we know nothing
6  about this.  Well, that strikes me as surreptitious
7  and underhanded, and this kind of language suggests
8  that people are stealing stuff and doing stuff they
9  are not supposed to do.  That's what I'm questioning.
10  And you can help us understand that that's not the
11  case by answering questions.
12    MR. WISER: Object to the form of the
13  statement.
14    THE WITNESS: Excuse me. Excuse me.  You
15  have raised a number of issues. First of which is
16  absolutely attacking me as an individual with respect
17  to what I did with this information.  And you are
18  making it seem as if the $300 million to which CAM is
19  probably entitled, though I get nothing from it, and
20  though CAM left me holding the bag, just like Fannie
21  Mae did --
22    BY MR. WIMBERLY:
23    Q.  Move to --
24    A.  If you are going to continue to do that,
25  then I'm going to continue to tell you that there is

---

**121**

1  no one more surreptitious than the people I worked
2  with at Fannie Mae, who stole my concept --
3    Q.  Ms. Williams?
4    A.  -- would never let me have an award to
5  myself because --
6    Q.  Move to strike.
7    A.  -- Richard Lawch hated me.
8    Q.  Move to strike the prior answer.
9    A.  And told me he was going to get around CAM
10  the minute I walked out the door.  And he did.
11    Q.  Ms. Williams let's get --
12    A.  Now, that's surreptitious.
13    Q.  Let's get back to the questions about this
14  e-mail. Again, I'm trying to explain what I'm
15  reading in this e-mail.
16    A.  And I'm trying to explain to you that when
17  I got this e-mail I did not know about the lawsuit
18  and Fannie Mae was not a party.  So stop referring to
19  it as me and Fannie Mae. Fannie Mae was not involved
20  in this lawsuit when I gave my statement.  This, this
21  was sent to me because I was being screwed.
22    Q.  Isn't it, but isn't it a fact,
23  Ms. Williams, based on your understanding of Fannie
24  Mae's policies on confidential information, that you
25  thought Betty Dance was giving you confidential

---

31 (Pages 118 to 121)

122

1   information and now that you see that it went to Bob
2   Jones, your reaction is it shouldn't have gone to Bob
3   Jones. That is your prior testimony. And that means
4   that Fannie Mae confidential information has gotten
5   to Bob Jones through this route.
6         MR. WISER: Object to the form of the
7   question.
8         THE WITNESS: And I believe what you just
9   said was, if you look at the testimony, I told you
10  that I did not believe that Betty Dance thought she
11  was sending it in confidence. I explained to you
12  that I'm not sure that Fannie -- that Betty Dance
13  knows what the limits of confidentiality are. She
14  sent it to me because she was concerned about me.
15        I in turn mentioned it to Bob so that we
16  could just forget working with Fannie Mae, despite
17  the fact that we had spent an enormous amount of
18  money and an enormous amount of time trying to make
19  something out of nothing. For which Fannie Mae has
20  been paid an extremely high amount of money.
21        BY MR. WIMBERLY:
22     Q.  Ms. Williams, we will get to those issues
23  on Friday. And I promise you, I have questions and
24  you'll be able to answer about the merits of the
25  case. But getting back --

123

1      A.  But you are asking me about the merits.
2   You are asking me to make a decision right here about
3   whether or not this is confidential, whether or not
4   this really meant they weren't going to do business.
5   Excuse me. That goes to the heart of the matter.
6   If -- you can interpret it however you want to
7   interpret it. I'm the one that worked at Fannie Mae
8   for nine years and I know darn well what it means.
9      Q.  Do you know when this document that you
10  got from the confidential source that we marked as
11  Exhibit 5 --
12     A.  It's not a confidential source. It's
13  Betty Dance. I wish you would refer to her in that
14  matter.
15     Q.  Ms. Williams, I appreciate you just
16  listening to the question and if you don't understand
17  it you can --
18     A.  I would appreciate your putting your hand
19  down.
20     Q.  Do you know if, if this document that's
21  Exhibit 5 was given to Nick Wiser?
22     A.  I have no idea.
23     Q.  Do you have any reason to believe that it
24  was?
25     A.  He just handed it to you so I suppose he

124

1   had it.
2      Q.  And do you know when he got it?
3      A.  I have no idea.
4      Q.  Did Mr. Jones talk to you about that
5   e-mail after you sent it to him?
6      A.  No. He did not.
7      Q.  Did he talk to you about that e-mail after
8   you sent it to him a second time in this envelope
9   February 22, 2002?
10     A.  I'm sorry --
11        MR. WISER: Object to the form of the
12  question.
13        THE WITNESS: You reversed it. I did
14  speak to him as soon as I found out about it and told
15  him that we were being screwed. And I believe that
16  that was a sufficient conversation. If he asked me
17  for it, if I sent it to him later on, I just don't
18  recall what the circumstances were. But yes that's
19  obviously my handwriting and I did send it to Bob at
20  home.
21        BY MR. WIMBERLY:
22     Q.  Did he talk to you about whether he was
23  going to send it to anybody else?
24     A.  No, he did not.
25        MR. WISER: Object to the form of the

