## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARIALICE BATHRUS WILLIAMS,**<br><br>**Plaintiff,**<br><br>v.<br><br>**FEDERAL NATIONAL MORTGAGE ASSOCIATION, et al.,**<br><br>**Defendants.** | **Civil Action No. 05-1483 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff, an African-American woman and former employee of the Federal National Mortgage Association ("Fannie Mae"), brings this action against defendants Fannie Mae and two of its vice-presidents, Richard Lawch and Grace Huebscher. She alleges that, after her departure from Fannie Mae, defendants discriminated against her by denying her subsequent potential business contracts on the basis of her race and prior protected civil rights activity and also interfered with her business relationships with other entities.[1] Plaintiff seeks damages pursuant to federal civil rights laws, 42 U.S.C. §§ 1981 and 1985(3) (Counts I through III), and District of Columbia tort law (Counts IV and V).[2]

---

[1] Plaintiff also originally asserted a sex discrimination claim under 42 U.S.C. § 1981, but withdrew the claim at the motions hearing held on June 5, 2006. Mot. Hrg. Tr. at 25.

[2] Plaintiff characterizes her § 1981 claim as being "applied through" 42 U.S.C. § 1983. However, as defendants point out, § 1983 has no applicability here. In order to bring a claim under § 1983, a plaintiff must allege that the defendant acted under the color of state law. <u>See</u> <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980) (holding that a plaintiff must allege both deprivation of a federal right and that the depriving party acted under the color of state law in order to bring a § 1983 claim). Because plaintiff has not alleged that defendants acted under the color of state law, she may not bring (and has not brought) any claims under § 1983.

Defendants move to dismiss all claims for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and in the alternative, move for summary judgment on the ground that the three-year statute of limitations has expired for each claim. Plaintiff has moved for a continuance to permit discovery in aid of her opposition to summary judgment pursuant to Fed. R. Civ. P. 56(f). The Court held a hearing on the motions on June 5, 2006. For the reasons explained below, the Court concludes that the amended complaint states a claim for relief as to race discrimination in violation of § 1981 with respect to the rejection of her May 2001 contract proposal and also states a claim for tortious interference with business relationships. The remainder of the claims will be dismissed for failure to state a claim upon which relief can be granted. The Court also concludes that full discovery should proceed in this matter, and thus grants plaintiff's motion for a continuance under Rule 56(f).

## BACKGROUND

The following facts are alleged in plaintiff's complaint, and are taken as true for purposes of resolving defendants' motion to dismiss. Plaintiff worked in various capacities at Fannie Mae's Multifamily Division from January 1990 to June 1998. See Am. Compl. ¶ 11. Plaintiff developed securities and other insurance products while working with Fannie Mae customers under the supervision of defendant Richard Lawch. Id. ¶¶ 13, 17. Plaintiff left Fannie Mae in June 1998 after a negotiated settlement agreement resolving allegations of race and sex discrimination as well as retaliation. Id. ¶ 19.

Both before and immediately after plaintiff left her position, Fannie Mae promised her a continuing post-departure business relationship, consistent with its common business practice of maintaining commercial relationships with former employees. Id. ¶¶ 20, 21, 24. Lou Hoyes, Senior Vice President of Fannie Mae's Multifamily Division, assured plaintiff in writing that

2

Fannie Mae would "do at least $1 billion of insurance-based business in the next year through her, as a broker, and would utilize her services in the years following in addressing components of a yearly total market of approximately $10 billion." Id. ¶ 22 .

In reliance on Hoyes's written statement as well as other "promises and assurances" by defendants to do business with her, plaintiff started her own firm in October 1998 ("Risk Mitigation Strategists, LLC") and obtained a broker's license. Id. ¶¶ 27, 33. Plaintiff also developed a business plan which included the use of risk transfer products through Fannie Mae, another common practice among former employees. Id. ¶ 28. In developing her firm, plaintiff incurred financial obligations of over $500,000 in reliance on the promises to do business with her. Id. ¶ 31. Furthermore, plaintiff's firm entered a joint venture with CAM Financial, another firm with which she hoped to do business utilizing Fannie Mae insurance products. Id. ¶ 32.

During this time and up until October 2003, defendants continued to promise plaintiff a business relationship, although no contracts were consummated despite plaintiff's business development efforts. Id. ¶¶ 36, 41-42. In May 2001, plaintiff discussed with Fannie Mae a specific proposal reflecting her ongoing and exhaustive work in refining her business products. In that proposal, plaintiff and CAM Financial "secured the interest of several A-plus rated insurance companies and brought an additional and significant proposal to [Fannie Mae] for doing specific mortgage-related business," which defendants rejected. Id. ¶ 42. During this time, defendants instead directed "all such business and accompanying financial remuneration" to Craig Ott, a white male without a history of protected EEO activities and whose credentials, expertise, and experience in the relevant business were "demonstrably inferior" to those of plaintiff. Id. ¶¶ 45, 59.

On May 31, 2001, defendant Huebscher forwarded an e-mail to defendant Lawch which considered assigning the project to Ott.  Id. ¶ 46.  In the e-mail, defendant Huebscher wrote:

> "Richard, Marialice [Williams] wants to pursue the credit risk
> insurance for DUS risk.  Do you want to pursue with her?  MY
> GUT IS NO but if you think it is worth continuing discussions, I
> will focus on her questions?"

Id. Defendant Lawch then responded by e-mail:

> "If Ofheo comes back with bad RBC rules we may be interested.
> Are these different players than Craig [Ott] is showing us?"

