## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

MARIALICE BATHRUS WILLIAMS,   :

                        :     Civil Action No. 1:05CV01483

      Plaintiff,          :

                        :

      vs.                 :     Judge John D. Bates

                        :

FEDERAL NATIONAL MORTGAGE   :

     ASSOCIATION, *et al*.       :

                        :

                        :

      Defendants.        :

_____:

### DEFENDANTS FEDERAL NATIONAL MORTGAGE ASSOCIATION, RICHARD LAWCH, AND GRACE HUEBSCHER'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Federal National Mortgage Association ("Fannie Mae"), Richard Lawch, and Grace Huebscher (collectively, "defendants") respectfully submit this memorandum in support of their motion for summary judgment pursuant to FED. R. CIV. P. 56.

### INTRODUCTION

Plaintiff Marialice Williams ("plaintiff"), an African-American female formerly employed by Fannie Mae, filed this action on July 28, 2005 alleging, among other things, that Fannie Mae and two of its officers discriminated against, tortiously interfered with and conspired against her and her business after she left Fannie Mae's employment in June 1998. In June 2006, after defendants filed dispositive motions related to plaintiff's amended complaint, this Court narrowed the case to two discrete claims based on plaintiff's attempts to contract with Fannie Mae and others: (1) a claim for racial discrimination under 42 U.S.C. § 1981 ("Section 1981") for Fannie Mae's purported refusal to contract with plaintiff concerning a May 2001 insurance proposal, and (2) a claim for "tortious interference" based on defendants' purported interference

with plaintiff's co-brokerage relationship with CAM Financial Services, Inc. ("CAM"), a third party that had done business with Fannie Mae in the past.  (*See* Memorandum Opinion ("Mem. Op.") (Docket No. 19) at 24-25.)  After eight months of full discovery, the undisputed record reveals that defendants are entitled to summary judgment on both claims.

As a threshold matter, there are three defenses applicable to both of plaintiff's claims. First, both are barred by the applicable three-year statute of limitations (*see* Mem. Op. at 19). (*See* Section I, *infra*.)  In defendants' prior summary judgment motion, plaintiff avoided summary judgment on her Section 1981 claim by amending her complaint to allege that she did not actually discover defendants' alleged misconduct until shortly after an October 2003 meeting with Fannie Mae on captive insurance, and arguing that additional discovery was necessary under FED. R. CIV. P. 56(f).  In that discovery, plaintiff's own deposition testimony proved that this meeting occurred in August of 2001, not in October 2003.  Thus, plaintiff could have pursued her allegations in 2001, and her claim is time-barred.  Moreover, plaintiff also admitted that her tortious interference claim is based upon Fannie Mae's refusal to do business with her, conceding that her tortious interference claim is simply a restatement of her Section 1981 claim. Because this Court previously concluded that the only specific proposal to Fannie Mae that plaintiff could identify is the May 2001 insurance proposal, this claim is thus similarly barred by the applicable three-year statute of limitations.

Second, both claims are barred because plaintiff's company, Risk Mitigation Strategists, LLC ("RMS"), not plaintiff, sought to contract with Fannie Mae with respect to the May 2001 insurance proposal, and plaintiff, as an individual, has no standing to assert these claims.  (*See* Section II, *infra*.)  Although plaintiff owned RMS, her Section 1981 claim is nonetheless barred by the Supreme Court's decision in *Domino's Pizza, Inc. v. McDonald*, 126 S. Ct. 1246 (2006),

which precludes an individual owner or shareholder from bringing a claim under Section 1981 based on a defendant's refusal to contract with a separate corporate entity. The same logic applies to plaintiff's interference claim because it was the corporation, RMS, that had any economic or contractual expectation.

Third, there are not, under either claim, any colorable damages because plaintiff has not presented evidence of any actual losses sustained in connection with Fannie Mae's refusal to accept her May 2001 insurance proposal. (*See* Section III, *infra*.) Indeed, under plaintiff's own theory no damages exist because Fannie Mae never pursued this proposal with anyone.

Even if the court were to reject these common defenses, plaintiff's two claims suffer from numerous individual defects. First, the undisputed facts demonstrate that plaintiff cannot make out a case of race discrimination under Section 1981. (*See* Section IV, *infra*.) In her Amended Complaint, plaintiff alleges that Fannie Mae pursued the May 2001 insurance proposal with Craig Ott, a white male, because it did not want to do business with an African-American. The undisputed facts establish, however, that Fannie Mae did not actually pursue the business proposal with Mr. Ott or anybody else. Rather, the company determined that such business was inconsistent with its basic business model. Plaintiff cannot rebut this legitimate business decision.

Second, plaintiff's tortious interference claim suffers equally obvious defects. As an initial matter, as noted above, plaintiff admitted in her deposition that this claim is based on Fannie Mae's purported refusal to do business with her and a company cannot interfere with its own contracts. (*See* Section V.A, *infra*.) Next, discovery has shown that plaintiff's "agreement" with CAM offered nothing more than a hope of future business and not the reasonable likelihood of a contract necessary to establish a valid business expectancy under the law. (*See* Section V.B,

*infra*.)  And even if plaintiff had a cognizable business expectancy, discovery has failed to identify any admissible evidence of intent necessary to sustain her claim.  (*See* Section V.C, *infra*.)  Finally, plaintiff has not produced any admissible evidence of causation.  (*See* Section V.D, *infra*.)  To the contrary, CAM's president testified that he knew of no reason why CAM would have terminated its co-brokerage agreement with the plaintiff.

## BACKGROUND

### I.      THE PARTIES AND OTHER ENTITIES.

#### A.      FANNIE MAE, RICHARD LAWCH, AND GRACE HUEBSCHER.

Fannie Mae is a shareholder-owned, congressionally chartered federal instrumentality that was established to carry out vital public policies prescribed by statute:  to create a secondary market for residential mortgage financing, stimulate the flow of private capital into housing, and improve the affordability of homeownership.  *See* 12 U.S.C. § 1716.  Fannie Mae does not make loans directly to consumers and, indeed, it is statutorily precluded from doing so.  *See id.*  Instead, Fannie Mae fulfills its important federal mission through its purchase or securitization activities, which help provide primary market lenders with a ready source of capital to fund low-, moderate-, and middle-income housing.  *See* 12 U.S.C. §§1716, 1719.  This lawsuit centers around one aspect of Fannie Mae's business, its multifamily purchase and securitization activities with a special class of lenders involved in the Delegated Underwriting and Servicing ("DUS") program.   Fannie Mae's DUS program involves a small group of multifamily lenders who have the right to commit Fannie Mae, on a loan-by-loan basis, to purchase multifamily loans.  (*See* March 25, 2003 Huebscher Dep. at 14:7-15, attached hereto at Exhibit A1.)  In exchange, these DUS lenders share the risk of loss with Fannie Mae.  (*See id.*; March 28, 2007 Williams Dep. at 27:4-13, attached hereto at Exhibit B.)

Fannie Mae has a long-standing commitment to diversity in all aspects of its business. That commitment has not gone unnoticed: in just the first six months of 2007, the corporation has been honored with awards that include:

- "Hispanic Corporate 100" – Hispanic Magazine (February 2007);

- "America's Top 50 Corporations for Multicultural Business Opportunities" – DiversityBusiness.com (March 2007); and,

- "40 Best Companies for African Americans" – Black Enterprise (June 2007).[1]

Importantly, Fannie Mae's dedication to diversity and specifically its efforts to work with Minority Women-Owned Businesses ("MWOB") has been a resounding success: between 1998 and 2003 (the time period relevant to plaintiff's claims), MWOB made up between 18 and 21% of its discretionary spending. (*See* Fannie Mae's Interrogatory Responses ("Fannie Mae's Interrog. Resp.") No. 3, attached hereto at Exhibit C.)

Defendant Richard Lawch has been employed by Fannie Mae since 1991, and currently holds the position of Senior Vice President of Community Investments. (*See* Declaration of Richard Lawch, ("Lawch Decl."), ¶ 1, attached hereto at Exhibit D.) Defendant Grace Huebscher has been employed by Fannie Mae since 1996, and currently holds the position of Vice President for Capital Markets. (*See* Declaration of Grace Huebscher, ("Huebscher Decl."), ¶ 1, attached hereto at Exhibit A.)

### B. PLAINTIFF AND RMS.

Plaintiff was employed by Fannie Mae as a director in its multifamily unit from January 1990 through June 1998 when she voluntarily left to join CAM. (*See* Am. Compl. (Docket. No. 9), ¶¶ 11; March 28, 2007 Williams Dep. at 73:19-22.) After she resigned from Fannie Mae,

---

[1]     *See* http://www.fanniemae.com/aboutfm/awards/2007.jhtml?p=About+Fannie+Mae&s=Awards+%26+Achievements&t=2007+Awards+%26amp;+Achievements (last accessed on June 19, 2007).

however, she was unable to reach a mutually-acceptable agreement with CAM, and decided to open her own company. (*See* March 21, 2003 Williams Dep. at 226:5-10, attached hereto at Exhibit E.) In October 1998, plaintiff formed RMS, a limited liability company, wholly-owned by plaintiff, with the sole intent that RMS would contract with Fannie Mae to "pursue the business [plaintiff] had been doing at Fannie Mae prior to [her] departure." (Am. Compl. ¶¶ 31-32; March 28, 2007 Williams Dep. at 20:17-20; May 7, 2007 Williams Dep. at 300:19-20, attached hereto at Exhibit F; District of Columbia Certificate of Revocation, attached hereto at Exhibit G.) The District of Columbia Department of Consumer and Regulatory Affairs revoked RMS's articles of incorporation in 2003 after the company "failed and/or refused to file reports and pay all fees and dues owing prior to June 16, 2002 and 2003." (District of Columbia Certificate of Revocation.)

