# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARIALICE BATHRUS WILLIAMS,

    Plaintiff,

    vs.

FEDERAL NATIONAL MORTGAGE
    ASSOCIATION, *et al.*

    Defendants.

Civil Action No. 1:05CV01483

Judge John D. Bates

**DECLARATION OF GRACE
HUEBSCHER**

I, Grace Huebscher, hereby declare as follows:

1.    I have been employed by the Federal National Mortgage Association ("Fannie Mae") since 1996. I currently hold the position of Vice President for Capital Markets.

2.    Attached hereto at Tab 1 are true and correct copies of excerpts from the transcript of my deposition testimony in the lawsuit entitled *CAM Financial Services, Inc. v. General Star Nat'l Insurance Co., et al.*, Civil Action No. 01-314 (S.D. Miss.) ("*CAM Financial* lawsuit"). That testimony is true and accurate.

3.    Although I met with Ms. Williams concerning the May 2001 Proposal, I did not promise Ms. Williams any business at that or any other time.

4.    I did not have any business interactions with Ms. Williams after December 20, 2001, when CAM Financial Services, Inc. ("CAM Financial") amended the complaint in the *CAM Financial* lawsuit to add Fannie Mae as a party.

5.    I did not have any business interactions with any officer, director or other representative from CAM Financial after December 20, 2001.

6.    I never made false and defamatory comments regarding Ms. Williams to any

officer, director or other representative from CAM Financial.

     7.      I never discouraged CAM Financial from doing business with Ms. Williams.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 18th of

June 2007 at Washington, DC.

 

GRACE HUEBSCHER

**1**

00001

1        IN THE UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF MISSISSIPPI

3            SOUTHERN DIVISION

4  - - - - - - - - - - - - - - - X

5  CAM FINANCIAL SERVICES, INC.,  :

6      Plaintiff,      : Case No.1:01cv314BrR

7   v.          :

8  GENERAL STAR NATIONAL INSURANCE :

9  COMPANY; GENERAL STAR INDEMNITY :

10  COMPANY; GENERAL STAR MANAGEMENT:

11  COMPANY, GENERAL RE CORPORATION;:

12  GENERAL REINSURANCE CORPORATION;:

13  CRUMP INSURANCE SERVICES OF   :

14  MEMPHIS, INC.; CRAIG OTT,    :

15  INDIVIDUALLY AND IN HIS     :

16  REPRESENTATIVE CAPACITY AS VICE :

17  PRESIDENT OF GENERAL STAR    :

18  MANAGEMENT COMPANY       :

19  FEDERAL NATIONAL MORTGAGE   :

20  ASSOCIATION          :

21  (FANNIE MAE),        :

22      Defendants.    :

23  - - - - - - - - - - - - - - - X

24          Washington, D.C.

25          Tuesday, March 25, 2003

**March 25, 2003 CAM of FM - Huebscher**          **Page 1**

**CONFIDENTIAL**
**FNMA.MBW.002343**

00002

1      Videotaped deposition of GRACE ANN

2  HUEBSCHER, a witness herein, called for examination

3  by counsel for Plaintiff in the above-entitled

4  matter, pursuant to notice, the witness being duly

5  sworn by MARY GRACE CASTLEBERRY, a Notary Public in

6  and for the District of Columbia, taken at the Four

7  Seasons Hotel, 2800 Pennsylvania Avenue, N.W.,

8  Washington, D.C., at 9:53 a.m., Tuesday, March 25,

9  2003, and the proceedings being taken down by

10  Stenotype by MARY GRACE CASTLEBERRY, RPR, and

11  transcribed under her direction.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**March 25, 2003 CAM of FM - Huebscher**                    **Page 2**

CONFIDENTIAL
FNMA.MBW.002344

00013

 1  National Cooperative Bank. And from 1989 to 1994, I

 2  believe, I was with National Cooperative Bank running

 3  their mortgage company in Washington, D.C. And from

 4  1994 to 1996, I was with Hamilton Securities and from

 5  1996 until now, I was with Fannie Mae.

 6      Q.  And I want to come back to a couple of

 7  those. The only professional degrees, then, you have

 8  are your B.A. in economics and Spanish Literature?

