# **EXHIBIT B**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


------------------------ X

MARIALICE BATHRUS          )

WILLIAMS,                  )   Civil Action No.

        Plaintiff,         )   1:05CV01483

    vs.                    )   Judge John Bates

FEDERAL NATIONAL MORTGAGE)

ASSOCIATION, et al.,       )

        Defendants.        )

------------------------ X


            Videotaped Deposition of

          Marialice Bathrus Williams

          Wednesday, March 28, 2007

              Washington, D.C.


    Pages 1 - 131

    Volume 1

    Job No.: 179392

    Reported by:  Deborah Larson Hommer, RPR

Marialice Williams

|  | Page 2 |
|---|---|
| 1 | |
| 2 | |
| 3 | Wednesday, March 28, 2007 |
| 4 | 10:30 a.m. |
| 5 | |
| 6 | |
| 7 | Videotaped Deposition of MARIALICE BATHRUS |
| 8 | WILLIAMS held at the offices of: |
| 9 | |
| 10 | O'Melveny & Myers LLP |
| 11 | 1625 Eye Street, N.W. |
| 12 | Conference Room 10D |
| 13 | Washington, D.C. 20006 |
| 14 | |
| 15 | Pursuant to notice, before Deborah Larson |
| 16 | Hommer, Registered Professional Reporter and |
| 17 | Notary Public in and for the District of |
| 18 | Columbia. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

|  | Page 4 |
|---|---|
| 1 | Fannie Mae |
| 2 | 3900 Wisconsin Avenue, N.W. |
| 3 | Washington, D.C. 20016 |
| 4 | (202) 752-6167 |
| 5 | jonathan_griffith@fanniemae.com |
| 6 | BY:  Jonathan Griffith, Esquire |
| 7 | |
| 8 | Also Present: |
| 9 | Robert Cherouny, Videographer |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES: |
| 2 | On Behalf of Plaintiff MARIALICE WILLIAMS |
| 3 | Law Offices of Harley Jay Daniels |
| 4 | 5511 Second Street, N.W. |
| 5 | Washington, D.C. 20011 |
| 6 | (202) 468-7737 |
| 7 | harleydaniels@hotmail.com |
| 8 | BY: Harley Jay Daniels, Esquire |
| 9 | |
| 10 | On Behalf of the Defendants FEDERAL NATIONAL |
| 11 | MORTGAGE ASSOCIATION, et al. |
| 12 | O'Melveny & Myers LLP |
| 13 | 1625 Eye Street, N.W. |
| 14 | Washington, D.C. 20006-4001 |
| 15 | (202) 383-5300 |
| 16 | ebecker@omm.com |
| 17 | kgrundeman@omm.com |
| 18 | sgoldfrank@omm.com |
| 19 | BY:  Evelyn L. Becker, Esquire |
| 20 | Kyra A. Grundeman, Esquire |
| 21 | Sarah Alexander Goldfrank, Esquire |
| 22 | |

|  | Page 5 |
|---|---|
| 1 | I N D E X |
| 2 | |
| 3 | EXAMINATION OF WILLIAMS BY        PAGE |
| 4 | Ms. Becker            7 |
| 5 | |
| 6 | WILLIAMS DEPOSITION EXHIBITS:     PAGE |
| 7 | 1 - E-mail and attachment from Jones to |
| 8 | Noble, et al., dated 5/15/01      33 |
| 9 | 2 - Unsigned letter from Williams to |
| 10 | Huebscher          75 |
| 11 | 3 - E-mail from Williams to Newman, |
| 12 | et al., dated 5/3/01       79 |
| 13 | 4 - Unsigned letter from Jones to |
| 14 | Williams dated 8/6/00       79 |
| 15 | 5 - E-mail and attachments from |
| 16 | Hartsfield to Grove dated 6/14/02    80 |
| 17 | 6 - Mutual non-disclosure agreement    87 |
| 18 | 7 - Defendants' first set of requests |
| 19 | for production of documents       90 |
| 20 | 8 - Deposition of Marialice Williams |
| 21 | dated 3/17/03         109 |
| 22 | (Exhibits retained by the reporter.) |

2 (Pages 2 to 5)

Marialice Williams

Page 6

1            P R O C E E D I N G S
2            THE VIDEOGRAPHER:  This is tape
3    number 1 of the videotaped deposition of
4    Marialice Williams taken by the Defendant in
5    the matter of Williams versus Fannie Mae.
6    This case is taking place in the United States
7    District Court for the District of Columbia.
8    It's case number 1:05CV01483.  This deposition
9    is being held at the offices of O'Melveny &
10   Myers, 1625 Eye Street, Northwest, Washington,
11   D.C.  Today's date is March 28, 2007, and the
12   time indicated at the lower portion of the
13   television screen currently reads 10:30 a.m.
14           And my name is Robert Cherouny from
15   the firm of Esquire Deposition Services.  I am
16   the certified legal video specialist.  And the
17   court reporter is Deborah Hommer, also in
18   association with Esquire Deposition Services.
19   And will the counsel please introduce
20   themselves and indicate which party they
21   represent.
22           MS. BECKER:  My name is Evelyn

Page 7

1    Becker.  I represent Fannie Mae, Grace
2    Huebscher and Richard Lawch.
3            MS. GRUNDEMAN:  Kyra Grundeman,
4    representing Fannie Mae, Grace Huebscher and
5    Richard Lawch.
6            MS. GOLDFRANK:  Sarah Goldfrank,
7    representing Fannie Mae, Grace Huebscher,
8    Richard Lawch.
9            MR. GRIFFITH:  Jonathan Griffith
10   from Fannie Mae.
11           MR. DANIELS:  Harley Daniels for
12   Plaintiff Marialice Bathrus Williams.
13           THE VIDEOGRAPHER:  And will the
14   court reporter please swear in the witness.
15   Thereupon,
16           MARIALICE BATHRUS WILLIAMS,
17   the Witness, called for examination by counsel
18   for the Defendants, and, after having been
19   sworn by the notary, was examined and
20   testified as follows:
21   EXAMINATION BY COUNSEL FOR THE DEFENDANTS
22           BY MS. BECKER:

Page 8

1            Q.   Good morning, Ms. Williams.
2            A.   Good morning.
3            Q.   My name is Evelyn Becker.  I am
4    going to ask you some questions today.  Could
5    you please state your name for the record.
6            A.   Marialice Bathrus Williams.
7            Q.   What is your current address?
8            A.   1922 First Street, Northwest,
9    Washington, D.C., 20001.
10           Q.   How long have you lived at that
11   address?
12           A.   A little over -- two years and
13   three months.
14           Q.   What was your address immediately
15   prior?
16           A.   5722 First Street, Northwest,
17   Washington, D.C., 20011.
18           Q.   How long did you live at that
19   address?
20           A.   Since 1980 -- the last time I lived
21   there -- it was a rental property of mine, and
22   I moved into it.  I think for a couple of --

Page 9

1    just a couple of years the last time.
2            Q.   What was your residence immediately
3    prior to that?
4            A.   I know this is crazy.  I'm nervous,
5    so I can't remember the -- oh, 700 New
6    Hampshire Avenue, Northwest, Washington, D.C.,
7    20037, I believe.
8            Q.   How long did you live at that
9    address?
10           A.   Just about six years, I think.
11           Q.   You have been deposed before; is
12   that correct?
13           A.   Yes.
14           Q.   How many times?
15           A.   Oh, I don't -- I don't recall.  You
16   mean overall, like in your life?
17           Q.   Yes.
18           A.   Maybe five times, three -- three or
19   four times, I think.  I'm 61.  I haven't
20   really been in the law much in the last few
21   years.
22           Q.   You were deposed in the course of

3 (Pages 6 to 9)

Marialice Williams

---

Page 10

1    the CAM Financial litigation; is that correct?
2        A.   Yes.
3        Q.   Other than the depositions that you
4    testified at in the course of the CAM
5    Financial litigation, have you been deposed in
6    any other matters?
7        A.   Yes.
8        Q.   What were those matters?
9        A.   The members of the board of
10   directors of -- the advisory board of WPFW
11   radio station sued the Pacifica Network on an
12   issue involving governance, and I was deposed
13   in that matter.
14       Q.   Have you been deposed in any other
15   matters?
16       A.   I'm thinking.  I -- I just can't
17   remember if there was any other -- I'm just
18   trying to remember.  Oh, there was a -- I
19   believe there was a deposition at Fannie Mae
20   in a Fannie Mae case regarding a multi-family
21   securitization between Fannie Mae and a west
22   coast savings & loan, and I thought it was

---

Page 11

1    Coast Savings Bank, which I don't think now
2    has the same name.  I think it has changed
3    names.
4        Q.   Have you given testimony in any
5    other depositions?
6        A.   Not that I can recall right now.
7        Q.   Have you ever given testimony in
8    court?
9        A.   Yes.
10       Q.   When was that?
11       A.   In New Mexico I had a suit
12   against -- I believe it was General Motors.
13   This was a very long time ago.  And I had to
14   testify as to the facts in the case.
15       Q.   Can you give me an estimate of the
16   year?
17       A.   Approximately 19 -- 1987.
18       Q.   Did you sue General Motors?
19       A.   Yes, I did.
20       Q.   For what?
21       A.   I had an automobile that had a
22   major defect, and I had been taking it to the

---

Page 12

1    General Motors dealer, and it was never
2    corrected.  And the car eventually basically
3    blew up.
4        Q.   Did you receive any money as a
5    result of that litigation?
6        A.   Yes, I did.  I'm -- it was -- I
7    think it was whatever was determined to be the
8    value of that automobile, and it was not an
9    expensive automobile -- it was 9 or $10,000 or
10   something like that.
11       Q.   Did a lawyer represent you in that
12   case?
13       A.   Yes.
14       Q.   Who was the lawyer?
15       A.   Harley Daniels.
16       Q.   Other than the lawsuits that you've
17   already testified about, have you been
18   involved in any lawsuits as a witness?
19       A.   No.
20       Q.   Have you been involved in any other
21   lawsuits as a party?
22       A.   No.

---

Page 13

1        Q.   You're a lawyer; is that correct?
2        A.   Yes.
3        Q.   Are you currently licensed to
4    practice?
5        A.   Yes, I am.
6        Q.   Where?
7        A.   In the District of Columbia.
8        Q.   Do you currently have an active
9    practice?
10       A.   No.
11       Q.   When is the last time that you had
12   an active law practice?
13       A.   It would be 1980 -- maybe '81 or
14   '82.
15       Q.   Were you practicing in the District
16   of Columbia at that time?
17       A.   Yes.
18       Q.   What was the nature of your
19   practice?
20       A.   Oh, I'm sorry.  I was assistant
21   general counsel of the Office of Management
22   and Budget.  It wasn't private practice.  I'm

---

4 (Pages 10 to 13)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 14

1  sorry.
2    Q.  How long did you serve in that
3  capacity?
4    A.  Only about two years.  Maybe less
5  than that.
6    Q.  Outside of that position, was there
7  any other time that you practiced law
8  actively?
9    A.  Only with the government when I
10  graduated from law school and I went to the
11  Department of Justice.
12    Q.  What was your first position at the
13  Department of Justice?
14    A.  I believe it was just -- they
15  called it just attorney.  It was on, I think,
16  a separate schedule from if you were like a --
17  some other type of position.
18    Q.  Was that also in the Office of
19  Management and Budget?
20    A.  No.  That was in the civil rights
21  division in the employment section.
22    Q.  How long did you practice in the

Page 15

1  civil rights division of the employment
2  section at the Department of Justice?
3    A.  Eighteen months.
4    Q.  After that position, did you go to
5  OMB?
6    A.  No.  I went to the Equal Employment
7  Opportunity Commission as special assistant to
8  the chairman.
9    Q.  How long were you in that position?
10    A.  Just about 18 months there, I
11  think.
12    Q.  What was your next position in the
13  government?
14    A.  I worked at the administrative
15  office of the U.S. courts for the Supreme
16  Court.
17    Q.  What did you do there?
18    A.  I was -- I performed management
19  studies of the east -- of the eastern district
20  of Virginia federal court and the Connecticut
21  court.
22    Q.  Were you practicing law in that

Page 16

1  position?
2    A.  No.
3    Q.  What was your next position?
4    A.  My next position was -- when I left
5  there, I went to -- I worked at HUD, Housing
6  and Urban Development.  And I worked as a
7  senior legislative assistant to Patricia
8  Roberts Harris who was the Secretary of HUD at
9  the time.
10    Q.  Did you practice law in that
11  position?
12    A.  No.
13    Q.  What was your next position?
14    A.  I went to OMB and I was the
15  assistant director of the civil rights office.
16  And then, when David Stockman came in, the
17  titles were changed to -- my title was changed
18  to assistant general counsel.  I believe
19  that's the title.
20    Q.  When your title was assistant
21  general counsel, were you still in the civil
22  rights division?

Page 17

1    A.  Yes.
2    Q.  Were you practicing law in that
3  capacity?
4    A.  No.
5    Q.  Other than the 18 months that you
6  were at the civil rights division practicing
7  in the employment section, is there any other
8  time that you were actively practicing law?
9    A.  Between working at the
10  administrative office of the U.S. courts and
11  before -- no.  I'm sorry.  I should have
12  brought my resume.
13    My father was an attorney in the
14  District of Columbia, and from time to time I
15  would practice in his office.  When I came
16  back from New Mexico in 1988 before I worked
17  at Fannie Mae I worked with my father in his
18  office.
19    Q.  How long --
20    A.  In his law office.
21    Q.  How long did you work there?
22    A.  Just a few months.

5 (Pages 14 to 17)

Marialice Williams

Page 18

1     Q.  Between the few months that you
2  worked in your father's office and the
3  18 months that you worked in the civil rights
4  division, are those the only times that you
5  actively practiced law?
6     A.  I have in the last five years had
7  an occasional instance where I've practiced.
8  For example, I think I may have done a will
9  for someone, for one person -- two people.  I
10  represented, as a favor to a friend -- the
11  National Association of University Women had a
12  dispute with their interior designer of their
13  new building.
14        I'm trying to remember if there are
15  any other matters.  And that's pretty much it.
16     Q.  Were you paid for those
17  representations?
18     A.  I was paid by -- yes, I was paid.
19     Q.  I got a little bit of ahead of
20  myself in some of those questions, but let me
21  go back and ask if there is any reason that
22  you're not able to give full and truthful

Page 19

1  testimony here today?
2     A.  No.
3     Q.  Are you on any medication that
4  would preclude you from giving complete and
5  full testimony today?
6     A.  No.
7     Q.  Did you do anything to prepare for
8  your deposition today?
9     A.  Yes.
10     Q.  What did you do?
11     A.  I reviewed a number of the
12  information -- a number of -- some of the
13  information that was provided by O'Melveny &
14  Myers as a result of a request for documents.
15     Q.  These were documents produced by
16  Fannie Mae?
17     A.  Yes.
18     Q.  Did you review all of those
19  documents?
20     A.  I reviewed a great deal of it.
21     Q.  Did you do anything else to prepare
22  for your deposition?

Page 20

1     A.  No.
2     Q.  Did you meet with your attorney?
3     A.  No, we didn't meet -- well, we had
4  one phone conversation.
5     Q.  When was that?
6     A.  Yesterday.
7     Q.  How long was the conversation?
8     A.  Five minutes.
9     Q.  Did you bring any documents with
10  you today?
11     A.  No, I did not.
12     Q.  Other than your attorney, did you
13  discuss your deposition with anybody else?
14     A.  No.
15     Q.  What is Risk Mitigation
16  Strategists, LLC?
17     A.  It doesn't exist anymore, but what
18  it was was a company that was formed when I
19  left Fannie Mae to continue to pursue the
20  business that I had been doing at Fannie Mae
21  prior to my departure.
22        MS. BECKER:  Can you read back her

Page 21

1  answer.
2        (The reporter read the record as
3  requested.)
4        BY MS. BECKER:
5     Q.  When was it formed?
6     A.  19 -- I believe in 1988.
7     Q.  You said it no longer exists.  When
8  did it stop existing?
9     A.  It still exists, but not as an LLC.
10     Q.  What does it exist as currently?
11     A.  I have a person with whom I have
12  been working over a number of years who, along
13  with myself, we still gave a show of interest
14  from people who want to pursue the product
15  that I developed at Fannie Mae.
16     Q.  What type of entity is it
17  currently?
18     A.  It's just my own business.  It's
19  under sole proprietorship.
20     Q.  Who is this other person that you
21  were referring to?
22     A.  I work with Harvey Hartsfield.

6 (Pages 18 to 21)

Marialice Williams

1    Q.   How is it that it stopped being an
2  LLC?
3    A.   When I moved out of my offices in
4  the Watergate office building and moved
5  into -- my office into my home at 5722 First
6  Street, I just don't think I paid the annual
7  fee.  And then your -- you know, the -- the
8  District of Columbia government regulates
9  that.  It just lapsed.
10    Q.   When did you move out of the
11  Watergate?
12    A.   I think it was 2001.
13    Q.   What month?
14    A.   I believe -- it was May or June, I
15  believe, of that year.
16    Q.   Do you know when the status of RMS
17  as an LLC lapsed?
18    A.   I really don't recall exactly.
19    Q.   Do you have any documentation from
20  the government indicating that its status as
21  an LLC lapsed?
22    A.   No.

1    Q.   Are there any documents that could
2  identify when the status of RMS as an LLC
3  lapsed?
4    A.   I don't think so.
5    Q.   When is the last time that you paid
6  the annual fee for the LLC?
7    A.   I don't recall.
8    Q.   Was it sometime in 2001?
9    A.   I don't recall.
10    Q.   Who were the officers of Risk
11  Mitigation Strategists, LLC?
12    A.   Myself and Harvey Hartsfield.
13    Q.   What was your title?
14    A.   President.
15    Q.   What was Mr. Hartsfield's title?
16    A.   Vice president.
17    Q.   Were there any employees --
18    A.   No.
19    Q.   -- of RMS?
20    A.   No.
21    Q.   Was there anyone else associated
22  with RMS?

1    A.   No, not the LLC.
2    Q.   Has anyone else been associated
3  with RMS since its LLC status lapsed?
4    A.   Yes.
5    Q.   Who was that?
6    A.   Tim Webb worked with me as RMS on a
7  project at the Department -- D.C. Department
8  of Mental Health, attempting to procure
9  financing for the new St. Elizabeth's
10  Hospital.
11    Q.   When did that occur?
12    A.   That was three years ago, I
13  believe.  Let's see.  2007...
14    Q.   During both the time when RMS was
15  an LLC and the time when it was not an LLC,
16  can you identify the clients of RMS?
17    A.   RMS worked with Red Mortgage
18  Capital.  It was a DUS lender of Fannie Mae.
19  They worked with Aries Capital.  We worked
20  with, for a short time, Washington Mortgage.
21  Oh, goodness.  We worked with Countrywide.  We
22  worked with First Atlantic Guarantee

1  Corporation.  We worked with Swiss Re.  We
2  worked with Marsh Mac.
3       We worked with -- we worked with
4  Lend Lease Bovis.  We worked with -- we worked
5  with Pinnacle Mortgage.  We worked with the
6  Thurgood Marshall Center.  We worked with
7  Zurich AIG Insurance Companies.  We worked
8  with quite a few reinsurers.  Morgan Stanley,
9  Metropolitan Savings.  We worked for Eric
10  Rosenfield, investment banker.
11       We worked with -- that's not a
12  complete list, but that's a lot of them.  Some
13  of them were short relationships and didn't --
14  you know, I just, you know, can't recall all
15  of them, sitting here.
16       We worked with Fannie Mae.  I think
17  I said that.  We worked with CAM Financial.  I
18  forgot to put them in there, I think.
19    Q.   Can you recall any other clients of
20  RMS?
21    A.   We worked with -- oh, goodness.
22  Just -- what's his name?  Let's see.  That's

Esquire Deposition Services        MD - 1-800-539-6398
D.C. - 1-800-441-3376             VA - 1-800-752-8979

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 26

1   about all I can -- I know there were other
2   people.  I can even see some of them.  I just
3   am not able to put names to them.  If they
4   come out later, I can -- I will write them.
5       Q.  What was the nature of the work
6   that you did with Red Mortgage Capital?
7       A.  We were pursuing the possibility of
8   laying off risk associated with pools of
9   mortgages and individual loans that had been
10  originated by a number of DUS lenders.  And I
11  don't know if you're familiar with how the
12  structure works on the DUS loans, how the risk
13  is borne between the parties or split between
14  the parties.  Are you familiar with how that's
15  done on that?
16      Q.  I'm sorry.  This is your
17  deposition.
18      A.  Well, I was --
19          MR. DANIELS:  We have a question --
20          THE WITNESS: -- just asking so
21  that --
22          MR. DANIELS:  Go ahead.

Page 27

1          THE WITNESS: -- I could answer
2   your -- I didn't want it not to make sense to
3   you.
4          In Fannie Mae DUS transactions,
5   often there is -- not often, but there is
6   always some level of risk associated with the
7   loan that's either being securitized or being
8   purchased.  And the way that that risk breaks
9   out is that the first level of risk belongs to
10  the Red Mortgage or the Lend Lease or whoever
11  the DUS lender is, and then there is another
12  level of risk that is shared by Fannie Mae and
13  by the DUS lender.
14          And Fannie Mae had, at that time,
15  over $90 billion worth of DUS product.  And I
16  had been asked by Red Mortgage and Lend Lease
17  and others to try to come up with an insurance
18  that would, in fact, absorb that -- either the
19  primary or the secondary level of risk for
20  those individuals.  And ultimately what we
21  uncovered when we did our research was that
22  the insurance companies would have preferred

Page 28

1   to insure -- the risk is what they call
2   pari passu so that when you're reaching
3   through the second level of risk, it's shared
4   by Fannie Mae and the lender.  And the cost
5   was going to be much less expensive if Fannie
6   Mae would join with the lender and also lay
7   off that same -- its portion of that secondary
8   risk level.
9          BY MS. BECKER:
10      Q.  How long were you in discussions
11  with Red Mortgage Capital?
12      A.  For about two years, I believe.
13      Q.  What time frame was that?
14      A.  It would be beginning in 1998.
15      Q.  So it would have been 1998 to 2000,
16  approximately?
17      A.  It could have been longer than
18  that.  The -- yes, it could have been longer
19  than that.  2001, perhaps.
20      Q.  Do you have any recollection of any
21  discussions with Red Mortgage Capital that
22  extended beyond 2000 or 2001?

Page 29

1       A.  There could have -- could have been
2   communication on my part because I did
3   prepare, from time to time, updates about
4   things that were going on in the marketplace
5   with respect to insurance vis-a-vis the
6   risk -- laying off of risk.
7          And I would -- and there were also
8   a lot of issues pertaining to how certain
9   forms of collateral were perceived by
10  regulatory -- regulatory entities.  And so I
11  would try to keep my people up to date through
12  a newsletter or an e-mail or whatever, and I
13  often did that.  I just can't tell you exactly
14  when the last time is I did that.
15      Q.  Do you have a recollection of any
16  specific communications with Red Mortgage
17  Capital after 2000 or 2001?
18      A.  No, I don't.
19      Q.  What was the time frame of your
20  discussions with Lend Lease?
21      A.  Let's see.  I flew to Dallas to
22  meet with them 2001, I believe.

