# **EXHIBIT F**

Marialice Williams

Page 132

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------x

MARIALICE BATHRUS          :

WILLIAMS,                  :

        Plaintiff     : Civil Action No.

                      : 1:05CV01483

v.                    : Judge John Bates

                      : PAGES 132 through 312

FEDERAL NATIONAL          :

MORTGAGE ASSOCIATION, et :

al.,                      :

        Defendants    :

------------------------x VOLUME II

        Continued Videotaped Deposition of

        Marialice Bathrus Williams

            Washington, DC

          Monday, May 7, 2007


Reported by:  Joanne Liverani, RMR

JOB NO.   180771

Marialice Williams

---

Page 133

```
1
2
3                    May 7, 2007
4                    10:29 A.m.
5
6
7    Continued Videotaped Deposition of Marialice Bathrus
8    Williams, held at the offices of:
9
10        O'Melveny & Myers LLP
11        1625 Eye Street
12        Washington, DC   20006
13
14   Pursuant to notice, before Joanne Liverani, RMR, a
15   Notary Public of the District of Columbia.
16
17
18
19
20
21
22
```

---

Page 135

```
1              -and-
2         Fannie Mae
3           3900 Wisconsin Avenue, Northwest
4           Washington, DC   20016
5           (202)752-6167
6    BY:   Jonathan Griffith, Esq.
7
8    Also Present:
9           Edward Diggs, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
```

---

Page 134

```
1    APPEARANCES:
2    For the Plaintiff, MARIALICE BATHRUS WILLIAMS
3      Law Offices of Harley Jay Daniels
4         303 Van Ness Street, Northwest
5         Suite W228
6         Washington, DC   20008
7         (202)468-7737
8    BY:  Harley Jay Daniels, Esq.
9            -and-
10        Brian Lederer, Esq.
11        3003 Van Ness Street, Northwest
12        Washington, DC   20008
13        (202)244-1715
14
15   For the Defendants, FEDERAL NATIONAL MORTGAGE
16   ASSOCIATION, ET AL.
17     O'Melveny & Myers, LLP
18        1625 Eye Street, Northwest
19        Washington, DC   20006-4001
20        (202)383-5300
21   BY:  Evelyn L. Becker, Esq.
22        Kyra A. Grundeman, Esq.
```

---

Page 136

```
1              C O N T E N T S
2    EXAMINATION OF THE WITNESS:              PAGE
3    Examination By Ms. Becker          138
4    MARIALICE BATHRUS WILLIAMS
5    Deposition Exhibits              PAGE
6    9    Bates stamp FNMA.MBW.008129 through   139
         8133
7
     10   one-page e-mail, Subject:  Your       147
8         January 25, 2007 correspondence
9    11   Bates stamp FNMA.MBW.008139 through   150
         8144
10
     12   Amended Complaint              185
11
     13   Plaintiff's Answers to Defendants'   198
12        Interrogatories
13   14   Statement of Financial Affairs from  248
          the United States Bankruptcy Court,
14        District of Columbia
15   15   Notice of Chapter 7 Bankruptcy Case,  254
          Meeting of Creditors & Deadlines,
16        United States Bankruptcy Court,
          District of Columbia (DC)
17
     16   2001 Form 1040, U.S.Individual Income  262
18        Tax Return for the witness
19   17   2002 Form 1040, U.S.Individual Income  281
          Tax Return for the witness
20
     18   2003 Form 1040, U.S. Individual       298
21        Income Tax Return for the witness
22
```

2 (Pages 133 to 136)

Marialice Williams

Page 137

1        VIDEOGRAPHER:  Good morning.
2   Here begins videotape number one, Volume II of the
3   deposition of Marialice Bathrus Williams in the
4   matter of Marialice Bathrus Williams versus Federal
5   National Mortgage Association, et al., in the
6   United States District Court for the District of
7   Columbia.  Case No. 1:05CV01483.
8        Today's date is May 7th, 2007.  The
9   time is 10:29:14 a.m.  This deposition is being
10  taken at the law firm O'Melveny & Myers at 1625 I
11  Street, Northwest, Washington, DC and is made at
12  the request of Evelyn Becker of the law offices of
13  O'Melveny & Myers.
14       The videographer is Edward Diggs.  The
15  court reporter is Joanne Liverani, here on behalf
16  of Esquire Deposition Services located at 1020 19th
17  Street, Northwest, Washington, DC.
18       Would counsel and all present please
19  identify yourselves and state whom you represent.
20       MR. DANIELS:  My name is Harley
21  Daniels.  I represent the plaintiff.
22       MR. LEDERER:  My name is Brian

Page 138

1   Lederer.  I represent the plaintiff.
2        MS. BECKER:  Evelyn Becker, on
3   behalf of Fannie Mae, Richard Lawch, and Grace
4   Huebscher.
5        MS. GRUNDEMAN:  Kyra Grundeman,
6   on behalf of Fannie Mae, Richard Lawch, and Grace
7   Huebscher.
8        MR. GRIFFITH:  Jonathan
9   Griffith, on behalf of Fannie Mae.
10       Thereupon,
11       MARIALICE BATHRUS WILLIAMS,
12  the Witness, called for examination by counsel for the
13  Defendants, and, after having been sworn by the notary,
14  was examined and testified as follows:
15  EXAMINATION BY COUNSEL FOR THE DEFENDANTS, FEDERAL
16  NATIONAL MORTGAGE ASSOCIATION, ET AL.
17  BY MS. BECKER:
18   Q   Good morning, Ms. Williams.
19   A   Good morning.
20   Q   This is a continuation of your
21  deposition from March 28, 2007.  Do you feel that
22  you are able to give full and truthful testimony

Page 139

1   here today?
2    A   Yes.
3    Q   If at any time during the day you feel
4   that you're no longer able to give full and
5   truthful testimony, will you please let me know
6   that?
7    A   Yes.
8        MS. BECKER:  'd like to hand you
9   what will be marked by the court reporter as
10  Exhibit 9.
11       Thank you.
12       (Deposition Exhibit No. 9 - Bates stamp
13       FNMA.MBW.008129 through 8133 - was marked for
14       identification.)
15  BY MS. BECKER:
16   Q   Can you identify Exhibit 9?
17   A   Exhibit 9 is a subpoena issued by the
18  United States District Court in the matter of Cam
19  Financial Services, Incorporated versus General
20  Star National Insurance Company.
21   Q   Who's the subpoena directed to?
22   A   It is to me.

Page 140

1    Q   What is the date of the subpoena?
2    A   The date is April 24th, 2002.
3    Q   Do you recall receiving this subpoena?
4    A   Yes.
5    Q   Did you search for documents in response
6   to this subpoena?
7    A   Yes.
8    Q   Did you produce documents in response to
9   this subpoena?
10   A   Yes.
11   Q   I'd like to turn your attention to
12  Page 8131 of this exhibit, which is the third page
13  in the exhibit.
14       Under where it says "documents
15  requested," can you tell me what the third category
16  of documents requested is?
17   A   All documents that refer to or relate to
18  Fannie Mae.
19   Q   Did you search for documents in response
20  to document request number three?
21   A   Yes, I did.
22   Q   Did you produce any documents that you

3 (Pages 137 to 140)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 141

1  had in your possession relating to document request
2  number three?
3      A   I believe I did.
4      Q   What is document request number six?
5      A   All documents that constitute,
6  represent, refer to, or relate to communications
7  between you and anyone else regarding Fannie Mae.
8      Q   Did you search for documents responsive
9  to document request number six?
10     A   Yes, I did.
11     Q   Did you produce any documents that you
12 had in your possession in response to document
13 request number six?
14     A   I believe I did.
15     Q   What is document request number seven?
16     A   All documents that constitute,
17 represent, refer to, or relate to communications
18 between you and anyone employed or retained by
19 Fannie Mae following the termination of your
20 employment with Fannie Mae.
21     Q   Did you search for documents in response
22 to document request number seven?

Page 142

1      A   Yes, I did.
2      Q   Did you produce any documents that you
3  had in your possession responsive to document
4  request number seven?
5      A   I -- I believe I did.  I know that I
6  delivered a doc -- a box of documents to Fannie Mae
7  which were never returned to me so I really can't
8  say what was in it and which of these it was
9  specifically related to.  So you're asking me about
10 these specifics, but I can't tell you whether or
11 not they were marked for these or whatever.
12     Q   Would it be fair to say, though, that to
13 the extent you had documents in your possession
14 responsive to any of the documents requested in the
15 subpoena, dated April 24, 2002, that you produced
16 those documents in the Cam litigation?
17     A   In April of 2002, I had a great deal of
18 mat -- things, boxes and materials in storage.  And
19 it was a very -- it was a transitional time in my
20 life, and I probably gave whatever I had at the
21 time that I could put my hands on.  I can't tell
22 you if it was exhaustive of what I possessed.

Page 143

1      Q   Are you saying that you did less than an
2  exhaustive search in response to a subpoena issued
3  in the Cam litigation on April 24, 2002?
4      A   If you notice -- if you notice the -- it
5  says "April 24, 2002."  And it asks that this
6  information be retrieved by Friday, May 10th,
7  2002.  And I am certain that I searched very hard
8  at that time, but I had documents in a -- in a
9  storage area.  I had them in boxes in a garage.  I
10 had them in my office.  I'd had a computer crash
11 earlier.
12         So I -- I -- I can tell you that I
13 searched through what I thought I had, and I
14 thought I'd given -- I gave whatever I could find
15 in that time frame.
16     Q   What did you search for -- let me
17 rephrase the question.
18         Where did you search for documents in
19 response to the subpoena issued to you on -- on
20 April 24th, 2002?
21     A   Oh, I don't -- I -- I can't -- I can't
22 recall precisely.

Page 144

1      Q   Did you search in all the places that
2  you just identified, including your --
3      A   I believe I did.
4      Q   I'm sorry, if I could just finish my
5  question.  It'll make the record a little bit
6  easier.
7          Did you search for documents that you
8  had on your computer?
9      A   Yes, I did.
10     Q   Did you search for any documents you had
11 in storage?
12     A   Yes, I did.
13     Q   Did you search for any documents you had
14 in your office?
15     A   Yes.
16     Q   And did you produce any responsive
17 documents that you found?
18     A   I produced a box of documents that I
19 took to 3900 Wisconsin Avenue, Northwest, by the
20 time it was requested.  I cannot tell you precisely
21 what was in that box, and those materials were
22 never returned to me.

4 (Pages 141 to 144)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 145

1    Q   Can you tell me whether you produced any
2  documents that you found that were responsive to
3  the documents requested in the April 24, 2002
4  subpoena?
5    A   I believe they were all responsive to
6  whatever the request was, but I cannot tell you
7  specifically what they were.  I cannot tell you.  I
8  don't have them.
9    Q   Do you have any reason to believe that
10  there were documents in your possession as of April
11  or May of 2002 responsive to the documents
12  requested in the subpoena issued April 24, 2002
13  that you did not produce in the Cam litigation?
14    A   I think there may have been some records
15  that I may have found later.
16    Q   Do you remember what those records were?
17    A   Whatever the balance of materials that I
18  produced in response to the defendants' request for
19  documents in this particular matter.
20    Q   So at some point in time you found
21  additional documents beyond the documents that you
22  found when you searched in the April 2002 time

Page 146

1  frame; is that correct?
2    A   I believe that is correct.
3    Q   And did you produce those documents?
4    A   I produced those documents in response
5  to defendants' request for documents in this
6  matter.
7    Q   Between the two productions that you
8  made to Fannie Mae, did you produce all documents
9  in your possession responsive to the April 24, 2002
10  subpoena that you had in your possession as of
11  April or May of 2002?
12    A   No.  Well, yes and no.
13        Yes, I produced what I had.  But there
14  were many other e-mails, telephone records or
15  whatever that I was not able to retrieve at two
16  different points in which -- actually, I've had
17  three computer crashes in the last ten years, but
18  two of them during the time that I was working on
19  this Fannie Mae product.  So there would be e-mails
20  I would not be able to retrieve, as well as
21  documents that I would not be able to retrieve
22  because they were only on that particular computer.

Page 147

1        I only now understand how to back up
2  that information so you don't lose it.
3    Q   You testified that you had three
4  computer crashes.  Can you tell me what the dates
5  of those three crashes were?
6    A   One was approximately two years ago.
7  One was approximately nin -- 2000, I believe, and
8  then I think one was in 2002 or '3.  But I -- I
9  cannot say that for absolute certainty but those --
10  that's what I'm remembering.
11        MS. BECKER:  I'm handing you
12  what I'll ask the court reporter to mark as
13  Exhibit 10.
14        (Deposition Exhibit No. 10 - one-page e-mail,
15        Subject:  Your January 25, 2007
16        correspondence - was marked for
17        identification.)
18        MS. BECKER:  Exhibit 10 is an
19  e-mail sent to me, Kyra Grundeman, and Sarah
20  Goldfrank.
21        THE WITNESS:  Mm-hmm.
22  BY MS. BECKER:

Page 148

1    Q   Do you recognize this e-mail?
2    A   Yes, it says what I just said except it
3  says two crashes instead of three.
4    Q   Does this e-mail refresh your
5  recollection as to the date of the -- of two of the
6  crashes?
7    A   Yes, 2004 and 2001, I think I said that
8  pretty much.  Close to that.
9    Q   So 2004 and 2001 are -- are two of the
10  accurate dates; is that correct?
11    A   I believe they are.
12    Q   What was the third crash?
13    A   There may only have been two.  I
14  think -- I think there were two.  2001 and 2004.  I
15  think that's correct.  I did have a laptop that
16  crashed but that was not as serious.
17    Q   Did you keep documents on your laptop
18  relating to Fannie Mae?
19    A   Yes.
20    Q   When did your laptop crash?
21    A   Let's see.  Oh, gosh, actually there
22  were two com -- two crashes.  One was last year,

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 149

1 which would be 2006. And one would be, I think,
2 around 2003 or '4. Yes --
3    Q    What documents --
4    A    -- 2004.
5    Q    What documents relating to Fannie Mae
6 were stored on your laptop?
7    A    I -- I can't say precisely but whatever
8 e-mails or materials that I had prepared for
9 presentations to prospective insurance companies or
10 to various and large cross-section of potential
11 clients. And there would've been newsletters that
12 I did explaining what type of structure we were
13 looking at for credit enhancement and that type of
14 thing.
15    Q    In response to the subpoena issued
16 April 24, 2002, did you search for documents on
17 your laptop?
18    A    I believe I did.
19    Q    Did you produce any documents responsive
20 to the subpoena of April 24, 2002, that were on
21 your laptop, in the Cam litigation?
22    A    I -- I suspect those were generally

Page 150

1 duplicates of whatever was on my larger computer.
2 I generally didn't print from my laptop. I used it
3 largely for traveling.
4    Q    Between the documents on your laptop and
5 the documents on your main computer, would you have
6 produced any documents relating to the April 24,
7 2002 subpoena that were stored on either of those
8 computers?
9    A    Oh, I'm sure that I would've used both
10 of those sources to look for documents in response
11 to the sus -- subpoena.
12    Q    And you would've produced any that you
13 had in your possession; is that correct?
14    A    I would have produced what I had on
15 those two computers at that time.
16        MS. BECKER: I'd like to hand
17 you what I will ask the court reporter to mark as
18 Exhibit 11.
19    (Deposition Exhibit No. 11 - Bates stamp
20    FNMA.MBW.008139 through 8144 - was marked for
21    identification.)
22        MR. DANIELS: Is there a

Page 151

1 question --
2        THE WITNESS: I'm sorry, are you
3 waiting for me?
4 BY MS. BECKER:
5    Q    Can you identify Exhibit 11?
6    A    It's a subpoena for me to be deposed in
7 the Fannie Mae -- excuse me, in the Cam Financial
8 Services and GenStar Insurance matter.
9    Q    Did a deposition in fact take place on
10 March 17, 2003?
11    A    I don't recall, but if that's the date
12 that's in here, it must have been the correct date.
13    Q    Were you asked to produce documents in
14 connection with that deposition?
15    A    I didn't remember that I was, but I
16 guess I was. Says here you as well as documents.
17 Right. That's what it says.
18    Q    Would you have searched for documents
19 responsive to document -- documents requested in
20 the subpoena dated January 6th, 2003?
21    A    I really don't remember.
22    Q    Do you have any reason to believe that

Page 152

1 you didn't search for documents responsive to this
2 subpoena?
3    A    I'm sure I did. I just don't recall.
4    Q    I'd like to direct your attention to
5 Page 8142, which is Page 4 of Exhibit 11.
6        Do you see under number eight where it
7 defines the term "MCRI"?
8    A    Yes.
9    Q    How does this subpoena define MCRI?
10    A    It says: Multifamily credit risk
11 insurance, multifamily collateral replacement
12 insurance or similar devices.
13        I know what MCRI is 'cause I created it.
14    Q    Can you explain to me what MCRI is?
15    A    Certainly. It is a form of credit
16 enhancement which enables a -- an -- a company that
17 is selling a portfolio of mortgage loans to Fannie
18 Mae in exchange for -- well, excuse me, as
19 exchanging mortgage loans for mortgage-backed
20 securities. And in those transactions, Fannie Mae
21 generally requires, once those loans are reviewed
22 and those properties are reviewed, a certain level

Esquire Deposition Services        MD - 1-800-539-6398
D.C. - 1-800-441-3376            VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 153

1  of -- of credit risk is assessed, not just credit
2  risk, other real estate risk and other risk is
3  assessed against that portfolio. And once it is
4  determined how much that risk is, there's a certain
5  percentage with respect to the actual amount of the
6  mortgage loans themselves which must be set aside
7  traditionally to cover the losses on those loans
8  during the lifetime of those mortgage-backed
9  securities.
10      What I created was, for the first time
11  in the multifamily securitization marketplace, as I
12  had done with other things I had created for Fannie
13  Mae, in this particular instance what I did was I
14  was able to take the responsibility for the loss
15  coverage outside of the pool of mortgages so that
16  when Fannie Mae actually issued the securities, all
17  of the securities were issued at AAA plus, and the
18  credit enhancement or the loss coverage piece was
19  an independent insurance policy, which was designed
20  to cover any losses on those loans during the
21  lifetime of that mortgage-backed security.
22      And so that's why we called it

Page 154

1  "multifamily," meaning pools of multifamily
2  mortgage loans, credit risk insurance, because it
3  was in fact insuring against the losses that would
4  be associated with any of those mortgage loans
5  during the lifetime of the security, which would be
6  occasioned -- those losses would be occasioned by
7  the parameters of what's described within the
8  Fannie Mae credit model, which I had a fortunate
9  opportunity to have a great deal of input on.
10      Q   You'll recall in your last deposition we
11  talked about your May 2001 proposal. Do you -- do
12  you remember that?
13      A   Yes, we did talk about that. That was a
14  DUS-related proposal.
15      Q   Does MCRI, as you've described it,
16  relate to your May 2001 proposal?
17      A   MCRI relates to every single type of
18  proposal that I took to Fannie Mae, including the
19  DUS proposal, affordable housing, even the
20  insurance of environmental losses; it ran the whole
21  gamut, even in the terms of their equity program,
22  substituting an insurance policy rather than cash

Page 155

1  in those transactions where affordable housing
2  deals were being done with market -- with tax
3  credits. So we were going to use it on everything,
4  including the May 2001 DUS proposal.
5      Q   I'd like to ask you to turn to the next
6  page of the document, under document request number
7  seven. Can you identify document request number
8  seven?
9      A   All documents that refer to or relate to
10  any type of mortgage collateral insurance,
11  including but not limited to, MCRI, environmental
12  hazard insurance, single family credit risk
13  insurance, single family collateral replacement
14  insurance, or captive insurance.
15      Q   As you sit here today do you believe
16  that you searched for documents in response to
17  document request number seven in connection with
18  the January 6, 2003 subpoena?
19      A   I believe I did look for information on
20  all of those things.
21      Q   Would you have produced those documents
22  if you had them in your possession?

Page 156

1      A   Whatever was in my possession I would
2  have produced. Which was not everything I did,
3  just what I had in my possession.
4      Q   What would you have done that you did
5  not have in your possession?
6      A   As I stated earlier in this deposition,
7  there were considerable number of e-mails,
8  telephone calls I would not have had in my
9  possession. There would even have been strategy
10  papers and other things which would have been
11  created and put in the computer, which I would not
12  necessarily have had access to. And again, I think
13  there were a number of places in storage where I
14  may not have seen that there were boxes that may
15  have related to Fannie Mae.
16      So there -- there are any number of ways
17  in which whatever I gave in response to this may
18  not have been an exhaustive, although I attempted
19  to locate everything, it may not have been as
20  exhaustive as it might have been.
21      Q   With respect to the e-mails and strategy
22  papers that you believe you may have had, is the

Esquire Deposition Services      MD - 1-800-539-6398
D.C. - 1-800-441-3376            VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 157

1    reason that you would not have had those in your
2    possession relating to the computer crashes that
3    you've already testified about?
4        A    Computer crashes, yes, and loss of
5    storage documents.  I had a storage bin on U Street
6    which -- and I was doing a lot of traveling at the
7    time because of personal reasons and -- to help out
8    someone in my family, and somehow in there my
9    possessions were taken into custody by the storage
10   people and sold at some auction which I did not
11   know anything about.  And I was unable to retrieve
12   anything from that.
13       Q    When were your possessions taken from
14   the storage unit?
15       A    In 2006, I believe it was.  Or maybe it
16   was 2005.  August of 2005 or 2006, early June --
17   January, February, March, in that area.
18       Q    So those documents in your storage unit
19   on U Street would have been there in the 2002 and
20   2003 time frames; is that correct?
21       A    Some of them might have been.  Well,
22   I'll go into great detail so you will understand

Page 158

1    the complexity of my storage situation.
2        When I left Fannie Mae in 1998, I took
3    an office at the Watergate office building.  I
4    began working in earnest to do a project with
5    Fannie Mae and kept documents and everything in
6    that office for some length of time.  In 2001,
7    right after 9/11, the -- I remember having a
8    computer crash, then 2001, a number of documents
9    that we might have ordinarily stored, due to the
10   fact that we were all aware that the insurance
11   market had dried up a number of things that I was
12   working on, we disposed of at the time we moved out
13   of the office building at the Watergate.
14       When I was living at the Watergate as
15   well, during that time, I had a storage area,
16   because I was living in a co-op, and I had moved
17   out of a house.
18       So I had huge numbers of boxes at that
19   storage area.  I had boxes in my office.  I had --
20   then I -- then I moved and I tried to consolidate
21   in -- back into a house and had a huge garage there
22   in which I put a great deal of papers and boxes and

Page 159

1    so forth, and it was packed to the rafters.
2        My mother died.  I had all of her things
3    that I had moved in there.  It was just very
4    difficult to see what was in that garage and to
5    really get -- find one box.
6        Because of that situation, records were
7    ruined, a -- a $10,000 rug of my mother's was
8    ruined.  All kinds of things happened in that
9    garage, but that was the deterioration that
10   occurred in that garage.
11       Okay.  So then I moved from there into
12   where I'm moving -- where I'm living now, and I
13   store boxes in a storage area.  Meanwhile, it's
14   very difficult to keep up with what's -- so what
15   you keep close to you is what you're work --
16   working on currently, which is a great deal of
17   what -- is what I produced when it was time to
18   respond to defendants' request for documents in
19   this case.
20       I did have an opportunity then to pull a
21   lot of things out that I had not seen before.  But
22   then I also did lose that storage area.  So that's

Page 160

1    the -- the story of my storage and boxes, and
2    that's as well as I can put it.
3        Q    In response to the 2002 and 2003
4    subpoenas, did you search the storage area?
5        A    Yes, I did.
6        Q    And did you produce any documents that
7    were in the storage area?
8        A    I don't recall.
9        Q    Do you have any reason to believe you
10   didn't produce the documents that were in the
11   storage area?
12       A    No, I don't.  No.
13       Q    As far as e-mails that you would've had
14   with Fannie Mae, would those have been generally
15   kept on your computers?
16       A    Yes.
17       Q    Is the only reason that you would not
18   have had those e-mails in your possession based on
19   the computer crashes that you've already described?
20       A    Yes.
21       Q    When did you move out of the Watergate?
22       A    I believe it was -- I have -- I -- I

8  (Pages 157 to 160)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 161

1  don't have it with me. Either 2001 or 2002. I
2  believe it was 2001.
3      Q   Do you remember when in 2001?
4      A   I filed bankruptcy. I had to sell my
5  property and pay off my business debts I had
6  acquired from trying to do business with Fannie
7  Mae. I think it was around 2000 -- 2001 or 2002.
8          I just cannot remember precisely when it
9  was. I just can't.
10     Q   How did --
11     A   It's on -- should be on my tax records,
12 I think. It should be on my forms I gave to
13 somebody here.
14     Q   How does the timing of your bankruptcy
15 relate to when you moved out of the Watergate?
16     A   Well, I could no longer afford to live
17 there. I could no longer afford to have an office
18 in the Watergate. I didn't get any of the business
19 I thought I was going to get from Fannie Mae, and
20 so I had to move.
21     Q   Did you move before or after you filed
22 bankruptcy?

Page 162

1      A   I moved after I filed bankruptcy.
2      Q   How long after?
3      A   No. I moved before I filed bankruptcy.
4  I think I moved in 2001 and filed bankruptcy in
5  2002. I spent the -- the balance of my retirement
6  funds from Fannie Mae just eking out a living
7  through the next year and then filed bankruptcy.
8          When I sold my unit at the Watergate, I
9  had to pay off a $200,000 business debt I had
10 acquired which became -- meant that I virtually had
11 no -- nothing left on the sale because I had to
12 split it with my mother who was the joint owner of
13 the apartment when --
14     Q   Did you move out of the Watergate after
15 September 11, 2001?
16     A   Yes. I believe so.
17     Q   Was it shortly thereafter or --
18     A   I just don't recall and I -- I would
19 like to tell you. I'm trying to think if I have
20 anything in my possession that would let me know.
21 I just don't recall when it was.
22     Q   Did you have office space in the

Page 163

1  Watergate?
2      A   Yes, I did.
3      Q   Did you have a home in the Watergate?
4      A   Yes, I did.
5      Q   Did you vacate both the -- both the home
6  and the office at the same time?
7      A   Yes, I did.
8      Q   Do you recall when the Cam litigation
9  was filed?
10     A   No, I don't.
11     Q   Do you have any recollection of when you
12 first knew about the Cam litigation?
13     A   Let's see. It would have to have been
14 prior to May -- April 24th, 2002.
15     Q   Was the subpoena that you received in
16 the Cam litigation the first that you had heard of
17 the Cam litigation?
18     A   Of the litigation, yes.
19     Q   What was your involvement in the Cam
20 litigation?
21     A   I didn't have any involvement in the Cam
22 litigation except as a -- as a person who was

Page 164

1  deposed because I probably had more information
2  about the product than was under -- in question
3  than anyone else. It was five, I think, five or
4  six or seven very grueling days.
5      Q   Did anyone from Fannie Mae ever contact
6  you about the Cam litigation?
7      A   No. Yes -- well, Fannie Mae's
8  representative, yes.
9      Q   Who was that?
10     A   His name was Gerard Wimberly.
11     Q   And Mr. Wimberly is with the McGlinchey
12 Stafford firm; is that correct?
13     A   Correct.
14     Q   What was the reason that Mr. Wimberly
15 contacted you, as you recall?
16     A   He contacted me prior to serving me with
17 any documentation, having me served, about
18 defending Fannie Mae -- Fannie Mae's position
19 against Bob Jones from Cam Financial.
20     Q   Was he asking for your cooperation in
21 defending Fannie Mae's position against Bob Jones?
22     A   Yes.

9 (Pages 161 to 164)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 165

1    Q    What was your response?
2    A    My attorney at the time, Julia Williams,
3  spoke to him and I -- I'm not certain exactly what
4  she said, but I believe she told him that -- I
5  don't remember what she told him.
6    Q    Were you willing to cooperate in
7  defending Fannie Mae's position against Bob Jones?
8    A    I did not believe that Fannie Mae
9  treated Bob Jones in a fair manner based on my
10 personal involvement in Bob Jones's development of
11 MCRI along with me.
12   Q    Did you make that known to Fannie Mae?
13   A    I made that known to Fannie Mae before I
14 left Fannie Mae because I had been asked about the
15 exact same issue before I left, as well as being
16 asked about it in the deposition.
17   Q    Do you remember the time frame in which
18 you were contacted by Mr. Wimberly?
19   A    It was just prior to this subpoena being
20 issued, I believe.
21   Q    So that would've been in the winter or
22 early spring of 2002?

Page 166

1    A    Correct.
2    Q    And did you make it known to Fannie Mae
3  that you were not willing to cooperate in --
4    A    I told Fannie Mae I would cooperate with
5  them as -- as it was required by me of the law.  I
6  believe that's what we said, and I did cooperate.
7    Q    Do you remember whether Fannie Mae
8  wanted to meet with you?
9    A    Yes.
10   Q    Did you meet with Fannie Mae?
11   A    No.
12   Q    Why not?
13   A    Because they made it clear that, you
14 know, that -- you know, they didn't have anything
15 to offer me.  They weren't -- still weren't
16 attempting to, you know, do the right thing with
17 me, so I didn't see what there was to -- to gain
18 except to be honest and truthful about what I
19 remembered and what I knew.  And I knew that Fannie
20 Mae had acted in a certain manner toward Bob Jones,
21 and I knew that they were going to -- as long as
22 Richard Lawch was in charge, he was going to do

Page 167

1  whatever it took to try to keep Bob Jones from
2  getting the business he might have deserved.
3    Q    Why would Mr. Lawch have done that, in
4  your view?
5    A    Because he didn't like Bob Jones and he
6  didn't -- and I think Richard was very torn because
7  he had pad -- virtually paid no attention to the
8  development of this entire product, and then once
9  it turned out that it was something really good, he
10 was very reluctant not to try to take, you know,
11 credit for it.  He wanted the -- you know, to be
12 the -- the lead person, but he didn't have any
13 knowledge about how it was done.  So he basically
14 just went at the whole thing all wrong, but --
15       MR. DANIELS:  Speak up.
16       THE WITNESS:  Mm?
17       MR. DANIELS:  Speak up.  You
18 were trailing off in your answer.  Please.
19       THE WITNESS:  Yes, he -- Richard
20 was -- it was common knowledge how Richard felt
21 about Cam, and it was pretty common knowledge how
22 he felt about me generally, too.  But in this --

Page 168

1  that instance, I was working there and since I had
2  been consistently producing products that enabled
3  Fannie Mae to compete effectively in the secondary
4  marketplace, Richard wasn't really able to do
5  anything more than simply limit my compensation,
6  et cetera.
7       So -- but he did call Bob Jones several
8  times a redneck, quite a few times.  He just really
9  had great contempt for him.
10 BY MS. BECKER:
11   Q    You said it was common knowledge how he
12 felt about you?
13   A    Mm-hmm.
14   Q    And how did he feel about you?
15   A    Yes.
16       Richard and I did not have a good
17 relationship after a time at Fannie Mae.  He was
18 fond of telling people that I had withheld
19 information from him when he arrived, and I never
20 understood what he meant.  But I did unfortunately
21 meet one of his prior employers and I mentioned to
22 him that I didn't, and from that day forward,

10  (Pages 165 to 168)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 169

1    Richard was very unkind to me.
2        Q    And that was while you were at --
3    working at Fannie Mae?
4        A    Yes.
5            But I always thought he respected my
6    ability.  But he didn't really.
7        Q    At what point did you believe that he
8    respected your ability?
9        A    I believe he respected my ability when I
10   was able to convince Rob Levin, who was at that
11   time the -- responsible for the business side of
12   Fannie Mae, when I convinced him to assign someone
13   from the REMIC office to the multifamily division
14   so that we could jointly have Fannie Mae issue the
15   first senior subordinate securities ever.  And at
16   that time, I -- Richard was still relatively new,
17   and he was a little more cooperative.  And product
18   development at Fannie Mae takes a very long time,
19   and we were on a very fast track and we were able
20   to do it and able to accomplish that particular
21   task.
22           And then over time, I think, it -- the

Page 170

1    personal side of the relationship, based on, you
2    know, your typical dog-eat-dog kind of environment,
3    I had several people working for me and Richard
4    managed to change that working relationship, and
5    those people then began to report directly to
6    Richard and that was fine, you know.  I still -- I
7    still created and -- and developed new products for
8    Fannie Mae to make a lot more money, so I was happy
9    to be able to do that and to bring in the -- the
10   kind of product I thought Fannie Mae ought to be
11   securitizing.
12       Q    Do you believe that Mr. Lawch's view of
13   you changed at some point in time?
14       A    I think it changed at some point in
15   time, and I think it was exactly when I mentioned
16   it; when he was made aware that I knew his prior
17   employer, and he knew if I knew his prior employer,
18   what his prior employer was going to say about him.
19   And therefore I think he felt somewhat concerned
20   that I would know that information.  And I'm
21   certain he would be concerned like everyone else
22   would in their job whether or not I would impart

Page 171

1    that information to anyone else.
2        Q    Was --
3        A    It was a corporate environment.
4        Q    Who's the prior employer that you're
5    referring to?
6        A    A law firm that he worked for.
7        Q    What's the name of the law firm?
8        A    I don't recall the name of it.
9        Q    When did Mr. Lawch become aware that you
10   were aware of his relationship with this law firm?
11       A    I spoke at a -- at a -- an American Bar
12   Association conference to a session that was -- a
13   panel that was put together by an African-American
14   man who was attempting to do business at Fannie Mae
15   at the time in the affordable housing area.  And
16   while I was at that conference, I virtually ran
17   into this other person whom I had known when he was
18   a freshman at Harvard.  And he asked me what I was
19   doing and I told him I'm -- was working at Fannie
20   Mae and that I had a new vice president and -- gave
21   him his name.  And he said, oh, he used to work for
22   me.

Page 172

1            And when I left that conference and went
2    back to my office, I said to Richard, oh, I met,
3    you know, someone you used to work for.  And that's
4    when I think things started to go downhill.
5        Q    Who was this person?
6        A    Chuck Hamilton.
7        Q    And when was the conference?
8        A    Oh, I really -- sometime after Richard
9    arrived at Fannie Mae, and I can't really recall
10   when that was.  Let's see.
11           I can't recall when that was.
12       Q    Was this while you were still working at
13   Fannie Mae?
14       A    It was -- oh, absolutely.  Yes.
15       Q    Did Mr. Hamilton express to you
16   something negative about Mr. Lawch?
17       A    Yes.
18       Q    What was that?
19       A    I guess I could summarize it by saying
20   he didn't think he was a very good lawyer.
21       Q    Did he express anything else negative
22   about Mr. Lawch?