125

1   question.
2         BY MR. WIMBERLY:
3      Q.  So he didn't talk to you about sending it
4   to Nick Wiser?
5      A.  No. He did not.
6      Q.  What does this sentence, what does this
7   mean? He says: "We are proceeding with her clients
8   as if we know nothing about this," quote, unquote.
9   What does that mean?
10        MR. WISER: Object to the form of the
11  question.
12        THE WITNESS: He means that I had a number
13  of clients who happened to be Fannie Mae lenders.
14  And who were afraid to ask Fannie Mae directly if
15  they could do something and asked me to ask. And in
16  doing so, I called Bob and said is this a form of
17  insurance that we could use, do you
18  think, to lay off this upper layer, first tier loss
19  on Fannie Mae DUS loans?
20        As we looked at the product more, it
21  wasn't the first tier because there is a reserve
22  account that's required to be established with each
23  DUS loan. Therefore, we were really looking at
24  secondary and tertiary loan loss, and what we have
25  figured out is that if Fannie Mae and the DUS lender

32 (Pages 122 to 125)

Marialice Williams
                          Washington, DC                          March 17, 2003

---

126

1  could agree to go in together on this insurance, it
2  would be much cheaper. And those clients came to me
3  because they knew I had developed on my own the
4  credit risk insurance program with Bob Jones, so they
5  were confident that I would be able to design a
6  program for them that would not harm Fannie Mae but
7  in fact would shift the risk from Fannie Mae to a
8  third party. That's why if you look at this other
9  memo, you will understand why --
10       BY MR. WIMBERLY:
11       Q.   Which one are you talking about?
12       A.   -- the risk-based capital number five is
13  such a critical issue. Because the Ofheo is too dumb
14  to know the real risk exposure that Fannie Mae has
15  under risk-based capital rules, Fannie Mae is able to
16  get away with not requiring third party -- that there
17  be some additional layoff of some of this risk.
18       But those of us who are intelligent enough
19  to be able to understand what the true risk is
20  realize that Fannie Mae needs this program but if she
21  is not required to do it by Ofheo, she is not going
22  to do it regardless of whether it even benefits her
23  own customers and they are crying for relief because
24  of their own RBC rules. Ask Red Capital. They will
25  tell you.

---

127

1       Q.   I promise not to put my hand up if you'll
2  promise not to poke your finger at me.
3       We have got just a couple minutes left on
4  the videotape so we are going to break for a minute
5  while he changes the tape, Ms. Williams.
6       THE VIDEOGRAPHER: The time is 4:14:36.
7  We are going off the record. This is the end of tape
8  number one. Going on to tape number two.
9       (Recess.)
10       THE VIDEOGRAPHER: The time is 4:33:44.
11  This is the beginning of tape number two and we are
12  back on the record.
13       BY MR. WIMBERLY:
14       Q.   Ms. Williams, I'm going to hand you a set
15  of documents that I'd just like to mark en globo as
16  Exhibit 6 for the record and you don't have to read
17  all of them completely through. I'd just ask you to
18  get a basic familiarity with what's there and I have
19  a few questions for you.
20            (Exhibit No. 6 was marked
21             for identification.)
22       BY MR. WIMBERLY:
23       Q.   For the record, these are several
24  documents, most of which came from CAM's records,
25  that were produced in this litigation and hence they

---

128

1  bear CAM Bates numbers. The top three pages are
2  Fannie Mae documents, and please let me know when you
3  are finished reviewing that.
4       The top document, Ms. Williams, is an
5  e-mail from you, is it not, dated September 4, 1998?
6       A.   Yes, it is.
7       Q.   And that was after you had left Fannie
8  Mae?
9       A.   Correct.
10       Q.   And it is an e-mail on top of a string of
11  e-mails. Do you see the e-mails from the second
12  e-mail down at the bottom of the page, all of them
13  dated April 8, 1998? Do you see that?
14       A.   Yes.
15       Q.   Now, how did you obtain these April 8
16  e-mails in order to be transmitting them under your
17  e-mail dated September 4, 1998?
18       A.   I'm sorry. You are talking about the top
19  page?
20       Q.   Right. I'm just saying, how did you
21  obtain them?
22       A.   I believe it's a message to Richard Lawch
23  that I wrote.
24       Q.   But you attached these April 8 e-mails,
25  did you not?

---

129

1       A.   It looks like a series of e-mails back and
2  forth to me.
3       Q.   Right. To you as the, it looks like that
4  in your perception or it looks like that to you? I
5  don't want to misunderstand what you are saying?
6       A.   I believe it says author, Marialice
7  Williams. It says to Richard Lawch Rhoda Newman and
8  Alan Greenwald.
9       Q.   And that's the September 4, 1998 e-mail?
10       A.   Right.
11       Q.   Okay. And the first April 8 e-mail is
12  authored by Alan Greenwald, correct?
13       A.   Well, it looks to me as if the first
14  e-mail is April 8th at 4:18 p.m. from me.
15       Q.   Right. That's the one right at the
16  bottom, right?
17       A.   Right.
18       Q.   And then the second e-mail is from Alan
19  Greenwald?
20       A.   Right. He works at Fannie Mae.
21       Q.   And the third one is from you, is that
22  correct?
23       A.   Yes.
24       Q.   Also dated April 8, 1998, correct?
25       A.   Right.