Id.  Defendant Huebscher then replied:

> "Probably not so if we want to engage Craig [Ott] on this project,
> that might be a better choice.  If you like that plan then let's
> discuss what we want to ask Craig to find for us . . . ."

Id.  At some point in the next month, June 2001, plaintiff received the e-mail from a former colleague.  Id. ¶ 47.  Plaintiff states that she did not understand the full meaning of the conduct reflected in the e-mail until October 2003, over two years later.  Id.

Despite the sentiment of the e-mail, plaintiff continued to propose projects and work assiduously on developing a business relationship with defendants based on their assurances of prospective business.  Id. ¶ 48.  Plaintiff also alleges that from July 1998 to October 2003, defendants conspired to deny her the promised business relationships because of her race, sex, and former protected EEO activities, and defamed her to other potential clients in order to destroy her business reputation and relationships with other lenders and customers of Fannie Mae.  Id. ¶ 62.  As part of defendants' alleged campaign to destroy plaintiff's business relationships, plaintiff alleges that defendants "purposefully discouraged" CAM Financial from entering into a co-brokerage agreement with plaintiff, causing her over $35,000,000 in lost co-brokerage fees.  Id. ¶¶ 61, 67.

4

In October 2003, plaintiff attended a meeting with Fannie Mae officials, including defendant Huebscher, on the use of Captive Insurance Companies by Fannie Mae's Multifamily Division.  Id. ¶ 51.  After the meeting, Fannie Mae stopped all contact with plaintiff, and refused to respond to her calls.  Id. ¶ 53.  Plaintiff alleges that, because of defendants' refusal to do business with her and her resultant bankruptcy, she suffered severe emotional distress, pain and suffering.  Id. ¶¶ 66, 69.

Plaintiff filed suit on July 28, 2005.  Her original complaint alleged that defendants unlawfully denied her the opportunity to make and enforce contracts and interfered with contractual relationships based on her race and sex, and in retaliation against her former EEO activities, and unlawfully conspired to do the same in violation of federal laws 42 U.S.C. §§ 1981 and 1985(3).  She also raised four claims based on District of Columbia common law (breach of contractual relations, tortious interference with business relations, intentional infliction of emotional distress, and defamation).  See Compl. ¶¶ 61-82.  In response to defendants' first motion to dismiss, plaintiff filed an amended complaint dropping the counts related to breach of contract, contractual interference, and defamation but continuing to pursue the other claims.  See Am. Compl. ¶¶ 70-84.

## ANALYSIS

### I.    Defendants' Motion to Dismiss Under Rule 12(b)(6)

#### A.    Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).  All that the Federal Rules of Civil Procedure

require of a complaint is that it contain "'a short and plain statement of the claim' that will give

the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005) (quoting Conley, 355 U.S. at

47). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a

complaint only if it is clear that no relief could be granted under any set of facts that could be

proved consistent with the allegations.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514

(2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

     Under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should

be liberally construed in his or her favor. Leatherman v. Tarrant Cty. Narcotics and

Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968

(D.C. Cir. 1979). The plaintiff must be given every favorable inference that may be drawn from

the allegations of fact. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air

Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, "the court need not accept

inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the

complaint. Nor must the court accept legal conclusions cast in the form of factual allegations."

Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Domen v. Nat'l

Rehabilitation Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996) (citing Papasan v. Allain, 478 U.S.

265, 286 (1986)).

     Furthermore, in resolving a motion to dismiss, the Court may consider documents

specifically referenced in the complaint where the authenticity of the document is not

questioned. See Newborn v. Yahoo!, Inc., 391 F. Supp. 2d 181, 188 n. 6 (D.D.C. 2005); see also

New York State Bar Ass'n v. F.T.C., 276 F. Supp. 2d 110, 114 n. 6 (D.D.C. 2003) ("[A]

document is not 'outside' the complaint if the complaint specifically refers to the document and if

its authenticity is not questioned") (quoting Cooper v. Pickett, 137 F.3d 616, 622-23 (9th Cir.

1997)). In the present case, plaintiff cites in her complaint a letter written by Fannie Mae Senior

Vice President Lou Hoyes, a document which defendants have submitted in support of their

motion to dismiss. See Am. Compl. ¶¶ 23, 32; Defs.' Mot. to Dismiss 1-2. Because the

complaint relies upon the document and its authenticity is not questioned, the Court may

properly consider it in resolving the motion.

### B.    Racial Discrimination Under 42 U.S.C. § 1981[3]

Plaintiff alleges that defendants' course of conduct from July 1998 to October 2003, and

the lack of any contracts awarded to her, supports her claim that defendants denied her the

opportunity to make and enforce contracts on the basis of race, in violation of 42 U.S.C. § 1981.