### C.    CAM.

CAM is a financial services company that does both insurance and mortgage brokerage for multifamily properties. (*See* Jones Dep. at 7:17-20, attached hereto at Exhibit H.) In 1997, while plaintiff still worked at Fannie Mae, Fannie Mae and CAM entered into a memorandum of understanding concerning multifamily credit risk insurance. (*See* CAM Amended Complaint ¶ 16, attached hereto at Exhibit I.) From 1997 through 1999, Fannie Mae used CAM as an insurance broker for the procurement of multifamily credit risk insurance. By early 1999, however, the companies had a dispute with respect to the extent of their contractual relationship. (*Id.* ¶ 46.) In the end, CAM brokered five non-DUS Fannie Mae insurance policies, two with AIG (one in 1997 and one in 1998) and three with General Star National Insurance Company (all in 1999). (*Id.* ¶¶ 19, 22 & 45.)

CAM and Fannie Mae did not enter into any transactions following 1999, and all prospects for new business relationships between the two ended in December 2001 when CAM

filed suit against Fannie Mae for millions of dollars in compensatory and punitive damages on the basis that its brokerage relationship with Fannie Mae had allegedly been "destroye[d]." (*Id.* ¶¶ 48, 85, 96.) Defendants have not had any business interaction with CAM since the filing of the lawsuit in December 2001. (*See* Huebscher Decl. ¶¶ 4, 5; Lawch Decl. ¶¶ 3, 4.) Ultimately, the parties voluntarily dismissed the litigation after agreeing to arbitrate the underlying claims. (*See* Dismissal Order, attached hereto at Exhibit J.)

## II.    THE MAY 2001 PROPOSAL.

In May 2001, RMS made a proposal to Fannie Mae (hereinafter, "May 2001 Proposal") to "lay[] off risk associated with [Fannie Mae's] Delegated Underwriting and Servicing ("DUS") Program," (Williams Interrog. Resp. No. 3, attached hereto at Exhibit K) by "secur[ing] the insurance and the DUS lenders as clients and bring[ing] the deal back to Fannie Mae." (Williams Interrog. Resp. No. 4; *see also* March 28, 2007 Williams Dep. at 36:13-20; May 7, 2007 Williams Dep. at 154:10-14; Jones Dep. Exh. 2, attached hereto as Exhibit H1.) RMS sought to lay-off risk by providing insurance for certain losses that a DUS lender otherwise would have to bear in the event of default on a loan.

On May 15, 2001, CAM's president, Bob Jones, e-mailed Stephen Noble from Zurich Insurance, an insurer to whom CAM was pitching the proposal, a document from RMS entitled "Opportunity To Provide Insurance Coverage For . . . Fannie Mae's Delegated Underwriting And Servicing Program," which outlined the May 2001 Proposal. (March 28, 2007 Williams Dep. Exh. 1, attached hereto at Exhibit B1.) The cover e-mail, which was also sent to plaintiff, indicated that RMS represented three DUS lenders and that Mr. Jones and plaintiff hoped to be able to share performance data "based on your interest in a potential transaction." (March 28, 2007 Williams Dep. Exh. 1, at FNMW.MBW.008015.)

7

On May 23, 2001, plaintiff sent an e-mail to defendant Huebscher with an "update from RMS," indicating that several insurers had expressed interest in RMS's May 2001 Proposal and asking a number of questions.  (Jones Dep. Exh. 7, at FNMA.MBW.008031, attached hereto at Exhibit H3.)  On May 31, 2001, defendant Huebscher forwarded the e-mail to her supervisor, defendant Lawch, indicating that plaintiff was interested in pursuing insurance for the DUS program.  (*See* Jones Dep. Exh. 7, at FNMA.MBW.006230.)  Defendant Huebscher's initial reaction was that it wouldn't be worth pursuing.  (*Id.*)  She explained that the proposal "wasn't really consistent with what I understood our business model to be."  (March 26, 2003 Huebscher Dep. at 463:21-22, attached hereto at Exhibit A1.)  Because lenders could commit Fannie Mae to the purchase of loans without prior approval, Fannie Mae wanted lenders to share the risk of a loan default.  In short, as defendant Huebscher put it, Fannie Mae wanted to make sure that the lenders had "skin [in] the game."  (March 26, 2003 Huebscher Dep. at 449:12-25, attached hereto at Exhibit A1; March 27, 2003 Huebscher Dep. at 519:19-23, attached hereto at Exhibit A1.)  Allowing lenders to insure this risk would remove a strong incentive to underwrite the loans properly, and thus "[i]f our programs are all delegated and the individuals that are selling and servicing for us are doing the underwriting and credit-risk analysis for us on our behalf, [Fannie Mae] [] like[d] them to have a stake in the game."  (March 26, 2003 Huebscher Dep. at 449:21-25.)

While laying-off the risk of DUS lenders was generally inconsistent with Fannie Mae's business model, at the time defendants received RMS's May 2001 Proposal, the Office of Federal Housing Enterprise Oversight (OFHEO) — the federal agency responsible for regulation of Fannie Mae's business — was in the midst of finalizing a new, risk-based capital rule, and Fannie Mae was concerned about the regulation's potential impact on its DUS program.  (*See*

March 26, 2003 Huebscher Dep. at 463:7-14.)  Thus, defendant Lawch indicated "if Ofheo [sic] comes back with bad RBC Rules we may be interested [in insurance]."  (Jones Dep. Exh. 7, at FNMA.MBW.006230.)[2]  As defendant Huebscher testified, "we were in the process of receiving and finalizing what were going to be Fannie Mae's risk based capital guidelines . . .  [a]nd so I think [Lawch] was trying to keep all of his options open."  (*See* March 26, 2003 Huebscher Dep. at 463:7-14.)

In the end, OFHEO's final risk-based capital rule obviated any need for Fannie Mae to pursue proposals involving the laying-off of DUS risk.  In July 2001, shortly after Fannie Mae received plaintiff's e-mail, OFHEO issued its final rule.  (*See* Risk-Based Capital, 66 Fed. Reg. 47730 (September 13, 2001) (codified at 12 C.F.R. part 1750).)[3]  The final rule contained significant revisions from OFHEO's previously proposed rule, including, among other things, cutting in half the capital impact of risk-sharing with DUS lenders.  (*See id.*; Risk-Based Capital, 64 Fed. Reg. 18084 (April 13, 1999); Fannie Mae's Interrog. Resp. No. 7.)  Thus, the final rule obviated the need for Fannie Mae to obtain insurance for capital purposes and Fannie Mae did not pursue DUS insurance coverage at the time because it was inconsistent with the risk-sharing nature of Fannie Mae's business model.  (*See* March 26, 2003 Huebscher Dep. at 449:12-25; *see, e.g.*, Fannie Mae's Interrog. Resp. No. 7.)  Under these circumstances, Fannie Mae decided that it would not pursue the DUS proposal with either RMS or Craig Ott.  (*See id.*)

Plaintiff testified that she recognized in mid-2001 that Fannie Mae was not going to consummate the proposed DUS transaction with her.  (*See, e.g.,* March 17, 2003 Williams Dep.

---

[2]        If the new regulation had required Fannie Mae to hold substantially more capital based on the risk that a DUS lender would be unable to fulfill its risk-sharing obligations, the possibility of insuring the risk could have become more attractive.  (*See* March 26, 2003 Huebscher Dep. at 464-465, attached hereto at Exhibit A1.)
[3]        OFHEO's risk-based capital rule, while not published in the Federal Register until September 2001, was available from OFHEO as of July 19, 2001.  *See* http://www.ofheo.gov/media/archive/docs/regs/RBCFinal.pdf (last accessed June 21, 2007.)

at 88, 91, 102, 104, 121, attached hereto at Exhibit L.)  CAM also stopped working on the

proposal in August 2001 because it heard from plaintiff that Fannie Mae was not pursuing the

proposal.  (*See* Jones Dep at 54.)

### III.    PLAINTIFF'S CO-BROKERAGE AGREEMENT WITH CAM.

As noted above, when plaintiff left Fannie Mae in 1998, she hoped to go to work with

CAM.  After plaintiff was unable to reach an agreement with CAM, she formed a company,

RMS, that tried to purchase CAM, "but this offer, too, was rebuffed."  (Jones Dep. Exh. 4, at

FNMA.MBW.007369, attached hereto at Exhibit H2.)  Thus, although CAM and plaintiff had

talked about a joint venture, they never actually entered into an agreement.  (*See* Jones Dep. at

31:2-25.)