 9      A.  Yes.

10      Q.  When you went to work for Fannie Mae in

11  1996, what position did you originally come on board

12  as?

13      A.  I was the director of aggregation.

14      Q.  What does the director of aggregation do?

15      A.  I was hired to start Fannie Mae's

16  multifamily conduit which was a means by which we

17  allowed our lenders, which normally risk share with

18  us, to deliver loans to us on a nonrecourse basis.

19      Q.  And I'm sorry, did you say risk share?

20      A.  Yes. And, you know, pause if you have --

21  I use a lot of lingo.

22      Q.  I understand. And some of that I may ask

23  you to define as we go along. Let me see. You said

24  you were hired to start Fannie Mae's multifamily

25  conduit which is a means by which we allowed our

**March 25, 2003 CAM of FM - Huebscher**          **Page 13**

**CONFIDENTIAL**
**FNMA.MBW.002355**

00014

1  lenders, which we normally share risk with us, to

2  deliver loans on a nonrecourse basis.

3       Can you give me that in layman's terms?

4    A.  Sure. Fannie Mae multifamily, as its

5  business model, primarily chooses to purchase loans

6  from lenders and would like those lenders to share in

7  the risk of that sale. Our prominent program is the

8  DUS program which stands for delegated underwriting

9  and servicing.

10     That's -- the majority of the volume or

11  purchases of mortgages through multifamily come

12  through that channel. And we buy loans from the DUS

13  lenders one by one, and the lenders, when they sell

14  them to us, they agree to share in the losses if any

15  losses occur on a loan-by-loan basis.

16    Q.  And so when you say one by one, that's on

17  a loan-by-loan basis --

18    A.  Right.

19    Q.  -- as opposed to a lender-by-lender basis.

20    A.  Yes, with that specific lender. All the

21  DUS lenders share risk according to a prescribed

22  formula on a loan level basis and they take 5 percent

23  of the first loss of any loan, if in fact it goes

24  into default, then they share thereafter. That's the

25  primary majority of our business and has always been.

**March 25, 2003 CAM of FM - Huebscher**         **Page 14**

**CONFIDENTIAL**
**FNMA.MBW.002356**

00015
1        We also buy pools from lenders from mostly

2  depositories and insurance companies and there too

3  typically we require that they share risk in those

4  portfolios.

5        What had happened in mid-1980s is that

6  many of our DUS lenders were going to Wall Street and

7  selling their loans without any risk sharing. And

8  typically they do this because either they've had too

9  much concentration to one borrower, maybe a

10  geographic concentration, or they just choose not to

11  take a risk in a particular market so that they were

12  selling those loans to the Wall Street firms.

13        The Wall Street firms, without any risk

14  sharing. The Wall Street firms would then turn

15  around and create securities, typically REMICs, which

16  are real estate mortgage investment conduits. And

17  those pools and REMICs were basically rated by rating

18  agencies and chopped up into AAA, AA, all the way

19  down to unrated securities and sold to third parties.

20        What was happening was many of the Wall

21  Street firms were coming to Fannie Mae and saying to

22  Fannie Mae, would you please wrap the risk for AAA

23  down to BBB, which is the risk profile we typically

24  like to take. And what Fannie Mae discovered is why

25  not provide this service directly to our lenders

**March 25, 2003 CAM of FM - Huebscher**                    **Page 15**

**CONFIDENTIAL**
**FNMA.MBW.002357**

00016

1 rather than having them go through a Wall Street firm

2 who is going to take a slice and, you know, basically

3 improve the economics.

4     Q.   And let Fannie Mae keep that slice that

5 was going to the Wall Street firm?

6     A.   Or sharing it with the lenders, just

7 improving the economics, or even passing that on to a

8 savings to the borrowers ultimately who are

9 multifamily owners of properties who are taking out

10 these mortgages. So that was our job and we started

11 out doing exactly what the Wall Street firms were

12 doing, which is taking a position in the loans,

13 buying the loans, waiting until we had enough to

14 aggregate into a REMIC, going to a rating agency,

15 having them all rated, Fannie Mae would wrap through

16 BBB and either buy those securities ourselves or sell

17 them to a third party and we would also sell the B

18 pieces.