8 (Pages 26 to 29)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 30

1    Q.   Do you remember when in 2001?
2    A.   It was in the summer, but I'm -- I
3    believe it was August.
4    Q.   Is that the only communication you
5    ever had with Lend Lease?
6    A.   No.  I had daily contact with all
7    of these people.  When you're doing product
8    development, you always have to -- it's very,
9    you know, by the book.  You have -- there are
10   so many issues, so you're constantly dealing
11   with issues regarding their portfolio or their
12   originating, what's going on in the insurance
13   side, because there is no compatibility
14   between the insurance industry and the
15   mortgage industry on that level.
16   Q.   What was the time frame of your
17   daily communications with Lend Lease?
18   A.   Probably through that same time
19   through until 2001.  Maybe some communication
20   in 2002.
21   Q.   Do you have a recollection of any
22   specific communications after 2001 with Lend

Page 31

1    Lease?
2    A.   Not specifically, no.  I can't
3    recall a specific communication with them.
4    Q.   What was nature of RMS'
5    relationship with Aries Capital?
6    A.   I had a very close relationship
7    with Aries Capital.  I was invited on an
8    annual basis to their annual meeting which
9    they generally held -- since they were from
10   Chicago, they generally held it someplace
11   warm.  And we stayed -- we're actually still
12   in contact with one another.
13   Q.   What type of business, if any, did
14   you do with Aries Capital?
15   A.   We tried to do DUS business.  We
16   tried to do some more generalized
17   securitization transactions, but we did not
18   close any deals at all.
19   Q.   What was the time frame in which
20   you were attempting to do DUS business and
21   other business with Aries Capital?
22   A.   Let's see.  I had lunch in

Page 32

1    negotiation with Sid Gett from Aries Capital
2    as recently as two years ago, I believe.  2004
3    or '5.
4    Q.   Did the nature of the business that
5    you were attempting to do with Aries Capital
6    relate to Fannie Mae?
7    A.   I'm sorry?
8    Q.   Did the nature of the business that
9    you were attempting to do with Aries Capital
10   relate to Fannie Mae?
11   A.   Yes.
12   Q.   Explain that.
13   A.   My expertise is in product
14   development, and all investment banking firms
15   and mortgage companies are looking for
16   solutions to the issue of risk associated with
17   their portfolios.  And most people -- a lot of
18   people were trying to find less expensive ways
19   to lay off that risk or not have to post,
20   quote/unquote, collateral that consisted of a
21   portion of their mortgage-backed securities or
22   their REMIC securities.

Page 33

1    So I was always attempting to find
2    insurance companies that would work with these
3    lenders to come up with products based in
4    large part on what I had developed at Fannie
5    Mae.
6    Q.   In previous discovery and in some
7    of the court papers there has been discussion
8    of a May 2001 proposal.  Do you understand
9    what that term means?
10   A.   I am just trying to remember -- no.
11   If you can give me a little -- I could --
12   MR. DANIELS:  I didn't hear the
13   term.
14   MS. BECKER:  May 2001 proposal.
15   THE WITNESS:  I don't know why I'm
16   blocking on it.  I just -- I know that -- I
17   know that it's there.  I know that I responded
18   to it.  I'm just blanking right now on what it
19   is.  So if you could tell me, I could tell you
20   about it.
21   (Deposition Exhibit No. 1 was
22   marked for identification.)

9 (Pages 30 to 33)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 34

BY MS. BECKER:
1    Q.   I am going to hand you what has
2 been marked as Exhibit 1.  Do you recognize
3 this document?
4    A.   I see what it is.
5    Q.   What is it?
6    A.   It's an e-mail, it appears, from
7 Bob Jones at CAM Financial to Steve Noble at
8 Zurich and myself and Danny Groves.
9    Q.   And what is it discussing?
10   A.   It discusses a structure for
11 providing insurance that I really just
12 described to you about the mezzanine tranche
13 of risk associated with Fannie Mae's DUS
14 loans.
15   Q.   And what's the date of this e-mail?
16   A.   May 15, 2001.
17   Q.   There is an attachment to the
18 e-mail; is that correct?
19   A.   Yes.
20   Q.   And what is the attachment?
21   A.   The attachment is a description

Page 35

1 written by me, I believe, about how to
2 actually -- it's a description of what Bob
3 is -- it's a broader description of what Bob
4 is describing in the front of the e-mail.
5    MR. DANIELS:  I'm sorry.  How was
6 that marked for identification?
7    MS. BECKER:  Exhibit 1.
8    BY MS. BECKER:
9    Q.   Does this e-mail and the attachment
10 refresh your recollection as to your May 2001
11 proposal to Fannie Mae?
12   A.   Yes.  I now know exactly what
13 you're talking about.
14   Q.   Can you explain for the record so
15 it's clear what your May 2001 proposal to
16 Fannie Mae was?
17   A.   I was attempting to assist DUS
18 lenders and others in their efforts to
19 eliminate the risk associated with selling or
20 securitizing multi-family mortgage loans with
21 Fannie Mae.
22   Q.   This proposal was made by Risk

Page 36

1 Mitigation Strategists, LLC; is that correct?
2    A.   I'm not certain if we were still an
3 LLC then or not.  I would have to see.
4    Q.   If I could direct --
5    A.   Unless we put LLC on it -- I mean,
6 we stopped using it after a while.
7    Q.   If I could direct your attention to
8 the top --
9    A.   Yes, I see it.
10   Q.   -- of the first page.  Does that --
11   A.   Risk Mitigation Strategists, LLC,
12 yes.
13   Q.   Does that refresh your recollection
14 as to whether the May 2001 proposal was made
15 by Risk Mitigation Strategists, LLC?
16   A.   Yes.
17   Q.   And was the proposal made by Risk
18 Mitigation --
19   A.   It was made by Risk Mitigation
20 Strategists, LLC, I believe.
21   Q.   Did any of the discussions that you
22 had with Aries Capital relate to the May 2001

Page 37

1 proposal?
2    A.   Yes.
3    Q.   What was the time frame of the
4 discussions that you had with Aries Capital
5 that related to the May 2001 proposal?
6    A.   All of those individuals that I
7 previously stated I was working with at the
8 exact same time.  When I would send a message
9 to Lend Lease, it would go to Red Mortgage, it
10 would go to Aries, it would go to the cadre of
11 people that were looking for relief.
12   Q.   And what was the time frame of
13 those discussions?
14   A.   From 1998 until the present time,
15 but not actively -- I mean, I am still now
16 working with not those lenders but other
17 lenders to look at those options as well.
18 That's still an ongoing thing that I do.  But
19 not related to the DUS proposal because that
20 only affects DUS lenders.
21   Q.   When is the last time that you had
22 communications with Aries Capital relating to

10 (Pages 34 to 37)

Marialice Williams

Page 38

1  the DUS proposal?
2      A.  I don't recall.
3      Q.  Would it be fair to say any
4  communications that you had with Aries Capital
5  relating to the DUS proposal would have been
6  in the same time frame that you were having
7  communications with Fannie Mae regarding the
8  DUS proposal?
9      A.  Yes and no, because Fannie Mae does
10  not facilitate or work directly with -- was
11  not working -- I was trying to come up with a
12  way to lay off cap -- to lay off risk with
13  these -- with this group of people -- of
14  lenders.  When I thought there was a need to
15  involve Fannie Mae further in the discussion,
16  we might contact them or say something to
17  them, but it did not mean that we were not
18  working on pursuing our end of the -- of the
19  deal.
20      In other words, Fannie Mae was not
21  paying me to do product development for them.
22  I had to develop the product and then go to

Page 39

1  them.
2      Q.  When is the last discussion that
3  you recall with Aries Capital relating to the
4  DUS proposal --
5      A.  I really don't --
6      Q.  -- to Fannie Mae?
7      A.  I don't remember.
8      MR. DANIELS:  Can we go off the
9  record for a moment?
10      MS. BECKER:  Sure.
11      THE VIDEOGRAPHER:  The time is
12  11:25.  We're going off the record.
13      (Recess.)
14      THE VIDEOGRAPHER:  The time is
15  11:36.  We're back on the record.
16      BY MS. BECKER:
17      Q.  Ms. Williams, when is the last time
18  that you communicated with Aries Capital --
19  I'm sorry.  When is the last time that you
20  communicated with Fannie Mae regarding Aries
21  Capital?
22      A.  I really don't recall.  Oh, I

Page 40

1  forgot to tell you something earlier.  You
2  asked me a question and I left out something
3  important.  When I went to Fannie Mae, I went
4  to the general counsel's office, so I was
5  there for just about six months, I think,
6  before I transferred to the multi-family
7  division.
8      Q.  And you were practicing law while
9  you were at Fannie Mae?
10      A.  I reviewed documents, so I guess
11  you could call that practicing law.  But there
12  was no courtroom or court appearances or
13  anything of that nature.
14      Q.  Do you recall any communications
15  that you had with Fannie Mae relating to Aries
16  Capital after 2001?
17      A.  I don't recall.  I believe there
18  were, but I do not -- I can't tell you the
19  exact date.
20      Q.  Who were those communications with?
21      A.  When I talked to Fannie Mae, I
22  generally spoke to either Rhoda Newman or

Page 41

1  Richard Lawch, or I spoke to someone in the
2  credit policy office or I spoke to someone in
3  the counsel's office, just depending on what
4  the issue was.
5      Q.  Who in the credit policy office did
6  you talk to?
7      A.  I can describe him, but I am
8  blanking on his name -- yes, I can remember
9  his name.  His name was Jeff Arpin, I believe.
10      Q.  Who did you talk to in the
11  counsel's office?
12      A.  It was usually Paul van Hook or
13  David Kalinsky or Kathy Miles.  Oh, and also
14  Dan -- I can't recall his last name, but he
15  was specifically assigned to handle insurance
16  matters.
17      Q.  Is it fair to say that you don't
18  recall any communications with anyone at
19  Fannie Mae regarding Aries Capital after 2001?
20      A.  No, that's not fair to say.  I
21  don't recall at this time.  I just am not
22  remembering when the last time is I spoke with

11 (Pages 38 to 41)

Marialice Williams

Page 42

1  them.
2      Q.  So can you remember any specific
3  communications with anyone at Fannie Mae
4  regarding Aries Capital after 2001?
5      A.  I can't specifically remember them,
6  no.
7      Q.  Do you have any documentation that
8  would show any communications with Fannie Mae
9  regarding Aries Capital after 2001?
10     A.  I don't think so.  I don't -- it
11  would have been phone calls, and I didn't
12  record phone calls.
13     Q.  Do you have any recollection of
14  with whom you might have spoken at Fannie Mae
15  regarding Aries Capital after 2001?
16     A.  I think I answered that, which
17  would have been all of those people I
18  described.
19     Q.  Are you saying that you believe you
20  spoke to all of those people?
21     A.  I may have spoken to them.  I just
22  cannot remember the day, the time or the hour

Page 43

1  or anything like that.  But we were ongoing
2  with our attempting to do our product
3  development, and I believe I spoke with some
4  of those people or one of those people or one
5  or more of those people after 2001.
6      Q.  And what is your recollection based
7  on?
8      A.  My own head.
9      Q.  Is there anything specific that
10  makes you believe that you had a conversation
11  with anyone at Fannie Mae regarding Aries
12  Capital after 2001?
13     A.  I never stopped pursuing the desire
14  to do business with Fannie Mae.  I never
15  stopped the desire to do additional and
16  further development of a concept which I was
17  solely responsible for and thought I would be
18  making my living from pursuing with promises
19  from people from Fannie Mae.  So I was always
20  out there looking to do business that would
21  specifically take me back to Fannie Mae
22  portfolios and risk.

Page 44

1      I have an appointment Friday, for
2  example, with someone who wants to look at the
3  possibility of doing some variation on the
4  insurance product and possibly use Fannie Mae.
5      Q.  Who is that appointment with?
6      A.  I cannot disclose that at this
7  time.
8      Q.  Can you tell me what the nature of
9  your last communications with Fannie Mae
10  regarding Aries Capital would have been?
11     A.  No, I can't.  I can't tell you.  It
12  would have been something related to
13  attempting to either do the DUS business --
14  some form of credit enhancement would have
15  been what the discussion would have been
16  about.
17     Q.  What business did you do with
18  Washington Mortgage?
19     A.  Washington Mortgage called me
20  almost immediately after I left Fannie Mae to
21  pursue the possibility of laying off their DUS
22  risk.

Page 45

1      Q.  That would have been in 1998?
2      A.  That's correct.
3      Q.  How long were you in communication
4  with Washington Mortgage?
5      A.  I don't recall.  Months.  Maybe a
6  year.  Not long.  Not very long.
7      Q.  Did you ever do any business deals
8  with Washington Mortgage?
9      A.  No, I didn't, because Richard Lawch
10  called Shekar Narassiman and told him I was
11  stupid or something like that.  It was a
12  very -- it was not a nice thing.  And I
13  stopped working with them.  They were very
14  thick.
15     Q.  The time frame in which Mr. Lawch
16  would have made this statement would have been
17  1998; is that correct?
18     A.  No.  I understand he repeated it
19  more or less frequently from that point
20  forward, probably through until this day.
21     Q.  What's the basis for your belief
22  that Mr. Lawch referred to you in that way?

12  (Pages 42 to 45)

Marialice Williams

Page 46

1    A.   What is the basis for it?  I
2  overheard a conversation between Alan
3  Greenwald and Shekar Narassiman in which the
4  question of my intelligence was raised, and
5  that was prior to my departure from Fannie
6  Mae.
7    Q.   Other than the conversation that
8  you overheard before 1998, do you have any
9  other basis for your belief that Mr. Lawch
10  made comments about you?
11    A.   Yes.  When I was dealing with Red
12  Mortgage Capital, they indicated that they had
13  had conversations with Mr. Lawch and they were
14  afraid to let him know the extent to which
15  they were involved in doing some things
16  because -- and I don't know for what reason,
17  but I think there was some concern that they
18  had that had to do with their relationship to
19  Richard Lawch.
20    Q.   Who did you talk to at Red Mortgage
21  Capital about the conversation between them
22  and Mr. Lawch?

Page 47

1    A.   I can't remember his name right
2  now.  I could probably find it, but it was
3  through David -- David -- the person in
4  charge.  I'm just blanking on his last name.
5  A very tall gentleman who is a vegetarian.
6  And he had someone who he had assigned to me
7  to work on this project.  And I had an
8  independent relationship, meaning I had worked
9  directly with this person without Mr. Lawch's
10  knowledge.  And he assigned this other person
11  to work with me on this -- in pursuing this
12  type of situation.
13    Q.   When did you have this conversation
14  with David?
15    A.   I didn't have it with David.  I had
16  it with the person he assigned to me, and it
17  was in an e-mail.  And he said, I told you not
18  to -- I know what happened:  I cc'd -- I did
19  not mean to cc Fannie Mae on an e-mail in
20  responding to more than one customer.  And
21  when I did -- and it was on there, and it was
22  an accident.  And this person e-mailed me back

Page 48

1  and said, please do not disclose to Fannie Mae
2  that we are having these discussions.  I asked
3  you not to do that.
4        And I immediately called that
5  person and said, I sincerely apologize.  I did
6  not mean to -- and I didn't mean to -- why
7  would I sabotage myself?  I did not mean to
8  say anything -- did not mean to put the cc on
9  there; it was an accident.  And if you would
10  like for me to call Fannie Mae and explain to
11  them, I will do that.
12    Q.   What was the time frame of that
13  e-mail?
14    A.   I would think sometime in 1999 or
15  2000, perhaps 2001.
16    Q.   Did anyone at Red Mortgage Capital
17  tell you that Mr. Lawch had made disparaging
18  comments about you?
19    A.   Yes.  That person I was just
20  referring to.  And I think that's -- I don't
21  know if he spoke directly to David or not.
22    Q.   What disparaging comments were you

Page 49

1  told that Mr. Lawch made about you?
2    A.   Just that I may or may not be able
3  to do what it is I was attempting to do with
4  them and -- more innuendo than specifically --
5  it wasn't as direct as what he said to Shekar.
6  It was not of that nature.  But it was clear
7  that he was discouraging them from doing
8  business with me.
9    Q.   And when did you learn that
10  Mr. Lawch was discouraging Red Mortgage
11  Capital from doing business with you?
12    A.   Sometime between 1998 and 2001.
13    Q.   What was the nature of the business
14  you did with Countrywide?
15    A.   Hal Potter, who had been a
16  multi-family staff person -- actually, he was
17  the director of multi-family, I believe, in
18  the California region -- had gone to
19  Countrywide to establish a multi-family
20  program for them.  You probably know that most
21  of their business is single-family.
22        And because the market --

13  (Pages 46 to 49)

Marialice Williams

Page 50

1  everything is driven by the market and the
2  spreads were so narrow, Countrywide was
3  looking for a cost-effective way to provide
4  for credit enhancement and do its own
5  securitization so that it didn't have to rely
6  on Fannie Mae because there was so little
7  profit and they did not want to sell to a
8  conduit as well. So they were attempting to
9  form their own program.
10       And I flew to California to meet
11  with Hal Potter to discuss it. And sometime
12  thereafter Countrywide abandoned their
13  decision to do multi-family. I don't know if
14  they do it now, but they abandoned it. I
15  believe Hal went to another company.
16       Q.  Did you ever do a deal involving
17  Countrywide?
18       A.  No.
19       Q.  When did you fly to California?
20       A.  Sometime between 1998 and 2001. I
21  believe it was -- sometime between 1998 and
22  2001. I flew to California several times.

Page 51

1       Q.  And when did they abandon --
2       A.  Oh, I don't know that. I don't
3  know that specifically.
4       Q.  You said sometime after you flew to
5  California they abandoned their decision to do
6  multi-family; is that correct?
7       A.  Yes. After I met with Hal, several
8  months, I believe, went -- and I'm not exactly
9  certain when they made the decision that they
10  were not going to move forward. I don't know
11  that.
12       Q.  When did you become aware that they
13  made that decision?
14       A.  Sometime after I went to
15  California. I cannot tell you the specific
16  date.
17       Q.  Would it have been within a couple
18  of months of your traveling to California?
19       A.  No, I believe it was maybe as much
20  as a year later. I'm not certain, but it
21  could have been up to a year later.
22       Q.  Do you have any records indicating

Page 52

1  when you flew to California?
2       A.  No.
3       Q.  Can you identify the time frame any
4  more precisely than 1998 to 2001?
5       A.  No. I can't. I just can't. I was
6  working every day, 10 hours, 11 hours,
7  12 hours a day, trying to do this product
8  development. I was working with different
9  types of assets, different insurance
10  companies, different insurance brokers,
11  different insurance concepts, reinsurers,
12  people who were holding automobile loans,
13  people who were holding credit card loans,
14  because securitization had become that much
15  more pervasive in the marketplace.
16       So that is why it is so difficult
17  to say on March 1, 1998, I did one thing or
18  another because my days were consumed by that.
19       I also relied heavily, mistakenly
20  perhaps, on my computer as the source of my
21  calendar. I've had two computer crashes of
22  major proportion from which I could not

Page 53

1  retrieve any information since I left Fannie
2  Mae. And so it's very, very difficult for me
3  to go back and recapture specific dates
4  associated with specific individuals. I have
5  some general idea. I know absolutely what I
6  did, and I did it daily, as did
7  Mr. Hartsfield, but...
8       Q.  What type of business did you do
9  with First Atlantic?
10       A.  First Atlantic is a face amount
11  certificate company. There are only three in
12  the country. And they have a very unique
13  structure which enables them to issue
14  certificates backed by certain types of assets
15  but unique to the certificate structure. Some
16  of the limitations that apply to securities
17  and to REMICs as well did not apply to the
18  certificates. And it looked as if this was
19  going to be -- and I still believe it is -- a
20  major way to be able to do the types of
21  business with smaller companies so they don't
22  get ripped off by conduits and to do business

14 (Pages 50 to 53)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 54

1  with people who have -- who lend in areas that
2  are not popular, to do affordable mortgages
3  and that kind of thing, because you can remove
4  the asset from the pool and replace it with
5  something else, which you cannot do in a
6  mortgage-backed security, and only on a
7  limited basis in a REMIC, and it has to be
8  predetermined when you're going to make those
9  decisions.
10     Q.  Did you close any transactions
11  involving First Atlantic?
12     A.  No.
13     Q.  What was the time frame in which
14  you worked with First Atlantic?
15     A.  I still work with them.  I'm
16  actually on their board.
17     Q.  Did you ever have any
18  communications with Fannie Mae about First
19  Atlantic?
20     A.  Yes.
21     Q.  When was that?
22     A.  I believe it was between 2001,

Page 55

1  2002.
2     Q.  What was the nature of those
3  communications?
4     A.  To inform them that I had yet again
5  discovered a product that I thought could be
6  helpful to Fannie Mae in fulfilling their
7  mission to do affordable housing.  I spoke
8  with Rob Levin.  I spoke with Rhoda Newman,
9  Grace Huebscher about First Atlantic and the
10  concept.
11     Q.  Did these discussions relate to
12  RMS' May 2001 proposal?
13     A.  No, not at all.  It could have been
14  adapted, but no, this was a new concept.
15     Q.  What was the nature of the business
16  that you did with Swiss Re?
17     A.  To attempt to -- they had opened a
18  section of their company called something -- I
19  just can't remember the exact name, but it was
20  something associated with risk, almost like a
21  risk mitigation unit.  And it was the time
22  when the insurance companies -- I am sure you

Page 56

1  probably recall this -- when suddenly
2  insurance companies, banks, lenders and
3  everyone began to work together to seek new
4  ways to provide credit enhancement that did
5  not conflict or provide issues with respect to
6  the various aspects of the accounting
7  regulations which had to be adhered to because
8  of the nature of the securities.
9        And when those rules would change,
10  it would change the way you could do business.
11  So you had to constantly go back and look at
12  new ways to modify, you know, your credit
13  enhancement vehicle.
14     Q.  Did the communications you had with
15  Swiss Re relate in any way to RMS' May 2001
16  proposal?
17     A.  Yes, absolutely.
18     Q.  What was the time frame of those
19  communications?
20     A.  Actually, I had a continuing
21  dialogue with quite a few insurance companies
22  from 1998 all the way through to the current

Page 57

1  time.  I am meeting with an insurance company
2  also this week.
3     Q.  Which insurance company?
4     A.  I can't tell you that.  I have a
5  confidentiality agreement.
6     Q.  When is the last time that you
7  communicated to Fannie Mae about Swiss Re?
8     A.  Oh, goodness.  Prior to 9/11.  I do
9  know that because that part of Swiss Re, I
10  believe, was shut down after 9/11.
11     Q.  And by 9/11, you mean September 11,
12  2001?
13     A.  Yes.
14     Q.  What was the nature of the business
15  that you did with Marsh Mac?
16     A.  I worked with Marsh Mac for several
17  years trying to find an appropriate insurance
18  company to do the Fannie Mae business.
19     Q.  What were those years that you
20  worked with Marsh Mac?
21     A.  From 1998 through, I believe, 2002.
22     Q.  When in 2002?

15 (Pages 54 to 57)

Marialice Williams

Page 58

1    A.  Actually, I have to change my
2  answer. I still talk to Marsh Mac.  But
3  you're saying about the May 1 -- May 2001
4  proposal?
5    Q.  Yes.
6    A.  I think that was probably around
7  the same time.  September 11, 2001, created,
8  as you know, a crisis in the insurance
9  industry.  And much negotiation and discussion
10  with companies for that specific type of
11  business was limited or stopped entirely after
12  9/11.
13    Q.  And when you say that type of
14  business, what do you mean?
15    A.  You asked me about the May 2000
16  proposal, yes.
17    Q.  And just to clarify for the record,
18  you mean the May 2001 proposal?
19    A.  Proposal, yes.
20    Q.  What is the name of the business
21  that you did with Pinnacle Mortgage?
22    A.  Pinnacle Mortgage was looking for a

Page 59

1  way to come to Fannie Mae with its own credit
2  enhancement rather than relying on Fannie Mae
3  because of the cost.  And so I went to Florida
4  to meet with Pinnacle about the possibility of
5  utilizing a captive insurance vehicle, renting
6  a captive cell, and providing their own credit
7  enhancement so that they could come to Fannie
8  Mae with a full package rather than coming
9  just with their loans and being required to
10  rely on Fannie Mae and paying the fee.
11    Q.  When did you go to Florida?
12    A.  I went with Tim Webb, and it was --
13  I believe it was in 2002.
14    Q.  Did the meeting that you had in
15  Florida with Pinnacle Mortgage relate to the
16  2001 May proposal?
17    A.  Oh, no, not at all.  It related to
18  a captive insurance concept which I had
19  initiated with Fannie Mae prior to my
20  departure.  And I actually had people who were
21  very knowledgeable about captives speak
22  directly to Fannie Mae staff so that the

Page 60

1  concept would become clear.
2      And it was always -- there was
3  always a regulatory issue involving the nature
4  of being the owner of the captive insurance
5  company and the validity of that captive
6  insurance company.  And that was clarified --
7  and I wrote a newsletter about that decision
8  once that decision was made.  It was several
9  years after I left Fannie Mae.  So that
10  concept, which had been tentative, then became
11  a true possibility.
12    Q.  Did you ever have any
13  communications with Pinnacle Mortgage about
14  the May 2001 proposal?
15    A.  Oh, no.  They were not a DUS
16  lender, yes.
17    Q.  What is the nature of the business
18  that you did with the Thurgood Marshall
19  Center?
20    A.  I was their point person for the
21  coordination for their bond issuance.  They
22  got an industrial revenue bond issued by the

Page 61

1  District of Columbia to complete financing for
2  their facility, which is the first
3  African-American YMCA built in this country.
4    Q.  Did that work have anything to do
5  with Fannie Mae?
6    A.  No.
7    Q.  What's the nature of the business
8  that RMS did with Zurich?
9    A.  Did with?
10    Q.  Zurich.
11    A.  The same thing.  It had to do with
12  the May 2001 proposal and also with respect to
13  reinsurance for a potential captive insurance
14  execution.
15    Q.  Who at Zurich did you deal with?
16    A.  I do not recall the names off the
17  top of my head.
18    Q.  What is the time frame in which you
19  were in communications with Zurich about the
20  May 2001 proposal?
21    A.  We were in contact with most of
22  these insurers and reinsurers throughout the

16  (Pages 58 to 61)

Marialice Williams

Page 62

1  entire period of 1998 through 2001, 2002.
2      Q.  Do you remember when the last
3  contact that you had with Zurich related to
4  the May 2001 proposal was?
5      A.  I don't recall.  We're calling this
6  the May 2001 proposal -- I think it's because
7  it's the first time someone saw it in writing,
8  but it started before I left Fannie Mae, so it
9  wasn't new in May 2001.
10     Q.  When is the last communication you
11  had with Fannie Mae regarding Zurich?
12     A.  It was sometime after May 15, 2001.
13     Q.  Can you be any more specific?
14     A.  No, because, as I said, you're
15  constantly back and forth.  Zurich has a
16  question, then someone in their shop has a --
17  it's just -- it's -- product development in
18  the securitization field is a very lengthy
19  process and -- just takes a long time and a
20  lot of detail.
21     Q.  Did you close any deals with
22  Zurich?