11 (Pages 169 to 172)

Marialice Williams

Page 173

1    A   No.  Just that he was let go by that
2   comp -- by that firm.
3    Q   Why did you tell Mr. Lawch about your
4   meeting with Mr. Hamilton?
5    A   Because I had been to a conference that
6   Fannie Mae had authorized me to go to, and knowing
7   how small the world is, it would've gotten back to
8   Richard one way or the other that I had met Chuck,
9   so I decided to tell him that I met Chuck.  He was
10  very familiar with Richard, his family -- he knew
11  his wife, you know.  It wasn't a casual
12  relationship.
13   Q   Did Mr. Lawch have any reaction to being
14  told about your meeting with Mr. Hamilton?
15   A   Not initially, no.
16   Q   Did he have a reaction at some point
17  later?
18   A   I believe he did.
19   Q   What was that reaction?
20   A   I believe he simply started to treat me
21  in a less respectful manner.
22   Q   When did that begin?

Page 174

1    A   After I told him about Chuck Hamilton.
2   And I don't recall, as I said, the year that that
3   occurred, but it was after the time that Mr. Lawch
4   came to Fannie Mae and before I left there in 1998.
5   And I was in the multifamily division from 1990
6   until 1998.
7    Q   Did Mr. Lawch's treatment of you in a
8   less respectful manner start while you were still
9   working at Fannie Mae?
10   A   Yes.
11   Q   Can you describe what he did to treat
12  you in a less respectful manner?
13   A   Yes.  The -- probably the biggest thing,
14  which was really very hurtful, was that there was
15  no question when I created MCRI that I was going to
16  get some kind of award.
17      Well, at the sales and marketing
18  conference at Fannie Mae, it's a really big deal
19  when you get an award there.  Number one, I was
20  getting ready to go out of town the particular
21  weekend of that conference and Mr. Lawch was aware
22  of that.  He did not say to me, don't go out of

Page 175

1   town, something important is going to happen at the
2   conference.
3       I happen to run into Deborah McKinnon,
4   and Deborah was a director also and responsible in
5   the multifamily division for the disposal of
6   properties.  And I said to Deborah I was excited
7   that I was going out of town, and she said you
8   can't go out of town, and I said why not.  And she
9   said because you're getting an award for your MCRI
10  product.  I said, oh, gee, I just told Richard I
11  was leaving town.
12       And so when I got to the -- I -- I did
13  go to the ceremony, and as Bob Jones stated in his
14  deposition and as everyone at Fannie Mae will tell
15  you, I pretty much created that product by myself,
16  with a lot of people's help, but I clearly was the
17  person who worked on it on a day-to-day basis.  And
18  Mr. Lawch arranged it so that I would not get an
19  individual award, which would probably have been
20  about $10,000.  Instead, he made it a team award.
21  And when I rose to get the team award when it was
22  announced, the people at my table yelled in unison,

Page 176

1   what team?  Which I found rather interesting that I
2   wasn't the only person who took offense that -- but
3   I did not mention anything to Mr. Lawch about it,
4   but I did get my $1,500 reward.
5       And then Mr. Lawch began to give me
6   reviews that were not reflective of my productivity
7   at Fannie Mae.  And I don't think there's anyone at
8   Fannie Mae who knew my productivity who would agree
9   with Mr. Lawch's assessment.  He virtually said I
10  could not write.  That I thought more of myself
11  than anyone else.  And such mean and unbecoming
12  things of a vice president of Fannie Mae as I've
13  ever seen.  And this was all while I was producing
14  products that were enabling Fannie Mae to play a
15  substantial role in the secondary market in a
16  productive and competitive way.
17       So it just became a personal matter.
18  And I loved my job so much at Fannie Mae, I was not
19  going to let his feelings and his issues affect me
20  and my productivity.  And I would not have left
21  there had I not thought Fannie Mae was not going to
22  ultimately live up to her commitment to me to give

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 177

1  me the business that I had developed.
2      Q    Why do you think that Mr. Lawch turned
3  against you and decided to make your business
4  relationship with him personal?
5      A    I believe he's human, like any other
6  person, and I believe that personal embarrassment
7  that he may have felt at someone actually knowing
8  his history may have caused him to do whatever he
9  did.
10     Q    Do you believe that he treated you
11 differently while you were at Fannie Mae based on
12 your race?
13     A    Yes.
14     Q    And what's that based on?
15     A    That's based on, number one, what he did
16 about my award; number two, the way that he treated
17 me with respect to my supervisory responsibilities;
18 number three, when he -- Mr. -- Mr. Lawch, for
19 example, was such a poor manager than he had -- was
20 required to go to classes that involved him
21 becoming more sensitive to employees and with
22 respect to women and racial issues.

Page 178

1          And he -- if -- if somebody's not doing
2  well in a position, if I wasn't doing well as a
3  supervisor, I would've thought I should've been
4  given the same courtesy as everybody else; well,
5  give me some training that would make me a better
6  one, not just, you know, invite my staff into your
7  office and pal around with them and play golf in
8  your office, putt in your office with them.
9          And -- you know, and I mean it was a
10 real -- and I was the one excluded from the
11 knowledge of whatever was going on in the office.
12 He excluded me from discussions about the business,
13 and I was the director for capital markets.  And he
14 had his little cronies and his pets and that's the
15 way it worked, and that's the way it works in
16 corporate America and there's nothing anybody can
17 do about that.  But he definitely had a preference
18 for certain people, and they certainly weren't
19 black.
20     Q    Why do you attribute this to the race of
21 the people that he was dealing with as opposed to
22 him simply being a poor manager?

Page 179

1      A    I don't think I was the only
2  African-American person at Fannie Mae who felt that
3  he had an issue with African-American people.  We
4  knew -- we knew, for example, that certain
5  attitudes had to exist within his home, because his
6  children expressed very interesting thoughts about
7  black people and slaves and so forth.  And if you
8  ask Betty Dance, I'm sure she'll give you the whole
9  litany on what it was like being there with him and
10 his children being so disrespectful.  And there --
11 and I would say any other black person that was
12 there at the time could tell you.
13     Q    Did you talk to other African-Americans
14 while you were at Fannie Mae about Mr. Lawch?
15     A    I talked to a lot of African-Americans
16 and a lot of women who gravitated to my office
17 frequently about EEO issues.  And my recommendation
18 was always to people, talk to the person that
19 you're involved in the situation with because you
20 have to remember that if you file an EEO complaint,
21 you better be sure you're going to win it because
22 otherwise your career is going to be over here.

Page 180

1  And that had been proven time and time again.
2          And it was not easy for
3  African-Americans and women in the levels at Fannie
4  Mae where I was to survive unless you had a mentor
5  who was at a much higher level who was willing to
6  help you and -- and push your career along.  It did
7  not matter whether you were productive, smart,
8  intelligent or anything.  It only mattered who your
9  mentor was and if you had someone to -- to champion
10 your cause.
11     Q    Do you feel that you had a mentor or
12 someone to champion your cause at Fannie Mae?
13     A    No.  At Fannie Mae the tasks were given
14 out for assignments that could either make or break
15 your career.  And there was no question who was
16 getting the good assignments.
17         I made my mark at Fannie Mae because I
18 created the concepts that I developed, and
19 therefore was fortunate enough to -- to have some
20 impact on -- in -- in the sense of change at Fannie
21 Mae.  But I was not given the assignments that --
22 that were the achievements of my career, from day

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 181

1  one, including creating the first data -- database
2  that gave you consistent information on pools of
3  multifamily mortgages.  I mean that was my -- you
4  know, I created that with $65,000.  Show me
5  anybody's system that can be done for that price
6  now.  Took them $3 million to upgrade it.
7       So I know I had to have some kind of --
8  of capacity there.  But I did not get assignments
9  because I was get -- they were handed to me.  I
10 made my way at Fannie Mae.
11     Q   Why did you leave Fannie Mae?
12     A   I left Fannie Mae because I had a long
13 conversation with Lou Hoyes, and told him that I
14 was so happy that we had issued the first
15 securities based on this MCRI concept, and that it
16 was going to make a huge difference for the
17 communities I was concerned about, which were the
18 inner cities, or the rural areas where mortgages
19 tended to be smaller and less -- less than standard
20 according to Fannie Mae's underwriting, and that I
21 thought that I would take that opportunity, become
22 an insurance broker and do the MCRI business.  And

Page 182

1  he assured me that, you know, that would not be an
2  issue, that we would continue to work together.
3  And that is why I left Fannie Mae.
4       And he specifically said to me, are you
5  leaving Fannie Mae for something or are you leaving
6  because you don't want to be here?  And he then
7  also said to me, if you do want to stay here, I can
8  change your supervisory person to be Wendell Johns
9  tomorrow.  I can do that.  To which I said to him,
10 I have been trying to explain to you about Richard
11 Lawch for a long time.  I'm sorry that you waited
12 until this moment, but my mind's made up.  I have
13 the opportunities.  I really want to go out and see
14 that this product gets out into the marketplace,
15 that Fannie Mae can start to do the kind of
16 affordable housing program on the capital markets
17 side that I felt it should be doing according to
18 its charter.  And so I left.
19     Q   Did you leave understanding you would
20 have a position with Cam Financial?
21     A   I wasn't certain that I was going to
22 have a position with Cam Financial.  They had

Page 183

1  certainly lured me by saying they were going to put
2  me on their board, et cetera, et cetera, et cetera,
3  but you know, it wasn't going to matter one way or
4  the other.  I knew that there was a great deal more
5  to be done in the marketplace on this product, and
6  that I had the capability of doing it and would do
7  it with Cam or with ever -- whomever else had the
8  ability to finance the -- the amount of time that
9  it would take to do the product development.
10     Q   Did you file an internal complaint of
11 discrimination while you were at Fannie Mae?
12     A   I certainly did not.
13     Q   Why not?
14     A   Because I had watched what happened to
15 people who did file complaints.  Been there for a
16 long time.
17     Q   Did you tell anybody at Fannie Mae that
18 you believed that Mr. Lawch treated you differently
19 based on your race?
20     A   Certainly.
21     Q   Did you tell anybody at Fannie Mae that?
22     A   Certainly.

Page 184

1      Q   Who did you tell at Fannie Mae?
2      A   I had that conversation frequently with
3  one of the vice president -- one of the -- I can't
4  remember what level he was.  In credit policy there
5  were quite a few people that I was very close to
6  there.  I also discussed it with people within the
7  multifamily division who were African-American.
8       I don't believe I mentioned it to anyone
9  white, but -- yes, I did, Stuart Levy.  Who was
10 also in credit policy.
11     Q   Who's the most senior person that you
12 told at Fannie Mae?
13     A   I think I told vice president for
14 diversity, Maria Johnson.
15     Q   What was Ms. Johnson's reaction?
16     A   Same as mine; well, don't file a
17 complaint because that's the end of your career.
18     Q   Were those Ms. Johnson's exact words?
19     A   Or something to that effect, yes.  I've
20 known her a long time.  I introduced her to Rob
21 Levin.  He hired her because I introduced him to
22 her.

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 185

1    Q   When did you have this conversation with
2  Ms. Johnson?
3    A   I don't recall.  Probably all the way
4  through 'til 1998 when I left.  From the time she
5  arrived until the time I left.
6            MS. BECKER:  Can we go off the
7  record for a few minutes.
8            VIDEOGRAPHER:  Off the record at
9  11:38:36.
10    (Thereupon, a recess was taken.)
11            VIDEOGRAPHER:  On the record at
12  11:54:19.
13  BY MS. BECKER:
14    Q   I'm handing you what will be marked as
15  Exhibit 12.
16    (Deposition Exhibit No. 12 - Amended
17    Complaint - was marked for identification.)
18            MR. DANIELS:  May I take up a
19  preliminary matter before you continue your
20  questioning?  Today we handed you certain copies
21  of -- of Ms. Williams' tax records, and I want to
22  be certain that we are giving them to you under a

Page 186

1  confidentiality agreement.  Will they be used only
2  in connection with this litigation and not
3  shared -- the same confidentiality agreement we
4  signed when we -- when you gave us your documents?
5            MS. BECKER:  I'm going to need
6  to consult with my client before we make a final
7  decision on that.  We will -- we'll discuss that
8  later in the deposition before we take up those
9  records.
10            MR. DANIELS:  Okay.  But I -- I
11  handed them over in good faith that we would agree
12  to this confidentiality.  I should've raised it
13  before I gave them to Sarah earlier today.
14  BY MS. BECKER:
15    Q   Ms. Williams, can you identify
16  Exhibit 12?
17    A   Yes, it is the amended complaint in the
18  civil action of Marialice Bathrus Williams versus
19  the -- Fannie Mae, Richard Lawch, and Grace
20  Huebscher.
21    Q   This is the complaint that you filed; is
22  that correct?

Page 187

1    A   Yes, it is.
2    Q   And your understanding is this is the
3  operative complaint in the case; is that correct?
4    A   Correct.
5    Q   I'd like to ask you to look at
6  Paragraph 19 of the complaint on Page 7.
7    A   Mm-hmm.
8    Q   Can you read that?
9    A   In June 1998 Plaintiff Williams left the
10  employment of Fannie Mae pursuant to a negotiated
11  settlement agreement which ostensibly resolved
12  issues of alleged unlawful discrimination and
13  retaliation on the bases of race and sex charges
14  which have been stated by Plaintiff Williams prior
15  to her departure from Fannie Mae employment in
16  which constituted protected activities as defined
17  by the civil rights laws of the United States.
18    Q   Did you make allegations of unlawful
19  discrimination and retaliation on the basis of race
20  and sex prior to leaving Fannie Mae?
21    A   Yes, I did.
22    Q   Who did you make those allegations to?

Page 188

1    A   I made them to Tom Nieds (ph), I believe
2  was his name, who was the first person who was
3  charged with working out my settlement agreement
4  for my departure from Fannie Mae.
5    Q   Who is Tom Nieds?
6    A   That's a good question.  I don't really
7  know who he is, what -- where he came from or what
8  his claim to fame is.  He certainly didn't ever do
9  anything I ever thought was particularly
10  significant.  He was just an officer and somebody's
11  friend.  What kind of -- I think he was Jim
12  Johnson's friend.  Or Jim Johnson's wife's friend
13  or something like that.
14    Q   What were the allegations of
15  discrimination and retaliation on the basis of race
16  and sex that you made to Mr. Nieds?
17    A   I told him that I thought that the
18  settlement agreement that they were offering me was
19  absolutely not reflective of my contributions to
20  Fannie Mae, and that the offer was basically the --
21  what was -- if you were getting ready to be
22  terminated for cause from Fannie Mae, you pretty

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 189

1  much got the settlement that I got, whether you'd
2  ever produced anything or not.  And at that point I
3  just simply said to him, you know, I -- you know,
4  white people leave here and they don't get this
5  kind of settlement.  You know, they get an enhanced
6  settlement and all I'm getting is this.  And number
7  two, you wouldn't even extend the time for me to
8  exercise my options, which meant I was -- I was
9  going to have a huge taxable event.  You know, I
10  mean just little petty crap they could've been
11  nicer about.
12       But again, you know, I'm sure Mr. Nieds
13  was taking his instructions from Mr. Lawch, and he
14  sure didn't care.  And didn't care about my
15  accomplishments and eventually was taken off the
16  negotiations.  Someone else was put on it.
17     Q   Do you believe that Mr. Lawch was behind
18  the original settlement offer?
19     A   Yes.
20     Q   And you believe that that original
21  settlement offer was the product of discrimination
22  and retaliation by Mr. Lawch?

Page 190

1     A   Yes.
2     Q   Did Fannie Mae subsequently make you a
3  different offer?
4     A   No.  They modified it to some extent but
5  not much.
6     Q   Was the modification an enhancement of
7  your compensation under the settlement agreement?
8     A   Modest amendment, mod -- modest.
9     Q   My question is:  Was the modest
10  amendment giving you more money than you had
11  originally been offered?
12     A   It was giving me a little more than
13  someone who was about to be terminated from the
14  company.
15     Q   Do you remember when these negotiations
16  with Mr. Nieds took place, in relation to when you
17  left Fannie Mae?
18     A   In June of 1998.
19     Q   Do you remember when in June?
20     A   No, I think it took the whole month of
21  June.  I met with him several times and then I had
22  to call a lawyer.

Page 191

1     Q   Who did you call?
2     A   I called Brian Lederer.
3     Q   Did Mr. Lederer represent you in
4  relation to the settlement agreement that you
5  negotiated with Fannie Mae in June of 1998?
6     A   Yes.
7     Q   Other than Mr. Lederer, did you talk to
8  anybody else about your settlement agreement?
9     A   I think I called Tom White, who had been
10  a senior vice president for multifamily.  I -- I
11  believe I called him because I was just so stunned
12  at the offer, but I -- I -- I can't tell you
13  honestly what -- I thought I had called Tom White.
14     Q   Did you talk to anybody else about your
15  settlement agreement?
16     A   I don't think so.
17     Q   I'd like to turn your attention to
18  Paragraph 51 of the complaint.  Do you remember a
19  meeting on the subject of captive insurance
20  companies?
21     A   Yes.  Had several.  Before and after I
22  left Fannie Mae.

Page 192

1     Q   What meetings did you have before you
2  left Fannie Mae?
3     A   Before I left Fannie Mae I had meetings
4  with the credit officers in credit policy with the
5  division, Fannie Mae members of the multifamily
6  division, with -- I brought in -- prior to the
7  merger with Marsh Mac, oh, Lord, I forgot the name.
8  There was another major insurance brokerage which
9  merged with Marsh Mac and we brought in very, very,
10  very high-level officials from Marsh Mac, GenStar,
11  and other place and a couple of other places, very
12  high-level individuals, to discuss the basic
13  concept of captive insurance.  And then I wrote a
14  proposal following that meeting to Fannie Mae.  I
15  was still an employee at the time.
16       Then over the next few years, a
17  significant number of developments occurred which
18  made it far more feasible for corporations like
19  Fannie Mae to form captive insurance companies
20  because an Internal Revenue Service opinion came
21  out that in fact captive insurance companies are
22  true insurance companies, and therefore the

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 193

1  expenses of operating that insurance company were
2  deductible by the owner. Even though it might've
3  been a subsidiary of Fannie Mae, it could -- it
4  could still deduct those expenses, et cetera,
5  et cetera.
6        And because of that -- my friend Harvey
7  Hartsfield and I had been extremely active with the
8  DC office of insurance, securities, and -- DISB,
9  insurance, securities, and banking, and I had
10  explained the concept to them. I'd gone back to
11  Fannie Mae and explained that the DC had the -- a
12  new captive law and that we would prefer to use the
13  captive in DC if we were going to pursue this.
14        We had a gentleman from Atlanta, whose
15  name is escaping me, plus Bob Jones, all of us were
16  pursuing this concept of captive insurance
17  companies, either being located in the Cayman
18  Islands, the Virgin Islands, which also had a new
19  captive insurance law, and the District of
20  Columbia. And those discussions continued, my
21  discussions on that still continuing to the
22  present, but with Fannie Mae certainly until, as

Page 194

1  far as I can remember, into 2002 and beyond.
2        Q   You reference a particular meeting here
3  in Washington, DC?
4        A   Mm-hmm.
5        Q   Who was -- who was at that meeting?
6        A   The individuals listed there: Harvey
7  Hartsfield, Kate Westover, Grace Huebscher, Rhoda
8  Newman. There was an attorney whom I did not know.
9  I thought her name was Carol or Carolyn. She was
10  new to Fannie Mae at that time, relatively new, and
11  she was serving as counsel. And I had been
12  instructed to work through Rhoda Newman as the
13  staff contact person for any business I had. And
14  those were the people who were at the meeting.
15        Q   What occurred at the meeting?
16        A   Kate Westover and Harvey Hartsfield and
17  I made an add -- an additional presentation to
18  Fannie Mae about the feasibility of using the DC as
19  a captive jurisdiction, largely because the
20  implementing regulations for DC were being written
21  by Kate. We had recommended her to Larry Mirel,
22  who at the time was the commissioner for insurance

Page 195

1  securities and banking. And Kate is an
2  international expert on captives and was discussing
3  the concept that we had that either Fannie Mae
4  could own a captive and rent out cells to various
5  individuals so that they use their own individual
6  captive cell as a credit enhancement or Fannie Mae
7  would simply have the option of utilizing credit --
8  the -- the captive for credit enhancement for
9  itself and charging the customers for that service.
10        Q   Were there any materials handed out at
11  the meeting?
12        A   Yes, I know that we did di -- diagrams
13  because it's a -- a somewhat complicated --
14  somewhat complex structure in that you have
15  several, quite a few parties. You have a
16  reinsurer, you have -- and -- and we had done
17  diagrams with arrows and so forth indicating the
18  actual process of securitization utilizing this
19  captive insurance as -- as a credit enhancement
20  vehicle.
21        Q   Was that done in something like a
22  PowerPoint presentation?

Page 196

1        A   I think we used a PowerPoint as well
2  as -- no, I think we had hard copy in that meeting.
3  And -- but they were depictions of our whole -- our
4  whole concept. Our whole captive insurance
5  concept. And we talked about the various parties
6  and clients of ours whom we had discussed the
7  concept with.
8        Because again, you know, you can't just
9  come to Fannie Mae with an idea, you have to come
10  with the whole package. So you've got a lot of
11  product development to do prior to -- to going to
12  Fannie Mae and certainly prior to presenting any
13  transaction utilizing a particular structure.
14        Q   I'd like to turn your attention to
15  Paragraph 53 of the complaint.
16        What happened after that meeting to make
17  you believe that you had been blackballed by Fannie
18  Mae?
19        A   I really didn't get any further com --
20  communication or correspondence from them after
21  attempting to contact them. I still continued to
22  cc Fannie Mae on e-mails regarding the development

Esquire Deposition Services        MD - 1-800-539-6398
D.C. - 1-800-441-3376              VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 197

1  of that concept. But I think by then Bob Jones had
2  amended his complaint to include Fannie Mae,
3  because as I recall, initially Fannie Mae was not a
4  party to the Cam litigation. Initially it was only
5  GenStar and GenRe, which were failing to -- to
6  honor the confidentiality agreement and exclusivity
7  agreement that he had with them.
8        But then I believe the judge said that
9  Fannie Mae was an indispensable party, given that
10  she was actually distributing the funds that were
11  going to these various places and -- and were --
12  and had knowledge of the agreements that Bob and
13  Cam had with these companies.
14        MS. BECKER: Let's go off the
15  record for just a minute.
16        VIDEOGRAPHER: Off the record at
17  12:13:57.
18    (Thereupon, at this point in the proceedings
19      a luncheon recess was taken.)
20        VIDEOGRAPHER: On the record at
21  1:16:18.
22        MS. BECKER: Ms. Williams, I'm

Page 198

1  handing you what I'll ask the court reporter to
2  mark as Exhibit 13.
3    (Deposition Exhibit No. 13 - Plaintiff's
4      Answers to Defendants' Interrogatories - was
5      marked for identification.)
6        MR. DANIELS: Before we -- did
7  you get an answer on the tax returns? Did you --
8        MS. BECKER: Let -- let's cover
9  it -- when -- before we get to the tax returns.
10        MR. DANIELS: Okay.
11  BY MS. BECKER:
12    Q  Do you recognize that document?
13    A  Yes.
14    Q  What is it?
15    A  Plaintiff's Answers to Defendants'
16  Interrogatories in the case of Marialice Bathrus
17  Williams versus Fannie Mae, et al.
18    Q  Did you prepare these interrogatory
19  responses?
20    A  With my attorney. Attorneys.
21    Q  Are these interrogatory responses
22  accurate?

Page 199

1    A  I believe they are.
2    Q  I'd like to direct your attention to
3  your answer to interrogatory number one. Is your
4  answer to interrogatory number one complete or is
5  there any additional information that you believe
6  is responsive to the question posed in interrog --
7  interrogatory number one?
8    A  You said is that my --
9    Q  Is your answer to interrogatory number
10  one complete or is there any additional information
11  that you would like to add to your answer?
12    A  In the second paragraph of my answer on
13  Page 1, it says: It was the actions, not the
14  statements, that made me aware that Fannie Mae was
15  excluding me from the pool of insurance brokers.
16        And I'd have to say that based on that,
17  the actions, right, it was the actions that made me
18  know.
19    Q  You referred to a statement by Richard
20  Lawch that he was, quote, working with an
21  international broker for doing some insurance
22  business for the MBS pools.

Page 200

1        Do you see that?
2    A  Mm-hmm. Yes.
3    Q  How does that support your claims in
4  this case?
5    A  Mr. Lawch was fully aware that I was
6  capable of doing the business that Fannie Mae
7  wanted to do, using the insurance concept that I
8  had developed. He was fully aware that I had left
9  Fannie Mae in order to pursue the insurance
10  business, with respect to MCRI, and therefore when
11  I approached him and he said that he had hired a,
12  quote/unquote, international broker, I knew that
13  what he was saying was that he was looking at
14  someone other than me for doing that business, and
15  I knew that the person was Craig Ott, who is a
16  white man, and I am a black woman. And I know that
17  I knew much more than Craig Ott will ever know
18  about anything related to Fannie Mae or ins -- or
19  the MCRI business, and therefore I knew that that
20  was a discriminatory remark. That he was selecting
21  a white man with no experience or knowledge over
22  me, a black person, to do the aggregation business.

18 (Pages 197 to 200)

Marialice Williams

Page 201

1    Q   How many insurance deals did you do
2  while you were at Fannie Mae?
3    A   I closed the very first deal at Fannie
4  Mae, was working on a second one when I left.  I
5  closed my deal with Metropolitan just before I left
6  Fannie Mae.
7    Q   So you closed one deal while you were at
8  Fannie Mae?
9    A   One deal using MCRI, while I was at
10  Fannie Mae, yes.
11    Q   When did you start working on that deal?
12    A   Three years before it closed, and I left
13  in '98, so it was probably be -- about '95, '94,
14  maybe even '93.
15    Q   When did you first become a mortgage
16  broker?
17    A   I'm not a mortgage broker.
18    Q   When did you first get your insurance
19  broker's license?
20    A   The summer after I left Fannie Mae.  I
21  believe it was around August of 1998.
22    Q   Do you still have that license?

Page 202

1    A   No, I don't.
2    Q   When did the license expire?
3    A   I think it was about two years ago.
4    Q   So that would've been 2005?
5    A   I believe it was 2005.  I'm not
6  absolutely certain.
7    Q   How many insurance transactions have you
8  brokered since you left Fannie Mae?
9    A   None.
10    Q   I'd like to turn your attention to
11  interrogatory number two and your answer.
12        I'd like to ask you to refer to what was
13  previously marked as Exhibit 2, which I believe the
14  court reporter has.
15    A   This says Exhibit 1.
16    Q   If you turn to Exhibit 2.  Is Exhibit 2
17  the letter that you're referring to in your answer
18  to interrogatory number two?
19    A   Yes.
20    Q   How does this -- how does Exhibit 2
21  support your tortious interference claim?
22    A   What I did not know at the time that I

Page 203

1  was asked to write this letter was that Fannie Mae
2  was continuing to do business with Cam Financial,
3  not just old business, but new business with Cam
4  Financial.  And it's business that they could have
5  done with me, which I did not know then.  I thought
6  Fannie Mae was asking me to write this letter to
7  say that I was not in business with Bob Jones in
8  order to -- because they were concerned that Bob
9  would get business through me, when in reality Bob
10  was already getting business through Fannie Mae
11  that I was not included in.
12    Q   How does that demonstrate that Fannie
13  Mae tortiously interfered with your relationship
14  with Cam?
15    A   Well, if they're telling me I'm can't --
16  I'm not to do business with Cam, they're giving me
17  the impression that Cam is undesirable and someone
18  with whom they would not want to do business, when
19  in reality they were doing business with Cam,
20  business that at that point I would be completely
21  excluded from because the relationship was between
22  Cam and Fannie Mae.

Page 204

1    Q   How did that affect your relationship
2  with Cam?
3    A   It meant that I could not do business
4  with Cam if I wanted to continue to work with
5  Fannie Mae, which turned out to be a joke anyway,
6  since Fannie Mae never did anything with me.  It
7  was just one more stalling technique, one more
8  tactic that Richard and his crew designed to
9  exclude me from the business that I had created,
10  which is one more obfuscation of the real point,
11  which was we're not going to do this business with
12  Marialice; we are just going to lead her on.  And,
13  oh, today we'll get her -- to write a letter that
14  she doesn't work with Cam.  Oh, tomorrow we'll ask
15  her some -- to do something else.
16        And that's the way it went.  On and on
17  and on 'til I was broke.  And no business.  And you
18  can look in my tax returns and see that I relied on
19  them, that I spent my entire settlement trying to
20  do this business with Fannie Mae.
21    Q   Does Exhibit 2 accurately describe your
22  relationship with Cam?

19 (Pages 201 to 204)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 205

1    A   Yes, it does.  At that point.
2    Q   I'd like to ask you to look at
3  interrogatory number three.  And in particular,
4  your response on Page 3.  Are you calculating your
5  damages at $22 million?
6    A   No.  That's -- I didn't ask for
7  $22 million.  I believe I asked for more than that.
8  That was just on the DUS program.  After I read all
9  the documents that Fannie Mae provided, you know,
10  it turned out that they did a great deal of
11  business other than DUS business.  They did not do
12  the DUS business; they did other business with
13  insurance.  And I believe when I get the answers
14  from Fannie Mae I'll know how much that is, and it
15  certainly is a lot more than 22 million.
16    Q   So your understanding is that Fannie Mae
17  did not do DUS business; is that correct?
18    A   My understanding is that they didn't.
19  But I wouldn't know.  They never told me the truth
20  about anything.
21    Q   I'd like to ask you to look at
22  interrogatory number five.  Do you stand by that

Page 206

1  answer or -- or do you wish to amend your response
2  in any way?
3    A   I believe that that is an accurate
4  response because I don't know how much business
5  Fannie Mae gave -- gave to Craig Ott precisely.  I
6  don't know how much business they gave to Bob
7  Jones.  I don't know the complete answer to that.
8      All I know is there's an aggregation
9  product on the market.  It is anonymous as to who
10  the broker may have been on the deals, and
11  therefore I cannot say how much business was given
12  to Craig Ott, but Fannie Mae certainly knows how
13  much they gave to Craig Ott, and they certainly
14  know how much they gave to Bob Jones.  And in the
15  information that was given to me or, excuse me,
16  that Mr. Daniels and Mr. Lederer's law clerk gave
17  to them regard -- from -- that was taken from the
18  Bob Jones/Cam Financial case, there were certain
19  indications as to how much business Fannie Mae was
20  doing in both aggregation and on the regular MCRI
21  business, and it -- indications were that it was
22  a -- a very substantial amount of money.  And I

Page 207

1  don't know how much of it -- I don't know how much
2  went to Craig Ott.  I just don't know.
3      I guess we could go to Bond Buyer and
4  find out, find out how many aggregation pools.
5    Q   I'd like you to look at your answer to
6  interrogatory number seven.
7    A   Mm-hmm.
8    Q   Was your co-brokerage agreement with Cam
9  Financial ever reduced to writing?
10    A   Ever?
11    Q   Reduced to writing?
12    A   I believe we did have a one-pager that
13  said simply exactly what was in here.  We'll just
14  split the insurance if we do a deal together.
15    Q   Did you produce that one-pager?
16    A   I -- I don't remember.  I think I did.
17  Yes, yes, I did produce I think a number of
18  iterations of it, and I think I produced it in the
19  document request from Fannie Mae.
20      And I believe it's the same thing I
21  described in here, in this other Exhibit 2 over
22  here.

Page 208

1    Q   You're referring to Exhibit 2?
2    A   Yes.
3    Q   We've been unable to locate a written
4  document that would be a co-brokerage agreement
5  between you and Cam in your discovery responses.
6  Would you be willing to allow your attorneys to
7  direct us to the production number of the document
8  that you're referring to?
9    A   I believe the last -- my last deposition
10  you gave me as an exhibit a co-brokerage agreement
11  between Cam and myself.  You handed it to me and
12  marked it as an exhibit.
13    Q   Can you identify it?
14      MR. DANIELS:  You think it was
15  Bob Jones's deposition that that happened?
16      THE WITNESS:  No, it was the
17  last time I was here.
18      MR. DANIELS:  Okay.
19      THE WITNESS:  There was a
20  document that someone handed me.  It was -- and
21  said --
22      MR. DANIELS:  I think the

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 209

1    question was whether --
2    BY MS. BECKER:
3        Q   I'm sorry.  Ms. Williams, can you review
4    the exhibits from your -- the previous day of your
5    deposition and see if you can identify that
6    document?
7        A   Those are here?
8        Q   Yes.
9        A   Well, here's one right here at
10   Exhibit 4, unsigned.  And then here's one I think
11   that Harvey mailed to them, that's exhibit --
12   excuse me, it's Page 10546 to Danny Groves from
13   Harvey Hartsfield.  These were -- and that's
14   January 14th, 2002.  And that's -- you know, we
15   kept trying to go at it to try and get something
16   that we could all agree with.
17              And let's see, there's another one here
18   at 10548/49.  That one's unsigned as well.  I
19   thought we had a one -- perhaps we never did sign
20   a -- a final one, but I -- I thought we had.
21   Perhaps I'm mistaken.
22              MR. DANIELS:  What was the

Page 210

1    question that was on the table, please.  Could you
2    go back?
3              MADAM REPORTER:  Sure.  The
4    original question?
5              MR. DANIELS:  Yes.  The one
6    that --
7        (The reporter read the record as requested.)
8              MR. DANIELS:  And the answer.
9              THE WITNESS:  The --
10       (The reporter read the record as requested.)
11             THE WITNESS:  And that's pretty
12   much what these agreements say, with some other
13   language.  But I -- if there was a signed one and
14   it's not in here, then it's probably that I can't
15   locate the signed copy.  I thought we did actually
16   have a signed agreement.  Because as late as 2002,
17   Bob Jones and I went to Baltimore to meet with a --
18   a major rated insurance company to talk more about
19   both MCRI as well as captive insurance/reinsurance.
20   BY MS. BECKER:
21       Q   Do you have any evidence of a signed
22   co-brokerage agreement between you and Cam?