---

33 (Pages 126 to 129)

Marialice Williams
Washington, DC
March 17, 2003

130

1    Q.   And then the next one is April 8, 1988
2   from Alan Greenwald?
3    A.   Yes.
4    Q.   And then did you not attach those e-mails
5   to your e-mail at the top dated September 4, 1998?
6    A.   I guess.  Yes.  That's what it looks like
7   to me.
8    Q.   Now, how did you obtain those e-mails that
9   you attached to your September 4 e-mail?
10       MR. WISER: I'm going to object to the
11  form of the question.
12       THE WITNESS: I'm not sure I'm
13  understanding what you are asking me.
14       BY MR. WIMBERLY:
15   Q.   How did you obtain them?
16   A.   Someone sent them to me.
17   Q.   And so is it fair to say that you had
18  copies of these in your e-mail data bank in order to
19  be able to attach them to --
20   A.   This is a 1998.  My computer didn't crash
21  until much later.
22   Q.   I understand that, Ms. Williams.  My
23  question is only is it fair to say, therefore, that
24  these April 8 e-mails were in your possession as of
25  September 4, 1998?

131

1        MR. WISER: Object to the form of the
2   question.
3        MR. WIMBERLY: What's wrong with the form
4   of the question?
5        THE WITNESS: I don't even know what you
6   are asking me, so I guess I'm getting confused.
7        MR. WISER: What's wrong with the question
8   is it's misleading.  I would say what the deal is but
9   I don't want to be accused of a speaking objection.
10       MR. WIMBERLY: Thank you.
11       MR. WISER: However, you know --
12       MR. WIMBERLY: You can't resist.
13       MR. WISER: I can't resist.  I object to
14  the form of the question because it doesn't make any
15  sense what you are asking in relation to what this
16  is.
17       BY MR. WIMBERLY:
18   Q.   Ms. Williams, I can restate it if it
19  doesn't -- if I'm confusing you.
20   A.   I'm sorry.  Is there a question because
21  I'm not sure what your question is.
22   Q.   I don't mean to be confusing.  I'm trying
23  to understand this document and the e-mails.  And --
24   A.   The e-mails that I received, and that's
25  it.

132

1    Q.   That's one answer.  And you received them
2   in April of 1998?  Is that correct?
3    A.   Yes.  But you also may not know that my
4   computer didn't always have the right date, so I
5   don't know whether this is correct.  I don't know
6   what you are asking me.
7    Q.   I'm just -- well --
8    A.   What is the point?  If you could help me
9   with the point then maybe I could give you the
10  answer.
11   Q.   Ms. Williams, I'll try to ask the right
12  questions, but sometimes I won't get it right so you
13  have to forgive me?
14   A.   Well, you are getting paid a lot of money
15  to get it right.
16   Q.   Thank you, Mrs. Williams.
17   A.   And wasting a lot of my time getting it
18  wrong.
19   Q.   I do apologize but so we can get done
20  today, bear with me.  These April 8 e-mails were
21  available to you on September 4 so that you could
22  attach them to your September 4 e-mail, is that not
23  correct?
24       MR. WISER: Object to the form of the
25  question.

133

1        THE WITNESS: I don't -- I got some
2   e-mails and then I forwarded them to some people at
3   Fannie Mae.  Is that what you want to know?  That's
4   what I did.
5        BY MR. WIMBERLY:
6    Q.   That's an answer.  Thank you.  And how did
7   you get these e-mails?
8    A.   They were sent to me.
9    Q.   And when were they sent to you?
10   A.   On the dates that were indicated here.
11   Q.   And the dates indicated were what?
12   A.   Oh you really just -- April 4th, 1998 at
13  4:18 p.m., it doesn't say p.m.  April 8th, 1998 at
14  4:43 p.m., April 8th, 1998 at 6:47 p.m., and the last
15  one from Alan Greenwald, April 8th, 1998 at 6:54 p.m.
16  and then the one on the top, priority normal, to --
17  I don't even know if that's a correct date on that.
18  And I don't even remember what this is about and I
19  have no idea.  Sorry.
20   Q.   Those dates were dates when you were
21  employed by Fannie Mae, is that not correct?
22   A.   Not September 4th.  No.
23   Q.   The dates under April 8th were dates when
24  you were employed by Fanny Mae, is that correct?
25   A.   Yes, it is.