Defendants move to dismiss this claim on the ground that plaintiff has failed to identify, first,

any specific contract that was denied to plaintiff or, second, that another person outside of her

protected class received a contract she was denied. In response, plaintiff contends, without

citing any cases, that the law does not require her to identify any specific potential contracts at

issue and, instead, that general allegations of reasonable and good faith efforts to develop a

business relationship are sufficient to sustain a § 1981 claim. The Court declines to adopt

---

[3] It bears noting that the federal government may not be sued under § 1981 because the terms of this provision do not contain a waiver of federal sovereign immunity. See, e.g., Idrogo v. U.S. Army, 18 F. Supp. 2d 25, 29 (D.D.C. 1998); Williams v. Glickman, 936 F. Supp. 1, 5 (D.D.C. 1996). Thus, the Court briefly addresses plaintiff's characterization of Fannie Mae as an "instrumentality of the federal government." Am. Compl. ¶ 2. Little discussion is needed, as it is well-established that Fannie Mae is a private, for-profit entity. See Federal Nat. Mortg. Ass'n v. United States., 379 F.3d 1303, 1305 (Fed. Cir. 2004) ("Formerly a federal government agency, FNMA is a private, for-profit entity that provides liquidity for mortgage investments"). See also Katz v. Dime Sav. Bank, FSB, 992 F. Supp. 250, 255 (W.D.N.Y. 1997) (holding that defendants, including Fannie Mae, do not have sovereign immunity). Accordingly, Fannie Mae does not have sovereign immunity, and the Court considers plaintiff's claim on its merits.

plaintiff's interpretation of § 1981, but finds that plaintiff has alleged one contract denied to her with sufficient specificity to support her claim.

In order to plead a claim of racial discrimination under § 1981, a plaintiff must allege that (1) the plaintiff is a member of a racial minority; (2) the defendant intended to discriminate against the plaintiff on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981.  See Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087 (2d Cir. 1993); Mitchell v. DCX, 274 F. Supp. 2d 33, 45 (D.D.C. 2003).  See also White v. Florida Highway Patrol, Div. of  Florida Dep't of Highway Safety and Motor Vehicles, 928 F. Supp. 1153, 1157 (M.D. Fla. 1996); Thomas v. St. Luke's Health Systems, Inc., 869 F. Supp. 1413, 1432 (N.D. Iowa 1994), aff'd, 61 F.3d 908 (8th Cir. 1995).

Courts have looked to the body of case law analyzing § 1981 claims in employment discrimination cases to evaluate the viability of non-employment contract claims.  See Mitchell, 274 F. Supp. 2d at 45-46 (explaining that "[t]he allocation of burdens in a § 1981 case is governed by the burden-shifting analysis created by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)," and applying those standards in non-employment refusal-to-contract context). Under that case law, an inference of discrimination is created if the plaintiff is "significantly better qualified for the job" – or, here by analogy, the contract – than the less qualified candidate selected by the defendant.  See Aka v. Washington Hosp. Center, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc); see also Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999) (evidence demonstrating that similarly situated persons outside of protected class were treated more favorably is sufficient to support inference of discrimination).

It is undisputed that plaintiff has pleaded facts sufficient to support the first element of the prima facie case because she asserts that she is African-American.  See Am. Compl. ¶ 1.  As

to discriminatory intent, plaintiff has not presented any direct evidence, but has alleged facts supporting an inference of discrimination. Specifically, she alleges that "all such business" (presumably including the May 2001 proposal) promised to her instead went to Craig Ott (a white male). See Am. Compl. ¶ 45. Plaintiff also alleges that Ott's expertise and experience were "demonstrably inferior" to hers. Id. ¶ 59. Therefore, plaintiff has alleged facts sufficient to support an inference of discrimination.

In order to satisfy the third element of the prima facie case, the denial of an enumerated activity, plaintiff alleges, among other things, that in May 2001, she brought a specific proposal to defendants in association with CAM Financial and defendants rejected it. See id. ¶ 42. Plaintiff alleges that she "secured the interest of several A-plus rated insurance companies and brought an additional and significant proposal to [defendant] for doing specific mortgage-related business." Id. Although the subject and scope of the proposed contract are unclear, this aspect of the complaint sufficiently identifies a contractual interest, and the denial of the right "to make" a contract, so as to state a claim under § 1981. That said, plaintiff's May 2001 proposal is the only contract alleged with enough specificity to state a claim under § 1981.[4]

Throughout her complaint, plaintiff alleges that defendants made general promises to do business with her, but ultimately no contracts were achieved. See, e.g., id. ¶ 22 ("Mr. Hoyes reasonably assured in writing to Plaintiff Williams that Fannie Mae would do at least $1 billion

---

[4] Plaintiff's counsel suggested at the motions hearing that defendants' actions at or after the October 2003 meeting indicated another rejection of a contract proposed by plaintiff. However, plaintiff's allegations with regard to the October 2003 meeting do not refer to any contract proposal, but rather allege only that "[plaintiff] participated in a meeting in Washington, D.C. with certain officials of Fannie Mae," that plaintiff had "prepared extensively" for the meeting, and that the subject of the meeting was "the use of Captive Insurance Companies by Fannie Mae's Multifamily Division." See Am. Compl. ¶ 51. These factual allegations are insufficient to support an inference that plaintiff made a contract proposal.

of insurance-based business in the next year through her, as a broker, and would utilize her services in the years following . . . ."); id. ¶ 50 ("Through this time [October 2003], while no contracts had been achieved, Plaintiff Williams had been led to believe by the Defendants that such contracts would occur"); id. ¶ 55 ("At all times from July 1, 1998, to the present, [defendants] have purposefully, intentionally, improperly, and willfully refused to do business with Plaintiff").  However, vague and conclusory allegations about the speculative loss of prospective business opportunities – in contrast to the actual loss of a specific potential contractual interest – fail to allege the type of contractual interests enumerated in § 1981's protection of the right "to make and enforce contracts." Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1267 (10th Cir. 1989) ("Plaintiff has alleged that defendants' actions have interfered with his 'prospective business opportunities'. . . . but we find that vague and conclusory allegation insufficient to state a deprivation of the right to make and enforce contracts that is protected by § 1981"); see also Gonzalez v. Ingersoll Mill. Mach. Co., 133 F.3d 1025, 1034 (7th Cir. 1998) (holding that a laid-off at-will employee failed to state a claim under § 1981 because there was no underlying "contractual relationship" at issue, a required element); Morris v. Office Max, Inc., 89 F.3d 411, 414 (7th Cir. 1996) (holding that a potential retail purchase is not enough to establish a contract under § 1981 where the store does not actually refuse to sell a specific item; plaintiff's "general interest in [the] merchandise" is insufficient to implicate a contractual interest).  Thus, plaintiff's allegations of general promises and assurances by defendants of a future business relationship or opportunities to do business do not identify a contractual interest under § 1981.[5]  Accordingly, the Court grants in part and denies in part