In May 2001, plaintiff wrote to Fannie Mae to "clearly define" the scope of her

company's relationship with CAM.  (Jones Dep. Exh. 2.)  According to the letter, RMS and

CAM did not have "any connection with respect to ownership and no one from CAM or RMS

has an interest in the other's business ventures." (*Id.* at FNMA.MBW.008003.)  Instead, she

stated that they merely had a "co-brokerage agreement."  (*Id.*)

Although neither CAM nor plaintiff has produced a signed co-brokerage agreement, they

both contend that an agreement did exist.  In her May 2001 letter to Fannie Mae, plaintiff

described the agreement as follows: "The agreement indicates that when CAM locates an

insurance company for a project that RMS is working on, RMS agrees to compensate CAM

through some form of split commission."  (Jones Dep. Exh. 2.)  Her interrogatory responses

similarly described the agreement as "a simple, common co-brokerage agreement with CAM

Financial that entailed paying them a commission in the event that they secured the insurance

that I needed on any of the proposals that I was working on."  (Williams Interrog. Resp. No. 7.)

Bob Jones, CAM's president until 2005 and plaintiff's principal contact at the firm, recalled only two Fannie Mae related projects or presentations that plaintiff or RMS worked on with CAM:  The May 2001 DUS proposal and her presentation on captive insurance in August 2001.  (*See* Jones Dep. at 58-59.)  Mr. Jones also indicated that CAM worked on several non-Fannie Mae product development projects with plaintiff, but that none of them resulted in an actual transaction with the exception of a $10,000 application fee paid by First Atlantic.  (*See id.* at 32-37.)  Mr. Jones indicated that he did not believe that the co-brokerage agreement formally terminated prior to his departure from the company in 2005, testifying that: "I know no reason why it was ever terminated." (Jones Dep. at 35:18-19.)  Plaintiff herself testified: "I don't recall when it expired. I'm not sure if it had a term in here.  Let's see.  Does this say? This doesn't say so I don't know. Well, it certainly had to expire when I was no longer a broker.  I haven't been a broker for two years." (May 7, 2007 Williams Dep. at 224:8-10).  Plaintiff' brokerage license expired in April 2003.  (*See* District of Columbia Dept. of Insurance, Securities & Banking Licensee Look-up, attached hereto at Exhibit M.)

In her discovery responses, plaintiff asserts that she had conversations with CAM president Jones in which he informed her that (1) Fannie Mae was actively discouraging CAM from doing business with her and (2) Fannie Mae had made "false and defamatory" statements about her.  (Williams Interrog. Resp. Nos. 9 & 10.)  She could not say, however, when these conversations occurred, what was said by Fannie Mae, or even who made the alleged remarks. (*Id.*; May 7, 2007 Williams Dep. at 221:223:22.)  Moreover, plaintiff's allegations were directly contradicted by Mr. Jones himself, who could not recall a single conversation regarding RMS or the plaintiff with defendants Huebscher or Lawch.[4]  More specifically, Mr. Jones could not recall

---

[4]       When asked, "Did you ever have any conversations with Ms. Huebscher about Marialice Williams or Risk Mitigation Strategists, LLC, for which Ms. Williams was not present," Mr. Jones responded, "I just don't recall."

any instance where defendants discouraged CAM from business relationships with the plaintiff,[5] or made disparaging remarks about the plaintiff.[6] Mr. Jones' recollection is consistent with declarations submitted by defendants Huebscher and Lawch, indicating that no such conversations occurred. (*See* Huebscher Decl. ¶¶ 6, 7; Lawch Decl. ¶¶ 5, 6.)

## IV.    PLAINTIFF'S KNOWLEDGE OF FANNIE MAE'S DECISIONS.

On August 29, 2004, plaintiff sent Fannie Mae's CEO a draft complaint alleging that the company had refused to do business with her and had "blackballed" her on account of her race. As evidence of this purported conduct, plaintiff attached a copy of a May 2001 e-mail between defendants Lawch and Huebscher, and stated that the e-mail "made the blackball clear." (Draft Compl. ¶ 19, attached hereto at Exhibit N.) The complaint also asserted (erroneously) that plaintiff did not discover this e-mail until May 2002. (*Id*.) This complaint was never filed.

Nearly a year later, on July 28, 2005, plaintiff filed suit against Fannie Mae, Lawch and Huebscher. The new complaint reiterated that the e-mail constituted "evidence of the ongoing and inexplicable blackballing of Plaintiff Williams from all Fannie Mae business." (Compl. ¶ 45.) The complaint, however, removed the previous reference to "May 2002" and instead

---

(Jones Dep. at 43.) When asked, "Whether you had any discussions with Mr. Lawch about Marialice Williams or Risk Mitigation Strategies, LLC after Ms. Williams [Plaintiff] left Fannie Mae," Mr. Jones responded, "I don't recall." When asked further, "You don't recall any?" Mr. Jones responded, "No." (*Id.* at 46.)

[5]        When asked, "Did Ms. Huebscher ever tell CAM Services not to do business with Ms. Williams or Risk Mitigation Strategies," Mr. Jones responded, "Not that I recall." (Jones Dep. at 43.) When asked, "And after Ms. Williams left Fannie Mae, I take it then that you don't recall any conversation in which Mr. Lawch told CAM not to do business with Ms. Williams," Mr. Jones responded, "I don't recall of any conversations." (*Id.* at 62.)

[6]        When asked, "Did Ms. Huebscher make any disparaging remarks about Ms. Williams or Risk Mitigation Strategists, LLC to you," Mr. Jones responded, "I don't recall." When asked, "Did Ms. Huebscher ever discuss Ms. Williams' business acumen with CAM or with you," Mr. Jones responded, "I don't have any knowledge or recall." When asked, "Do you recall whether Ms. Huebscher ever made any false statements to you about Ms. Williams or Risk Mitigation Strategists, LLC," Mr. Jones responded, "I have no recall [*sic*]. I don't think so." (Jones Dep. at 44.) When asked, "And you don't recall any conversations in which Mr. Lawch made any disparaging remarks about Ms. Williams after she left Fannie Mae," Mr. Jones responded, "I don't recall of any." When asked, "And you don't recall any false statements that Mr. Lawch made to you about Ms. Williams after she left Fannie Mae," Mr. Jones responded, "Well, same answer; same question." (*Id.* at 62:19-63:8.)

asserted that the plaintiff did not "discover" the significance of this evidence until much later. (Compl. ¶ 46.)

Fannie Mae moved to dismiss the complaint, noting that "much later" turned out to be a matter of days. Documents provided by plaintiff herself indicated that she received the e-mail on June 4, 2001 — less than a week after it had originally been sent. Instead of responding to Fannie Mae's motion to dismiss, plaintiff changed her story and amended her complaint. This time she alleged, for the first time, that it was not the e-mail that put her on notice of her claims. Instead it was an "October 8, 2003" meeting on "captive insurance" that provided the triggering event for limitations purposes. (Am. Comp. ¶¶ 51-52.) According to her new complaint, it was not until after this meeting that she actually realized that Fannie Mae did not intend to do business with her. Plaintiff alleged that, following the meeting, "defendant Huebscher and other officials at Fannie Mae stopped responding to Plaintiff Williams' correspondence and telephone calls . . . and it became clear for the first time" to plaintiff that defendants were not willing to do any business with her. (Am. Compl. ¶ 53.) As plaintiff recently testified, "I really didn't get any further com -- communication or correspondence from them after attempting to contact them." (May 7, 2007 Williams Dep. at 196:19-21.) This testimony confirmed testimony she gave three years earlier in the CAM case. (*See* May 5, 2003 Williams Dep. at 32-33, attached hereto at Exhibit O.)

Discovery has demonstrated that plaintiff's amended complaint is premised on an admittedly inaccurate date. First, consistent with her original complaint, plaintiff admitted that after reading the May e-mail between Huebscher and Lawch, "It was clear that [Fannie Mae] was

not going to do business with [her]."  (March 17, 2003 Williams Dep. at 91).[7]  More importantly, the captive insurance meeting she now contends starts the clock on her limitations period did not occur on October 8, 2003.  Plaintiff **herself** testified that the meeting occurred on August 21, 2001.  (*See* May 6, 2003 Williams Dep. at 128:25-129:13, attached hereto at Exhibit P ("Q:  Did you in fact have that meeting on the 21st of August?  A.  Yes, we did.  Q.  And who was there?  A.  Kate Westover.  Q.  And what was her position?  A.  Kate Westover is an international authority on captive insurance.").)  This testimony is supported by a wealth of documentary evidence, including the testimony of CAM's president, and a declaration from the internationally renowned captive insurance expert (Kathryn "Kate" Westover), who made the actual presentation to Fannie Mae.  (May 6, 2003 Williams Dep. at 128:25-129:13; Jones Dep. at 54-55 ("I was copied on some e-mails that Ms. Williams was making a captive presentation in about August of 2001.  It's somewhere in that time frame, August, September"); Declaration of Kathryn Westover, attached hereto at Exhibit Q; FNMA.MBW.008057, attached hereto at Exhibit R.)