19          We really only did it to provide an extra

20 service to our DUS lenders really as more of a -- as

21 trying to be good, you know, just to provide

22 basically another outlet for them in case they needed

23 it. It's not something that they would primarily

24 choose to do, nor would we primarily choose to do,

25 but it was an added service on top of our flagship

**March 25, 2003 CAM of FM - Huebscher**                **Page 16**

**CONFIDENTIAL**
**FNMA.MBW.002358**

00017

1  product of DUS.

2      Q.   When you say that it is just an added

3  service and is not something that you would choose to

4  do -- and I want to make sure that I'm understanding

5  this.  And I'm not trying to put words in your mouth.

6          Do not hesitate to correct me if I

7  characterize your testimony in any way that is not

8  correct.  When you say it's not something that Fannie

9  Mae would choose to do, was this a source of

10  significant revenue for Fannie Mae to perform these

11  securitizations?

12         MR. WIMBERLY:  Objection, form.

13         THE WITNESS:  No, it wasn't.

14         BY MR. WISER:

15      Q.   What sort of volume are you talking about

16  in terms of performing these securitizations on an

17  annual basis once the program gets started?

18         MR. WIMBERLY:  Objection, form.

19         THE WITNESS:  You mean how many mortgages?

20         BY MR. WISER:

21      Q.   How many mortgages and the unpaid

22  principal balance.

23      A.   It varied, but in terms of a percentage of

24  our volume, it was, you know, minuscule.

25      Q.   And I can appreciate that because of

March 25, 2003 CAM of FM - Huebscher                Page 17

CONFIDENTIAL
FNMA.MBW.002359

00018

1 understanding what Fannie Mae's principal line is

2 but, at the same time, can you give me something that

3 is not expressed in terms of its relationship to the

4 principal business but rather a dollar figure? What

5 was the typical unpaid principal balance of loans

6 that were securitized in 1998, approximately?

7     MR. WIMBERLY: Objection to form.

8     THE WITNESS: It could be -- I don't

9 remember the exact amounts but 70 million to maybe

10 150 million compared to total volume in that given

11 year of maybe 8 to 10 billion.

12     BY MR. WISER:

13     Q.   That would have gone through the DUS

14 program?

15     A.   No.  The 70 to 150 million would have been

16 what would have gone through aggregation on this

17 nonrecourse basis versus 8 to 10 billion in annual

18 volume.

19     Q.   And I asked you just because it was the

20 first year that came into my head for 1998.  Has that

21 increased since 1998?

22     MR. WIMBERLY: Objection to form.

23     THE WITNESS: No.

24     BY MR. WISER:

25     Q.   Has it stayed approximately the same?

**March 25, 2003 CAM of FM - Huebscher**                    **Page 18**

CONFIDENTIAL
FNMA.MBW.002360

00019

1    A.   And less at times.

2    Q.   We'll get back to that.  You started, I

3  believe you said, as the director of aggregation?

4    A.   Uh-huh.

5    Q.   And what happened -- I mean, what was

6  your -- give me how you have progressed through

7  various positions at Fannie Mae since that time.

8    A.   I've worked for Richard Lawch the whole

9  time I've been at Fannie Mae.  Richard has also

10  expanded his responsibilities over time and as he's

11  expanded, I've taken on some of his responsibilities.

12  I was running aggregation -- I still actually do run

13  aggregation although it's part of a team which I

14  manage.

15      I expanded into managing pool purchases

16  from depositories and insurance companies, I helped

17  create another channel, our MFLEX lenders, which is

18  basically just instead of buying pools at one

19  particular point in time from a depository, we would

20  buy loan by loan from depositories using risk

21  sharing.  And I've more recently gotten involved with

22  product development and customer management

23  responsibilities in the DUS world as well.

24    Q.   When you say product development, what

25  does that include?