Page 63

1      A.  No.
2      Q.  What was the nature of the business
3  that you did with AIG?
4      A.  AIG was the insurer that was used
5  in the first multi-family credit risk
6  insurance transaction and they were brought to
7  Fannie Mae by Bob Jones and Danny Groves.  And
8  once I left Fannie Mae, we resurrected a
9  relationship there to look at these other ways
10  of using their insurance, and I am in contact
11  with them even now.
12     Q.  Have you closed any deals with
13  AIG --
14     A.  No.
15     Q.  -- since you left Fannie Mae?
16     A.  No.
17     Q.  Did the communications that you had
18  with AIG since you left Fannie Mae relate to
19  the May 2001 proposal?
20     A.  Yes.
21     Q.  What was the time frame of the
22  communications that you had with AIG relating

Page 64

1  to the May 2001 proposal?
2      A.  You said the date?  The date?
3  Sometime after May 2001.  I know that.
4      Q.  Can you be any more specific?
5      A.  No, I can't.
6      Q.  Did you remain in communications
7  with AIG for several months after May 2001?
8      A.  I am still in contact with them.
9      Q.  Are you still in contact with them
10  regarding the May 2001 proposal?
11     A.  No.  That's because I haven't had
12  an opportunity to raise it with them, but I
13  intend to try to raise it with them again.
14     Q.  When is the last time that you
15  recall having a discussion with AIG regarding
16  the May 2001 proposal?
17     A.  Oh, about the May 2001 proposal?  I
18  just cannot remember.  It would be probably
19  December 2002 to -- I just don't know.  I
20  mean, I can't be absolutely certain when that
21  could have been.
22     Q.  What makes you think it might have

Page 65

1  been December 2002?
2      A.  I'm just thinking about a trip that
3  I made to New York, and I know that it was in
4  December of 2002, and I believe I spoke to --
5  I know I spoke to AIG, but I don't know if I
6  spoke to -- about the 9 -- about the May
7  proposal.  I just don't recall.
8      Q.  Who at AIG did you talk to in
9  December 2002?
10     A.  I don't recall.  But I may -- I
11  just remembered something else from earlier.
12  So if that pops back in, I will write it down
13  definitely.  And I believe he has a Hispanic
14  name, and I will try to remember it.
15     Q.  When is the last time that you
16  discussed anything relating to AIG with Fannie
17  Mae?
18     A.  With Fannie Mae, I really don't
19  remember.  I really don't.  I'm -- I don't
20  recall discussing anything about AIG.  You
21  don't do that.  You don't go to Fannie Mae and
22  discuss what you're discussing with an

17 (Pages 62 to 65)

Marialice Williams

Page 66

1  insurance company unless you've got a deal
2  that's hopping.  You just don't do it.
3      Q.  So would it be fair to say that you
4  never had a deal that you considered to be far
5  enough along to make it appropriate for you to
6  discuss?
7      A.  Well, Fannie Mae would never
8  consent to its lenders -- or authorize them to
9  utilize the insurance for the May 2001
10  proposal.  So it never -- there was never
11  any -- I mean, you can see on here there is no
12  one from Fannie Mae designated on this May 15,
13  2001, message to Steve Noble at Zurich.  You
14  just don't -- you don't do it that way.
15          And Fannie Mae has to decide how
16  they want to use the product.  So you may
17  have -- for example, I created the
18  multi-family credit risk insurance
19  specifically to assist affordable lenders
20  because it works with them.  When I left,
21  Fannie Mae did not pursue that in that venue.
22  They used it for their priority lenders in

Page 67

1  their aggregation program and other places.
2      Q.  So would it be fair to say that
3  after you left Fannie Mae you had no
4  communications with Fannie Mae about AIG?
5      A.  No, that's not true.  We did have
6  some, but I think it was limited to a large
7  extent by the disagreement I'm sure you're
8  aware of between AIG and Fannie Mae where
9  Fannie Mae refused to provide certain
10  information and documentation which I knew
11  existed in a box in Tim Howard's office under
12  somebody's desk.  And ultimately it was
13  compiled and put together, and some of it was
14  disclosed.
15          But there was a lot of conflict
16  between AIG and Fannie Mae over the concept of
17  multi-family credit risk insurance.  Because
18  insurers don't understand that real estate may
19  be thriving, but the market for a
20  mortgage-backed security may not be.
21          So, duh, why is this property not
22  defaulting but I'm not making more on this

Page 68

1  deal?  It's -- you understand.  They don't
2  realize their mortgages became a commodity;
3  they were no longer mortgages.
4      Q.  What is the nature of the business
5  that RMS did with Morgan Stanley?
6      A.  Morgan Stanley was very interested
7  in looking at as many options as possible for
8  credit enhancement.  It's always about credit
9  enhancement and laying off risk.  So Liz
10  Haberkorn Cowherd -- what a name -- and I used
11  to meet periodically in New York and talk and
12  e-mail and so forth about potential new
13  transactions with -- I had done a number of
14  transactions with Morgan Stanley when I was --
15  in fact, Morgan Stanley was the one that
16  helped me to create the first -- what is known
17  in the marketplace as ACES.  I named it ACES,
18  the alternative credit enhancement structure.
19      Q.  Did any of the discussions that you
20  had with Morgan Stanley relate to the May 2001
21  proposal?
22      A.  No.

Page 69

1      Q.  What was the nature of the
2  communications or business that you did with
3  Metropolitan Savings?
4      A.  For quite some time after --
5  Metropolitan Savings is the institution for
6  which -- for which it was essentially -- no,
7  that's not true.  Let me start over.
8          Metropolitan Savings was the first
9  mortgage holder that utilized the multi-family
10  credit risk insurance.  And because I had met
11  so many times with them, I continued my
12  relationship with them far beyond my tenure at
13  Fannie Mae because they had not only
14  additional business they wanted to do under
15  the MCRI structure, they also had -- it was
16  kicking around at Fannie Mae at the time, but
17  Larry Small didn't understand how Freddie Mac
18  had been able to securitize some commercial
19  loans along with some residential loans in a
20  pool of securities.  The REMIC was done
21  outside of Freddie Mac.  It was not issued off
22  the shelf or anything like that.  It was

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 70

1   issued by one of the major -- I think it was
2   Morgan Stanley.
3           So when I left Fannie Mae, I
4   believe Eric Rosenfield did close a deal with
5   Metropolitan Savings involving some
6   commercial, but they had a lot more because
7   they do the very small multi-family deals,
8   between 5 and 50 units in the properties,
9   which is not standard in the multi-family
10  business.
11          And so it's a little more
12  difficult -- it's kind of a hybrid mortgage,
13  and so I was working with them on different
14  ways to securitize their portfolio.
15      Q.  Did the work you did with Morgan --
16  I'm sorry -- with Metropolitan Savings relate
17  in any way to the May 2001 proposal?
18      A.  No.  They were not a DUS lender.
19  Or they weren't then.  I don't know if they
20  are or are not now.
21      Q.  Did the work that you did with Eric
22  Rosenfield relate in any way to the May 2001

Page 71

1   proposal?
2       A.  Eric Rosenfield was the investment
3   banker whom Bob Jones and I used to test every
4   single theory that we had about potential new
5   structures.  So Eric was very familiar with
6   this May 2001 proposal as well as everything
7   else we were doing.
8       Q.  Did you close any deals with Eric
9   Rosenfield?
10      A.  No.  He closed deals I worked on,
11  but he did not pay me.
12      Q.  Would it be fair to say that
13  Mr. Rosenfield was acting in more of a
14  consulting capacity relating to the May 2001
15  proposal?
16      A.  No.  He was just a business
17  associate, and we just ran things by him.
18      Q.  Has there ever been any
19  relationship between Risk Mitigation
20  Strategists, LLC, and CAM Financial?
21      A.  No.  No relationship in the formal
22  sense.  Excuse me.  I change that.

Page 72

1           MR. DANIELS:  Excuse me.  Are you
2   about to go in a different line?  Because this
3   may be a good place for a lunch break.
4           MS. BECKER:  Okay.  Let's go off
5   the record.
6           THE VIDEOGRAPHER:  The time is
7   12:26.  We're off the record.
8           (Recess.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 73

1       A F T E R N O O N  S E S S I O N
2           (1:34 p.m.)
3           THE VIDEOGRAPHER:  The time is
4   1:34.  We're back on the record.
5   Whereupon,
6           MARIALICE BATHRUS WILLIAMS,
7   was recalled as a witness and, having been
8   previously duly sworn, was examined and
9   testified further as follows:
10  EXAMINATION BY COUNSEL FOR THE DEFENDANTS
11          BY MS. BECKER:
12      Q.  Good afternoon.
13      A.  Good afternoon.
14      Q.  Before we broke for lunch, we were
15  talking about the relationship between CAM and
16  Risk Mitigation Strategists, LLC.  Has there
17  ever been a formal relationship between those
18  two entities?
19      A.  Before -- before I left Fannie Mae,
20  I was offered a job by CAM Financial.  That is
21  the reason I left Fannie Mae, to work with CAM
22  Financial and Fannie Mae.  We had an

19 (Pages 70 to 73)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 74

1  understanding, we thought, with Lou Hoyes, who
2  was the then senior vice president for
3  multi-family, that we would just continue to
4  do business.  And for one reason or another,
5  it turned out that the best relationship -- I
6  then became an insurance broker myself, and
7  signed a joint broker agreement with CAM.  And
8  then Fannie Mae asked me to write them a
9  letter that said I was not doing business with
10  CAM Financial -- in order to get business from
11  them, I would not be able to do business with
12  CAM Financial.
13          And so I wrote a letter to Fannie
14  Mae saying that -- which was true, I did not
15  have -- I was not doing business with them.  I
16  was in a joint venture agreement in the event
17  that we did this insurance stuff together.
18  But that was the extent, up to that point, of
19  our relationship, although we still continued
20  to talk and dialogue and meet jointly with
21  people, and I still had the expertise, and
22  Bob's company had the cash to move forward

Page 75

1  with the marketing.
2      Q.  Was there a joint broker agreement,
3  then, between CAM Financial and Risk
4  Mitigation Strategists, LLC?
5      A.  No, it was just between myself --
6  oops.  I have to look at it, but I think it's
7  just between me and CAM.  I don't think
8  it's -- I'm just not remembering completely.
9  And I think I gave it -- in the documents that
10  I provided, I believe I gave a copy of it.
11      (Deposition Exhibit No. 2 was
12  marked for identification.)
13      BY MS. BECKER:
14      Q.  I am handing you Exhibit 2.  Can
15  you identify that document?
16      A.  Yes.  This is the letter that I
17  wrote to Grace Huebscher after I met with her
18  and I was told that Rhoda Newman was going to
19  be assigned to me.  I think that's what this
20  was about.  And describing some of the things
21  that we did, but also saying that CAM and RMS
22  do not have any connection with respect to

Page 76

1  ownership, and we did not have an interest in
2  each other's business.
3      Q.  Does this document refresh your
4  recollection as to whether the joint broker
5  agreement was between Risk Mitigation
6  Strategists and CAM Financial Services?
7      A.  I'm certain -- listen to me.  I am
8  almost certain that it was just between myself
9  because RMS can't be -- couldn't be a partner
10  of anyone in a brokerage capacity because that
11  wasn't what Risk Mitigation Strategists was.
12  I was just a licensed broker.  But my
13  company -- I couldn't have done that legally,
14  I don't think.  I don't think.
15      Q.  I would like to direct your
16  attention to the third paragraph of the letter
17  in the second sentence beginning, "However."
18  It states, "However, CAM and RMS have a broker
19  agreement that is common in the insurance
20  business."
21          Was that an accurate statement?
22      A.  It's probably a misstatement of --

Page 77

1  I do have a copy of the agreement.  I can
2  check it and I can let you know.  I just am
3  not looking at it right now.  It does say
4  there, but I don't think -- I don't think the
5  agreement reads between -- I think it was
6  between CAM and Marialice Williams, I believe.
7  But I think you all have a copy of it.
8      Q.  So you believe that the letter you
9  wrote to Ms. Huebscher mischaracterizes the
10  nature of the broker agreement?
11      A.  No.  I think that it does not say
12  RMS, LLC, first of all, and it doesn't say
13  CAM, LLC, or whatever they are.  So I would
14  say it doesn't misrepresent.  I don't think
15  anybody had any question about it at the time,
16  and I'm -- I'm just -- I would have to look at
17  the agreement, and I could do that, but I'm
18  not going -- no, I don't think I
19  mischaracterized anything.
20      Q.  Let me direct your attention to the
21  last sentence of the first paragraph.  It
22  says, "I welcome the opportunity to clearly

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

af779bd1-e112-4d83-87a0-2544073c0e93

Page 78

1  define the relationship between my company,
2  Risk Mitigation Strategists, LLC (RMS) and CAM
3  Financial Services, Inc."
4  　　　Do you see that?
5  　　　A.  So are you asking me -- I mean,
6  what's the question?  Did I mischaracterize
7  it?  I don't think so.  I think it was
8  referring to myself as RMS, you know -- I
9  don't know.  I don't know what happened in the
10 letter or why I wrote it that way.  I have no
11 idea, because I -- I will show you the joint
12 venture agreement, and I don't believe it's
13 between CAM and RMS.  I think it's between CAM
14 and Marialice Williams as a broker because I'm
15 the only one who could -- RMS was not a
16 broker.
17 　　　Q.  Do you know what the time frame is
18 in which the letter to Ms. Huebscher was
19 written?
20 　　　A.  It was during the summer of 2000,
21 2001 or 2002.  I just really do not precisely
22 remember.

Page 79

1  　　　Q.  Was it your understanding that
2  Fannie Mae required you to clarify the
3  relationship between RMS and CAM prior to your
4  doing business with Fannie Mae?
5  　　　A.  Yes.
6  　　　(Deposition Exhibit No. 3 was
7  marked for identification.)
8  　　　BY MS. BECKER:
9  　　　Q.  I would like to hand you what's
10 marked as Exhibit 3.  Does this refresh your
11 recollection as to the time frame of the --
12 　　　A.  Yes.
13 　　　Q.  -- correspondence?
14 　　　A.  It appears that I sent it on --
15 sometime in May of 2001.
16 　　　MR. DANIELS:  This is 3?
17 　　　MS. BECKER:  That was 3, yes.
18 　　　(Deposition Exhibit No. 4 was
19 marked for identification.)
20 　　　BY MS. BECKER:
21 　　　Q.  I am handing you what has been
22 marked as Exhibit 4.  What is that document?

Page 80

1  　　　A.  This is dated August 6, 2000, and
2  it is an unsigned and never was signed letter
3  from Bob Jones to Marialice Williams about
4  sharing commissions.
5  　　　Q.  And who was this letter set up to
6  be between?
7  　　　A.  Risk Mitigation Strategists and CAM
8  Financial.
9  　　　Q.  Why was this letter never signed?
10 　　　A.  Because -- probably because I
11 didn't want to sign it as Risk Mitigation
12 Strategists and probably because there was so
13 much going on at the time that was
14 conflicting, I didn't know who was telling me
15 the truth about anything, whether Bob was
16 telling me the truth -- I now know Bob wasn't
17 telling me the truth, too.  And so I was
18 reluctant to sign it.  My -- I was reluctant
19 to sign it and did not sign it.  And if I did,
20 I don't remember.  I don't.
21 　　　(Deposition Exhibit No. 5 was
22 marked for identification.)

Page 81

1  　　　BY MS. BECKER:
2  　　　Q.  I am handing you --
3  　　　A.  This is not the one I was referring
4  to.
5  　　　Q.  I am handing you what's been marked
6  as Exhibit 6 -- I'm sorry, 5.  Do you
7  recognize this document?
8  　　　A.  Uh-huh.
9  　　　Q.  What is it?
10 　　　A.  No -- actually, I don't recognize
11 this at all.  I don't even recall seeing it.
12 　　　Q.  Do you recognize --
13 　　　A.  Oh, I remember the scenario
14 perfectly.
15 　　　Q.  Do you now recognize the document?
16 　　　A.  I recognize the document.  I don't
17 recognize this particular e-mail.
18 　　　Q.  I would like to direct your
19 attention to what's been marked as page 10547.
20 Do you see that?
21 　　　A.  Uh-huh.
22 　　　Q.  What is that?

21 (Pages 78 to 81)

Marialice Williams

Page 82

1    A.  That is the -- 47 -- an
2  out-of-order page of -- it looks like it's out
3  of order somewhere.
4       THE VIDEOGRAPHER:  The time is
5  1:47.  This is the end of tape number 1.
6  We're going to go off the record to change to
7  tape number 2.
8       (Pause.)
9       THE VIDEOGRAPHER:  The time is
10  1:49.  This is the beginning of tape number 2.
11  We're back on the record.
12       BY MS. BECKER:
13    Q.  Ms. Williams, can you identify the
14  document marked 104 -- 10547 in Exhibit 5?
15    A.  It appears to be page 2 of 2 of a
16  proposed joint venture agreement between CAM
17  Financial Services and Risk Mitigation
18  Strategists.
19    Q.  At the bottom of the page there is
20  a signature.  Do you see that?
21    A.  Yes.
22    Q.  Whose signature is that?

Page 83

1    A.  That's Harvey Hartsfield.
2    Q.  So Mr. Hartsfield is signing this
3  joint venture agreement on behalf of Risk
4  Mitigation Strategists; is that correct?
5    A.  Yes, he signed it on behalf of Risk
6  Mitigation Strategists.  He, too, is an
7  insurance broker.  He is still actively
8  licensed.  It was never consummated.  No
9  agreement was ever consummated with CAM.
10    Q.  So there never was a joint venture
11  agreement with CAM; is that correct?
12    A.  There was a limited joint venture
13  agreement that is not these documents that we
14  have been looking at.  These are all attempts,
15  prior to the discussions with Fannie Mae
16  telling me not to do business with them.  And
17  then after Fannie Mae said you can't do
18  business with them directly, that is when --
19  or I guess we did wind up signing -- I believe
20  it's three paragraphs, and it simply says that
21  we agree to share commissions if we both work
22  on the transaction.  But I believe that one is

Page 84

1  only signed by me.  I believe that.  I can
2  check.
3    Q.  So your testimony is that there is
4  a co-brokerage agreement --
5    A.  Uh-huh.
6    Q.  -- between --
7    A.  Was.
8    Q.  There was a co-brokerage agreement
9  between you, Marialice Williams, and CAM; is
10  that correct?
11    A.  I believe that's the way it is.
12    Q.  And, separately, your testimony is
13  that there was a limited joint venture
14  agreement between you, Marialice Williams, and
15  CAM?
16    A.  I'm sorry.  I didn't understand --
17  what was the prior question?
18    Q.  The first question was whether
19  there was a co-brokerage agreement between
20  Marialice Williams and CAM?
21    A.  I believe it was called -- no.  I'm
22  not sure whether it -- you know, I have to be

Page 85

1  honest with you, from 1998 in June until, as
2  you can see, two -- several -- two years later
3  at least, we know that I was attempting to
4  work out something with CAM Financial.
5  Nothing ever worked out that would have
6  reflected anything that I would have
7  contemplated before I left Fannie Mae.
8       But because we all kept going at
9  trying to do this business, since I had
10  created it, there was a point at which I
11  believe Bob actively had an insurance company
12  in Baltimore, and -- Fidelity, I believe it
13  was -- that wanted to hear a presentation
14  jointly -- jointly.  And at that time, because
15  the relationship was with CAM, the --
16  Fidelity's relationship was with CAM, in order
17  for me to ensure, because Bob had not paid me
18  or shared -- and I didn't know until later how
19  much money he was making from Fannie Mae until
20  I saw those tapes and stuff -- I thought the
21  only way I could ensure that I could -- would
22  be on there was to get something signed.