Page 211

1        A   No, if -- if it's not here then -- and I
2    didn't give it to you in the other -- then -- then
3    maybe it's not.  Maybe it's lost.  But I thought
4    there was one signed and I thought we had given it
5    to you.  But I could be mistaken.
6              And by that time Bob was giving me the
7    runaround just like Fannie Mae was 'cause they were
8    all lying and stealing and not paying me anything,
9    and I had created the whole thing.  So I guess
10   maybe we didn't sign one in final.  It's all just a
11   big runaround.  I was the only one that took it
12   seriously.
13       Q   Are you able to identify the exact terms
14   of the co-brokerage agreement that you allegedly
15   had with Cam?
16       A   In Exhibit 2 I have described it, and I
17   don't think there's any better description.  I've
18   also shown you in Exhibit 3 and 4 that there were
19   several instances, and I told you that the
20   agreement is pretty much exactly what Exhibit 4
21   says:  That if we do any business together, there
22   will be a 50/50 split between the two of us.  And

Page 212

1    that was pretty much the extent of the agreement.
2              And you could have that agreement with
3    any broker, anywhere, any day of the week, any
4    time.  It's just a very simple, plain, clear 50/50
5    split on commissions.
6        Q   So in the event that you did a deal with
7    Fannie Mae, the co-brokerage agreement meant that
8    you would have to split any proceeds with Cam
9    50/50?
10       A   If I did what?
11             MS. BECKER:  Can you read back
12   the question.
13       (The reporter read the record as requested.)
14             THE WITNESS:  Not necessarily.
15   Depended on who the insurance company was.  If it
16   was an insurance company that I had an exclusive
17   arrangement with, no, I wouldn't have to split
18   anything with Bob.  If Bob located the insurance
19   company, certainly I would have to split that with
20   him, and that's -- it's just a standard kind of a
21   co-brokerage agreement, which I explained in here
22   to Fannie Mae:  It's just a plain co-brokerage

21 (Pages 209 to 212)

Marialice Williams

Page 213

1  agreement.
2        You could sometimes in the insurance
3  business split commission with somebody you never
4  seen or heard of in your entire life. It just
5  depend on who -- would depend on who was the
6  procurer of the actual insurance itself.
7  BY MS. BECKER:
8     Q    In what way did Fannie Mae interfere
9  with your co-brokerage agreement with Cam?
10    A    Fannie Mae interfered with my
11 relationship with Cam Financial by saying that they
12 sen -- essentially did not want me doing business
13 with them. That is why I was asked to write this
14 letter, which I wrote, which is in here, which
15 basically says to Cam Financial, you know, Fannie
16 Mae doesn't want you doing business with Cam
17 Financial.
18       And for two people who had been working
19 together for five years, it was a little bit
20 strange to have somebody come out of left field and
21 ask you to write that kind of letter. I don't know
22 what their motivation was. But it certainly did

Page 214

1  destroy what -- whatever relationship I had with
2  Cam at that point, because obviously Fannie Mae --
3  and then Fannie Mae wasn't even being truthful then
4  because they weren't going to give me any business
5  whether I was doing it with Bob or not. But I did
6  not know that at the time, and I also did not know
7  they were still doing business with Bob, which is
8  why it doesn't all make sense at all.
9        So you wonder what kind of subterfuge or
10 crap they are handing you when you -- you know,
11 you're told to do one thing and then you discover
12 later on, well, they told you not to do business
13 with them, but then they weren't doing business
14 with you, but then they were doing business with
15 him. And -- so was it that they didn't want you to
16 do business with him 'cause you'd get part of what
17 they're getting. Or did they not want Bob to get
18 something you might get. Well, obviously that
19 wasn't true because they weren't giving you
20 anything.
21       So, you know, it was -- it was me
22 spinning around like a whirling dervish for several

Page 215

1  years, spending every dime I had doing product
2  development, in order to see that Fannie Mae
3  adhered to its chartered obligation by doing
4  affordable housing loans, which was what my whole
5  point was of my whole program. But they weren't
6  particularly interested in doing that business
7  anyway.
8        So that's where I am on this. You
9  can -- I'm sure you can imagine my frustration. I
10 don't understand it any more than you do. I don't
11 understand why they had me write the letter. I
12 don't understand why Bob Jones lied. I don't
13 understand why Fannie Mae lied about what they were
14 doing. I don't understand it either. I just know
15 that I'm the one that wound up being hurt and
16 having no money and no business.
17    Q    So fundamentally your claim related to
18 the co-brokerage agreement is that Fannie Mae
19 didn't do any business with you; is that fair to
20 say?
21    A    That's right.
22    Q    I'd like to ask you to look at your

Page 216

1  answer to interrogatory number nine.
2        VIDEOGRAPHER: Excuse me,
3  Ms. Becker, but we are about to run out of tape.
4        This is the end of videotape number one
5  of the testimony of Marialice Bathrus Williams, May
6  7th, 2007. Off the record at 1:45:40.
7        (Discussion held off the record.)
8        VIDEOGRAPHER: This is the
9  videotape tape number two, Volume II, of the
10 testimony of Marialice Bathrus Williams, May 7th,
11 2007. On the record at 1:50:54.
12 BY MS. BECKER:
13    Q    I'd like to ask you to look at your
14 answer to interrogatory number nine. What phone
15 conversations between you and Bob Jones are you
16 referring to?
17    A    Conversations with Bob Jones regarding
18 business he was doing with Fannie Mae that I was
19 not aware of. And he indicated in one of those
20 conversations that, you know, he evidently had the
21 same kind of discussion with Fannie Mae that I had
22 about not doing business with him, but for some

22  (Pages 213 to 216)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 217

1  reason he was still getting business, and I was
2  not.
3      Q   What did he tell you that led you to
4  believe that Fannie Mae was discouraging Cam
5  Financial from doing business with you?
6      A   He said, I don't think Fannie Mae wants
7  to do business with you.
8      Q   Did he say that Fannie Mae was
9  discouraging Cam from doing business with you?
10     A   Yes.
11     Q   What did he say in that regard?
12     A   Cam didn't want Fannie -- him to do
13  business with me.
14     Q   I'm sorry, can you repeat that?
15     A   Fannie -- Fannie Mae did not want Cam
16  Financial to do business with me.
17     Q   What specifically did he say about that?
18     A   Fannie Mae did not want Cam Financial to
19  do business with me.
20     Q   What business were you doing with Cam
21  Financial at that time?
22     A   I -- I think we've gone through this

Page 218

1  whole litany of things that I tried to do with Cam
2  Financial and Fannie Mae and then I was asked not
3  to do business with Cam Financial, Cam Financial
4  was asked not to do business with me. I still had
5  to continue to try to do business. I -- I mean I'm
6  not sure of what answer you want or are looking for
7  because I can't remember what your question was,
8  really.
9          MS. BECKER: Can you read back
10  the question.
11     (The reporter read the record as requested.)
12          THE WITNESS: I was -- Cam
13  Financial and I were visiting various insurance
14  companies together, depending upon who had the
15  contact. It was often that I had the knowledge.
16  It was known that I had the knowledge of the
17  secondary market and that I had the knowledge of
18  the processes and functions at Fannie Mae and was
19  familiar with the process that one goes through in
20  order to do securitization at Fannie Mae.
21  Therefore, it was important to Fam -- to Cam in
22  many instances that I be present at meetings where

Page 219

1  they were trying to convince insurers or reinsurers
2  to participate in this particular type of insurance
3  program. And likewise, if -- if there was
4  something that I needed on the insurance side,
5  the -- one of the consultants that we worked with
6  on the -- in -- on the captive insurance was a
7  personal friend of Cam Financial, so we started
8  using Cam Financial in order to access this
9  particular individual. It was prior to the time
10  that we started working with Kate Westover.
11  BY MS. BECKER:
12     Q   Do you remember when your conversation
13  with Bob Jones took place?
14     A   I can't remember the exact dates, but it
15  was 2002/2003. Late into the game, after we
16  were -- late into the game, 2002/2003.
17     Q   How do you recall that?
18     A   Because it didn't -- I didn't know
19  really until that time that -- well, really
20  honestly, 2005/2006, and 2006 I really learned the
21  extent of Cam's relationship with Fannie Mae. And
22  I repeated to Mr. Jones that I was just absolutely

Page 220

1  shocked at the amount of business that they had
2  done with Fannie Mae, at which time he reiterated
3  that, well, you know, Fannie Mae just didn't want
4  to do business with you, didn't want us to do
5  business with you.
6      Q   You said that he reiterated that?
7      A   Mm-hmm.
8      Q   That's Mr. Jones?
9      A   Mr. Jones, yes.
10     Q   And when is the first time that he said
11  that?
12     A   We had the discussions initially when I
13  received the e -- e-mail from Betty Dance in 2001
14  about the DUS proposal. But we had so many other
15  things on the table, of course, I just assumed that
16  that was only about the DUS proposal and that
17  perhaps Fannie Mae still was sincere since it did
18  in fact meet with me and have lunch with me after
19  that time about doing some other business other
20  than the DUS business. Or the -- I mean I -- I
21  forgot the question.
22     (The reporter read the record as requested.)

23  (Pages 217 to 220)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 221

1       THE WITNESS: Right. The first
2  time was right after the receipt of the e-mail from
3  Betty Dance, indicating that Grace Huebscher was
4  going to use Craig Ott rather than me for her
5  aggregation program.
6       MR. DANIELS: Is there a
7  question pending? Where are we?
8       MS. BECKER: No. I'm waiting
9  for an exhibit.
10       MR. DANIELS: Do you need a
11  break to get this together?
12       MS. BECKER: It'll just be a
13  second.
14       MR. DANIELS: Is it something we
15  can come back to? I have never seen anything --
16  huh?
17  BY MS. BECKER:
18    Q   I'd like to turn your attention to your
19  answer to interrogatory number ten.
20       MR. DANIELS: Thank you.
21  BY MS. BECKER:
22    Q   What false and defamatory information

Page 222

1  was communicated to Cam about you?
2    A   I had several conversations with Bob
3  Jones where I was told of negative and defamatory
4  things that were said about me. Did he tell me
5  what they were precisely? No. But we know they
6  were said. He knows they were said. Richard Lawch
7  knows they were said. You have to ask them.
8    Q   Is it fair to say you don't know what
9  was said?
10    A   I know it was false and defamatory.
11    Q   How do you know that?
12    A   Because I was told that it was.
13    Q   Did Mr. Jones use the words "false" and
14  "defamatory"?
15    A   Maybe not the words false and
16  defamatory, but he certainly said unpleasant and
17  terrible things were said about me to Washington
18  Mortgage and, let's see, in one instance I know of
19  specifically, and to Red Mortgage Capital. And
20  there was just a lot of negative things that
21  Richard would say about me to various people, Bob
22  Jones being one of them.

Page 223

1    Q   Do you know what any of these unpleasant
2  or terrible things were?
3    A   That I was stupid, that I didn't know
4  anything about the business. Et cetera.
5    Q   What other statements other than that
6  you were stupid and that you didn't know the
7  business?
8    A   I don't know. I think people sometimes
9  don't like to tell you the specific words, but he
10  told me Fannie Mae said some pretty terrible things
11  about you. I don't think I'd tell Bob Jones, for
12  example, that Richard called him a redneck -- no, I
13  think I did tell him that. But that's, you know,
14  that's the way Richard Lawch is.
15       If you know him as a person he -- he
16  makes cutting and sarcastic and cynical and
17  defamatory and false statements about lots of
18  people. But he particularly says them about people
19  that he doesn't like, like me.
20    Q   Is it accurate that you don't recall the
21  dates of these conversations?
22    A   I don't recall the dates, no.

Page 224

1    Q   Turning your attention to interrogatory
2  number 11, do you know when the co-brokerage
3  agreement with Cam that you allege existed expired?
4    A   No, I really don't know. I don't recall
5  when it expired. I'm not sure if it had a term in
6  here. Let's see. Does this say?
7       This doesn't say so I don't know.
8       Well, it certainly had to expire when I
9  was no longer a broker. I haven't been a broker
10  for two years. I don't believe it's -- I think
11  it's been two years now.
12    Q   Turning your attention to interrogatory
13  number 13. Can you explain to me how you calculate
14  your damages in this case?
15    A   The losses were calculated based upon
16  the amount of potential business that Fannie Mae
17  did using structures developed by me. Generally
18  speaking, the fees ranged about 25 basis points
19  annually for the insurance. In some instances the
20  fees were as high as 56 basis points. And the
21  broker's fee is approximately 10 percent of the
22  premium fee.

24 (Pages 221 to 224)

Marialice Williams

Page 225

1       Annual reports from Fannie Mae reflect
2   about $2 billion of MBS, one-off transactions which
3   were closed andually -- an -- annually,
4   substantially more MBS were issued with the DUS
5   portfolio. I would have no way of knowing exactly
6   what the credit enhancement arrangements were for
7   all those transactions and the extent to which the
8   insurance was used, but Fannie Mae would know all
9   of that including how much was closed under the
10  aggregation program, how much was closed under the
11  one-off transaction specifically. Only Fannie Mae
12  would be able to answer that.
13      However, in looking at the documents
14  that were filed in the court in Mississippi, it was
15  pretty apparent that several hundred million
16  dollars, more than a billion, actually, I think, of
17  business was done with using some form of the
18  insurance concept, all of which were knockoffs of
19  the concept that I developed, and all of the
20  relationships were those which I brought to Fannie
21  Mae with Bob under signed confidentiality
22  agreements. So it would be fairly simple I guess

Page 226

1   for Fannie Mae to track that.
2       But the only tracking I could do was
3   through, as I said, looking at their annual reports
4   to see how much they did, and then looking at Bob
5   Jones's account when he was assessing his
6   calculations for damages in his case. And that
7   information you have as well.
8       Q   Based on the calculations that you have
9   done, using the annual reports and information
10  relating to Bob Jones, how do you calculate your
11  damages in this case?
12      A   Ten percent of the premium fee that was
13  charged for the insurance would be what the insurer
14  would receive minus -- oh, no, 10 percent was the
15  premium. So if I was entitled to 50 percent of
16  that, then we're looking at, let's see -- I can
17  tell you real fast what that would be. It would
18  be -- well, I can only tell you what it would be on
19  the 2 billion -- 112, 1.2, 12, 11.2. It would be
20  5.1 million in actual fees that would be derived
21  from that particular package.
22      I believe that's what it would be for

Page 227

1   me, which would be 50 percent of the 10 percent of
2   the actual fee charged. And then I don't have any
3   idea how much the aggregation program did, and I
4   don't know if that's the extent of it. As I said,
5   here again, because I don't know how much the DUS
6   portfolio was credit enhanced with any kind of
7   insurance project -- product. So --
8       Q   So is the 5.1 million that you're
9   alleging, does that have anything to do with DUS
10  deals?
11      A   No, I don't know how much the DUS deals
12  were. This was only one small part that was
13  recorded, said 2 billion -- annual reports from
14  Fannie Mae reflect that 2 billion -- that's just
15  for one year. So let's see, '98, '99, '2000, '1,
16  '2, '3, '4, '5. When did I file in '5? So that's
17  seven times five, that's 35 million right there
18  without me knowing the balance of what else
19  would've been there.
20      Q   And that amount that you're identifying
21  is unrelated to DUS deals; is that correct?
22      A   Right. I didn't leave there just to do

Page 228

1   DUS deals. I left there to do MCRI. MCRI could've
2   been used on the equity program, could've been used
3   on aggregation, affordable housing, DUS, the
4   standard one-off negotiated transactions, the DUS
5   securitization transactions as well. I don't -- I
6   don't know how much they did on that.
7       I can only tell you based on what was in
8   this particular thing and what's in Bob's notes
9   that we're talking about at least 35 million for
10  those few years.
11      Q   Have you calculated any damages relating
12  to DUS deals?
13      A   I don't know that any DUS deals were
14  done, but we know what the fees would've been, yes.
15  And the only reason Fan -- and Fannie Mae didn't do
16  the DUS deals because she didn't feel like it, not
17  that it wasn't needed in the marketplace and
18  wouldn't have opened it up to other people. She
19  just decided whether or not -- I don't know whether
20  she decided to do it or not. It had to do with
21  accounting for its own customers, but, you know,
22  Fannie Mae does what it wants to do. And she

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 229

1  wouldn't even permit as -- and as long as I knew,
2  she wouldn't even permit her own people to use it.
3  So I don't know who that was hurting except the
4  American public.
5          Remember, the proposal for the meeting,
6  the captive concept, that was not necessarily to be
7  used for dusk -- DUS people.  That was to be used
8  in their standard program, securitization program,
9  and then negotiated transactions program.  Or
10  one-off deals is what they called them.
11     Q   I'd like to turn your attention to your
12  answer to interrogatory number 14.  You've
13  identified certain expenses in response to this
14  interrogatory.  Can you tell me how you calculate
15  rent at $1,450 a month?
16     A   That's what my lease was.
17     Q   This was your lease at the Watergate?
18     A   Watergate.
19     Q   Was that the lease on your personal
20  apartment or on your business --
21     A   No, I had an office.  It had three
22  offices.  It had an office for someone who came in

Page 230

1  occasionally and did secretarial work.  It had an
2  office for first Rob Robinson and then Harvey
3  Hartsfield.  And then I had my own office and then
4  the outer office was a conference area.  And it was
5  a unit number 701 in the Watergate office building
6  itself.
7          My apartment was in the south building
8  at the Watergate.  And although I did use a portion
9  of my apartment for my -- for office, I did not --
10  I worked every day in my office in the Watergate
11  office building.
12          And that does not include what I had to
13  pay in order to make the office suitable for use.
14  I had it reconfigured slightly, to the tune of
15  quite a few thousand dollars.  And it also doesn't
16  reflect that, you know, I had to live during that
17  period, and I basically lived off of my money that
18  I got from Fannie Mae at retirement and a $200,000
19  loan I took out on my apartment with Bank of
20  America that had to be paid off when I did my
21  apartment -- you know, when I left my apartment.  I
22  mean when I paid off my -- sold my apartment.  So I

Page 231

1  mean I had extraordinary expenses, living expenses.
2     Q   Do you have any documents reflecting the
3  rent that you paid to the Watergate on the business
4  offices?
5     A   Yes, it's on my tax return.  And I have
6  a lease.
7     Q   Did you produce that lease?
8     A   I don't know whether I did or not.  I
9  don't know if I could find it.  I don't think it
10  would be too difficult to find it or to have an
11  affidavit done by Gigi Winston and her father who
12  rented the -- found the space for me and rented it
13  to me and all the people that came to visit me
14  there.  I don't think it was any secret that I
15  actually rented the apartment, so I don't think
16  there would be any problem getting documentation to
17  prove that I actually had a space there.  And the
18  fact that Harvey Hartsfield and Rob Robinson worked
19  there on a daily basis, so.
20          And Bob Johns -- Jones came to visit
21  there, and people from Fannie Mae came to visit
22  there, Washington Mortgage came there, Red Mortgage

Page 232

1  Capital came there, Chris Tawa came there.  I mean
2  it's -- you know, obviously I was there.
3     Q   Was that office the headquarters for
4  RMS?
5     A   It was the headquarters for Marialice
6  Williams & Associates; it was the headquarters for
7  RMS, LLC and the headquarters for RMS without the
8  LLC.
9     Q   How did you calculate phone and office
10  equipment at $1,000 a month?
11     A   That's what it cost.  I just went to the
12  bills.  I had three telephone lines since there
13  were three people in the office.  I had fax
14  machines, copiers; I had everything that you would
15  have in a typical office.  And the -- and the
16  commercial phone lines and -- and the cell phones'
17  cost, I'm sure that's not even -- that's probably a
18  gross understatement of what it cost.
19     Q   Do you still have those bills?
20     A   No, but I have a tax return and the
21  backup documentation, yes.  I think one year I had
22  $140,000 -- she has my tax re -- you have my tax

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 233

1 returns, just look at them and you can see how much
2 it cost me.
3    Q    My question is do you have the bills
4 that reflect --
5    A    Of course I have them.  I had to prepare
6 my tax returns; therefore, I have all my backup
7 documentation and it's all on my tax returns.
8    Q    So you do have those bills?
9    A    Yes.
10    Q    How did you calculate 15,000 -- I'm
11 sorry, 1500 a month in travel costs?
12    A    By the expenses that I used to travel
13 to -- I mean the same way you have phone and
14 office -- yes, I have those receipts as well.
15    Q    Did you have expense reports that you
16 prepared for these trips or did you simply keep
17 receipts somewhere?
18    A    I just kept receipts.  I was just an
19 individual.
20    Q    And where did you keep these receipts?
21    A    Oh, Jesus.  In a file.
22    Q    Do you still have that file?

Page 234

1    A    Yes, I did my tax returns and I have my
2 backup documentation.
3    Q    When did these travel expenses start?
4    A    The day I left Fannie Mae.
5    Q    And they were consistently 1500 a month
6 every month?
7    A    That was an average.  In a -- in a
8 typical month, I would go to New York two or three
9 times to meet with Marsh Mac.  I would go to
10 Dallas, Texas to meet with Lend Lease.  I would go
11 to California to meet with Countrywide Mortgage.
12 These were not inexpensive travel trips at all.
13    Q    Did you calculate this based on an
14 average or did you look at the actual receipts and
15 add them up?
16    A    I prepared my tax returns from actual
17 receipts.  When this question was responded to, I'm
18 certain I gave an average number.  I could have
19 given an exact number on all of these things.  And
20 I believe you will see the exact numbers on my tax
21 returns that are backed up by large manila
22 envelopes filled with receipts.

Page 235

1    Q    How long did you have an office
2 assistant?
3    A    That's really not quite accurate in
4 terms of "office assistant."  It's really a person
5 who was working as a consultant, doing a lot of the
6 marketing work and so forth with me; and I had them
7 from the day I started until the day I left the
8 Watergate and even really beyond that time, I
9 believe.
10    Q    Who is this individual?
11    A    There were two different individuals;
12 one is Rob Robinson, Robert Robinson, was the first
13 person.  I paid him two grand a month.  And the
14 second person was Harvey Hartsfield, who was paid
15 $3,000 a month.  We went on all of our -- we went
16 on all of our business calls together and business
17 trips, conferences.
18        MR. DANIELS:  Marialice, do you
19 have to put more quarters in the --
20        THE WITNESS:  Yeah, in about 20
21 minutes.
22 BY MS. BECKER:

Page 236

1    Q    What was the time frame in which
2 Mr. Robinson worked for you?
3    A    From -- I believe it was from 1998 until
4 19 -- until 2000, I think, almost 2000.
5    Q    What was the time frame during which --
6    A    The balance of the time from about 1999
7 or 2000 through till 2002, '3, something like that,
8 because he was still working with me when I moved
9 out of the Watergate and moved to 5722 First
10 Street.
11    Q    Just so that the record is clear, we're
12 talking about Harvey Hartsfield here?
13    A    Correct.
14    Q    And what were the dates he was employed
15 with you?
16    A    I don't recall the exact dates.
17    Q    What's your best estimate?
18    A    He started when Rob Robinson stopped and
19 then he stopped in 2003, I believe it was.  And
20 we're still working together.
21    Q    When did you stop paying him 3,000 a
22 month?

27 (Pages 233 to 236)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 237

1    A   I don't recall.
2    Q   Do you have any records that would
3  indicate that?
4    A   I'm sure that the exact amount would be
5  on my tax returns and that's how we could estimate
6  when it would've been.  Mr. Hartsfield and I are
7  still working together.  I do not pay him myself;
8  we're paid out of other funds from a contractor.
9          MS. BECKER:  Do you want to take
10  a short break so you can go put money in the meter?
11         THE WITNESS:  Mm-hmm.
12         MS. BECKER:  Okay.
13         VIDEOGRAPHER:  Off the record at
14  2:22:54.
15    (Thereupon, a recess was taken.)
16         VIDEOGRAPHER:  On the record at
17  2:40.
18  BY MS. BECKER:
19    Q   Ms. Williams, directing your attention
20  to your response to interrogatory number 15, who is
21  Conway Downing?
22    A   Conway Downing is -- has been the sort

Page 238

1  of law -- law clerk for this transaction with us,
2  works with Mr. Daniels and Mr. Lederer.  And he --
3  I was married to him -- I'm marr -- still married
4  to him, although we've been separated for some
5  time, but we still have a number of business
6  transactions together.  And he worked in the office
7  at the Watergate, one of the three offices, over
8  the time that we were trying to do this business
9  with Fannie Mae.
10         And as recently as two weeks ago on
11  Friday, I think I mentioned it to you in the last
12  part of the deposition, we have -- he's still
13  arranging meetings with people to talk about
14  potential business, with Fannie Mae, using a con --
15  a -- another concept that's not mentioned in this
16  document.
17    Q   Is he a licensed attorney?
18    A   In the state of Virginia.
19    Q   Does he represent you in connection with
20  this litigation?
21    A   No, doesn't represent me.  He's serving
22  as a clerk.  He's the person that went to

Page 239

1  Mississippi and got the records and does certain
2  legal research at Mr. Daniels' and Mr. Lederer's
3  direction.
4    Q   Has he ever represented you?
5    A   No.
6    Q   Who else represents you in this
7  litigation -- or who does represent you in this
8  litigation?
9    A   Michael Beasley, Brian Lederer, and
10  Harley Daniels.
11    Q   Did you also have a personal
12  relationship with Mr. Daniels?
13    A   I was married to Mr. Daniels from 1980
14  to 1990.
15    Q   So you were married to Mr. Daniels when
16  you were working at Fannie Mae; is that correct?
17    A   Yes, for part of the time, yes.
18    Q   Did you ever discuss with Mr. Daniels
19  your working relationship with Richard Lawch?
20    A   Absolutely.
21    Q   What did you tell him about that
22  relationship?

Page 240

1    A   I told him Richard was the worst boss
2  I've ever had and that he was a miserable son of a
3  gun and that he did not like me and treated me
4  poorly and that I would -- that I was being taken
5  advantage of, that I was being treated unfairly,
6  et cetera.
7    Q   Did you tell Mr. Daniels that you
8  believed that Mr. Lawch discriminated against you
9  on basis of your race?
10    A   Yes, I did.
11    Q   Did Mr. Daniels provide you with any
12  advice on how to deal with Fannie Mae?
13    A   No, not at that time.
14    Q   Did he provide you with any advice in
15  connection with your settlement agreement with
16  Fannie Mae?
17    A   I did discuss it with him to some extent
18  but I -- Brian Lederer actually represented me.
19    Q   What was the nature of your discussions
20  with Mr. Daniels regarding your settlement
21  agreement?
22    A   How unfair, how could they do this.  All

28 (Pages 237 to 240)

Marialice Williams

Page 241

1  those years I put in.  All that money I made for
2  them.  How could they treat me like I'm just some
3  piece of crap that's leaving there under pressure.
4  I can't believe they're only paying me this and I
5  made them all that money.
6          Let's see, what else did I discuss with
7  him?  Just general matters that -- that we
8  discussed -- that I discussed earlier.  The
9  unfairness, how awful Richard Lawch was.  How he
10 stepped in the middle of my negotiations and
11 probably caused Tom Nieds to treat me like crap,
12 which he did.  He was really nasty and crappy to
13 me.
14     Q   What was Mr. Daniels' reaction to the
15 situation?
16         MR. DANIELS:  I'm going to
17 object to that.  At that point we were no longer
18 married, and I was speaking to her in the capacity
19 as an attorney and I gave her advice at that time,
20 so I ask her not to answer that question.
21 BY MS. BECKER:
22     Q   What was the date of your divorce?

Page 242

1     A   I don't remember.
2         MR. DANIELS:  August 1993.
3  BY MS. BECKER:
4     Q   When did Mr. Daniels first represent you
5  in a legal capacity?
6     A   In 1987, in Hobbs, New Mexico, in a
7  matter involving an automobile that was defective.
8     Q   When did Mr. Daniels first represent you
9  in connection with Fannie Mae?
10    A   I don't recall the exact date.  But it
11 would have been the same time I met with
12 Mr. Lederer, Mr. Beasley, and Mr. Daniels at the
13 same time.  And I believe it was before the
14 depositions were concluded because they attended
15 the final deposition after the death of Julia
16 Williams, my -- my attorney prior to that time.  So
17 at the last deposition in the Cam Financial matter,
18 where I was deposed, Mr. -- all three of my counsel
19 were present at that time.
20    Q   What was the date of that last
21 deposition?
22    A   I don't remember.

Page 243

1     Q   Does December 16, 2003 sound like the
2  last date that you were deposed in connection with
3  the Cam litigation?
4     A   It could've been.
5     Q   When in relation to that last deposition
6  did Mr. Williams first represent -- I'm sorry, did
7  Mr. Daniels first represent you?
8     A   When in relation to it?
9     Q   Yes.
10    A   He went to that deposition with me.
11    Q   Was that the first time that he
12 represented you in connection with Fannie Mae?
13    A   As far as I know.
14    Q   At the time that you were negotiating
15 your settlement agreement with Fannie Mae, what was
16 Mr. Daniels reaction to the situation?
17    A   I don't know.
18        MR. DANIELS:  Yeah, I'm -- I'm
19 going to ask you not to answer that question.
20        THE WITNESS:  Okay.
21        MR. DANIELS:  It involves legal
22 advice.

Page 244

1          MS. BECKER:  On what basis?
2          MR. DANIELS:  Lawyer-client
3  privilege.
4          MS. BECKER:  The witness has
5  just testified that there was no attorney-client
6  relationship at that time.
7          MR. DANIELS:  1988?
8          MR. LEDERER:  1998 --
9          MR. DANIELS:  '98.  I -- I still
10 invoke client -- attorney-client relationship.
11         THE WITNESS:  You did
12 represent -- yes, right, I did seek his counsel
13 first.  I -- I misspoke.  He did represent me.
14 BY MS. BECKER:
15    Q   When did Mr. Daniels first represent you
16 in connection with Fannie Mae?
17    A   Prior to my departure.  That's right.  I
18 do remember that now.
19         MR. DANIELS:  Mm-hmm.
20 BY MS. BECKER:
21    Q   Are you going to follow Mr. Daniels'
22 instruction and not answer my question?

29 (Pages 241 to 244)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 245

1    A    Right.
2    Q    About Mr. Daniels?
3    A    No, I'm not going to answer the
4    question.
5    Q    If I could just finish my question, then
6    you can answer.  Are you going to follow
7    Mr. Daniels' instruction and not answer the
8    question that I posed to you about Mr. Daniels'
9    reaction to your settlement agreement with Fannie
10   Mae?
11   A    Are you going to -- I'm sorry.  I'm
12   totally lost on the question.
13            MR. DANIELS:  I asked you not to
14   answer the question.  She wants to know whether
15   you're going to follow my advice.
16            THE WITNESS:  I'm not going to
17   answer the question.
18   BY MS. BECKER:
19   Q    If I were to ask you any other questions
20   about your communications with Mr. Daniels relating
21   to Fannie Mae, would you also decline to answer
22   those questions?

Page 246

1    A    Yes, as far as him representing me, yes.
2    He would've been my counsel and I would -- right.
3    That would be privileged.
4    Q    Who's Jane Harrison?
5    A    She is a close associate of Bob Jones,
6    and she was with two or three different DUS lenders
7    while I knew her.
8    Q    When is the last conversation that you
9    had with Ms. Harrison?
10   A    I don't remember.
11   Q    Can you give me a ballpark?
12   A    No.
13   Q    Was it in the last two years?
14   A    Maybe.
15   Q    Was it in the last year?
16   A    I don't think so.
17   Q    Who at the DC Department of Insurance,
18   Securities and Banking has information relevant to
19   this case?
20   A    Tom Hampton is the new commissioner at
21   the department, and he's fully aware of the
22   concepts that we were trying to do.  We met with

Page 247

1    him and his predecessor, Larry Mirel, who's the
2    former commissioner of the DC Department of
3    Insurance, Securities and Banking.  Met with him
4    several times.  They hired Kate Westover as our --
5    our representative to write the actual implementing
6    regulations for the Department of Insurance,
7    Securities and Banking with respect to captive
8    insurance.
9    Q    Other than the individuals on the list
10   that you've identified in response to interrogatory
11   number 15, are there any other individuals who have
12   information relating to your claims?
13   A    I believe those were the persons that
14   we -- that I was able to identify by going through
15   the records that I sent to Fannie Mae in response
16   to their request for interrogatories.  There may
17   have been some others but these were the majority
18   of the ones, I believe, that we sent to you as
19   response to your request for information.
20   Q    Is there anybody else that you can think
21   of who has information relating to your claims?
22   A    Not -- not at this time, I cannot say

Page 248

1    who else would have.
2    Q    When did you file for bankruptcy?
3    A    You know, I can't remember.  I think it
4    was 2001 or 2002.
5            MS. BECKER:  I'm going to ask
6    the court reporter to mark this as Exhibit 14, I
7    believe.
8            MADAM REPORTER:  Thank you.
9            MS. BECKER:  Mm-hmm.
10   (Deposition Exhibit No. 14 - Statement of
11   Financial Affairs from the United States
12   Bankruptcy Court, District of Columbia -  was
13   marked for identification.)
14            THE WITNESS:  Boy, everybody
15   messes up the spelling of my name, don't they?
16   BY MS. BECKER:
17   Q    Do you recognize this document?
18   A    No.
19   Q    I'd like to ask you to turn to the last
20   page of the document.
21   A    Mm-hmm.
22   Q    Do you see where it says "signature of

30 (Pages 245 to 248)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 249

1  debtor"?
2      A    Mm-hmm.
3      Q    Is that your signature?
4      A    It sure is.
5      Q    Did you prepare this document?
6      A    No.
7      Q    Did you review it?
8      A    I think I did.
9      Q    Who prepared it?
10     A    My bankruptcy attorney, Richard Gins.
11     Q    Did your signature indicate under
12  penalty of perjury that you'd read the answers
13  contained in the foregoing statement of financial
14  affairs and any attachments thereto and that
15  they're true and correct?
16     A    I'm sorry, you lost me in your question.
17  It was too long.
18          THE WITNESS:  Could you tell me
19  what her question because I don't know what I'm
20  answering?
21          Do you want to know did I sign this and
22  say that I believe that what's in here is true?

Page 250

1  BY MS. BECKER:
2      Q    Yes.
3      A    Yes, I do.
4      Q    Does this refresh your recollection as
5  to when you filed for bankruptcy?
6      A    No, it doesn't because I don't see it on
7  here.  And there's no date on here either.
8      Q    In Section 1, income from employment or
9  operation of business, it says:  To state the gross
10  amounts received during the two years immediately
11  preceding this calendar year; do you see that?
12     A    Mm-hmm.
13     Q    And here there's information listed for
14  2000, 2001, and 2002.  Do you see that?
15     A    Mm-hmm.
16     Q    So would it be fair to assume that this
17  document was filed in 2002 or 2003?
18     A    Yes, I think it was filed in 2002, which
19  is what I said from the beginning.  It was either
20  to 2001 or 2002.  It appears that it was 2002.
21     Q    I'd like to turn your attention to the
22  last page of this document under Section 18.