34 (Pages 130 to 133)

Marialice Williams                                                      March 17, 2003
                              Washington, DC

---

134

1     Q.   All these dates and times other than the
2  top e-mail date of September 4th --
3     A.   Correct.
4     Q.   -- those were times when you were at
5  Fannie Mae, correct?
6     A.   Correct.
7     Q.   You were not employed by Fannie Mae on
8  September 4?
9     A.   That's correct.
10    Q.   Correct?  Turn the page, Ms. Williams.
11       MR. WISER:  Before you ask a question, did
12  you make this an exhibit?
13       MR. WIMBERLY:  I just put it all en globo.
14  It's number 6.
15       MR. WISER:  Does it have a number?
16       MR. WIMBERLY:  It has number 6.  I need a
17  stamp for that.  This is Exhibit 6.
18       MR. WISER:  Okay.
19       BY MR. WIMBERLY:
20    Q.   Are you looking at the second page of that
21  exhibit?
22    A.   Yes, I am.
23    Q.   And that is what?  What is this document?
24    A.   I believe these are e-mails.  One is dated
25  February 6th, 1998.  One is dated February 6, 1998.

---

135

1  And this one is September 2nd, '98.  This is a
2  mistake.  It wasn't -- that's the incorrect date.
3     Q.   What is incorrect, September 2nd?
4     A.   September 2nd.  I believe that -- it's
5  probably the same thing with September 4th.  It must
6  have been my computer that was off on date time,
7  because there is no reason why I would have these
8  e-mails and I'm not at Fannie Mae.
9       MS. WILLIAMS:  Can I ask you -- what --
10       THE WITNESS:  Yes.  See this is Fannie
11  Mae.  See that FM-FS3?  Those are sent to me at
12  Fannie Mae.  I was not at Fannie Mae on September
13  2nd; I had no way to get to any e-mail at Fannie Mae
14  on the second of September.  So that must be a
15  mistake in the computer.  That's happened to me
16  before.  Has that ever happened to you?
17       BY MR. WIMBERLY:
18    Q.   Ms. Williams, there might be a time when
19  you can ask me questions.  But it will move quicker
20  if you let me ask the questions.  I appreciate your
21  answer --
22    A.   My computer was incorrect.  You are making
23  some assumption about these two dates.  I was not --
24  these are the incorrect dates.  Jesus!
25    Q.   So what would be the correct date?

---

136

1     A.   I don't know.  I don't know.
2     Q.   But your computer hadn't had its problem?
3     A.   Fannie Mae is in possession of my
4  computer.  You should ask them to go and look at it.
5  I do know that it happened to more than me.  Fannie
6  Mae had notorious computer problems in 1998 and prior
7  to that.  So you might want to check with them
8  because it doesn't even make sense that I answered
9  these in September.
10    Q.   Okay, Ms. Williams.  Would you turn to the
11  next --
12    A.   Yes.
13    Q.   -- document?
14    A.   Uh-hmmm.
15    Q.   Do you see this document?  What is it?
16       MR. WISER:  Would you say which document?
17  Give me the Bates number.
18       BY MR. WIMBERLY:
19    Q.   I am -- I'm sorry.  It's Bates number
20  5642.
21    A.   Okay.
22    Q.   For the record, the first document we
23  talked about for this exhibit was Fannie Mae 2902,
24  and then the next one was Fannie Mae 12695 to 12696.
25       Ms. Williams, I would appreciate it if you

---

137

1  would --
2     A.   You have asides with that gentleman all
3  the time.  My attorney was trying to ask me a
4  question and I was simply trying to respond to her.
5  I am fully attentive to what you are saying so far as
6  you are clear.
7     Q.   Ms. Williams, if you would just look at
8  the document.  I just asked you to identify it.
9     A.   It's a memorandum from me to Lou Hoyes
10  about multifamily mortgage pool credit risk
11  insurance.
12    Q.   Do you know do you know why CAM has a copy
13  of this document?
14    A.   Probably because I had to sent it to them
15  in draft to -- you see the date on here, 1996?  This
16  is at the very beginning, and unless I was going
17  to -- I am not, at that time was not a licensed
18  insurance broker, and knew nothing about credit risk
19  insurance or any other form of insurance?
20       And whenever I wrote things, I would
21  have -- or often when I wrote things I would have to
22  run them through CAM to make certain that those, that
23  my, that I was saying things properly from the
24  insurance perspective; and at that time, CAM was
25  under a confidentiality agreement with Fannie Mae

---

35 (Pages 134 to 137)

**138**

1  that enabled me to have conversations with them about
2  internal Fannie Mae business.
3      Q.   What confidentiality agreement? The time
4  being December 3, 1996, correct? What
5  confidentiality agreement are you referring to?
6      A.   I don't know. The one that I believe was
7  signed between Fannie Mae and CAM.
8      Q.   Would it surprise you if I told you there
9  is no confidentiality agreement?
10     A.   It really would.
11     Q.   Because I have not seen a confidentiality
12 agreement effective on December 3rd, 1996 or at any
13 time between Fannie Mae and CAM. Ms. Williams, there
14 is no confidentiality agreement.
15     A.   And?
16          MR. WISER: I object to the statement.
17          BY MR. WIMBERLY:
18     Q.   Is that --
19     A.   How do you think this product got
20 developed? Fannie Mae didn't do it. CAM had to do
21 it. There was a personal relationship. There was a
22 joint venture, of sorts -- they had a joint document
23 they signed together. They had an agreement to do
24 business together.
25     Q.   But you don't know specifically about any