---

[5] At the motions hearing, plaintiff suggested that the Supreme Court's recent decision in Domino's Pizza, Inc. v. McDonald, 126 S. Ct. 1246 (2006), is instructive on the disposition of

(continued...)

defendants' motion to dismiss the § 1981 claim (Count I), allowing it to proceed only as to the May 2001 project.

### C.    Retaliation Under 42 U.S.C. § 1981

Plaintiff alleges that the same course of conduct by defendants – that is, from July 1998 to October 2003 – also constitutes unlawful retaliation for her prior protected civil rights activities, including the filing of an EEO complaint prior to her June 1998 departure, in violation of § 1981.  Before evaluating the sufficiency of plaintiff's allegations, the Court pauses to note the scarcity of law in this area.  The Court's review of the case law indicates that the vast majority of § 1981 retaliation claims have arisen in the employment context.  As one court has aptly noted, there are few cases addressing § 1981 discrimination claims outside of the employment context, and "even fewer cases dealing with the question of retaliation outside the employment context under § 1981."  See Benton v. Cousins Properties, Inc., 230 F. Supp. 2d 1351, 1370, 1381 (N.D. Ga. 2002), aff'd, 97 Fed. Appx. 904 (11th Cir. 2004).  Thus, one must extrapolate the pertinent elements of the McDonnell Douglas analysis to a § 1981 retaliation claim.  Id. at 1370.

---

[5](...continued)
her claim.  Domino's addressed whether a non-party to a contract may bring an action under § 1981 in the context of a shareholder's relationship to the contracting corporate party.  See id. at 1250.  The Supreme Court's discussion of the standards applicable to § 1981 are fully consistent with the disposition reached above.  See id.  The Court reiterated the well-established principle that "a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who already have made contracts," a principle that underlies the decision today.  Id. at 1249-50.  At the same time, it emphasized that the focus of § 1981, including after the 1991 amendments, is on a "contractual relationship," either existing or "proposed" (id. at 1250), which, as discussed above, is distinct from speculative prospective business opportunities.

In order to make a prima facie case for retaliation under § 1981 in the employment context, plaintiff must show that:  (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is at least an inference of causation between the two.  See Carney v. American Univ., 151 F.3d 1090, 1094-95 (D.C. Cir. 1998) (assuming without deciding that § 1981 authorizes a claim for retaliation, and applying the traditional three-part test used in employment cases).[6]  Extrapolating these elements to a non-employment, commercial setting, the elements would be substantially the same, except that instead of an adverse employment action, plaintiff must show an adverse decision in the making of a contract.

Plaintiff alleges that she engaged in statutorily protected activity before leaving Fannie Mae.  See Am. Compl. ¶ 19.  She also alleges that defendants took action adverse to her by denying her contracting rights under § 1981 when she proposed the May 2001 contract.  However, plaintiff does not allege facts sufficient to show a causal connection between her statutorily-protected activity and defendants' alleged rejection of her May 2001 proposal.  Instead, plaintiff relies solely on the temporal proximity of events to support causation.  It is true that causation may be construed from "close temporal proximity" between the protected action and the act of discrimination (or alleged retaliation).  See Childs-Pierce v. Utility Workers Union of Am., 383 F. Supp. 2d 60, 76 (D.D.C. 2005) (holding that nine weeks suffices as close temporal proximity for retaliation claim under § 1981).  Although the case law is mixed with regard to how close temporal proximity must be to support an inference of causation, under the relevant case law, temporal proximity refers to a period of weeks or months -- not a period of

---

[6] This Court also assumes without deciding that a retaliation claim is authorized under § 1981.  Defendants have not raised the issue, and as explained in this opinion, the Court will dismiss the claim on other grounds.

years.  See id.; see also Mitchell v. Baldrige, 759 F.2d 80, 86-87 (D.C. Cir. 1985) (holding that

three months is sufficient for temporal proximity); Castle v. Bentsen, 867 F. Supp. 1, 3 (D.D.C.

1994) (holding that three to five months is sufficient); Kipp v. Missouri Highway & Transp.

Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (holding that two months is not sufficient).

Here, plaintiff alleges that she engaged in statutorily protected activity before she left

Fannie Mae in June 1998 and that defendants did not take adverse action until May 2001, just

over three years later.  See Am. Compl. ¶¶ 19, 42.  A three-year period between the protected

activity and the adverse contract decision is too long under any standard to support an inference

of causation.  Therefore, the Court concludes that plaintiff has not established a prima facie case

of retaliation under § 1981.  Because plaintiff failed to plead facts sufficient to support her

retaliation claim, defendants' motion to dismiss this claim is granted.