A few months after the meeting — and Fannie Mae's purported refusal to contact her — plaintiff's "co-broker," CAM, filed suit against Fannie Mae.  (*See* CAM Amended Complaint.)  In early 2002, shortly after CAM filed its lawsuit, Fannie Mae's counsel asked to meet with

---

[7]     Indeed, on March 17, 2003, seven months **before** she now contends she discovered Fannie Mae's alleged discrimination, plaintiff testified extensively about this e-mail exchange and what she understood it meant.  Among other things:

- When asked how she knew that it was decided that Fannie Mae rejected plaintiff's proposal, plaintiff stated that it was "[i]n the context of this e-mail."  (March 17, 2003 Williams Dep. at 102.)
- Plaintiff acknowledged that she had discussions with others "as soon as probably I got this e-mail.  It's pretty shocking when you spent almost two hundred and some thousand dollars building a business to suddenly one day walk in the door and no [sic] you don't have ding, after lies and lies and lies and confidentiality and being asked if you wanted to do it, and then being crapped on in the midst of all of it."  (March 17, 2003 Williams Dep. at 94, attached hereto at Exhibit L.)
- Additionally, in this same deposition, plaintiff stated that the e-mail was sent to her "because it's pretty clear from this e-mail that I was not going to be given the same opportunity as everyone else was being given to do this" and it was "because I was being screwed."  (March 17, 2003 Williams Dep. at 94, 121.)

plaintiff in order to obtain information for the lawsuit.  Plaintiff refused the meeting.  (*See* May 7, 2007 Williams Dep. at 166:7-11.)  Defendants did not have any business interaction with plaintiff or CAM after the filing of the lawsuit.  (*See* Huebscher Decl. ¶¶ 4, 5; Lawch Decl. ¶¶ 3, 4.)  Defendants did not promise plaintiff any business or even meet with her after this date.  (*See* Huebscher Decl. ¶¶ 3, 4; Lawch Decl. ¶¶ 2, 3.)

Plaintiff's recent testimony is entirely consistent with the documentary record and her previous testimony.  Plaintiff testified in March of 2003 and again in 2007 that she provided all of the information in her possession related to Fannie Mae in response to a subpoena issued in the CAM litigation in early 2002.  (*See* March 17, 2003 Williams Dep. at 37:8-18, attached hereto at Exhibit L; May 7, 2007 Williams Dep. at 145-147.)  Plaintiff, however, did not produce a single e-mail or electronic document concerning Fannie Mae.  Plaintiff explained the absence of any such documents by claiming to have had a computer crash in the fall of 2001.  (*See* May 7, 2007 Williams Dep. Exh. 10; March 17, 2003 Williams Dep. at 37:8-18.)

Plaintiff's testimony also reveals that as early as June 2001 she believed that defendant Lawch was discriminating against her.  In her interrogatory responses, she indicated that her evidence of discrimination was a statement by defendant Lawch that "he was working with an 'international broker' for doing some insurance business for the MBS pools."  (Williams Interrog. Resp. No. 1.)  Plaintiff testified that: "I knew that that was a discriminatory remark. That he was selecting a white man with no experience or knowledge over me, a black person, to do the aggregation business."  (May 7, 2007 Williams Dep. at 200.)  Plaintiff also testified — at an earlier deposition — that she heard defendant Lawch's statement in early 2001.  (*See* March 17, 2003 Williams Dep. at 107-108, attached hereto at Exhibit L.)

**<u>ARGUMENT</u>**

I.    **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BOTH CLAIMS BECAUSE THEY ARE BARRED BY THE APPLICABLE THREE-YEAR STATUTE OF LIMITATIONS.**

As this Court previously recognized, "the statute of limitation is three years for both the Section 1981 claim and the tortious interference claim." (Mem. Op. at 19-20 (citing *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998) (Section 1981) and (*Beard v. Edmondson & Gallagher*, 790 A.2d 541, 546 (D.C. 2002) (tortious interference).) Defendants previously moved for summary judgment on the ground that plaintiff's claims are time barred because plaintiff's undisputed testimonial admissions established that she knew, or at the very least should have known, that she had a cause of action against defendants on or about June 4, 2001. (*See id.* at 20 (quoting plaintiff's deposition testimony).)

In response to defendants' motion for summary judgment, plaintiff moved for a continuance pursuant to FED. R. CIV. P. 56(f). In that motion, plaintiff argued that "it was not until the time following a business development meeting with Defendants which was conducted on October 8, 2003, that plaintiff became fully aware of [defendants' alleged] plot." (Plaintiff's Mot. for Continuance Under Rule 56(f) at 4 (Docket No. 13).) In her amended complaint, plaintiff alleged that this business development meeting concerned captive insurance and involved a presentation by Kate Westover, an expert on captive insurance. (Am. Compl. ¶ 51.) In the amended complaint, plaintiff also alleged that after the meeting "officials of Fannie Mae stopped responding to Plaintiff Williams correspondence and telephone calls" and it "became clear" that defendants had been "blackballing" plaintiff and "her business entities." (*Id.* ¶ 53.)

The Court granted plaintiff's FED. R. CIV. P. 56(f) motion, stating that "[t]o create a triable issue of fact over a statute of limitations issue, a plaintiff may show that the defendant engaged in subsequent misrepresentation, tolling the statue of limitations." (Mem. Op. at 21.) The Court held that "[i]f plaintiff can demonstrate that defendants continued to promise other

business opportunities to her, then a trier of fact could reasonably conclude that she could not have been aware of any racially discriminatory intent on the part of defendants in rejecting her May 2001 proposal." (*Id.* at 22.)  The Court also denied defendants' Motion for Summary Judgment on the basis that the tortious interference claim was time-barred because it concluded there was no information in the record concerning the date of plaintiff's "anticipated co-brokerage agreement with CAM."  (Mem. Op. at 24 n.12.)

Discovery has revealed that plaintiff's tortious interference and Section 1981 claims are, in fact, one and the same.  Plaintiff hoped to use CAM to procure insurance for transactions she pitched to Fannie Mae, and contends that Fannie Mae interfered with her relationship with CAM by refusing to enter into those transactions.  Indeed, plaintiff admitted in her sworn deposition testimony that her tortious interference claim is based on defendants' purported refusal to do business with her: when asked, "So fundamentally your claim related to the co-brokerage agreement is that Fannie Mae didn't do any business with you; is that fair to say," plaintiff responded, "That's right."  (May 7, 2007 Williams Dep. at 215; *see also id.* at 202-03; Section II.B *infra*.)  Because plaintiff's tortious interference claim is based on the same underlying factual allegations as her Section 1981 claim, any claim for tortious interference would have accrued at the same time, and is time-barred for the same reasons, as that claim.

The evidence developed in discovery since the Court's ruling demonstrates without dispute that: (1) the business development meeting that plaintiff identified as key to her discovery of Fannie Mae's (or defendants') alleged "plot" to deny her business occurred in August 2001, not October 2003 as alleged in the amended complaint; and (2) there is no evidence of any fraudulent concealment[8] by defendants, nor any evidence that defendants

---

[8]     As explained *supra*, plaintiff has not produced evidence that supports even a colorable theory of fraudulent concealment.  Nevertheless, defendants note that "[f]or the court to toll the statute of limitations on the basis of

continued to offer her future business.

First, the allegation in plaintiff's amended complaint that the date of the so-called captive insurance meeting that plaintiff contends triggered her discovery of defendants' wrongdoing is October 2003 is simply inaccurate.  According to the plaintiff's own deposition testimony, this meeting occurred in August 2001, not October 2003. (*See* May 6, 2003 Williams Dep. at 128:25-129:13.)  That admission is supported by a wealth of additional evidence that the meeting occurred in August 2001.  (*See* May 6, 2003 Williams Dep. at 128:25-129:13; Jones Dep. at 54-55; Declaration of Kathryn Westover; FNMA.MBW.008057.)  Plaintiff contends that it was after such meeting that "officials of Fannie Mae stopped responding to [her] correspondence and telephone calls" and it "became clear" that defendants had been "blackballing" her and "her business entities" (Am. Compl. ¶53).  As such, plaintiff has in fact admitted that she had no further contact with defendants concerning the May 2001 — or any other — business proposal after August 2001.

Second, plaintiff admitted in her deposition that she had notice of defendant's purported racially discriminatory intent in 2001.  Specifically, she alleged that a statement by defendant Lawch indicating he would be working with an "international broker" evidences her allegation that Fannie Mae denied her the opportunity — on the basis of race — to make and enforce a contract with respect to the May 2001 proposal.  (Williams Interrog. Resp. No. 1.)[9]  And, in her deposition, she testified that she knew at the time she heard the remark before June 2001 "[t]hat he was selecting a white man with no experience or knowledge over me, a black person, to do

---

'fraud or concealment,' the plaintiff must show that a defendant engaged in a course of conduct designed to conceal evidence of the alleged wrongdoing, and that the plaintiff was not on actual or constructive notice of that evidence, despite the exercise of due diligence." *Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 60 (D.D.C. 2006) (citing *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994)).