**March 25, 2003 CAM of FM - Huebscher**          **Page 19**

**CONFIDENTIAL**
**FNMA.MBW.002361**

00239
```
 1            UNITED STATES DISTRICT COURT

 2          SOUTHERN DISTRICT OF MISSISSIPPI

 3              SOUTHERN DIVISION

 4   - - - - - - - - - - - - - - x

 5  CAM FINANCIAL SERVICES, INC.,  :

 6        Plaintiff,    :    Case No.

 7        vs.           :    1:01cv314BrR

 8  GENERAL STAR NATIONAL INSURANCE :

 9  COMPANY; GENERAL STAR INDEMNITY :

10  COMPANY, GENERAL STAR MANAGEMENT:

11  COMPANY, GENERAL RE CORPORATION;:

12  GENERAL REINSURANCE CORPORATION;:

13  CRUMP INSURANCE SERVICES OF    :

14  MEMPHIS, INC.; CRAIG OTT;      :

15  INDIVIDUALLY AND IN HIS        :

16  REPRESENTATIVE CAPACITY AS VICE :

17  PRESIDENT OF GENERAL STAR      :

18  MANAGEMENT COMPANY             :

19  FEDERAL NATIONAL MORTGAGE      :

20  ASSOCIATION (FANNIE MAE),      :

21        Defendants.   :

22   - - - - - - - - - - - - - - x

23            Washington, D.C.

24            Wednesday, March 26, 2003

25
```

March 26, 2003 CAM of FM - Huebscher          Page 239

CONFIDENTIAL
FNMA.MBW.002581

00240

1   Continued Videotaped Deposition of:

2           GRACE HUEBSCHER

3   the witness, called for examination by counsel

4   for the Plaintiff, pursuant to notice and

5   agreement, commencing at 9:20 a.m., at the Four

6   Seasons Hotel, 2800 Pennsylvania Avenue NW,

7   before Virlana Kardash, RPR, CSR, a Notary Public

8   in and for the District of Columbia, when were

9   present on behalf of the respective parties:

10

11  APPEARANCES:

12

13  On behalf of the Plaintiff:

14  N. WISER, Esquire

15  BYRD & WISER

16  145 Main Street

17  Biloxi, Mississippi  39530

18  228-432-8123

19

20  On behalf of the Defendant Fannie Mae:

21  G. WIMBERLY, JR., Esquire

22  McGLINCHEY STAFFORD

23  643 Magazine Street

24  New Orleans, Louisiana  70130

25  504-586-1200

**March 26, 2003 CAM of FM - Huebscher**          **Page 240**

**CONFIDENTIAL**
**FNMA.MBW.002582**

00448

1    Or had there been meetings prior to this

2  time?

3    A  I believe there were other meetings.

4    Q  When did those meetings start?

5    A  They could have been over probably a

6  couple of months before this because Renee is the

7  boss of, you know, the big boss of the division

8  that would have written this business and was

9  coming in to do last-minute due diligence.

10    Q  That is Renee Henderson that's

11  referenced in the first paragraph?

12    A  Yes.

13    Q  Who is Gavin?

14    A  Gavin Wellington works for Walter

15  Bauman and provides the equivalent pricing and

16  analytics that Rick and Walter, who have been

17  referred to in the past, are providing now in

18  aggregation.

19    Q  They're the number crunchers?

20    A  Yes.

21    Q  Got you.  And I believe the question I

22  was in the process of asking before I sidetracked

23  myself is is it your testimony that the reason

24  that it took approximately eight to ten months

25  after Craig Ott's original proposal was finding

CONFIDENTIAL
FNMA.MBW.002790

00449

1  someone that was willing to write this kind of

2  insurance?

3      MR. WIMBERLY:  Objection.  Form.

4      THE WITNESS:  I think that's one

5  reason.  In addition, there really hasn't been a

6  compelling need either on our part, that really

7  aggregation has not produced the kind of volume --

8  hasn't really produced significant volume ever.

9      It's just not a mainstream product for us.

10      BY MR. WISER:

11  Q    Why is that?

12  A    As I mentioned in prior testimony,

13  Fannie Mae's flagship product DUS, Delegated

14  Underwriting and Servicing, and its business model

15  in general is more reliant on seller recourse than

16  it is on third-party recourse partly -- mostly

17  because we like our selling entities, our seller

18  servicers, to have what we call "skin of the

19  game."

20      So it's our preference to do it that way.

21  If our programs are all delegated and the

22  individuals that are selling and servicing for us

23  are doing the underwriting and credit-risk

24  analysis for us on our behalf, we would like them

25  to have a stake in the game.