22  (Pages 82 to 85)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 86

1  Because I've had the experience with Eric
2  Rosenfield in Metropolitan -- you know,
3  everybody seemed to be kind of not honoring
4  what they were saying.
5       So I believe that the small
6  agreement was one to ensure that I would
7  receive commissions if that company was used
8  to do any Fannie Mae business or any other
9  business. That's why you don't see two
10 signatures on anything.
11     Q.  You believe that there were two
12 signatures on a co-brokerage agreement?
13     A.  I believe there was on this one
14 document, but it's none of these -- there is
15 no language anywhere like this in the document
16 I'm referring to. I believe it's just a
17 little three-paragraph thing that says we will
18 share the commissions in this deal or
19 something like that, and that happens all the
20 time.
21     Q.  And is it your testimony that the
22 three-paragraph document indicating that you

Page 87

1  would share commissions with CAM is the only
2  formalized agreement between you and CAM?
3     A.  I know that. And I now know why.
4     Q.  I would like to show you what will
5  be marked as Exhibit 6.
6       (Deposition Exhibit No. 6 was
7  marked for identification.)
8       BY MS. BECKER:
9     Q.  Can you identify that document?
10    A.  This is a mutual non-disclosure
11 agreement.
12    Q.  What was your understanding of the
13 purpose of this document?
14    A.  The purpose of this document was to
15 ensure that Fannie Mae did not take my ideas
16 and go to another insurance company.
17    Q.  Who are the parties to the mutual
18 non-disclosure agreement?
19       MR. DANIELS:  I'm sorry. I lost
20 track of this. Is this 6?
21       THE WITNESS:  Yes. Marialice
22 Williams and Fannie Mae, Grace Huebscher

Page 88

1  signatory.
2       BY MS. BECKER:
3     Q.  I would like to direct your
4  attention to the first paragraph of the mutual
5  non-disclosure agreement. Do you see where it
6  says that, "This mutual non-disclosure
7  agreement is made and entered into as of the
8  date set forth below by and between Fannie Mae
9  and the entity whose name and address are set
10 forth below (the Company)"?
11    A.  Uh-huh.
12    Q.  Who is the entity whose name and
13 address are set forth below?
14    A.  Mine. My company and -- RMS.
15    Q.  The company that's identified below
16 with their address is Risk Mitigation
17 Strategists, LLC; is that correct?
18    A.  That's correct.
19    Q.  Did Risk Mitigation Strategists,
20 LLC, ever file tax returns?
21    A.  I don't remember -- no. No, I'm
22 filing them now. I don't -- I mean, I'm not

Page 89

1  even sure. I don't think so. We had no
2  income, so we didn't file any tax return.
3     Q.  Was the income from Risk Mitigation
4  Strategists, LLC, zero?
5     A.  Yes.
6     Q.  I believe you just testified that
7  you are currently filing tax returns for Risk
8  Mitigation Strategists, LLC?
9     A.  No, not for Risk Mitigation
10 Strategists. Well, I guess we are to the
11 extent that it's one of the noted companies
12 that I had during that time. I haven't seen
13 the new returns. You don't want to know the
14 story.
15    Q.  Did Risk Mitigation Strategists,
16 LLC, have any operating expenses?
17    A.  Yes. Yes, it did.
18    Q.  What were those?
19    A.  They were typical office expenses
20 that anyone would have that's in business:
21 Rent, telephones and so forth. They were --
22 none of them were in the name of Risk

23 (Pages 86 to 89)

Marialice Williams

Page 90

1  Mitigation Strategists.  They were just all in
2  my personal name.
3       Q.   Did Risk Mitigation Strategists,
4  LLC, have a payroll?
5       A.   No.
6       Q.   Were there ever any financial
7  statements for Risk Mitigation Strategists?
8       A.   No.
9            (Deposition Exhibit No. 7 was
10  marked for identification.)
11            BY MS. BECKER:
12       Q.   I am handing you what's been marked
13  as Exhibit 7.  Do you recognize this document?
14       A.   Yes.
15       Q.   What is it?
16       A.   It's a complaint filed in the
17  District Court by me against Fannie Mae.
18       Q.   Do you recognize this document as
19  Fannie Mae's request for production of
20  documents directed to you in this litigation?
21       A.   Do I recognize it as --
22       Q.   Fannie Mae's request for production

Page 91

1  of documents in this litigation.
2       A.   Oh, I don't -- I don't know.
3       Q.   Have you seen this document before?
4       A.   Yes.
5       Q.   What is your understanding of what
6  this document is?
7       A.   It's a complaint.  It's a complaint
8  with these various -- oh, I'm sorry.  I
9  apologize.  I wasn't reading it.  I was just
10  seeing that.  This is a request for production
11  of documents to me.
12       Q.   Have you seen that document before?
13       A.   Yes.
14       Q.   Did you search for documents in
15  response to Fannie Mae's document requests?
16       A.   I searched everything I had to
17  comply with this.
18       Q.   Where did you search?
19       A.   My office.
20       Q.   Where is your office?
21       A.   1922 First Street, Northwest.
22       Q.   That's at your home; is that

Page 92

1  correct?
2       A.   Yes.
3       Q.   Where else did you search?
4       A.   That's the only place I searched.
5  It's the only place I have documents.
6       Q.   Did you contact Julia Williams?
7       A.   She's dead.
8       Q.   Do you have documents related to
9  the CAM litigation?
10       A.   You sent me a lot of documents from
11  the CAM litigation.
12       Q.   Other than documents that Fannie
13  Mae has produced to you, do you have any
14  documents in your possession related to the
15  CAM litigation?
16       A.   I don't think so, but I had a
17  storage area -- unit on U Street, Northwest,
18  the 1300 block, and I was traveling a lot and
19  they changed the rate by $10, and by the time
20  I got the notice, they had sold all the
21  contents of that.  And that's the only other
22  place where I had documents in boxes and stuff

Page 93

1  like that, and a mink coat and, you know,
2  things -- old stuff, but, you know, it's gone.
3  I don't know where it is and I can't get it.
4       Q.   What documents do you believe were
5  in the storage area on U Street?
6       A.   I really -- I can't say.  I would
7  have gone through it if it would have been
8  available and I would have disclosed them to
9  you.
10       Q.   Do you have any recollection of
11  putting documents in the --
12       A.   No.
13       Q.   -- U Street storage facility?
14       A.   No.  I know that there were boxes
15  that contained legal files and records of
16  things that I no longer have.
17       Q.   Do you have any reason to believe
18  that there were any documents in the U Street
19  storage facility related in any way to Fannie
20  Mae or to CAM?
21       A.   You know, I remember when Bob Jones
22  filed the original complaint in his case, and

24  (Pages 90 to 93)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 94

1    the original case did not involve Fannie Mae.
2    And I know that I saw that complaint, and I am
3    pretty sure I had a copy of it, but I don't
4    have it now. And then, later on, Fannie Mae
5    was added as a necessary party.
6        Q.   Do you have any reason to believe
7    that you had documents in the U Street storage
8    facility related to Fannie Mae or CAM?
9        A.   I believe there may have been some
10   there.
11       Q.   What do you believe that those may
12   have been?
13       A.   Oh, I couldn't tell you.
14       Q.   Other than Ms. Williams, did you
15   work with anybody -- with any other lawyer in
16   connection with the CAM litigation?
17       A.   No. At my last deposition, Michael
18   Beasley, Harley Daniels and Brian Lederer
19   attended the deposition with me.
20       Q.   Do you know where Julia Williams'
21   files are?
22       A.   No.

Page 95

1        Q.   Have you made any effort to locate
2    her files relating to the CAM litigation?
3        A.   I'm sorry. I apologize. She had
4    nothing but some -- you know, when they send
5    you a copy of the deposition so you can check
6    it to see if that's what you really said, you
7    know, where you check through it after it's
8    taken. That's all she had in a file. I do
9    remember that.
10       I did go to her office right after
11   her death. Her family had already boxed up
12   her entire office, and they did it in no order
13   that represented anything intelligent. And I
14   did search through there, and I do remember
15   there was a file and all it had in it were
16   about four sheets of paper, and they were four
17   pages from a deposition, and that's all she
18   had.
19       Q.   Are you referring to what's known
20   as errata sheets?
21       A.   I don't know what they're called.
22   No, they were actual -- they had my testimony

Page 96

1    on it.
2        Q.   They were deposition transcripts?
3        A.   Yes.
4        Q.   There were four pages?
5        A.   Just about four pages.
6        Q.   And that's the only thing, to your
7    knowledge, that Ms. Williams had relating to
8    the CAM litigation?
9        A.   That's as far as I know.
10       Q.   You've previously testified that
11   you had reviewed the documents that Fannie Mae
12   produced, at least in large part; is that
13   correct?
14       A.   A lot of it, yes, watching the
15   videos.
16       Q.   Based on your review of the
17   documents that Fannie Mae produced, do you
18   have any present intention of amending your
19   complaint?
20       A.   Yes. My attorney has spoken to me
21   about that.
22       Q.   I am not going to ask you any

Page 97

1    questions about any conversations that you've
2    had with your lawyer, but I am going to ask
3    you whether you currently have any intent to
4    amend your complaint?
5        A.   I intend to follow my attorney's
6    advice.
7        Q.   Do you intend to amend your
8    complaint?
9        A.   I believe -- yes.
10       Q.   In what way do you intend to amend
11   your complaint?
12       A.   I intend to amend my complaint to
13   further clarify that I was denied business
14   with Fannie Mae on the basis of my race.
15       Q.   Is there any other respect in which
16   you intend to amend your complaint?
17       A.   We really have not finished our
18   discussions.
19       Q.   What do you intend to clarify with
20   respect to your allegation that you were
21   denied business with Fannie Mae based on your
22   race?

25 (Pages 94 to 97)

Marialice Williams

Page 98

1    A.  Until I saw certain documentation,
2  I had been led to believe there was no
3  business going on between CAM and Fannie Mae
4  after 1998, which turns out is incorrect.
5    Q.  What documents are you referring
6  to?
7    A.  There is a -- let's see.
8  Mr. Daniels' law clerk went to Mississippi and
9  obtained from the courthouse there, although
10  it was difficult since it was part of Katrina,
11  the record in the -- public record in the Bob
12  Jones case.  And that was my initial -- the
13  beginning of when -- that was when I began to
14  understand that CAM Financial had made a great
15  deal of money from Fannie Mae and I had made
16  none, and I had done a great deal of work,
17  including creating the product itself.
18    And then I discovered in the
19  depositions that what I was -- had seen
20  represented only a portion of the business
21  that -- because we did not copy all the
22  records, absolutely every record, that there

Page 99

1  were, in fact -- there was a substantial
2  amount of business that continued to be done
3  between Fannie Mae and Bob Jones.
4    Q.  Assuming that business was done
5  between --
6    THE VIDEOGRAPHER:  Excuse me.  I
7  have to go off the record real quick.  The
8  time is 2:12.  We have to go off the record.
9    (Pause.)
10    THE VIDEOGRAPHER:  The time is
11  2:12.  We're back on the record.
12    BY MS. BECKER:
13    Q.  Assuming that there was business
14  between CAM Financial and Fannie Mae after you
15  left Fannie Mae, how would that affect your
16  complaint that you were denied business with
17  Fannie Mae based on your race?
18    A.  Well, Mr. Ott whom Richard Lawch
19  bragged about being a, quote/unquote,
20  international broker and Bob Jones both are
21  less educated, less knowledgeable about the
22  financial markets, less knowledgeable about

Page 100

1  Fannie Mae, totally un -- have no clue,
2  really, about Fannie Mae and its processes and
3  procedures, and yet they were given a great
4  deal of business using a product that I had
5  created and had been told that I was going to
6  be able to get business from once I left.
7    And it didn't make sense that Craig
8  Ott was an international broker because Fannie
9  Mae wouldn't permit any of the insurance
10  business to be done with any international
11  firm.  It had to be a firm that was from the
12  United States and it had to be a triple A
13  rated firm, and Bob Jones and I had identified
14  and brought into Fannie Mae and had under
15  confidentiality agreement every single firm
16  that had those standards at that time.
17    So if Mr. Ott -- and I saw a copy
18  of something that purported to be some kind of
19  insurance policy or something that he wrote
20  that looked like something a third grader
21  would have written; I, on the other hand, had
22  written policy after policy -- I believe it

Page 101

1  was up to 50 versions of it, went through all
2  the -- went through all the language, went
3  through -- worked with lawyers from AIG and
4  Fannie Mae who were happy they were working
5  with a lawyer because Bob was not.  And, you
6  know, I felt I had made such a significant
7  contribution to Fannie Mae's bottom line that
8  I should have been given the business, as
9  were -- most white people who left Fannie Mae
10  usually left and got some kind of contract or
11  something.
12    I was told over and over again
13  there wasn't going to be any contract for me
14  because we don't pay people to do marketing,
15  but if you can bring something in here that's
16  decent, we will try to do it with you.  And I
17  brought lots of things in, and they did
18  nothing.  It turns out they did do something;
19  they just didn't do it with me.
20    Q.  So the new allegation that you
21  intend to bring in your complaint is that
22  Fannie Mae did business with Bob Jones instead

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

1  of with you?
2      A.  And Craig Ott.
3          MR. DANIELS:  Yes, we have two
4  1981s.  In other words, the -- Bob Jones will
5  be recast as a 1981, together with Craig Ott,
6  a person of inferior qualification.
7          MS. BECKER:  Do you intend to drop
8  your claim for tortious interference?
9          MR. DANIELS:  I will state for the
10  record that until we take Bob Jones'
11  deposition, I can't tell whether the tortious
12  interference claims will survive.  But it will
13  in large part depend on his deposition because
14  I have reason to believe that he isn't fully
15  being truthful about what Fannie Mae told him
16  about doing business with Marialice.  I don't
17  believe it.
18          BY MS. BECKER:
19      Q.  What specific business did Fannie
20  Mae do with CAM Financial that you intend to
21  raise in your amended complaint?
22      A.  All of the transactions that Fannie

1  Mae did with Bob Jones after I left Fannie
2  Mae.  I'm sorry.  My chest...
3          MR. DANIELS:  Hang in there a bit,
4  Marialice.
5          THE WITNESS:  Okay.
6          MR. DANIELS:  This is key.
7          BY MS. BECKER:
8      Q.  What are those transactions?
9      A.  I don't know because I wasn't
10  involved.  They're written in -- they're in
11  the information that was provided by you that
12  was stated by Bob.  I didn't write it down.
13  It's in all those documents I went through
14  from the Mississippi case.  It's who the
15  people are and what they did.
16          And -- I believe that all of the
17  aggregation deals were done using the same
18  concept because I had worked with Grace and --
19  before I left Fannie Mae on that issue, just
20  as I had worked with Wendell Johns and Chris
21  Tawa about the possibility of using insurance
22  for the equity program of Fannie Mae as well

1  as the affordable housing program.
2          I did not quit my job because I
3  didn't think I was going to have a lot of
4  work.  I thought I was going to have a ton of
5  work.
6      Q.  What are agg deals?
7      A.  Aggregation deals?  That's a
8  program -- it's a concept that I created, and
9  it then became a way of Fannie Mae doing what
10  conduits do on Wall Street with respect to
11  securitizing mortgages.  In other words,
12  instead of having an investment banker come
13  in, such as Morgan Stanley, and give you one
14  pool of mortgage loans that represents one
15  company, their company, because they're the
16  conduit, Fannie Mae decided instead to step
17  into that role and aggregate those pools like
18  a conduit would do and then issue one security
19  backed by multi -- by different lenders, pools
20  of mortgages.
21      Q.  How is an aggregation deal
22  different from a DUS deal?

1      A.  DUS is -- it's no different.  It's
2  just the size and difference of the structure.
3  And it depends -- see, a lot of the DUS loans
4  are purchased; those were loans that were
5  purchased by Fannie Mae as opposed to
6  securitized.  Securitization is securitization
7  is securitization.
8          So when there was a securitization
9  deal on the DUS side, it was just like one
10  that we would do for any other lender.
11      Q.  There are certain loans, as I
12  understand it, that are characterized as DUS
13  loans; is that correct?
14      A.  Because they're done by the premier
15  group of lenders that Fannie Mae has ordained
16  as fit to submit their loans without any prior
17  review in many instances.
18          MR. DANIELS:  Marialice, what does
19  DUS mean?  Maybe just for the --
20          THE WITNESS:  It means delegated
21  underwriting and servicing, the notion being
22  that they're good enough to do it themselves,

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 106

1  like a brokerage, if you will.
2       BY MS. BECKER:
3       Q.  And are those different from
4  aggregation loans?
5       A.  Aggregation loans have already been
6  originated, and they come to Fannie Mae --
7  they could be anywhere between two-year
8  seasoned up to within three years prior to the
9  termination of the loan document.  So that's
10 why they called the section where I worked and
11 what I ran, until Richard Lawch came, the
12 negotiated transactions section because you're
13 negotiating with loans that have already been
14 originated.
15      The DUS loans are all originated
16 according to a standard set of underwriting
17 practices that Fannie Mae has proscribed.
18      Q.  And how is that different from the
19 aggregation loans?
20      A.  Because aggregation loans have
21 already been originated.  They could have
22 been, let's say -- oh, I will give you a great

Page 107

1  example.  I am Fannie Mae.  I am going to get
2  50 loans from BB&T, 50 loans from PNC, 50
3  loans from Bank of America.  I am going to
4  aggregate them.  But they have already been
5  originated, and I don't know necessarily under
6  what standards.  But what I do, when I
7  negotiate the document that actually -- the
8  trust agreement in which the loans are
9  described and so forth, the documentation, I
10 describe how those loans were done.
11      In the DUS program, all you have to
12 do is hold up the multi-family guide and say,
13 this is how these loans are done, because
14 they're all done to the letter by a specified
15 group of people who have applied for and been
16 accepted into this program.
17      Q.  Is there any other respect in which
18 you intend to amend your complaint?
19      A.  We haven't finalized the discussion
20 yet.  To my knowledge, that's the major area.
21      Q.  Ms. Williams, you previously
22 testified that you had two computer crashes;

Page 108

1  is that correct?
2       A.  Yes.
3       Q.  What were the dates of those
4  computer crashes?
5       A.  I don't recall exactly, but I can
6  tell you that the one at the Watergate -- one
7  was while I still had an office at the
8  Watergate.  So it had to be prior to, let's
9  see -- on 9/11 I was still at the Watergate,
10 so it had to be in 2001.  I believe it may
11 have been in the summertime.
12      Q.  Was it before 9/11?
13      A.  I believe -- I believe it was
14 before 9/11.  It was after the date of the
15 e-mail that I received notifying me -- from
16 the -- I think it was -- yes, I'm pretty sure
17 it was -- I'm pretty sure it was the summer of
18 2001.
19      Q.  What did you do when your computer
20 crashed?
21      A.  I cried.
22      Q.  Did you replace the computer?

Page 109

1       A.  Yes.  And they could not retrieve
2  anything from the hard drive.
3       Q.  When did you get a replacement?
4       A.  Immediately.
5       Q.  Would it have been within a month
6  of when the computer crashed?
7       A.  Definitely.
8       (Deposition Exhibit No. 8 was
9  marked for identification.)
10      BY MS. BECKER:
11      Q.  I am handing you what has been
12 marked as Exhibit 8.
13      A.  Right.
14      Q.  Do you recognize that document?
15      A.  I don't recognize it, but I see
16 that it is the complaint filed in 2003 -- no.
17 This is my deposition -- my deposition in Bob
18 Jones' case.
19      Q.  Dated March 17, 2003?
20      A.  Yes.
21      Q.  I would like to ask you to turn to
22 page 42 of the deposition.  Starting on

28 (Pages 106 to 109)

Marialice Williams

Page 110

1  line 21 you're talking about the computer
2  crash that occurred at the Watergate; is that
3  correct?
4      A.  Uh-huh.
5      Q.  I would like to ask you to turn to
6  the next page which is page 43.  Starting on
7  line 19, can you read that?
8      A.  "I have documents that I have
9  accumulated since my new computer," yes.
10     Q.  Can you read the whole --
11     A.  "But at the time that I received my
12  new computer, I had no further contact with
13  Fannie Mae, CAM or anyone interested in either
14  of those two issues."
15     Q.  What were you referring to with
16  respect to "those two issues"?
17     A.  I don't remember.
18     Q.  Was this a true statement when you
19  made it?
20     A.  It's out of context.  I would have
21  to look at the whole thing.  I don't even know
22  what it's about.

Page 111

1      Q.  Feel free to read whatever you
2  think is necessary to put it in context.
3          MR. DANIELS:  Frankly, given --
4  excuse me.  Frankly --
5          MS. BECKER:  If you're going to
6  testify --
7          MR. DANIELS:  Okay.  Let's see how
8  I can do this so we can -- I object to her --
9          MS. BECKER:  If you're going to
10 make a speaking objection, I object to that as
11 well.  If you want to object for the record,
12 you can object.
13         MR. DANIELS:  Okay.  I object to
14 the form of the question on the ground that
15 the statement being referred to is extremely
16 vague, and that --
17         MS. BECKER:  Counsel, you're making
18 a speaking objection, and I would like to ask
19 you to not do that, please.  You're just
20 coaching the witness at this point.
21         MR. DANIELS:  I don't need to coach
22 Marialice.

Page 112

1          THE WITNESS:  He doesn't need to
2  coach me.
3          MR. DANIELS:  Go ahead, Marialice.
4          MS. BECKER:  Then please don't.
5          THE WITNESS:  Well, no -- actually,
6  there is nothing in here that clarifies -- I
7  mean, I don't see -- would you like to help
8  me?  I don't know where to start.
9          This is just a bunch of argument by
10 attorneys.  I don't even see any substantive
11 question in here for me.
12         MR. DANIELS:  Counsel, perhaps you
13 can save us time.  Is there a reference to
14 which -- that we can refer to that you're
15 familiar with?
16         MS. BECKER:  I am asking the
17 witness to clarify.
18         THE WITNESS:  Well, I can't.  I'm
19 sorry.
20         BY MS. BECKER:
21     Q.  Okay.  What did you mean by "I have
22 documents that I have accumulated since my new

Page 113

1  computer, but at the time that I received my
2  new computer, I had no further contact with
3  Fannie Mae"?
4      A.  What did I mean by that?  It's a
5  whole sentence and it says "of those two
6  issues," and if I could find out what those
7  two issues are, I could tell you why I had no
8  further contact with anybody about them.
9      Q.  I would read it as saying that
10 those two issues are Fannie Mae or CAM in the
11 context of that sentence.  But it's your
12 testimony, so I am asking you to --
13     A.  I don't think it refers to Fannie
14 Mae and CAM.
15     Q.  Okay.  Was it true as of the date
16 of your deposition on March 17, 2003, that at
17 the time that you got your new computer, which
18 would have been sometime in the summer of
19 2001, that you had no further contact with
20 Fannie Mae or CAM?
21     A.  Oh, no, that's not true.  I have
22 given you documents on that.

29 (Pages 110 to 113)

Marialice Williams

Page 114

1    Q.   Why would you have testified to
2  that?
3    A.   I didn't.  You're telling me that I
4  testified to that.  I am telling you I didn't.
5    Q.   You're saying that you didn't say,
6  "I have documents that I have accumulated
7  since my new computer" --
8    A.   You said.
9    Q.   Excuse me.  I would like to finish
10  my question.
11         Are you saying that you did not
12  testify, "I have documents that I have
13  accumulated since my new computer, but at the
14  time that I received my new computer, I had no
15  further contact with Fannie Mae, CAM, or
16  anyone interested in either of those two
17  issues"?
18    A.   "Those two issues" are not
19  referring to Fannie Mae and CAM and,
20  therefore, the conclusion that you are drawing
21  is not what I was saying nor is it what I
22  intended to say.

Page 115

1    Q.   What did you intend to say?
2    A.   Exactly what I said, "or anyone
3  interested in either of those two issues,"
4  which must have been something else related to
5  something else that I can't find in this
6  document while we're sitting here.
7    Q.   So you have no idea what you were
8  referring to in this?
9    A.   I have no idea.
10    Q.   What was the further contact that
11  you had with Fannie Mae or CAM after the
12  summer of 2001?
13    A.   I believe I supplied all the
14  documentation to you indicating that I did
15  have contact with Fannie Mae and that I did
16  have other transactions and things I worked on
17  that I --
18    Q.   So it would be in the documents
19  that you produced?
20    A.   I believe so.
21    Q.   What was the nature of the
22  communications you had with Fannie Mae or CAM

Page 116

1  after 2001?
2    A.   I communicated and sent things and
3  talked to CAM Financial, as far as I know --
4  when was Katrina?  That was in 2004, '5 --
5  2005.  I can tell you that when I was on
6  Martha's Vineyard -- that was 2005, I
7  believe -- in the summer of 2005, I spoke with
8  Bob Jones about business.  I know that.
9    Q.   Did your discussion with Bob Jones
10  in 2005 relate to Fannie Mae?
11    A.   Yes.
12    Q.   In what way?
13    A.   I was still speaking with people
14  who had an interest in pursuing credit
15  enhancement.
16    Q.   Tell me specifically what you
17  discussed with Bob Jones in 2005 relating to
18  Fannie Mae.
19    A.   How is the insurance business?  Is
20  there any hope we're going to get back to
21  doing any of this stuff?  You know, how is
22  your case going?  Is there anything we can do,

Page 117

1  you know, to resurrect what we were trying to
2  do?  Along those lines, generally speaking.
3    Q.   Were there any specific business
4  discussions about specific deals or specific
5  proposals?
6    A.   I did not discuss specific deals
7  with anyone until I had a confidentiality
8  agreement in place and knew that I was the
9  sole representation of that individual.  I
10  just -- you just don't do that.
11    Q.   So is it fair to say that you did
12  not have any discussion with Bob Jones in 2005
13  about any specific deals related to Fannie
14  Mae?
15    A.   I had about specific deals, but I
16  did not reveal the names of those specific
17  people to Bob Jones.
18    Q.   What were the specific deals that
19  you were discussing with Bob Jones where you
20  didn't reveal the names of them?
21    A.   Oh, I just can't remember right
22  now.