Page 251

1      A    Mm-hmm.
2      Q    Do you see where it says "none," and
3  there's a box checked there?
4      A    Mm-hmm.
5      Q    Did you check none in response to the
6  question in Section 18?
7      A    Identify any business listed in response
8  that is a single asset real estate.  Yeah, I -- I
9  didn't have any business that was a single asset
10  real estate.
11     Q    Do you see where it says:  If the debtor
12  is an individual list the names, addresses,
13  taxpayer identification numbers, nature of the
14  businesses, and beginning and ending dates of all
15  businesses in which the debtor was an officer,
16  director, partner, or managing executive of a
17  corporation, partnership, or sole proprietorship?
18     A    If -- I'm sorry, was -- was that the
19  first, second, or third paragraph you read?
20     Q    The first paragraph.
21     A    If the debtor's an individual, mm-hmm.
22  Okay.  Yes, I see that.

Page 252

1      Q    Why didn't you identify RMS?
2      A    I don't know.  I thought I did.
3      Q    Can you explain that?
4      A    This isn't even -- I don't know what
5  copy this is, but this doesn't have everything on
6  here that it should have on here.  So I don't know
7  where you got this, but it doesn't look to me like
8  it's complete or final.  Because my attorney
9  certainly knew that I was -- he certainly knew
10  everything about me, saw my tax returns and
11  everything.
12     Q    You signed this document; correct?
13     A    Mm-hmm.  Yes.
14     Q    Do you agree that indicating "none"
15  under Section 18 is incorrect?
16     A    No, I don't agree because it says:
17  Identify any business listed in response to
18  subdivision A.  And there is no response to
19  subdivision A here, so wherever the response to
20  subdivision A is must be where all that information
21  is located, and it's not on here.
22     Q    You're looking at B; is that correct?

Esquire Deposition Services

D.C. - 1-800-441-3376

MD - 1-800-539-6398

VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 253

1    A   Mm-hmm.
2    Q   Look up under 18A.
3    A   Right.  You know, I don't know.  My
4  attorney prepared this, Richard Gins.  You can ask
5  him why he didn't put it on there.  I'm sure that I
6  looked at it just as I'm looking at it now, saw
7  this B section, said none, and signed it.
8        But again, like I said, it's not dated,
9  and he certainly had knowledge of exactly what I
10  was doing.  So I guess you have to call my
11  bankruptcy attorney and ask him why he didn't put
12  it on there.
13    Q   Do you agree that RMS was a business in
14  which you were an officer, director, partner, or
15  managing executive?
16    A   I was the owner of RMS.
17        MS. BECKER:  I'd like to hand
18  you what I'll ask the court reporter to mark as
19  Exhibit 15.
20        (Deposition Exhibit No. 15 - Notice of
21        Chapter 7 Bankruptcy Case, Meeting of
22        Creditors & Deadlines, United States

Page 254

1        Bankruptcy Court, District of Columbia (DC) -
2        was marked for identification.)
3        THE WITNESS:  Maybe he didn't
4  put it on there because there's no -- I didn't make
5  any money from it.  And had a negative cash flow.
6  I don't know why he didn't put it on there.
7  BY MS. BECKER:
8    Q   Do you recognize this document?
9    A   No.
10    Q   Have you ever seen this document before?
11    A   I don't know.
12        Yes, I've seen this document.
13    Q   What is it?
14    A   It's my petition for bankruptcy.
15    Q   I'd like to turn your attention to
16  Schedule F, which is creditors holding unsecured
17  non-priority claims.
18    A   Mm-hmm.
19    Q   Is this a statement of the outstanding
20  credit card debts that you had at the time that you
21  filed bankruptcy?
22    A   That's what it says.  Un -- creditors

Page 255

1  holding -- you said E?
2    Q   F?
3    A   Yes, it says:  Schedule F, creditors
4  holding unsecured non-priority claims.
5    Q   Did you have an American Express card?
6    A   Yes, I did.
7    Q   Did you use that for personal or for
8  business expenses?
9    A   Business.
10    Q   Did you use it exclusively for business
11  expenses?
12    A   Yes.  Pretty much.
13    Q   Does that mean that you also used it for
14  some personal expenses?
15    A   I -- I don't recall.  This is really a
16  long time ago, and I'm sure that I used my American
17  Express travel largely for travel for business.  I
18  may have used my American Express card for personal
19  but not my travel part of it, no.
20        Oh, also I might have been going to
21  American Bar Association conferences be -- a lot
22  because I was chairman of one of the -- of a

Page 256

1  subcommittee for the ABA at that time, I believe.
2  Or at least active on Affordable Housing Committee.
3  And I was also going to places like Mortgage
4  Bankers Association conferences to meet with Fannie
5  Mae and clients.
6        So a lot of that travel was on -- it --
7  it was mostly business travel.  I didn't have any
8  extra money.  I was spending it all trying to
9  develop this business with Fannie Mae.
10    Q   Your work as ABA conference chairperson,
11  was that related in any way to expenses that you
12  incurred related to Fannie Mae?
13    A   Fannie Mae.  Sure, I talked about Fannie
14  Mae while I was in those conferences and, you know,
15  the potential solutions I had found that -- to
16  problems.  It was affordable housing.  I mean
17  that's the whole thrust of what I've been trying to
18  do with Fannie Mae and everyplace else was
19  affordable housing.  How to get access to the
20  secondary market for individuals who were not
21  middle class or white, and therefore I was always
22  trying to come up with concepts for how to provide

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 257

1  housing for inner city, disabled individuals.
2        I'm still doing that.  Right now I'm
3  working on a project for affordable housing for
4  people recovering from mental illness.  That's --
5  that's what I do.  It's all related.
6        Q   Do you have any documentation that would
7  indicate that your business expenses from American
8  Express travel related to Fannie Mae?
9        A   If they -- if they're on a particular --
10  sure.  If they're -- if it was an expense, it was
11  on an American Express bill.  And if it was on an
12  Express bill and I did -- deducted it from my --
13  used it as an expense, then there would be a record
14  in my tax records, as there is for every year that
15  I prepared my tax returns.  I have all my receipts,
16  pretty much.
17        Q   Are you willing to turn those receipts
18  over in this litigation?
19        A   No.
20        Q   Why not?
21        A   Because it's none of your business.  I
22  mean I have my tax returns, they're signed.  I mean

Page 258

1  if you want to go to the IRS and ask them for the
2  information, I'm sure they might give it to you.
3  They do anything else they want to do.
4        Q   Do you have the information in your
5  possession?
6        A   Yes, I do.
7        Q   Are you refusing to turn it over?
8        A   I'm sorry, is this -- is this okay?
9            MR. DANIELS:  Yeah.
10            THE WITNESS:  Yeah, you know,
11  I -- I prepared my tax returns just the way you do.
12  From receipts, it goes onto a schedule, and it gets
13  filed with the IRS.  That is the way tax returns
14  are prepared.
15        How do you get the receipts?  You have
16  them in a package.  You save them from your trips.
17  You save them from your luncheons.  You save them
18  from whatever you have.  You put them in a package.
19  When it's time to do your taxes, you add up those
20  receipts and you put them into your tax return.
21  And that's how it is done and that is how I do it
22  and that is how I believe most people do their

Page 259

1  taxes.  So I have receipts for what I claimed on my
2  tax returns.
3  BY MS. BECKER:
4        Q   Can you tell me what the business --
5        A   And that doesn't have anything to do
6  with what's on a bankruptcy petition, so I don't
7  understand the relevance of your question.  Because
8  you're asking me about this particular exhibit
9  which has nothing to do with my tax return.
10        Q   I'm asking you about receipts that you
11  have that would back up the notion that --
12        A   The notion?
13        Q   The notion that the American Express
14  travel expenses that you're identifying here were
15  related to Fannie Mae.  Are you willing to turn
16  over those receipts or not?
17        A   No.
18        Q   Your Bank of America card that's listed
19  here, did you use that for business expenses or for
20  personal expenses?
21        A   For both.  I've answered this question.
22  The answer's going to be the same for every credit

Page 260

1  card that's in here.  For many of these credit
2  cards, the reason I had the credit card was to
3  write a check so that I could pay my bills for my
4  office because I wasn't getting any business from
5  Fannie Mae.  So I ran up credit card ch -- writing
6  checks.  I ran up credit card bills with American
7  Express.
8        You see all of these individuals here
9  that are listed, that is largely what I used my
10  money for, was in order to survive to keep myself
11  going, because I was convinced any day I was going
12  to get this in -- this business from Fannie Mae.
13  And as it turned out, I didn't get it soon enough
14  so I had to file bankruptcy.
15        Q   It lists under Bank of America bankcard
16  services, did you use that for business expenses or
17  for personal expenses?
18        A   Both.  If you ask me that question about
19  every single thing in here, I'm going to give you
20  the same answer.  So if you want to waste all of
21  our time asking me, go right ahead and I'll answer
22  it all, but I have to be out of here at 4:00.

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 261

1    Q   For each of these credit cards, is -- is
2  it your testimony that you used them partly for
3  business expenses and partly for personal expenses?
4    A   Yes.
5    Q   Can you tell me how much --
6    A   No.
7    Q   -- you used for business expenses --
8    A   No, I cannot.
9    Q   -- and how much you used for personal
10  expenses?
11    A   No, I cannot.
12       My business expenses are listed on my
13  tax returns and all that information comes from
14  receipts that were provided to my accountant.
15       MS. BECKER:  I'm going to ask
16  the court reporter to mark this is as Exhibit 15 or
17  16?
18       MADAM REPORTER:  Sixteen.
19       MS. BECKER:  Sixteen.
20  (Deposition Exhibit No. 16 - 2001 Form 1040,
21  U.S.Individual Income Tax Return for the
22  witness - was marked for identification.)

Page 262

1  BY MS. BECKER:
2    Q   Is this a copy of your 2001 tax return?
3    A   Yes, it is.
4    Q   When was this filed with the IRS?
5    A   In September of 2006.
6    Q   Why didn't you file before September of
7  2006?
8    A   Becau --
9       MR. DANIELS:  I'm going to
10  direct her not to answer that question.
11       MS. BECKER:  On what grounds?
12       MR. DANIELS:  On the ground that
13  it's not relevant to this lawsuit.
14       MS. BECKER:  Is that the only
15  basis of your objection?
16       MR. DANIELS:  For the moment,
17  yes.
18  BY MS. BECKER:
19    Q   If you turn to Page 2 of this tax
20  return, you'll see where there's a place for your
21  signature.  Is this tax return signed?
22    A   Yes, it was signed when it was filed.

Page 263

1    Q   Yeah.
2    A   This is a copy.  I did not keep copies
3  of the ones that were signed.  But these were in my
4  computer.  My accountant sent them to me in the
5  computer.  When I printed them out, Mr. Dan --
6  Mr. Down -- Downing and I signed them and sent them
7  in.  I did not make a copy of the -- of the return
8  with the signatures.
9    Q   Is this the original tax return that you
10  filed for the year 2001 or is this an amended tax
11  return?
12    A   This is the only tax return I have filed
13  for 2001.
14    Q   And when was this tax return prepared?
15    A   In 2004.
16    Q   Why wasn't the tax return filed at the
17  time that it was prepared?
18       THE WITNESS:  Do I answer this?
19       MR. DANIELS:  No, I'm going to
20  direct you not to answer that.  Not relevant to
21  this lawsuit.
22       MS. BECKER:  Is there any other

Page 264

1  basis --
2       MR. DANIELS:  Can we have a
3  proffer as to what you intend to prove by this?
4       MS. BECKER:  Is there any other
5  basis for your objection?
6       MR. DANIELS:  Do you have a
7  proffer?
8       MS. BECKER:  Is there any other
9  basis for your objection?
10       MR. LEDERER:  Yeah, it's
11  intrusive, it's immaterial.
12       MR. DANIELS:  And it's
13  irrelevant.
14       MR. LEDERER:  It's irrelevant.
15  If fact, if you want to --
16       MR. DANIELS:  That's okay.
17       MS. BECKER:  Is there any other
18  basis for your objection?
19       MR. DANIELS:  No, ma'am.
20       MR. LEDERER:  At the moment.
21  BY MS. BECKER:
22    Q   Are you going to decline to answer the

34 (Pages 261 to 264)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 265

1  question?
2      A   I am going to follow my attorney's
3  advice.
4          MR. DANIELS:  I direct you to
5  not answer that question.
6          MR. LEDERER:  You asked for a
7  proffer.
8          MR. DANIELS:  Are you going to
9  give me your proffer, or you decline to give me
10 your --
11         MS. BECKER:  I believe that her
12 tax returns are directly relevant to her statement
13 of damages in this case and directly relevant to
14 the proof --
15         MR. DANIELS:  But she's given
16 you those tax returns.
17         MS. BECKER:  -- that she would
18 offer relating to those -- those damages.  I'm
19 entitled --
20         MR. DANIELS:  When it was filed
21 has nothing to do with her damages.
22         MS. BECKER:  It -- it also goes

Page 266

1  to -- to her credibility in this case.
2          THE WITNESS:  My credibility?
3  This is my tax return.
4          MR. LEDERER:  Can you make a
5  proffer on that -- how that goes to her
6  credibility?
7          MR. DANIELS:  Yes.
8          MS. BECKER:  I don't know what
9  her testimony would be so I can't tell you what the
10 testimony would be.  But --
11         MR. LEDERER:  Yeah, but what
12 makes you think inquiring into how she filed her
13 tax returns, when she filed her tax returns, why
14 she filed them then instead of later has anything
15 to do with her credibility?  These are financial
16 figures going to damages.  They are signed, filed
17 returns.
18         So we're just asking for your proffer,
19 other than an inquiry into her financial affairs.
20         MR. DANIELS:  We've -- we've got
21 a record on it.  Let's go on.
22         MR. LEDERER:  Yeah.

Page 267

1          MS. BECKER:  Do you have any
2  other basis for your objection?
3          MR. DANIELS:  Do you have any
4  more to proffer?
5          MS. BECKER:  I don't know what
6  her testimony would be so I can't tell you what it
7  be --
8          MR. DANIELS:  I don't know what
9  you're looking for so I have to say from my point
10 of view it looks irrelevant, immaterial,
11 oppressive, and none of your business for the
12 purposes of this lawsuit.
13         MS. BECKER:  Again, I believe it
14 goes to her damages and to her credibility.
15         MR. DANIELS:  Okay.
16 BY MS. BECKER:
17     Q   I would like to direct your attention to
18 page --
19     A   Well, you can pay me what it says on
20 here is my losses for each one of those years
21 and --
22     Q   I'd like to turn --

Page 268

1      A   -- and then we won't have any more
2  discussion.  'Cause it's only because of Fannie Mae
3  that I had those losses, so they can pay me those
4  losses there and I will forfeit the 35 million they
5  owe me.
6      Q   You have backup documentation,
7  Ms. Williams, is that correct, relating to your
8  2001 tax return?
9      A   Of course I do.
10     Q   And you're not -- not willing to produce
11 those; is that correct?
12     A   No, I'm not.
13     Q   Okay.  Looking to Page 4 of your tax
14 return, you identify under expenses in line 17
15 legal and professional services in the amount of
16 $36,000.  Do you see that?
17     A   Yes, I do see it and I showed you where
18 it came from.  I showed you that I paid someone
19 $2,000 a year and someone 3,000.  Twelve times
20 three is 36.
21         MR. DANIELS:  A month.  A month.
22 You said a year.

35 (Pages 265 to 268)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 269

1          THE WITNESS:  Huh?
2          MR. DANIELS:  You said a year.
3    You meant a month.
4          THE WITNESS:  A year.  $36,000 I
5    paid.
6          MR. DANIELS:  But you said
7    2,000.
8          THE WITNESS:  Two thousand
9    versus 3,000 per -- month, right, which totals then
10   the 36,000.  That's completely consistent with what
11   I put in my thing there.
12   BY MS. BECKER:
13      Q   Who did you pay for legal and
14   professional services?
15      A   I paid Harvey Hartsfield.  In this
16   particular year.
17      Q   What was the nature of his legal and
18   professional services?
19      A   Professional services.  For that he was
20   a marketing consultant; he was also an insurance
21   broker.  We jointly went out to look at projects
22   together.  He did a great deal of research, a great

Page 270

1    deal of marketing stuff.  He was constantly in
2    contact because he was -- had been in the insurance
3    business longer than I had.  He was constantly in
4    contact with the various sources we were trying to
5    use, like Swiss Re, Aon, White Mountain, Risk
6    Mountains, Goldman Sachs, Bear Stearns.  You name
7    it.  Forbes, Alexander Forbes in Europe.  He was
8    constantly in touch with these people in order to
9    come up with the -- the type of insurance that we
10   would need for whatever execution might be
11   necessary.
12        We did presentations to Fannie Mae, we
13   did presentations to everybody you can think of.
14   In this business.
15      Q   You identify $10,000 in travel meals and
16   entertainment expenses.  Do you see that?
17      A   That would be consistent with the 1500
18   that I talked about per month on an average in my
19   response in the interrogatory that you referred me
20   to earlier.  And as you can see that's even less
21   than what I believe the actual amount might have
22   been.  It was probably more than that.  But we were

Page 271

1    going from receipts and that's largely where it
2    came from.  Some receipts perhaps weren't there.
3          There's nothing inconsistent with my tax
4    return, my bankruptcy petition, and my statements
5    in my interrogatories.  It is 100 percent
6    consistent.
7      Q   Did you add up the amount of your
8    travel, meal, and entertainment expenses based on
9    the receipts that you had from the year 2001?
10     A   I didn't add them up.  The -- someone
11   who worked for my accountant added them up.
12     Q   Did you review those receipts yourself?
13     A   No, I put them in the file.  She re --
14   she added them up.  You're not required to
15   independently add up your own receipts as far as I
16   know.  I thought it was the job of the accountant
17   and their bookkeeper.  I thought they were better
18   at adding than I was.
19     Q   Do you have any basis to say whether you
20   actually incurred $10,000 in travel, meals, and
21   entertainment expenses?
22     A   I probably incurred more than that.  And

Page 272

1    some of it may not even be recorded.
2      Q   Do you have any basis to say that you
3    definitely incurred $10,000 in travel, meal, and
4    entertainment --
5      A   I have receipts.  I have told you on
6    every single return I have filed, I have backup
7    receipts which my accountant used to add up to come
8    to the decisions about what should be placed on my
9    return.  I do not have one entry on my tax returns
10   that does not have corresponding receipts.
11        I have just spent almost $10,000 trying
12   to get all of my tax returns filed accurately, and
13   I am now --
14        MR. DANIELS:  Marialice, I don't
15   think you need to go on.
16        THE WITNESS:  I'm just so sick
17   of this.
18        MR. DANIELS:  I mean this
19   question's been asked and asked and asked and
20   asked.  I think she gave a generic answer to --
21   to -- to your questions:  Yes, she has receipts.
22   BY MS. BECKER:

36 (Pages 269 to 272)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 273

1    Q   Did you independently review those
2   receipts to verify whether you had incurred $10,000
3   of expenses in meals, travel, and entertainment for
4   the year 2001?
5    A   I don't remember.  I don't remember.
6       I provided the information to my
7   accountant, and my accountant used a calculator and
8   added it up and put it on the return.  I do not
9   recall whether I independently sat down and added
10  up each receipt.  Do you do that?  I don't gen --
11  generally do that on my tax returns.  I rely on a
12  professional person to do it.
13   Q   What's the name of the person who
14  prepared your tax returns?
15   A   It's right here on the return.  Just
16  look at it and see.  It's right here on the return.
17  The DMP Group, LLC, 5600 Colorado Avenue,
18  Northwest.
19   Q   What's the --
20   A   Washington, DC 20011.  Employer ID
21  number 68-049-7011.  I believe her -- her social
22  security number is ███████████ and her telephone

Page 274

1   number is (202)726-2630.
2       MS. BECKER:  Move to strike as
3   non-responsive.
4   BY MS. BECKER:
5    Q   Who's the individual at the DMP Group
6   who prepared this return?
7    A   The DMP Group prepared my return.  I
8   cannot tell you whether it was Schlimb (ph) or
9   Schlomb (ph).  It was the DMP Group who prepared
10  the return.
11   Q   You referred to a she?  Was there a
12  person you were referring to --
13   A   Dana Lucas was the person who was there
14  who did some of the work, and there were other
15  people who worked on it.
16   Q   On Page 5 of your tax return, you
17  identified $12,000 in temporary services.  Do you
18  see that?
19   A   Yes.  Uh-huh.
20   Q   And what is that for?
21   A   Temporary services.
22   Q   Can you explain what that means?

Page 275

1    A   No.  Temporary services.  It's an -- a
2   term of art.  I believe it's defined as people who
3   do work on a temporary basis.
4    Q   Who are the individuals that you
5   retained for temporary services?
6    A   I can't tell you their names right now.
7   I have the receipts.
8    Q   Are you willing to produce those
9   receipts?
10   A   No.
11   Q   Can you give me any more information
12  about what expenses that you're claiming in
13  temporary services on your 2001 tax return?
14   A   They went to individuals who performed
15  temporary services for me, such as administrative
16  typing, filing, and that kind of thing.  I was
17  running a -- a very -- a very serious business and
18  making no money.  I could not hire someone
19  full-time.  I had to hire some different people at
20  different times to perform those services which
21  were necessary to keep me on track so that I could
22  keep my eye on the prize, which I never got.

Page 276

1    Q   Can you explain the $7,200 in telephone
2   expenses and what those were based on?
3    A   What was it based on?  It was based on
4   the usage of my telephones.
5    Q   How many telephones did you have?
6    A   Several.  I don't know.  Maybe seven,
7   maybe five.  They were commercial lines.  Anybody
8   who runs any kind of business, including a law
9   firm, should know that commercial phone costs are
10  higher than residential.  And if you also have
11  services for computers, that gets added in.  If you
12  have a fax machine that gets added in.
13   Q   Were you paying a flat rate?
14   A   Is there an issue here about whether or
15  not I was running a bona fide business, whether or
16  not I was actually at the Watergate?  This seems to
17  be coming up consistently from you.  If -- if you
18  want to know, I have filed a tax return.  That is
19  the evidence that I had the expense.
20      Where did the tax return come from?
21  I've told you over and over again I have receipts.
22  I've told you over and over again that the receipts

37 (Pages 273 to 276)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 277

1  are the basis for this.  Do you think that I just
2  sat around and made some stuff up to put in a tax
3  return because it -- it would satisfy my desire
4  to -- whatever?  I mean I -- I don't understand
5  your questioning and it's dragging on and on, and
6  it is the worst interrogation I've ever had in my
7  life over something that's completely irrelevant.
8      If you can't take my tax return that I
9  filed with the Internal Revenue Service and use it
10  and look at it and say, okay, do you have receipts
11  for this, yes, well, what else do you want me to
12  tell you?  There's nothing else to say.  Here's my
13  tax return.  I have the receipts.  Dana Lucas and
14  the DMP Group prepared the return.  I filed it with
15  the IRS.  Don't you think it's the IRS's job to
16  look into it?
17      Q   Did you have a flat rate with your
18  telephone companies or were you paying based on --
19      A   I don't remember what it was.  That was
20  so long ago.  Do you have a flat rate?  Do you know
21  whether or not in 2001 you had a flat rate on your
22  commercial telephone?  I don't remember.  I'm

Page 278

1  sorry.  But we can certainly call Verizon or
2  whoever it was, and we can get the answer to that
3  for you.
4      Q   Are you willing to provide your receipts
5  relating to your telephone costs?
6      A   No.
7          MS. BECKER:  I'd like to ask the
8  court reporter to mark this as --
9          THE WITNESS:  Are we going to go
10  through this on every return?  I can't do this
11  today.  I'm sorry, I can't give you any more
12  answers.  I've got to go.  You did not tell me I
13  was going to be here for seven hours today.  I was
14  told it was going to be a couple of hours, that you
15  only had a couple hours more to do.  And you're now
16  into five and a half hours.
17      And I work for a living and the reason I
18  have any income at all is because I have to work
19  for a living on an hourly basis.  And I really
20  can't go through this crap.  And if my lawyer tells
21  me I have to sit here and go through the same thing
22  on every one of these returns, I'm going to say

Page 279

1  somebody's crazy or the law is really crazy,
2  because this is outrageous.  There's nothing I'm
3  going to say to you on any one of those returns
4  that's any different from what I've said to you
5  about 2001.  I have my backup.
6      You can see -- I guess what you're upset
7  about is that it really shows that I paid all this
8  stuff and that you all didn't pay me and therefore
9  I went bankrupt.  And nearly lost my mind.  All
10  because of lying and cheating and backstabbing and
11  everything else that Fannie Mae does to cover
12  itself up.  So if you want to go through all that,
13  that's fine, and I'll go through it if my attorney
14  tells me I have to.  But I think you're wasting
15  everybody's money and time.
16      I'm not going to give you any different
17  answer on any question you give me on my tax
18  returns, other than the ones you've just gotten.
19  Now I'm sorry that I gave you my tax returns.
20  Because obviously you don't even know what to do
21  with them.
22          MS. BECKER:  Have you marked

Page 280

1  this as exhibit --
2          MADAM REPORTER:  Haven't seen
3  it --
4          THE WITNESS:  Do I have to sit
5  here and do this with every one of these tax
6  returns?
7          MR. DANIELS:  You have to bear
8  under the way she does things.
9          THE WITNESS:  Well, she can't
10  cause me to lose my -- my livelihood.  She's --
11  that's not fair.  I mean they didn't give me --
12          MR. DANIELS:  Four -- 4:00 --
13          THE WITNESS:  -- a livelihood to
14  begin with and now they want to take away the one I
15  have.
16          MR. DANIELS:  Well, what I would
17  propose is that we go until four and reconvene.
18          THE WITNESS:  I can't go until
19  four.  I have to go 'til ten minutes of four.
20          MR. DANIELS:  Ten minutes of
21  four and then we reconvene to finish what they want
22  to do and for our redirect.  'Cause there's no way

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 281

1  I'm going to finish my redirect, giving where we
2  are right now.
3          MADAM REPORTER:  I don't have
4  that --
5          MS. BECKER:  I'd like to ask the
6  court reporter to mark this as Exhibit 17.
7          THE WITNESS:  I would never hire
8  this law firm.  All this wasting time --
9          (Deposition Exhibit No. 17 - 2002 Form 1040,
10         U.S.Individual Income Tax Return for the
11         witness - was marked for identification.)
12         MR. DANIELS:  Let me ask -- I
13  mean I -- are we going to have -- can we proceed to
14  quarter to four -- ten to four and reset it for
15  another date to finish this and to do my redirect?
16         MS. BECKER:  I'd like to finish
17  today if we can.
18         THE WITNESS:  I cannot stay
19  here.
20         MR. DANIELS:  We can -- she says
21  she can't.  And I -- I'm going to need time for
22  my --

Page 282

1          THE WITNESS:  You told me two
2  hours and it's not fair for you to keep me five and
3  a half.  So if you can't be honest about what
4  you're doing, then I don't see why I have to be
5  responsive to you.  I think you need to accommodate
6  me.  You have a job.
7          MR. DANIELS:  Marialice --
8          THE WITNESS:  I don't have a
9  job.
10 BY MS. BECKER:
11     Q   Are you looking at your 2002 tax return?
12     A   I don't have it.
13     Q   When was this document prepared?
14     A   I don't know.
15     Q   Was it prepared in 2003?
16     A   I don't know.
17     Q   Who prepared this document?
18     A   The DMP Group.  Dana Lucas, I imagine.
19     Q   When did you provide --
20     A   All of my tax returns were prepared by
21  the same individual for the years 2000, 2001, 2002,
22  and 2003.  2004 and 2005 were prepared -- were

Page 283

1  amended returns that were prepared by this same
2  individual but they were amended.  So -- that's the
3  same question.  You're going to ask me the same
4  question.  Go ahead.  How do you know these are
5  your receipts, how do you know you had this?
6  Because I had the receipts.
7      Q   When did you provide information to the
8  DPM Group in connection with your 2002 tax return?
9      A   In 2003.  Or '4.  Or maybe it was '5.
10  I'm not sure.
11     Q   When was this filed with the IRS?
12     A   Same time I told you I filed them.  I've
13  already answered that question, 2000 -- zero, 2001,
14  2002, '3, '4, and '5 were filed in September of
15  2005 -- '6.
16         MR. DANIELS:  Six.
17 BY MS. BECKER:
18     Q   You've not provided us with any tax
19  returns for 2004; is that correct?
20     A   I explained that to you when I gave you
21  the returns.  I said the 2004 is being reviewed and
22  will be finalized by the end of this week. I gave

Page 284

1  you the original of 2005 which will be filed
2  tomorrow.  2000 is being reworked because there's
3  some questions about whether or not my spouse filed
4  an independent return in that year; therefore,
5  another return may have to be prepared.
6          MR. DANIELS:  Did you get back
7  your originals, Marialice?
8          THE WITNESS:  Yes, she gave me
9  back the original.
10 BY MS. BECKER:
11     Q   Do you have an original return that you
12  filed for 2004?
13     A   I just told you that 2004 is being
14  reviewed and reworked and will be filed before the
15  end of the week, and I will send you a copy.  2005
16  is in its original form, which I gave you this
17  morning, which has been returned to me.  2003, '2,
18  and '1 you have been given copies of.
19         And 2000 -- listen carefully because
20  you're going to ask me again -- 2000 is not -- has
21  been filed and will be amended because there's some
22  question as to whether or not my husband filed a

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 285

1  separate return in that year.
2        MR. DANIELS:  In the
3  communication concerning these tax returns we said
4  we wouldn't have all the tax returns today, that we
5  would provide the rest of them as soon as they're
6  available and give you an opportunity to ex --
7  examine her on them in this deposition.  On Friday
8  that was communication.
9  BY MS. BECKER:
10    Q    Have you already filed the tax return
11  for 2004?
12    A    No -- yes.  And I just told you it is
13  being reworked and amended.  Did you understand
14  that?
15    Q    Are you willing to provide the original
16  2004 return that you filed?
17    A    No.
18    Q    Why not?
19    A    Because it's incorrect and I needed to
20  amend it; that's why I had to go pay another $5,000
21  to another accountant.
22    Q    What's incorrect about it?

Page 286

1    A    I don't know.  It's incorrect.  I'm not
2  an accountant.  My name is not CPA, it's JD.
3    Q    Is your testimony that you don't know
4  what's incorrect --
5    A    I don't know what's incorrect on the
6  return.
7    Q    -- on your 2004 tax return?
8    A    No, I don't know what's incorrect on the
9  aturn [sic].  I had to hire a second -- a -- a CPA
10  to fix the first one.  If I knew, I would've done
11  it myself.
12    Q    Did you know what's incorrect about your
13  2000 tax return?
14    A    I just told you that it appears that my
15  husband filed separately.
16        Don't you listen?  I am so tired of
17  repeating this over and over again.  You are so
18  irritating.  Want to ask me again?
19    Q    Yes.  I'd -- I'd like to know --
20    A    You can ask me as many times as you
21  like.
22        MR. DANIELS:  All right.  It's

Page 287

1  been asked and answered.  Please, Evelyn, please.
2        MS. BECKER:  What -- what is it
3  about -- what is it about the -- that was --
4        MR. DANIELS:  I mean she's --
5  she's -- she's explained it three times to you
6  already, four times.
7        MS. BECKER:  What is it about --
8        THE WITNESS:  Because my
9  attorney said, give them the tax returns.  I gave
10  them to you, told you why you didn't have the ones
11  you didn't have, then I come in here, you want to
12  ask me every detail again.
13        I've told you four times why you have
14  exactly what you do and what you don't have.  I've
15  explained to you when you're going to have them.
16  But you keep asking me the same thing over and over
17  again.  And I can't answer it any other way.
18        I mean what's more important?  I could
19  give you some questions to ask me about the tax
20  returns, like, gee, you had $170,000 loss in 2002.
21  I bet that was because Fannie Mae didn't give you
22  any business and you had to spend your entire

Page 288

1  retirement in that little pissy package they gave
2  you to stay alive and do this business until Fannie
3  Mae did some with you, which they ultimately never
4  did, and therefore you had to find another means of
5  making a living.  If you want to ask me that, I can
6  answer those questions.  But you're going through
7  nonsense.
8        I mean the return is here.  I told you
9  it was filed and signed and that this is a copy
10  that I printed off of my computer this morning.  I
11  did not save a copy of the signed return.  Now, if
12  you want me to get a verification from IRS that
13  this is in fact a correct return, that's fine, but
14  it's all clear as a bell to me.  And if I tell you
15  that I have backup documentation for each one of
16  these numbers, what is the issue?  Other than
17  harassment.
18  BY MS. BECKER:
19    Q    I'm asking about your 2000 tax return.
20    A    And I told you --
21        MR. DANIELS:  What's your
22  question, Evelyn, on the 2000 tax return?

40 (Pages 285 to 288)

Marialice Williams

Page 289

1  BY MS. BECKER:
2      Q   My question is:  What is it about the
3  2000 tax return as it was filed that's inaccurate?
4      A   I --
5          MR. DANIELS:  Marialice, I
6  direct you not to answer the question.
7          THE WITNESS:  Okay.
8          MR. DANIELS:  You've answered it
9  four -- four or five times already.  And Evelyn can
10 look at the --
11         THE WITNESS:  Records and see.
12         MR. DANIELS:  -- transcript and
13 see what the answer is.
14         MS. BECKER:  What's the basis
15 for your instruction?
16         MR. DANIELS:  Asked and
17 answered.  The same exact question.  The same exact
18 question.
19         MS. BECKER:  That's not a
20 legitimate basis for an instruction not to answer.
21 If you want to follow --
22         MR. DANIELS:  Well, I mean if --

Page 290

1  if you were -- you were asking probing questions
2  which -- which went to -- to question her
3  response --
4          THE WITNESS:  Well, let's just
5  tell her one more time because --
6          MR. DANIELS:  Well, go ahead and
7  answer --
8          THE WITNESS:  -- obviously she
9  has an issue with her hearing.
10         MR. DANIELS:  Okay.  Ask her one
11 more time.
12         THE WITNESS:  And her memory.
13 Because she can't even remember what questions she
14 asks me.
15         MR. DANIELS:  Go ahead.
16 Tell her -- tell her the answer.
17         THE WITNESS:  My 2000 return is
18 not filed because I filed it originally with -- as
19 a joint tax return with my husband.  As I've told
20 you five times now, it appears he may have filed
21 his own return individually for that year.  As a
22 result, I think I have to file a different return.