**139**

1  confidentiality agreement governing the relationship
2  between these two parties, do you?
3      A.   I simply know that I was directed to work
4  with CAM, and in working with CAM, I often asked them
5  if they would review things in advance of my giving
6  them to my superiors who knew absolutely nothing
7  about insurance, even less than I did, and therefore,
8  I, I often asked for their assistance. So that I
9  wouldn't be incorrect in what I was stating.
10     Q.   Ms. Williams, did you send this December
11 3, 1996 document to Bob Jones?
12     A.   I don't recall.
13     Q.   Do you have any reason to believe that you
14 didn't send it to him?
15          MR. WISER: Object to the form of the
16 question.
17          THE WITNESS: I don't recall.
18          BY MR. WIMBERLY:
19     Q.   Would you turn to the next document in the
20 same exhibit, Bates numbered 6860 and 6861. Those
21 are CAM Bates numbers, which means that these
22 documents came, this document came from CAM's
23 records. Do you see that?
24     A.   Yes, I do.
25     Q.   What is it?

**140**

1      A.   It is a memorandum to Lou Hoyes from
2  Marialice Williams describing the closing of a
3  $92 million multifamily small loan MBS with
4  Metropolitan Savings Bank of Cleveland, Ohio, using
5  multifamily credit risk insurance as the recourse
6  collateral alternative.
7      Q.   Now please turn back to the December 3,
8  1996 memo.
9          MR. WISER: 5642?
10         MR. WIMBERLY: Yes, 5642 and 5643.
11         BY MR. WIMBERLY:
12     Q.   Do you see anywhere in here an indication
13 that CAM was sent this document? Excuse me. Let me
14 strike that. Is this document addressed to CAM or
15 any of its principals?
16     A.   The December 3rd 1996 memo?
17     Q.   Yes. December 3rd, 1996?
18     A.   Do you see CAM listed here? It says, to me
19 it says Lou Hoyes. I just answered that.
20     Q.   CAM is not indicated to be the addressee
21 of this memo?
22     A.   No. They are mentioned in this document.
23     Q.   They are mentioned in the document. Where
24 are they mentioned in the document? Right at the
25 end, is that --

**141**

1      A.   It says we have some measure of confidence
2  that we will have exclusivity for a period of time
3  because the broker is a company that currently does
4  originations for a DUS lender and has loyalty to
5  Fannie Mae.
6      Q.   And that, you're reading from the last
7  paragraph on page 5643.
8      A.   Yes.
9      Q.   There is no indication that CAM or any of
10 its principals was designated to receive a carbon
11 copy. Otherwise known as cc?
12     A.   I mentioned to you just two seconds ago
13 that there were times when, because of my lack of
14 experience in the insurance world, I let CAM review
15 things so that they were absolutely correct. It is a
16 very important thing at Fannie Mae that you cannot
17 get your superior into difficulty by misstating the
18 facts.
19         I do not know, I did not know a great deal
20 of this information in here until discussion with
21 Fannie Mae -- with CAM Financial.
22         Do you know what product development is?
23     Q.   Ms. Williams, let's get --
24     A.   No, I'm asking you because I have to
25 explain this in that context.

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Marialice Williams

Washington, DC

March 17, 2003

142

1    Q.  Let's get --

2    A.  That's what the process of product

3  development is.

4    Q.  So how does it --

5    A.  CAM Financial came into Fannie Mae.

6  Wanted to develop a product. My boss authorized me

7  to work with CAM Financial. It is not unusual that

8  people share information from Fannie Mae with those

9  with whom it is contemplating doing business.

10    Q.  Was it --

11    A.  And the reason for that is so that

12  everyone can be on the same page. It's the essence

13  of product development. And that is why I utilized

14  CAM as an outside source of information, just as I

15  also often talked to AIG and many other insurance

16  companies, and we had to provide information to get

17  information correct.

18    Q.  Now, if you turn to the next one that you

19  looked at earlier, August 26th, 1997, do you see CAM

20  indicated anywhere in here as an addressee or on the

21  cc, as a carbon copy recipient?

22    A.  No. I don't. This is public information

23  at this point.

24    Q.  Did Lou Hoyes give you or anybody

25  permission to send the December 3, 1996 document to

143

1  CAM?

2        MR. WISER: Object to the form of the

3  question.

4        THE WITNESS: Fannie Mae, Lou Hoyes, the

5  public information office, the attorneys, Paul,

6  David, and at the end, Kathy Miles all shared

7  information with CAM Financial as it was required in

8  order to complete the product development.

9        BY MR. WIMBERLY:

10    Q.  But you don't have --

11    A.  No one gave me permission because it was

12  de rigueur. It was the way you did product

13  development.

14    Q.  You probably need to spell that for the

15  court reporter.