**D.    Conspiracy Under 42 U.S.C. § 1985(3)**[7]

Plaintiff's third claim against defendants alleges that they engaged in a conspiracy in

violation of 42 U.S.C. § 1985(3) to discriminate and retaliate against her in the making and

enforcing of contracts, based on the same course of conduct alleged in support of her § 1981

claims.  Defendants move to dismiss on the ground that the only conspiracy alleged is that

between Fannie Mae and two of its officers, which fails to state a claim for a conspiracy under

the intracorporate conspiracy doctrine.

---

[7] Defendants' contention that a heightened pleading standard applies to § 1985 claims is in error.  This Circuit has firmly rejected heightened pleading requirements in § 1981 cases and its reasoning applies with equal force to § 1985 claims.  See Sparrow v. United Airlines, Inc., 216 F.3d 1111, 1115 (D.C. Cir. 2000) ("as the Supreme Court held in Leatherman, this [dismissal under Rule 12(b)(6)] may not be accomplished by employing heightened pleading standards except in those cases specifically listed in Federal Rule 9(b)").

In order to sufficiently plead a conspiracy claim under § 1985, plaintiff must allege that: (1) the conspiracy involved two or more persons; (2) the conspiracy is for the purpose of depriving (directly or indirectly) someone or a group of people of the equal protection of the laws; (3) there has been an overt act in furtherance of the conspiracy; and (4) plaintiff has been deprived of her rights.  See Brown v. Sim, No. 03-2655, 2005 WL 3276190 at *3 (D.D.C. Sept. 30, 2005) (citing Great American Federal Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 373 (1979)); see also Love v. Bolinger, 927 F. Supp. 1131, 1139 (S.D. Ind. 1996); Greene v. Hawes, 913 F. Supp. 136, 144 (N.D.N.Y. 1996).

Of these elements, the one dispositive here is the requirement that the conspiracy involve two or more persons.  Generally, the law does not recognize a conspiracy between a corporation and its agents.  See McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000). Accordingly, under the "intracorporate conspiracy doctrine,"

> because a company cannot conspire with itself, the officers and directors of a corporation generally cannot be held liable under § 1985(3) for actions taken in concert with one another . . . . Instead, the relevant inquiry is whether the acts of the defendants were in fact taken on behalf of the corporation, each acting within the scope of their employment, or instead were taken solely for personal, nonbusiness motivations.

Weaver v. Gross, 605 F. Supp. 210, 214-15 (D.D.C. 1985) (holding that an intracorporate conspiracy may only exist when the employees act outside the scope of their employment); see also Brown, 2005 WL 3276190, at *4; Cross v. General Motors Corp., 721 F.2d 1152, 1156 (8th Cir. 1983); Brace v. Ohio State Univ., 866 F. Supp. 1069, 1075 (S.D. Ohio 1994).

In order to claim civil conspiracy against a corporation, plaintiff must allege facts in her complaint suggesting that the officers of Fannie Mae were acting outside the scope of their

employment.  See Norkol/Fibercore, Inc. v. Gubb, 279 F. Supp. 2d 993, 1000 (E.D. Wis. 2003)

(dismissing conspiracy claim because of failure to allege that corporate employees were pursuing

personal interests); see also Bremiller v. Cleveland Psychiatric Inst., 879 F. Supp. 782, 789 (N.D.

Ohio 1995) (holding that the plaintiff pleaded facts sufficient to show employees were acting

outside the scope of employment).  Plaintiff does not allege in her complaint that defendants

Lawch and Huebscher were acting outside the scope of their employment.  As counsel for

plaintiff candidly acknowledged at the motions hearing, plaintiff alleges just the opposite – that

Lawch and Huebscher acted within the scope of their employment – so that plaintiff may be able

to recover against Fannie Mae.  See Mot. Hrg. Tr. at 27.  Because no factual allegations of the

complaint support an inference that Lawch and Huebscher acted outside the scope of their

employment, the alleged conspiracy among the corporation and its agents is insufficient and

defendants' motion to dismiss this claim is granted.

### E.    Tortious Interference with the Reasonable Expectation of Prospective Economic Advantage

Plaintiff's fourth claim against defendants alleges that they tortiously interfered in her

business relationships with third parties by making knowingly false and defamatory statements

about her.  To state a prima facie case for tortious interference with a business relationship or

reasonable expectation of prospective economic advantage, a plaintiff must allege:  (1) a valid

business relationship or expectancy with a third party; (2) knowledge of the relationship or

expectancy on the part of the defendant; (3) intentional interference by the defendant, causing a

breach or termination of the relationship or expectancy; and (4) resultant damage.  See Bennett

Enter., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995) (holding that all four

elements must be met in order to bring tortious interference with prospective economic

advantage claim). Defendants move to dismiss on the ground that plaintiff fails to identify any valid business relationships or any conduct amounting to intentional interference under the law, and furthermore, that no termination of a business expectancy is alleged.

As to the threshold element of a valid business relationship, the amended complaint casts a wide net but ultimately identifies only one such relationship – that with CAM Financial concerning a co-brokerage agreement. See Am. Compl. ¶ 61. Aside from this allegation, plaintiff does not specifically name any other third parties with which she had a business relationship or expectancy; plaintiff instead alleges that defendants interfered with other unspecified relationships between plaintiff and "various lenders and customers of Fannie Mae" and "Fannie Mae consultants, brokers, lenders and customers and their representatives." Am. Compl. ¶¶ 60, 61. Because her intent to work with CAM Financial is the only expectancy that plaintiff specifically alleges, it is the only relationship that conceivably can support her tortious interference claim.