[9]    Moreover, that remark is the only "evidence" of discrimination plaintiff has advanced in support of her discrimination claim.  (*See id.*)

the aggregation business." (May 7, 2007 Williams Dep. at 200.)  Thus, it is beyond dispute that plaintiff was aware of any alleged discriminatory intent on the part of the defendants outside the statute of limitations period and cannot assert that she was not on notice of her discrimination claim.

In short, plaintiff's recent averments, designed as they were to overcome glaring limitations problems, stand in contravention to the sworn testimony and documentary evidence produced in this case.  Not only do the undisputed facts prove that plaintiff knew about the alleged discriminatory intent in 2001, but they also show that plaintiff could not possibly have been "promise[d] other business opportunities" except outside the statute of limitations period. As such, plaintiff's claims must be dismissed.

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BOTH CLAIMS BECAUSE IT WAS RMS, NOT PLAINTIFF, THAT SOUGHT TO CONTRACT WITH FANNIE MAE.

### A.    PLAINTIFF DOES NOT HAVE STANDING TO ASSERT A SECTION 1981 CLAIM BECAUSE THE MAY 2001 PROPOSAL CAME FROM HER COMPANY, RMS.

In *Domino's Pizza v. McDonald*, 126 S. Ct. 1246, (2006), the Supreme Court recently held that the president and sole shareholder of a company — like the plaintiff here — does not have standing to pursue a Section 1981 claim based on an actual or proposed contractual relationship between the company and the defendant.  *Id.* at 1252.  Plaintiff's admission that the May 2001 Proposal came from her company, RMS, thus bars her individual discrimination claim.

*Domino's Pizza* involved a Section 1981 claim brought by the president and sole shareholder of a small corporation, which had previously contracted with the defendant.  The plaintiff alleged "that [defendant] had broken its contracts with [plaintiff's company] because of racial animus toward [him], and that the breach had harmed [him] personally by causing him 'to

19

suffer monetary damages and damages for pain and suffering, emotional distress, and humiliation.'" *Id.* at 1248. The Supreme Court rejected plaintiff's lawsuit, concluding that because his claim derived from a contractual relationship between the defendant and his company, only the company could bring the claim. *Id.* at 1250-51. The Court specifically rejected plaintiff's argument that because he was the "actual target" of the discrimination and personally lost benefits that would have accrued to him but for the alleged discriminatory conduct. *Id.* at 1250.

The Supreme Court's decision in *Domino's Pizza* applies with full force to the undisputed facts of this case. Plaintiff concedes that the May 2001 Proposal "was made by Risk Mitigation Strategists, LLC . . ." (March 28, 2007 Williams Dep. at 36.) Her written proposals to both Fannie Mae and a potential insurance company confirm this testimony. In early May, plaintiff sent Fannie Mae a letter indicating that "RMS w[ould] continue to work" on the proposed business and followed up with an e-mail providing an "update[s] from RMS." (Jones Dep. Exh. 2; Jones Dep. Exh. 7, at FNMA.MBW.008031.) Similarly, the proposal that Bob Jones and plaintiff forwarded to Zurich Insurance indicated that RMS represented three DUS lenders and that "RMS is seeking insurance coverage for [these] lenders." (March 28, 2007 Williams Dep. Exh. 1, at FNMA.MBW.008015, 008017.) Thus, the undisputed facts demonstrate that plaintiff does not have standing to pursue her discrimination claim because the May 2001 Proposal was made by RMS rather than plaintiff.

**B.    PLAINTIFF SIMILARLY DOES NOT HAVE STANDING TO ASSERT A TORTIOUS INTERFERENCE CLAIM BECAUSE THE MAY 2001 PROPOSAL WAS MADE BY HER COMPANY, RMS.**

As described above, plaintiff's own testimony bears out the fact that her tortious interference claim is, at bottom, based on defendants' purported refusal to pursue business with her (*see* p. 17, *supra*). (*See, e.g.* May 7, 2007 Williams Dep. at 202-03, 215.) This Court

previously concluded that the only specific Fannie Mae proposal plaintiff identified is the May 2001 Proposal.  (*See* Mem. Op. at 9.)  Because that proposal was made by RMS rather than plaintiff herself, she lacks standing to pursue this claim.  *See, e.g., Vann v. Spak*, Case No. 01-55555, 2001 U.S. App. LEXIS 21428, at *2 (9th Cir. Sep. 10, 2001) (holding that dismissal was proper where plaintiff  lacked standing to bring a tortious interference claim because he was not a party to the underlying contract); *Osborn v. Bell Helicopter Textron*, 828 F. Supp. 446, 450-51 (N.D. Tex. 1993) (granting summary judgment where plaintiff lacked standing because the tortious interference claim he made belonged to his business, rather than to himself).

## III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BOTH CLAIMS BECAUSE PLAINTIFF CANNOT IDENTIFY ANY DAMAGES ARISING FROM FANNIE MAE'S REFUSAL TO CONTRACT.

### A.    THE COURT SHOULD DISMISS PLAINTIFF'S CLAIM BECAUSE SHE HAS ADDUCED NO EVIDENCE TO SUPPORT HER AVERRED DAMAGES WHICH, EVEN AS ALLEGED, CANNOT SUPPORT A CLAIM UNDER SECTION 1981.

Plaintiff must, of course, prove her damages. *See Carey v. Piphus*, 435 U.S. 247 (1978). As discovery has revealed, however, plaintiff's claimed damages are nothing more than "mere unsupported allegations."  *See Devera v. Adams*, 874 F. Supp. 17, 20 (D.D.C. 1995) ("[T]he non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.").  Plaintiff's efforts at proof evince a wholesale failure to "'provide evidence that would permit a reasonable jury to find' in [her] favor."  *See id.* (quoting *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987)).  While the court "may consider any evidence that would be admissible at trial," in this case, all plaintiff has offered is her own averments, which, standing alone, cannot rebuff this motion for summary judgment. *See Moore v. Ashcroft*, 401 F. Supp. 2d 1, 20-21 (D.D.C. 2005).

In particular, Fannie Mae asked plaintiff to describe in detail each of her damages and to specify which damages relate to the May 2001 Proposal. Plaintiff merely responded that "[l]osses were calculated based upon the amount of potential business that Fannie Mae did using structures developed by [her]." (Williams Interrog. Resp. No. 13.) This measure of damages is, of course, wholly divorced from the business outlined in the May 2001 Proposal. But, more importantly, the record demonstrates that Fannie Mae did not pursue the May 2001 Proposal with anybody else. (*See* March 26, 2003 Huebscher Dep. at 465.; Fannie Mae Interrog. Resp. Nos. 2 & 4.) Thus, plaintiff's claim fails under her own theory of damages because Fannie Mae did not enter into the May 2001 Proposal with any individual or entity and thus plaintiff did not suffer any losses in that respect.

Moreover, even if plaintiff could recover for transactions that never occurred (with Mr. Ott or anybody else), plaintiff's speculative, back-of–the-envelope calculations about what "might have been" had Fannie Mae chosen to insure some or all of its DUS portfolio are insufficient to support her claims. *See e.g., Whetstone Candy Co. v. Nat'l Consumers League*, 360 F. Supp. 2d 77, 82-83 (D.D.C. 2004) (granting summary judgment because plaintiff's claims of lost sales are but conclusory assertions since "sales forecasts were not in the record, nor were declarations by the employees who prepared them, or relevant expert reports"); *Miller Billboard Adver., Inc. v. Outdoor Sys.*, Case No. 99-1405, 2000 U.S. App. LEXIS 2800, at *7-9 (7th Cir. Feb. 22, 2000). Plaintiff's gambit of multiplying Fannie Mae's total business activity in a given sector by the fees that plaintiff claims she would have charged had she brokered insurance for this activity from the time she left Fannie Mae going forward[10] is simply divorced from reality.

---

[10]    Plaintiff's rambling testimony on her damages theory includes: (1) "Annual reports from Fannie Mae reflect *about* $2 billion of MBS, one-off transactions which were closed . . . annually, substantially more MBS were issued with the DUS portfolio," (May 7, 2007 Williams Dep. at 225 (emphasis added)); (2) "*Generally speaking*, the fees range from about 25 basis points annually for the insurance. In some instances, fees were as high as 56 basis

Finally, plaintiff's purported reliance damages are similarly deficient. Plaintiff's interrogatory responses list a number of recurrent business expenses (e.g., rent, travel, phone and office equipment, office assistant.) (*See* Williams Interrog. Resp. No. 14.) But plaintiff cannot attribute any specific amount to the May 2001 proposal. (*Id.*) This is not surprising given that she first raised the proposal with Defendant Lawch in early 2001 and conceded that — a few months later — she knew it would not go forward. This suggests that even if plaintiff could present specific evidence of reliance damages, they would be *de minimus* at best. Moreover, when Fannie Mae requested that plaintiff produce more specific information on these damages to help determine whether any could be fairly attributable to her May proposal, she simply refused. (*See, e.g.,* May 7, 2007 Williams Dep. at 268, 295-296.) For example, plaintiff admitted that her credit card statements contained charges related to both personal and business expenses, and would not — and could not — decipher between the two. (*See* May 7, 2007 Williams Dep. at 260:1-11.)