**March 26, 2003 CAM of FM - Huebscher**                    **Page 449**

**CONFIDENTIAL**
**FNMA.MBW.002791**

00461

1  a matter of best evidence, but you didn't ask me

2  to bring it today.

3        MR. WISER: I understand that. And I'm

4  not suggesting that I did.

5        MR. WIMBERLY: It's available to you,

6  Mr. Wiser.

7        MR. WISER: I would like to get that

8  back.

9        MR. WIMBERLY: I assure you we'll take

10  care of it.

11        MR. WISER: And the reason I was

12  mentioning it now is that I did go back and look,

13  and in looking at the documents that CAM has

14  produced, this is all we received. It was just

15  this one page.

16        Therefore, I was going to check and make

17  sure. I've been advised that this is all that was

18  in the envelope. So while there may be more to

19  this document than 9692, that's all that we've

20  got. And everything that was produced to you was

21  all that we received.

22        MR. WIMBERLY: So noted.

23        BY MR. WISER:

24  Q   Ms. Huebscher, have you seen this

25  e-mail before?

CONFIDENTIAL
FNMA.MBW.002803

00462

1    A   Yes.

2    Q   Do you recall the substance of the

3  communications that were contained in the e-mail?

4    A   Yes.

5    Q   What's this about?

6    A   This is Marialice approached Rhoda and

7  said that she's had some conversations with some

8  of the DUS community about reinsuring their DUS

9  risk, and that's basically, I think, the nature of

10  it.

11    Q   And what was the response to Fannie Mae

12  upon receipt of this information from

13  Ms. Williams?

14      MR. WIMBERLY:  Objection.  Form.

15      THE WITNESS:  Did you say what was the

16  response by Fannie Mae?

17      BY MR. WISER:

18    Q   Yes.

19    A   As you can see from my e-mail reply,

20  I'm asking Richard for advice.  At this point in

21  time, I'm not really that involved with DUS.  In

22  fact, I was just beginning to be more involved --

23  well, no -- it's 2002 -- yes.

24      So I wasn't really that involved with DUS.

25  So I'm asking him is this something that we want

CONFIDENTIAL
FNMA.MBW.002804

00463

1  to pursue. And actually, I was surprised that

2  Richard wanted to pursue it in light of what I had

3  just said in my previous testimony, which is we

4  like the DUS lenders to have risk, to have at

5  risk, and wouldn't necessarily want them to rely

6  on third party to reinsurance.

7      But as you see, what Richard has said back

8  here, we also were in the process of receiving and

9  finalizing what were going to be Fannie Mae's

10 risk-based capital guidelines for OFHEO,

11 O-F-H-E-O. And that's Fannie Mae's regulator.

12     And so I think he was trying to keep all of

13 his options open, and I think -- and then you see

14 my reply there.

15     Q   I see that, in forwarding this message

16 on to Richard Lawch, you comment that, "My gut is

17 no."

18     A   Yes. My gut is no based on what I just

19 said; I was really surprised that we would

20 consider that from a business perspective. That

21 wasn't really consistent with what I understood

22 our business model to be.

23     Q   So the fact that you said, "Do we want

24 to pursue with her" was not really a reference to

25 Marialice Williams but, rather, was directed as to

**March 26, 2003 CAM of FM - Huebscher**          **Page 463**

**CONFIDENTIAL**
**FNMA.MBW.002805**

00464

1  the subject matter itself; is that correct?

2      A    Pretty much.

3      Q    What was Richard's response?

4      A    I just explained that.

5      Q    Would you give that to me again.

6      A    Sure.  "If OFHEO comes back with bad

7  RBC rules, we may be interested.  Are these

8  different players than Craig is showing us?"

9      Q    And RBC rules would be the risk-based

10 capital?

11     A    Yes.

12     Q    What is it about bad RBC rules that

13 might have interested?

14     A    As I mentioned in my testimony just

15 previous to this is that we were in the midst of

16 receiving revised guidelines from our regulator

17 OFHEO, and we weren't certain how they were going

18 to view the DUS entities.