30 (Pages 114 to 117)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 118

1      Q.   What specific deals did you have
2   going related to Fannie Mae in the 2005 time
3   frame?
4      A.   You don't have deals related to
5   Fannie Mae.  What you have is you have
6   clients, and they're looking for a way to lay
7   off risk and they're looking at their various
8   options:  Should I go this way?  Should I go
9   that way?  What's cheaper?  What's better?
10  What will give me a better product?  What kind
11  of execution?
12      That's what you talk about.  You
13  don't talk about, I want to go to Fannie Mae
14  and I want to do it this way.  That's not how
15  it works in the marketplace.
16      Q.   So you weren't having a discussion
17  with Bob Jones in 2005 about any specific
18  business related to Fannie Mae?
19      A.   Potential business for Fannie Mae,
20  yes.
21      Q.   And what was that specific
22  potential business that you were discussing

Page 119

1   with Bob Jones?
2      A.   I don't remember right now.
3      Q.   Other than the communication that
4   you had with Bob Jones in 2005, what other
5   communications did you have with CAM between
6   the summer of 2001 and the present?
7      A.   You said other than Fannie Mae?
8      MS. BECKER:  Can you read the
9   question back?
10      (The reporter read the record as
11  requested.)
12      THE WITNESS:  I had a lot of
13  conversations with Bob Jones.  I probably
14  spoke to him every week, every other week,
15  about any number of insurance proposals.  We
16  had a new -- in the District of Columbia, we
17  have one of the newest captive insurance --
18  we're one of the newest captive insurance
19  jurisdictions.
20      And Bob Jones had the reinsurance
21  contacts, and when you're doing a captive
22  insurance transaction, the most critical

Page 120

1   person to your deal is your reinsurer because
2   the rating of the reinsurer is what attaches
3   to the rating of the credit enhancement which
4   relates to the rating of the securities
5   themselves.
6      So there were -- because I had an
7   entree to the insurance commissioner in the
8   District of Columbia -- I don't recall if he
9   was in Washington; if he wasn't in Washington,
10  he was on the telephone with Larry to
11  discuss -- when we were discussing Tom -- it
12  was Tom Hampton, Larry -- the former insurance
13  commissioner; Tom Hampton is now the insurance
14  commissioner, and Dana -- I can't remember his
15  last name, but he was the counsel.  And then
16  the head of the insurance side was a woman.
17      They were all in a room with us,
18  and we were all discussing this whole concept
19  of trying to do affordable housing mortgage
20  loan securitization using captive insurance as
21  the credit enhancement, and we could not move
22  forward.  We were working with -- I know

Page 121

1   Pinnacle was one of them, but there were
2   several other people.  And there were some
3   things that weren't even mortgage loan-related
4   such as John Taylor at the NCRC, it's called.
5   It's an organization that represents community
6   housing organizations.  And we were discussing
7   the feasibility of using the captive.
8      We believed that at that time -- or
9   at least it appeared from the beginning that
10  that would be an appropriate utilization of a
11  captive, a form of captive insurance.  And
12  that's -- you know, we just -- we continued to
13  have those discussions.
14      BY MS. BECKER:
15      Q.   Was there anytime between the
16  summer of 2001 and the present where you had
17  communications with Bob Jones relating to
18  Fannie Mae?
19      A.   Yes, I talked to Bob Jones about
20  Fannie Mae every week or every other week or
21  every few days or whenever he called or
22  whenever I called him.

31 (Pages 118 to 121)

Marialice Williams

Page 122

1    Q.  And what was the nature of those
2  discussions?
3    A.  Are we ever going to do this
4  business again?  Shall I -- you know, that
5  kind of thing.
6       MR. DANIELS:  Asked and answered.
7       THE WITNESS:  Yes, I did answer
8  that, didn't I?
9       BY MS. BECKER:
10   Q.  Do you need the question read back?
11   A.  No.  I said -- that's what I said.
12   Q.  Okay.  What was the nature of the
13  communications that you had with Bob Jones
14  related to Fannie Mae from the summer of 2001
15  to the present?
16   A.  They were personal in nature.
17  Fannie Mae we discussed.
18   Q.  And I am focusing you on Fannie
19  Mae.
20   A.  Fannie Mae.  Fannie Mae.  We talked
21  about Fannie Mae a lot.  He had a major
22  lawsuit against Fannie Mae.  We talked about

Page 123

1  it a lot.
2    Q.  Other than the lawsuit, what
3  discussions did you have with Bob Jones
4  relating to Fannie Mae from the summer of 2001
5  to the present?
6    A.  We talked about every client that I
7  was -- every client I would get, I would
8  pretty much discuss it with Bob Jones because,
9  again, he's the one that had a lot of the
10  contacts that I didn't have and I had some
11  contacts he didn't have.  So when something
12  came in and it looked like it was viable, I
13  would call Bob.  I thought he was my friend.
14  I thought he was my loyal business associate
15  at that time.  I now know that that is not
16  true.
17   Q.  Between the summer of 2001 and the
18  present, did you have any discussions with Bob
19  Jones relating to any specific proposals with
20  Fannie Mae?
21   A.  Yes, and I have given you all of
22  that information in my -- everything that I

Page 124

1  had relating to Bob Jones, potential Fannie
2  Mae transactions.  I honestly cannot remember
3  all of -- or any right now of the -- I would
4  have to go back and make sure it was 2001.
5       I wouldn't want to say something
6  now on the record and then you come back and
7  say, well, you said this and that's -- you
8  know, now you're changing it or whatever.  So
9  for me to answer that one, I mean, I would
10  have to go back to records and look at them to
11  answer that question to know the exact dates,
12  which year and which specific things we talked
13  about.  I wouldn't be able to do that, sitting
14  here.
15   Q.  As you sit here today, do you have
16  any recollection of any discussions with Bob
17  Jones after the summer of 2001 relating to any
18  specific business proposals --
19   A.  Yes, I believe I've answered
20  that --
21   Q.  -- with Fannie Mae?
22   A.  -- several times, and said yes.

Page 125

1    Q.  What were those proposals?
2    A.  I cannot remember --
3    Q.  What were the discussions?
4    A.  -- but I did provide that
5  information as requested in this exhibit back
6  here where you asked me for all of those
7  things I gave you -- and it was marked by the
8  numbers of each of your requests exactly what
9  they were.  And it did include items that were
10  discussed with Bob Jones.
11       And I believe at the very outset of
12  this conversation, if you go back in her
13  record, it says -- you know, I know Pinnacle
14  was after 2001 and I know I discussed that
15  with Bob Jones.  Any number of things.  I'm
16  just -- I'm just not feeling very well, and
17  that's not helping at all.
18       I can't -- it's -- you know.  I can
19  answer it when I look back at the
20  documentation.
21   Q.  Do you feel, as you're sitting here
22  right now, that you can answer questions with

32 (Pages 122 to 125)

Marialice Williams

Page 126

1    a full recollection?
2        A.  No.
3            MS. BECKER:  Let's go off the
4    record.
5            THE VIDEOGRAPHER:  The time is
6    2:46.  We're off the record.
7            (Discussion held off the record.)
8            THE VIDEOGRAPHER:  The time is
9    2:46.  That's the end of today's deposition.
10
11           (Whereupon, signature not having
12   been waived, the taking of the deposition
13   adjourned at 2:46 p.m.)
14
15
16
17
18
19
20
21
22

Page 128

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Deborah Larson Hommer, RPR, the officer
3    before whom the foregoing deposition was
4    taken, do hereby certify that the witness
5    whose testimony appears in the foregoing
6    deposition was duly sworn by me; that the
7    testimony of said witness was taken by me in
8    stenotype and thereafter reduced to
9    typewriting under my direction; that said
10   deposition is a true record of the testimony
11   given by said witness; that I am neither
12   counsel for, related to, nor employed by any
13   of the parties to the action in which this
14   deposition was taken; and, further, that I am
15   not a relative or employee of any attorney or
16   counsel employed by the parties hereto, nor
17   financially or otherwise interested in the
18   outcome of the action.
19       _____
20            Notary Public in and for
             the District of Columbia
         My Commission Expires:
21       October 14, 2008
22

Page 127

1            *  *  *
2
3        ACKNOWLEDGMENT OF DEPONENT
4
5        I, Marialice Bathrus Williams, do hereby
6    acknowledge I have read and examined the
7    foregoing pages of testimony, and the same is
8    a true, correct and complete transcription of
9    the testimony given by me, and any changes
10   and/or corrections, if any, appear in the
11   attached errata sheet signed by me.
12
13   _____  _____
14   Date          Signature
15
16
17
18
19
20
21
22

Page 129

1    April 10, 2007
2
3    Harley Jay Daniels, Esquire
     Law Offices of Harley Jay Daniels
     5511 Second Street, N.W.
4    Washington, D.C.  20011
5
     Re: Marialice Williams v. Fannie Mae,
6    et al.
         Deposition of Marialice Bathrus Williams
7
8    As requested at the time of deposition, your
     original deposition transcript in the
9    above-captioned case is being held for thirty
     (30) days for review and signature.
10
     This task may be accomplished in one of two
11   ways; either the deponent may appear at our
     office to read and sign the deposition
12   transcript for which the deponent should make
     an appointment at (202) 429-0014, or counsel
13   may provide the witness with a copy of the
     transcript, from which the deponent shall make
14   an errata sheet.
15   If the latter method is chosen and the witness
     is provided with a copy of the deposition
16   transcript for review, the deponent should
     keep in mind that the purpose of review is
17   only to ensure accuracy and not to revise in
     an editorial manner.  If any changes or
18   corrections are necessary, the deponent should
     prepare an errata sheet listing by page and
19   line numbers the change or correction made;
     i.e., page 15, line 8, change "he said" to
20   "she said."  When the errata sheet is
     completed it should be signed by the deponent.
21   This signed errata sheet will subsequently be
     attached to the original deposition transcript
22   and be filed with the Court.

33 (Pages 126 to 129)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

Page 130

1    The original transcript will be held until May
     4, 2007, at which time if the deponent has not
2    followed either of the above two steps for
     reading his deposition transcript, it will be
3    assumed that reading and signing are no longer
     desired, and the deposition will be filed.

4
5    Sincerely,
6
7    Deborah Larson Hommer, RPR
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 131

1    Esquire Deposition Services
     1020 19th Street, Northwest
2    Suite 620
     Washington, D.C.  20036
3    (202) 429-0014
4         ERRATA SHEET
5
     Case Name:  Marialice Bathrus Williams v.
6         Fannie Mae, et al.
     Witness Name:  Marialice Bathrus Williams
7    Deposition Date:  March 28, 2007
     Job No.: 179392
8
     Page No.  Line No.       Change
9
10
11
12
13
14
15
16
17
18
19
20
21
     _____
22   Signature            Date

34 (Pages 130 to 131)

af779bd1-e112-4d83-87a0-2544073c0e93

Marialice Williams

## A

**abandon** 51:1
**abandoned** 50:12
50:14 51:5
**able** 18:22 26:3
49:2 53:20 69:18
74:11 100:6
124:13
**above-captioned**
129:9
**absolutely** 53:5
56:17 64:20 98:22
**absorb** 27:18
**accepted** 107:16
**accident** 47:22 48:9
**accomplished**
129:10
**accounting** 56:6
**accumulated** 110:9
112:22 114:6,13
**accuracy** 129:17
**accurate** 76:21
**ACES** 68:17,17
**acknowledge** 127:6
**ACKNOWLED...**
127:3
**acting** 71:13
**action** 1:6 128:13
128:18
**active** 13:8,12
**actively** 14:8 17:8
18:5 37:15 83:7
85:11
**actual** 95:22
**adapted** 55:14
**added** 94:5
**additional** 43:15
69:14
**address** 8:7,11,14
8:19 9:9 88:9,13
88:16
**adhered** 56:7
**adjourned** 126:13
**administrative**

15:14 17:10
**advice** 97:6
**advisory** 10:10
**affect** 99:15
**affordable** 54:2
55:7 66:19 104:1
120:19
**afraid** 46:14
**African-American**
61:3
**afternoon** 73:12,13
**agg** 104:6
**aggregate** 104:17
107:4
**aggregation** 67:1
103:17 104:7,21
106:4,5,19,20
**ago** 11:13 24:12
32:2
**agree** 83:21
**agreement** 5:17
57:5 74:7,16 75:2
76:5,19 77:1,5,10
77:17 78:12 82:16
83:3,9,11,13 84:4
84:8,14,19 86:6
86:12 87:2,11,18
88:5,7 100:15
107:8 117:8
**ahead** 18:19 26:22
112:3
**AIG** 25:7 63:3,4,13
63:18,22 64:7,15
65:5,8,16,20 67:4
67:8,16 101:3
**al** 1:10 3:11 5:8,12
129:6 131:6
**Alan** 46:2
**Alexander** 3:21
**allegation** 97:20
101:20
**alternative** 68:18
**amend** 97:4,7,10
97:12,16 107:18
**amended** 102:21

**amending** 96:18
**America** 107:3
**amount** 53:10 99:2
**and/or** 127:10
**annual** 22:6 23:6
31:8,8
**answer** 21:1 27:1
58:2 122:7 124:9
124:11 125:19,22
**answered** 42:16
122:6 124:19
**anybody** 20:13
77:15 94:15 113:8
**anymore** 20:17
**anytime** 121:15
**apologize** 48:5 91:9
95:3
**appear** 127:10
129:11
**appearances** 3:1
40:12
**appeared** 121:9
**appears** 34:7 79:14
82:15 128:5
**applied** 107:15
**apply** 53:16,17
**appointment** 44:1
44:5 129:12
**appropriate** 57:17
66:5 121:10
**approximately**
11:17 28:16
**April** 129:1
**area** 92:17 93:5
107:20
**areas** 54:1
**argument** 112:9
**Aries** 24:19 31:5,7
31:14,21 32:1,5,9
36:22 37:4,10,22
38:4 39:3,18,20
40:15 41:19 42:4
42:9,15 43:11
44:10
**Arpin** 41:9

**asked** 27:16 40:2
48:2 58:15 74:8
122:6 125:6
**asking** 26:20 78:5
112:16 113:12
**aspects** 56:6
**asset** 54:4
**assets** 52:9 53:14
**assigned** 41:15
47:6,10,16 75:19
**assist** 35:17 66:19
**assistant** 13:20
15:7 16:7,15,18
16:20
**associate** 71:17
123:14
**associated** 23:21
24:2 26:8 27:6
32:16 34:14 35:19
53:4 55:20
**association** 1:10
3:11 6:18 18:11
**assumed** 130:3
**Assuming** 99:4,13
**Atlantic** 24:22 53:9
53:10 54:11,14,19
55:9
**attached** 127:11
129:21
**attaches** 120:2
**attachment** 5:7
34:18,21,22 35:9
**attachments** 5:15
**attempt** 55:17
**attempting** 24:8
31:20 32:5,9 33:1
35:17 43:2 44:13
49:3 50:8 85:3
**attempts** 83:14
**attended** 94:19
**attention** 36:7
76:16 77:20 81:19
88:4
**attorney** 14:15
17:13 20:2,12

96:20 128:15
**attorneys** 112:10
**attorney's** 97:5
**August** 30:3 80:1
**authorize** 66:8
**automobile** 11:21
12:8,9 52:12
**available** 93:8
**Avenue** 4:2 9:6
**aware** 51:12 67:8
**a.m** 2:4 6:13

## B

**back** 17:16 18:21
20:22 39:15 43:21
47:22 53:3 56:11
62:15 65:12 73:4
82:11 99:11
116:20 119:9
122:10 124:4,6,10
125:5,12,19
**backed** 53:14
104:19
**Baltimore** 85:12
**Bank** 11:1 107:3
**banker** 25:10 71:3
104:12
**banking** 32:14
**banks** 56:2
**based** 33:3 43:6
96:16 97:21 99:17
**basically** 12:2
**basis** 31:8 45:21
46:1,9 54:7 97:14
**Bates** 1:8
**Bathrus** 1:5,15 2:7
7:12,16 8:6 73:6
127:5 129:5,6
131:5,6
**BB&T** 107:2
**Beasley** 94:18
**Becker** 3:19 5:4
6:22 7:1,22 8:3
20:22 21:4 28:9
33:14 34:1 35:7,8

39:10,16 72:4
73:11 75:13 79:8
79:17,20 81:1
82:12 87:8 88:2
90:11 99:12 102:7
102:18 103:7
106:2 109:10
111:5,9,17 112:4
112:16,20 119:8
121:14 122:9
126:3
**began** 56:3 98:13
**beginning** 28:14
76:17 82:10 98:13
121:9
**behalf** 3:2,10 83:3
83:5
**belief** 45:21 46:9
**believe** 9:7 10:19
11:12 14:14 16:18
21:6 22:14,15
24:13 28:12 29:22
30:3 32:2 35:1
36:20 40:17 41:9
42:19 43:3,10
49:17 50:15,21
51:8,19 53:19
54:22 57:10,21
59:13 65:4,13
70:4 75:10 77:6,8
78:12 83:19,22
84:1,11,21 85:11
85:12 86:5,11,13
86:16 89:6 93:4
93:17 94:6,9,11
97:9 98:2 100:22
102:14,17 103:16
108:10,13,13
115:13,20 116:7
124:19 125:11
**believed** 121:8
**belongs** 27:9
**best** 74:5
**better** 118:9,10
**beyond** 28:22

69:12
**billion** 27:15
**bit** 18:19 103:3
**blanking** 33:18
41:8 47:4
**blew** 12:3
**block** 92:18
**blocking** 33:16
**board** 10:9,10
54:16
**Bob** 34:8 35:2,3
63:7 71:3 80:3,15
80:16 85:11,17
93:21 98:11 99:3
99:20 100:13
101:5,22 102:4,10
103:1,12 109:17
116:8,9,17 117:12
117:17,19 118:17
119:1,4,13,20
121:17,19 122:13
123:3,8,13,18
124:1,16 125:10
125:15
**Bob's** 74:22
**bond** 60:21,22
**book** 30:9
**borne** 26:13
**bottom** 82:19 101:7
**Bovis** 25:4
**box** 67:11
**boxed** 95:11
**boxes** 92:22 93:14
**bragged** 99:19
**break** 72:3
**breaks** 27:8
**Brian** 94:18
**bring** 20:9 101:15
101:21
**broader** 35:3
**broke** 73:14
**broker** 74:6,7 75:2
76:4,12,18 77:10
78:14,16 83:7
99:20 100:8

**brokerage** 76:10
106:1
**brokers** 52:10
**brought** 17:12 63:6
100:14 101:17
**Budget** 13:22 14:19
**building** 18:13 22:4
**built** 61:3
**bunch** 112:9
**business** 20:20
21:18 31:13,15,20
31:21 32:4,8
43:14,20 44:13,17
45:7 49:8,11,13
49:21 53:8,21,22
55:15 56:10 57:14
57:18 58:11,14,20
60:17 61:7 63:2
68:4 69:2,14
70:10 71:16 74:4
74:9,10,11,15
76:2,20 79:4
83:16,18 85:9
86:8,9 89:20
97:13,21 98:3,20
99:2,4,13,16
100:4,6,10 101:8
101:22 102:16,19
116:8,19 117:3
118:18,19,22
122:4 123:14
124:18

---

**C**

**C** 6:1
**cadre** 37:10
**calendar** 52:21
**California** 49:18
50:10,19,22 51:5
51:15,18 52:1
**call** 28:1 40:11
48:10 123:13
**called** 7:17 14:15
44:19 45:10 48:4
55:18 84:21 95:21

106:10 121:4,21
121:22
**calling** 62:5
**calls** 42:11,12
**CAM** 10:1,4 25:17
34:8 71:20 73:15
73:20,21 74:7,10
74:12 75:3,7,21
76:6,18 77:6,13
78:2,13,13 79:3
80:7 82:16 83:9
83:11 84:9,15,20
85:4,15,16 87:1,2
92:9,11,15 93:20
94:8,16 95:2 96:8
98:3,14 99:14
102:20 110:13
113:10,14,20
114:15,19 115:11
115:22 116:3
119:5
**cap** 38:12
**capacity** 14:3 17:3
71:14 76:10
**Capital** 24:18,19
26:6 28:11,21
29:17 31:5,7,14
31:21 32:1,5,9
36:22 37:4,22
38:4 39:3,18,21
40:16 41:19 42:4
42:9,15 43:12
44:10 46:12,21
48:16 49:11
**captive** 59:5,6,18
60:4,5 61:13
119:17,18,21
120:20 121:7,11
121:11
**captives** 59:21
**car** 12:2
**card** 52:13
**case** 6:6,8 10:20
11:14 12:12 93:22
94:1 98:12 103:14

109:18 116:22
129:9 131:5
**cash** 74:22
**cc** 47:19 48:8
**cc'd** 47:18
**cell** 59:6
**Center** 25:6 60:19
**certain** 29:8 36:2
51:9,20 53:14
64:20 67:9 76:7,8
98:1 105:11
**certificate** 53:11,15
128:1
**certificates** 53:14
53:18
**certified** 6:16
**certify** 128:4
**chairman** 15:8
**change** 56:9,10
58:1 71:22 82:6
129:19,19 131:8
**changed** 11:2 16:17
16:17 92:19
**changes** 127:9
129:17
**changing** 124:8
**characterized**
105:12
**charge** 47:4
**cheaper** 118:9
**check** 77:2 84:2
95:5,7
**Cherouny** 4:9 6:14
**chest** 103:2
**Chicago** 31:10
**chosen** 129:15
**Chris** 103:20
**civil** 1:6 14:20 15:1
16:15,21 17:6
18:3
**claim** 102:8
**claims** 102:12
**clarified** 60:6
**clarifies** 112:6
**clarify** 58:17 79:2

Marialice Williams

97:13,19 112:17
**clear** 35:15 49:6
  60:1
**clearly** 77:22
**clerk** 98:8
**client** 123:6,7
**clients** 24:16 25:19
  118:6
**close** 31:6,18 54:10
  62:21 70:4 71:8
**closed** 63:12 71:10
**clue** 100:1
**coach** 111:21 112:2
**coaching** 111:20
**coast** 10:22 11:1
**coat** 93:1
**collateral** 29:9
  32:20
**Columbia** 1:2 2:18
  6:7 13:7,16 17:14
  22:8 61:1 119:16
  120:8 128:20
**come** 26:4 27:17
  33:3 38:11 59:1,7
  104:12 106:6
  124:6
**coming** 59:8
**comments** 46:10
  48:18,22
**commercial** 69:18
  70:6
**Commission** 15:7
  128:20
**commissioner**
  120:7,13,14
**commissions** 80:4
  83:21 86:7,18
  87:1
**commodity** 68:2
**common** 76:19
**communicated**
  39:18,20 57:7
  116:2
**communication**
  29:2 30:4,19 31:3

45:3 62:10 119:3
**communications**
  29:16 30:17,22
  37:22 38:4,7
  40:14,20 41:18
  42:3,8 44:9 54:18
  55:3 56:14,19
  60:13 61:19 63:17
  63:22 64:6 67:4
  69:2 115:22 119:5
  121:17 122:13
**community** 121:5
**companies** 25:7
  27:22 32:15 33:2
  52:10 53:21 55:22
  56:2,21 58:10
  89:11
**company** 20:18
  50:15 53:11 55:18
  57:1,3,18 60:5,6
  66:1 74:22 76:13
  78:1 85:11 86:7
  87:16 88:10,14,15
  104:15,15
**compatibility**
  30:13
**compiled** 67:13
**complaint** 90:16
  91:7,7 93:22 94:2
  96:19 97:4,8,11
  97:12,16 99:16
  101:21 102:21
  107:18 109:16
**complete** 19:4
  25:12 61:1 127:8
**completed** 129:20
**completely** 75:8
**comply** 91:17
**computer** 52:20,21
  107:22 108:4,19
  108:22 109:6
  110:1,9,12 113:1
  113:2,17 114:7,13
  114:14
**concept** 43:16

55:10,14 59:18
  60:1,10 67:16
  103:18 104:8
  120:18
**concepts** 52:11
**concern** 46:17
**conclusion** 114:20
**conduit** 50:8
  104:16,18
**conduits** 53:22
  104:10
**Conference** 2:12
**confidentiality**
  57:5 100:15 117:7
**conflict** 56:5 67:15
**conflicting** 80:14
**Connecticut** 15:20
**connection** 75:22
  94:16
**consent** 66:8
**considered** 66:4
**consisted** 32:20
**constantly** 30:10
  56:11 62:15
**consulting** 71:14
**consumed** 52:18
**consummated** 83:8
  83:9
**contact** 30:6 31:12
  38:16 61:21 62:3
  63:10 64:8,9 92:6
  110:12 113:2,8,19
  114:15 115:10,15
**contacts** 119:21
  123:10,11
**contained** 93:15
**contemplated** 85:7
**contents** 92:21
**context** 110:20
  111:2 113:11
**continue** 20:19
  74:3
**continued** 69:11
  74:19 99:2 121:12
**continuing** 56:20

**contract** 101:10,13
**contribution** 101:7
**conversation** 20:4
  20:7 43:10 46:2,7
  46:21 47:13
  125:12
**conversations**
  46:13 97:1 119:13
**coordination** 60:21
**copy** 75:10 77:1,7
  94:3 95:5 98:21
  100:17 129:13,15
**Corporation** 25:1
**correct** 9:12 10:1
  13:1 34:19 36:1
  45:2,17 51:6 83:4
  83:11 84:10 88:17
  88:18 92:1 96:13
  105:13 108:1
  110:3 127:8
**corrected** 12:2
**correction** 129:19
**corrections** 127:10
  129:18
**correspondence**
  79:13
**cost** 28:4 59:3
**cost-effective** 50:3
**counsel** 6:19 7:17
  7:21 13:21 16:18
  16:21 73:10
  111:17 112:12
  120:15 128:12,16
  129:12
**counsel's** 40:4 41:3
  41:11
**country** 53:12 61:3
**Countrywide** 24:21
  49:14,19 50:2,12
  50:17
**couple** 8:22 9:1
  51:17
**course** 9:22 10:4
**court** 1:1 6:7,17
  7:14 11:8 15:16