Page 291

1          Now, you want me to say it again?
2  BY MS. BECKER:
3      Q   Directing your attention to your 2002
4  tax return and looking specifically at Page 2 of
5  this return, you did sign a copy of this return at
6  some time; is that correct?
7      A   As I've stated previously, I signed all
8  of these returns when I filed them.
9      Q   What's the date on which you signed this
10 return?
11     A   I don't recall.
12     Q   Turning your attention to page --
13     A   As I also told you, they were all filed
14 in September of 2006.  I have said that four times
15 also.
16     Q   Is that when you would've signed them?
17         MR. DANIELS:  Just answer yes
18 or no.
19         THE WITNESS:  I -- yes.
20         MR. DANIELS:  Good.
21         THE WITNESS:  God.
22 BY MS. BECKER:

Page 292

1      Q   Turning your attention to Page 4 of this
2  return.  You're identifying your business as Risk
3  Mitigation Strategist, LLC; is that correct?
4      A   That is on there.  That may or may not
5  be correct.
6      Q   What may be incorrect about it?
7      A   The LLC may be incorrect for 2002.  I
8  would have to go back and check.
9      Q   Can you explain why you identified your
10 business or profession as legal consultant?
11     A   That's actually -- it should be legal,
12 comma, consultant.
13     Q   You indicate in part one of this return
14 $13,272 in income.  Do you see that?
15     A   Yes.
16     Q   Where does that $13,272 in income come
17 from?
18     A   I don't know because I'm not looking at
19 the backup information.
20     Q   Do you know whether you received income
21 in 2002 from any source?
22     A   I know what's listed on my tax retet --

41 (Pages 289 to 292)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 293

1  return is a reflection of what is in my records.
2      Q   Can you give me any -- more information
3  about --
4      A   No, I can't.
5      Q   -- the source -- the source --
6      A   No.
7      Q   -- of your income in 2002?
8      A   I can't.  No, I can't.  And I'm not
9  looking at the records.
10     Q   And the only place --
11     A   It was not from Fannie Mae.
12     Q   Is the only place that I would know
13  where that income came from by looking at your
14  backup documentation?
15     A   For $13,000?  I don't --
16         MR. DANIELS:  I don't -- I don't
17  see the relevance of that at all.  I mean if she
18  received money from Fannie Mae, that -- you'd all
19  know about that.  Other than that, her sources of
20  income have nothing to do with this whatsoever.
21 BY MS. BECKER:
22     Q   Do you know what your sources of income

Page 294

1  were in 2002?
2         MR. DANIELS:  Marialice, don't
3  answer the question any further.
4  BY MS. BECKER:
5      Q   Are you going to follow your counsel's
6  instruction?
7      A   I have nothing to say.
8      Q   You identify in part two under expenses
9  $40,930 in legal and professional services.  Do you
10  see that?
11     A   Yes.
12     Q   Do you know what that's for?
13     A   No.  It's in my records.
14     Q   Other than looking at your records, is
15  there any way that I can determine what your
16  expenses for legal and professional services in
17  2002 were?
18     A   No.
19     Q   Are you willing to provide those
20  records?
21     A   No.
22     Q   You identify office expenses in the

Page 295

1  amount of $389; do you see that?
2      A   Yes -- no, I don't -- yes, I see that,
3  mm-hmm.
4      Q   Do you know what that was for?
5      A   No.  It's in my records.
6      Q   In 2002 you identify $10,000 in travel,
7  meal, and entertainment expenses.  Do you see that?
8      A   Yes, I do.
9      Q   Does it strike you as unusual that your
10  travel, meal, and entertainment expenses in 2001
11  and 2002 were identical?
12     A   No.
13     Q   Why not?
14     A   I don't know.  I don't know.  I'm sorry.
15  I don't know.  If you look at the backup, maybe
16  we'll know, but I don't have the backup with me.
17  I'm sorry.
18     Q   And you're not willing to provide it?
19     A   And I'm not going to show it to you.
20  It's my stated tax return that I've agreed in
21  writing, that I signed.  So every question you ask
22  me, you're asking me did you sign this tax return,

Page 296

1  did you look at those numbers and are they correct?
2  And all I can say to you is I don't know what any
3  of these numbers.
4         So you can ask me all of them
5  individually, which I'm sure you will, but I'm
6  telling you right now unless I'm looking at the
7  backup, I'm not going to have an answer for you.  I
8  apologize but I just don't.  I don't memorize my
9  expenses for a year.
10     Q   Looking to the next page of your tax
11  return in 2002, you identify $1,150 in dues and
12  subscriptions.  Do you see that?
13     A   Yes, I do.
14     Q   Do you know what that's for?
15     A   No.  I don't.  I'm sure it's in my
16  expenses but I just don't know.
17 BY MS. BECKER:
18     Q   Do you know what the conference that you
19  list under part five other expenses is?
20     A   I don't remember.
21     Q   You don't know what that conference was?
22     A   I don't remember.  It was 2002.  I just

Esquire Deposition Services                MD - 1-800-539-6398
D.C. - 1-800-441-3376                       VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 297

1  don't remember, I'm sorry.
2      Q   Do you know what the temporary services
3  are that you claimed?
4      A   I'm sure they're the same ones I had
5  from the year before.  That I explained to you.  I
6  had someone come in and do administrative stuff
7  and -- from time to time.
8      Q   Do you remember the name of any of those
9  individuals?
10     A   No, I don't remember anybody from 2002.
11  I'd have to look in my records.
12     Q   Did you work with a temporary service
13  agency?
14     A   No, I did not.
15     Q   How did you hire the individuals that
16  you identified --
17     A   I don't remember.
18     Q   Are these individuals different from the
19  office assistant that you identified in your
20  interrogatory responses?
21     A   I don't know.  I don't remember.
22         MS. BECKER:  I'd like to ask the

Page 298

1  court reporter to mark this as Exhibit 18.
2      (Deposition Exhibit No. 18 - 2003 Form 1040,
3      U.S. Individual Income Tax Return for the
4      witness - was marked for identification.)
5  BY MS. BECKER:
6      Q   Turning your attention to Page 4 of this
7  exhibit --
8          MR. LEDERER:  What year is that
9  return?
10         MS. BECKER:  2003.
11         MR. DANIELS:  2003.
12         MR. LEDERER:  Thank you.
13  BY MS. BECKER:
14     Q   You identify again under business name,
15  M. Williams and Associates; do you see that?
16     A   That's right, and it doesn't have LLC
17  next to it.
18     Q   And is this accurate for 2003?
19     A   Yes, it is.
20     Q   Is that because RMS was dissolved as of
21  2003?
22     A   No.  RMS, as I said, and I don't believe

Page 299

1  L -- RMS was an LLC in 2002 either.  RMS is a -- is
2  the name of a part of the business that I do.  I do
3  four different or five different things.  RMS is
4  one of them.
5      Q   Is there a reason that you don't list
6  RMS here on your 2003 tax return?
7      A   Yes, because it's not an independent
8  entity so I didn't list it.
9      Q   What do you mean by "it's not an
10  independent entity"?
11     A   Just what I said.  And it didn't have
12  any income, so therefore I put down where I had the
13  income from.  And that's what's under my income for
14  that year.  RMS didn't have any income.
15     Q   Why --
16     A   It only existed -- it had some
17  tangential income because of some work I might've
18  done for somebody in the mortgage industry.  But --
19  you know, my RMS business was formed to do business
20  with Fannie Mae.  Do you know of any business
21  Fannie Mae gave me?  I don't know of any.
22  Therefore, there was no reason to keep RMS as a --

Page 300

1  and -- and if it had no income, there was no reason
2  in 2003 to put it on the tax return.
3      Q   Why did you list Risk Mitigation
4  Strategists, LLC on your 2002 tax return?
5      A   I didn't list it.  My accountant listed
6  it and it's probably incorrect.
7      Q   Do you intend to go back and amend your
8  2002 tax return?
9      A   I don't know.
10     Q   You identify in your 2003 tax return
11  $108,343 in income.  Do you see that?
12     A   I certainly do.
13     Q   And what's the source of that income?
14     A   Non-Fannie Mae work.
15     Q   Can you be more specific?
16     A   No, I can't.  It's consulting fees.  I
17  think that's what it says here.  Consultant,
18  consulting fees.
19     Q   Who paid you the consulting fees in
20  2003?
21     A   The DC Department of Mental Health and
22  others.  And I don't recall the others.

43 (Pages 297 to 300)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 301

1    Q   Do you remember how much the DC
2  Department of Mental Health paid you in consulting
3  fees?
4    A   No, I don't remember what it was
5  specifically.
6    Q   Do you remember whether they were the
7  majority of this amount?
8    A   Probably so.
9    Q   How would I determine what your income
10 was from consulting fees in 2003?
11   A   By what I put on my tax return, what I
12 turned into the Internal Revenue Service, and from
13 the receipts I have in my own files.
14       Are you saying I'm a liar and that this
15 is -- I did not make this money?  I don't get what
16 your point is if it's sitting right here in front
17 of you.  And it has a specific number and it says:
18 Reported to you on Form W-2 on the
19 statutory employee -- blah -- blah, blah, blah,
20 blah, blah, blah.
21       Well, this is my gross receipts.  My
22 gross receipts were 108,000 in 2003.  My accountant

Page 302

1  obviously added it up from numbers that I gave her
2  from receipts and so forth.  I have the receipts.
3  That's what it is.
4        What else?  It's not from Fannie Mae.
5  It's not from Bob Jones.
6    Q   You're not willing to provide those
7  receipts; is that correct?
8    A   No, I'm not giving you that.  If it's
9  not from you, what do you care?  Fannie Mae didn't
10 pay it.
11   Q   Looking at your expenses in part two
12 under legal and professional services expenses, you
13 identified $19,793; do you see that?
14   A   Right, mm-hmm.
15   Q   What is that for?
16   A   I can't remember.  It's paid to
17 individuals.  The receipts are in the file.
18   Q   And again, you identified $10,000 in
19 travel, meals, and entertainment expenses; do you
20 see that?
21   A   Yes, I do.
22   Q   Did you do anything to verify that

Page 303

1  number?
2    A   I did -- it was not my job to verify the
3  number.  My job is to provide an accountant with
4  receipts.  When the accountant adds up the
5  receipts, they put them on this form.
6    Q   What steps did you take to make sure
7  that the tax returns that you filed with the IRS
8  were accurate?
9    A   I hired an accountant who was licensed
10 by the state of Washington, DC, whose
11 responsibility was to complete returns based on
12 information provided by the customer.  I then hired
13 someone who was former head of the tax division for
14 the United States Internal Revenue, and he went
15 back and redid 2004 and 2005.  I gave him the same
16 receipts.  So I guess they must be accurate.
17   Q   What's the name of the individual who
18 redid your 2004 and 2005 tax returns?
19   A   It's on the tax return I gave you for
20 2005.  You can get the correct spelling of his
21 name.  It's Daniel Black, CPA.
22       THE WITNESS:  I have to go.  I

Page 304

1  cannot stay any longer.  You told me you were going
2  to be two hours, and I'm sorry, I -- I can't -- I
3  can't do this anymore.  Because I -- I have things
4  I have to do.
5        MR. DANIELS:  You have to do --
6        THE WITNESS:  So this is -- I've
7  given you now four hours more than you said it was
8  going to take, and had you told me it was going to
9  be six hours, I could've prepared for that.  But
10 I'm really sorry.  I do have to make a living, and
11 I can't let you keep me --
12       MR. DANIELS:  Can we -- can we
13 set another date to finish up?
14       MS. BECKER:  What is the basis
15 for your statement that we told you that this would
16 be two hours?
17       THE WITNESS:  You told me two
18 hours the last -- when we left here the last time,
19 you said a couple of hours.
20       MS. BECKER:  That's not what I
21 said, ma'am.
22       THE WITNESS:  Well --

44  (Pages 301 to 304)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

Page 305

1        MR. DANIELS:  Marialice --
2        THE WITNESS:  -- you can think
3  that's not what you said; that is what you said to
4  me.  And if you didn't mean to say that, then you
5  said it inadvertently, which I will accept, but you
6  have to understand that I was --
7        MR. DANIELS:  We can do this
8  again.
9        THE WITNESS:  -- led to believe
10 that it was two hours by you --
11       MR. LEDERER:  You're supposed
12 to --
13       THE WITNESS:  -- and if it was
14 not two hours, you should have let me know.
15       MR. LEDERER:  You're going to
16 get the 2005 return.
17       MR. DANIELS:  How can we finish
18 up without -- reasonably.  I know he's anxious to
19 file his -- his stuff, but --
20       MS. BECKER:  When is --
21       MR. DANIELS:  Lawyers are
22 supposed to work this out.

Page 306

1        VIDEOGRAPHER:  Excuse me.
2        MS. BECKER:  When is your client
3  available?
4        MR. DANIELS:  June --
5        VIDEOGRAPHER:  Do you want to
6  stay on the record?
7        MS. BECKER:  Yes.
8        MR. DANIELS:  Yeah, I think so.
9        MS. BECKER:  When is your client
10 available for deposition to continue --
11       MR. DANIELS:  Well, my client's
12 available but I'm not.  I -- I'll be back -- I'll
13 be back the 19th, so -- and we've got a status
14 conference on the 22nd.  I -- I could do it --
15 what is your schedule, Marialice?
16       THE WITNESS:  I'm -- whenever
17 you all are available as long as you give me some
18 idea of the amount of time it's going to take.
19       MR. DANIELS:  Okay.  I -- you --
20 you're my ride so hold on.  And I don't know your
21 car --
22       MS. GRUNDEMAN:  We need the

Page 307

1  original exhibits, by the way.
2        MR. DANIELS:  Is she taking --
3        MS. GRUNDEMAN:  Yeah.
4        MR. LEDERER:  Marialice --
5        MR. DANIELS:  I -- I'd say the
6  23rd or the 24th and we can finish up -- that --
7  that'd be the end of everything.
8        THE WITNESS:  These are not for
9  me?
10       MR. LEDERER:  There -- there --
11 their original marked exhibits.  We have copies.
12       MR. DANIELS:  And I -- I'll have
13 an hour, hour and a half of cross-examination.
14       MS. BECKER:  We will check the
15 schedule and our calendars and make a determination
16 as to whether we'll continue --
17       MR. DANIELS:  Fair enough.
18       MS. BECKER:  -- the deposition
19 on those dates --
20       MR. DANIELS:  Okay.  Thank you
21 very much.
22       MS. BECKER:  -- or propose other

Page 308

1  dates.  Thank you.
2        MR. LEDERER:  Or -- or propose
3  other dates and then -- that's fine.
4        VIDEOGRAPHER:  This testimony is
5  con -- ended for the day at 3:51:35.
6        (Thereupon, at 3:52 p.m. the deposition was
7        adjourned sine die.)
8        (The witness reserved signature.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

45 (Pages 305 to 308)

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

# Marialice Williams

| Page 309 |
|---|

1
2
3  \*    \*    \*
4
5  **ACKNOWLEDGMENT OF DEPONENT**
6
7  I, Marialice Bathrus Williams, do hereby
8  acknowledge I have read and examined the foregoing pages
9  of testimony, and the same is a true, correct and
10  complete transcription of the testimony given by me, and
11  any changes and/or corrections, if any, appear in the
12  attached errata sheet signed by me.
13
14  _____    _____
15  Date        Marialice Bathrus Williams
16
17
18
19
20
21
22

| Page 311 |
|---|

1
2  Harley Jay Daniels, Esq.
   Law Offices of Harley Jay Daniels
   3003 Van Ness Street, Northwest
3  Suite W228
   Washington, DC  20008
4
      IN RE:  WILLIAMS V. FNMA, ET AL.
5      CONTINUED  DEPO OF:  MARIALICE B. WILLIAMS
6
7  Dear Mr. Daniels:
8  Enclosed for review is your copy of the above referenced
   deposition.  Please have the deponent read the copy of
9  the transcript and sign the enclosed certificate of
   deponent.  Also enclosed is an errata sheet which the
10 deponent should use to note corrections and the reasons
   for such corrections.  This and any additional errata
11 sheets should be signed and dated by the deponent.
12 The deponent has thirty days in which to read and sign
   the transcript.  After the deponent has reviewed the
13 copy of the transcript, please return the certificate of
   deponent and any errata sheets to 1020 19th Street,
14 Northwest, Suite 620, Washington, D.C.  20036.
15 Sincerely,
16 Joanne Liverani
17
18
19
20
21
22

| Page 310 |
|---|

1      **CERTIFICATE OF NOTARY PUBLIC**
2  I, Joanne Liverani, the officer before whom the
3  foregoing deposition was taken, do hereby certify that
4  the witness whose testimony appears in the foregoing
5  deposition was duly sworn by me; that the testimony of
6  said witness was taken by me in stenotype and thereafter
7  reduced to typewriting under my direction; that said
8  deposition is a true record of the testimony given by
9  said witness; that I am neither counsel for, related to,
10 nor employed by any of the parties to the action in
11 which this deposition was taken; and, further, that I am
12 not a relative or employee of any attorney or counsel
13 employed by the parties hereto, nor financially or
14 otherwise interested in the outcome of this action.
15
16
         Joanne Liverani,
17         Registered Merit Reporter
         and Notary Public for the
18         District of Columbia
   My Commission expires:
19 July 31, 2010
20
21
22

| Page 312 |
|---|

1  ESQUIRE DEPOSITION SERVICES
   1020 19TH STREET, NORTHWEST
2  SUITE 620
   WASHINGTON, D.C.  20036
3
4      ERRATA SHEET
   Case Name:  WILLIAMS V. FNMA, ET AL.
5  Witness Name:  MARIALICE BATHRUS WILLIAMS
   Deposition Date:  5/7/07
6  Job No.:  180771
7  Page No.  Line No.  Change
8
9
10
11
12
13
14
15
16
17
18
19
20
21  _____    _____
   Signature      Date
22

**Esquire Deposition Services**

D.C. - 1-800-441-3376

MD - 1-800-539-6398

VA - 1-800-752-8979

a77cbcf5-7ff0-478d-a5f4-3a9a93751c41

Marialice Williams

| A | | | | |
|---|---|---|---|---|

**A**

AAA 153:17
ABA 256:1,10
ability 169:6,8,9
    183:8
able 138:22 139:4
    146:15,20,21
    153:14 168:4
    169:10,19,20
    170:9 211:13
    225:12 247:14
absolute 147:9
absolutely 172:14
    188:19 202:6
    219:22 239:20
accept 305:5
access 156:12
    219:8 256:19
accommodate
    282:5
accomplish 169:20
accomplishments
    189:15
account 226:5
accountant 261:14
    263:4 271:11,16
    272:7 273:7,7
    285:21 286:2
    300:5 301:22
    303:3,4,9
accounting 228:21
accurate 148:10
    198:22 206:3
    223:20 235:3
    298:18 303:8,16
accurately 204:21
    272:12
achievements
    180:22
acknowledge 309:8
ACKNOWLED...
    309:5
acquired 161:6
    162:10

acted 166:20
action 132:6
    186:18 310:10,14
actions 199:13,17
    199:17
active 193:7 256:2
activities 187:16
actual 153:5
    195:18 213:6
    226:20 227:2
    234:14,16 247:5
    270:21
add 194:17 199:11
    234:15 258:19
    271:7,10,15 272:7
added 271:11,14
    273:8,9 276:11,12
    302:1
adding 271:18
additional 145:21
    194:17 199:5,10
    311:10
addresses 251:12
adds 303:4
adhered 215:3
adjourned 308:7
administrative
    275:15 297:6
advantage 240:14
advice 240:12,14
    241:19 243:22
    245:15 265:3
affairs 136:13
    248:11 249:14
    266:19
affect 176:19 204:1
affidavit 231:11
afford 161:16,17
affordable 154:19
    155:1 171:15
    182:16 215:4
    228:3 256:2,16,19
    257:3
African-American
    171:13 179:2,3

184:7
**African-America...**
    179:13,15 180:3
agency 297:13
aggregation 200:22
    206:8,20 207:4
    221:5 225:10
    227:3 228:3
ago 147:6 202:3
    238:10 255:16
    277:20
agree 176:8 186:11
    209:16 252:14,16
    253:13
agreed 295:20
agreement 186:1,3
    187:11 188:3,18
    190:7 191:4,8,15
    197:6,7 207:8
    208:4,10 210:16
    210:22 211:14,20
    212:1,2,7,21
    213:1,9 215:18
    224:3 240:15,21
    243:15 245:9
agreements 197:12
    210:12 225:22
ahead 260:21 283:4
    290:6,15
al 132:12 134:16
    137:5 138:16
    198:17 311:4
    312:4
**Alexander** 270:7
alive 288:2
allegations 187:18
    187:22 188:14
allege 224:3
alleged 187:12
allegedly 211:14
alleging 227:9
allow 208:6
amend 206:1
    285:20 300:7
amended 136:10

185:16 186:17
    197:2 263:10
    283:1,2 284:21
    285:13
amendment 190:8
    190:10
**America** 178:16
    230:20 259:18
    260:15
**American** 171:11
    229:4 255:5,16,18
    255:21 257:7,11
    259:13 260:6
amount 153:5
    183:8 206:22
    220:1 224:16
    227:20 237:4
    268:15 270:21
    271:7 295:1 301:7
    306:18
amounts 250:10
andually 225:3
and/or 309:11
announced 175:22
annual 225:1 226:3
    226:9 227:13
annually 224:19
    225:3
anonymous 206:9
answer 167:18
    198:7 199:3,4,9
    199:11,12 202:11
    202:17 206:1,7
    207:5 210:8 216:1
    216:14 218:6
    221:19 225:12
    229:12 241:20
    243:19 244:22
    245:3,6,7,14,17
    245:21 260:20,21
    262:10 263:18,20
    264:22 265:5
    272:20 278:2
    279:17 287:17
    288:6 289:6,13,20

290:7,16 291:17
    294:3 296:7
answered 259:21
    283:13 287:1
    289:8,17
answering 249:20
answers 136:11
    198:4,15 205:13
    249:12 278:12
answer's 259:22
anxious 305:18
anybody 178:16
    183:17,21 191:8
    191:14 247:20
    276:7 297:10
anybody's 181:5
anymore 304:3
anyway 204:5
    215:7
**Aon** 270:5
apartment 162:13
    229:20 230:7,9,19
    230:21,21,22
    231:15
apologize 296:8
apparent 225:15
appear 309:11
**APPEARANCES**
    134:1
appears 250:20
    286:14 290:20
    310:4
approached 200:11
approximately
    147:6,7 224:21
**April** 140:2 142:15
    142:17 143:3,5,20
    145:3,10,12,22
    146:9,11 149:16
    149:20 150:6
    163:14
area 143:9 157:17
    158:15,19 159:13
    159:22 160:4,7,11
    171:15 230:4

Marialice Williams

**areas** 181:18
**arranged** 175:18
**arrangement** 212:17
**arrangements** 225:6
**arranging** 238:13
**arrived** 168:19
   172:9 185:5
**arrows** 195:17
**art** 275:2
**aside** 153:6
**asked** 151:13
   165:14,16 171:18
   203:1 205:7
   213:13 218:2,4
   245:13 265:6
   272:19,19,19,20
   287:1 289:16
**asking** 142:9
   164:20 203:6
   259:8,10 260:21
   266:18 287:16
   288:19 290:1
   295:22
**asks** 143:5 290:14
**assessed** 153:1,3
**assessing** 226:5
**assessment** 176:9
**asset** 251:8,9
**assign** 169:12
**assignments**
   180:14,16,21
   181:8
**assistant** 235:2,4
   297:19
**associate** 246:5
**associated** 154:4
**Associates** 232:6
   298:15
**Association** 132:11
   134:16 137:5
   138:16 171:12
   255:21 256:4
**assume** 250:16

**assumed** 220:15
**assured** 182:1
**Atlanta** 193:14
**attached** 309:12
**attachments**
   249:14
**attempted** 156:18
**attempting** 166:16
   171:14 196:21
**attended** 242:14
**attention** 140:11
   152:4 167:7
   191:17 196:14
   199:2 202:10
   221:18 224:1,12
   229:11 237:19
   250:21 254:15
   267:17 291:3,12
   292:1 298:6
**attitudes** 179:5
**attorney** 165:2
   194:8 198:20
   238:17 241:19
   242:16 249:10
   252:8 253:4,11
   279:13 287:9
   310:12
**attorneys** 198:20
   208:6
**attorney's** 265:2
**attorney-client**
   244:5,10
**attribute** 178:20
**aturn** 286:9
**auction** 157:10
**August** 157:16
   201:21 242:2
**authorized** 173:6
**automobile** 242:7
**available** 285:6
   306:3,10,12,17
**Avenue** 135:3
   144:19 273:17
**average** 234:7,14
   234:18 270:18

**award** 174:16,19
   175:9,19,20,21
   177:16
**aware** 158:10
   170:16 171:9,10
   174:21 199:14
   200:5,8 216:19
   246:21
**awful** 241:9
**a.m** 133:5 137:9

————————

## B

**B** 252:22 253:7
   311:5
**back** 147:1 158:21
   172:2 173:7
   193:10 210:2
   212:11 218:9
   221:15 259:11
   284:6,9 292:8
   300:7 303:15
   306:12,13
**backed** 234:21
**backstabbing**
   279:10
**backup** 232:21
   233:6 234:2 268:6
   272:6 279:5
   288:15 292:19
   293:14 295:15,16
   296:7
**balance** 145:17
   162:5 227:18
   236:6
**ballpark** 246:11
**Baltimore** 210:17
**Bank** 230:19
   259:18 260:15
**bankcard** 260:15
**Bankers** 256:4
**banking** 193:9
   195:1 246:18
   247:3,7
**bankrupt** 279:9
**bankruptcy** 136:13

136:15,16 161:4
   161:14,22 162:1,3
   162:4,7 248:2,12
   249:10 250:5
   253:11,21 254:1
   254:14,21 259:6
   260:14 271:4
**Bar** 171:11 255:21
**based** 160:18 165:9
   170:1 177:11,14
   177:15 181:15
   183:19 199:16
   224:15 226:8
   228:7 234:13
   271:8 276:2,3,3
   277:18 303:11
**bases** 187:13
**basic** 192:12
**basically** 167:13
   188:20 213:15
   230:17
**basis** 175:17
   187:19 188:15
   224:18,20 231:19
   240:9 244:1
   262:15 264:1,5,9
   264:18 267:2
   271:19 272:2
   275:3 277:1
   278:19 289:14,20
   304:14
**Bates** 132:8 136:6,9
   139:12 150:19
**Bathrus** 132:4,16
   133:7 134:2 136:4
   137:3,4 138:11
   186:18 198:16
   216:5,10 309:7,15
   312:5
**bear** 270:6 280:7
**Beasley** 239:9
   242:12
**Becau** 262:8
**Becker** 134:21
   136:3 137:12

138:2,2,17 139:8
   139:15 147:11,18
   147:22 150:16
   151:4 168:10
   185:6,13 186:5,14
   197:14,22 198:8
   198:11 209:2
   210:20 212:11
   213:7 216:3,12
   218:9 219:11
   221:8,12,17,21
   235:22 237:9,12
   237:18 241:21
   242:3 244:1,4,14
   244:20 245:18
   248:5,9,16 250:1
   253:17 254:7
   259:3 261:15,19
   262:1,11,14,18
   263:22 264:4,8,17
   264:21 265:11,17
   265:22 266:8
   267:1,5,13,16
   269:12 272:22
   274:2,4 278:7
   279:22 281:5,16
   282:10 283:17
   284:10 285:9
   287:2,7 288:18
   289:1,14,19 291:2
   291:22 293:21
   294:4 296:17
   297:22 298:5,10
   298:13 304:14,20
   305:20 306:2,7,9
   307:14,18,22
**becoming** 177:21
**began** 158:4 170:5
   176:5
**beginning** 250:19
   251:14
**begins** 137:2
**behalf** 137:15
   138:3,6,9
**believe** 141:3,14

142:5 144:3 145:5
145:9 146:2 147:7
148:11 149:18
151:22 155:15,19
156:22 157:15
160:9,22 161:2
162:16 165:4,8,20
166:6 169:7,9
170:12 173:18,20
177:5,6,10 184:8
188:1 189:17,20
191:11 196:17
197:8 199:1,5
201:21 202:5,13
205:7,13 206:3
207:12,20 208:9
217:4 224:10
226:22 234:20
235:9 236:3,19
241:4 242:13
247:13,18 248:7
249:22 256:1
258:22 265:11
267:13 270:21
273:21 275:2
298:22 305:9
**believed** 183:18
240:8
**bell** 288:14
**best** 236:17
**bet** 287:21
**better** 178:5 179:21
211:17 271:17
**Betty** 179:8 220:13
221:3
**beyond** 145:21
194:1 235:8
**big** 174:18 211:11
**biggest** 174:13
**bill** 257:11,12
**billion** 225:2,16
226:19 227:13,14
**bills** 232:12,19
233:3,8 260:3,6
**bin** 157:5

**bit** 144:5 213:19
**black** 178:19 179:7
179:11 200:16,22
303:21
**blackballed** 196:17
**blah** 301:19,19,19
301:19,20,20,20
**board** 183:2
**Bob** 164:19,21
165:7,9,10 166:20
167:1,5 168:7
175:13 193:15
197:1,12 203:7,8
203:9 206:6,14,18
208:15 210:17
211:6 212:18,18
214:5,7,17 215:12
216:15,17 219:13
222:2,21 223:11
225:21 226:4,10
231:20 246:5
302:5
**Bob's** 228:8
**bona** 276:15
**Bond** 207:3
**bookkeeper** 271:17
**boss** 240:1
**box** 142:6 144:18
144:21 159:5
251:3
**boxes** 142:18 143:9
156:14 158:18,19
158:22 159:13
160:1
**Boy** 248:14
**break** 180:14
221:11 237:10
**Brian** 134:10
137:22 191:2
239:9 240:18
**bring** 170:9
**broke** 204:17
**broker** 181:22
199:21 200:12
201:16,17 206:10

212:3 224:9,9
269:21
**brokerage** 192:8
**brokered** 202:8
**brokers** 199:15
**broker's** 201:19
224:21
**brought** 192:6,9
225:20
**building** 158:3,13
230:5,7,11
**business** 161:5,6,18
162:9 167:2
169:11 171:14
177:1,3 178:12
181:22 194:13
199:22 200:6,10
200:14,19,22
203:2,3,3,4,7,9,10
203:16,18,19,20
204:3,9,11,17,20
205:11,11,12,12
205:17 206:4,6,11
206:19,21 211:21
213:3,12,16 214:4
214:7,12,13,14,16
215:6,16,19
216:18,22 217:1,5
217:7,9,13,16,19
217:20 218:3,4,5
220:1,4,5,19,20
223:4,7 224:16
225:17 229:20
231:3 235:16,16
238:5,8,14 250:9
251:7,9 252:17
253:13 255:8,9,10
255:17 256:7,9
257:7,21 259:4,19
260:4,12,16 261:3
261:7,12 267:11
270:3,14 275:17
276:8,15 287:22
288:2 292:2,10
298:14 299:2,19

299:19,20
**businesses** 251:14
251:15
**Buyer** 207:3

_____

**C**

**C** 136:1
**calculate** 224:13
226:10 229:14
232:9 233:10
234:13
**calculated** 224:15
228:11
**calculating** 205:4
**calculations** 226:6
226:8
**calculator** 273:7
**calendar** 250:11
**calendars** 307:15
**California** 234:11
**call** 168:7 190:22
191:1 253:10
278:1
**called** 138:12
153:22 191:2,9,11
191:13 223:12
229:10
**calls** 156:8 235:16
**Cam** 139:18 142:16
143:3 145:13
149:21 151:7
163:8,12,16,17,19
163:21 164:6,19
167:21 182:20,22
183:7 197:4,13
203:2,3,14,16,17
203:19,22 204:2,4
204:14,22 207:8
208:5,11 210:22
211:15 212:8
213:9,11,15,16
214:2 217:4,9,12
217:15,18,20
218:1,3,3,12,21
219:7,8 222:1

224:3 242:17
243:3
**Cam's** 219:21
**capability** 183:6
**capable** 200:6
**capacity** 181:8
241:18 242:5
**capital** 178:13
182:16 222:19
232:1
**captive** 155:14
191:19 192:13,19
192:21 193:12,13
193:16,19 194:19
195:4,6,8,19
196:4 210:19
219:6 229:6 247:7
**captives** 195:2
**car** 306:21
**card** 254:20 255:5
255:18 259:18
260:1,2,5,6
**cards** 260:2 261:1
**care** 189:14,14
302:9
**career** 179:22
180:6,15,22
184:17
**carefully** 284:19
**Carol** 194:9
**Carolyn** 194:9
**case** 136:15 137:7
159:19 187:3
198:16 200:4
206:18 224:14
226:6,11 246:19
253:21 265:13
266:1 312:4
**cash** 154:22 254:5
**casual** 173:11
**category** 140:15
**cause** 152:13
180:10,12 188:22
211:7 214:16
268:2 280:10,22

**caused** 177:8
241:11
**Cayman** 193:17
**cc** 196:22
**cell** 195:6 232:16
**cells** 195:4
**ceremony** 175:13
**certain** 143:7
152:22 153:4
165:3 166:20
170:21 178:18
179:4 182:21
185:20,22 202:6
206:18 229:13
234:18 239:1
**certainly** 152:15
178:18 183:1,12
183:20,22 188:8
193:22 196:12
205:15 206:12,13
212:19 213:22
222:16 224:8
252:9,9 253:9
278:1 300:12
**certainty** 147:9
**certificate** 310:1
311:9,13
**certify** 310:3
**cetera** 168:6 183:2
183:2,2 193:4,5
223:4 240:6
**ch** 260:5
**chairman** 255:22
**chairperson** 256:10
**champion** 180:9,12
**change** 170:4
180:20 182:8
312:7
**changed** 170:13,14
**changes** 309:11
**Chapter** 136:15
253:21
**charge** 166:22
**charged** 188:3
226:13 227:2

**charges** 187:13
**charging** 195:9
**charter** 182:18
**chartered** 215:3
**cheating** 279:10
**check** 251:5 260:3
292:8 307:14
**checked** 251:3
**checks** 260:6
**children** 179:6,10
**Chris** 232:1
**Chuck** 172:6 173:8
173:9 174:1
**cities** 181:18
**city** 257:1
**civil** 132:6 186:18
187:17
**claim** 188:8 202:21
215:17
**claimed** 259:1
297:3
**claiming** 275:12
**claims** 200:3
247:12,21 254:17
255:4
**class** 256:21
**classes** 177:20
**clear** 166:13 212:4
236:11 288:14
**clearly** 175:16
**clerk** 206:16 238:1
238:22
**client** 186:6 244:10
306:2,9
**clients** 149:11
196:6 256:5
**client's** 306:11
**close** 148:8 159:15
184:5 246:5
**closed** 201:3,5,7,12
225:3,9,10
**collateral** 152:11
155:10,13
**Colorado** 273:17
**Columbia** 132:2