16    A.  Oh, I suspect she is probably smarter than

17  we all are.

18    Q.  I think you are probably right. So is the

19  answer the same for August 26th?

20    A.  Everything else in here.

21    Q.  Everything else being the entire --

22    A.  Anything else in here.

23    Q.  -- the entire set of documents?

24    A.  If you had notes on a telephone conference

25  with AIG and CAM Financial, wouldn't --

144

1        MR. WIMBERLY: Counsel, would you ask your

2  client to -- otherwise we'll never get done. Not

3  today.

4        THE WITNESS: Because you can't get to the

5  point.

6        MR. WISER: And I'm going to object to her

7  answer to the extent she has not reviewed every

8  document in the packet.

9        MR. WIMBERLY: She has reviewed it. She's

10  reviewing it right now, Mr. Wiser.

11        MR. WISER: At the very beginning you gave

12  her packet and you said you don't have to review

13  all this right now. If she's going to answer and

14  answer in globo, rather than --

15        MR. WIMBERLY: She --

16        MR. WISER: -- as you examine the

17  documents -- if I could finish, please. Then I'm

18  just objecting to that extent.

19        MR. WIMBERLY: She just stated that every

20  document in here which implied, necessarily implied

21  she has looked at them sufficiently to testify. So --

22        MR. WISER: I just made my objection for

23  the record.

24        BY MR. WIMBERLY:

25    Q.  Would you like to take a look at any of

145

1  these, further?

2    A.  If you tell me which ones you are going to

3  ask me about I'll know which ones to look at.

4    Q.  I'll ask you about every one of them.

5    A.  Well then we can't get to it today because

6  there is quite a few of them.

7        MS. WILLIAMS: Marialice --

8        BY MR. WIMBERLY:

9    Q.  Well, Marialice, we are going to be here

10  until three hours is up.

11    A.  And then I want you to call the Mayor of

12  the District of Columbia right now, and tell him I

13  can't prepare his budget because you have to go

14  through each one of these documents. I was told I

15  would be here -- just a minute -- from 1 to 4.

16        I was told I would be here from 1 to 4.

17  You couldn't get the equipment done in time. You

18  lawyers kept arguing all through the whole thing. It

19  is not my fault that you can't get your act together.

20  Now, you cannot ask me, who is not getting paid

21  through any of this, to help you out, to go through

22  these documents at a time when something more

23  important, the absolute homelessness situation in the

24  District of Columbia needs to be resolved, and I'm

25  responsible for a major part of it. And that's why I

37 (Pages 142 to 145)

Marialice Williams                                                    March 17, 2003
                        Washington, DC

---

**146**

1  need to leave.
2       MR. WIMBERLY: Ms. Williams, would you
3  please caution your client to listen to the questions
4  and just respond to the questions so that we can move
5  efficiently.
6       THE WITNESS: Then why don't you ask them
7  fast instead of asking me the same question over and
8  over?
9       MS. WILLIAMS: Marialice --
10      THE WITNESS: What do you want to know
11  about these documents? I have already told you.
12      BY MR. WIMBERLY:
13   Q.   I want to know if anybody gave you
14  permission --
15      THE WITNESS: Where does fairness come in
16  on my part, Julia? Why do I have to sit here after they
17  told me three hours?
18      BY MR. WIMBERLY:
19   Q.   -- you or anybody else to provide these
20  documents to CAM, because CAM had them in their
21  possession?
22   A.   Yes. They did tell me.
23   Q.   And you answered it was all part of a
24  bunch of things?
25   A.   Not a bunch of things. It was part of a

---

**147**

1  product development process.
2   Q.   Okay, a process?
3   A.   Which involves multiple, multiple billions
4  of dollars.
5   Q.   But you don't have any, you can't point to
6  any specific permission given for any of these
7  particular documents, correct?
8   A.   Yes, I can.
9   Q.   And what is it?
10   A.   I was given approval by Richard Lawch to
11  work with Bob Jones. Working with Bob Jones means
12  putting together a product. Putting together a
13  product means getting the information correct to give
14  to someone about the product.
15   Q.   Mr. Lawch didn't tell you to send these
16  particular documents to Bob Jones, did he?
17      MR. WISER: Object to the form
18  of the question.
19      THE WITNESS: Excuse me. It says
20  attendees on here.
21      BY MR. WIMBERLY:
22   Q.   Ms. Williams, I'm trying to --
23   A.   No --
24   Q.   I'm trying to --
25   A.   -- Richard Lawch did not say "Today,