Defendants contend that even the relationship with CAM Financial is too unilateral to support a claim of a valid business relationship or expectancy. It is well-established that "[a] protected relationship exists only if there is a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope." Klein v. Grynberg, 44 F.3d 1497, 1506 (10th Cir. 1995); see also Ellsworth Assocs. v. United States, 917 F. Supp. 841, 850 (D.D.C. 1996). Construing the complaint in the light most favorable to plaintiff, the Court concludes that she has satisfied this standard. Plaintiff alleges that she intended to work with CAM Financial under a co-brokerage agreement as part of her business plan, and that she had a business history with CAM Financial, including a past joint venture. See Am Compl. ¶ 32.

These factual allegations indicate that it was reasonably likely that a co-brokerage contract would have resulted.

Defendants contend that this claim nonetheless fails because plaintiff fails to allege facts supporting an inference of intentional interference. Defendants correctly note that a general intent to interfere is not enough; there must be a "strong showing of intent" in order to make a prima facie case for tortious interference. Bennett, 45 F.3d at 499; see Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 423 (D.D.C. 1988). However, a plaintiff who alleges slander on the part of the defendant sufficiently asserts this strong showing of intent. Genetic Sys. Corp., 691 F. Supp. at 423 ("A competitor's conduct must be more egregious . . . . it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement.") (citing Business Equip. Ctr., Ltd. v. DeJur-Amsco Corp., 465 F. Supp. 775, 788 (D.D.C. 1978)). In this case, plaintiff alleges that defendants communicated "knowingly false and defamatory information" against plaintiff to companies associated with her, including CAM Financial. Am. Compl. ¶ 62. Accordingly, the Court concludes that plaintiff pleads facts sufficient to support this element.

The elements of termination and resultant damage are easily met and require little discussion. Plaintiff pleads that defendants' interference caused a breach or termination of her expected co-brokerage contract with CAM Financial. See id. ¶ 64. In addition, plaintiff alleges resulting damages with specificity: she claims loss "in an amount in excess of $35,000,000 as a direct result of lost co-brokerage commissions with CAM Financial." Id. ¶ 67. Accordingly, the Court concludes that plaintiff's claim of tortious interference with a business relationship may proceed with respect to her alleged relationship with CAM Financial only, but not in any other respect.

###### F.   Intentional Infliction of Emotional Distress

Plaintiff's final claim against defendants alleges that their course of conduct from July 1998 to October 2003 constitutes intentional infliction of emotional distress.  To support a claim for this tort, the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  Duncan v. Children's Nat'l Med. Ctr., 702 A.2d 207, 211 (D.C. 1997) (quoting District of Columbia v. Thompson, 570 A.2d 277, 290 (D.C. 1990), vacated on other grounds, 593 A.2d 621 (D.C. 1991)); see Wise v. District of Columbia, Case No. 03-cv-310, 2005 U.S. Dist. LEXIS 6361, at *16 (D.D.C. Mar. 21, 2005); Hoffman v. Hill & Knowlton, Inc., 777 F. Supp. 1003, 1005 (D.D.C. 1991).  More specifically, a plaintiff must allege "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  Duncan, 702 A.2d at 211 (quoting Drejza v. Vaccaro, 650 A.2d 1308, 1312 (D.C. 1994)); accord, Sturdza v. United Arab Emirates, 281 F.3d 1287, 1305 (D.C. Cir. 2002) (citing Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984)).

Plaintiff highlights defendants' "active, conspiratorial, malicious and secretive attempts to curtail or terminate Plaintiff Williams's prospective and ongoing business relationships" and their efforts to damage her personal and business reputation all during a period when they gave false appearances of intending to do business with her.  Am. Compl. ¶ 83.  The conduct alleged fails, as a matter of law, to rise to the level of extreme and outrageous conduct under District of Columbia law.  Conduct must be truly outrageous to make a prima facie case for intentional infliction of emotional distress.  See Browning v. Clinton, 292 F.3d 235, 248 (D.C. Cir. 2002) (holding insults uttered at a press conference and threats insufficient to withstand dismissal of intentional infliction of emotional distress claim); Thompson, 570 A.2d at 290 (holding that

repeated criticisms of employee, misrepresentations, refusal to promote, physical pushing and

verbal threats, and ultimately, termination of employment did not rise to level of outrageous

conduct); Tiefenbacher v. Am. Ass'n of Retired Persons, No. 05-1802-CKK, 2006 WL 1126841,

at *2-3 (D.D.C. Apr. 27, 2006) (holding wrongful discharge and retaliation not enough to state a

claim for intentional infliction of emotional distress).

Plaintiff essentially alleges that defendants refused to contract with her because of her

race and engaged in a campaign to prevent others from doing business with her.  Even taking

defendants' alleged misrepresentations into account, their alleged conduct is not atrocious and

outside the bounds of civilized society under District of Columbia law.  In the commercial arena

and elsewhere, it is commonplace that sought-after contracts fail to materialize for illegitimate

reasons and that other parties engage in misrepresentation, renege on promises, and seek to take

business away from others.  While such conduct may support other causes of action (such as

plaintiff's § 1981 claim), it does not rise to the level of outrageous behavior required to support a

claim for intentional infliction of emotional distress.  Accordingly, the Court grants defendants'

motion to dismiss this claim.