### B. PLAINTIFF OFFERS NO EVIDENCE OF ANY SPECIFIC DAMAGES RESULTING FROM THE TERMINATION OF HER CO-BROKERAGE AGREEMENT.

Finally, plaintiff's thoroughly unsubstantiated and illogical estimation of damages also entitles defendants to summary judgment on plaintiff's tortious interference claim. As noted with respect to plaintiff's Section 1981 claim (*see* Section III.A, *supra*), plaintiff cannot document any damages related to her proposal to do business with Fannie Mae. Moreover, as described below, it is well-established that a defendant cannot tortiously interfere with its own contracts and business relationships. (*See* Section V.A, *infra*.) Therefore, plaintiff's damages

---

points. And the broker's fee is approximately 10 percent of the premium fee," (*Id.* at 224 (emphasis added)); and (3) "[T]hat's just for one year. So, let's see, '98, '99, '2000, '1, '2, '3, '4, '5. When did I file in '5? So that's seven times five, that's 35 million right there without me knowing the balance of what else would've been there." (*Id.* at 227.)

allegations must flow from *non-Fannie Mae* business that CAM and plaintiff would have done if the co-brokerage agreement had not been breached. Plaintiff, however, fails to allege — let alone document with evidence — any damages allegations that do not flow from lost business opportunities with Fannie Mae itself.[11] Indeed, it is difficult to see how plaintiff could have suffered any damages given that her "co-brokerage agreement" consisted of *her* paying CAM for transactions *she* put together. (*See* Jones Dep. Exh. 2, at FNMA.MBW.008003.) In short, plaintiff once again does not come close to producing the type of evidence necessary to survive summary judgment on a key element of her tortious interference claim. Accordingly, this claim should be dismissed as a matter of law.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S SECTION 1981 CLAIM BECAUSE THERE IS NO EVIDENCE OF RACE DISCRIMINATION.

Plaintiff's claim under Section 1981 — which focuses solely on a May 2001 DUS proposal — fails as a matter of law because the undisputed facts reveal that Fannie Mae had a legitimate nondiscriminatory reason for declining to pursue the May 2001 proposal with *any* individual or entity, including RMS.

### A. PLAINTIFF CANNOT EVEN MAKE OUT A PRIMA FACIE SECTION 1981 CLAIM.

Even assuming plaintiff had standing to pursue her Section 1981 claim, plaintiff's complaint cannot survive summary judgment because she cannot establish a *prima facie* case of discrimination. In order to establish a claim of racial discrimination under Section 1981, a plaintiff must demonstrate that: "(1) [she] is a member of a protected class; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981 (which includes the right to make and enforce

---

[11]    Indeed, plaintiff stated that her "[l]osses are calculated based upon the amount of potential business that

contracts).  *Bennett v. United States Chess Fed'n*, 468 F. Supp. 2d 79, 86 (D.D.C. 2006); *see also*

Mem. Op at 8.  In showing discriminatory intent, "plaintiff must show that a defendant

intentionally treated him or her differently because of his or her race."[12]  *Bennett,* 468 F. Supp. at

87.  As this Court previously recognized:

> Under [controlling] case law, an inference of discrimination is
> created if the plaintiff is "significantly better qualified for the job"
> – or here by analogy, the contract – than the less qualified
> candidate.

(Mem. Op. at 8 (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (*en banc*);

*Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999).)  While plaintiff was able to survive

defendants' dismissal motion by alleging that Fannie Mae contracted with Craig Ott[13] with

respect to the May 2001 Proposal, the undisputed facts reveal that Fannie Mae did not give the

May 2001 Proposal to Craig Ott or anybody else.

  The May 2001 Proposal was flawed for two reasons.  First, because DUS lenders could

commit Fannie Mae to purchase multifamily loans without prior approval, Fannie Mae wanted to

ensure good loan underwriting by requiring its lenders to share in the default risk.  (*See* March 26

2003 Huebscher Dep. at 449.)  As such, the insurance strategies detailed in the May 2001

proposal were "not really consistent" with Fannie Mae's business plan.  (March 26, 2003

Huebscher Dep. at 463.)  Second, while the prospect of an unfavorable risk-based capital rule led

---

Fannie Mae did using structures developed by me." (Williams Interrog. Resp. No. 7.)

[12]    In her responses to defendants' interrogatory requests, plaintiff suggested that defendant Lawch had made a remark that evidenced discrimination:  "Mr. Lawch stated that he was working with an 'international broker' for doing some insurance business for the MBS pools."  (Williams Interrog. Resp. No. 1.)  As an initial matter, it is unclear how such statement has any probative value.  Moreover, the undisputed facts reveal that Fannie Mae never pursued the May 2001 Proposal with anyone (*see* Fannie Mae Interrog. Resp. No. 7), and, in fact, that it never hired an "international broker" for the multifamily division's securitization and other loan programs (*see id*. at No. 9).

[13]    While it is unnecessary for this Court to reach any conclusions about Mr. Ott's and plaintiff's relative qualifications, the undisputed facts show that Mr. Ott had extensive experience in the insurance business, including service as a vice president of a major insurance company.  (*See, e.g.*, Jan. 19, 2004 Ott Dep. at 14-20, attached hereto at Exhibit S; March 26, 2003 Huebscher Dep. at 465.)  Plaintiff, on the other hand, consummated a single insurance transaction at Fannie Mae, and did not close a single transaction in her 5 years as an insurance broker. (*See* May 7, 2007 Williams Dep. at 201:1-10; 202:7-9.)

Fannie Mae to explore the possibility of using credit risk insurance for its DUS loans in mid-2001, the final OFHEO rule obviated the need to pursue such insurance.  (*See* March 26, 2003 Huebscher Dep. at 463; Jones Dep. Exh. 7, at FNMA.MBW.006230; Fannie Mae Interrog. Resp. Nos. 2 & 4.)  In short, Fannie Mae ultimately concluded that the May 2001 proposal was inconsistent with Fannie Mae's business model and that it should not pursue RMS's May 2001 Proposal with RMS, with Mr. Ott, or with anybody else.  (*See* March 26, 2003 Huebscher Dep. at 465; Fannie Mae Interrog. Resp. Nos. 2 & 4.)  These undisputed facts demonstrate that plaintiff cannot meet her *prima facie* burden with respect to her Section 1981 claim.

### B. FANNIE MAE HAS A LEGITIMATE NONDISCRIMINATORY REASON FOR DECLINING TO PURSUE THE MAY 2001 PROPOSAL.

Assuming plaintiff could establish by a preponderance of the evidence a *prima facie* case (which she cannot), the burden would then shift to the defendants to present evidence of a legitimate, nondiscriminatory reason for their actions. *See Clifton Terrace Assoc., Ltd. v. United Tech. Corp.*, 929 F. 2d 714, 722 (D.C. Cir. 1991).  This point is easily established in the defendants' favor by the undisputed facts described above.  As discussed in Section IV.A, *supra*, Fannie Mae determined that it should not pursue the May 2001 Proposal because the concept proposed was inconsistent with Fannie Mae's business model that required risk-sharing between Fannie Mae and its DUS lenders, and the Risk-Based Capital Rules issued by OFHEO in July 2001 obviated any need to pursue the proposal.  Because plaintiff will not be able to point to any evidence establishing a reasonable inference that the defendant's proffered explanation is unworthy of credence, her complaint fails under the *McDonnell Douglas* framework.  *See, e.g., Clifton Terrace*, 929 F. 2d at 722; *Chauhan v. M. Alfieri Co.*, 897 F.2d 123, 127-28 (3d Cir. 1990); *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 109 (1st Cir. 1988); *see also Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

C.    THERE IS NOT A SHRED OF EVIDENCE FROM WHICH A JURY COULD
      FIND IN PLAINTIFF'S FAVOR.

Where, as here, the defendants have met their burden of production, the burden-shifting

framework disappears, and a court reviewing summary judgment looks to whether a reasonable

jury could infer intentional discrimination or retaliation from all the evidence, including "'(1) the

plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's

proffered explanation for its action; and (3) any further evidence of discrimination that may be

available to the plaintiff (such as independent evidence of discriminatory statements or attitudes

on the part of the employer).'"  *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir.

2004) (quoting *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002); *see

also Moore v. Ashcroft*, 401 F. Supp. 2d 1, 22 (D.D.C. 2005) ("If Defendant is successful, then

the '*McDonnell Douglas* framework — with its presumptions and burdens — disappears, and the

sole remaining issue [is] discrimination *vel non*'") (citing *Reeves v. Sanderson Plumbing Prods.,

Inc.*, 530 U.S. 133 (2000)).  Here, plaintiff's claim fails because (1) evidence to support her

*prima facie* case is woefully deficient, (2) she has offered no evidence to attack defendants'

proffered explanation for declining to pursue the May 2001 Proposal, and (3) the record is

notably clear of any other evidence of discrimination.

Both contemporaneously with the May 2001 Proposal and through the course of

discovery, all relevant decision-makers at Fannie Mae have pointed to objectively verifiable

legitimate non-discriminatory reasons why Fannie Mae chose to not contract with RMS.  (*See*

Section III.A & B.)  Moreover, although plaintiff avers that Fannie Mae directed the business

outlined in the May 2001 Proposal "to a less qualified male contractor, Mr. Craig Ott," (Am.