19     Many of our DUS entities are unrated

20 entities; they don't have official long-term debt

21 rating.  So we were uncertain of what kind of

22 treatment they would have.  So what I think

23 Richard must have been jumping to as a possibility

24 is if, in fact, there's un-- like you know, say

25 they penalize us for more capital, would we be

CONFIDENTIAL
FNMA.MBW.002806

00465

1  better off, through some kind of reinsurance of

2  their risk, getting a higher rated counterparty so

3  we'd have to post less capital against that

4  business.

5      Q  Why do you respond that, "If we want to

6  engage Craig on the project, it might be a better

7  choice"?

8      MR. WIMBERLY:  Objection.

9  Mischaracterization.  Misleading.

10     THE WITNESS:  This is, again, a very --

11  there's thousands of things happening in our

12  business.  This is probably one of those things

13  that's a real quick e-mail exchange between

14  Richard and I and is so tangential to the business

15  at hand.

16     But probably what I'm saying -- keep in mind

17  this is May, 2001.  You know, we had successful

18  Gen Star transactions with Craig.  Craig has now

19  brought us, you know, Great American.  We've had

20  success with him.

21     So is he potentially more proven to help out

22  in this area?  We did not pursue it, by the way.

23  And we did not pursue it with Marialice.

24     BY MR. WISER:

25     Q  Why if the DUS lender had approached

March 26, 2003 CAM of FM - Huebscher          Page 465

CONFIDENTIAL
FNMA.MBW.002807

00466

1  Marialice, would you consider going to someone

2  else besides Marialice Williams?

3      A    I think at the end of the day we

4  actually had some DUS lenders approach us and

5  said, "Are you okay with us talking to Marialice?"

6  And we said, "Sure."

7      Q    Who were those DUS lenders?

8      A    I think Lend Lease was one of those.

9      Q    Okay.  Any others?

10     A    I don't remember the other names.  So

11  we didn't prohibit it from happening.

12     Q    There is a reference here, in the very

13  top, in your last response there, "Maybe you and I

14  can discuss or put on agenda for our team's weekly

15  strategy meeting"?

16     A    Uh-huh.

17     Q    What is the team's weekly strategy

18  meeting?

19     A    It was Richard's direct reports at the

20  time, those individuals that were reportedly

21  directly to Richard Lawch.

22     Q    Was that a formal meeting that,

23  theoretically, took place each week?

24     A    Theoretically took place each week.

25     Q    Did it, in fact, take place each week?

CONFIDENTIAL
FNMA.MBW.002808

00502
```
 1        IN THE UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF MISSISSIPPI
 2              SOUTHERN DIVISION
     - - - - - - - - - - - - - - -x
 3                               :
    CAM FINANCIAL SERVICES, INC.,  :
 4                               :
         Plaintiff,              :
 5                              : Case No.
      v.                        : 1:01cv314BrR
 6                               :
    GENERAL STAR NATIONAL INSURANCE :
 7  COMPANY; GENERAL STAR INDEMNITY :
      COMPANY; GENERAL STAR MANAGEMENT :
 8  COMPANY, GENERAL RE CORPORATION; :
      CRUMP INSURANCE SERVICES OF    :
 9  MEMPHIS, INC.; CRAIG OTT,       :
      INDIVIDUALLY AND IN HIS       :
10  REPRESENTATIVE CAPACITY AS VICE :
      PRESIDENT OF GENERAL STAR      :
11  MANAGEMENT COMPANY; FEDERAL     :

12  NATIONAL MORTGAGE ASSOCIATION   :

13  (FANNIE MAE),                   :

14                              :

15       Defendants.            :

16                              :

17  - - - - - - - - - - - - - - -x

18              Washington, D.C.

19              Thursday, March 27, 2003

20      The continued deposition of GRACE HUEBSCHER,

21  called for examination by counsel for Plaintiff in

22  the above-entitled matter, pursuant to notice, at

23  the Four Seasons Hotel, 2800 Pennsylvania Avenue,

24  N.W., Washington, D.C., Room 478, convened at 9:26

25  a.m., before Sandy Medford Nelson, a notary public
```

March 27, 2003 CAM of FM - Huebscher          Page 502

CONFIDENTIAL
FNMA.MBW.002843

00503
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**March 27, 2003 CAM of FM - Huebscher                    Page 503**