15:20,21 33:7
  40:12 90:17
  129:22
**courthouse** 98:9
**courtroom** 40:12
**courts** 15:15 17:10
**Cowherd** 68:10
**co-brokerage** 84:4
  84:8,19 86:12
**Craig** 100:7 102:2
  102:5
**crash** 110:2
**crashed** 108:20
  109:6
**crashes** 52:21
  107:22 108:4
**crazy** 9:4
**create** 68:16
**created** 58:7 66:17
  85:10 100:5 104:8
**creating** 49:17
**credit** 41:2,5 44:14
  50:4 52:13 56:4
  56:12 59:1,6 63:5
  66:18 67:17 68:8
  68:8,18 69:10
  116:14 120:3,21
**cried** 108:21
**crisis** 58:8
**critical** 119:22
**current** 8:7 56:22
**currently** 6:13 13:3
  13:8 21:10,17
  89:7 97:3
**customer** 47:20

---

**D**

**D** 5:1 6:1
**daily** 30:6,17 53:6
**Dallas** 29:21
**Dan** 41:14
**Dana** 120:14
**Daniels** 3:3,8 7:11
  7:11 12:15 26:19
  26:22 33:12 35:5

Marialice Williams

39:8 72:1 79:16
87:19 94:18 98:8
102:3,9 103:3,6
105:18 111:3,7,13
111:21 112:3,12
122:6 129:2,3
**Danny** 34:9 63:7
**date** 6:11 29:11
34:16 40:19 51:16
64:2,2 88:8
108:14 113:15
127:14 131:7,22
**dated** 5:8,12,14,16
5:21 80:1 109:19
**dates** 53:3 108:3
124:11
**David** 16:16 41:13
47:3,3,14,15
48:21
**day** 42:22 45:20
52:6,7
**days** 52:18 121:21
129:9
**dead** 92:7
**deal** 19:20 38:19
50:16 61:15 66:1
66:4 68:1 70:4
86:18 98:15,16
100:4 104:21,22
105:9 120:1
**dealer** 12:1
**dealing** 30:10
46:11
**deals** 31:18 45:7
62:21 63:12 70:7
71:8,10 103:17
104:6,7 117:4,6
117:13,15,18
118:1,4
**death** 95:11
**Deborah** 1:22 2:15
6:17 128:2 130:7
**December** 64:19
65:1,4,9
**decent** 101:16

**decide** 66:15
**decided** 104:16
**decision** 50:13 51:5
51:9,13 60:7,8
**decisions** 54:9
**defaulting** 67:22
**defect** 11:22
**Defendant** 6:4
**Defendants** 1:11
3:10 5:18 7:18,21
73:10
**define** 78:1
**definitely** 65:13
109:7
**delegated** 105:20
**denied** 97:13,21
99:16
**Department** 14:11
14:13 15:2 24:7,7
**departure** 20:21
46:5 59:20
**depend** 102:13
**depending** 41:3
**depends** 105:3
**deponent** 127:3
129:11,12,13,16
129:18,20 130:1
**deposed** 9:11,22
10:5,12,14
**deposition** 1:14 2:7
5:6,20 6:3,8,15,18
10:19 19:8,22
20:13 26:17 33:21
75:11 79:6,18
80:21 87:6 90:9
94:17,19 95:5,17
96:2 102:11,13
109:8,17,17,22
113:16 126:9,12
128:3,6,10,14
129:6,8,8,11,15
129:21 130:2,3
131:1,7
**depositions** 10:3
11:5 98:19

**describe** 41:7
107:10
**described** 34:13
42:18 107:9
**describing** 35:4
75:20
**description** 34:22
35:2,3
**designated** 66:12
**designer** 18:12
**desire** 43:13,15
**desired** 130:3
**desk** 67:12
**detail** 62:20
**determined** 12:7
**develop** 38:22
**developed** 21:15
33:4
**development** 16:6
30:8 32:14 38:21
43:3,16 52:8
62:17
**dialogue** 56:21
74:20
**difference** 105:2
**different** 52:8,9,10
52:11 70:13 72:2
104:19,22 105:1
106:3,18
**difficult** 52:16 53:2
70:12 98:10
**direct** 36:4,7 49:5
76:15 77:20 81:18
88:3
**directed** 90:20
**direction** 128:9
**directly** 38:10 47:9
48:21 59:22 83:18
**director** 16:15
49:17
**directors** 10:10
**disagreement** 67:7
**disclose** 44:6 48:1
**disclosed** 67:14
93:8

**discouraging** 49:7
49:10
**discovered** 55:5
98:18
**discovery** 33:6
**discuss** 20:13 50:11
65:22 66:6 117:6
120:11 123:8
**discussed** 65:16
116:17 122:17
125:10,14
**discusses** 34:11
**discussing** 34:10
65:20,22 117:19
118:22 120:11,18
121:6
**discussion** 33:7
38:15 39:2 44:15
58:9 64:15 107:19
116:9 117:12
118:16 126:7
**discussions** 28:10
28:21 29:20 36:21
37:4,13 48:2
55:11 68:19 83:15
97:18 117:4
121:13 122:2
123:3,18 124:16
125:3
**disparaging** 48:17
48:22
**dispute** 18:12
**district** 1:1,2 2:17
6:7,7 13:7,15
15:19 17:14 22:8
61:1 90:17 119:16
120:8 128:20
**division** 14:21 15:1
16:22 17:6 18:4
40:7
**document** 34:4
75:15 76:3 79:22
81:7,15,16 82:14
86:14,15,22 87:9
87:13,14 90:13,18

91:3,6,12,15
106:9 107:7
109:14 115:6
**documentation**
22:19 42:7 67:10
98:1 107:9 115:14
125:20
**documents** 5:19
19:14,15,19 20:9
23:1 40:10 75:9
83:13 90:20 91:1
91:11,14 92:5,8
92:10,12,14,22
93:4,11,18 94:7
96:11,17 98:5
103:13 110:8
112:22 113:22
114:6,12 115:18
**doing** 20:20 30:7
44:3 46:15 49:7
49:11 71:7 74:9
74:15 79:4 102:16
104:9 116:21
119:21
**drawing** 114:20
**drive** 109:2
**driven** 50:1
**drop** 102:7
**duh** 67:21
**duly** 73:8 128:6
**DUS** 24:18 26:10
26:12 27:4,11,13
27:15 31:15,20
34:14 35:17 37:19
37:20 38:1,5,8
39:4 44:13,21
60:15 70:18
104:22 105:1,3,9
105:12,19 106:15
107:11
**D.C** 1:17 2:13 3:5
3:14 4:3 6:11 8:9
8:17 9:6 24:7
129:4 131:2

Marialice Williams

**E**

**E** 5:1 6:1,1 73:1,1
**earlier** 40:1 65:11
**east** 15:19
**eastern** 15:19
**ebecker@omm.c...**
  3:16
**editorial** 129:17
**educated** 99:21
**effort** 95:1
**efforts** 35:18
**Eighteen** 15:3
**either** 27:7,18
  40:22 44:13
  110:13 114:16
  115:3 129:11
  130:2
**eliminate** 35:19
**Elizabeth's** 24:9
**employed** 128:12
  128:16
**employee** 128:15
**employees** 23:17
**employment** 14:21
  15:1,6 17:7
**enables** 53:13
**enhancement**
  44:14 50:4 56:4
  56:13 59:2,7 68:8
  68:9,18 116:15
  120:3,21
**ensure** 85:17,21
  86:6 87:15 129:17
**entered** 88:7
**entire** 62:1 95:12
**entirely** 58:11
**entities** 29:10 73:18
**entity** 21:16 88:9
  88:12
**entree** 120:7
**Equal** 15:6
**equity** 103:22
**Eric** 25:9 70:4,21
  71:2,5,8 86:1

**errata** 95:20
  127:11 129:14,18
  129:20,21 131:4
**Esquire** 3:8,19,20
  3:21 4:6 6:15,18
  129:2 131:1
**essentially** 69:6
**establish** 49:19
**estate** 67:18
**estimate** 11:15
**et** 1:10 3:11 5:8,12
  129:6 131:6
**Evelyn** 3:19 6:22
  8:3
**event** 74:16
**eventually** 12:2
**everybody** 86:3
**exact** 37:8 40:19
  55:19 124:11
**exactly** 22:18 29:13
  35:12 51:8 108:5
  115:2 125:8
**examination** 5:3
  7:17,21 73:10
**examined** 7:19
  73:8 127:6
**example** 18:8 44:2
  66:17 107:1
**excuse** 71:22 72:1
  99:6 111:4 114:9
**execution** 61:14
  118:11
**exhibit** 33:21 34:3
  35:7 75:11,14
  79:6,10,18,22
  80:21 81:6 82:14
  87:5,6 90:9,13
  109:8,12 125:5
**Exhibits** 5:6,22
**exist** 20:17 21:10
**existed** 67:11
**existing** 21:8
**exists** 21:7,9
**expenses** 89:16,19
**expensive** 12:9

28:5 32:18
**experience** 86:1
**expertise** 32:13
  74:21
**Expires** 128:20
**explain** 32:12
  35:14 48:10
**extended** 28:22
**extent** 46:14 67:7
  74:18 89:11
**extremely** 111:15
**Eye** 2:11 3:13 6:10
**e-mail** 5:7,11,15
  29:12 34:7,16,19
  35:4,9 47:17,19
  48:13 68:12 81:17
  108:15
**e-mailed** 47:22

**F**

**F** 73:1
**face** 53:10
**facilitate** 38:10
**facility** 61:2 93:13
  93:19 94:8
**fact** 27:18 68:15
  99:1
**facts** 11:14
**fair** 38:3 41:17,20
  66:3 67:2 71:12
  117:11
**familiar** 26:11,14
  71:5 112:15
**family** 95:11
**Fannie** 4:1 6:5 7:1
  7:4,7,10 10:19,20
  10:21 17:17 19:16
  20:19,20 21:15
  24:18 25:16 27:4
  27:12,14 28:4,5
  32:6,10 33:4
  34:14 35:11,16,21
  38:7,9,15,20 39:6
  39:20 40:3,9,15
  40:21 41:19 42:3

42:8,14 43:11,14
  43:19,21 44:4,9
  44:20 46:5 47:19
  48:1,10 50:6 53:1
  54:18 55:6 57:7
  57:18 59:1,2,7,10
  59:19,22 60:9
  61:5 62:8,11 63:7
  63:8,15,18 65:16
  65:18,21 66:7,12
  66:15,21 67:3,4,8
  67:9,16 69:13,16
  70:3 73:19,21,22
  74:8,13 79:2,4
  83:15,17 85:7,19
  86:8 87:15,22
  88:8 90:17,19,22
  91:15 92:12 93:19
  94:1,4,8 96:11,17
  97:14,21 98:3,15
  99:3,14,15,17
  100:1,2,8,14
  101:4,7,9,22
  102:15,19,22
  103:1,19,22 104:9
  104:16 105:5,15
  106:6,17 107:1
  110:13 113:3,10
  113:13,20 114:15
  114:19 115:11,15
  115:22 116:10,18
  117:13 118:2,5,13
  118:18,19 119:7
  121:18,20 122:14
  122:17,18,20,20
  122:21,22 123:4
  123:20 124:1,21
  129:5 131:6
**far** 66:4 69:12 96:9
  116:3
**father** 17:13,17
**father's** 18:2
**favor** 18:10
**feasibility** 121:7
**federal** 1:9 3:10

15:20
**fee** 22:7 23:6 59:10
**feel** 111:1 125:21
**feeling** 125:16
**felt** 101:6
**Fidelity** 85:12
**Fidelity's** 85:16
**field** 62:18
**file** 88:20 89:2 95:8
  95:15
**filed** 90:16 93:22
  109:16 129:22
  130:3
**files** 93:15 94:21
  95:2
**filing** 88:22 89:7
**finalized** 107:19
**financial** 10:1,5
  25:17 34:8 71:20
  73:20,22 74:10,12
  75:3 76:6 78:3
  80:8 82:17 85:4
  90:6 98:14 99:14
  99:22 102:20
  116:3
**financially** 128:17
**financing** 24:9 61:1
**find** 32:18 33:1
  47:2 57:17 113:6
  115:5
**finish** 114:9
**finished** 97:17
**firm** 6:15 100:11
  100:11,13,15
**firms** 32:14
**first** 5:18 8:8,16
  14:12 22:5 24:22
  27:9 36:10 53:9
  53:10 54:11,14,18
  55:9 61:2 62:7
  63:5 68:16 69:8
  77:12,21 84:18
  88:4 91:21
**fit** 105:16
**five** 9:18 18:6 20:8

Marialice Williams

**flew** 29:21 50:10,22
  51:4 52:1
**Florida** 59:3,11,15
**fly** 50:19
**focusing** 122:18
**follow** 97:5
**followed** 130:2
**follows** 7:20 73:9
**foregoing** 127:7
  128:3,5
**forgot** 25:18 40:1
**form** 44:14 50:9
  111:14 121:11
**formal** 71:21 73:17
**formalized** 87:2
**formed** 20:18 21:5
**former** 120:12
**forms** 29:9
**forth** 62:15 68:12
  88:8,10,13 89:21
  107:9
**forward** 45:20
  51:10 74:22
  120:22
**four** 9:19 95:16,16
  96:4,5
**frame** 28:13 29:19
  30:16 31:19 37:3
  37:12 38:6 45:15
  48:12 52:3 54:13
  56:18 61:18 63:21
  78:17 79:11 118:3
**Frankly** 111:3,4
**Freddie** 69:17,21
**free** 111:1
**frequently** 45:19
**Friday** 44:1
**friend** 18:10
  123:13
**front** 35:4
**fulfilling** 55:6
**full** 18:22 19:5 59:8
  126:1
**fully** 102:14
**further** 38:15

43:16 73:9 97:13
  110:12 113:2,8,19
  114:15 115:10
  128:14

---
**G**

**G** 6:1
**general** 11:12,18
  12:1 13:21 16:18
  16:21 40:4 53:5
**generalized** 31:16
**generally** 31:9,10
  40:22 117:2
**gentleman** 47:5
**Gett** 32:1
**give** 11:15 18:22
  33:11 104:13
  106:22 118:10
**given** 11:4,7 100:3
  101:8 111:3
  113:22 123:21
  127:9 128:11
**giving** 19:4
**go** 15:4 18:21 26:22
  37:9,10,10 38:22
  39:8 53:3 56:11
  59:11 65:21 72:2
  72:4 82:6 87:16
  95:10 99:7,8
  112:3 118:8,8,13
  124:4,10 125:12
  126:3
**going** 8:4 28:5 29:4
  30:12 34:2 39:12
  51:10 53:19 54:8
  75:18 77:18 80:13
  82:6 85:8 96:22
  97:2 98:3 100:5
  101:13 104:3,4
  107:1,3 111:5,9
  116:20,22 118:2
  122:3
**Goldfrank** 3:21 7:6
  7:6
**good** 8:1,2 72:3

73:12,13 105:22
**goodness** 24:21
  25:21 57:8
**governance** 10:12
**government** 14:9
  15:13 22:8,20
**Grace** 7:1,4,7 55:9
  75:17 87:22
  103:18
**grader** 100:20
**graduated** 14:10
**great** 19:20 98:14
  98:16 100:3
  106:22
**Greenwald** 46:3
**Griffith** 4:6 7:9,9
**ground** 111:14
**group** 38:13 105:15
  107:15
**Grove** 5:16
**Groves** 34:9 63:7
**Grundeman** 3:20
  7:3,3
**Guarantee** 24:22
**guess** 40:10 83:19
  89:10
**guide** 107:12

---
**H**

**Haberkorn** 68:10
**Hal** 49:15 50:11,15
  51:7
**Hampshire** 9:6
**Hampton** 120:12
  120:13
**hand** 34:2 79:9
  100:21
**handing** 75:14
  79:21 81:2,5
  90:12 109:11
**handle** 41:15
**Hang** 103:3
**happened** 47:18
  78:9
**happens** 86:19

**happy** 101:4
**hard** 109:2
**Harley** 3:3,8 7:11
  12:15 94:18 129:2
  129:3
**harleydaniels@h...**
  3:7
**Harris** 16:8
**Hartsfield** 5:16
  21:22 23:12 53:7
  83:1,2
**Hartsfield's** 23:15
**Harvey** 21:22
  23:12 83:1
**head** 43:8 61:17
  120:16
**Health** 24:8
**hear** 33:12 85:13
**heavily** 52:19
**held** 2:8 6:9 31:9
  31:10 126:7 129:9
  130:1
**help** 112:7
**helped** 68:16
**helpful** 55:6
**helping** 125:17
**hereto** 128:16
**Hispanic** 65:13
**hold** 107:12
**holder** 69:9
**holding** 52:12,13
**home** 22:5 91:22
**Hommer** 1:22 2:16
  6:17 128:2 130:7
**honest** 85:1
**honestly** 124:2
**honoring** 86:3
**Hook** 41:12
**hope** 116:20
**hopping** 66:2
**Hospital** 24:10
**hour** 42:22
**hours** 52:6,6,7
**housing** 16:5 55:7
  104:1 120:19

121:6
**Howard's** 67:11
**Hoyes** 74:1
**HUD** 16:5,8
**Huebscher** 5:10
  7:2,4,7 55:9 75:17
  77:9 78:18 87:22
**hybrid** 70:12

---
**I**

**idea** 53:5 78:11
  115:7,9
**ideas** 87:15
**identification**
  33:22 35:6 75:12
  79:7,19 80:22
  87:7 90:10 109:9
**identified** 88:15
  100:13
**identify** 23:2 24:16
  52:3 75:15 82:13
  87:9
**immediately** 8:14
  9:2 44:20 48:4
  109:4
**important** 40:3
**include** 125:9
**including** 98:17
**income** 89:2,3
**incorrect** 98:4
**independent** 47:8
**indicate** 6:20
**indicated** 6:12
  46:12
**indicating** 22:20
  51:22 86:22
  115:14
**individual** 26:9
  117:9
**individuals** 27:20
  37:6 53:4
**industrial** 60:22
**industry** 30:14,15
  58:9
**inferior** 102:6

Marialice Williams

**inform** 55:4
**information** 19:12
    19:13 53:1 67:10
    103:11 123:22
    125:5
**initial** 98:12
**initiated** 59:19
**innuendo** 49:4
**instance** 18:7
**instances** 105:17
**institution** 69:5
**insurance** 25:7
    27:17,22 29:5
    30:12,14 33:2
    34:12 41:15 44:4
    52:9,10,11 55:22
    56:2,21 57:1,3,17
    58:8 59:5,18 60:4
    60:6 61:13 63:6
    63:10 66:1,9,18
    67:17 69:10 74:6
    74:17 76:19 83:7
    85:11 87:16 100:9
    100:19 103:21
    116:19 119:15,17
    119:18,22 120:7
    120:12,13,16,20
    121:11
**insure** 28:1
**insurer** 63:4
**insurers** 61:22
    67:18
**intelligence** 46:4
**intelligent** 95:13
**intend** 64:13 97:5,7
    97:10,12,16,19
    101:21 102:7,20
    107:18 115:1
**intended** 114:22
**intent** 97:3
**intention** 96:18
**interest** 21:13 76:1
    116:14
**interested** 68:6
    110:13 114:16

    115:3 128:17
**interference** 102:8
    102:12
**interior** 18:12
**international** 99:20
    100:8,10
**introduce** 6:19
**investment** 25:10
    32:14 71:2 104:12
**invited** 31:7
**involve** 38:15 94:1
**involved** 12:18,20
    46:15 103:10
**involving** 10:12
    50:16 54:11 60:3
    70:5
**issuance** 60:21
**issue** 10:12 32:16
    41:4 53:13 60:3
    103:19 104:18
**issued** 60:22 69:21
    70:1
**issues** 29:8 30:10
    30:11 56:5 110:14
    110:16 113:6,7,10
    114:17,18 115:3
**items** 125:9
**i.e** 129:19

_____

**J**

**Jay** 3:3,8 129:2,3
**Jeff** 41:9
**job** 1:21 73:20
    104:2 131:7
**John** 1:8 121:4
**Johns** 103:20
**join** 28:6
**joint** 74:7,16 75:2
    76:4 78:11 82:16
    83:3,10,12 84:13
**jointly** 74:20 85:14
    85:14
**Jonathan** 4:6 7:9
**jonathan_griffit...**
    4:5

**Jones** 5:7,13 34:8
    63:7 71:3 80:3
    93:21 98:12 99:3
    99:20 100:13
    101:22 102:4,10
    103:1 109:18
    116:8,9,17 117:12
    117:17,19 118:17
    119:1,4,13,20
    121:17,19 122:13
    123:3,8,19 124:1
    124:17 125:10,15
**Judge** 1:8
**Julia** 92:6 94:20
**June** 22:14 85:1
**jurisdictions**
    119:19
**Justice** 14:11,13
    15:2

_____

**K**

**Kalinsky** 41:13
**Kathy** 41:13
**Katrina** 98:10
    116:4
**keep** 29:11 129:16
**kept** 85:8
**key** 103:6
**kgrundeman@o...**
    3:17
**kicking** 69:16
**kind** 54:3 70:12
    86:3 100:18
    101:10 118:10
    122:5
**knew** 67:10 117:8
**know** 9:4 22:7,16
    25:14,14 26:1,11
    30:9 33:15,16,17
    33:17 35:12 46:14
    46:16 47:18 48:21
    49:20 50:13 51:2
    51:3,10 53:5
    56:12 57:9 58:8
    64:3,19 65:3,5,5

    70:19 77:2 78:8,9
    78:9,17 80:14,16
    84:22 85:3,18
    86:2 87:3,3 89:13
    91:2 93:1,2,3,14
    93:21 94:2,20
    95:4,7,21 96:9
    101:6 103:9 107:5
    110:21 112:8
    116:3,8,21 117:1
    120:22 121:12
    122:4 123:15
    124:8,11 125:13
    125:13,14,18
**knowledge** 47:10
    96:7 107:20
**knowledgeable**
    59:21 99:21,22
**known** 68:16 95:19
**Kyra** 3:20 7:3

_____

**L**

**L** 3:19
**language** 86:15
    101:2
**lapsed** 22:9,17,21
    23:3 24:3
**large** 33:4 67:6
    96:12 102:13
**Larry** 69:17 120:10
    120:12
**Larson** 1:22 2:15
    128:2 130:7
**law** 3:3 9:20 13:12
    14:7,10 15:22
    16:10 17:2,8,20
    18:5 40:8,11 98:8
    129:3
**Lawch** 7:2,5,8 41:1
    45:9,15,22 46:9
    46:13,19,22 48:17
    49:1,10 99:18
    106:11
**Lawch's** 47:9
**lawsuit** 122:22

    123:2
**lawsuits** 12:16,18
    12:21
**lawyer** 12:11,14
    13:1 94:15 97:2
    101:5
**lawyers** 101:3
**lay** 28:6 32:19
    38:12,12 118:6
**laying** 26:8 29:6
    44:21 68:9
**learn** 49:9
**Lease** 25:4 27:10
    27:16 29:20 30:5
    30:17 31:1 37:9
**led** 98:2
**Lederer** 94:18
**left** 16:4 20:19 40:2
    44:20 53:1 60:9
    62:8 63:8,15,18
    66:20 67:3 70:3
    73:19,21 85:7
    99:15 100:6 101:9
    101:10 103:1,19
**legal** 6:16 93:15
**legally** 76:13
**legislative** 16:7
**lend** 25:4 27:10,16
    29:20 30:5,17,22
    37:9 54:1
**lender** 24:18 27:11
    27:13 28:4,6
    60:16 70:18
    105:10
**lenders** 26:10 33:3
    35:18 37:16,17,20
    38:14 56:2 66:8
    66:19,22 104:19
    105:15
**lengthy** 62:18
**letter** 5:9,13 74:9
    74:13 75:16 76:16
    77:8 78:10,18
    80:2,5,9 107:14
**let's** 24:13 25:22