133:15 136:14,16
137:7 193:20
248:12 254:1
310:18
**com** 148:22 196:19
**come** 196:9,9
213:20 221:15
256:22 270:9
272:7 276:20
287:11 292:16
297:6
**comes** 261:13
**coming** 276:17
**comma** 292:12
**commercial** 232:16
276:7,9 277:22
**commission** 213:3
310:18
**commissioner**
194:22 246:20
247:2
**commissions** 212:5
**commitment**
176:22
**Committee** 256:2
**common** 167:20,21
168:11
**communicated**
222:1
**communication**
196:20 285:3,8
**communications**
141:6,17 245:20
**communities**
181:17
**comp** 173:2
**companies** 149:9
191:20 192:19,21
192:22 193:17
197:13 218:14
277:18
**company** 139:20
152:16 190:14
193:1 210:18
212:15,16,19

**compensation**
168:5 190:7
**compete** 168:3
**competitive** 176:16
**complaint** 136:10
179:20 183:10
184:17 185:17
186:17,21 187:3,6
191:18 196:15
197:2
**complaints** 183:15
**complete** 199:4,10
206:7 252:8
303:11 309:10
**completely** 203:20
269:10 277:7
**complex** 195:14
**complexity** 158:1
**complicated**
195:13
**computer** 143:10
144:8 146:17,22
147:4 150:1,5
156:11 157:2,4
158:8 160:19
263:4,5 288:10
**computers** 150:8
150:15 160:15
276:11
**con** 238:14 308:5
**concept** 181:15
192:13 193:10,16
195:3 196:4,5,7
197:1 200:7
225:18,19 229:6
238:15
**concepts** 180:18
246:22 256:22
**concerned** 170:19
170:21 181:17
203:8
**concerning** 285:3
**concluded** 242:14
**conference** 171:12
171:16 172:1,7

173:5 174:18,21
175:2 230:4
256:10 296:18,21
306:14
**conferences** 235:17
255:21 256:4,14
**confidentiality**
186:1,3,12 197:6
225:21
**connection** 151:14
155:17 186:2
238:19 240:15
242:9 243:2,12
244:16 283:8
**considerable** 156:7
**consistent** 181:2
269:10 270:17
271:6
**consistently** 168:2
234:5 276:17
**consolidate** 158:20
**constantly** 270:1,3
270:8
**constitute** 141:5,16
**constituted** 187:16
**consult** 186:6
**consultant** 235:5
269:20 292:10,12
300:17
**consultants** 219:5
**consulting** 300:16
300:18,19 301:2
301:10
**contact** 164:5
194:13 196:21
218:15 270:2,4
**contacted** 164:15
164:16 165:18
**contained** 249:13
**contempt** 168:9
**continuation**
138:20
**continue** 182:2
185:19 204:4
218:5 306:10

Marialice Williams

307:16
**continued** 132:15
133:7 193:20
196:21 311:5
**continuing** 193:21
203:2
**contractor** 237:8
**contributions**
188:19
**conversation**
181:13 184:2
185:1 219:12
246:8
**conversations**
216:15,17,20
222:2 223:21
**convince** 169:10
219:1
**convinced** 169:12
260:11
**Conway** 237:21,22
**cooperate** 165:6
166:3,4,6
**cooperation** 164:20
**cooperative** 169:17
**copiers** 232:14
**copies** 185:20
263:2 284:18
307:11
**copy** 196:2 210:15
252:5 262:2 263:2
263:7 284:15
288:9,11 291:5
311:8,8,13
**corporate** 171:3
178:16
**corporation** 251:17
**corporations**
192:18
**correct** 146:1,2
148:10,15 150:13
151:12 157:20
164:12,13 166:1
186:22 187:3,4
205:17 227:21

236:13 239:16
249:15 252:12,22
268:7,11 283:19
288:13 291:6
292:3,5 296:1
302:7 303:20
309:9
**corrections** 309:11
311:10,10
**correspondence**
136:8 147:16
196:20
**corresponding**
272:10
**cost** 232:11,17,18
233:2
**costs** 233:11 276:9
278:5
**could've** 189:10
228:1,2 243:4
304:9
**counsel** 137:18
138:12,15 194:11
242:18 244:12
246:2 310:9,12
**counsel's** 294:5
**Countrywide**
234:11
**couple** 192:11
278:14,15 304:19
**course** 220:15
233:5 268:9
**court** 132:1 136:13
136:16 137:6,15
139:9,18 147:12
150:17 198:1
202:14 225:14
248:6,12 253:18
254:1 261:16
278:8 281:6 298:1
**courtesy** 178:4
**cover** 153:7,20
198:8 279:11
**coverage** 153:15,18
**co-brokerage**

207:8 208:4,10
210:22 211:14
212:7,21,22 213:9
215:18 224:2
**co-op** 158:16
**CPA** 286:2,9
303:21
**Craig** 200:15,17
206:5,12,13 207:2
221:4
**crap** 189:10 214:10
241:3,11 278:20
**crappy** 241:12
**crash** 143:10
148:12,20 158:8
**crashed** 148:16
**crashes** 146:17
147:4,5 148:3,6
148:22 157:2,4
160:19
**crazy** 279:1,1
**created** 152:13
153:10,12 156:11
170:7 174:15
175:15 180:18
181:4 204:9 211:9
**creating** 181:1
**credibility** 266:1,2
266:6,15 267:14
**credit** 149:13
152:10,15 153:1,1
153:18 154:2,8
155:12 167:11
184:4,10 192:4,4
195:6,7,8,19
225:6 227:6
254:20 259:22
260:1,2,5,6 261:1
**creditors** 136:15
253:22 254:16,22
255:3
**credits** 155:3
**crew** 204:8
**cronies** 178:14
**cross-examination**

307:13
**cross-section**
149:10
**currently** 159:16
**custody** 157:9
**customer** 303:12
**customers** 195:9
228:21
**cutting** 223:16
**cynical** 223:16

---

**D**

**d** 139:8
**daily** 231:19
**Dallas** 234:10
**damages** 205:5
224:14 226:6,11
228:11 265:13,18
265:21 266:16
267:14
**Dan** 263:5
**Dana** 274:13
277:13 282:18
**Dance** 179:8
220:13 221:3
**Daniel** 303:21
**Daniels** 134:3,8
137:20,21 150:22
167:15,17 185:18
186:10 198:6,10
206:16 208:14,18
208:22 209:22
210:5,8 221:6,10
221:14,20 235:18
238:2 239:2,10,12
239:13,15,18
240:7,11,20
241:14,16 242:2,4
242:8,12 243:7,16
243:18,21 244:2,7
244:9,15,19,21
245:2,7,8,13,20
258:9 262:9,12,16
263:19 264:2,6,12
264:16,19 265:4,8

265:15,20 266:7
266:20 267:3,8,15
268:21 269:2,6
272:14,18 280:7
280:12,16,20
281:12,20 282:7
283:16 284:6
285:2 286:22
287:4 288:21
289:5,8,12,16,22
290:6,10,15
291:17,20 293:16
294:2 298:11
304:5,12 305:1,7
305:17,21 306:4,8
306:11,19 307:2,5
307:12,17,20
311:1,2,7
**Danny** 209:12
**data** 181:1
**database** 181:1
**date** 137:8 140:1,2
148:5 151:11,12
241:22 242:10,20
243:2 250:7
281:15 291:9
304:13 309:15
312:5,21
**dated** 142:15
151:20 253:8
311:11
**dates** 147:4 148:10
219:14 223:21,22
236:14,16 251:14
307:19 308:1,3
**day** 139:3 168:22
180:22 209:4
212:3 230:10
234:4 235:7,7
260:11 308:5
**days** 164:4 311:12
**day-to-day** 175:17
**DC** 132:17 133:12
134:6,12,19 135:4
136:16 137:11,17

Marialice Williams

193:8,11,13 194:3
194:18,20 246:17
247:2 254:1
273:20 300:21
301:1 303:10
311:3
**Deadlines** 136:15
253:22
**deal** 142:17 154:9
158:22 159:16
174:18 183:4
201:3,5,7,9,11
205:10 207:14
212:6 240:12
269:22 270:1
**dealing** 178:21
**deals** 155:2 201:1
206:10 227:10,11
227:21 228:1,12
228:13,16 229:10
**Dear** 311:7
**death** 242:15
**Deborah** 175:3,4,6
**debt** 162:9
**debtor** 249:1
251:11,15
**debtor's** 251:21
**debts** 161:5 254:20
**December** 243:1
**decided** 173:9
177:3 228:19,20
**decision** 186:7
**decisions** 272:8
**decline** 245:21
264:22 265:9
**deduct** 193:4
**deducted** 257:12
**deductible** 193:2
**defamatory** 221:22
222:3,10,14,16
223:17
**defective** 242:7
**defendants** 132:13
134:15 136:11
138:13,15 145:18

146:5 159:18
198:4,15
**defending** 164:18
164:21 165:7
**define** 152:9
**defined** 187:16
275:2
**defines** 152:7
**definitely** 178:17
272:3
**delivered** 142:6
**demonstrate**
203:12
**department** 246:17
246:21 247:2,6
300:21 301:2
**departure** 187:15
188:4 244:17
**depend** 213:5,5
**Depended** 212:15
**depending** 218:14
**depictions** 196:3
**DEPO** 311:5
**deponent** 309:5
311:8,9,10,11,12
311:12,13
**deposed** 151:6
164:1 242:18
243:2
**deposition** 132:15
133:7 136:5 137:3
137:9,16 138:21
139:12 147:14
150:19 151:9,14
154:10 156:6
165:16 175:14
185:16 186:8
198:3 208:9,15
209:5 238:12
242:15,17,21
243:5,10 248:10
253:20 261:20
281:9 285:7 298:2
306:10 307:18
308:6 310:3,5,8

310:11 311:8
312:1,5
**depositions** 242:14
**derived** 226:20
**dervish** 214:22
**describe** 174:11
204:21
**described** 154:7,15
160:19 207:21
211:16
**description** 211:17
**deserved** 167:2
**designed** 153:19
204:8
**desire** 277:3
**destroy** 214:1
**detail** 157:22
287:12
**deterioration** 159:9
**determination**
307:15
**determine** 294:15
301:9
**determined** 153:4
**develop** 256:9
**developed** 170:7
177:1 180:18
200:8 224:17
225:19
**development**
165:10 167:8
169:18 183:9
196:11,22 215:2
**developments**
192:17
**devices** 152:12
**di** 195:12
**diagrams** 195:12
195:17
**die** 308:7
**died** 159:2
**difference** 181:16
**different** 146:16
190:3 235:11
246:6 275:19,20

279:4,16 290:22
297:18 299:3,3
**differently** 177:11
183:18
**difficult** 159:4,14
231:10
**Diggs** 135:9 137:14
**dime** 215:1
**direct** 152:4 199:2
208:7 262:10
263:20 265:4
267:17 289:6
**directed** 139:21
**directing** 237:19
291:3
**direction** 239:3
310:7
**directly** 170:5
265:12,13
**director** 175:4
178:13 251:16
253:14
**disabled** 257:1
**DISB** 193:8
**discouraging** 217:4
217:9
**discover** 214:11
**discovery** 208:5
**discriminated**
240:8
**discrimination**
183:11 187:12,19
188:15 189:21
**discriminatory**
200:20
**discuss** 186:7
192:12 239:18
240:17 241:6
**discussed** 184:6
196:6 241:8,8
**discussing** 195:2
**discussion** 216:7,21
268:2
**discussions** 178:12
193:20,21 220:12

240:19
**disposal** 175:5
**disposed** 158:12
**disrespectful**
179:10
**dissolved** 298:20
**distributing** 197:10
**District** 132:1,2
133:15 136:14,16
137:6,6 139:18
193:19 248:12
254:1 310:18
**diversity** 184:14
**division** 169:13
174:5 175:5 184:7
192:5,6 303:13
**divorce** 241:22
**DMP** 273:17 274:5
274:7,9 277:14
282:18
**doc** 142:6
**document** 140:20
141:1,4,9,12,15
141:22 142:3
151:19 155:6,6,7
155:17 198:12
207:19 208:4,7,20
209:6 238:16
248:17,20 249:5
250:17,22 252:12
254:8,10,12
282:13,17
**documentation**
164:17 231:16
232:21 233:7
234:2 257:6 268:6
288:15 293:14
**documents** 140:5,8
140:14,16,17,19
140:22 141:5,8,11
141:16,21 142:2,6
142:13,14,16
143:8,18 144:7,10
144:13,17,18
145:2,3,10,11,19

145:21,21 146:3,4
146:5,8,21 148:17
149:3,5,16,19
150:4,5,6,10
151:13,16,18,19
152:1 155:9,16,21
157:5,18 158:5,8
159:18 160:6,10
186:4 205:9
225:13 231:2
**dog-eat-dog** 170:2
**doing** 157:6 171:19
178:1,2 182:17
183:6 199:21
200:6,14 203:19
206:20 213:12,16
214:5,7,13,14
215:1,3,6,14
216:18,22 217:5,9
217:20 220:19
235:5 253:10
257:2 282:4
**dollars** 225:16
230:15
**downhill** 172:4
**Downing** 237:21,22
263:6
**DPM** 283:8
**dragging** 277:5
**dried** 158:11
**due** 158:9
**dues** 296:11
**duly** 310:5
**duplicates** 150:1
**DUS** 154:19 155:4
205:8,11,12,17
220:14,16,20
225:4 227:5,9,11
227:21 228:1,3,4
228:12,13,16
229:7 246:6
**dusk** 229:7
**DUS-related**
154:14
**D.C** 311:14 312:2

| E |
| --- |

**e** 136:1 220:13
255:1
**earlier** 143:11
156:6 186:13
241:8 270:20
**early** 157:16
165:22
**earnest** 158:4
**easier** 144:6
**easy** 180:2
**Edward** 135:9
137:14
**EEO** 179:17,20
**effect** 184:19
**effectively** 168:3
**eight** 152:6
**either** 150:7 161:1
180:14 193:17
195:3 215:14
250:7,19 299:1
**eking** 162:6
**embarrassment**
177:6
**employed** 141:18
236:14 310:10,13
**employee** 192:15
301:19 310:12
**employees** 177:21
**employer** 170:17
170:17,18 171:4
273:20
**employers** 168:21
**employment**
141:20 187:10,15
250:8
**enabled** 168:2
**enables** 152:16
**enabling** 176:14
**enclosed** 311:8,9,9
**ended** 308:5
**enhanced** 189:5
227:6
**enhancement**

149:13 152:16
153:18 190:6
195:6,8,19 225:6
**entertainment**
270:16 271:8,21
272:4 273:3 295:7
295:10 302:19
**entire** 167:8 204:19
213:4 287:22
**entitled** 226:15
265:19
**entity** 299:8,10
**entry** 272:9
**envelopes** 234:22
**environment** 170:2
171:3
**environmental**
154:20 155:11
**equipment** 232:10
**equity** 154:21
228:2
**errata** 309:12
311:9,10,13 312:3
**escaping** 193:15
**Esq** 134:8,10,21,22
135:6 311:1
**Esquire** 137:16
312:1
**essentially** 213:12
**estate** 153:2 251:8
251:10
**estimate** 236:17
237:5
**et** 132:11 134:16
137:5 138:16
168:6 183:2,2,2
193:4,5 198:17
223:4 240:6 311:4
312:4
**Europe** 270:7
**Evelyn** 134:21
137:12 138:2
287:1 288:22
289:9
**event** 189:9 212:6

**eventually** 189:15
**everybody** 178:4
248:14 270:13
**everybody's** 279:15
**everyplace** 256:18
**evidence** 210:21
276:19
**evidently** 216:20
**ex** 285:6
**exact** 165:15
184:18 211:13
219:14 234:19,20
236:16 237:4
242:10 289:17,17
**exactly** 165:3
170:15 207:13
211:20 225:5
253:9 287:14
**examination** 136:2
136:3 138:12,15
**examine** 285:7
**examined** 138:14
309:8
**example** 177:19
179:4 223:12
**exchange** 152:18
**exchanging** 152:19
**excited** 175:6
**exclude** 204:9
**excluded** 178:10,12
203:21
**excluding** 199:15
**exclusive** 212:16
**exclusively** 255:10
**exclusivity** 197:6
**excuse** 151:7
152:18 206:15
209:12 216:2
306:1
**execution** 270:10
**executive** 251:16
253:15
**exercise** 189:8
**exhaustive** 142:22
143:2 156:18,20

**exhibit** 139:10,12
139:16,17 140:12
140:13 147:13,14
147:18 150:18,19
151:5 152:5
185:15,16 186:16
198:2,3 202:13,15
202:16,16,20
204:21 207:21
208:1,10,12
209:10,11 211:16
211:18,20 221:9
248:6,10 253:19
253:20 259:8
261:16,20 280:1
281:6,9 298:1,2,7
**exhibits** 136:5
209:4 307:1,11
**exist** 179:5
**existed** 224:3
299:16
**expense** 233:15
257:10,13 276:19
**expenses** 193:1,4
229:13 231:1,1
233:12 234:3
255:8,11,14
256:11 257:7
259:14,19,20
260:16,17 261:3,3
261:7,10,12
268:14 270:16
271:8,21 273:3
275:12 276:2
294:8,16,22 295:7
295:10 296:9,16
296:19 302:11,12
302:19
**experience** 200:21
**expert** 195:2
**expire** 202:2 224:8
**expired** 224:3,5
**expires** 310:18
**explain** 152:14
182:10 224:13

Marialice Williams

252:3 274:22
276:1 292:9
**explained** 193:10
  193:11 212:21
  283:20 287:5,15
  297:5
**explaining** 149:12
**express** 172:15,21
  255:5,17,18 257:8
  257:11,12 259:13
  260:7
**expressed** 179:6
**extend** 189:7
**extent** 142:13
  190:4 212:1
  219:21 225:7
  227:4 240:17
**extra** 256:8
**extraordinary**
  231:1
**extremely** 193:7
**eye** 133:11 134:18
  275:22
**e-mail** 136:7
  147:14,19 148:1,4
  220:13 221:2
**e-mails** 146:14,19
  149:8 156:7,21
  160:13,18 196:22

**F**

**F** 254:16 255:2,3
**fact** 151:9 154:3
  158:10 192:21
  220:18 231:18
  264:15 288:13
**failing** 197:5
**fair** 142:12 165:9
  215:19 222:8
  250:16 280:11
  282:2 307:17
**fairly** 225:22
**faith** 186:11
**false** 221:22 222:10
  222:13,15 223:17

**Fam** 218:21
**fame** 188:8
**familiar** 173:10
  218:19
**family** 155:12,13
  157:8 173:10
**Fan** 228:15
**Fannie** 135:2 138:3
  138:6,9 140:18
  141:7,19,20 142:6
  146:8,19 148:18
  149:5 151:7
  152:17,20 153:12
  153:16 154:8,18
  156:15 158:2,5
  160:14 161:6,19
  162:6 164:5,7,18
  164:18,21 165:7,8
  165:12,13,14
  166:2,4,7,10,19
  168:3,17 169:3,12
  169:14,18 170:8
  170:10 171:14,19
  172:9,13 173:6
  174:4,9,18 175:14
  176:7,8,12,14,18
  176:21 177:11
  179:2,14 180:3,12
  180:13,17,20
  181:10,11,12,20
  182:3,5,15 183:11
  183:17,21 184:1
  184:12 186:19
  187:10,15,20
  188:4,20,22 190:2
  190:17 191:5,22
  192:2,3,5,14,19
  193:3,11,22
  194:10,18 195:3,6
  196:9,12,17,22
  197:2,3,9 198:17
  199:14 200:6,9,18
  201:2,3,6,8,10,20
  202:8 203:1,6,10
  203:12,22 204:5,6

204:20 205:9,14
205:16 206:5,12
206:19 207:19
211:7 212:7,22
213:8,10,15 214:2
214:3 215:2,13,18
216:18,21 217:4,6
217:8,12,15,15,18
218:2,18,20
219:21 220:2,3,17
223:10 224:16
225:1,8,11,20
226:1 227:14
228:15,22 230:18
231:21 234:4
238:9,14 239:16
240:12,16 242:9
243:12,15 244:16
245:9,21 247:15
256:4,9,12,13,13
256:18 257:8
259:15 260:5,12
268:2 270:12
279:11 287:21
288:2 293:11,18
299:20,21 302:4,9
**far** 160:13 192:18
  194:1 243:13
  246:1 271:15
**fast** 169:19 226:17
**father** 231:11
**fax** 232:13 276:12
**feasibility** 194:18
**feasible** 192:18
**February** 157:17
**Federal** 132:10
  134:15 137:4
  138:15
**fee** 224:21,22
  226:12 227:2
**feel** 138:21 139:3
  168:14 180:11
  228:16
**feelings** 176:19
**fees** 224:18,20

226:20 228:14
300:16,18,19
301:3,10
**felt** 167:20,22
  168:12 170:19
  177:7 179:2
  182:17
**fide** 276:15
**field** 213:20
**figures** 266:16
**file** 179:20 183:10
  183:15 184:16
  227:16 233:21,22
  248:2 260:14
  262:6 271:13
  290:22 302:17
  305:19
**filed** 161:4,21
  162:1,3,4,7 163:9
  186:21 225:14
  250:5,17,18
  254:21 258:13
  262:4,22 263:10
  263:12,16 265:20
  266:12,13,14,16
  272:6,12 276:18
  277:9,14 283:11
  283:12,14 284:1,3
  284:12,14,21,22
  285:10,16 286:15
  288:9 289:3
  290:18,18,20
  291:8,13 303:7
**files** 301:13
**filing** 275:16
**filled** 234:22
**final** 186:6 209:20
  211:10 242:15
  252:8
**finalized** 283:22
**finance** 183:8
**financial** 136:13
  139:19 151:7
  164:19 182:20,22
  203:2,4 206:18

207:9 213:11,15
213:17 217:5,16
217:18,21 218:2,3
218:3,13 219:7,8
242:17 248:11
249:13 266:15,19
**financially** 310:13
**find** 143:14 159:5
  207:4,4 231:9,10
  288:4
**fine** 170:6 279:13
  288:13 308:3
**finish** 144:4 245:5
  280:21 281:1,15
  281:16 304:13
  305:17 307:6
**firm** 137:10 164:12
  171:6,7,10 173:2
  276:9 281:8
**first** 153:10 163:12
  163:16 169:15
  181:1,14 188:2
  201:3,15,18
  220:10 221:1
  230:2 235:12
  236:9 242:4,8
  243:6,7,11 244:13
  244:15 251:19,20
  266:10
**five** 164:3,3 205:22
  213:19 227:17
  276:7 278:16
  282:2 289:9
  290:20 296:19
  299:3
**fix** 286:10
**flat** 276:13 277:17
  277:20,21
**flow** 254:5
**FNMA** 311:4 312:4
**FNMA.MBW.00...**
  136:6 139:13
**FNMA.MBW.00...**
  136:9 150:20
**follow** 244:21

245:6,15 265:2
289:21 294:5
**following** 141:19
192:14
**follows** 138:14
**fond** 168:18
**Forbes** 270:7,7
**foregoing** 249:13
309:8 310:3,4
**forfeit** 268:4
**forgot** 192:7
220:21
**form** 136:17,19,20
152:15 192:19
225:17 261:20
281:9 284:16
298:2 301:18
303:5
**formed** 299:19
**former** 247:2
303:13
**forms** 161:12
**forth** 159:1 179:7
195:17 235:6
302:2
**fortunate** 154:8
180:19
**forward** 168:22
**found** 136:12,17 145:2
145:15,20,22
176:1 231:12
256:15
**four** 280:12,17,19
280:19,21 281:14
281:14 287:6,13
289:9,9 291:14
299:3 304:7
**frame** 143:15 146:1
165:17 236:1,5
**frames** 157:20
**frequently** 179:17
184:2
**freshman** 171:18
**Friday** 143:6
238:11 285:7

**friend** 188:11,12,12
193:6 219:7
**front** 301:16
**frustration** 215:9
**full** 138:22 139:4
**fully** 200:5,8
246:21
**full-time** 275:19
**functions** 218:18
**fundamentally**
215:17
**funds** 162:6 197:10
237:8
**further** 196:19
294:3 310:11

---
**G**

**gain** 166:17
**game** 219:15,16
**gamut** 154:21
**garage** 143:9
158:21 159:4,9,10
**gee** 175:10 287:20
**gen** 273:10
**general** 139:19
241:7
**generally** 149:22
150:2 152:21
160:14 167:22
224:17 273:11
**generic** 272:20
**GenRe** 197:5
**GenStar** 151:8
192:10 197:5
**gentleman** 193:14
**Gerard** 164:10
**getting** 167:2
174:20 175:9
180:16 188:21
189:6 203:10
214:17 217:1
231:16 260:4
**Gigi** 231:11
**Gins** 249:10 253:4
**give** 138:22 139:4

176:5,22 178:5
179:8 211:2 214:4
246:11 258:2
260:19 265:9,9
275:11 278:11
279:16,17 280:11
285:6 287:9,19,21
293:2 306:17
**given** 143:14 178:4
180:13,21 197:9
206:11,15 211:4
234:19 265:15
284:18 304:7
309:10 310:8
**giving** 185:22
190:10,12 203:16
211:6 214:19
281:1 302:8
**go** 157:22 172:4
173:1,6 174:20,22
175:8,13 177:20
182:13 185:6
197:14 207:3
209:15 210:2
234:8,9,10 237:10
258:1 260:21
266:21 272:15
278:9,12,20,21
279:12,13 280:17
280:18,19 283:4
285:20 290:6,15
292:8 300:7
303:22
**God** 291:21
**goes** 218:19 258:12
265:22 266:5
267:14
**going** 155:3 161:19
166:21,22 170:18
174:15 175:1,7
176:19,21 178:11
179:21,22 181:16
182:21 183:1,3
186:5 189:9
193:13 196:11

197:11 204:11,12
214:4 221:4
241:16 243:19
244:21 245:3,6,11
245:15,16 247:14
248:5 255:20
256:3 259:22
260:11,11,19
261:15 262:9
263:19 264:22
265:2,8 266:16
271:1 278:9,13,14
278:22 279:3,16
281:1,13,21 283:3
284:20 287:15
288:6 294:5
295:19 296:7
304:1,8,8 305:15
306:18
**Goldfrank** 147:20
**Goldman** 270:6
**golf** 178:7
**good** 137:1 138:18
138:19 167:9
168:16 172:20
180:16 186:11
188:6 291:20
**gosh** 148:21
**gotten** 173:7
279:18
**Grace** 138:3,6
186:19 194:7
221:3
**grand** 235:13
**gravitated** 179:16
**great** 142:17 154:9
157:22 158:22
159:16 168:9
183:4 205:10
269:22,22
**Griffith** 135:6
138:8,9
**gross** 232:18 250:9
301:21,22
**ground** 262:12

**grounds** 262:11
**Group** 273:17
274:5,7,9 277:14
282:18 283:8
**Groves** 209:12
**grueling** 164:4
**Grundeman**
134:22 138:5,5
147:19 306:22
307:3
**guess** 151:16
172:19 207:3
211:9 225:22
253:10 279:6
303:16
**gun** 240:3

---
**H**

**half** 278:16 282:3
307:13
**Hamilton** 172:6,15
173:4,14 174:1
**Hampton** 246:20
**hand** 139:8 150:16
253:17
**handed** 181:9
185:20 186:11
195:10 208:11,20
**handing** 147:11
185:14 198:1
214:10
**hands** 142:21
**happen** 175:1,3
**happened** 159:8
183:14 196:16
208:15
**happy** 170:8
181:14
**harassment** 288:17
**hard** 143:7 196:2
**Harley** 134:3,8
137:20 239:10
311:1,2
**Harrison** 246:4,9
**Hartsfield** 193:7

Marialice Williams

194:7,16 209:13
230:3 231:18
235:14 236:12
237:6 269:15
**Harvard** 171:18
**Harvey** 193:6
194:6,16 209:11
209:13 230:2
231:18 235:14
236:12 269:15
**hazard** 155:12
**head** 303:13
**headquarters**
232:3,5,6,7
**Health** 300:21
301:2
**heard** 163:16 213:4
**hearing** 290:9
**held** 133:8 216:7
**help** 157:7 175:16
180:6
**hereto** 310:13
**high** 224:20
**higher** 180:5
276:10
**high-level** 192:10
192:12
**hire** 275:18,19
281:7 286:9
297:15
**hired** 184:21
200:11 247:4
303:9,12
**history** 177:8
**Hobbs** 242:6
**hold** 306:20
**holding** 254:16
255:1,4
**home** 163:3,5 179:5
**honest** 166:18
282:3
**honestly** 191:13
219:20
**honor** 197:6
**hour** 307:13,13

**hourly** 278:19
**hours** 278:13,14,15
278:16 282:2
304:2,7,9,16,18
304:19 305:10,14
**house** 158:17,21
**housing** 154:19
155:1 171:15
182:16 215:4
228:3 256:2,16,19
257:1,3
**Hoyes** 181:13
**Huebscher** 138:4,7
186:20 194:7
221:3
**huge** 158:18,21
181:16 189:9
**huh** 221:16 269:1
**human** 177:5
**hundred** 225:15
**hurt** 215:15
**hurtful** 174:14
**hurting** 229:3
**husband** 284:22
286:15 290:19

——————
**I**
**ID** 273:20
**idea** 196:9 227:3
306:18
**identical** 295:11
**identification**
139:14 147:17
150:21 185:17
198:5 248:13
251:13 254:2
261:22 281:11
298:4
**identified** 144:2
229:13 247:10
274:17 292:9
297:16,19 302:13
302:18
**identify** 137:19
139:16 151:5

155:7 186:15
208:13 209:5
211:13 247:14
251:7 252:1,17
268:14 270:15
294:8,22 295:6
296:11 298:14
300:10
**identifying** 227:20
259:14 292:2
**II** 132:14 137:2
216:9
**illness** 257:4
**imagine** 215:9
282:18
**immaterial** 264:11
267:10
**immediately**
250:10
**impact** 180:20
**impart** 170:22
**implementing**
194:20 247:5
**important** 175:1
218:21 287:18
**impression** 203:17
**inaccurate** 289:3
**inadvertently**
305:5
**include** 197:2
230:12
**included** 203:11
**including** 144:2
154:18 155:4,11
181:1 225:9 276:8
**income** 136:17,19
136:21 250:8
261:21 278:18
281:10 292:14,16
292:20 293:7,13
293:20,22 298:3
299:12,13,13,14
299:17 300:1,11
300:13 301:9
**inconsistent** 271:3

**Incorporated**
139:19
**incorrect** 252:15
285:19,22 286:1,4
286:5,8,12 292:6
292:7 300:6
**incurred** 256:12
271:20,22 272:3
273:2
**independent**
153:19 284:4
299:7,10
**independently**
271:15 273:1,9
**indicate** 237:3
249:11 257:7
292:13
**indicated** 216:19
**indicating** 195:17
221:3 252:14
**indications** 206:19
206:21
**indispensable**
197:9
**individual** 136:20
175:19 195:5
219:9 233:19
235:10 251:12,21
274:5 282:21
283:2 298:3
303:17
**individually** 290:21
296:5
**individuals** 192:12
194:6 195:5
235:11 247:9,11
256:20 257:1
260:8 275:4,14
297:9,15,18
302:17
**industry** 299:18
**inexpensive** 234:12
**information** 143:6
147:2 155:19
164:1 168:19

170:20 171:1
181:2 199:5,10
206:15 221:22
226:7,9 246:18
247:12,19,21
250:13 252:20
258:2,4 261:13
273:6 275:11
283:7 292:19
293:2 303:12
**initially** 173:15
197:3,4 220:12
**inner** 181:18 257:1
**input** 154:9
**inquiring** 266:12
**inquiry** 266:19
**ins** 200:18
**instance** 153:13
168:1 222:18
**instances** 211:19
218:22 224:19
**instructed** 194:12
**instruction** 244:22
245:7 289:15,20
294:6
**instructions** 189:13
**insurance** 139:20
149:9 151:8
152:11,12 153:19
154:2,20,22
155:10,12,13,14
155:14 158:10
181:22 191:19
192:8,13,19,21,22
193:1,8,9,16,19
194:22 195:19
196:4 199:15,21
200:7,9 201:1,18
202:7 205:13
207:14 210:18
212:15,16,18
213:2,6 218:13
219:2,4,6 224:19
225:8,18 226:13
227:7 246:17

247:3,6,8 269:20
270:2,9
**insurance/reinsu...**
210:19
**insurer** 226:13
**insurers** 219:1
**insuring** 154:3
**intelligent** 180:8
**intend** 264:3 300:7
**interested** 215:6
310:14
**interesting** 176:1
179:6
**interfere** 213:8
**interfered** 203:13
213:10
**interference**
202:21
**internal** 183:10
192:20 277:9
301:12 303:14
**international** 195:2
199:21 200:12
**interrog** 199:6
**interrogation**
277:6
**interrogatories**
136:12 198:4,16
247:16 271:5
**interrogatory**
198:18,21 199:3,4
199:7,9 202:11,18
205:3,22 207:6
216:1,14 221:19
224:1,12 229:12
229:14 237:20
247:10 270:19
297:20
**introduced** 184:20
184:21
**intrusive** 264:11
**invite** 178:6
**invoke** 244:10
**involved** 177:20
179:19

**involvement**
163:19,21 165:10
**involves** 243:21
**involving** 242:7
**irrelevant** 264:13
264:14 267:10
277:7
**irritating** 286:18
**IRS** 258:1,13 262:4
277:15 283:11
288:12 303:7
**IRS's** 277:15
**Islands** 193:18,18
**issue** 165:15 169:14
179:3 182:2
276:14 288:16
290:9
**issued** 139:17
143:2,19 145:12
149:15 153:16,17
165:20 181:14
225:4
**issues** 176:19
177:22 179:17
187:12
**iterations** 207:18
**It'd** 213:4
**It'll** 144:5 221:12

_____
**J**

**Jane** 246:4
**January** 136:8
147:15 151:20
155:18 157:17
209:14
**Jay** 134:3,8 311:1,2
**JD** 286:2
**Jesus** 233:21
**Jim** 188:11,12
**Joanne** 132:20
133:14 137:15
310:2,16 311:16
**job** 132:21 170:22
176:18 271:16
277:15 282:6,9