---

**148**

1  Marialice, I'm going to pay attention to what you are
2  doing, and I'm going to tell you to send something."
3  No. He told me to get the job done and I got the job
4  done. Now if it was incorrect to send these things
5  then someone should have told me. Richard and all of
6  Fannie Mae was fully aware that I was working with
7  Bob Jones at all times. I was on the phone as many
8  as three and hour hours a day with Bob Jones.
9  Richard Lawch knew of all of that discussion.
10      No. He did not say Marialice, do not send
11  the message on August 27th, 1997 to make sure it's
12  correct to Bob Jones before you send it to Lou Hoyes
13  so we won't look like idiots. No. He did not say
14  that to me. I was a director at Fannie Mae and it
15  gave me sufficient authority to be able to act within
16  the scope of that and get a project done.
17   Q.   But as a director at Fannie Mae, you did
18  not have specific authority to release confidential
19  information?
20   A.   Yes, I did. It was not confidential.
21      It was information that was necessary to
22  develop a product -- and that was my job.
23   Q.   I understand.
24   A.   Now stop badgering me about these memos.
25   Q.   You didn't have specific authorization to

---

**149**

1  release any document that was --
2   A.   Yes, I did.
3   Q.   -- that was characterized --
4   A.   Yes I did.
5   Q.   -- that was classified as confidential
6  information?
7   A.   Yes I did.
8      MR. WISER: Object to the form of the
9  question.
10      THE WITNESS: Yes I did. That's my
11  answer. Go on to the next question so we can get out
12  of here.
13      BY MR. WIMBERLY:
14   Q.   On what do you base that?
15      MR. WIMBERLY: Counselor, would you please
16  -- would you please --
17      MS. WILLIAMS: Marialice --
18      THE WITNESS: Would you please tell him to
19  stop badgering me about all these questions? He's
20  repeating himself.
21      MR. WIMBERLY: If she needs a break --
22      THE WITNESS: Yes. I need a break. I
23  need a break until Friday because I cannot stay here.
24  I have had to go to all kinds of things to get rid of
25  these issues with Fannie Mae and you are just making

---

Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Marialice Williams                                                          March 17, 2003
                            Washington, DC

```
                                              150
```

1  it all worse.  You are not even prepared and you want
2  to turn around and badger me about some crap that's
3  so unimportant, and so insignificant, and you and
4  everybody else at Fannie Mae knows that this is the
5  way you do product development.
6        Now you get somebody at Fannie Mae to say
7  that's not the way it's done.  And stop whispering in
8  front of me.  That's rude.
9        Now, you can go get a goddamn subpoena and
10  force me to come back here, but I'm going to go help
11  the District of Columbia's homeless and you can do
12  what you need to do.
13        (Witness leaves the deposition room.)
14        MR. WIMBERLY:  I think it's safely to say
15  we are break --
16        MR. WISER:  Shall we recess?
17        MR. LEECH:  Let's get the time.
18        MR. WIMBERLY:  What time is it?
19        THE VIDEOGRAPHER:  Time is now 4:58:27.
20        MR. WIMBERLY:  We can work this out any
21  way you want.
22        MR. WISER:  Let's stay on the record.
23        MR. WIMBERLY:  This is on the record.  The
24  witness has obviously reached a state of mind and
25  emotion that indicates that we can't proceed, and she

```
                                              151
```

1  refuses to come back anyway, obviously.  So we are
2  going to need to break here and reconvene.  But I
3  reserve our right, my right to complete my three
4  hours and -- on a liberal calculation --
5        MR. LEECH:  I have got 123 minutes that
6  that have been used.
7        MR. WIMBERLY:  So that's about, that's two
8  hours.  So --
9        MR. LEECH:  You have got one more.
10        MR. WIMBERLY:  So I've got -- and I know
11  the plaintiffs are always precise.  That's 59
12  minutes.
13        (Laughter.)
14        MR. WISER:  Can I ask that the camera be
15  placed on Mr. Wimberly's face when he said that?
16  Because he couldn't hold it straight either.
17        MR. WIMBERLY:  I was teasing, Mr. Wiser.
18  So that the record reflects, I think we've had a good
19  -- had a day.  And so --
20        MS. WILLIAMS:  My client is gone for the
21  day.
22        MR. WISER:  I know; we gathered that.
23        MR. WIMBERLY:  You should stay here.  I
24  mean, we are on the record.
25        MR. WISER:  I have no objection to what

```
                                              152
```

1  you propose in terms of your additional hour.  I
2  don't know, I don't speak for either of the
3  Mrs. Williamses --
4        MS. WILLIAMS:  I didn't -- I don't know
5  what went on when I left the room.
6        MR. WIMBERLY:  And you don't have to.  I
7  just want to make sure you don't have an objection.
8  I reserve the time, and now I take it nobody else --
9        MR. WISER:  Why don't you explain to
10  Ms. Julia Williams what happened?
11        While you were out they counted out the
12  time of actual deposition which is like two hours.
13        MR. JONES:  It's two hours and three
14  minutes.
15        MR. WISER:  It's two hours and three
16  minutes.
17        MR. WIMBERLY:  Now, let me say though --
18        MR. WISER:  What he just asked is he wants
19  to reserve that additional hour that he didn't get
20  today, whenever he takes back up with Marialice, I
21  assume on Friday.
22        MR. WIMBERLY:  And let me make it clear,
23  Ms. Williams, because you were out of the room.  We
24  have got, I have got a three-hour block and I have
25  been trying to work with that, and she has left after

```
                                              153
```