## II.    Plaintiff's Rule 56(f) Motion for a Continuance to Permit Discovery in Aid of Opposition to Summary Judgment

Defendants have moved for summary judgment on the ground that all of plaintiff's claims

are time-barred.  In this case, the statute of limitations is three years for both the § 1981 claim

and the tortious interference claim.[8]  See Carney, 151 F.3d at 1095 (holding that claims under §

---

[8]  At the motions hearing, plaintiff raised the issue of whether 28 U.S.C. § 1658 -- the catch-all four year statute of limitations for civil actions arising under federal statutes enacted after December 1, 1990 -- applies to her § 1981 claim, in light of  Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369 (2004).  The Court concludes that the three-year statute of limitations

(continued...)

1981 have a three-year statute of limitations); <u>Beard v. Edmondson & Gallagher</u>, 790 A.2d 541,

546 (D.C. 2002) (holding the same for tortious interference).  Defendants' motion is based on

their contention that plaintiff's undisputed deposition testimony in another case establishes that

she knew or should have known that she had a cause of action on or about June 4, 2001, when

she read the May 31, 2001, e-mail indicating that she would not receive the contract she sought.

In that testimony, plaintiff states that, after reading the e-mail, "it was clear that [defendant

Fannie Mae] was not going to do business with [her]."  Defs.' Mot. for Summ. J. at 3 (quoting

Ex. E, Marialice Williams Dep. at 91 (Mar. 17, 2003)).[9]  In response, plaintiff moves for a

continuance to permit discovery in aid of her opposition to summary judgment pursuant to Fed.

R. Civ. P. 56(f).

---

[8](...continued)
discussed above is not affected by that decision.  In <u>Jones</u>, the Supreme Court held that the
catch-all four-year statute of limitations applies to a federal claim "<u>if</u> the plaintiff's claim against
the defendant was made possible by a post-1990 enactment" – there, the 1991 amendments to
§ 1981  <u>Id.</u> at 382 (emphasis added).  Thus, § 1981 claims authorized pre-1991 would continue
to be subject to limitations periods borrowed from local law, while claims arising under the 1991
amendments would be subject to the § 1658 catch-all period.  <u>See id.</u> at 384-85 & n.18 (noting
that lower courts would be "required to determine whether the plaintiff has alleged a violation of
the relevant statute as it stood prior to December 1, 1990, or whether her claims necessarily
depend on a subsequent amendment" in order to decide which statute of limitations is
applicable).  Plaintiff's § 1981 claim is authorized by the pre-1991 version of § 1981 because it
concerns only pre-formation contractual issues, rather than the category of post-formation
conduct covered by the 1991 amendments.  <u>See</u> <u>Domino's Pizza, Inc.</u>, 126 S. Ct. at 1250.  As
such, it remains appropriate to borrow the limitations period from local law.

[9]  Defendants quote other excerpts of the deposition to similar effect.  For example,
plaintiff stated that "it was clear from [the e-mail dated May 31, 2001] that [defendants] were not
doing anything but taking my time and attention and using that with other people."  <u>Id.</u>, quoting
Williams Dep. at 88.  Plaintiff also noted that when she received the e-mail, she knew she was
"being screwed" and that it was clear to her that she was "not going to be given the same
opportunity as everyone else" to do business with defendants.  Id. at 4, quoting Williams Dep. at
94, 121.

In order to prevail, plaintiff must show what facts she "intend[s] to discover that would create a triable issue" and why she cannot yet produce them.  See Byrd v. United States EPA, 174 F.3d 239, 248 n. 8 (D.C. Cir.1999) (citing Hotel & Restaurant Employees Union, Local 25 v. Attorney Gen. of the United States, 804 F.2d 1256, 1259 (D.C. Cir. 1986), vacated on other grounds, 808 F.2d 847 (D.C. Cir. 1987)); see also Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004) (holding that every Rule 56(f) motion must include (1) the nature of the uncompleted discovery; (2) an explanation of how the facts sought are reasonably expected to create a genuine issue of material fact; (3) a showing that the plaintiff made efforts to obtain these facts by other means; and (4) why these efforts were not successful).

To create a triable fact over a statute of limitations issue, a plaintiff may show that the defendant engaged in subsequent misrepresentation, tolling the statute of limitations.  See Sprint Commc'ns Co., L.P. v. F.C.C., 76 F.3d 1221, 1226 (D.C. Cir. 1996) ("If, however, the plaintiff did not discover the injury because the defendant fraudulently concealed material facts related to its wrongdoing, then the court will deem the cause of action not to have accrued during the period of such concealment – unless the defendant shows that the plaintiff would have discovered the fraud with the exercise of due diligence."); see also Richards v. Mileski, 662 F.2d 65, 70 (D.C. Cir. 1981) (same).  Here, plaintiff alleges that defendants engaged in misrepresentations and fraud *after* denying her the May 2001 proposal, and she casts such conduct as lying at the heart of her case.  See Pl.'s Mot. for Continuance at 3-5.  Plaintiff alleges that, after June 2001, defendants provided "continuing encouragement" with regard to prospective business opportunities, participated in business development efforts with her, and through those and similar actions, led her to believe that she would be rewarded with business contracts, all the while knowing that they would not accept any contracts from her.  Id.  If

plaintiff can demonstrate that defendants continued to promise other business opportunities to her, then a trier of fact could reasonably conclude that she could not have been aware of any racially discriminatory intent on the part of defendants in rejecting her May 2001 proposal.