Compl. ¶ 45), discovery has shown this is unquestionably not the case.  The truth is that Fannie

Mae never actually chose between plaintiff and Mr. Ott; indeed, Fannie Mae chose to not pursue

the May 2001 Proposal with anyone. (*See* **CITE**.) Because plaintiff cannot produce any evidence that the business related to the May 2001 Proposal was given to anyone else, her claim simply fails as a matter of law.

In short, considering all the evidence, the only conclusion a jury reasonably could reach is that Fannie Mae abstained from contracting with RMS — indeed abstained from contracting for the proposed business altogether — because the proposal was unnecessary and strategically disadvantageous.

## V. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM.

As plaintiff herself has acknowledged, to succeed on a claim of tortious interference under District of Columbia law, a plaintiff must show: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of [defendant]; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." (Plaintiff's Opposition to Defendants' Motion to Dismiss, at 9 (Docket No. 12) (quoting *Ulico Cas. Co. v. Prof'l Indem. Agency, Inc.*, Case No. 98-1018, 1999 U.S. Dist. LEXIS 8591, at * 4 (D.D.C. May 5, 1999).) The undisputed facts demonstrate that plaintiff cannot meet this burden for four additional and independent reasons. First, because plaintiff has admitted that the facts underlying her tortious interference claim relate to Fannie Mae's alleged refusal to do business with her, her claim fails as a matter of law because a party cannot interfere with its own contracts. (*See* Section V.A, *supra*.) Second, while plaintiff concedes that her tortious interference claim is based on defendants' refusal to do business with her and thus is barred as a matter of law, discovery has shown that any claim plaintiff may assert with respect to a business relationship with CAM is nothing more than a hope that does not establish a valid business expectancy under the law. (*See* Section V.B, *infra*.)

28

Third, plaintiff has failed to present any admissible evidence showing that defendants actually intended to interfere with her co-brokerage relationship with CAM.  (*See* Section V.C, *infra*.) Fourth, plaintiff has failed to present any facts that show that defendants' alleged interference actually impaired her co-brokerage agreement with CAM.  (*See* Section V.D, *infra*.)

### A.   PLAINTIFF'S OWN STATEMENTS ESTABLISH THAT HER ALLEGATIONS OF TORTIOUS INTERFERENCE ARE BASED ON FANNIE MAE'S PURPORTED REFUSAL TO DO BUSINESS WITH HER, AND THEREFORE HER CLAIM CANNOT STAND AS A MATTER OF LAW.

Plaintiff's own testimony bears out the fact that her tortious interference claim is, at bottom, based on defendants' purported refusal to do business with her.  When asked, "So fundamentally your claim related to the co-brokerage agreement is that Fannie Mae didn't do any business with you; is that fair to say," plaintiff responded, "That's right."  (May 7, 2007 Williams Dep. at 215; *see also id.* at 202-03.)  Indeed, plaintiff stated that her "[l]osses are calculated based upon the amount of potential business that Fannie Mae did using structures developed by me." (Williams Interrog. Resp. No. 13.)  Plaintiff, however, fails to understand the basic limits of a claim of tortious interference.  It is well-established that a defendant may not tortiously interfere with its own contracts and business relationships.  *See Donahoe v. Watt*, 546 F. Supp. 753, 757 (D.D.C. 1982) ("A defendant's conduct under his own contract with the plaintiff may or may not rise to the level of a breach of that contract, but it cannot support an action for interference with it."); *see also Rosenkoff v. Finklestein*, 195 F.2d 203, 205 (D.C. Cir. 1952) ("An invalid promise cannot be turned into a valid claim by describing the promisor's refusal to perform it as an interference either with the expectancies or with the contract rights of the promisee.").  Thus her tortious interference claim must be dismissed on this basis alone.

### B.   PLAINTIFF'S DID NOT HAVE A VALID BUSINESS EXPECTANCY FOR FUTURE DEALS WITH CAM.

Even if plaintiff's tortious interference claim was sufficiently distinct from her proposed

relationship with Fannie Mae to permit her claim to proceed (and it is not), her "co-brokerage agreement" with CAM does not create a valid business expectancy. As this Court previously recognized, "[i]t is well-established that '[a] protected relationship exists only if there is a reasonable likelihood or probability that a contract would have resulted; there must be something beyond mere hope.'" (Mem. Op. at 16 (quoting *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995).) The undisputed evidence in this case demonstrates that this "agreement" (which no one has been able to produce) was little more than a promise by Ms. Williams (or her company RMS) to provide CAM a commission if it secured insurance for future projects that Ms. Williams or her company was working on. As Ms. Williams explained, "[t]he agreement indicates that when CAM locates an insurance company for a project that RMS is working on, RMS agrees to compensate CAM through some form of split commission." (Jones Dep. Exh. 2, at FNMA.MBW.008003.) But plaintiff has not been able to provide evidence of anything more than a "hope" for future projects. Indeed, Bob Jones characterized all of CAM's work with Ms. Williams as simply "product development." (Jones Dep. at 33:17-21; *see also* March 28, 2007 Williams Dep. at 118:1-15.) Thus plaintiff's tortious interference claim fails for this reason as well.

### C.    PLAINTIFF CANNOT SHOW INTENTIONAL INTERFERENCE WITH HER CO-BROKERAGE AGREEMENT.

Even if plaintiff's co-brokerage agreement created a valid business expectancy with CAM, her claims would still fail because she cannot demonstrate intentional interference with that agreement. This Court previously held that plaintiff must make a "strong showing of intent" in order to make out a claim for tortious interference. (*See* Mem. Op. at 17 (citing cases).) Plaintiff, however, fails to produce any admissible evidence that reveals any such intent, let alone the "strong showing" necessary for her to proceed. Instead, she provides only vague and

self-serving hearsay about statements defendants purportedly made to CAM and cites to a letter

she sent to both defendants Mae and CAM.  (*See* Williams Interrog. Resp. Nos. 2, 9 & 10.)  As

explained below, this "evidence" does not create a genuine issue of material fact.

### 1. *Plaintiff's Self-Serving Hearsay Statements Do Not Create A Genuine Issue of Material Fact.*

The Court permitted plaintiff's tortious interference claim to proceed to discovery based

on her allegation that defendants communicated "knowingly false and defamatory" information

about plaintiff to CAM.  (Mem. Op. at 17.)  However, in response to defendants' interrogatory

requests, the only evidence plaintiff could provide about these purported communications was

her vague recollection of discussions she had with CAM president Bob Jones.  (*See* Williams

Interrog. Reponses Nos. 9 & 10.)  In her deposition, plaintiff could not recall when these alleged

conversations occurred, or what defendants supposed said to Mr. Jones.  (*See* May 7, 2007

Williams Dep. at 222-23.)[14]

In contrast to these vague and conclusory hearsay allegations propounded by plaintiff,

Fannie Mae has produced sworn declarations from defendants Huebscher and Lawch stating that

the alleged conversations never occurred.  (*See* Huebscher Decl. ¶¶ 6 & 7; Lawch Decl. 5 & 6.)

More importantly, Mr. Jones — the other purported participant in this dialogue — testified under

oath that he could not recall a single conversation regarding plaintiff or her company with either

defendant Huebscher or defendant Lawch.[15]  More specifically, Mr. Jones could not recall any

---

[14]    Specifically, plaintiff states: "I learned of Defendant actively discouraging CAM Financial from doing business with me as a result of phone conversations from Bob Jones, President of CAM Financial," (*See* Williams Interrog. Resp. No. 9), and "I learned of false and defamatory information about me being communicated to CAM Financial through telephone conversations with Bob Jones, President of CAM Financial." (*See id.* at No. 10.)

[15]    When asked, "Did you ever have any conversations with Ms. Huebscher about Marialice Williams or Risk Mitigation Strategists, LLC, for which Ms. Williams was not present," Mr. Jones responded, "I just don't recall." (Jones Dep. at 43) When asked, "Whether you had any discussions with Mr. Lawch about Marialice Williams or Risk Mitigation Strategies, LLC after Ms. Williams [plaintiff] left Fannie Mae," Mr. Jones responded, "I don't recall." When asked further, "You don't recall any?" Mr. Jones responded, "No." (*Id.* at 46.)

instance where defendants discouraged CAM from business relationships with plaintiff,[16] or made disparaging remarks about plaintiff.[17]  Indeed, Mr. Jones could recall only one set of innocuous remarks made by anyone from Fannie Mae with respect to plaintiff: those made by Fannie Mae employees Rhoda Newman and Betty Dance that "Marialice [plaintiff] was trying to drum up business" in her post-employment visits to the Fannie Mae offices.  (Jones Dep. at 47.)