CONFIDENTIAL
FNMA.MBW.002844

```
00504
 1 APPEARANCES:
      On behalf of the Plaintiff:
 2       NICHOLAS VAN WISER, ESQ.
         Byrd & Wiser
 3       Metro Plaza One
         8401 Colesville Road, Suite 501
 4       Silver Spring, Maryland  20910
         (301) 495-3131
 5    On behalf of the Defendant Fannie Mae:
         GERALD E. WIMBERLY, JR., ESQ.
 6       WILLIAM H. LEACH, ESQ.
         McGlinchey Stafford, PLLC
 7       643 Magazine Street
         New Orleans, Louisiana  70130
 8       (504) 586-1200

 9       JONATHAN L. GRIFFITH, ESQ.

10       Associate General Counsel

11       Fannie Mae

12       3900 Wisconsin Avenue, N.W.

13       Washington, D.C.  20016-2892

14       (504) 586-1200

15  On behalf of the General Star Defendants:

16       WILSON CARROLL, ESQ.

17       Phelps Dunbar, LLP

18       SkyTel Centre, Suite 500

19       200 South Lamar Street

20       Post Office Box 23066

21       Jackson, Mississippi  39225-3066

22       (504) 586-1200

23  ALSO PRESENT:

24       JONATHON PERRY, Videographer

25       BOB JONES
```

March 27, 2003 CAM of FM - Huebscher      Page 504

CONFIDENTIAL
FNMA.MBW.002845

00505

```
 1          C O N T E N T S

 2              EXAMINATION BY COUNSEL FOR

 3  WITNESS          PLAINTIFF     DEFENDANTS

 4  GRACE HUEBSCHER     506, 577      571

 5          E X H I B I T S

 6  HUEBSCHER DEPOSITION EXHIBITS          MARKED

 7  No. 423 - Spreadsheet          519

 8  No. 424 - Email            541

 9  No. 425 - Document           550

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**March 27, 2003 CAM of FM - Huebscher**          **Page 505**

**CONFIDENTIAL**
**FNMA.MBW.002846**

00519

1          (Deposition Exhibit No. 423

2           marked for identification.)

3      MR. WISER: Did y'all get one?

4      BY MR. WISER:

5      Q   Okay. And I'm just going to ask you about

6 the first page.

7      A   Okay. Are we done with this one?

8      Q   I don't know yet. We may not be.

9      A   Okay.

10     Q   Can you tell me--I'm sorry. Have you had

11 a chance to look at it?

12     A   Well, I generally know what this is.

13     Q   Okay. Can you tell me generally what this

14 is?

15     A   As I mentioned previously when--Fannie Mae

16 has a lot of different tools by which it can manage

17 first loss risk, and not only portfolios. It buys

18 from lenders and flow, but aggregation as well.

19 So, what this is is a comparison of the cost of

20 various executions against us because one of the

21 things that, you know, DUS, is--because of the fact

22 that you have seller risk sharing and that skin in

23 the game, as I discussed before--

24     Q   Yes.

25     A   --we believe that the performance under

**March 27, 2003 CAM of FM - Huebscher**          **Page 519**

**CONFIDENTIAL**
**FNMA.MBW.002860**

00520

1  DUS warrants an all-in pricing to the market that's

2  better and lower than aggregation.  So, we try to

3  manage the pricing on those two executions to

4  ensure that that relationship takes place.  So,

5  that's why DUS is here.

6     Q    Okay.  It's kind of the benchmark, would

7  you say?

8     A    I don't know if that's fair to say.  I

9  mean, the whole competitive marketplace.

10        MR. LEACH:  I'm going to just object to

11  the document you've marked as an exhibit to the

12  extent I think she's testifying as to the first

13  page, but it attaches several seemingly separate

14  pieces of correspondence.  I just want the record

15  to be clear that she's testifying as to the first

16  page.  I don't know whether you intend to

17  continue--to include all of the other pages in the

18  exhibit.  That's your decision, but they are,

19  apparently, separate documents.

20        MR. WISER:  I understand.  I'd like to

21  have them included in the exhibit, but I don't

22  intend to ask her any questions about anything

23  other than the first page at this point.

24        MR. LEACH:  Okay, Mr. Wiser.

25        MR. WISER:  But your objection is noted.

CONFIDENTIAL
FNMA.MBW.002861