29:21 31:22 72:4
98:7 106:22 108:8
111:7 126:3
**level** 27:6,9,12,19
28:3,8 30:15
**Levin** 55:8
**licensed** 13:3 76:12
83:8
**life** 9:16
**limitations** 53:16
**limited** 54:7 58:11
67:6 83:12 84:13
**line** 72:2 101:7
110:1,7 129:19,19
131:8
**lines** 117:2
**list** 25:12
**listen** 76:7
**listing** 129:18
**litigation** 10:1,5
12:5 90:20 91:1
92:9,11,15 94:16
95:2 96:8
**little** 8:12 18:19
33:11 50:6 70:11
86:17
**live** 8:18 9:8
**lived** 8:10,20
**living** 43:18
**Liz** 68:9
**LLC** 20:16 21:9
22:2,17,21 23:2,6
23:11 24:1,3,15
24:15 36:1,3,5,11
36:15,20 71:20
73:16 75:4 77:12
77:13 78:2 88:17
88:20 89:4,8,16
90:4
**LLP** 2:10 3:12
**loan** 10:22 27:7
106:9 120:20
**loans** 26:9,12 34:15
35:20 52:12,13
59:9 69:19,19

104:14 105:3,4,11
105:13,16 106:4,5
106:13,15,19,20
107:2,2,3,8,10,13
**loan-related** 121:3
**locate** 95:1
**long** 8:10,18 9:8
11:13 14:2,22
15:9 17:19,21
20:7 28:10 45:3,6
45:6 62:19
**longer** 21:7 28:17
28:18 68:3 93:16
130:3
**look** 37:17 44:2
56:11 63:9 75:6
77:16 110:21
124:10 125:19
**looked** 53:18
100:20 123:12
**looking** 32:15
37:11 43:20 50:3
58:22 68:7 77:3
83:14 118:6,7
**looks** 82:2
**lost** 87:19
**lot** 25:12 29:8
32:17 62:20 67:15
70:6 92:10,18
96:14 104:3 105:3
119:12 122:21
123:1,9
**lots** 101:17
**Lou** 74:1
**lower** 6:12
**loyal** 123:14
**lunch** 31:22 72:3
73:14

———————————
**M**
**Mac** 25:2 57:15,16
57:20 58:2 69:17
69:21
**Mae** 4:1 6:5 7:1,4,7
7:10 10:19,20,21

17:17 19:16 20:19
20:20 21:15 24:18
25:16 27:4,12,14
28:4,6 32:6,10
33:5 35:11,16,21
38:7,9,15,20 39:6
39:20 40:3,9,15
40:21 41:19 42:3
42:8,14 43:11,14
43:19,21 44:4,9
44:20 46:6 47:19
48:1,10 50:6 53:2
54:18 55:6 57:7
57:18 59:1,2,8,10
59:19,22 60:9
61:5 62:8,11 63:7
63:8,15,18 65:17
65:18,21 66:7,12
66:15,21 67:3,4,8
67:9,16 69:13,16
70:3 73:19,21,22
74:8,14 79:2,4
83:15,17 85:7,19
86:8 87:15,22
88:8 90:17 92:13
93:20 94:1,4,8
96:11,17 97:14,21
98:3,15 99:3,14
99:15,17 100:1,2
100:9,14 101:4,9
101:22 102:15,20
103:1,2,19,22
104:9,16 105:5,15
106:6,17 107:1
110:13 113:3,10
113:14,20 114:15
114:19 115:11,15
115:22 116:10,18
117:14 118:2,5,13
118:18,19 119:7
121:18,20 122:14
122:17,19,20,20
122:21,22 123:4
123:20 124:2,21
129:5 131:6

**Mae's** 34:14 90:19
90:22 91:15 101:7
**major** 11:22 52:22
53:20 70:1 107:20
122:21
**making** 43:18
67:22 85:19
111:17
**management** 13:21
14:19 15:18
**manner** 129:17
**March** 1:16 2:3
6:11 52:17 109:19
113:16 131:7
**Marialice** 1:5,15
2:7 3:2 5:20 6:4
7:12,16 8:6 73:6
77:6 78:14 80:3
84:9,14,20 87:21
102:16 103:4
105:18 111:22
112:3 127:5 129:5
129:6 131:5,6
**marked** 33:22 34:3
35:6 75:12 79:7
79:10,19,22 80:22
81:5,19 82:14
87:5,7 90:10,12
109:9,12 125:7
**market** 49:22 50:1
67:19
**marketing** 75:1
101:14
**marketplace** 29:4
52:15 68:17
118:15
**markets** 99:22
**Marsh** 25:2 57:15
57:16,20 58:2
**Marshall** 25:6
60:18
**Martha's** 116:6
**matter** 6:5 10:13
**matters** 10:6,8,15
18:15 41:16

**MCRI** 69:15
**mean** 9:16 36:5
37:15 38:17 47:19
48:6,6,7,8 57:11
58:14,18 64:20
66:11 78:5 88:22
105:19 112:7,21
113:4 124:9
**meaning** 47:8
**means** 33:9 105:20
**medication** 19:3
**meet** 20:2,3 29:22
50:10 59:4 68:11
74:20
**meeting** 31:8 57:1
59:14
**members** 10:9
**Mental** 24:8
**message** 37:8 66:13
**met** 51:7 69:10
75:17
**method** 129:15
**Metropolitan** 25:9
69:3,5,8 70:5,16
86:2
**Mexico** 11:11
17:16
**mezzanine** 34:13
**Michael** 94:17
**Miles** 41:13
**mind** 129:16
**mine** 8:21 88:14
**mink** 93:1
**minutes** 20:8
**mischaracterize**
78:6
**mischaracterized**
77:19
**mischaracterizes**
77:9
**misrepresent** 77:14
**mission** 55:7
**Mississippi** 98:8
103:14
**misstatement**

76:22
**mistakenly** 52:19
**mitigation** 20:15
23:11 36:1,11,15
36:18,19 55:21
71:19 73:16 75:4
76:5,11 78:2 80:7
80:11 82:17 83:4
83:6 88:16,19
89:3,8,9,15 90:1,3
90:7
**modify** 56:12
**moment** 39:9
**money** 12:4 85:19
98:15
**month** 22:13 109:5
**months** 8:13 15:3
15:10 17:5,22
18:1,3 40:5 45:5
51:8,18 64:7
**Morgan** 25:8 68:5
68:6,14,15,20
70:2,15 104:13
**morning** 8:1,2
**mortgage** 1:9 3:11
24:17,20 25:5
26:6 27:10,16
28:11,21 29:16
30:15 32:15 35:20
37:9 44:18,19
45:4,8 46:12,20
48:16 49:10 58:21
58:22 59:15 60:13
69:9 70:12 104:14
120:19 121:3
**mortgages** 26:9
54:2 68:2,3
104:11,20
**mortgage-backed**
32:21 54:6 67:20
**Motors** 11:12,18
12:1
**move** 22:10 51:10
74:22 120:21
**moved** 8:22 22:3,4

**multi** 104:19
**multi-family** 10:20
35:20 40:6 49:16
49:17,19 50:13
51:6 63:5 66:18
67:17 69:9 70:7,9
74:3 107:12
**mutual** 5:17 87:10
87:17 88:4,6
**Myers** 2:10 3:12
6:10 19:14

--------

**N**

**N** 5:1 6:1 73:1,1,1
**name** 6:14,22 8:3,5
11:2 25:22 41:8,9
41:9,14 47:1,4
55:19 58:20 65:14
68:10 88:9,12
89:22 90:2 120:15
131:5,6
**named** 68:17
**names** 11:3 26:3
61:16 117:16,20
**Narassiman** 45:10
46:3
**narrow** 50:2
**National** 1:9 3:10
18:11
**nature** 13:18 26:5
31:4 32:4,8 40:13
44:8 49:6,13 55:2
55:15 56:8 57:14
60:3,17 61:7 63:2
68:4 69:1 77:10
115:21 122:1,12
122:16
**NCRC** 121:4
**necessarily** 107:5
**necessary** 94:5
111:2 129:18
**need** 38:14 111:21
112:1 122:10
**negotiate** 107:7
**negotiated** 106:12

**negotiating** 106:13
**negotiation** 32:1
58:9
**neither** 128:11
**nervous** 9:4
**Network** 10:11
**never** 12:1 43:13
43:14 66:4,7,10
66:10 80:2,9 83:8
83:10
**new** 9:5 11:11
17:16 18:13 24:9
55:14 56:3,12
62:9 65:3 68:11
68:12 71:4 89:13
101:20 110:9,12
112:22 113:2,17
114:7,13,14
119:16
**newest** 119:17,18
**Newman** 5:11
40:22 55:8 75:18
**newsletter** 29:12
60:7
**nice** 45:12
**Noble** 5:8 34:8
66:13
**non-disclosure**
5:17 87:10,18
88:5,6
**Northwest** 6:10 8:8
8:16 9:6 91:21
92:17 131:1
**notary** 2:17 7:19
128:1,19
**noted** 89:11
**notice** 2:15 92:20
**notifying** 108:15
**notion** 105:21
**number** 6:3,8
19:11,12 21:12
26:10 68:13 82:5
82:7,10 119:15
125:15
**numbers** 125:8

129:19
**N.W** 2:11 3:4,13
4:2 129:3

--------

**O**

**O** 6:1 73:1,1,1
**object** 111:8,10,11
111:12,13
**objection** 111:10
111:18
**obtained** 98:9
**occasional** 18:7
**occur** 24:11
**occurred** 110:2
**October** 128:21
**offered** 73:20
**office** 13:21 14:18
15:15 16:15 17:10
17:15,18,20 18:2
22:4,5 40:4 41:2,3
41:5,11 67:11
89:19 91:19,20
95:10,12 108:7
129:11
**officer** 128:2
**officers** 23:10
**offices** 2:8 3:3 6:9
22:3 129:3
**oh** 9:5,15 10:18
13:20 24:21 25:21
39:22 41:13 51:2
57:8 59:17 60:15
64:17 81:13 91:2
91:8 94:13 106:22
113:21 117:21
**Okay** 72:4 103:5
111:7,13 112:21
113:15 122:12
**old** 93:2
**OMB** 15:5 16:14
**once** 60:8 63:8
100:6
**ongoing** 37:18 43:1
**oops** 75:6
**opened** 55:17

**operating** 89:16
**opportunity** 15:7
64:12 77:22
**opposed** 105:5
**options** 37:17 68:7
118:8
**ordained** 105:15
**order** 74:10 82:3
85:16 95:12
**organization** 121:5
**organizations**
121:6
**original** 93:22 94:1
129:8,21 130:1
**originated** 26:10
106:6,14,15,21
107:5
**originating** 30:12
**other's** 76:2
**Ott** 99:18 100:8,17
102:2,5
**outcome** 128:18
**outset** 125:11
**outside** 14:6 69:21
**out-of-order** 82:2
**overall** 9:16
**overheard** 46:2,8
**owner** 60:4
**ownership** 76:1
**O'Melveny** 2:10
3:12 6:9 19:13

--------

**P**

**P** 6:1
**Pacifica** 10:11
**package** 59:8
**page** 5:3,6 36:10
81:19 82:2,15,19
109:22 110:6,6
129:18,19 131:8
**pages** 1:19 95:17
96:4,5 127:7
**paid** 18:16,18,18
22:6 23:5 85:17
**paper** 95:16

Marialice Williams

**papers** 33:7
**paragraph** 76:16
77:21 88:4
**paragraphs** 83:20
**pari** 28:2
**part** 29:2 33:4 57:9
96:12 98:10
102:13
**particular** 81:17
**parties** 26:13,14
87:17 128:13,16
**partner** 76:9
**party** 6:20 12:21
94:5
**passu** 28:2
**Patricia** 16:7
**Paul** 41:12
**Pause** 82:8 99:9
**pay** 71:11 101:14
**paying** 38:21 59:10
**payroll** 90:4
**people** 18:9 21:14
26:2 29:11 30:7
32:17,18 37:11
38:13 42:17,20
43:4,4,5,19 52:12
52:13 54:1 59:20
74:21 101:9,14
103:15 107:15
116:13 117:17
121:2
**perceived** 29:9
**perfectly** 81:14
**performed** 15:18
**period** 62:1
**periodically** 68:11
**permit** 100:9
**person** 18:9 21:11
21:20 47:3,9,10
47:16,22 48:5,19
49:16 60:20 102:6
120:1
**personal** 90:2
122:16
**pertaining** 29:8

**pervasive** 52:15
**phone** 20:4 42:11
42:12
**Pinnacle** 25:5
58:21,22 59:4,15
60:13 121:1
125:13
**place** 6:6 72:3 92:4
92:5,22 117:8
**places** 67:1
**Plaintiff** 1:7 3:2
7:12
**please** 6:19 7:14
8:5 48:1 111:19
112:4
**PNC** 107:2
**point** 45:19 60:20
74:18 85:10
111:20
**policy** 41:2,5
100:19,22,22
**pool** 54:4 69:20
104:14
**pools** 26:8 104:17
104:19
**pops** 65:12
**popular** 54:2
**portfolio** 30:11
70:14
**portfolios** 32:17
43:22
**portion** 6:12 28:7
32:21 98:20
**position** 14:6,12,17
15:4,9,12 16:1,3,4
16:11,13
**possession** 92:14
**possibility** 26:7
44:3,21 59:4
60:11 103:21
**possible** 68:7
**possibly** 44:4
**post** 32:19
**potential** 61:13
68:12 71:4 118:19

118:22 124:1
**Potter** 49:15 50:11
**practice** 13:4,9,12
13:19,22 14:22
16:10 17:15
**practiced** 14:7 18:5
18:7
**practices** 106:17
**practicing** 13:15
15:22 17:2,6,8
40:8,11
**precisely** 52:4
78:21
**preclude** 19:4
**predetermined**
54:8
**preferred** 27:22
**premier** 105:14
**prepare** 19:7,21
29:3 129:18
**present** 4:8 37:14
96:18 119:6
121:16 122:15
123:5,18
**presentation** 85:13
**president** 23:14,16
74:2
**pretty** 18:15 94:3
108:16,17 123:8
**previous** 33:6
**previously** 37:7
73:8 96:10 107:21
**primary** 27:19
**prior** 8:15 9:3
20:21 46:5 57:8
59:19 79:3 83:15
84:17 105:16
106:8 108:8
**priority** 66:22
**private** 13:22
**probably** 30:18
45:20 47:2 49:20
56:1 58:6 64:18
76:22 80:10,12
119:13

**procedures** 100:3
**process** 62:19
**processes** 100:2
**procure** 24:8
**produced** 19:15
92:13 96:12,17
115:19
**product** 21:14
27:15 30:7 32:13
38:21,22 43:2
44:4 52:7 55:5
62:17 66:16 98:17
100:4 118:10
**production** 5:19
90:19,22 91:10
**products** 33:3
**Professional** 2:16
**profit** 50:7
**program** 49:20
50:9 67:1 103:22
104:1,8 107:11,16
**project** 24:7 47:7
**promises** 43:18
**properties** 70:8
**property** 8:21
67:21
**proportion** 52:22
**proposal** 33:8,14
35:11,15,22 36:14
36:17 37:1,5,19
38:1,5,8 39:4
55:12 56:16 58:4
58:16,18,19 59:16
60:14 61:12,20
62:4,6 63:19 64:1
64:10,16,17 65:7
66:10 68:21 70:17
71:1,6,15
**proposals** 117:5
119:15 123:19
124:18 125:1
**proposed** 82:16
**proprietorship**
21:19
**proscribed** 106:17

**provide** 50:3 56:4,5
67:9 125:4 129:13
**provided** 19:13
75:10 103:11
129:15
**providing** 34:12
59:6
**public** 2:17 98:11
128:1,19
**purchased** 27:8
105:4,5
**purported** 100:18
**purpose** 87:13,14
129:16
**Pursuant** 2:15
**pursue** 20:19 21:14
44:21 66:21
**pursuing** 26:7
38:18 43:13,18
47:11 116:14
**put** 25:18 26:3 36:5
48:8 67:13 111:2
**putting** 93:11
**p.m** 73:2 126:13

---

**Q**

**qualification** 102:6
**question** 26:19
40:2 46:4 62:16
77:15 78:6 84:17
84:18 111:14
112:11 114:10
119:9 122:10
124:11
**questions** 8:4 18:20
97:1 125:22
**quick** 99:7
**quit** 104:2
**quite** 25:8 56:21
69:4
**quote/unquote**
32:20 99:19

---

**R**

**R** 6:1 73:1

Marialice Williams

**race** 97:14,22 99:17
**radio** 10:11
**raise** 64:12,13
  102:21
**raised** 46:4
**ran** 71:17 106:11
**rate** 92:19
**rated** 100:13
**rating** 120:2,3,4
**reaching** 28:2
**read** 20:22 21:2
  110:7,10 111:1
  113:9 119:8,10
  122:10 127:6
  129:11
**reading** 91:9 130:2
  130:3
**reads** 6:13 77:5
**real** 67:18 99:7
**realize** 68:2
**really** 9:20 22:18
  34:12 39:5,22
  65:18,19 78:21
  93:6 95:6 97:17
  100:2
**reason** 18:21 46:16
  73:21 74:4 93:17
  94:6 102:14
**recall** 9:15 11:6
  22:18 23:7,9
  25:14,19 31:3
  38:2 39:3,22
  40:14,17 41:14,18
  41:21 45:5 56:1
  61:16 62:5 64:15
  65:7,10,20 81:11
  108:5 120:8
**recalled** 73:7
**recapture** 53:3
**recast** 102:5
**receive** 12:4 86:7
**received** 108:15
  110:11 113:1
  114:14
**Recess** 39:13 72:8

**recognize** 34:3 81:7
  81:10,12,15,16,17
  90:13,18,21
  109:14,15
**recollection** 28:20
  29:15 30:21 35:10
  36:13 42:13 43:6
  76:4 79:11 93:10
  124:16 126:1
**record** 8:5 21:2
  35:14 39:9,12,15
  42:12 58:17 72:5
  72:7 73:4 82:6,11
  98:11,11,22 99:7
  99:8,11 102:10
  111:11 119:10
  124:6 125:13
  126:4,6,7 128:10
**records** 51:22
  93:15 98:22
  124:10
**Red** 24:17 26:6
  27:10,16 28:11,21
  29:16 37:9 46:11
  46:20 48:16 49:10
**reduced** 128:8
**refer** 112:14
**reference** 112:13
**referred** 45:22
  111:15
**referring** 21:21
  48:20 78:8 81:3
  86:16 95:19 98:5
  110:15 114:19
  115:8
**refers** 113:13
**reflected** 85:6
**refresh** 35:10 36:13
  76:3 79:10
**refused** 67:9
**regarding** 10:20
  30:11 38:7 39:20
  41:19 42:4,9,15
  43:11 44:10 62:11
  64:10,15

**region** 49:18
**Registered** 2:16
**regulates** 22:8
**regulations** 56:7
**regulatory** 29:10
  29:10 60:3
**reinsurance** 61:13
  119:20
**reinsurer** 120:1,2
**reinsurers** 25:8
  52:11 61:22
**relate** 32:6,10
  36:22 55:11 56:15
  59:15 63:18 68:20
  70:16,22 116:10
**related** 37:5,19
  44:12 59:17 62:3
  92:8,14 93:19
  94:8 115:4 117:13
  118:2,4,18 122:14
  128:12
**relates** 120:4
**relating** 37:22 38:5
  39:3 40:15 63:22
  65:16 71:14 95:2
  96:7 116:17
  121:17 123:4,19
  124:1,17
**relationship** 31:5,6
  46:18 47:8 63:9
  69:12 71:19,21
  73:15,17 74:5,19
  78:1 79:3 85:15
  85:16
**relationships** 25:13
**relative** 128:15
**relied** 52:19
**relief** 37:11
**reluctant** 80:18,18
**rely** 50:5 59:10
**relying** 59:2
**remain** 64:6
**remember** 9:5
  10:17,18 18:14
  30:1 33:10 39:7

41:8 42:2,5,22
  47:1 55:19 62:2
  64:18 65:14,19
  78:22 80:20 81:13
  88:21 93:21 95:9
  95:14 110:17
  117:21 119:2
  120:14 124:2
  125:2
**remembered** 65:11
**remembering**
  41:22 75:8
**REMIC** 32:22 54:7
  69:20
**REMICs** 53:17
**remove** 54:3
**Rent** 89:21
**rental** 8:21
**renting** 59:5
**repeated** 45:18
**replace** 54:4
  108:22
**replacement** 109:3
**Reported** 1:22
**reporter** 2:16 5:22
  6:17 7:14 21:2
  119:10
**represent** 6:21 7:1
  12:11
**representation**
  117:9
**representations**
  18:17
**represented** 18:10
  95:13 98:20
**representing** 7:4,7
**represents** 104:14
  121:5
**request** 19:14
  90:19,22 91:10
**requested** 21:3
  119:11 125:5
  129:8
**requests** 5:18 91:15
  125:8

**required** 59:9 79:2
**research** 27:21
**residence** 9:2
**residential** 69:19
**respect** 29:5 56:5
  61:12 75:22 97:15
  97:20 104:10
  107:17 110:16
**responded** 33:17
**responding** 47:20
**response** 91:15
**responsible** 43:17
**result** 12:5 19:14
**resume** 17:12
**resurrect** 117:1
**resurrected** 63:8
**retained** 5:22
**retrieve** 53:1 109:1
**return** 89:2
**returns** 88:20 89:7
  89:13
**reveal** 117:16,20
**revenue** 60:22
**review** 19:18 96:16
  105:17 129:9,16
  129:16
**reviewed** 19:11,20
  40:10 96:11
**revise** 129:17
**Rhoda** 40:22 55:8
  75:18
**Richard** 7:2,5,8
  41:1 45:9 46:19
  99:18 106:11
**right** 11:6 33:18
  47:1 77:3 95:10
  109:13 117:21
  119:2 124:3
  125:22
**rights** 14:20 15:1
  16:15,22 17:6
  18:3
**ripped** 53:22
**risk** 20:15 23:10
  26:8,12 27:6,8,9

Marialice Williams

27:12,19 28:1,3,8
29:6,6 32:16,19
34:14 35:19,22
36:11,15,17,19
38:12 43:22 44:22
55:20,21 63:5
66:18 67:17 68:9
69:10 71:19 73:16
75:3 76:5,11 78:2
80:7,11 82:17
83:3,5 88:16,19
89:3,7,9,15,22
90:3,7 118:7
**RMS** 22:16 23:2,19
23:22 24:3,6,14
24:16,17 25:20
31:4 55:12 56:15
61:8 68:5 75:21
76:9,18 77:12
78:2,8,13,15 79:3
88:14
**Rob** 55:8
**Robert** 4:9 6:14
**Roberts** 16:8
**role** 104:17
**room** 2:12 120:17
**Rosenfield** 25:10
70:4,22 71:2,9,13
86:2
**RPR** 1:22 128:2
130:7
**rules** 56:9

─────── **S** ───────

**S** 6:1 73:1,1,1
**sabotage** 48:7
**Sarah** 3:21 7:6
**save** 112:13
**savings** 10:22 11:1
25:9 69:3,5,8 70:5
70:16
**saw** 62:7 85:20
94:2 98:1 100:17
**saying** 42:19 58:3
74:14 75:21 86:4

113:9 114:5,11,21
**says** 77:22 83:20
86:17 88:6 113:5
125:13
**scenario** 81:13
**schedule** 14:16
**school** 14:10
**screen** 6:13
**search** 91:14,18
92:3 95:14
**searched** 91:16
92:4
**seasoned** 106:8
**second** 3:4 28:3
76:17 129:3
**secondary** 27:19
28:7
**Secretary** 16:8
**section** 14:21 15:2
17:7 55:18 106:10
106:12
**securities** 32:21,22
53:16 56:8 69:20
120:4
**securitization**
10:21 31:17 50:5
52:14 62:18 105:6
105:6,7,8 120:20
**securitize** 69:18
70:14
**securitized** 27:7
105:6
**securitizing** 35:20
104:11
**security** 54:6 67:20
104:18
**see** 24:13 25:22
26:2 29:21 31:22
34:5 36:3,9 66:11
78:4 81:20 82:20
85:2 86:9 88:5
95:6 98:7 105:3
108:9 109:15
111:7 112:7,10
**seeing** 81:11 91:10