303:2,3 312:6
**John** 132:8
**Johns** 182:8 231:20
**Johnson** 184:14
185:2
**Johnson's** 184:15
184:18 188:12,12
**joint** 162:12 290:19
**jointly** 169:14
269:21
**joke** 204:5
**Jonathan** 135:6
138:8
**Jones** 164:19,21
165:7,9 166:20
167:1,5 168:7
175:13 193:15
197:1 203:7 206:7
206:14 210:17
215:12 216:15,17
219:13,22 220:8,9
222:3,13,22
223:11 226:10
231:20 246:5
302:5
**Jones's** 165:10
208:15 226:5
**Jones/Cam** 206:18
**judge** 132:8 197:8
**Julia** 165:2 242:15
**July** 310:19
**June** 157:16 187:9
190:18,19,21
191:5 306:4
**jurisdiction** 194:19

_____
**K**

**Kate** 194:7,16,21
195:1 219:10
247:4
**keep** 148:17 159:14
159:15 167:1
233:16,20 260:10
263:2 275:21,22
282:2 287:16

299:22 304:11
**kept** 158:5 160:15
209:15 233:18
**kind** 170:2,10
174:16 181:7
182:15 188:11
189:5 212:20
213:21 214:9
216:21 227:6
275:16 276:8
**kinds** 159:8
**knew** 163:12
166:19,19,21
170:16,17,17
173:10 176:8
179:4,4 183:4
200:12,15,17,19
229:1 246:7 252:9
252:9 286:10
**knockoffs** 225:18
**know** 139:5 142:5
152:13 157:11
162:20 166:14,14
166:16 167:10,11
170:2,6,20 172:3
173:11 178:6,9
181:4,7 182:1
183:3 188:7 189:3
189:3,5,9,12
194:8 195:12
196:8 199:18
200:16,17 202:22
203:5 205:9,14,19
206:4,6,7,8,14
207:1,1,2 209:14
213:15,21 214:6,6
214:10,21 215:14
216:20 219:18
220:3 222:5,8,10
222:11,18 223:1,3
223:6,8,13,15
224:2,4,7 225:8
227:4,5,11 228:6
228:13,14,19,21
229:3 230:16,21

231:8,9 232:2
243:13,17 245:14
248:3 249:19,21
252:2,4,6 253:3,3
254:6,11 256:14
258:10 266:8
267:5,8 271:16
276:6,9,18 277:20
279:20 282:14,16
283:4,5 286:1,3,5
286:8,12,19
292:18,20,22
293:12,19,22
294:12 295:4,14
295:14,15,16
296:2,14,16,18,21
297:2,21 299:19
299:20,21 300:9
305:14,18 306:20
**knowing** 173:6
177:7 225:5
227:18
**knowledge** 167:13
167:20,21 168:11
178:11 197:12
200:21 218:15,16
218:17 253:9
**known** 165:12,13
166:2 171:17
184:20 218:16
**knows** 206:12
222:6,7
**Kyra** 134:22 138:5
147:19

_____
**L**

**L** 134:21 299:1
**language** 210:13
**laptop** 148:15,17
148:20 149:6,17
149:21 150:2,4
**large** 149:10
234:21
**largely** 150:3
194:19 255:17

Marialice Williams

260:9 271:1
**larger** 150:1
**Larry** 194:21 247:1
**late** 210:16 219:15
219:16
**law** 134:3 137:10
137:12 166:5
171:6,7,10 193:12
193:19 206:16
238:1,1 276:8
279:1 281:8 311:2
**Lawch** 138:3,6
166:22 167:3
171:9 172:16,22
173:3,13 174:3,21
175:18 176:3,5
177:2,18 179:14
182:11 183:18
186:19 189:13,17
189:22 199:20
200:5 222:6
223:14 239:19
240:8 241:9
**Lawch's** 170:12
174:7 176:9
**laws** 187:17
**lawsuit** 262:13
263:21 267:12
**lawyer** 172:20
190:22 278:20
**Lawyers** 305:21
**Lawyer-client**
244:2
**lead** 167:12 204:12
**learned** 219:20
**lease** 229:16,17,19
231:6,7 234:10
**leave** 181:11
182:19 189:4
227:22
**leaving** 175:11
182:5,5 187:20
241:3
**led** 217:3 305:9
**Lederer** 134:10

137:22 138:1
191:2,3,7 238:2
239:9 240:18
242:12 244:8
264:10,14,20
265:6 266:4,11,22
298:8,12 305:11
305:15 307:4,10
308:2
**Lederer's** 206:16
239:2
**left** 158:2 162:11
165:14,15 172:1
174:4 176:20
181:12 182:3,18
185:4,5 187:9
190:17 191:22
192:2,3 200:8
201:4,5,12,20
202:8 213:20
228:1 230:21
234:4 235:7
304:18
**legal** 239:2 242:5
243:21 268:15
269:13,17 292:10
292:11 294:9,16
302:12
**legitimate** 289:20
**Lend** 234:10
**lenders** 246:6
**length** 158:6
**letter** 202:17 203:1
203:6 204:13
213:14,21 215:11
**let's** 148:21 163:13
172:10 197:14
198:8 209:17
222:18 224:6
226:16 227:15
241:6 266:21
290:4
**level** 152:22 180:5
184:4
**levels** 180:3

**Levin** 169:10
184:21
**Levy** 184:9
**liar** 301:14
**license** 201:19,22
202:2
**licensed** 238:17
303:9
**lied** 215:12,13
**life** 142:20 213:4
277:7
**lifetime** 153:8,21
154:5
**likewise** 219:3
**limit** 168:5
**limited** 155:11
**line** 268:14 312:7
**lines** 232:12,16
276:7
**list** 247:9 251:12
296:19 299:5,8
300:3,5
**listed** 194:6 250:13
251:7 252:17
259:18 260:9
261:12 292:22
300:5
**listen** 284:19
286:16
**lists** 260:15
**litany** 179:9 218:1
**litigation** 142:16
143:3 145:13
149:21 163:8,12
163:16,17,18,20
163:22 164:6
186:2 197:4
238:20 239:7,8
243:3 257:18
**little** 144:5 169:17
178:14 189:10
190:12 213:19
288:1
**live** 161:16 176:22
230:16

**lived** 230:17
**livelihood** 280:10
280:13
**Liverani** 132:20
133:14 137:15
310:2,16 311:16
**living** 158:14,16
159:12 162:6
231:1 278:17,19
288:5 304:10
**LLC** 232:7,8
273:17 292:3,7
298:16 299:1
300:4
**LLP** 133:10 134:17
**loan** 230:19
**loans** 152:17,19,21
153:6,7,20 154:2
154:4 215:4
**locate** 156:19 208:3
210:15
**located** 137:16
193:17 212:18
252:21
**long** 162:2 166:21
169:18 181:12
182:11 183:16
184:20 229:1
235:1 249:17
255:16 277:20
306:17
**longer** 139:4
161:16,17 224:9
241:17 270:3
304:1
**look** 150:10 155:19
187:5 204:18
205:2,21 207:5
215:22 216:13
233:1 234:14
252:7 253:2
269:21 273:16
277:10,16 289:10
295:15 296:1
297:11

**looked** 253:6
**looking** 149:13
200:13 218:6
225:13 226:3,4,16
252:22 253:6
267:9 268:13
282:11 291:4
292:18 293:9,13
294:14 296:6,10
302:11
**looks** 267:10
**Lord** 192:7
**lose** 147:2 159:22
280:10
**loss** 153:14,18
157:4 287:20
**losses** 153:7,20
154:3,6,20 224:15
267:20 268:3,4
**lost** 211:3 245:12
249:16 279:9
**lot** 157:6 159:21
170:8 175:16
179:15,16 196:10
205:15 222:20
235:5 255:21
256:6
**lots** 223:17
**Lou** 181:13
**loved** 176:18
**Lucas** 274:13
277:13 282:18
**lunch** 220:18
**luncheon** 197:19
**luncheons** 258:17
**lured** 183:1
**lying** 211:8 279:10

--------

**M**

**M** 298:15
**Mac** 192:7,9,10
234:9
**machine** 276:12
**machines** 232:14
**MADAM** 210:3

Marialice Williams

248:8 261:18
280:2 281:3
**Mae** 135:2 138:3,6
138:9 140:18
141:7,19,20 142:6
146:8,19 148:18
149:5 151:7
152:18,20 153:13
153:16 154:8,18
156:15 158:2,5
160:14 161:7,19
162:6 164:5,18
165:8,12,13,14
166:2,4,7,10,20
168:3,17 169:3,12
169:14,18 170:8
170:10 171:14,20
172:9,13 173:6
174:4,9,18 175:14
176:7,8,12,14,18
176:21 177:11
179:2,14 180:4,12
180:13,17,21
181:10,11,12
182:3,5,15 183:11
183:17,21 184:1
184:12 186:19
187:10,15,20
188:4,20,22 190:2
190:17 191:5,22
192:2,3,5,14,19
193:3,11,22
194:10,18 195:3,6
196:9,12,18,22
197:2,3,9 198:17
199:14 200:6,9,18
201:2,4,6,8,10,20
202:8 203:1,6,10
203:13,22 204:5,6
204:20 205:9,14
205:16 206:5,12
206:19 207:19
211:7 212:7,22
213:8,10,16 214:2
214:3 215:2,13,18

216:18,21 217:4,6
217:8,15,18 218:2
218:18,20 219:21
220:2,3,17 223:10
224:16 225:1,8,11
225:21 226:1
227:14 228:15,22
230:18 231:21
234:4 238:9,14
239:16 240:12,16
242:9 243:12,15
244:16 245:10,21
247:15 256:5,9,12
256:13,14,18
257:8 259:15
260:5,12 268:2
270:12 279:11
287:21 288:3
293:11,18 299:20
299:21 300:14
302:4,9
**Mae's** 164:7,18,21
165:7 181:20
**mailed** 209:11
**main** 150:5
**major** 192:8
210:18
**majority** 247:17
301:7
**making** 275:18
288:5
**man** 171:14 200:16
200:21
**managed** 170:4
**manager** 177:19
178:22
**managing** 251:16
253:15
**manila** 234:21
**manner** 165:9
166:20 173:21
174:8,12
**March** 138:21
151:10 157:17
**Maria** 184:14

**Marialice** 132:4,16
133:7 134:2 136:4
137:3,4 138:11
186:18 198:16
204:12 216:5,10
232:5 235:18
272:14 282:7
284:7 289:5 294:2
305:1 306:15
307:4 309:7,15
311:5 312:5
**mark** 147:12
150:17 180:17
198:2 248:6
253:18 261:16
278:8 281:6 298:1
**marked** 139:9,13
142:11 147:16
150:20 185:14,17
198:5 202:13
208:12 248:13
254:2 261:22
279:22 281:11
298:4 307:11
**market** 155:2
158:11 176:15
206:9 218:17
256:20
**marketing** 174:17
235:6 269:20
270:1
**marketplace**
153:11 168:4
182:14 183:5
228:17
**markets** 178:13
182:16
**marr** 238:3
**married** 238:3,3
239:13,15 241:18
**Marsh** 192:7,9,10
234:9
**mat** 142:18
**materials** 142:18
144:21 145:17

149:8 195:10
**matter** 137:4
139:18 145:19
146:6 151:8
176:17 180:7
183:3 185:19
242:7,17
**mattered** 180:8
**matters** 241:7
**ma'am** 264:19
304:21
**MBS** 199:22 225:2
225:4
**McGlinchey**
164:11
**McKinnon** 175:3
**MCRI** 152:7,9,13
152:14 154:15,17
155:11 165:11
174:15 175:9
181:15,22 200:10
200:19 201:9
206:20 210:19
228:1,1
**meal** 271:8 272:3
295:7,10
**meals** 270:15
271:20 273:3
302:19
**mean** 176:11 178:9
181:3 189:10
218:5 220:20
230:22 231:1
232:1 233:13
255:13 256:16
257:22,22 272:18
277:4 280:11
281:13 287:4,18
288:8 289:22
293:17 299:9
305:4
**meaning** 154:1
**means** 274:22
288:4
**meant** 162:10

168:20 189:8
204:3 212:7 269:3
**meet** 166:8,10
168:21 210:17
220:18 234:9,10
234:11 256:4
**meeting** 136:15
173:4,14 191:19
192:14 194:2,5,14
194:15 195:11
196:2,16 229:5
253:21
**meetings** 192:1,3
218:22 238:13
**members** 192:5
**memorize** 296:8
**memory** 290:12
**mental** 257:4
300:21 301:2
**mention** 176:3
**mentioned** 168:21
170:15 184:8
238:11,15
**mentor** 180:4,9,11
**merged** 192:9
**merger** 192:7
**Merit** 310:17
**messes** 248:15
**met** 172:2 173:8,9
190:21 242:11
246:22 247:3
**meter** 237:10
**Metropolitan**
201:5
**Mexico** 242:6
**Michael** 239:9
**middle** 241:10
256:21
**might've** 193:2
299:17
**million** 181:6 205:5
205:7,15 225:15
226:20 227:8,17
228:9 268:4
**mind** 279:9

**mind's** 182:12
**mine** 184:16
**minus** 226:14
**minute** 197:15
**minutes** 185:7
  235:21 280:19,20
**Mirel** 194:21 247:1
**miserable** 240:2
**Mississippi** 225:14
  239:1
**misspoke** 244:13
**mistaken** 209:21
  211:5
**Mitigation** 292:3
  300:3
**Mm** 167:16
**mm-hmm** 147:21
  168:13 187:7
  194:4 200:2 207:7
  220:7 237:11
  244:19 248:9,21
  249:2 250:12,15
  251:1,4,21 252:13
  253:1 254:18
  295:3 302:14
**mod** 190:8
**model** 154:8
**modest** 190:8,8,9
**modification** 190:6
**modified** 190:4
**moment** 182:12
  262:16 264:20
**Monday** 132:18
**money** 170:8
  190:10 206:22
  215:16 230:17
  237:10 241:1,5
  254:5 256:8
  260:10 275:18
  279:15 293:18
  301:15
**month** 190:20
  229:15 232:10
  233:11 234:5,6,8
  235:13,15 236:22

268:21,21 269:3,9
  270:18
**morning** 137:1
  138:18,19 284:17
  288:10
**mortgage** 132:11
  134:15 137:5
  138:16 152:17,19
  153:6 154:2,4
  155:10 201:15,17
  222:18,19 231:22
  231:22 234:11
  256:3 299:18
**mortgages** 153:15
  181:3,18
**mortgage-backed**
  152:19 153:8,21
**mother** 159:2
  162:12
**mother's** 159:7
**motivation** 213:22
**Mountain** 270:5
**Mountains** 270:6
**move** 160:21
  161:20,21 162:14
  274:2
**moved** 158:12,16
  158:20 159:3,11
  161:15 162:1,3,4
  236:8,9
**moving** 159:12
**multifamily** 152:10
  152:11 153:11
  154:1,1 169:13
  174:5 175:5 181:3
  184:7 191:10
  192:5
**Myers** 133:10
  134:17 137:10,13

_____
**N**
_____
**N** 136:1,1
**name** 137:20,22
  164:10 171:7,8,21
  188:2 192:7

193:15 194:9
  248:15 270:6
  273:13 286:2
  297:8 298:14
  299:2 303:17,21
  312:4,5
**names** 251:12
  275:6
**nasty** 241:12
**National** 132:10
  134:15 137:5
  138:16 139:20
**nature** 240:19
  251:13 269:17
**nearly** 279:9
**necessarily** 156:12
  212:14 229:6
**necessary** 270:11
  275:21
**need** 186:5 221:10
  270:10 272:15
  281:21 282:5
  306:22
**needed** 219:4
  228:17 285:19
**negative** 172:16,21
  222:3,20 254:5
**negotiated** 187:10
  191:5 228:4 229:9
**negotiating** 243:14
**negotiations**
  189:16 190:15
  241:10
**neither** 310:9
**Ness** 134:4,11
  311:2
**never** 142:7 144:22
  168:19 204:6
  205:19 209:19
  213:3 221:15
  275:22 281:7
  288:3
**new** 169:16 170:7
  171:20 193:12,18
  194:10,10 203:3

234:8 242:6
  246:20
**Newman** 194:8,12
**newsletters** 149:11
**nicer** 189:11
**Nieds** 188:1,5,16
  189:12 190:16
  241:11
**nin** 147:7
**nine** 216:1,14
**nonsense** 288:7
**Non-Fannie** 300:14
**non-priority**
  254:17 255:4
**non-responsive**
  274:3
**Northwest** 134:4
  134:11,18 135:3
  137:11,17 144:19
  273:18 311:2,14
  312:1
**notary** 133:15
  138:13 310:1,17
**note** 311:10
**notes** 228:8
**notice** 133:14
  136:15 143:4,4
  253:20
**notion** 259:11,12
  259:13
**number** 137:2
  140:20 141:2,4,9
  141:13,15,22
  142:4 152:6 155:6
  155:7,17 156:7,13
  156:16 158:8,11
  174:19 177:15,16
  177:18 189:6
  192:17 199:3,4,7
  199:9 202:11,18
  205:3,22 207:6,17
  208:7 216:1,4,9
  216:14 221:19
  224:2,13 229:12
  230:5 234:18,19

237:20 238:5
  247:11 273:21,22
  274:1 301:17
  303:1,3
**numbers** 158:18
  234:20 251:13
  288:16 296:1,3
  302:1

_____
**O**
_____
**O** 136:1
**obfuscation** 204:10
**object** 241:17
**objection** 262:15
  264:5,9,18 267:2
**obligation** 215:3
**obviously** 214:2,18
  232:2 279:20
  290:8 302:1
**occasionally** 230:1
**occasioned** 154:6,6
**occurred** 159:10
  174:3 192:17
  194:15
**offense** 176:2
**offer** 166:15 188:20
  189:18,21 190:3
  191:12 265:18
**offered** 190:11
**offering** 188:18
**office** 143:10
  144:14 158:3,3,6
  158:13,19 161:17
  162:22 163:6
  169:13 172:2
  178:7,8,8,11
  179:16 193:8
  229:21,22 230:2,3
  230:4,5,9,10,11
  230:13 232:3,9,13
  232:15 233:14
  235:1,4 238:6
  260:4 294:22
  297:19
**officer** 188:10

Marialice Williams

251:15 253:14
310:2
**officers** 192:4
**offices** 133:8 134:3
137:12 229:22
231:4 238:7 311:2
**officials** 192:10
**oh** 143:21 148:21
150:9 171:21
172:2,8,14 175:10
192:7 204:13,14
226:14 233:21
255:20
**okay** 159:11 186:10
198:10 208:18
237:12 243:20
251:22 258:8
264:16 267:15
268:13 277:10
289:7 290:10
306:19 307:20
**old** 203:3
**once** 152:21 153:3
167:8
**ones** 247:18 263:3
279:18 287:10
297:4
**one's** 209:18
**one-off** 225:2,11
228:4 229:10
**one-page** 136:7
147:14
**one-pager** 207:12
207:15
**opened** 228:18
**operating** 193:1
**operation** 250:9
**operative** 187:3
**opinion** 192:20
**opportunities**
182:13
**opportunity** 154:9
159:20 181:21
285:6
**opposed** 178:21

**oppressive** 267:11
**option** 195:7
**options** 189:8
**order** 200:9 203:8
215:2 218:20
219:8 230:13
260:10 270:8
**ordinarily** 158:9
**original** 189:18,20
210:4 263:9 284:1
284:9,11,16
285:15 307:1,11
**originally** 190:11
290:18
**originals** 284:7
**ostensibly** 187:11
**Ott** 200:15,17
206:5,12,13 207:2
221:4
**ought** 170:10
**outcome** 310:14
**outer** 230:4
**outrageous** 279:2
**outside** 153:15
**outstanding** 254:19
**owe** 268:5
**owner** 162:12
193:2 253:16
**O'Melveny** 133:10
134:17 137:10,13

───────────
**P**
**package** 196:10
226:21 258:16,18
288:1
**packed** 159:1
**pad** 167:7
**page** 136:2,5
140:12,12 152:5,5
155:6 187:6
199:13 205:4
209:12 248:20
250:22 262:19
267:18 268:13
274:16 291:4,12

292:1 296:10
298:6 312:7
**pages** 132:9 309:8
**paid** 167:7 230:20
230:22 231:3
235:13,14 237:8
268:18 269:5,15
279:7 300:19
301:2 302:16
**pal** 178:7
**panel** 171:13
**papers** 156:10,22
158:22
**paragraph** 187:6
191:18 196:15
199:12 251:19,20
**parameters** 154:7
**part** 214:16 227:12
238:12 239:17
255:19 292:13
294:8 296:19
299:2 302:11
**participate** 219:2
**particular** 145:19
146:22 153:13
169:20 174:20
194:2 196:13
205:3 219:2,9
226:21 228:8
257:9 259:8
269:16
**particularly** 188:9
215:6 223:18
**parties** 195:15
196:5 310:10,13
**partly** 261:2,3
**partner** 251:16
253:14
**partnership** 251:17
**party** 197:4,9
**pay** 161:5 162:9
230:13 237:7
260:3 267:19
268:3 269:13
279:8 285:20

302:10
**paying** 211:8
236:21 241:4
276:13 277:18
**penalty** 249:12
**pending** 221:7
**people** 157:10
168:18 170:3,5
175:22 178:18,21
179:3,7,18 183:15
184:5,6 189:4
194:14 213:18
222:21 223:8,18
223:18 228:18
229:2,7 231:13,21
232:13 238:13
257:4 258:22
270:8 274:15
275:2,19
**people's** 175:16
**percent** 224:21
226:12,14,15
227:1,1 271:5
**percentage** 153:5
**perform** 275:20
**performed** 275:14
**period** 230:17
**perjury** 249:12
**permit** 229:1,2
**person** 163:22
167:12 171:17
172:5 175:17
176:2 177:6 179:2
179:11,18 182:8
184:11 188:2
194:13 200:15,22
223:15 235:4,13
235:14 238:22
273:12,13 274:12
274:13
**personal** 157:7
165:10 170:1
176:17 177:4,6
219:7 229:19
239:11 255:7,14

255:18 259:20
260:17 261:3,9
**persons** 247:13
**petition** 254:14
259:6 271:4
**pets** 178:14
**petty** 189:10
**ph** 188:1 274:8,9
**phone** 216:14
232:9,16 233:13
276:9
**phones** 232:16
**piece** 153:18 241:3
**pissy** 288:1
**place** 151:9 190:16
192:11 219:13
262:20 293:10,12
**placed** 272:8
**places** 144:1
156:13 192:11
197:11 256:3
**plain** 212:4,22
**plaintiff** 132:6
134:2 137:21
138:1 187:9,14
**Plaintiff's** 136:11
198:3,15
**play** 176:14 178:7
**please** 137:18
139:5 167:18
210:1 287:1,1
311:8,13
**plus** 153:17 193:15
**point** 145:20 169:7
170:13,14 173:16
189:2 197:18
203:20 204:10
205:1 214:2 215:5
241:17 267:9
301:16
**points** 146:16
224:18,20
**policy** 153:19
154:22 184:4,10
192:4

**pool** 153:15 199:15
**pools** 154:1 181:2
  199:22 207:4
**poor** 177:19 178:22
**poorly** 240:4
**portfolio** 152:17
  153:3 225:5 227:6
**portion** 230:8
**posed** 199:6 245:8
**position** 164:18,21
  165:7 178:2
  182:20,22
**possessed** 142:22
**possession** 141:1
  141:12 142:3,13
  145:10 146:9,10
  150:13 155:22
  156:1,3,5,9 157:2
  160:18 162:20
  258:5
**possessions** 157:9
  157:13
**potential** 149:10
  224:16 238:14
  256:15
**PowerPoint** 195:22
  196:1
**preceding** 250:11
**precisely** 143:22
  144:20 149:7
  161:8 206:5 222:5
**predecessor** 247:1
**prefer** 193:12
**preference** 178:17
**preliminary** 185:19
**premium** 224:22
  226:12,15
**prepare** 198:18
  233:5 249:5
**prepared** 149:8
  233:16 234:16
  249:9 253:4
  257:15 258:11,14
  263:14,17 273:14
  274:6,7,9 277:14

**present** 135:8
  137:18 193:22
  218:22 242:19
**presentation**
  194:17 195:22
**presentations**
  149:9 270:12,13
**presenting** 196:12
**president** 171:20
  176:12 184:3,13
  191:10
**pressure** 241:3
**pretty** 148:8
  167:21 175:15
  188:22 210:11
  211:20 212:1
  223:10 225:15
  255:12 257:16
**previous** 209:4
**previously** 202:13
  291:7
**price** 181:5
**print** 150:2
**printed** 263:5
  288:10
**prior** 163:14
  164:16 165:19
  168:21 170:16,17
  170:18 171:4
  187:14,20 192:6
  196:11,12 219:9
  242:16 244:17
**privilege** 244:3
**privileged** 246:3
**prize** 275:22
**probably** 142:20
  164:1 174:13
  175:19 185:3
  201:13 210:14
  232:17 241:11
  270:22 271:22
  300:6 301:8

**probing** 290:1
**problem** 231:16
**problems** 256:16
**proceed** 281:13
**proceedings** 197:18
**proceeds** 212:8
**process** 195:18
  218:19
**processes** 218:18
**procurer** 213:6
**produce** 140:8,22
  141:11 142:2
  144:16 145:13
  146:3,8 149:19
  151:13 160:6,10
  207:15,17 231:7
  268:10 275:8
**produced** 142:15
  144:18 145:1,18
  146:4,13 150:6,12
  150:14 155:21
  156:2 159:17
  189:2 207:18
**producing** 168:2
  176:13
**product** 146:19
  164:2 167:8
  169:17 170:10
  175:10,15 182:14
  183:5,9 189:21
  196:11 206:9
  215:1 227:7
**production** 208:7
**productions** 146:7
**productive** 176:16
  180:7
**productivity** 176:6
  176:8,20
**products** 168:2
  170:7 176:14
**profession** 292:10
**professional**
  268:15 269:14,18
  269:19 273:12
  294:9,16 302:12

**proffer** 264:3,7
  265:7,9 266:5,18
  267:4
**program** 154:21
  182:16 205:8
  215:5 219:3 221:5
  225:10 227:3
  228:2 229:8,8,9
**project** 158:4 227:7
  257:3
**projects** 269:21
**proof** 265:14
**properties** 152:22
  175:6
**property** 161:5
**proposal** 154:11,14
  154:16,18,19
  155:4 192:14
  220:14,16 229:5
**propose** 280:17
  307:22 308:2
**proprietorship**
  251:17
**prospective** 149:9
**protected** 187:16
**prove** 231:17 264:3
**proven** 180:1
**provide** 240:11,14
  256:22 278:4
  282:19 283:7
  285:5,15 294:19
  295:18 302:6
  303:3
**provided** 205:9
  261:14 273:6
  283:18 303:12
**public** 133:15
  229:4 310:1,17
**pull** 159:20
**purposes** 267:12
**pursuant** 133:14
  187:10
**pursue** 193:13
  200:9
**pursuing** 193:16

**push** 180:6
**put** 142:21 156:11
  158:22 160:2
  171:13 183:1
  189:16 235:19
  237:10 241:1
  253:5,11 254:4,6
  258:18,20 269:11
  271:13 273:8
  277:2 299:12
  300:2 301:11
  303:5
**putt** 178:8
**p.m** 308:6

**Q**

**quarter** 281:14
**quarters** 235:19
**question** 143:17
  144:5 151:1 164:2
  174:15 180:15
  188:6 190:9 199:6
  209:1 210:1,4
  212:12 218:7,10
  220:21 221:7
  233:3 234:17
  241:20 243:19
  244:22 245:4,5,8
  245:12,14,17
  249:16,19 251:6
  259:7,21 260:18
  262:10 265:1,5
  279:17 283:3,4,13
  284:22 288:22
  289:2,6,17,18
  290:2 294:3
  295:21
**questioning** 185:20
  277:5
**questions** 245:19
  245:22 272:21
  284:3 287:19
  288:6 290:1,13
**question's** 272:19
**quite** 168:8 184:5

195:15 230:15
235:3
**quote** 199:20
**quote/unquote**
200:12

**R**

**race** 177:12 178:20
183:19 187:13,19
188:15 240:9
**racial** 177:22
**rafters** 159:1
**raised** 186:12
**ran** 154:20 171:16
260:5,6
**ranged** 224:18
**rate** 276:13 277:17
277:20,21
**rated** 210:18
**reaction** 173:13,16
173:19 184:15
241:14 243:16
245:9
**read** 187:8 205:8
210:7,10 212:11
212:13 218:9,11
220:22 249:12
251:19 309:8
311:8,12
**ready** 174:20
188:21
**real** 153:2 178:10
204:10 226:17
251:8,10
**reality** 203:9,19
**really** 142:7 151:21
159:5 167:9 168:4
168:8 169:6 172:8
172:9 174:14,18
182:13 188:6
196:19 218:8
219:19,19,20
224:4 235:3,4,8
241:12 255:15
278:19 279:1,7

**304**:10
**reason** 145:9
151:22 157:1
160:9,17 164:14
217:1 228:15
260:2 278:17
299:5,22 300:1
**reasonably** 305:18
**reasons** 157:7
311:10
**recall** 140:3 143:22
151:11 152:3
154:10 160:8
162:18,21 163:8
164:15 171:8
172:9,11 174:2
185:3 197:3
219:17 223:20,22
224:4 236:16
237:1 242:10
255:15 273:9
291:11 300:22
**receipt** 221:2
273:10
**receipts** 233:14,17
233:18,20 234:14
234:17,22 257:15
257:17 258:12,15
258:20 259:1,10
259:16 261:14
271:1,2,9,12,15
272:5,7,10,21
273:2 275:7,9
276:21,22 277:10
277:13 278:4
283:5,6 301:13,21
301:22 302:2,2,7
302:17 303:4,5,16
**receive** 226:14
**received** 163:15
220:13 250:10
292:20 293:18
**receiving** 140:3
**recess** 185:10
197:19 237:15

**recognize** 148:1
198:12 248:17
254:8
**recollection** 148:5
163:11 250:4
**recommendation**
179:17
**recommended**
194:21
**reconfigured**
230:14
**reconvene** 280:17
280:21
**record** 144:5 185:7
185:8,11 197:15
197:16,20 210:7
210:10 212:13
216:6,7,11 218:11
220:22 236:11
237:13,16 257:13
266:21 306:6
310:8
**recorded** 227:13
272:1
**records** 145:14,16
146:14 159:6
161:11 185:21
186:9 237:2 239:1
247:15 257:14
289:11 293:1,9
294:13,14,20
295:5 297:11
**recovering** 257:4
**Red** 222:19 231:22
**redid** 303:15,18
**redirect** 280:22
281:1,15
**redneck** 168:8
223:12
**reduced** 207:9,11
310:7
**refer** 140:17 141:6
141:17 155:9
202:12
**reference** 194:2

**referenced** 311:8
**referred** 199:19
270:19 274:11
**referring** 171:5
202:17 208:1,8
216:16 274:12
**reflect** 225:1
227:14 230:16
233:4
**reflecting** 231:2
**reflection** 293:1
**reflective** 176:6
188:19
**refresh** 148:4 250:4
**refusing** 258:7
**regard** 206:17
217:11
**regarding** 141:7
196:22 216:17
240:20
**Registered** 310:17
**regular** 206:20
**regulations** 194:20
247:6
**reinsurer** 195:16
**reinsurers** 219:1
**reiterated** 220:2,6
**relate** 140:17 141:6
141:17 154:16
155:9 161:15
**related** 142:9
156:15 200:18
215:17 256:11,12
257:5,8 259:15
310:9
**relates** 154:17
**relating** 141:1
148:18 149:5
150:6 157:2
226:10 228:11
245:20 247:12,21
265:18 268:7
278:5
**relation** 190:16
191:4 243:5,8

**relationship** 168:17
170:1,4 171:10
173:12 177:4
203:13,21 204:1
204:22 213:11
214:1 219:21
239:12,19,22
244:6,10
**relationships**
225:20
**relative** 310:12
**relatively** 169:16
194:10
**relevance** 259:7
293:17
**relevant** 246:18
262:13 263:20
265:12,13
**relied** 204:18
**reluctant** 167:10
**rely** 273:11
**remark** 200:20
**remember** 145:16
151:15,21 154:12
158:7 161:3,8
165:5,17 166:7
179:20 184:4
190:15,19 191:18
194:1 207:16
218:7 219:12,14
229:5 242:1,22
244:18 246:10
248:3 273:5,5
277:19,22 290:13
296:20,22 297:1,8
297:10,17,21
301:1,4,6 302:16
**remembered**
166:19
**remembering**
147:10
**REMIC** 169:13
**rent** 195:4 229:15
231:3
**rented** 231:12,12

Marialice Williams

231:15
**repeat** 217:14
**repeated** 219:22
**repeating** 286:17
**rephrase** 143:17
**replacement**
152:11 155:13
**report** 170:5
**Reported** 132:20
301:18
**reporter** 137:15
139:9 147:12
150:17 198:1
202:14 210:3,7,10
212:13 218:11
220:22 248:6,8
253:18 261:16,18
278:8 280:2 281:3
281:6 298:1
310:17
**reports** 225:1
226:3,9 227:13
233:15
**represent** 137:19
137:21 138:1
141:6,17 191:3
238:19,21 239:7
242:4,8 243:6,7
244:12,13,15
**representative**
164:8 247:5
**represented** 239:4
240:18 243:12
**representing** 246:1
**represents** 239:6
**request** 137:12
140:20 141:1,4,9
141:13,15,22
142:4 145:6,18
146:5 155:6,7,17
159:18 207:19
247:16,19
**requested** 140:15
140:16 142:14
144:20 145:3,12

151:19 210:7,10
212:13 218:11
220:22
**required** 166:5
177:20 271:14
**requires** 152:21
**research** 239:2
269:22
**reserved** 308:8
**reset** 281:14
**residential** 276:10
**resolved** 187:11
**respect** 153:5
156:21 177:17,22
200:10 247:7
**respected** 169:5,8,9
**respectful** 173:21
174:8,12
**respond** 159:18
**responded** 234:17
**response** 140:5,8
140:19 141:12,21
143:2,19 145:18
146:4 149:15
150:10 155:16
156:17 160:3
165:1 205:4 206:1
206:4 229:13
237:20 247:10,15
247:19 251:5,7
252:17,18,19
270:19 290:3
**responses** 198:19
198:21 208:5
297:20
**responsibilities**
177:17
**responsibility**
153:14 303:11
**responsible** 169:11
175:4
**responsive** 141:8
142:3,14 144:16
145:2,5,11 146:9
149:19 151:19