1  123 minutes of testimony.  We have a flat, basic
2  objection to your client doing that.  It's contempt
3  of the subpoena.  But I don't want to burden the
4  record here with that stuff.  I want to say, though,
5  that --
6        MR. WISER:  You still are on the record.
7        MR. WIMBERLY:  I know.  I know, and I'm not
8  going to go on and on about this.  But I do object
9  strenuously to her departure, all right?
10        And so, but she is not here so there is
11  nothing we can do but cut this off.  But I would
12  appreciate it if you would do what you can to help
13  her, you know, deal with the process here.  Because
14  it's not productive and I think it is something that
15  maybe we could work to avoid.
16        MS. WILLIAMS:  I think the problem is that
17  we set the deposition from 1 to 4.  And it was her
18  understanding after 4 o'clock, it would be over.  And
19  she had other commitments, important commitments, and
20  you know --
21        MR. WISER:  Well, I think we can work
22  through that.
23        MR. WIMBERLY:  I think we can, too.  You
24  are going to be back on Friday and we'll look at
25  having an eight-hour day on Friday.

                                    39 (Pages 150 to 153)

Marialice Williams                                                    March 17, 2003
                              Washington, DC

---

**154**

1    MR. WISER: I mean, that's okay with me.
2  Or depending -- I know that Miss Marialice Williams
3  is under a doctor's care and is, as I understand it,
4  taking medication.
5    MS. WILLIAMS: Yes, she is.
6    MR. WISER: And since we have got an extra
7  day on Monday, I have no problem, if it's best for
8  her from a health perspective, to maybe get your,
9  however much time we get in Friday, if you don't get
10 your full eight hours maybe take that up Saturday.
11 That's okay with me, if we're going to be here
12 anyway. I don't care. I have no objection to your
13 eight hours.
14    MR. WIMBERLY: Monday. Monday.
15    MR. WISER: No, I meant Saturday. Or
16 Monday, that would be --
17    MR. WIMBERLY: Monday.
18    MR. WISER: I mean, depending on her
19 schedule, depending on everyone's schedule.
20    MS. WILLIAMS: Well -- right.
21    MR. WIMBERLY: I appreciate. What I hear
22 you saying, Nick is that I can go Friday and then
23 Monday and try to wrap up my part of this.
24    MR. WISER: That's fine with me. That is
25 subject to what Miss Williams has.

---

**155**

1    MS. WILLIAMS: Right. I don't know that I
2  can make that commitment. I have to talk to my
3  client.
4    MR. WIMBERLY: Well, I don't know -- then
5  don't make the commitment, Ms. Williams. I really,
6  it's a long day and I got to tell you that if we just
7  go with what the judge said. We have been over this
8  over and over again. We'll see you Friday, and we'll
9  commence at 9 and we'll go eight hours. And then if
10 you are willing to give us some more time on Monday
11 so that --
12    MS. WILLIAMS: That's not going to happen.
13 She doesn't want to do Monday.
14    MR. WIMBERLY: We'll just, we'll go and do
15 what we have to do.
16    MS. WILLIAMS: I mean, you know, as you
17 can see, she is under a lot of stress.
18    MR. WIMBERLY: I have a lot of personal
19 sympathy for her, but I got a case to deal with. And
20 so we'll see you on Friday. Same place, same time.
21    MR. LEECH: Wait, wait, before we go --
22    MR. WISER: Are we going to be here
23 Friday?
24    MR. LEECH: Let's be clear. Because we
25 are talking about a long day Friday. Eight hours of

---

**156**

1  testimony. Be sure she does not make the same
2  mistake that she thinks she made this time. We are
3  not talking about starting at 9 and ending at 5.
4  That won't be eight hours of testimony.
5    MR. WIMBERLY: Mr. Leech makes an
6  excellent point. And I can be here at 8 or 7 or 5 in
7  the morning. It doesn't matter, but Mr. Leech is
8  making a good point.
9    Eight hours means eight hours of
10 testimony. So we got a lunch break in there and we
11 are not agreeing to an arbitrary cut off at 5 or any
12 other time. But if we move efficiently, everybody
13 can do the math. And we get done.
14    MR. WISER: We'll talk. The judge has
15 ruled. I understand your position. Let's wind it
16 up.
17    THE VIDEOGRAPHER: The time -- going off?
18    MR. WIMBERLY: Yes, thank you.
19
20
21
22
23
24
25

---

**157**

1    THE VIDEOGRAPHER: The time is 5:05:02.
2  We are going off the record. This is the end of tape
3  number two and the end of testimony for March 17th,
4  2003.
5    (Whereupon, at 5:05:02 p.m., the taking of
6  the instant deposition ceased.)
7
8    _____
9        Signature of the Witness
10
11 SUBSCRIBED AND SWORN to before me this _____ day
12 of _____, 2003.
13
14    _____
15        NOTARY PUBLIC
16 My Commission expires: _____
17
18
19
20
21
22
23
24
25

---

40 (Pages 154 to 157)