The conundrum here is that there is a disconnect between the facts plaintiff seeks to prove and the discovery sought. Plaintiff seeks full access to documents from the CAM Financial litigation, CAM Financial Servs., Inc. v. General Star National Ins. Co., Fannie Mae, et al., No. 1:01-cv-314-LG-JMR (S.D. Miss.), which defendant has relied on in part to support its motion for summary judgment.[10] However, it is unclear how these documents would establish the misrepresentations and deceit alleged by plaintiff. In order to create a triable issue, plaintiff must discover evidence of defendants' attempts to hide its unlawful discriminatory intentions after June 2001. But plaintiff never explains why the documents in the CAM Financial litigation would reveal such facts; her counsel only makes the conclusory statement that the documents would do so.

> Those documents would facilitate our response to the motion for summary judgment and our ability to show that material facts are in dispute, notwithstanding Defendants' claims in their Motion, as to the following: when they refused to do business, when Plaintiff should have known such, and when the statute of limitations began running. What we are seeking to demonstrate further, as already alleged in the amended complaint, [is] that Fannie Mae continued at least through October 2003, in a serious manner intended to be believed by Plaintiff, in business development with her. It was not until thereafter that Fannie Mae made clear in their actions against Plaintiff that they would not do business with her. Such demonstration clearly would create a material issue of fact in dispute . . . .

---

[10] These documents are unavailable directly from that court because they were destroyed by Hurricane Katrina.

Pl.'s Motion for Rule 56(f) Continuance, Lederer Aff. ¶ G.  There is little description of what the

CAM Financial litigation is about and why it would be relevant.  What little there is suggests

that the documents requested by plaintiff would not be relevant to any fraudulent conduct by

defendants after June 2001.  Plaintiff states that she was a key player in the litigation and that the

case involved business transactions similar to those in which she has expertise, but she fails to

explain how that is relevant to her allegations of fraud:

> The entire *CAM Financial* docket sheet does indeed have
> numerous personal references to Plaintiff Williams.  The subject
> matter of that case also addressed promises by Defendant Fannie
> Mae regarding complex business transactions of a nature of those
> which had been conducted by Plaintiff Williams while at Fannie
> Mae prior to her departure, and for which she was qualified to
> conduct following her departure from Fannie Mae.

Id. at 7.

Moreover, the complaint and amended complaint in that litigation were filed on August

3, 2001, and December 20, 2001, respectively, indicating that the conduct at issue is in the 2001

time frame or earlier.  See Doc. Nos. 1 and 37 in CAM Financial Servs., Inc., supra.[11]  But the

misrepresentations plaintiff seeks to prove extend far beyond those dates.  It is thus apparent to

the Court that there is likely to be discoverable information relevant to the misrepresentations

alleged and their possible impact on the statute of limitations – e.g., testimony from defendants

Lawch and Huebscher, their internal e-mails, and e-mails from those defendants to third parties

such as Craig Ott.  But it is also apparent that the litigation is not necessarily the repository of

this information.  Something close to full discovery in this case would be necessary to produce

---

[11] Plaintiff filed the docket sheet from this litigation as an exhibit in support of its Rule
56(f) motion after the motions hearing.

that information because the issues related to the statute of limitations are closely intertwined with the merits.

Whether plaintiff ultimately can prove the alleged misrepresentations remains to be seen. But under these circumstances, she should be given the chance to do so pursuant to Rule 56(f). See Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006) (noting that "before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation" of a party's proof, and ordering that discovery be allowed to proceed based on counsel's affidavit describing the facts that it intended to produce during discovery) (citations omitted). The Court will therefore grant plaintiff's motion for a Rule 56(f) continuance, and deny defendants' motion for summary judgment without prejudice.[12]

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss plaintiff's claims of retaliation under § 1981 (Count II), civil conspiracy under § 1985 (Count III), and intentional infliction of emotional distress (Count V). The Court grants in part and denies in part defendants' motion to dismiss Counts I and IV. Plaintiff's claim of race discrimination under 42 U.S.C. § 1981 (Count I) may proceed only with respect to her claim that defendants unlawfully rejected her May 2001 proposal. Her claim of tortious interference with business relationships or prospective economic advantage (Count IV) may proceed only with respect to defendants'

---

[12] It bears noting that defendants' evidence in support of summary judgment does not address when the statute of limitations began running on plaintiff's claim of tortious interference with business relationships. There is no information in the record as to plaintiff's anticipated co-brokerage agreement with CAM Financial and, thus, defendants' motion for summary judgment on this claim would be denied without prejudice in any event.

alleged tortious interference with the CAM Financial co-brokerage agreement.  Those claims are dismissed in all other respects.

The Court grants plaintiff's Rule 56(f) motion for a continuance to permit discovery in aid of plaintiff's opposition to summary judgment and denies defendants' motion for summary judgment without prejudice.  Full discovery shall proceed in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of the Court following the filing of defendants' answer to the amended complaint.  A separate order will be issued herewith.


_____/s/_____

JOHN D. BATES
United States District Judge

Dated:   June 26, 2006

Copies to:

Michael W. Beasley
411 East Broad St.
Falls Church, VA 22046
Email: beasleys@erols.com

Brian J.H. Lederer
3003 Van Ness St., NW
Suite W228
Washington, DC 20008

Evelyn L. Becker
Sarah Alexander Goldfrank
O'Melveny & Myers, LLP
1625 Eye St., NW
Washington, DC 20006
Email: ebecker@omm.com, sgoldfrank@omm.com