In the face of the sworn testimony provided by Fannie Mae, plaintiff's self-serving and inadmissible hearsay testimony is insufficient to defeat summary judgment.[18]  Indeed, courts have regularly granted summary judgment motions in similar circumstances.  *See, e.g., Poullard v. Smith Kline Beecham Corp.*, Case No. 02-1590, 2005 U.S. Dist. LEXIS 35182 (D.D.C. Nov. 30, 2005) (granting summary judgment because plaintiff's claim of defamatory remarks were unsupported by deposition testimony of any of the alleged participants, and therefore only second-hand hearsay); *In re Ashby Enterprises, Ltd.*, 47 B.R. 394, 397 (D.D.C. 1985) (affirming summary judgment where there was no evidence in the record to support the conclusion that defendants "ever contacted [plaintiff's] other creditors or in any other way tried to deter them"); *see also Abbott v. Gale*, 896 F. 2d 323 (8th Cir. 1990); *Schindler v. Marshfield Clinic*, Case No.

---

[16]    When asked, "Did Ms. Huebscher ever tell CAM Financial Services not to do business with Ms. Williams or Risk Mitigation Strategies," Mr. Jones responded, "Not that I recall." (Jones Dep. at 43.)  When asked, "And after Ms. Williams left Fannie Mae, I take it then that you don't recall any conversation in which Mr. Lawch told CAM not to do business with Ms. Williams," Mr. Jones responded, "I don't recall of any conversations." (*Id*. at 62.)

[17]    When asked, "Did Ms. Huebscher make any disparaging remarks about Ms. Williams or Risk Mitigation Strategists, LLC to you," Mr. Jones responded, "I don't recall." (Jones Dep. at 44.)  When asked, "Did Ms. Huebscher ever discuss Ms. Williams' business acumen with CAM Financial or with you," Mr. Jones responded, "I don't have any knowledge or recall." (*Id*.)  When asked, "Do you recall whether Ms. Huebscher ever made any false statements to you about Ms. Williams or Risk Mitigation Strategists, LLC," Mr. Jones responded, "I have no recall. I don't think so." (*Id*.)  When asked, "And you don't recall any conversations in which Mr. Lawch made any disparaging remarks about Ms. Williams after she left Fannie Mae," Mr. Jones responded, "I don't recall of any." (*Id*. at 62-63.)  When asked, "And you don't recall any false statements that Mr. Lawch made to you about Ms. Williams after she left Fannie Mae," Mr. Jones responded, "Well, same answer; same question."  (*Id*.)

[18]    Plaintiff acknowledges that her knowledge of such conversations is unspecific hearsay, on which she has no personal knowledge: "I had several conversations with [CAM President] Bob Jones where I was told of negative and defamatory things that were said about me. Did he tell me what they were precisely? No. But we know they were said. He knows they were said. Richard Lawch knows they were said. You have to ask them." (May 7, 2007 Williams Dep. at 222.)

05-705, 2007 U.S. Dist. LEXIS 1496, at *56 (W.D. Wis. Jan. 4, 2007); *Richardson v. Rush-Presbyterian-St. Luke's Med. Ctr.*, Case No. 99-7540, 2002 U.S. Dist. LEXIS 6346 (N.D. Ill. Mar. 18, 2002).

      **2.**    ***Plaintiff's Own Letter Describing Her Co-Brokerage Agreement Does Not Demonstrate Any Ill Intent By the Defendants.***

The only "evidence" other than her self-serving hearsay that plaintiff cites in support of her tortious interference claim is a letter that she herself wrote to Fannie Mae in May 2001 describing the co-brokerage agreement she had with CAM. (*See* Jones Dep. Exh. 2, at FNMA.MBW.008003.) The assertion that a letter written by plaintiff herself evidences any intent to interfere with plaintiff's co-brokerage agreement, let alone the "strong showing of intent" necessary for plaintiff to survive summary judgment, is absurd on its face.[19] Moreover, even an evidentiary showing that defendants were attempting to "persuade" plaintiff to end her co-brokerage agreement with CAM would be insufficient to show intentional interference. *See, e.g., Bowhead Info. Tech. Servs., LLC v. Catapult Tech., Ltd.*, 377 F. Supp. 2d 166, 173-75 (D.D.C. 2005) (efforts by the defendant to dissuade one of the parties from entering into a contract with another was not "anything other than a general intent to interfere with a plaintiff's business dealings, which is insufficient to impose liability").

Plaintiff's argument that this letter constitutes interference because Fannie Mae had been expanding its business relationship with CAM and used her letter as a "stalling tactic, one more tactic . . . to exclude me [plaintiff] from the business I [plaintiff] had created" (May 7, 2007 Williams Dep. at 204) is baseless. First, it is nonsensical to suggest that a letter describing the

---

[19]     This Court previously recognized plaintiff's burden to show a "strong showing of intent" on the part of defendants. *See* Mem. Op. at 19; *see also Chambliss v. Amtrak*, Case No. 05-2490, 2007 U.S. Dist. LEXIS 11522, at *96 (D.D.C. Feb. 20, 2007) ("Intentionally procuring a breach of contract requires 'a strong showing of intent . . . to establish liability.'" (quoting *Genetic Sys. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1998)).)

relationship — and which Ms. Williams shared with CAM before sending it to defendants — interfered with that relationship.  (*See* Jones Dep. Exh. 2, at FNMA.MBW.008003-8004; FNMA.MBW.007996-7998, attached hereto at Exhibit T.)  Second, the evidence is undisputed that Fannie Mae was not expanding its business with CAM at the time.  Indeed, it had been almost two years since CAM had brokered an insurance deal for Fannie Mae and CAM was on the verge of filing a lawsuit against Fannie Mae.  (*See* CAM Amended Complaint.)  Third, a letter written by plaintiff cannot serve as evidence of ill intent by defendants.  *See, e.g., Moore v. Ashcroft,* 401 F. Supp. 2d 1, 41 (D.D.C. 2005) (granting summary judgment because "plaintiff has provided no evidence to support her allegation other than her own personal, subjective opinion; she has . . . offered no supporting testimony through other witnesses . . . and has provided no independent documentation").

### D.    DEFENDANTS DID NOT CAUSE THE TERMINATION OF PLAINTIFF'S CO-BROKERAGE AGREEMENT.

A claim of tortious interference has, as one its four required elements, proof that the alleged interference "induc[ed] or caus[ed] a breach or termination of the relationship or expectancy."  *Bennett Enters. v. Domino's Pizza*, 45 F.3d 493, 499 (D.C. Cir. 1995) (citing *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 422-23 (D.D.C. 1998)).  Even if plaintiff could establish intent to interfere with her relationship with CAM, there is no evidence establishing a causal link between defendants' alleged actions and the dissolution of plaintiff's purported "co-brokerage agreement" with CAM.

To the contrary, testimony by both CAM's president and plaintiff demonstrate that the co-brokerage agreement continued in effect until plaintiff lost her brokerage license.  First, CAM president Bob Jones testified that he believed the co-brokerage agreement was in effect when he left the company in 2005.  (*See* Jones Dep. at 35 ("I know no reason why it [agreement] was ever

terminated.").)  More importantly, Mr. Jones testified that he continued to hold plaintiff's business capabilities in high regard, refuting any inference that the allegedly disparaging remarks about plaintiff — remarks that defendants, of course, submit never occurred — had any causal effect on CAM's business with plaintiff.[20]  Second, plaintiff testified that her agreement with CAM terminated due to her own actions: the loss of her brokerage license.[21]   In short, because plaintiff can point to no actions of defendants that terminated her co-brokerage agreement with CAM, plaintiff's cause of action for tortious interference cannot stand.  *See, e.g., Whetstone Candy Co. v. Nat'l Consumers League*, 360 F. Supp. 2d 77, 83 (D.D.C. 2004) (granting summary judgment in part because "no specific evidence was offered as to the existence of or breach of a contract, and none was offered as to the causal connection, if any, between the two events").

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that their motion for summary judgment be granted, and that plaintiff's two remaining claims be dismissed, in their entirety, with prejudice.

June 21, 2007                                        Respectfully submitted,


                                                    /s/ Sarah A. Goldfrank
                                                    Evelyn L. Becker (D.C. Bar No. 451163)
                                                    Sarah A. Goldfrank (D.C. Bar No. 482382)
                                                    Kyra A. Grundeman (D.C. Bar No. 493622)
                                                    O'Melveny & Myers LLP
                                                    1625 Eye Street, N.W.
                                                    Washington, D.C. 20006

---

[20]      For example, Mr. Jones testified that "The quality of her [plaintiff's] work was very good," and "[plaintiff] was, in my opinion, critical to making those transactions work."  (Jones Dep. at 80.)

[21]      Plaintiff testified on this point as follows: "I don't recall when it [the agreement] expired. I'm not sure if it had a term in here . . . Well, it certainly had to expire when I was no longer a broker. I haven't been a broker for two years."  (May 7, 2007 Williams Dep. at 224.)  Plaintiff's brokerage license lapsed in April 2003.  (*See* District of Columbia Dept. of Insurance, Securities & Banking Licensee Look-up.)

(202) 383-5300 (phone)
(202) 383-5414 (fax)

*Counsel for Defendants Federal National*
*Mortgage Association, Richard Lawch and*
*Grace Huebscher*


Jonathan L. Griffith (D.C. Bar No. 456080)
Fannie Mae
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 752-6167 (phone)
(202) 752-4948 (fax)

*Counsel for Defendant Federal National*
*Mortgage Association*