**seek** 56:3
**seen** 89:12 91:3,12
98:19
**sell** 50:7
**selling** 35:19
**send** 37:8 95:4
**senior** 16:7 74:2
**sense** 27:2 71:22
100:7
**sent** 79:14 92:10
116:2
**sentence** 76:17
77:21 113:5,11
**separate** 14:16
**separately** 84:12
**September** 57:11
58:7
**serve** 14:2
**Services** 6:15,18
76:6 78:3 82:17
131:1
**servicing** 105:21
**set** 5:18 80:5 88:8,9
88:13 106:16
**sgoldfrank@om...**
3:18
**share** 83:21 86:18
87:1
**shared** 27:12 28:3
85:18
**sharing** 80:4
**sheet** 127:11
129:14,18,20,21
131:4
**sheets** 95:16,20
**Shekar** 45:10 46:3
49:5
**shelf** 69:22
**shop** 62:16
**short** 24:20 25:13
**show** 21:13 42:8
78:11 87:4
**shut** 57:10
**Sid** 32:1
**side** 30:13 105:9

120:16
**sign** 80:11,18,19,19
129:11
**signatory** 88:1
**signature** 82:20,22
126:11 127:14
129:9 131:22
**signatures** 86:10
86:12
**signed** 74:7 80:2,9
83:5 84:1 85:22
127:11 129:20,21
**significant** 101:6
**signing** 83:2,19
130:3
**simply** 83:20
**sincerely** 48:5
130:5
**single** 71:4 100:15
**single-family** 49:21
**sit** 124:15
**sitting** 25:15 115:6
124:13 125:21
**situation** 47:12
**six** 9:10 40:5
**size** 105:2
**small** 69:17 70:7
86:5
**smaller** 53:21
**sold** 92:20
**sole** 21:19 117:9
**solely** 43:17
**solutions** 32:16
**somebody's** 67:12
**someplace** 31:10
**sorry** 13:20 14:1
17:11 26:16 32:7
35:5 39:19 70:16
81:6 84:16 87:19
91:8 95:3 103:2
112:19
**source** 52:20
**speak** 59:21
**speaking** 111:10,18
116:13 117:2

**special** 15:7
**specialist** 6:16
**specific** 29:16
30:22 31:3 42:2
43:9 51:15 53:3,4
58:10 62:13 64:4
102:19 117:3,4,4
117:6,13,15,16,18
118:1,17,21
123:19 124:12,18
**specifically** 31:2
41:15 42:5 43:21
49:4 51:3 66:19
116:16
**specified** 107:14
**split** 26:13
**spoke** 40:22 41:1,2
41:22 42:20 43:3
48:21 55:7,8 65:4
65:5,6 116:7
119:14
**spoken** 42:14,21
96:20
**spreads** 50:2
**St** 24:9
**staff** 49:16 59:22
**standard** 70:9
106:16
**standards** 100:16
107:6
**Stanley** 25:8 68:5,6
68:14,15,20 70:2
104:13
**start** 69:7 112:8
**started** 62:8
**Starting** 109:22
110:6
**state** 8:5 102:9
**stated** 37:7 103:12
**statement** 45:16
76:21 110:18
111:15
**statements** 90:7
**states** 1:1 6:6 76:18
100:12

Marialice Williams

**station** 10:11
**status** 22:16,20
  23:2 24:3
**stayed** 31:11
**stenotype** 128:8
**step** 104:16
**steps** 130:2
**Steve** 34:8 66:13
**Stockman** 16:16
**stop** 21:8
**stopped** 22:1 36:6
  43:13,15 45:13
  58:11
**storage** 92:17 93:5
  93:13,19 94:7
**story** 89:14
**Strategists** 20:16
  23:11 36:1,11,15
  36:20 71:20 73:16
  75:4 76:6,11 78:2
  80:7,12 82:18
  83:4,6 88:17,19
  89:4,8,10,15 90:1
  90:3,7
**Street** 2:11 3:4,13
  6:10 8:8,16 22:6
  91:21 92:17 93:5
  93:13,18 94:7
  104:10 129:3
  131:1
**structure** 26:12
  34:11 53:13,15
  68:18 69:15 105:2
**structures** 71:5
**studies** 15:19
**stuff** 74:17 85:20
  92:22 93:2 116:21
**stupid** 45:11
**submit** 105:16
**subsequently**
  129:21
**substantial** 99:1
**substantive** 112:10
**suddenly** 56:1
**sue** 11:18

**sued** 10:11
**suit** 11:11
**Suite** 131:2
**summer** 30:2 78:20
  108:17 113:18
  115:12 116:7
  119:6 121:16
  122:14 123:4,17
  124:17
**summertime**
  108:11
**supplied** 115:13
**Supreme** 15:15
**sure** 39:10 55:22
  67:7 84:22 89:1
  94:3 108:16,17
  124:4
**survive** 102:12
**swear** 7:14
**Swiss** 25:1 55:16
  56:15 57:7,9
**sworn** 7:19 73:8
  128:6

---

**T**

**T** 73:1
**take** 43:21 87:15
  102:10
**taken** 6:4 95:8
  128:4,7,14
**takes** 62:19
**talk** 41:6,10 46:20
  58:2 65:8 68:11
  74:20 118:12,13
**talked** 40:21 116:3
  121:19 122:20,22
  123:6 124:12
**talking** 35:13 73:15
  110:1
**tall** 47:5
**tape** 6:2 82:5,7,10
**tapes** 85:20
**task** 129:10
**Tawa** 103:21
**tax** 88:20 89:2,7

**Taylor** 121:4
**telephone** 120:10
**telephones** 89:21
**television** 6:13
**tell** 29:13 33:19,19
  40:1,18 44:8,11
  48:17 51:15 57:4
  94:13 102:11
  108:6 113:7 116:5
  116:16
**telling** 80:14,16,17
  83:16 114:3,4
**tentative** 60:10
**tenure** 69:12
**term** 33:9,13
**termination** 106:9
**test** 71:3
**testified** 7:20 10:4
  12:17 73:9 89:6
  96:10 107:22
  114:1,4
**testify** 11:14 111:6
  114:12
**testimony** 11:4,7
  19:1,5 84:3,12
  86:21 95:22
  113:12 127:7,9
  128:5,7,10
**theory** 71:4
**thick** 45:14
**thing** 37:18 45:12
  52:17 54:3 61:11
  86:17 96:6 110:21
  122:5
**things** 29:4 46:15
  71:17 75:20 93:2
  93:16 101:17
  115:16 116:2
  121:3 124:12
  125:7,15
**think** 8:22 9:10,19
  11:1,2 12:7 14:15
  15:11 18:8 22:6
  22:12 23:4 25:16
  25:18 40:5 42:10

  42:16 46:17 48:14
  48:20 58:6 62:6
  64:22 67:6 70:1
  75:6,7,9,19 76:14
  76:14 77:4,4,5,7
  77:11,14,18 78:7
  78:7,13 89:1
  92:16 104:3
  108:16 111:2
  113:13
**thinking** 10:16
  65:2
**third** 76:16 100:20
**thirty** 129:9
**thought** 10:22
  38:14 43:17 55:5
  74:1 85:20 104:4
  123:13,14
**three** 8:13 9:18,18
  24:12 53:11 83:20
  106:8
**three-paragraph**
  86:17,22
**thriving** 67:19
**Thurgood** 25:6
  60:18
**Tim** 24:6 59:12
  67:11
**time** 6:12 8:20 9:1
  11:13 13:11,16
  14:7 16:9 17:8,14
  17:14 23:5 24:14
  24:15,20 27:14
  28:13 29:3,3,14
  29:19 30:16,18
  31:19 37:3,8,12
  37:14,21 38:6
  39:11,14,17,19
  41:21,22 42:22
  44:7 45:15 48:12
  52:3 54:13 55:21
  56:18 57:1,6 58:7
  61:18 62:7,19
  63:21 64:14 65:15
  69:4,16 72:6 73:3

  77:15 78:17 79:11
  80:13 82:4,9
  85:14 86:20 89:12
  92:19 99:8,10
  100:16 110:11
  112:13 113:1,17
  114:14 118:2
  121:8 123:15
  126:5,8 129:8
  130:1
**times** 9:14,18,19
  18:4 50:22 69:11
  124:22
**title** 16:17,19,20
  23:13,15
**titles** 16:17
**today** 8:4 19:1,5,8
  20:10 124:15
**today's** 6:11 126:9
**told** 45:10 47:17
  49:1 75:18 100:5
  101:12 102:15
**Tom** 120:11,12,13
**ton** 104:4
**top** 36:8 61:17
**tortious** 102:8,11
**totally** 100:1
**track** 87:20
**tranche** 34:13
**transaction** 63:6
  83:22 119:22
**transactions** 27:4
  31:17 54:10 68:13
  68:14 102:22
  103:8 106:12
  115:16 124:2
**transcript** 129:8,12
  129:13,16,21
  130:1,2
**transcription** 127:8
**transcripts** 96:2
**transferred** 40:6
**traveling** 51:18
  92:18
**tried** 31:15,16

**trip** 65:2
**triple** 100:12
**true** 60:11 67:5
  69:7 74:14 110:18
  113:15,21 123:16
  127:8 128:10
**trust** 107:8
**truth** 80:15,16,17
**truthful** 18:22
  102:15
**try** 27:17 29:11
  64:13 65:14
  101:16
**trying** 10:18 18:14
  32:18 33:10 38:11
  52:7 57:17 85:9
  117:1 120:19
**turn** 109:21 110:5
**turned** 74:5
**turns** 98:4 101:18
**two** 8:12 14:4 18:9
  28:12 32:2 52:21
  73:18 85:2,2 86:9
  86:11 102:3
  107:22 110:14,16
  113:5,7,10 114:16
  114:18 115:3
  129:10 130:2
**two-year** 106:7
**type** 14:17 21:16
  31:13 47:12 53:8
  58:10,13
**types** 52:9 53:14,20
**typewriting** 128:9
**typical** 89:19

---

**U**

**U** 92:17 93:5,13,18
  94:7
**Uh-huh** 81:8,21
  84:5 88:11 110:4
**ultimately** 27:20
  67:12
**un** 100:1
**uncovered** 27:21

---

**understand** 33:8
  45:18 67:18 68:1
  69:17 84:16 98:14
  105:12
**understanding**
  74:1 79:1 87:12
  91:5
**underwriting**
  105:21 106:16
**unique** 53:12,15
**unit** 55:21 92:17
**United** 1:1 6:6
  100:12
**units** 70:8
**University** 18:11
**unsigned** 5:9,13
  80:2
**updates** 29:3
**Urban** 16:6
**use** 44:4 66:16
**usually** 41:12
  101:10
**utilization** 121:10
**utilize** 66:9
**utilized** 69:9
**utilizing** 59:5
**U.S** 15:15 17:10

---

**V**

**v** 129:5 131:5
**vague** 111:16
**validity** 60:5
**value** 12:8
**van** 41:12
**variation** 44:3
**various** 56:6 91:8
  118:7
**vegetarian** 47:5
**vehicle** 56:13 59:5
**venture** 74:16
  78:12 82:16 83:3
  83:10,12 84:13
**venue** 66:21
**versions** 101:1
**versus** 6:5

---

**viable** 123:12
**vice** 23:16 74:2
**video** 6:16
**Videographer** 4:9
  6:2 7:13 39:11,14
  72:6 73:3 82:4,9
  99:6,10 126:5,8
**videos** 96:15
**videotaped** 1:14
  2:7 6:3
**Vineyard** 116:6
**Virginia** 15:20
**vis-a-vis** 29:5
**Volume** 1:20
**vs** 1:8

---

**W**

**waived** 126:12
**Wall** 104:10
**want** 21:14 27:2
  50:7 66:16 80:11
  89:13 111:11
  118:13,14 124:5
**wanted** 69:14 85:13
**wants** 44:2
**warm** 31:11
**Washington** 1:17
  2:13 3:5,14 4:3
  6:10 8:9,17 9:6
  24:20 44:18,19
  45:4,8 120:9,9
  129:4 131:2
**wasn't** 13:22 49:5
  62:9 76:11 80:16
  91:9 101:13 103:9
  120:9
**watching** 96:14
**Watergate** 22:4,11
  108:6,8,9 110:2
**way** 27:8 38:12
  45:22 50:3 53:20
  56:10,15,22 59:1
  66:14 70:17,22
  78:10 84:11 85:21
  93:19 97:10 104:9

---

116:12 118:6,8,9
  118:14
**ways** 32:18 56:4,12
  63:9 70:14 129:11
**Webb** 24:6 59:12
**Wednesday** 1:16
  2:3
**week** 57:2 119:14
  119:14 121:20,20
**welcome** 77:22
**Wendell** 103:20
**went** 14:10 15:6
  16:5,14 40:3,3
  50:15 51:8,14
  59:3,12 98:8
  101:1,2,2 103:13
**weren't** 70:19
  118:16 121:3
**west** 10:21
**we're** 31:11 39:12
  39:15 62:5 72:7
  73:4 82:6,11
  99:11 115:6
  116:20 119:18
  126:6
**white** 101:9
**Williams** 1:6,15 2:8
  3:2 5:3,6,9,11,14
  5:20 6:4,5 7:12,16
  8:1,6 39:17 73:6
  77:6 78:14 80:3
  82:13 84:9,14,20
  87:22 92:6 94:14
  94:20 96:7 107:21
  127:5 129:5,6
  131:5,6
**wind** 83:19
**Wisconsin** 4:2
**witness** 7:14,17
  12:18 26:20 27:1
  33:15 73:7 87:21
  103:5 105:20
  111:20 112:1,5,17
  112:18 119:12
  122:7 128:4,7,11

---

129:13,15 131:6
**woman** 120:16
**Women** 18:11
**words** 38:20 102:4
  104:11
**work** 17:21 21:22
  26:5 33:2 38:10
  47:7,11 54:15
  56:3 61:4 70:15
  70:21 73:21 83:21
  85:4 94:15 98:16
  104:4,5
**worked** 15:14 16:5
  16:6 17:16,17
  18:2,3 24:6,17,19
  24:19,21,22 25:1
  25:2,3,3,4,4,5,6,7
  25:9,11,16,17,21
  47:8 54:14 57:16
  57:20 71:10 85:5
  101:3 103:18,20
  106:10 115:16
**working** 17:9 21:12
  37:7,16 38:11,18
  45:13 52:6,8
  70:13 101:4
  120:22
**works** 26:12 66:20
  118:15
**worth** 27:15
**wouldn't** 100:9
  124:5,13
**WPFW** 10:10
**write** 26:4 65:12
  74:8 103:12
**writing** 62:7
**written** 35:1 78:19
  100:21,22 103:10
**wrote** 60:7 74:13
  75:17 77:9 78:10
  100:19

---

**X**

**X** 1:4,12 5:1

Marialice Williams

**Y**

**year** 11:16 22:15
  45:6 51:20,21
  124:12
**years** 8:12 9:1,10
  9:21 14:4 18:6
  21:12 24:12 28:12
  32:2 57:17,19
  60:9 85:2 106:8
**Yesterday** 20:6
**YMCA** 61:3
**York** 65:3 68:11

**Z**

**zero** 89:4
**Zurich** 25:7 34:9
  61:8,10,15,19
  62:3,11,15,22
  66:13

**$**

**$10** 92:19
**$10,000** 12:9
**$90** 27:15

**1**

**1** 1:19,20 5:7 6:3
  33:21 34:3 35:7
  52:17 58:3 82:5
**1:05CV01483** 1:7
  6:8
**1:34** 73:2,4
**1:47** 82:5
**1:49** 82:10
**10** 52:6 129:1
**10D** 2:12
**10:30** 2:4 6:13
**1020** 131:1
**104** 82:14
**10547** 81:19 82:14
**109** 5:21
**11** 52:6 57:11 58:7
**11:25** 39:12
**11:36** 39:15
**12** 52:7

**12:26** 72:7
**1300** 92:18
**131** 1:19
**14** 128:21
**15** 34:17 62:12
  66:12 129:19
**1625** 2:11 3:13 6:10
**17** 109:19 113:16
**179392** 1:21 131:7
**18** 15:10 17:5 18:3
**19** 11:17 21:6 110:7
**19th** 131:1
**1922** 8:8 91:21
**1980** 8:20 13:13
**1981** 102:5
**1981s** 102:4
**1987** 11:17
**1988** 17:16 21:6
**1998** 28:14,15
  37:14 45:1,17
  46:8 49:12 50:20
  50:21 52:4,17
  56:22 57:21 62:1
  85:1 98:4
**1999** 48:14

**2**

**2** 5:9 75:11,14 82:7
  82:10,15,15
**2:12** 99:8,11
**2:46** 126:6,9,13
**2000** 28:15,22
  29:17 48:15 58:15
  78:20 80:1
**20001** 8:9
**20006** 2:13
**20006-4001** 3:14
**2001** 22:12 23:8
  28:19,22 29:17,22
  30:1,19,22 33:8
  33:14 34:17 35:10
  35:15 36:14,22
  37:5 40:16 41:19
  42:4,9,15 43:5,12
  48:15 49:12 50:20

**50:22** 52:4 54:22
  55:12 56:15 57:12
  58:3,7,18 59:16
  60:14 61:12,20
  62:1,4,6,9,12
  63:19 64:1,3,7,10
  64:16,17 66:9,13
  68:20 70:17,22
  71:6,14 78:21
  79:15 108:10,18
  113:19 115:12
  116:1 119:6
  121:16 122:14
  123:4,17 124:4,17
  125:14
**20011** 3:5 8:17
  129:4
**20016** 4:3
**2002** 30:20 55:1
  57:21,22 59:13
  62:1 64:19 65:1,4
  65:9 78:21
**2003** 109:16,19
  113:16
**20036** 131:2
**20037** 9:7
**2004** 32:2 116:4
**2005** 116:5,6,7,10
  116:17 117:12
  118:2,17 119:4
**2007** 1:16 2:3 6:11
  24:13 129:1 130:1
  131:7
**2008** 128:21
**202** 3:6,15 4:4
  129:12 131:3
**21** 110:1
**28** 1:16 2:3 6:11
  131:7

**3**

**3** 5:11 79:6,10,16
  79:17
**3/17/03** 5:21
**30** 129:9

**33** 5:8
**383-5300** 3:15
**3900** 4:2

**4**

**4** 5:13 79:18,22
  130:1
**42** 109:22
**429-0014** 129:12
  131:3
**43** 110:6
**468-7737** 3:6
**47** 82:1

**5**

**5** 5:15 32:3 70:8
  80:21 81:6 82:14
  116:4
**5/15/01** 5:8
**5/3/01** 5:12
**50** 70:8 101:1 107:2
  107:2,2
**5511** 3:4 129:3
**5722** 8:16 22:5

**6**

**6** 5:17 80:1 81:6
  87:5,6,20
**6/14/02** 5:16
**61** 9:19
**620** 131:2

**7**

**7** 5:4,18 90:9,13
**700** 9:5
**75** 5:10
**752-6167** 4:4
**79** 5:12,14

**8**

**8** 5:20 109:8,12
  129:19
**8/6/00** 5:14
**80** 5:16
**81** 13:13
**82** 13:14

**87** 5:17

**9**

**9** 12:9 65:6
**9/11** 57:8,10,11
  58:12 108:9,12,14
**90** 5:19

1

Fannie Mae DUS Lender Preliminary Informati

**Subject: Fannie Mae DUS Lender Preliminary Information**
**Date: Tue, 15 May 2001 14:34:15 -0500**
**From: Bob Jones <bobjones@cam-financial.com>**
**To: stephen.noble@zurichus.com, marialice@worldnet.att.net, dwgroves@bellsouth.net**

Bob Jones wrote:

Hi Steve. Pursuant to your conversation with Danny, I have attached a copy of Risk Mitigation's ( Marialice Williams company) write up Opportunity to Provide Insurance Coverage for the Mezzanine Tranche of Risk Associated with Fannie Mae's Delegated Underwriting and Servicing Program. I have also included CAM's proposed Mezzanine Risk Premium Pricing Grid for your review.

Risk Mitigation and CAM Financial Services are co-brokering coverage for individual DUS Lenders ( 26 premier lenders selected by Fannie Mae) who originate under the Fannie Mae Multifamily DUS Program. The 26 lenders represent approximately 65 billion of multifamily loans originated to Fannie Mae. Risk Mitigation currently represents 3 of the DUS Lenders that have approximately 10 billion in seasoned DUS program with Fannie Mae. There may also be several other DUS Lenders having an interest in this coverage at some point in time. The coverage that we are looking for is not first loss. Fannie Mae requires the DUS Lender to cover any loss on the first 5% of claims loss exposure. The coverage we are seeking is secondary risk exposure for the next 15% mezzanine exposure parri passu with Fannie Mae. At this time Fannie Mae hasn't made a decision if they want to cover their 7.5% portion of risk exposure. We should know soon on Fannie Mae's position. I have taken the pricing grid out to 15% in the event Fannie Mae wishes to cover her risk exposure.

Steve you will see the premium grid is not as rich as pricing to cover first loss exposure. However, the risk is much lower and there is the potential to write substantial premium as each DUS Lender will have several billion of product to cover. Considering CAM has been writing Fannie Mae first loss coverage since September 1997 without the first loan default or claim, I think it goes without saying it will be difficult to burn through the DUS Lender 5% first loss. Each DUS Lender's portfolio has a mix of substantial loan seasoning and amortization.

Marialice and I hope to be able to share actual DUS Lender performance and portfolio information shortly based on your interest in a potential transaction.

I will be out of town until Monday, May 21st. However, should you have any questions prior to then Danny or Marialice should be able to answer. Thanks for your interest in participating in this coverage.

| | Name: OPPORTUNITY TO PROVIDE INSURANCE COVERAGE 1 BJ1.doc |
|---|---|
| OPPORTUNITY TO PROVIDE INSURANCE COVERAGE 1 BJ1.doc | Type: Winword File (application/msword) Encoding: base64 |

10489    5/21/01 12:06 PM

FNMA.MBW.008015
CONFIDENTIAL

**EXHIBIT**
1
3-28-07

6/15/01-NOTE: The information below is proprietary and confidential. Unless your company has signed a confidentiality agreement with Risk Mitigation Strategies, LLC, you should not be in receipt of this information. This information contains confidential information about concepts developed by RMS and information about our clients with whom we share mutual confidentiality agreements.

## OPPORTUNITY TO PROVIDE INSURANCE COVERAGE
## FOR THE MEZZANINE TRANCHE OF RISK
## ASSOCIATED WITH FANNIE MAE'S
## DELEGATED UNDERWRITING AND SERVICING PROGRAM

### Background

One of the multifamily programs at Fannie Mae is called the Delegated Underwriting and Servicing or "DUS" as it is commonly known. The DUS program is a 'risk-sharing' program that requires Fannie Mae and DUS lenders to share responsibility for covering any losses that result from the liquidation of any defaulted DUS loans.

Fannie Mae has a lengthy and complex process for selecting the participants in this program. Fannie Mae continues to limit participation in this program because of the oversight that is necessary to run this program effectively. Currently, there are 26 companies originating multifamily loans for Fannie Mae under the DUS program. Multifamily mortgage loans are made on properties with 5 or more units. Any property with 4 or less units is still considered to be "single family" property.

Once accepted into the DUS program, DUS lenders originate and underwrite multifamily loans according to the Fannie Mae DUS Guide. And, Fannie Mae agrees to purchase or securitize all loans originated to these DUS standards. The DUS Guide is considered the underwriting "bible" in the multifamily industry. And, it is fair to say that most major companies that originate multifamily mortgage loans utilize some pared down version of this Guide.

As a result of strict adherence to the DUS Guide and oversight and monitoring by Fannie Mae of the DUS lenders' program activities, the historical default and loss statistics for the DUS program are lower overall than the statistics for single family mortgage programs.

### How the program works

Under this risk-sharing program, Fannie Mae requires that the DUS lenders assume responsibility for covering the first 5% of loss that results from liquidation of a defaulted property. Fannie Mae and the DUS lender are then responsible for covering the next 15% of loss on a *parri passu* basis. And, finally, the residual loss coverage or any loss above the 20% portion is fully Fannie Mae's responsibility.

Looking at the formula described above, it is easy to see why many financial institutions cannot participate in the DUS program. Risk-based capital and accounting requirements for the regulated financial institutions preclude many financial institutions from participating in the DUS program.

10490

FNMA.MBW.008016
CONFIDENTIAL

product as credit enhancement for its Multifamily Aggregation Facility since September 1998. Most of the providers of loans for the Aggregation Facility are DUS lenders. As a result of Fannie Mae's strict and sound underwriting standards as well as their monitoring and auditing procedures, there have been no losses or pending claims under this program.

10492

FNMA.MBW.008018
CONFIDENTIAL