152:1 199:6 282:5
**rest** 285:5
**result** 290:22
**retained** 141:18
275:5
**retaliation** 187:13
187:19 188:15
189:22
**retet** 292:22
**retirement** 162:5
230:18 288:1
**retrieve** 146:15,20
146:21 157:11
**retrieved** 143:6
**return** 136:18,19
136:21 231:5
232:20 258:20
259:9 261:21
262:2,20,21 263:7
263:9,11,12,14,16
266:3 268:8,14
271:4 272:6,9
273:8,15,16 274:6
274:7,10,16
275:13 276:18,20
277:3,8,13,14
278:10 281:10
282:11 283:8
284:4,5,11 285:1
285:10,16 286:6,7
286:13 288:8,11
288:13,19,22
289:3 290:17,19
290:21,22 291:4,5
291:5,10 292:2,13
293:1 295:20,22
296:11 298:3,9
299:6 300:2,4,8
300:10 301:11
303:19 305:16
311:13
**returned** 142:7
144:22 284:17
**returns** 198:7,9
204:18 233:1,6,7

234:1,16,21 237:5
252:10 257:15,22
258:11,13 259:2
261:13 265:12,16
266:13,13,17
272:9,12 273:11
273:14 278:22
279:3,18,19 280:6
282:20 283:1,19
283:21 285:3,4
287:9,20 291:8
303:7,11,18
**Revenue** 192:20
277:9 301:12
303:14
**review** 209:3 249:7
271:12 273:1
311:8
**reviewed** 152:21,22
283:21 284:14
311:12
**reviews** 176:6
**reward** 176:4
**reworked** 284:2,14
285:13
**Rhoda** 194:7,12
**Richard** 138:3,6
166:22 167:6,19
167:20 168:4,16
169:1,16 170:3,6
172:2,8 173:8,10
175:10 182:10
186:19 199:19
204:8 222:6,21
223:12,14 239:19
240:1 241:9
249:10 253:4
**ride** 306:20
**right** 151:17 158:7
166:16 199:17
209:9 215:21
221:1,2 227:17,22
244:12,17 245:1
246:2 253:3 257:2
260:21 269:9

273:15,16 275:6
281:2 286:22
296:6 298:16
301:16 302:14
**rights** 187:17
**risk** 152:10 153:1,2
153:2,2,4 154:2
155:12 270:5
292:2 300:3
**RMR** 132:20
133:14
**RMS** 232:4,7,7
252:1 253:13,16
298:20,22 299:1,1
299:3,6,14,19,22
**Rob** 169:10 184:20
230:2 231:18
235:12 236:18
**Robert** 235:12
**Robinson** 230:2
231:18 235:12,12
236:2,18
**role** 176:15
**rose** 175:21
**rug** 159:7
**ruined** 159:7,8
**run** 175:3 216:3
**runaround** 211:7
211:11
**running** 275:17
276:15
**runs** 276:8
**rural** 181:18

---

**S**

**S** 136:1
**Sachs** 270:6
**sale** 162:11
**sales** 174:17
**Sarah** 147:19
186:13
**sarcastic** 223:16
**sat** 273:9 277:2
**satisfy** 277:3
**save** 258:16,17,17

Marialice Williams

288:11
saw 252:10 253:6
saying 143:1
  172:19 183:1
  200:13 213:11
  301:14
says 140:14 143:5
  148:2,3 151:16,17
  152:10 199:13
  202:15 211:21
  213:15 223:18
  248:22 250:9
  251:2,11 252:16
  254:22 255:3
  267:19 281:20
  300:17 301:17
schedule 254:16
  255:3 258:12
  306:15 307:15
Schlimb 274:8
Schlomb 274:9
search 140:5,19
  141:8,21 143:2,16
  143:18 144:1,7,10
  144:13 149:16
  152:1 160:4
searched 143:7,13
  145:22 151:18
  155:16
second 199:12
  201:4 221:13
  235:14 251:19
  286:9
secondary 168:3
  176:15 218:17
  256:20
secret 231:14
secretarial 230:1
section 250:8,22
  251:6 252:15
  253:7
securities 152:20
  153:9,16,17
  169:15 181:15
  193:8,9 195:1

246:18 247:3,7
securitization
  153:11 195:18
  218:20 228:5
  229:8
securitizing 170:11
security 153:21
  154:5 273:22
see 148:21 152:6
  159:4 163:13
  166:17 172:10
  182:13 200:1
  204:18 209:5,17
  215:2 222:18
  224:6 226:4,16
  227:15 233:1
  234:20 241:6
  248:22 250:6,11
  250:14 251:2,11
  251:22 260:8
  262:20 268:16,17
  270:16,20 273:16
  274:18 279:6
  282:4 289:11,13
  292:14 293:17
  294:10 295:1,2,7
  296:12 298:15
  300:11 302:13,20
seek 244:12
seen 156:14 159:21
  176:13 213:4
  221:15 254:10,12
  280:2
selecting 200:20
sell 161:4
selling 152:17
sen 213:12
send 284:15
senior 169:15
  184:11 191:10
sense 180:20 214:8
sensitive 177:21
sent 147:19 247:15
  247:18 263:4,6
separate 285:1

separated 238:4
separately 286:15
September 162:15
  262:5,6 283:14
  291:14
serious 148:16
  275:17
seriously 211:12
served 164:17
service 192:20
  195:9 277:9
  297:12 301:12
services 137:16
  139:19 151:8
  260:16 268:15
  269:14,18,19
  274:17,21 275:1,5
  275:13,15,20
  276:11 294:9,16
  297:2 302:12
  312:1
serving 164:16
  194:11 238:21
session 171:12
set 153:6 304:13
settlement 187:11
  188:3,18 189:1,5
  189:6,18,21 190:7
  191:4,8,15 204:19
  240:15,20 243:15
  245:9
seven 141:15,22
  142:4 155:7,8,17
  164:4 207:6
  227:17 276:6
  278:13
sex 187:13,20
  188:16
shared 186:3
sheet 309:12 311:9
  312:3
sheets 311:11,13
she'll 179:8
shocked 220:1
short 237:10

shortly 162:17
should've 178:3
  186:12
show 181:4 295:19
showed 268:17,18
shown 211:18
shows 279:7
sic 286:9
sick 272:16
side 169:11 170:1
  182:17 219:4
sign 209:19 211:10
  249:21 291:5
  295:22 311:9,12
signature 248:22
  249:3,11 262:21
  308:8 312:21
signatures 263:8
signed 186:4
  210:13,15,16,21
  211:4 225:21
  252:12 253:7
  257:22 262:21,22
  263:3,6 266:16
  288:9,11 291:7,9
  291:16 295:21
  309:12 311:11
significant 188:10
  192:17
similar 152:12
simple 212:4
  225:22
simply 168:5
  173:20 178:22
  189:3 195:7
  207:13 233:16
sincere 220:17
Sincerely 311:15
sine 308:7
single 154:17
  155:12,13 251:8,9
  260:19 272:6
sit 155:15 278:21
  280:4
sitting 301:16

situation 158:1
  159:6 179:19
  241:15 243:16
six 141:4,9,13
  164:4 283:16
  304:9
Sixteen 261:18,19
slaves 179:7
slightly 230:14
small 173:7 227:12
smaller 181:19
smart 180:7
social 273:21
sold 157:10 162:8
  230:22
sole 251:17
solutions 256:15
somebody 161:13
  213:3,20 299:18
somebody's 178:1
  188:10 279:1
somewhat 170:19
  195:13,14
son 240:2
soon 260:13 285:5
sorry 144:4 151:2
  182:11 209:3
  217:14 233:11
  243:6 245:11
  249:16 251:18
  258:8 278:1,11
  279:19 295:14,17
  297:1 304:2,10
sort 237:22
sound 243:1
source 292:21
  293:5,5 300:13
sources 150:10
  270:4 293:19,22
south 230:7
space 162:22
  231:12,17
Speak 167:15,17
speaking 224:18
  241:18

**specific** 223:9
  300:15 301:17
**specifically** 142:9
  145:7 182:4
  217:17 222:19
  225:11 291:4
  301:5
**specifics** 142:10
**spelling** 248:15
  303:20
**spend** 287:22
**spending** 215:1
  256:8
**spent** 162:5 204:19
  272:11
**spinning** 214:22
**split** 162:12 207:14
  211:22 212:5,8,17
  212:19 213:3
**spoke** 165:3 171:11
**spouse** 284:3
**spring** 165:22
**staff** 178:6 194:13
**Stafford** 164:12
**stalling** 204:7
**stamp** 136:6,9
  139:12 150:19
**stand** 205:22
**standard** 181:19
  212:20 228:4
  229:8
**Star** 139:20
**start** 174:8 182:15
  201:11 234:3
**started** 172:4
  173:20 219:7,10
  235:7 236:18
**state** 137:19 238:18
  250:9 303:10
**stated** 156:6 175:13
  187:14 291:7
  295:20
**statement** 136:13
  199:19 248:10
  249:13 254:19

265:12 304:15
**statements** 199:14
  223:5,17 271:4
**States** 132:1 136:13
  136:16 137:6
  139:18 187:17
  248:11 253:22
  303:14
**status** 306:13
**statutory** 301:19
**stay** 182:7 281:18
  288:2 304:1 306:6
**stealing** 211:8
**Stearns** 270:6
**stenotype** 310:6
**stepped** 241:10
**steps** 303:6
**stop** 236:21
**stopped** 236:18,19
**storage** 142:18
  143:9 144:11
  156:13 157:5,5,9
  157:14,18 158:1
  158:15,19 159:13
  159:22 160:1,4,7
  160:11
**store** 159:13
**stored** 149:6 150:7
  158:9
**story** 160:1
**strange** 213:20
**Strategist** 292:3
**Strategists** 300:4
**strategy** 156:9,21
**Street** 133:11 134:4
  134:11,18 137:11
  137:17 157:5,19
  236:10 311:2,13
  312:1
**strike** 274:2 295:9
**structure** 149:12
  195:14 196:13
**structures** 224:17
**Stuart** 184:9
**stuff** 270:1 277:2

279:8 297:6
  305:19
**stunned** 191:11
**stupid** 223:3,6
**subcommittee**
  256:1
**subdivision** 252:18
  252:19,20
**subject** 136:7
  147:15 191:19
**subordinate** 169:15
**subpoena** 139:17
  139:21 140:1,3,6
  140:9 142:15
  143:2,19 145:4,12
  146:10 149:15,20
  150:7,11 151:6,20
  152:2,9 155:18
  163:15 165:19
**subpoenas** 160:4
**subscriptions**
  296:12
**subsequently** 190:2
**subsidiary** 193:3
**substantial** 176:15
  206:22
**substantially** 225:4
**substituting** 154:22
**subterfuge** 214:9
**suitable** 230:13
**Suite** 134:5 311:3
  311:14 312:2
**summarize** 172:19
**summer** 201:20
**supervisor** 178:3
**supervisory** 177:17
  182:8
**support** 200:3
  202:21
**supposed** 305:11
  305:22
**sure** 150:9 152:3
  179:8,21 189:12
  189:14 210:3
  215:9 218:6 224:5

232:17 237:4
  249:4 253:5
  255:16 256:13
  257:10 258:2
  283:10 296:5,15
  297:4 303:6
**survive** 180:4
  260:10
**sus** 150:11
**suspect** 149:22
**Swiss** 270:5
**sworn** 138:13 310:5
**system** 181:5

---

## T

**T** 136:1,1
**table** 175:22 210:1
  220:15
**tactic** 204:8
**take** 151:9 153:14
  167:10 181:21
  183:9 185:18
  186:8 237:9 277:8
  280:14 303:6
  304:8 306:18
**taken** 137:10 157:9
  157:13 185:10
  189:15 197:19
  206:17 237:15
  240:4 310:3,6,11
**takes** 169:18
**talk** 154:13 179:13
  179:18 191:7,14
  210:18 238:13
**talked** 154:11
  179:15 196:5
  256:13 270:18
**talking** 228:9
  236:12
**tangential** 299:17
**tape** 216:3,9
**task** 169:21
**tasks** 180:13
**Tawa** 232:1
**tax** 136:18,19,21

155:2 161:11
  185:21 198:7,9
  204:18 231:5
  232:20,22,22
  233:6,7 234:1,16
  234:20 237:5
  252:10 257:14,15
  257:22 258:11,13
  258:20 259:2,9
  261:13,21 262:2
  262:19,21 263:9
  263:10,12,14,16
  265:12,16 266:3
  266:13,13 268:8
  268:13 271:3
  272:9,12 273:11
  273:14 274:16
  275:13 276:18,20
  277:2,8,13 279:17
  279:19 280:5
  281:10 282:11,20
  283:8,18 285:3,4
  285:10 286:7,13
  287:9,19 288:19
  288:22 289:3
  290:19 291:4
  292:22 295:20,22
  296:10 298:3
  299:6 300:2,4,8
  300:10 301:11
  303:7,13,18,19
**taxable** 189:9
**taxes** 258:19 259:1
**taxpayer** 251:13
**team** 175:20,21
  176:1
**technique** 204:7
**telephone** 146:14
  156:8 232:12
  273:22 276:1
  277:18,22 278:5
**telephones** 276:4,5
**tell** 140:15 142:10
  142:21 143:12
  144:20 145:1,6,7

Marialice Williams

147:4 162:19
173:3,9 175:14
179:12 183:17,21
184:1 191:12
217:3 222:4 223:9
223:11,13 226:17
226:18 228:7
229:14 239:21
240:7 249:18
259:4 261:5 266:9
267:6 274:8 275:6
277:12 278:12
288:14 290:5,16
290:16
**telling** 168:18
203:15 296:6
**tells** 278:20 279:14
**temporary** 274:17
274:21 275:1,3,5
275:13,15 297:2
297:12
**ten** 146:17 221:19
226:12 280:19,20
281:14
**tended** 181:19
**term** 152:7 224:5
275:2
**terminated** 188:22
190:13
**termination** 141:19
**terms** 154:21
211:13 235:4
**terrible** 222:17
223:2,10
**testified** 138:14
147:3 157:3 244:5
**testimony** 138:22
139:5 216:5,10
261:2 266:9,10
267:6 286:3 308:4
309:9,10 310:4,5
310:8
**Texas** 234:10
**Thank** 139:11
221:20 248:8

298:12 307:20
308:1
**that'd** 307:7
**thereto** 249:14
**thing** 149:14
166:16 167:14
174:13 207:20
211:9 214:11
228:8 260:19
269:11 275:16
278:21 287:16
**things** 142:18
153:12 155:20
156:10 158:11
159:2,8,21 172:4
176:12 218:1
220:15 222:4,17
222:20 223:2,10
234:19 280:8
299:3 304:3
**think** 145:14 147:8
148:7,14,14,15
149:1 156:12
161:7,12 162:4,19
164:3 167:6
169:22 170:14,15
170:19 172:4,20
176:7 177:2 179:1
184:13 188:11
190:20 191:9,16
196:1,2 197:1
202:3 207:16,17
207:18 208:14,22
209:10 211:17
217:6,22 223:8,11
223:13 224:10
225:16 231:9,14
231:15 232:21
236:4 238:11
246:16 247:20
248:3 249:8
250:18 266:12
270:13 272:15,20
277:1,15 279:14
282:5 290:22

300:17 305:2
306:8
**third** 140:12,15
148:12 251:19
**thirty** 311:12
**thought** 143:13,14
161:19 169:5
170:10 176:10,21
178:3 181:21
188:9,17 191:13
194:9 203:5
209:19,20 210:15
211:3,4 252:2
271:16,17
**thoughts** 179:6
**thousand** 230:15
269:8
**three** 140:20 141:2
146:17 147:3,5
148:3 177:18
201:12 205:3
229:21 232:12,13
234:8 238:7
242:18 246:6
268:20 287:5
**thrust** 256:17
**till** 236:7
**time** 137:9 139:3
142:19,21 143:8
143:15 144:20
145:20,22 146:18
150:15 153:10
157:7,20 158:6,12
158:15 159:17
163:6 165:2,17
168:17 169:11,16
169:18,22 170:13
170:15 171:15
174:3 179:12
180:1,1 182:11
183:8,16 184:20
185:4,5 189:7
192:15 194:10,22
202:22 208:17
211:6 212:4 214:6

217:21 219:9,19
220:2,10,19 221:2
235:8 236:1,5,6
238:5,8 239:17
240:13 241:19
242:11,13,16,19
243:11,14 244:6
247:22 254:20
255:16 256:1
258:19 260:21
263:17 279:15
281:8,21 283:12
290:5,11 291:6
297:7,7 304:18
306:18
**times** 168:8,8
190:21 227:17
234:9 247:4
268:19 275:20
286:20 287:5,6,13
289:9 290:20
291:14
**timing** 161:14
**tired** 286:16
**today** 139:1 155:15
185:20 186:13
204:13 278:11,13
281:17 285:4
**Today's** 137:8
**told** 165:4,5 166:4
171:19 173:14
174:1 175:10
181:13 184:12,13
188:17 205:19
211:19 214:11,12
222:3,12 223:10
240:1 272:5
276:21,22 278:14
282:1 283:12
284:13 285:12
286:14 287:10,13
288:8,20 290:19
291:13 304:1,8,15
304:17
**Tom** 188:1,5 191:9

191:13 241:11
246:20
**tomorrow** 182:9
204:14 284:2
**torn** 167:6
**tortious** 202:21
**tortiously** 203:13
**totally** 245:12
**totals** 269:9
**touch** 270:8
**town** 174:20 175:1
175:7,8,11
**track** 169:19 226:1
275:21
**tracking** 226:2
**traditionally** 153:7
**trailing** 167:18
**training** 178:5
**transaction** 196:13
225:11 238:1
**transactions**
152:20 155:1
202:7 225:2,7
228:4,5 229:9
238:6
**transcript** 289:12
311:9,12,13
**transcription**
309:10
**transitional** 142:19
**travel** 233:11,12
234:3,12 255:17
255:17,19 256:6,7
257:8 259:14
270:15 271:8,20
272:3 273:3 295:6
295:10 302:19
**traveling** 150:3
157:6
**treat** 173:20 174:11
241:2,11
**treated** 165:9
177:10,16 183:18
240:3,5
**treatment** 174:7

**tried** 158:20 218:1
**trips** 233:16 234:12
  235:17 258:16
**true** 192:22 214:19
  249:15,22 309:9
  310:8
**truth** 205:19
**truthful** 138:22
  139:5 166:18
  214:3
**try** 167:1,10 209:15
  218:5
**trying** 161:6
  162:19 182:10
  204:19 209:15
  219:1 238:8
  246:22 256:8,17
  256:22 270:4
  272:11
**tune** 230:14
**turn** 140:11 155:5
  191:17 196:14
  202:10,16 221:18
  229:11 248:19
  250:21 254:15
  257:17 258:7
  259:15 262:19
  267:22
**turned** 167:9 177:2
  204:5 205:10
  260:13 301:12
**Turning** 224:1,12
  291:12 292:1
  298:6
**Twelve** 268:19
**two** 146:7,15,18
  147:6 148:3,5,9
  148:13,14,22,22
  150:15 177:16
  189:7 202:3,11,18
  211:22 213:18
  216:9 224:10,11
  234:8 235:11,13
  238:10 246:6,13
  250:10 269:8

  282:1 294:8
  302:11 304:2,16
  304:17 305:10,14
**type** 149:12,13
  154:17 155:10
  219:2 270:9
**typewriting** 310:7
**typical** 170:2
  232:15 234:8
**typing** 275:16

───────────
       **U**
───────────

**U** 157:5,19
**Uh-huh** 274:19
**ultimately** 176:22
  288:3
**Un** 254:22
**unable** 157:11
  208:3
**unbecoming**
  176:11
**understand** 147:1
  157:22 215:10,11
  215:12,13,14
  259:7 277:4
  285:13 305:6
**understanding**
  182:19 187:2
  205:16,18
**understatement**
  232:18
**understood** 168:20
**underwriting**
  181:20
**undesirable** 203:17
**unfair** 240:22
**unfairly** 240:5
**unfairness** 241:9
**unfortunately**
  168:20
**unison** 175:22
**unit** 157:14,18
  162:8 230:5
**United** 132:1
  136:13,16 137:6

  139:18 187:17
  248:11 253:22
  303:14
**unkind** 169:1
**unlawful** 187:12,18
**unpleasant** 222:16
  223:1
**unrelated** 227:21
**unsecured** 254:16
  255:4
**unsigned** 209:10,18
**unusual** 295:9
**upgrade** 181:6
**upset** 279:6
**usage** 276:4
**use** 155:3 193:12
  195:5 221:4
  222:13 229:2
  230:8,13 255:7,10
  259:19 260:16
  270:5 277:9
  311:10
**utilizing** 195:7,18
  196:13

───────────
       **V**
───────────

**v** 132:8 311:4 312:4
**vacate** 163:5
**Van** 134:4,11 311:2
**various** 149:10
  195:4 196:5
  197:11 218:13
  222:21 270:4
**vehicle** 195:20
**verification** 288:12
**verify** 273:2 302:22
  303:2
**Verizon** 278:1
**versus** 137:4
  139:19 186:18
  198:17 269:9

**vice** 171:20 176:12
  184:3,13 191:10
**videographer**
  135:9 137:1,14
  185:8,11 197:16
  197:20 216:2,8
  237:13,16 306:1,5
  308:4
**videotape** 137:2
  216:4,9
**Videotaped** 132:15
  133:7
**view** 167:4 170:12
  267:10
**Virgin** 193:18
**Virginia** 238:18
**virtually** 162:10
  167:7 171:16
  176:9
**visit** 231:13,20,21
**visiting** 218:13
**Volume** 132:14
  137:2 216:9

───────────
       **W**
───────────

**waited** 182:11
**waiting** 151:3
  221:8
**want** 182:6,7,13
  185:21 203:18
  213:12,16 214:15
  214:17 217:12,15
  217:18 218:6
  220:3,4 237:9
  249:21 258:1,3
  260:20 264:15
  276:18 277:11
  279:12 280:14,21
  286:18 287:11
  288:5,12 289:21
  291:1 306:5
**wanted** 166:8
  167:11 200:7
  204:4
**wants** 217:6 228:22

  245:14
**Washington**
  132:17 133:12
  134:6,12,19 135:4
  137:11,17 194:3
  222:17 231:22
  273:20 303:10
  311:3,14 312:2
**wasn't** 168:4
  173:11 176:2
  178:2 182:21
  183:3 214:3,19
  228:17 260:4
  263:16
**waste** 260:20
**wasting** 279:14
  281:8
**watched** 183:14
**Watergate** 158:3
  158:13,14 160:21
  161:15,18 162:8
  162:14 163:1,3
  229:17,18 230:5,8
  230:10 231:3
  235:8 236:9 238:7
  276:16
**way** 173:8 176:16
  177:16 178:15,15
  181:10 183:3
  185:3 204:16
  206:2 213:8
  223:14 225:5
  233:13 256:11
  258:11,13 280:8
  280:22 287:17
  294:15 307:1
**ways** 156:16
**week** 212:3 283:22
  284:15
**weekend** 174:21
**weeks** 238:10
**Wendell** 182:8
**went** 167:14 172:1
  204:16 207:2
  210:17 232:11

Marialice Williams

235:15,15 238:22
243:10 269:21
275:14 279:9
290:2 303:14
**weren't** 166:15,15
178:18 214:4,13
214:19 215:5
271:2
**Westover** 194:7,16
219:10 247:4
**we'll** 186:7 204:13
204:14 207:13
295:16 307:16
**we're** 204:11
226:16 228:9
236:11,20 237:8
266:18
**we've** 208:3 217:22
238:4 266:20,20
306:13
**whatsoever** 293:20
**whirling** 214:22
**white** 184:9 189:4
191:9,13 200:16
200:21 256:21
270:5
**wife** 173:11
**wife's** 188:12
**Williams** 132:5,16
133:8 134:2 136:4
137:3,4 138:11,18
165:2 185:21
186:15,18 187:9
187:14 197:22
198:17 209:3
216:5,10 232:6
237:19 242:16
243:6 268:7
298:15 309:7,15
311:4,5 312:4,5
**willing** 165:6 166:3
180:5 208:6
257:17 259:15
268:10 275:8
278:4 285:15

294:19 295:18
302:6
**Wimberly** 164:10
164:11,14 165:18
**win** 179:21
**Winston** 231:11
**winter** 165:21
**Wisconsin** 135:3
144:19
**wish** 206:1
**withheld** 168:18
**witness** 136:2,18,19
136:21 138:12
147:21 151:2
167:16,19 208:16
208:19 210:9,11
212:14 218:12
221:1 235:20
237:11 243:20
244:4,11 245:16
248:14 249:18
254:3 258:10
261:22 263:18
266:2 269:1,4,8
272:16 278:9
280:4,9,13,18
281:7,11,18 282:1
282:8 284:8 287:8
289:7,11 290:4,8
290:12,17 291:19
291:21 298:4
303:22 304:6,17
304:22 305:2,9,13
306:16 307:8
308:8 310:4,6,9
312:5
**woman** 200:16
**women** 177:22
179:16 180:3
**wonder** 214:9
**words** 184:18
222:13,15 223:9
**work** 159:15
171:21 172:3
182:2 194:12

204:4,14 230:1
235:6 256:10
274:14 275:3
278:17,18 297:12
299:17 300:14
305:22
**worked** 171:6
175:17 178:15
219:5 230:10
231:18 236:2
238:6 271:11
274:15
**working** 146:18
158:4,12 159:16
168:1 169:3 170:3
170:4 171:19
172:12 174:9
188:3 199:20
201:4,11 213:18
219:10 235:5
236:8,20 237:7
239:16,19 257:3
**works** 178:15
238:2
**world** 173:7
**worst** 240:1 277:6
**wouldn't** 189:7
205:19 212:17
228:18 229:1,2
285:4
**would've** 149:11
150:9,12 160:13
165:21 173:7
178:3 202:4
227:19 228:14
237:6 246:2
286:10 291:16
**wound** 215:15
**write** 176:10 203:1
203:6 204:13
213:13,21 215:11
247:5 260:3
**writing** 207:9,11
260:5 295:21
**written** 194:20

208:3
**wrong** 167:14
**wrote** 192:13
213:14
**W-2** 301:18
**W228** 134:5 311:3

**X**

**x** 132:3,14

**Y**

**Yeah** 235:20
243:18 251:8
258:9,10 263:1
264:10 266:11,22
306:8 307:3
**year** 148:22 162:7
174:2 227:15
232:21 246:15
250:11 257:14
263:10 268:19,22
269:2,4,16 271:9
273:4 284:4 285:1
290:21 296:9
297:5 298:8
299:14
**years** 146:17 147:6
192:16 201:12
202:3 213:19
215:1 224:10,11
228:10 241:1
246:13 250:10
267:20 282:21
**yelled** 175:22
**York** 234:8

**Z**

**zero** 283:13

**$**

**$1,000** 232:10
**$1,150** 296:11
**$1,450** 229:15
**$1,500** 176:4
**$10,000** 159:7

175:20 270:15
271:20 272:3,11
273:2 295:6
302:18
**$108,343** 300:11
**$12,000** 274:17
**$13,000** 293:15
**$13,272** 292:14,16
**$140,000** 232:22
**$170,000** 287:20
**$19,793** 302:13
**$2** 225:2
**$2,000** 268:19
**$200,000** 162:9
230:18
**$22** 205:5,7
**$3** 181:6
**$3,000** 235:15
**$36,000** 268:16
269:4
**$389** 295:1
**$40,930** 294:9
**$5,000** 285:20
**$65,000** 181:4
**$7,200** 276:1

**1**

**1** 199:13 202:15
227:15 250:8
284:18
**1.2** 226:19
**1:05CV01483**
132:7 137:7
**1:16:18** 197:21
**1:45:40** 216:6
**1:50:54** 216:11
**10** 136:7 147:13,14
147:18 224:21
226:14 227:1
**10th** 143:6
**10:29** 133:5
**10:29:14** 137:9
**100** 271:5
**1020** 137:16 311:13
312:1

Marialice Williams

**1040** 136:17,19,20
  261:20 281:9
  298:2
**10546** 209:12
**10548/49** 209:18
**108,000** 301:22
**11** 136:9 150:18,19
  151:5 152:5
  162:15 224:2
**11.2** 226:19
**11:38:36** 185:9
**11:54:19** 185:12
**112** 226:19
**12** 136:10 185:15
  185:16 186:16
  226:19
**12:13:57** 197:17
**13** 136:11 198:2,3
  224:13
**132** 132:9
**138** 136:3
**139** 136:6
**14** 136:13 229:12
  248:6,10
**14th** 209:14
**147** 136:7
**15** 136:15 237:20
  247:11 253:19,20
  261:16
**15,000** 233:10
**150** 136:9
**1500** 233:11 234:5
  270:17
**16** 136:17 243:1
  261:17,20
**1625** 133:11 134:18
  137:10
**17** 136:19 151:10
  268:14 281:6,9
**18** 136:20 250:22
  251:6 252:15
  298:1,2
**18A** 253:2
**180771** 132:21
  312:6

**185** 136:10
**19** 187:6 236:4
**19th** 137:16 306:13
  311:13 312:1
**198** 136:11
**1980** 239:13
**1987** 242:6
**1988** 244:7
**1990** 174:5 239:14
**1993** 242:2
**1998** 158:2 174:4,6
  185:4 187:9
  190:18 191:5
  201:21 236:3
  244:8
**1999** 236:6

———————
**2**

**2** 202:13,16,16,20
  204:21 207:21
  208:1 211:16
  226:19 227:13,14
  227:16 262:19
  284:17 291:4
**2,000** 269:7
**2:22:54** 237:14
**2:40** 237:17
**20** 235:20
**2000** 147:7 161:7
  227:15 236:4,4,7
  250:14 282:21
  283:13 284:2,19
  284:20 286:13
  288:19,22 289:3
  290:17
**20006** 133:12
**20006-4001** 134:19
**20008** 134:6,12
  311:3
**2001** 136:17 148:7
  148:9,14 154:11
  154:16 155:4
  158:6,8 161:1,2,3
  161:7 162:4,15
  220:13 248:4

**250**:14,20 261:20
  262:2 263:10,13
  268:8 271:9 273:4
  275:13 277:21
  279:5 282:21
  283:13 295:10
**20011** 273:20
**20016** 135:4
**2002** 136:19 140:2
  142:15,17 143:3,5
  143:7,20 145:3,11
  145:12,22 146:9
  146:11 147:8
  149:16,20 150:7
  157:19 160:3
  161:1,7 162:5
  163:14 165:22
  194:1 209:14
  210:16 236:7
  248:4 250:14,17
  250:18,20,20
  281:9 282:11,21
  283:8,14 287:20
  291:3 292:7,21
  293:7 294:1,17
  295:6,11 296:11
  296:22 297:10
  299:1 300:4,8
**2002/2003** 219:15
  219:16
**2003** 136:20 149:2
  151:10,20 155:18
  157:20 160:3
  236:19 243:1
  250:17 282:15,22
  283:9 284:17
  298:2,10,11,18,21
  299:6 300:2,10,20
  301:10,22
**20036** 311:14 312:2
**2004** 148:7,9,14
  149:4 263:15
  282:22 283:19,21
  284:12,13 285:11
  285:16 286:7

**303**:15,18
**2005** 157:16,16
  202:4,5 282:22
  283:15 284:1,15
  303:15,18,20
  305:16
**2005/2006** 219:20
**2006** 149:1 157:15
  157:16 219:20
  262:5,7 291:14
**2007** 132:18 133:4
  136:8 137:8
  138:21 147:15
  216:6,11
**2010** 310:19
**202)244-1715**
  134:13
**202)383-5300**
  134:20
**202)468-7737**
  134:7
**202)726-2630**
  274:1
**202)752-6167**
  135:5
**22** 205:15
**22nd** 306:14
**23rd** 307:6
**24** 142:15 143:3,5
  145:3,12 146:9
  149:16,20 150:6
**24th** 140:2 143:20
  163:14 307:6
**248** 136:13
**25** 136:8 147:15
  224:18
**254** 136:15
**262** 136:17
**28** 138:21
**281** 136:19
**298** 136:20

———————
**3**

**3** 147:8 205:4
  211:18 227:16

**236**:7 283:14
**3,000** 236:21
  268:19 269:9
**3:51:35** 308:5
**3:52** 308:6
**3003** 134:11 311:2
**303** 134:4
**31** 310:19
**312** 132:9
**35** 227:17 228:9
  268:4
**36** 268:20
**36,000** 269:10
**3900** 135:3 144:19

———————
**4**

**4** 149:2 152:5
  209:10 211:18,20
  227:16 268:13
  283:9,14 292:1
  298:6
**4:00** 260:22 280:12

———————
**5**

**5** 227:16,16 274:16
  283:9,14
**5.1** 226:20 227:8
**5/7/07** 312:5
**50** 226:15 227:1
**50/50** 211:22 212:4
  212:9
**51** 191:18
**53** 196:15
**56** 224:20
**5600** 273:17
**5722** 236:9
  ▮▮▮▮▮▮
  273:22

———————
**6**

**6** 155:18 283:15
**6th** 151:20
**620** 311:14 312:2
**68-049-7011**
  273:21

———————

Marialice Williams

| 7 |
| --- |
| **7** 132:18 133:4 136:15 187:6 253:21 |
| **7th** 137:8 216:6,10 |
| **701** 230:5 |

| 8 |
| --- |
| **8131** 140:12 |
| **8133** 136:6 139:13 |
| **8142** 152:5 |
| **8144** 136:9 150:20 |

| 9 |
| --- |
| **9** 136:6 139:10,12 139:16,17 |
| **9/11** 158:7 |
| **93** 201:14 |
| **94** 201:13 |
| **95** 201:13 |
| **98** 201:13 227:15 244:9 |
| **99** 227:15 |

1

**To:** Becker, Evelyn; Grundeman, Kyra; Goldfrank, Sarah
**Cc:** Harley Daniels; Michael W. Beasley; Michael Beasley
**Subject:** Your January 25 2007 correspondance

Dear Sarah,

We have just received from Ms. Williams that she has had two computer crashes, one in 2004 and one in 2001. Both computers were disposed of. How do you suggest we proceed from here?

Your second request, in general, is for Plaintiff to "confirm that ... [she] does not have any additional information in her possession or control that supports her allegation [s] ... ."   At this time, Plaintiff cannot make such a confirmation since she is now in possession/control of the Fannie Mae documents that you finally provided yesterday, February 5, 2007. As we have not yet reviewed those documents, we believe that your request is premature.

You asked for a meet and confer this week, but we are not sure what we can accomplish at such a meeting now. That request seems to us also to be premature.   After we have had a full opportunity to review Fannie Mae's complete discovery production and response (you have indicated that further production and response is forthcoming), then such a meet and confer may very well be quite productive.

Regards,

Brian

Dear Sarah:

I have begun to get answers to your questions. As answers arrive, I will communicate them to you promptly.

Have a nice evening.

Harley

re Search: New search found Try it!

