# **<u>EXHIBIT H</u>**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


MARIALICE BATHRUS WILLIAMS,    CIVIL ACTION
        Plaintiff,                NO. 1:05CV01483

VERSUS                          Judge John D. Bates

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, et al.
        Defendants.


        Videotaped Deposition of ROBERT G.
JONES, No. 3 Palmer Place, Gulfport,
Mississippi, taken in the Law Offices of
McGlinchey Stafford, PLLC, 643 Magazine
Street, New Orleans, Louisiana, 70130, on
Wednesday, the 11th day of April, 2007,
commencing at 9:16 a.m. and concluding at
12:22 p.m.


APPEARANCES:

        (Via telephone)
        HARLEY DANIELS, ESQUIRE
        BRIAN LEDERER, ESQUIRE
        3003 Van Ness Street, N.W.
        Suite #W228
        Washington, D.C.  20008
                (Attorneys for the Plaintiff,
                 Marialice Bathrus Williams)

        FANNIE MAE
        (By:  Jonathan L. Griffith, Esquire)
        3900 Wisconsin Avenue, NW
        Washington, DC  20016-2892
                (Attorneys for the Defendant,
                 Fannie Mae)

        O'MELVENY & MYERS, LLP
        (By:  Sarah Alexander Goldfrank, Esq.)
        1625 Eye Street, NW
        Washington, D.C. 20006-4001
                (Attorneys for the Defendant,
                 Fannie Mae, Richard Lawch, Grace
                 Huebscher)

Robert G. Jones

Page 2

```
1   APPEARANCES:  (Continued)
2
3       SETH M. HUNTER
        ATTORNEY & COUNSELOR AT LAW, PLLC
        404 Hemphill Street
4   Hattiesburg, Mississippi  39401
        (Attorney for Robert G. Jones)
5
6
    VIDEOGRAPHER:
7
    KARL STIEGMAN, CLVS
8
    REPORTED BY:
9
    NANCY LAPORTE
10  Certified Court Reporter
    State of Louisiana
11
12
13  *  *  *
14
    I N D E X
15
    Exhibits:
16
    Defendant's
17
    Jones 1 - Bates No. 6907, excerpts of "First
18  Amended Complaint"
19  Jones 2 - Bates Nos. 8002-8004, e-mail dated
    May 3, 2001, from Marialice Williams to Rhoda
20  Newman, Grace Huebscher, Bob Jones, and Harvey
    Hartsfield
21
    Jones 3 - Excerpt from deposition testimony
22  given by Robert Jones on January 30, 2004
23  Jones 4 - Letter from Marialice Williams to
    Lou Hoyes, dated February 2nd, 1999
24
    Jones 5 - Bates No. 7918, e-mail from
25  Ms. Williams to Bob Jones, "CC-ing"
    H. Hartsfield
```

Page 3

```
1   Exhibits:  (Continued)
2   Jones 6 - Bates Nos. 8015-8017, e-mail dated
    May 15th, 2001, from Bob Jones to Stephen
3   Noble
4   Jones 7 - Bates Nos. 6230-6232 and 8031,
    e-mail
5
    Plaintiff's:
6
    Exhibit 1 - Bates No. 7232, e-mail from Robert
7   Jones to Danny Groves
8
9   *  *  *
10
```

Page 4

```
1   S T I P U L A T I O N
2
3       It is stipulated and agreed by and
4   between counsel for the parties hereto that
5   the deposition of the aforementioned witness
6   is hereby being taken under the Federal Rules
7   of Civil Procedure, for all purposes, in
8   accordance with law;
9       That the formalities of reading and
10  signing are specifically not waived;
11      That the formalities of sealing,
12  certification, and filing are specifically
13  waived;
14      That all objections, save those as to
15  the form of the question and the
16  responsiveness of the answer, are hereby
17  reserved until such time as this deposition,
18  or any part thereof, may be used or sought to
19  be used in evidence.
20  *  *  *  *  *
21      NANCY LAPORTE, Certified Court Reporter,
22  in and for the Parish of Orleans, State of
23  Louisiana, officiated in administering the
24  oath to the witness.
25
```

Page 5

```
1       THE VIDEOGRAPHER:
2   This is the videotape deposition
3   of Robert G. Jones.  This deposition is being
4   held at 643 Magazine Street in New Orleans,
5   Louisiana on April 11th, 2007, at the time
6   indicated on the video screen, 9:16.  My name
7   is Karl Stiegman, and I am a certified legal
8   video specialist with Depo-Vue.  The court
9   reporter is Nancy Laporte with Esquire
10  Reporting.
11  Would counsel please introduce
12  themselves?
13      MR. GRIFFITH:
14  Jonathan Griffith for Fannie Mae.
15      MS. GOLDFRANK:
16  Sarah Goldfrank for Fannie Mae,
17  Richard Lawch and Grace Huebscher.
18      MR. HUNTER:
19  Seth Hunter representing Bob
20  Jones.
21      MR. DANIELS:
22  Harley Daniels and Brian Lederer
23  representing Marialice B. Williams.
24      THE VIDEOGRAPHER:
25  Would the court reporter please
```

2  (Pages 2 to 5)

## Robert G. Jones

Page 6

1  swear in the witness?
2  Thereupon,
3  ROBERT G. JONES,
4  having been first duly sworn, was examined and
5  testified as follows:
6  EXAMINATION BY MR. GRIFFITH:
7  Q.     Mr. Jones, can you state your
8  full name and address for the record, please?
9  A.     Robert Gayle Jones, No. 3 Palmer
10 Place, Gulfport, Mississippi.
11 Q.     Is there any reason why you
12 cannot testify fully and honestly today?
13 A.     No.
14 Q.     Mr. Jones, did you receive a
15 subpoena for documents in connection with your
16 testimony in this matter?
17 A.     I believe my counsel did. I did
18 not.
19 Q.     And did you have any documents
20 that were responsive to this subpoena?
21 A.     I had no documents. I had a C.D.
22 that were all Bates-stamped documents that was
23 used in the Fannie Mae litigation, and I gave
24 that to Mr. Hunter, and he talked to your
25 counsel.

Page 7

1  Q.     So the only documents you had
2  were documents that had been produced in the
3  CAM litigation; is that correct?
4  A.     That were produced, yes.
5  Q.     Mr. Jones, can you tell me, what
6  is CAM Financial Services, Inc.?
7      MR. HUNTER:
8  Before we get started on that, I
9  want to make a statement for the record that
10 Mr. Jones is here as representing Mr. Jones
11 and not as a representative of CAM Financial
12 Services, Incorporated.
13 You can go ahead and answer it,
14 Bob.
15     THE WITNESS:
16 CAM Financial Services was
17 incorporated in 1991 as a financial services
18 company to do both insurance brokerage for --
19 and mortgage brokerage of multi-family
20 properties.
21 EXAMINATION BY MR. GRIFFITH:
22 Q.     And Mr. Jones, what is your
23 relationship with CAM Financial Services?
24 A.     I am a stockholder of CAM
25 Financial Services.

Page 8

1  Q.     At one point in time, were you
2  president of CAM Financial Services?
3  A.     I was.
4  Q.     Can you tell me when you first
5  became president of CAM Financial Services?
6  A.     When CAM was incorporated in
7  1991.
8  Q.     When did you step down as
9  president?
10 A.     In June of 2005.
11 Q.     And do you have any other current
12 relationship with CAM Financial Services,
13 other than being a stockholder?
14 A.     That would be it.
15 Q.     And is CAM Financial Services
16 still doing business?
17 A.     I couldn't tell you.
18 Q.     And can you tell me if Hurricane
19 Katrina had an impact on CAM Financial
20 Services?
21 A.     Yes, it did.
22 Q.     What was that impact?
23 A.     CAM Financial Services' building,
24 documents, its operation was completely wiped
25 out by Hurricane Katrina.

Page 9

1  Q.     Are you aware of any new
2  transactions that CAM Financial Services has
3  done since Hurricane Katrina?
4  A.     I have no idea.
5  Q.     And how long has CAM Financial
6  Services been in the insurance business?
7  A.     I can't tell you how long, but up
8  until 19 -- up until 2005, during product
9  development, taking -- going back to the
10 product development days, since 1992, '93 is
11 when product development first began.
12 Q.     And can you tell me what
13 qualifications CAM had as an insurance broker?
14 A.     It's -- several of its
15 principals, Groves and Rumsey, had an
16 insurance background, and on the mortgage
17 brokerage side, I was at -- I had that
18 expertise.
19 Q.     And can you tell me what your
20 experience was -- has been on the insurance
21 side?
22 A.     You will have to go further with
23 that.
24 Q.     Let me start with this.
25 How many years have you been in

3 (Pages 6 to 9)

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 10

1  the insurance business?
2  A.    My first job out of college, and
3  while I was in college, I worked for State
4  Farm Insurance Agencies, and I was employed, I
5  guess you could go back to 1966 through the
6  early '70s, I worked with State Farm -- Great
7  -- um, I can't -- Coastal.  I can't tell you
8  the name of Coastal, but there was another
9  insurance company.  It was property casualty,
10  and also life insurance in that arena, and
11  I've always stayed active with -- on the
12  insurance side, but not employed by any
13  insurance companies until they -- we started
14  working on product development for Fannie Mae.
15  Q.    And that was in the early 1990s?
16  A.    1990s.
17  Q.    And you mentioned two other
18  members of CAM Financial, Mr. Groves and
19  Mr. Rumsey, I believe?
20  A.    Correct.
21  Q.    Can you tell me about Mr. Groves'
22  background in the insurance industry?
23  A.    He had some 20, 25 years
24  working -- well, off and on, either as a
25  general agency.  Prior to that, he was an

Page 11

1  employee of Nationwide Insurance for a number
2  of years.
3  Q.    Can you describe any other
4  experience or qualifications that Mr. Groves
5  had with respect to insurance?
6  A.    You would probably have to ask
7  him that.
8  Q.    How about Mr. Rumsey?  Can you
9  describe his experience in the insurance
10  industry?
11  A.    He had a surplus lines broker's
12  license.  He also had a general agency for --
13  I think it was called South Coast Insurance,
14  and probably early '90s, and I couldn't tell
15  you if South Coast is still in business or
16  not.  I assume it must be.
17  Q.    Mr. Jones, I am going to read for
18  you a paragraph from Ms. Williams' complaint
19  against Fannie Mae and ask you some questions
20  about it.
21  In Paragraph 16 of her complaint,
22  Ms. Williams alleges the following:  "In 1997,
23  utilizing products and processes which she had
24  solely created and developed, Plaintiff
25  Williams closed the first mortgage-backed

Page 12

1  securities transaction in the United States,
2  whereby Fannie Mae was able to transfer all of
3  the risk of loss, as opposed to merely
4  insuring the loss to a third-party insurer,
5  AIG."
6  Mr. Jones, is Ms. Williams'
7  statement that she had solely created and
8  developed the products and processes related
9  to the AIG transaction accurate?
10  A.    From a Fannie Mae perspective,
11  she represented Fannie Mae, and a number of
12  other players at Fannie Mae would have been a
13  party to that, but she was the lead person at
14  Fannie Mae, and it's reasonably accurate,
15  because, from what I understand, Fannie Mae
16  appointed her as the point person for the
17  creation of that product, and it took some
18  three years to develop and for --
19  Q.    You mentioned she was the point
20  person.
21  Were you aware of others at
22  Fannie Mae who were also involved in the
23  project?
24  A.    Yes.  I think I just mentioned
25  that, others at Fannie Mae.

Page 13

1  Q.    Can you tell me who those others
2  are?
3  A.    Lots of lawyers.  It was
4  practically all lawyers.  The names escape me
5  at this time.  Paul Van Hook would have been
6  the mortgage -- would be the multi-family
7  attorney.  There would have been --
8  Mr. Griffin (sic), my memory is not as good as
9  it used to be, but there were securities
10  attorneys at Fannie Mae that were involved in
11  this, but probably Paul Van Hook would have
12  been the primary attorney for the mortgage
13  company.
14  Q.    Would Richard Lawch have been
15  involved?
16  A.    He just would have been -- not
17  day-to-day, no.  He was involved in, I guess
18  giving -- well, not guess -- in direction, and
19  he would have been the party, along with Lou
20  Hoyes, that would have given Marialice the
21  freedom to develop -- Marialice Williams the
22  freedom to develop this product for Fannie
23  Mae.
24  Q.    We have been talking, Mr. Jones,
25  about Fannie Mae, Fannie Mae's involvement in

4  (Pages 10 to 13)

Robert G. Jones

Page 14

1   the products and processes related to the AIG
2   transaction.
3   Q.      Were any other entities involved
4   in developing those products and processes?
5   A.      From the outside of Fannie Mae,
6   yes. CAM Financial.
7   Q.      And what was CAM's role in
8   developing these products and processes?
9   A.      We were the party that developed
10  the -- or worked with Fannie Mae with outside
11  lawyers from AIG, the business people, the
12  business group from AIG in the product
13  development. Mr. Groves was pretty involved.
14  I was the point person on the CAM side, but
15  we -- drafts after drafts that were gone
16  through, and CAM was the author, I guess you
17  could say. All drafts came through me, and I
18  made the appropriate pen-and-ink changes, and
19  we would send the drafts to AIG's lawyers, and
20  then there was ASLICK lawyers, the surplus
21  lines company for AIG. There were business
22  people from AIG also involved. There was a
23  number of people.
24  Q.      And did CAM Financial introduce
25  the products and processes to Fannie Mae?

Page 15

1   A.      Yes.
2   Q.      And at what point in time did
3   Ms. Williams become involved in the process?
4   A.      She became involved after CAM
5   brought the first DUS lender to Fannie Mae.
6   She was involved -- she was in the first
7   meeting, along with some credit policy people
8   from Fannie Mae, and the DUS lender,
9   Eichler-Fein. That was in '93 or '94. I
10  think it was early '94 starting, and prior to
11  that, CAM had a -- was working with Mr. Groves
12  through a Nationwide subsidiary called
13  Scottsdale -- no -- yes, Scottsdale Insurance,
14  and we actually had a draft policy and --
15  well, it was a term sheet. It wasn't a
16  policy. That was the first product that we
17  took to Fannie Mae.
18  Q.      Mr. Jones, while Ms. Williams was
19  at Fannie Mae, how many insurance transactions
20  did CAM and AIG do with Fannie Mae?
21  A.      There was the -- the first one
22  was in 1997, and there was a second one in
23  early '98 -- no -- that was working for ten
24  months with Bay View Capital, Bay View Savings
25  Bank, while Marialice was at Fannie Mae, but

Page 16

1   that one did not close, and they took --
2   Fannie Mae took Marialice off of that -- off
3   of the Bay View Capital case. It was a seven
4   hundred million dollar case, and for some
5   reason, Mr. Lawch wouldn't let her work on it
6   after she had created this product for Fannie
7   Mae, and that was the demise of the Bay View
8   transaction. It did not close, and CAM didn't
9   get paid on that either.
10  Q.      Mr. Jones, at some point in time,
11  CAM Financial filed a lawsuit against Fannie
12  Mae; is that correct?
13  A.      That is correct.
14  Q.      And do you recall when that
15  lawsuit was filed against Fannie Mae?
16  A.      In -- I believe it was in
17  December of -- December 2001. It was the
18  first amended complaint.
19  Q.      Mr. Jones, I am going to show you
20  what's been marked as Jones Exhibit 1. It's a
21  document, the first page of which is entitled
22  "First Amended Complaint." The Bates number
23  on the first page is 6907, and it is -- I will
24  tell you -- an excerpt of that document. We
25  didn't copy the whole thing.

Page 17

1   Do you recognize this document,
2   Mr. Jones?
3   A.      You said it's excerpts?
4   Q.      Yes.
5   A.      I believe I do, yes.
6   Q.      And is this the complaint that
7   CAM Financial Services filed against Fannie
8   Mae in December of 2001?
9   A.      I believe it is.
10  Q.      And I will ask you to turn to the
11  last page of the exhibit, which is Bates
12  numbered 63 -- excuse me -- 6936.
13  A.      I am there.
14  Q.      Can you read for me the sentence,
15  kind of halfway down Paragraph 84 starting,
16  "In order to compensate CAM..."?
17  A.      Sure.
18  Q.      Actually, why don't you read the
19  full two sentences so the folks on the phone
20  can hear you.
21  A.      Starting with "in order"?
22  Q.      Yes, please.
23  A.      "In order to compensate CAM for
24  its time, efforts, expertise and expense, CAM
25  was to be the sole and exclusive agent for

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376    MD 1-800-539-6398    VA 1-800-752-8979

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 18

1  Fannie Mae in the procurement of the MCRI
2  insurance. CAM has fulfilled its commitment
3  to Fannie Mae, and Fannie Mae has breached
4  this agreement by failing and refusing to
5  allow CAM to serve as agent for Fannie Mae and
6  instead is using other entities for the
7  procurement of the MCRI insurance and other
8  derivative first loss risk coverage."
9  Q.    Thank you, Mr. Jones.
10  And, Mr. Jones, is it your
11  understanding that CAM was to be the sole and
12  exclusive agent for Fannie Mae in procurement
13  of MCRI insurance?
14  A.    That is correct.
15  Q.    And can you tell me what MCRI
16  insurance is?
17  A.    It stands for multi-family
18  credit. It's the acronym for multi-family
19  credit risk insurance.
20  Q.    And what is multi-family credit
21  risk insurance?
22  A.    That's exactly what it is.
23  Q.    Can you describe it a little more
24  fully?
25  A.    It's designed to insure various

Page 19

1  levels of tranche risk for Fannie Mae.
2  Q.    And does this insurance include
3  insurance for Fannie Mae's aggregation
4  program?
5  A.    It was expanded to -- during the
6  product development -- to cover aggregation,
7  which is a first-loss tranche risk, but it was
8  designed broad enough that it could cover
9  various levels of DUS risk. It could not only
10  do first loss. Various tranches. In fact,
11  when we first went to Fannie Mae, that was the
12  -- so that the goal was, make it broad enough
13  that -- at that time, we didn't have too much
14  success with insurance companies covering
15  first loss, because of the thrift debacle.
16  Q.    Mr. Jones, the complaint alleged
17  that Fannie Mae refused to allow CAM to serve
18  as agent, and instead used other entities for
19  the procurement of MCRI insurance.
20  Was Craig Ott one of the entities
21  that CAM claimed Fannie Mae was using to
22  procure MCRI insurance?
23  A.    Yes.
24  Q.    And did you discuss the
25  allegations contained in CAM's complaint with

Page 20

1  Ms. Williams at any point in time?
2  A.    It's been a long time ago. I am
3  not -- I just couldn't give you an absolute
4  answer on that. I don't know. I don't
5  recall.
6  Q.    So you don't recall talking to
7  her about the allegations prior to filing
8  suit?
9  A.    Prior to?
10  Q.    Yes, prior to.
11  A.    I don't recall.
12  Q.    Did Ms. Williams give a sworn
13  statement to CAM before it -- and CAM's
14  attorney -- before CAM filed suit against
15  Fannie Mae?
16  A.    You are helping me out now.
17  There was a deposition that was taken by
18  Mr. Wiser prior to Fannie Mae being brought
19  into the lawsuit.
20  Q.    Would you have discussed your
21  allegations, or potential allegations against
22  Fannie Mae, with Ms. Williams at that time?
23  A.    I don't know if I would have.
24  Mr. Wiser might have.
25  Q.    But she was aware at that time

Page 21

1  about a potential lawsuit; is that correct?
2  A.    I would say that is true.
3  Q.    Mr. Jones, are you familiar with
4  Marialice Williams?
5  A.    "Familiar" is a broad term.
6  Q.    Do you know who Ms. Williams is?
7  A.    Yes.
8  Q.    How long have you known
9  Ms. Williams?
10  A.    I first met Ms. Williams at the
11  first introduction of the DUS lender
12  Eichler-Fein in early 1994 when she was
13  working at Fannie Mae.
14  Q.    When was the last time you spoke
15  with Ms. Williams?
16  A.    It was either the death of her
17  mother, which I can't give you a date on that,
18  or it was shortly after Hurricane Katrina hit,
19  because she had -- was trying to locate us.
20  Q.    And have you spoken with her on
21  any other occasion?
22  A.    I don't believe so.
23  Q.    And do you recall whether the
24  conversation regarding the death of her mother
25  was before Hurricane Katrina or after?

6 (Pages 18 to 21)

Robert G. Jones

Page 22

1  A.     It may have been the same
2  conversation.  Things were pretty upside-down
3  after Katrina.
4  Q.     And what did that discussion --
5  what did you talk about during that
6  discussion?
7  A.     She just asked if we were okay
8  after she finally got a call through on the
9  cell phone.  In fact, we lost the signal, and
10 she tried several times to get us back.  It
11 was my wife and I, and we weren't even on the
12 Coast.  We hadn't even been able to get back
13 to our home at that time.
14 Q.     Mr. Jones, are you familiar with
15 a company called Risk Mitigation Strategies,
16 LLC?
17 A.     Yes.
18 Q.     And can you tell me what Risk
19 Mitigation Strategies, LLC is?
20 A.     I don't know the complete make-up
21 of what Risk Mitigation does, but I know that
22 she was -- formed that company to lay off risk
23 for mortgage companies, and a certificate
24 company, I believe.  She was also working on
25 some Fannie Mae programs, the DUS program at

Page 23

1  Fannie Mae, and a captive program at Fannie
2  Mae, and I think that was all done for Fannie
3  Mae.  I think that was all done through Risk
4  Mitigation.
5  Q.     Did CAM Financial Services ever
6  have a co-brokerage agreement with Risk
7  Mitigation strategies?
8  A.     Either Risk Mitigation
9  Strategists, or Marialice Williams &
10 Associates, and I wasn't completely familiar
11 with this, because Danny Groves handled the
12 brokerage setup with Marialice Williams.  I am
13 pretty sure it was consummated.  In fact, I
14 know it was.
15 Q.     Let me show you what I am marking
16 as Jones Exhibit 2, and it is a -- an e-mail
17 with an attachment.  The e-mail is dated May
18 3, 2001, from Marialice Williams to a group of
19 people, including Rhoda Newman, Grace
20 Huebscher, Bob Jones, and Harvey Hartsfield,
21 and the Bates numbers are 8002 through 8004.
22 I would ask you to read for me,
23 please, the third paragraph in the letter
24 attached to the e-mail.
25 A.     "My company, RMS, is licensed to

Page 24

1  do business in Washington, D.C.  CAM and RMS
2  do not have any connection with respect to
3  ownership and no one from CAM or RMS has an
4  interest in the other's business ventures.
5  However, CAM and RMS have a broker agreement
6  that is common in the insurance business.  The
7  agreement indicates that when CAM locates an
8  insurance company for a project that RMS is
9  working on, RMS agrees to compensate CAM
10 through some form of split commission.
11 However, it does not mean that CAM plays any
12 role in the development of the program or
13 project that RMS is working on nor does CAM
14 interface with RMS' customers."
15 Q.     Does this document refresh your
16 recollection as to whether CAM's co-brokerage
17 agreement was with Risk Mitigation Strategies,
18 LLC or with Marialice Associates?
19 A.     I think, again, Danny Groves did
20 the brokerage agreement, and I think it's a
21 pretty good indication that that is true.
22 Q.     Do you have any reason to believe
23 that the statement that Ms. Williams makes in
24 this letter is inaccurate in any way?
25 A.     No.

Page 25

1  Q.     Are you aware of whether CAM
2  Financial Services ever had a written
3  co-brokerage agreement with either Risk
4  Mitigation Strategies, LLC, or with Marialice
5  Williams, or any other entity controlled by
6  her?
7  A.     Again, Mr. Groves did the
8  brokerage agreement, and if -- assuming that
9  -- not assuming, but that would have been
10 produced in CAM's documents to Fannie Mae.
11 Q.     I have actually never seen one.
12 I am just asking.  I am not saying there is or
13 isn't.  Maybe just to refresh your
14 recollection, I am going to show you what I am
15 marking as Jones 3, and it is an excerpt from
16 deposition testimony given by Mr. Jones on
17 January 30, 2004, and if you could just look
18 at -- starting with line 20.  Maybe you could
19 read that for the record.
20 A.     "Did CAM have any written
21 agreements with Ms. Williams or her business
22 at the time?"
23 "I know that Ms. Williams
24 discussed and worked with Danny Groves on
25 several different brokers agreements.  I don't

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376    MD 1-800-539-6398    VA 1-800-752-8979

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 26

1    know that any of them were ever consummated."
2    Q.    At that point in time, Mr. Jones,
3    was it accurate to say that you weren't sure
4    whether a signed agreement had actually been
5    entered into?
6    A.    I know that there were verbals
7    that she -- that we had a 50/50 split on
8    commissions, and there were e-mails and
9    correspondence to that effect, and I know that
10   Mr. Groves went through a number of draft
11   brokerage agreements with Ms. Williams, but we
12   had an agreement, for sure, verbal, that there
13   was a 50/50 split on any deal she brought to
14   CAM.
15   Q.    Let me read for you Ms. Williams'
16   interrogatory response to Fannie Mae, and the
17   interrogatory asked Ms. Williams to describe
18   the contents and scope of her joint venture or
19   co-brokerage agreement.  Her response to that
20   was, quote:  I had a simple, common
21   co-brokerage agreement with CAM Financial that
22   entailed paying them a commission in the event
23   that they secured the insurance that I needed
24   on any of the proposals that I was working on.
25   These proposals ranged from insuring pools of

Page 27

1    automobile loans, charter school loans,
2    captive insurance, and reinsurance, etc.
3    Is that an accurate
4    characterization of Risk Mitigation
5    Strategies' agreement with CAM?
6    A.    Could you repeat that?
7    Q.    Sure.
8    "I had a simple, common
9    co-brokerage agreement with CAM Financial that
10   entailed paying them a commission in the event
11   that they secured the insurance that I needed
12   on any of the proposals that I was working on.
13   These proposals ranged from insuring pools of
14   automobile loans, charter school loans,
15   captive insurance, and reinsurance."
16   A.    I would say that as a reasonably
17   accurate statement.  I think when she means
18   reinsurance and captive, that she's referring
19   to tranche risk, and that would include
20   mortgages.
21   Q.    And with that caveat, you think
22   that her characterization is accurate?
23   A.    I have no reason to disagree with
24   it.
25   Q.    Other than the co-brokerage

Page 28

1    agreement described in Ms. Williams'
2    interrogatory responses, did CAM Financial
3    Services have any other co-brokerage
4    agreements with RMS?  And "RMS" I am using as
5    a shorthand for Risk Mitigation Strategies,
6    LLC.
7    A.    They would have -- on DUS
8    portfolio customers that Ms. Williams had, I
9    had -- was -- had made several proposals, I
10   think both to AIG and to Zurich, that if she
11   brought a customer in that would again be
12   tranche risk, and we would pay her for
13   bringing those to the table.
14   Q.    Was that part of the same
15   co-brokerage agreement, or was it a separate
16   agreement?
17   A.    No, it would be part of the
18   general.  It would encompass anything she
19   brought us.
20   Q.    And we've been talking about Risk
21   Mitigation Strategies.
22   Did CAM Financial have any
23   co-brokerage agreements with Marialice
24   Williams as opposed to Risk Mitigation?
25   A.    I am not understanding the

Page 29

1    question.
2    Q.    We've talked a little bit about
3    an agreement that CAM Financial Services had
4    with Risk Mitigation Strategies, LLC, and my
5    question to you is whether CAM had a separate
6    agreement, co-brokerage agreement with
7    Ms. Williams?
8    A.    I couldn't answer that because of
9    whether it entailed how her surplus lines
10   license read.  I think a surplus lines license
11   is for an individual, but again, it would be
12   part of the overall agreement.
13   Q.    Do you recall, Mr. Jones, when
14   the co-brokerage agreement was first entered
15   into?
16   A.    It would have been shortly after,
17   or in the three months, four months following
18   her leaving Fannie Mae.  It would have been in
19   the fall of '98 if I would put a time frame on
20   it.  That's when Mr. Groves was working with
21   her on brokerage agreements.
22   Q.    Mr. Jones, I am going to show you
23   what's been marked as Jones Exhibit 4.  It's a
24   letter from Marialice Williams to Lou Hoyes,
25   and it is dated February 2nd, 1999.

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376    MD 1-800-539-6398    VA 1-800-752-8979

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 30

1   Just for the record, I would ask
2   you to read the second paragraph of that
3   letter.
4   A.      "As you are aware, I left Fannie
5   Mae in July after being offered an appointment
6   and ownership opportunities with CAM Financial
7   Services, Inc.; however, after months of
8   negotiations with its cast of principals, I
9   was unable to reach any agreement with them
10  whatsoever.  With Mr. Lee and Mr. Moore, RMS,
11  made a bid last year to purchase CAM, but this
12  offer, too, was rebuffed."
13  Q.      Is it fair to say as of February
14  2nd, 1999, the only agreement between CAM
15  Financial Services and RMS for Marialice was
16  the co-brokerage agreement?
17  A.      I believe that's a correct
18  statement, and there's something in here about
19  the opportunities for appointment.  The cast
20  of principals at CAM had asked that Marialice
21  be able to get a letter from Lou Hoyes that
22  indicated her leaving, that she did not have a
23  non-compete clause with Fannie Mae, and I
24  don't know, for some reason or other,
25  Ms. Williams could not get that letter from

Page 31

1   Mr. Hoyes.
2   Q.      So I can get back to the
3   question, just to make sure I have a clean
4   answer, but the question was:  Is it fair to
5   say, as of early February, as of February 2nd,
6   1999, the only agreement between CAM and the
7   Risk Mitigation Strategists, LLC with
8   Ms. Williams was a co-brokerage agreement?
9   A.      To the best of my knowledge.
10  Q.      And is it also fair to say that
11  no other agreements, to use the language of
12  the letter, whatsoever had been reached?
13  A.      I think that's an accurate
14  statement.
15  Q.      Did CAM Financial Services and
16  Risk Mitigation Strategies, LLC ever enter
17  into a joint venture?
18  A.      No.  That was part of the
19  agreement that was supposed to be coming from
20  Mr. Hoyes that would have enabled Ms. Williams
21  to form an MWOB?  MWOB, yeah, and that would
22  be tied together with marketing with CAM
23  Financial Services.  That was something that
24  Mr. Hoyes had promised Ms. Williams at her
25  exit.

Page 32

1   Q.      By February 2nd, 1999, it was
2   clear that was not going to happen; is that
3   correct?
4   A.      Well, we were still -- I don't
5   think we were asking for it any further at
6   that time, and we were just trying to continue
7   to do some kind of business together, which
8   would help Ms. Williams.
9   Q.      And did -- I asked you whether
10  CAM Financial Services and Risk Mitigation
11  Strategies had ever joined into a joint
12  venture.
13  Did CAM Financial Services and
14  Marialice Williams ever enter into a joint
15  venture?
16  A.      We did not, or they did not.  I
17  can't -- I am here to appear as an individual.
18  Q.      Did you work on any non-Fannie
19  Mae projects with either Ms. Williams or Risk
20  Mitigation Strategies?
21  A.      Yes, we did.  We worked on --
22  with Mr. Hoyes' permission, we worked on a
23  commercial certificates coverage for a -- it
24  wasn't certificates -- it was commercial
25  mortgage portfolio for Metropolitan Bank.

Page 33

1   Mr. Hoyes gave us permission, Ms. Williams and
2   I, to pursue that, because Fannie Mae could
3   not provide, or could not purchase the
4   mortgage back that had a significant amount of
5   commercial loans in it as Metropolitan had
6   requested, and that was the first venture
7   outside of a Fannie Mae portfolio, and we
8   were -- she and I continued to work on captive
9   insurance.  I think it's part of my
10  deposition.  She -- to some certain extent
11  worked with her on First Atlantic on a
12  certificate coverage.  Again, we were -- CAM's
13  role would have been to find the insurance
14  capacity.  It was policies -- that particular
15  policy Marialice Williams had developed for
16  certificate coverage.
17  Q.      And how long did you continue to
18  do business with Ms. Williams or RMS?
19  A.      Again, this was product
20  development.  Probably the DUS transactions
21  for DUS customers.  We were pursuing tranche
22  coverage.  That would have been Fannie Mae
23  2000 -- Mr. Griffin, I can't remember when,
24  but it would have been 2001, I would say in
25  August -- well, actually, it was May, June,

9 (Pages 30 to 33)

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 34

1 July, and August, and we were looking for
2 tranche coverage for the DUS portfolios. She
3 asked us if we could find insurance companies.
4 That was the project she was working on for
5 Fannie Mae, and we were only working on it
6 from the insurance perspective.
7 Q.    And were there any other product
8 development projects that you were working on
9 with Ms. Williams, other than the DUS project?
10 A.    And the others that we talked
11 about.
12 Q.    And the others that we talked
13 about, yes.
14 A.    She brought a charter, or
15 introduced a charter loan program for charter
16 schools, but I don't believe we got involved
17 in that with her. I am not sure how far that
18 went.
19 Q.    And you mentioned that the work
20 you were doing with her was product
21 development work.
22 Did you do any actual
23 transactions with Ms. Williams, or with her
24 company, Risk Mitigation Strategists, LLC?
25 A.    I don't recall any actual

Page 35

1 transactions.
2 Q.    Did CAM ever breach its
3 co-brokerage agreement with Risk Mitigation
4 Strategists, LLC?
5 A.    I didn't hear you.
6 Q.    Did CAM Financial Services ever
7 breach its co-brokerage agreement with Risk
8 Mitigation Strategists, LLC?
9 A.    I am not aware if we did. I
10 don't know how broad breach is.
11 Q.    Is the co-brokerage agreement
12 still in effect?
13 A.    I don't know. I am not at CAM
14 anymore.
15 Q.    Was it in effect as of the date
16 that you stepped down as president of CAM
17 Financial?
18 A.    I know no reason why it was ever
19 terminated, I just couldn't answer that,
20 because Mr. Groves was responsible for
21 brokerage agreements.
22 Q.    Would you like to take a quick
23 break, Mr. Jones?
24    THE WITNESS:
25 Sure. Get some fresh water. Are

Page 36

1 we off?
2    MR. GRIFFITH:
3 Yes. Off the record.
4    THE VIDEOGRAPHER:
5       Going off of the record. It's
6 10:05. Videotape No. 1.
7       (Brief Recess.)
8    THE VIDEOGRAPHER:
9       We are back on the record. It's
10 10:13. Beginning of videotape No. 2.
11 EXAMINATION BY MR. GRIFFITH:
12 Q.    Mr. Jones, did you have anything
13 you wanted to clarify on the record?
14 A.    I do. You asked if there were
15 any transactions that were ever consummated
16 between CAM and Risk Mitigation. There was an
17 application fee of $10,000 that was taken from
18 -- I believe the company was First Atlantic,
19 and it was for the purpose of developing a
20 captive insurance policy for captive coverage,
21 and those fees were split between Risk
22 Mitigation and CAM.
23 Q.    Do you recall when that
24 transaction took place?
25 A.    I don't.

Page 37

1 Q.    And we talked a little bit, prior
2 to the break, about a DUS transaction
3 involving Fannie Mae and several other --
4 several other product development projects
5 that CAM worked on with Ms. Williams or Risk
6 Mitigation Strategists, and I believe you
7 testified about the timing of the DUS
8 transaction. On the non-Fannie Mae
9 transactions, can you give me a time frame for
10 those?
11 A.    The commercial transaction that
12 Marialice Williams and CAM worked on for
13 Metropolitan, this did not close, but it was
14 in August -- August of 1998 is to the best of
15 my recollection of when she and I talked to --
16 had a conference call with Lou Hoyes, and that
17 was the non-Fannie Mae transaction.
18 Q.    And then you've testified about
19 the First Atlantic transaction.
20 What about the charter
21 transaction?
22 A.    That was just product development
23 that Ms. Williams was working on, and she may
24 have sent a term sheet to me, but we did not
25 get involved in that. CAM did not get

10 (Pages 34 to 37)

Robert G. Jones

Page 38

1  involved in that.
2  Q.    Mr. Jones, are you familiar with
3  Grace Huebscher?
4  A.    I am.
5  Q.    Who is Ms. Huebscher?
6  A.    Grace Huebscher, at the time I
7  knew her, was heading the -- Fannie Mae's
8  aggregation program.
9  Q.    And can you tell me a little bit
10 about what that aggregation program is?
11 A.    The aggregation program was where
12 Fannie Mae purchased whole loans from
13 seller/servicers to do whole loans. I am
14 referring strictly to multi-family whole loans
15 now for approved Fannie Mae seller/servicers,
16 and then those loans are purchased for cash,
17 and Fannie Mae then holds those loans in
18 portfolio, and were the -- using the MCRI
19 insurance product to insure -- to lay off the
20 risk of first-loss exposure.
21 Q.    Mr. Jones, I am going to show you
22 what I am going to mark as Jones Exhibit 5.
23 It is a document with the Bates label 7918, and
24 at the top it appears to be an e-mail from
25 Ms. Williams to Bob Jones "CC-ing" an

Page 39

1  H. Hartsfield.
2  Take a look at that document.
3  A.    (Witness reviews document.)
4  Q.    My first question on this
5  document is whether this document relates to
6  the DUS proposal that we previously discussed
7  involving Risk Mitigation Strategists?
8  A.    I believe Marialice Williams was
9  talking with Fannie Mae at this time with --
10 it appears to be with Ken Bacon -- and there
11 was apparently some concern about risk-based
12 capital and covering a mezzanine level, either
13 first loss -- it appears that it's above the
14 first five percent, and, yes, this would be
15 during that same time frame that she was
16 pursuing this coverage for three DUS lenders.
17 Q.    In the top of the -- there is two
18 e-mails. It looks like one is responding to
19 the other, and in the bottom e-mail, the top
20 of that it reads, "Bob Jones wrote: Danny and
21 I have talked. We would like to treat this as
22 a separate business relationship from CAM's
23 relationship with Fannie Mae and Aggregation
24 and MBS."
25 Can you tell me what that means,

Page 40

1  those sentences mean?
2  A.    I think this is something --
3  Danny Groves had been talking with Zurich
4  Insurance, or Zurich North American, and it
5  was like to tweak their interest. They had, I
6  believe, something called asset deficiency,
7  and Mr. Groves was looking at perhaps
8  modifying the MCRI program. I don't recall
9  whether there was a separate policy that
10 Zurich had. I think there was a separate
11 policy that Zurich had called "asset
12 deficiency insurance."
13 Q.    I want to get back to a
14 discussion we started about Ms. Huebscher.
15       Did you ever have any discussions
16 with Ms. Huebscher about Marialice Williams or
17 Risk Mitigation Strategies, LLC after
18 Ms. Williams left Fannie Mae?
19 A.    Yes.
20 Q.    And when would have those
21 discussions have occurred?
22 A.    We were at a mortgage bankers
23 CREF conference. When I say "we,"
24 Ms. Williams, Ms. Huebscher, and me, and we
25 would have -- we had some conversation with

Page 41

1  Grace Huebscher at that conference about the
2  mortgage insurance programs.
3  Q.    And do you recall when those
4  conversations would have taken place?
5  A.    After Marialice Williams left
6  Fannie Mae. I'm trying to remember where that
7  conference -- there's an annual CREF
8  conference. I can picture us standing
9  together, but I can just tell you it was after
10 Marialice Williams left Fannie Mae, and it's
11 probably about this same time frame here.
12 Q.    By "this same time frame," in the
13 early to mid part of 2001?
14 A.    Correct.
15 Q.    And that was a discussion --
16 A.    Something jogged. Ms. Williams,
17 at the same conference, talked to Ken Bacon
18 about the -- insuring the DUS risk.
19 Q.    And the conversation you had
20 about Ms. Williams and RMS, Ms. Williams was
21 present for that conversation?
22 A.    Repeat that question?
23 Q.    I asked you whether you had had
24 any discussions with Ms. Huebscher about
25 Marialice Williams or Risk Mitigation

11 (Pages 38 to 41)

Robert G. Jones

Page 42

1  Strategies, LLC, and you mentioned this one
2  meeting at the conference with yourself and
3  Ms. Williams and Ms. Huebscher.
4  Other than that conversation, did
5  you have any other conversations with
6  Ms. Huebscher about Marialice Williams or Risk
7  Mitigation Strategists, LLC?
8  A.    I don't recall specific
9  conversations, but they could have occurred in
10  e-mails. I am not going to rule out that
11  there -- I just remember that one specific
12  one, and then there was a specific
13  conversation with Ken Bacon with Marialice
14  Williams and myself, and Mr. Bacon had said
15  for Marialice to please get in touch with him
16  afterward -- got back to Washington.
17  Q.    And the conversation you had with
18  Ms. Huebscher, Ms. Williams was present for
19  that conversation?
20  A.    Correct.
21  Q.    And do you recall any other
22  specific conversations with Ms. Huebscher
23  about Marialice Williams or Risk Mitigation
24  Strategists, LLC?
25  A.    I am thinking. My memory's not

Page 43

1  as good as it used to be. Lou Hoyes, Rhoda
2  Newman. There was conversations with Mari --
3  I just don't know that -- Rhoda Newman, after
4  Marialice Williams left, reported to Grace
5  Huebscher. I believe that's correct, and I
6  know there were conversations with Rhoda
7  Newman, Marialice Williams, and myself. I
8  just don't know that Grace Huebscher was ever
9  a party to those calls or not.
10  Q.    Did you ever have any
11  conversations with Ms. Huebscher about
12  Marialice Williams or Risk Mitigation
13  Strategists, LLC, for which Ms. Williams was
14  not present?
15  A.    I just don't recall.
16  Q.    Did Ms. Huebscher ever tell CAM
17  Financial Services not to do business with
18  Ms. Williams or Risk Mitigation Strategists,
19  LLC?
20  A.    Not that I recall.
21  Q.    Do you recall any disparaging
22  remarks that Ms. Huebscher made to you about
23  Ms. Williams or Risk Mitigation Strategists,
24  LLC?
25  A.    Repeat that question again?

Page 44

1  Q.    Okay.
2  Did Ms. Huebscher make any
3  disparaging remarks about Ms. Williams or Risk
4  Mitigation Strategists, LLC to you?
5  A.    I don't recall.
6  Q.    Did Ms. Huebscher ever -- strike
7  that.
8  Did Ms. Huebscher ever discuss
9  Ms. Williams' business acumen with CAM
10  Financial or with you?
11  A.    I don't have any knowledge or
12  recall.
13  Q.    Do you recall whether
14  Ms. Huebscher ever made any false statements
15  to you about Ms. Williams or Risk Mitigation
16  Strategists, LLC?
17  A.    I have no recall. I don't think
18  so.
19  Q.    Are you familiar with Richard
20  Lawch?
21  A.    I am.
22  Q.    Who is Mr. Lawch?
23  A.    He's a Fannie Mae employee, a
24  vice president, and at the time I knew him, he
25  was the number-two person in multi-family as

Page 45

1  far as the organization structure was
2  concerned, and I guess you could say he was
3  Marialice Williams' direct boss.
4  Q.    Did you have any discussions with
5  Mr. Lawch regarding Marialice Williams or Risk
6  Mitigation Strategies, LLC after she -- after
7  Ms. Williams left Fannie Mae?
8  A.    After she left?
9  Q.    Yes.
10  A.    I had conversations with Richard
11  Lawch before she left. I am trying to think
12  if there is any e-mails that involved me with
13  either Richard or Grace with Marialice after
14  she left Fannie Mae. At another CREF
15  conference, I remember Marialice and I were
16  walking toward Richard. This was after she
17  left Fannie Mae, and Richard turned his back
18  on us and refused to speak to us, and this was
19  in a lobby of one of the main hotels, and he
20  just got involved in some other conversations
21  with some other people, but it was obvious he
22  didn't want to have any -- for some reason,
23  and I thought it was strange why he would not
24  have -- why he would -- because he saw me, and
25  I was walking into this reception area, I

12  (Pages 42 to 45)

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 46

1  think it was.
2  Q.     Do you recall when this
3  conference was?
4  A.     It's a different one from the --
5  it might have been the same CREF conference
6  where Marialice -- I think it was the same
7  CREF conference where Marialice Williams and I
8  had a conversation with Richard -- with Grace
9  Huebscher and Ken Bacon.
10  Q.     Thank you for that.
11  I want to return to my original
12  question, because I don't think you actually
13  answered the question, so let me ask it again.
14  The question was whether you had
15  any discussions with Mr. Lawch about Marialice
16  Williams or Risk Mitigation Strategies, LLC
17  after Ms. Williams left Fannie Mae.
18  A.     I don't recall.
19  Q.     You don't recall any?
20  A.     No.
21  Q.     Other than -- strike that.
22  Did you talk to anybody else at
23  Fannie Mae about Marialice Williams or Risk
24  Mitigation Strategies, LLC after Ms. Williams
25  left Fannie Mae?

Page 47

1  A.     Rhoda Newman and I would have had
2  several conversations. I can't tell you the
3  content of any of them, but Rhoda Newman and
4  Marialice Williams were very good friends, and
5  so was Betty Dance. There would be
6  conversations that would come up. "We saw
7  Ms. Williams -- we saw Marialice. She came by
8  this past week," or something like that to
9  their offices there at Fannie Mae. Those kind
10  of conversations occurred.
11  Q.     Just to make sure I understand
12  who those conversations were with, they would
13  have been with Rhoda Newman or Betty Dance?
14  A.     That's correct.
15  Q.     Did either Ms. Newman or
16  Ms. Dance make any disparaging remarks about
17  Ms. Williams?
18  A.     Not that I recall, other than
19  that Marialice was trying to drum up business.
20  That's probably all related to that DUS
21  program I was talking about. I am assuming
22  that's why she was there. That and the
23  captive company.
24  Q.     Can I ask you just what type of
25  relationship you have with Ms. Williams?

Page 48

1  A.     You are going to have to
2  elaborate on that. It's professional. It's a
3  professional relationship.
4  Q.     Is it a close professional
5  relationship?
6  A.     I am sorry?
7  Q.     A close professional
8  relationship?
9  A.     Reasonable -- yes. I treated
10  Marialice as a friend, very good friend, but
11  it was professional, but family friend.
12  Q.     And we've been talking a little
13  bit about a proposal involving DUS loans, and
14  I wanted to focus you on a couple of documents
15  to make sure I understand what the proposal
16  entailed, and let me show you what I am going
17  to mark as Jones Exhibit 6. It is an e-mail
18  dated May 15th, 2001, from Bob Jones to
19  Stephen Noble, and it's got Bates numbers 8015
20  through 8017.
21  Mr. Jones, do you recognize this
22  document?
23  A.     I do.
24  Q.     And does this reflect the DUS
25  proposal that we've been discussing here

Page 49

1  today?
2  A.     Yes. This is the -- this is that
3  DUS proposal.
4  Q.     And in her interrogatory
5  responses, Ms. Williams, in a response to a
6  question about a May 2001 proposal, indicated
7  that the May 2001 proposal entailed the laying
8  off of risks associated with the Delegated
9  Underwriting Servicing program.
10  Is this the same transaction or
11  the same proposal?
12  A.     May of 2001?
13  Q.     Yes.
14  A.     I wasn't a party to that
15  interrogatory, but I would -- it's the same
16  time frame, and it involves the same 26 DUS
17  lenders. Yes.
18  Q.     And can I ask you to read -- to
19  turn to the third page of the exhibit, Bates
20  labeled 8017, and read for me the first
21  sentence under "laying of the risk "?
22  A.     "RMS is seeking insurance
23  coverage for three DUS lenders who want to lay
24  off their risk obligation on their DUS
25  portfolio."

13 (Pages 46 to 49)

Robert G. Jones

<table>
<tr><td>

Page 50

1  Q.    Does this accurately reflect the
2  DUS proposal that we, or the May proposal that
3  we've been discussing?
4  A.    I believe it is, yes. I believe
5  it is.
6  Q.    The sentence talks about three
7  DUS lenders.
8  Do you recall who those lenders
9  were? And I don't want to make this a memory
10 test. If you look at the paragraph above it,
11 there is a discussion, so that may jog your
12 memory.
13 A.    That is the same three lenders.
14 Q.    That is HomeStreet Capital, Lend
15 Lease (Bovis) Real Estate Investments, and Red
16 Mortgage Capital Group?
17 A.    That is correct.
18 Q.    And did the proposal involve any
19 other specific lenders?
20 A.    It could. This was the
21 preliminary, and this was the first three
22 lenders that Marialice was working with.
23 Q.    So this specific proposal only
24 related to these three, but there was a
25 possibility for future --

</td><td>

Page 52

1  were involved in this proposal?
2  A.    The specific insurance company
3  that we were writing to here is Zurich U.S.,
4  or Zurich North American, and then I had had
5  some conversation with AIG also. Danny had
6  the first conversation with Zurich, Danny
7  Groves.
8  Q.    And were there any other
9  insurance companies that you discussed this
10 proposal with?
11 A.    Not me. Mr. Groves may have,
12 but...
13 Q.    Sitting here today, you don't
14 know whether Mr. Groves would have discussed
15 this with other ones, or that he did discuss
16 this with other insurance carriers?
17 A.    I don't know.
18 Q.    And in this proposal, is it fair
19 to say that you didn't identify any specific
20 lenders, other than the three DUS lenders that
21 are listed on -- in the fourth paragraph of
22 Page 3 of this exhibit?
23 A.    Well, I did not in my e-mail -- I
24 did not identify those lenders, but they were
25 identified by Ms. Williams in her opportunity

</td></tr>
<tr><td>

Page 51

1  A.    For others. I think they --
2  these were three of the large ones, and --
3  Q.    And it hadn't gotten to the point
4  where the proposal actually involved those
5  other lenders?
6  A.    She indicates in there that
7  there's 65 billion or so in the write-up
8  somewhere. 64 billion that would probably
9  encompass the majority of those.
10 Q.    Let me ask you to turn to the
11 first page, in the second paragraph, and the
12 second sentence reads, "There may also be
13 several other DUS Lenders having an interest
14 in this coverage at some point in time."
15 And so, what can you tell me what
16 that sentence means?
17 A.    Well, I think it's what she's
18 referring to is this broker could be expanded
19 to other lenders.
20 Q.    Is it fair to say that the
21 proposal that you were submitting to Mr. Noble
22 at Zurich involved three particular lenders,
23 but then also -- involved three and also --
24 actually, just strike that.
25 Can you tell me what insurers

</td><td>

Page 53

1  to provide insurance coverage from mezzanine
2  tranche risk.
3  Q.    And does this document refresh
4  your recollection as to whether -- strike
5  that.
6  Was this proposal being made by
7  Risk Mitigation Strategies, LLC and CAM as
8  co-brokers?
9  A.    Yes, it would be. No, let me
10 elaborate on that. The clients would be
11 Ms. Williams and Fannie Mae. The insurance
12 companies are co-brokerage -- would be CAM
13 Financial Services for the insurance coverage.
14 Q.    And can you tell me what CAM
15 Financial Services' role was in this
16 particular proposal?
17 A.    To locate the insurance coverage
18 for Ms. Williams and Fannie Mae.
19 Q.    And what was Risk Mitigation
20 Strategies' role in this proposal?
21 A.    In representing those three --
22 those DUS lenders to lay off the risk on their
23 portfolios, and in conjunction with Fannie
24 Mae, not just the three DUS lenders. The
25 Fannie Mae and the DUS lender are responsible,

</td></tr>
</table>

14 (Pages 50 to 53)

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376    MD 1-800-539-6398    VA 1-800-752-8979

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 54

1  because that is Fannie Mae risk also. It's
2  not just the DUS lender's risk.
3  Q.    Mr. Jones --
4  A.    In fact, it's a pair of pursuit.
5  It is both lenders, both Fannie Mae and the
6  DUS lender.
7  Q.    When was the last work that
8  you -- that CAM Financial did on this
9  proposal?
10  A.    With Zurich -- I think we had the
11  open door with Zurich and AIG, and it was
12  another company that came along later, but I
13  think it was a captive. It would have been
14  this time frame from May to -- I would say the
15  window would have probably been May to August,
16  and we were waiting for Ms. Williams and
17  Fannie Mae to give us direction.
18  Q.    And did you ever get any
19  direction from Ms. Williams or Fannie Mae?
20  A.    Later from Ms. Williams that
21  Fannie Mae wasn't pursuing this coverage, but
22  they asked her to come in to make a captive
23  insurance proposal for Fannie Mae, and again,
24  we would have been involved in that.
25  Q.    And can you tell me about the

Page 55

1  captive insurance proposal?
2  A.    I only know that -- I think maybe
3  I was copied on some e-mails that Ms. Williams
4  was making a captive presentation in about
5  August of 2001. It's somewhere in that time
6  frame, August, September, and on the direction
7  of Rhoda Newman and Grace Huebscher.
8  Q.    Is it your understanding of CAM's
9  agreement with Fannie Mae that -- I think
10  you've actually testified to this before, so
11  just let me confirm it, that Fannie Mae agreed
12  that CAM was to be the sole and exclusive
13  agent for Fannie Mae in the procurement of
14  MCRI insurance?
15  A.    That's my testimony.
16  Q.    And did you ever discuss this
17  exclusive relationship with Ms. Williams?
18  A.    Yes. Once she was at Fannie Mae.
19  We went through a -- those MOUs, as you are
20  very much aware of, and some subsequent MOUs,
21  and I think it was everybody's, at that time,
22  it was of everybody's opinion that -- I think
23  you have seen my notes that, from two
24  conversations, one that involved Marialice
25  Williams and Richard Lawch, and the other with

Page 56

1  Richard Lawch, my notes reflected that CAM
2  was -- there were ten-page notes on those
3  yellow legal pads that it was our
4  understanding, CAM's understanding that we
5  were exclusive.
6  Q.    Did you have these -- did you
7  have these discussions with Marialice Williams
8  while she was at Fannie Mae? Is that correct?
9  A.    I don't know if we had specific
10  conversations to that effect. She was
11  thinking -- I think she was of the same
12  opinion that, under Mr. Lawch's direction,
13  that there was going to be MOUs with each new
14  insurance company, and in fact, Ms. Williams
15  is the one that reflected on that for us to
16  bring the GenStar, GenRe, Crump, and others,
17  in addition to AIG, and that was under the
18  direction of Mr. Lawch.
19  Q.    Did you have any discussions with
20  Ms. Williams after she left Fannie Mae about
21  CAM's exclusive relationship with Fannie Mae?
22  A.    The conversations would have
23  been, when she was in the process of leaving,
24  during the time where -- from May to June, or
25  May to July when she was leaving Fannie Mae

Page 57

1  that -- I think we all believed that CAM had
2  the exclusive with Fannie Mae and that
3  Ms. Williams was negotiating with Lou Hoyes to
4  expand that exclusive where she would -- where
5  Ms. Williams would have the marketing
6  exclusive with her lenders, and that that
7  would -- that business would be coming to
8  Fannie Mae, and then CAM would be insuring
9  that business. That was, to my knowledge, was
10  what she had discussed with Mr. Hoyes prior to
11  her leaving Fannie Mae. That's when I
12  mentioned the MWOB.
13  Q.    Was it -- is it -- was it CAM's
14  understanding that Fannie Mae had to do any
15  business, any MCRI business involving GenStar
16  or GenRe through CAM?
17  A.    Yes.
18  Q.    And CAM also had an exclusive
19  relationship with GenStar through Crump; is
20  that correct?
21  A.    That was the brokerage. We had a
22  wholesaler between us. When I say "we," CAM
23  and Fannie Mae would go through Crump as its
24  wholesaler -- not Fannie Mae, but CAM would,
25  because that's the insurance side of the

15 (Pages 54 to 57)

0ae31a4e-e891-4cb9-849f-fd525208370c

## Robert G. Jones

Page 58

1  transaction, and that's -- I think there's
2  agreements to that.
3  Q.    Just to make sure I understand
4  it, Crump agreed to exclusively write MCRI
5  through CAM, and GenStar committed to write
6  MCRI exclusively through Crump; is that
7  correct?
8  A.    That's correct. Worked both
9  ways. And that same exclusive with Crump was
10 to be developed with other insurance carriers.
11    MR. GRIFFITH:
12 Can we go off the record for a
13 little bit?
14    THE VIDEOGRAPHER:
15 We are going off the record.
16 This is videotape No. 2.
17   (Brief recess)
18  THE VIDEOGRAPHER:
19    We are going back on the record.
20 It's 11:13. This is videotape No. 2.
21 EXAMINATION BY MR. GRIFFITH:
22 Q.    Mr. Jones, we have discussed
23 today a May 2001 proposal involving DUS loans,
24 and we've also touched on a discussion
25 regarding captive insurance, both of which

Page 59

1  involved Ms. Williams.
2  Are you aware of any other
3  proposals that Ms. Williams made to Fannie Mae
4  after the time she left?
5  A.    I am thinking, but I am not sure.
6  She may have made some. I don't know.
7  Q.    But sitting here today, you can't
8  --
9  A.    These are the ones I am familiar
10 with.
11 Q.    These two are the ones that you
12 recall?
13 A.    Correct.
14 Q.    And you don't recall today any
15 others?
16 A.    Not offhand.
17 Q.    Now, you testified earlier that
18 you don't recall any conversations with
19 Ms. Huebscher regarding --
20 A.    I am sorry. I am having some
21 trouble. Some technical problems.
22 Q.    Just let me know if you don't
23 hear me. I will try to speak loudly.
24    Mr. Jones, you testified earlier
25 today that you didn't recall Ms. Huebscher

Page 60

1  making any disparaging remarks about
2  Ms. Williams to you, and you also testified
3  that you didn't recall having any
4  conversations about Ms. Williams or RMS, Risk
5  Mitigation Strategies, with Mr. Lawch.
6  My question now is: Do you
7  recall discussing that type of conversation
8  with Ms. Williams?
9  A.    Before or after she departed
10 Fannie Mae? I'm not with you.
11 Q.    After she departed Fannie Mae.
12 A.    With either Mr. Lawch or
13 Ms. Huebscher?
14 Q.    Yes.
15 A.    Only -- the only one I am
16 somewhat familiar with, or would be familiar
17 with is an e-mail that Ms. Williams told me
18 about that was in late May or early June of
19 2001, of which you know about, and that's of
20 whether or not they were going to pursue this
21 coverage with Ms. Williams, and that e-mail --
22 that's a long time ago, and we furnished the
23 original of that e-mail to Fannie Mae. I
24 think it was part of my deposition, but that
25 something about Fannie Mae was pursuing

Page 61

1  different strategies or something, or
2  considering Craig Ott for that type of
3  coverage, depending on Mr. Lawch's comments,
4  depending on risk-based -- what OFHEO said
5  about risk-based capital.
6  Q.    Other than that, you are not
7  aware of anything?
8  A.    That's the -- at this time, I
9  can't think of any others. We gave you that.
10 Could we take a time out
11 technically for a technical problem?
12    MR. GRIFFITH:
13 Sure. Let's go off the record.
14  THE VIDEOGRAPHER:
15    We are going off of the record.
16 It's 11:17. This is videotape No. 2.
17   (Brief recess)
18  THE VIDEOGRAPHER:
19    We are back on the record. It's
20 11:19. This is videotape No. 2.
21 EXAMINATION BY MR. GRIFFITH:
22 Q.    Mr. Jones, I am going to give you
23 what's been marked as Jones Exhibit 7. It's a
24 document, Bates labeled 6230 through 6232, and
25 I have also included, attached to that is a

16 (Pages 58 to 61)

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 62

1  document that's Bates labeled 8031.
2  Can you take a look at that
3  document for me, please?
4  A.     (Witness reviews document.)
5        Okay.
6  Q.     And Mr. Jones, is Exhibit 7 the
7  e-mail that you were referring to in your
8  previous testimony?
9  A.     That's correct.
10 Q.     Thank you.
11 Mr. Jones, you testified
12 previously that you did not recall speaking
13 with Mr. Lawch about Marialice Williams or
14 Risk Mitigation Strategies, LLC, correct?
15 A.     After...
16 Q.     After Ms. Williams left Fannie
17 Mae; is that correct?
18 A.     That is correct.
19 Q.     And after Ms. Williams left
20 Fannie Mae, I take it then that you don't
21 recall any conversation in which Mr. Lawch
22 told CAM not to do business with Ms. Williams?
23 A.     I don't recall of any
24 conversations.
25 Q.     And you don't recall any

Page 63

1  conversations in which Mr. Lawch made any
2  disparaging remarks about Ms. Williams after
3  she left Fannie Mae?
4  A.     I don't recall of any.
5  Q.     And you don't recall any false
6  statements that Mr. Lawch made to you about
7  Ms. Williams after she left Fannie Mae?
8  A.     Well, same answer; same question.
9  Q.     Really just the same question.
10       MR. GRIFFITH:
11 I don't have anything further.
12 EXAMINATION BY MR. DANIELS:  (Via telephone)
13 Q.     This is Harley Daniels asking
14 questions of Mr. Jones.
15 Are you receiving me?
16 A.     I hear you, Mr. Daniels.
17 Q.     For the record, Mr. Jones, isn't
18 it true that you are a person of the --
19       THE COURT REPORTER:
20 I'm sorry.  I can't understand
21 that.
22       THE WITNESS:
23 I can't hear that.
24       MS. GOLDFRANK:
25 You'll have to repeat yourself.

Page 64

1  We couldn't hear you over hear.
2  EXAMINATION BY MR. DANIELS:
3  Q.     Isn't it true, Mr. Jones, that
4  you are a person of the --
5        THE COURT REPORTER:
6  The white race?
7        MS. GOLDFRANK:
8  Yes.
9  EXAMINATION BY MR. DANIELS:
10 Q.     -- white race?
11 A.     Caucasian, white.
12 Q.     Isn't it true that Mr. Groves is
13 a member of the Caucasian race?
14 A.     That's correct.
15 Q.     Isn't it true that Mr. Rumsey is
16 a member of the Caucasian race?
17 A.     Yes.
18 Q.     Isn't it true that Mr. Craig Ott
19 is a member of the Caucasian race?
20 A.     I believe so, yes.
21 Q.     Did CAM have any -- isn't it true
22 that all of the CAM shareholders were members
23 of the Caucasian race?
24 A.     That's correct.
25 Q.     Now, isn't it true that you began

Page 65

1  to seek business from Fannie Mae in
2  approximately 1992, 1993?
3  A.     Our first meeting with Fannie
4  Mae -- well, with DUS lenders, I was already
5  doing -- CAM was already doing business with
6  DUS lenders, and then, yes, that's correct.
7  We went to Fannie Mae.  CAM went to Fannie Mae
8  with one of those DUS lenders in either late
9  '93 or early '94.
10 Q.     And what was the nature of that
11 business?
12 A.     Prior to Fannie Mae, it was
13 multi-family mortgage brokerage, and then
14 involving Fannie Mae was the introduction and
15 development of a multi-family mortgage
16 insurance coverage policy in the early
17 development stages.
18 Q.     Now, at that time, did Mr. Groves
19 have any experience in the area of the
20 secondary mortgage market?
21 A.     Is he saying Mr. Groves?
22 Q.     Yes.
23 A.     Only on the -- can you repeat
24 that question?
25       MR. GRIFFITH:

17 (Pages 62 to 65)

Robert G. Jones

Page 66

1 Maybe we'll see if the court
2 reporter can repeat it.
3     MR. DANIELS:
4 Certainly, please.  In fact, if
5 Mr. Jones would direct those questions to the
6 court reporter, I'd appreciate it.
7 (Court reporter reads back prior question)
8     THE WITNESS:
9 Not to my knowledge.
10 EXAMINATION BY MR. DANIELS:
11 Q.     Did Mr. Rumsey have any
12 experience in that area?
13 A.     With -- only with REO, real
14 estate owned.  Multi-family REO with Freddie
15 Mac and Fannie Mae.
16 Q.     You would agree it was not a
17 major part of his expertise at that time; is
18 that correct?
19 A.     On the secondary market, that is
20 correct.  This is the property set that
21 tanked.
22 Q.     And, Mr. Jones, your experience
23 was basically in the insurance area; isn't
24 that correct?
25 A.     No.  My experience was mortgage

Page 67

1 banking.  My background was mortgage banking,
2 and yes, I had some insurance experience.
3 Q.     And isn't it fair to say that the
4 general subject of what you were trying to
5 accomplish with Fannie Mae would be the merger
6 of insurance and mortgage -- secure-type
7 mortgages?
8 A.     That is correct.  In laying off
9 risk in hard to -- in the inner-city of
10 America where thrifts and commercial banks --
11 where there was a void there, and it was to --
12 our -- the objective that we were wanting to
13 -- that CAM or that Bob Jones wanted to -- it
14 was combining those two experiences to improve
15 the efficiency of a transaction, and for those
16 thrifts and small commercial banks to lay --
17 to be able to put those mortgages in
18 securities.
19 Q.     And wouldn't you agree that it
20 was that that was Marialice's passion for this
21 particular issue?
22     MR. GRIFFITH:
23 I'm going to ask the court
24 reporter to read that back, because I don't
25 think Mr. Jones heard you.

Page 68

1 (Court reporter reads back previous question)
2 EXAMINATION BY MR. DANIELS:
3 Q.     That was the development of
4 low-income housing.
5 A.     That is correct.  On the
6 inner-city, mid-city properties on low to
7 "mod" incoming housing, there was not an
8 execution that was efficient in the
9 marketplace.
10 Q.     And was this fact, the fact that
11 it would improve the ability of Fannie Mae to
12 issue loans in urban areas more efficiently,
13 was this generally known to Richard Lawch and
14 Grace Huebscher and the people you were
15 dealing with at Fannie Mae?
16 A.     No.  Only Marialice Williams.
17 Q.     Now --
18 A.     Well, wait, wait.
19     MR. GRIFFITH:
20 Hold on a second.  I think
21 Mr. Jones is going to finish his answer.
22     THE WITNESS:
23 There were some changes in
24 accounting in how risk-based capital was
25 reported at the thrift and at the -- for

Page 69

1 commercial banks that Mr. Lawch would have
2 known about, because the -- that particular
3 type transaction had -- there was a void in
4 the marketplace, and for that -- for those
5 portfolios to be sold to Fannie Mae, and that
6 was the -- I would -- I can't speak for
7 certain that Mr. Lawch would have known about
8 that, but Fannie Mae's volume had dried up
9 for -- from those banks and thrifts that were
10 trying to sell their mortgages, and both
11 Fannie Mae and Freddie Mac corporately would
12 have known that that execution was no longer
13 available because of the changings in the
14 general accounting standards, and that's why
15 it was so important to -- for Ms. Williams,
16 from the Fannie Mae perspective, to develop
17 this type of coverage with -- with CAM and its
18 insurance contacts, to open that back up in
19 the marketplace.  There was a void of those
20 transactions for affordable housing.
21 EXAMINATION BY MR. DANIELS:
22 Q.     Now, do you think it would be
23 fair to call all of these various products
24 involving insurance and the secondary mortgage
25 market, would you call them credit-enhancement

18 (Pages 66 to 69)

Robert G. Jones

Page 70

1  products?
2  A.     Absolutely.
3  Q.     Would you mean some of the
4  programs that Fannie Mae was involved in that
5  caused for a credit-enhancement using these
6  various insurance pools?
7     MR. GRIFFITH:
8  Objection, vague.
9     THE WITNESS:
10 You heard the question, but I
11 couldn't.
12    MR. DANIELS:
13 Would you ask the question to
14 Mr. Jones, please, and let's let him determine
15 whether it was vague or not.
16 (Court reporter reads back previous question)
17    MR. GRIFFITH:
18 Objection, foundation and
19 vagueness. Go ahead.
20 EXAMINATION BY MR. DANIELS:
21 Q.     Can I ask the witness to answer
22 the question, please?
23 A.     You are going to have to repeat
24 it one more time.
25 Q.     Now, you've agreed that the

Page 71

1  merger of insurance and the secondary mortgage
2  market, in general, could be categorized or
3  called credit enhancement; is that correct?
4  A.     In the insuring of the first
5  level of risk, or even the mezzanine level of
6  risk, yes. And that enhancement became a
7  triple-A-rated insurance policy.
8  Q.     And that enhancement could apply
9  to DUS programs; is that correct?
10    MR. GRIFFITH:
11 Objection.
12    THE WITNESS:
13 I don't understand the question.
14 EXAMINATION BY MR. DANIELS:
15 Q.     Would you call what you were
16 proposing to Fannie Mae, in the DUS program,
17 as a credit enhancement?
18 A.     Yes. That is correct. That's
19 the first proposal that was made to Fannie Mae
20 in the presence of Marialice Williams, and
21 also people from credit policy, was to -- was
22 a credit-enhancement for the DUS lender.
23 Q.     Now -- was that also true --
24    MR. GRIFFITH:
25 Hold on one second. We've got a

Page 72

1  note from our videographer here. We are just
2  changing the tapes.
3     THE VIDEOGRAPHER:
4  We are going off the record.
5  It's 11:33. It's the end of videotape No. 2.
6        (Off the record)
7    THE VIDEOGRAPHER:
8        We are back on the record. It's
9  11:36. This is videotape No. 3.
10 EXAMINATION BY MR. DANIELS:
11 Q.     Mr. Jones, wouldn't you agree
12 that the -- that the products you developed
13 for credit-enhancement were also applicable to
14 Fannie Mae's aggregation program?
15 A.     Yes.
16    MR. GRIFFITH:
17 Objection. Objection.
18    MR. DANIELS:
19 He answered yes?
20    THE WITNESS:
21 Yes.
22 EXAMINATION BY MR. DANIELS:
23 Q.     And wouldn't you agree that they
24 would also be applicable to the negotiated
25 transactions program?

Page 73

1  A.     Yes, I would agree.
2  Q.     And wouldn't you agree that they
3  would also be applicable to the captive
4  insurance program?
5     MR. GRIFFITH:
6  Objection.
7     THE WITNESS:
8  Yes, I would agree.
9  EXAMINATION BY MR. DANIELS:
10 Q.     And would they also apply to the
11 face amount certificate program that you and
12 Marialice worked on with First Atlantic, I
13 believe it was?
14    MR. GRIFFITH:
15 Objection.
16    THE WITNESS:
17 That is correct.
18 EXAMINATION BY MR. DANIELS:
19 Q.     Now, moving on, I have got an
20 exhibit which I haven't marked, but it has the
21 numbers 9703 on it.
22    MS. GOLDFRANK:
23 Is it something we sent down to
24 you?
25    MR. DANIELS:

19 (Pages 70 to 73)

## Robert G. Jones

Page 74

1 Yes. It's a memo -- it's an
2 e-mail from Bob Jones to probably D. Groves
3 dated September 7th, 1998 .
4       MS. GOLDFRANK:
5 Is it 7297?
6       MR. DANIELS:
7 9703 is on the right on the
8 bottom MBW 007232. I think it was sort of
9 partially referred to in one of the questions
10 that came earlier.
11       MS. GOLDFRANK:
12 You think we used it earlier?
13       MR. DANIELS:
14 That number was referred to
15 earlier. I don't think you asked a question
16 about it.
17       MR. GRIFFITH:
18 What's the number again?
19       MR. DANIELS:
20 007232.
21   THE VIDEOGRAPHER:
22       Going off of the record. It's
23 11:39. This is videotape No. 3.
24       (Off the record)
25   THE VIDEOGRAPHER:

Page 75

1   Going back on the record. It's
2 11:40. This is videotape No. 3.
3 EXAMINATION BY MR. DANIELS:
4 Q.    Mr. Jones, do you have what we've
5 marked as Plaintiff's 1? Is that what we are
6 calling it?
7 A.    7232? Yes, I do.
8 Q.    Now, this is -- this is an e-mail
9 that you wrote to Danny Groves, right?
10 A.    That is correct.
11 Q.    And in there you say, "In light
12 of all of the recent developments involving
13 Marialice leaving Fannie Mae," what did you
14 mean by that? What were the recent
15 developments you were referring to?
16 A.    Let me read the entire e-mail
17 first.
18 Q.    Certainly.
19 A.    This is where Chuck -- like me to
20 answer that question?
21 Q.    Please, yes.
22 A.    Chuck here, I am referring to
23 Chuck Rumsey, had been asking that Marialice
24 Williams furnish a -- something from Lou Hoyes
25 that would just say that Marialice Williams

Page 76

1 did not have a non-compete clause, and that
2 she was free to move forward with CAM, because
3 we did not have the Fannie Mae agreement that
4 she had been trying -- that she thought she
5 was going to get from Mr. Hoyes when she left
6 Fannie Mae. Mr. Rumsey would not move forward
7 with Ms. Williams without the comfort level
8 that there was no non-compete clause, so in
9 trying to keep the -- our entire effort, the
10 CAM corporate strategy to expand its business
11 with Fannie Mae, I was proposing that -- and I
12 don't have what the document is here, but that
13 CAM be purchased, or we join with an equity
14 partner to raise capital, and that suitor
15 could have been a suitor by Ms. Williams, and
16 there was someone from -- a group from Crump
17 had -- Crump, who was our wholesale broker,
18 had indicated an interest in buying CAM, and
19 that was the purpose of this e-mail was about.
20 Q.       And so when you are referring to
21 the recent developments involving Marialice
22 leaving Fannie Mae, are you -- you are only
23 referring to the fact that she didn't supply
24 you, or Fannie wouldn't give you a non-compete
25 assurance, or were there other elements

Page 77

1 involved?
2 A.    The assurance -- this is from
3 Mr. Rumsey's perspective -- that he didn't
4 want to get sued by Fannie Mae for pursuing
5 marketing with Marialice and Fannie Mae
6 customers, and had asked that she be able to
7 get -- I guess it's a comfort letter -- that
8 there was no -- that she wouldn't be violating
9 any kind of non-compete clauses in her leaving
10 Fannie Mae.
11 Q.    Now, this was, in effect,
12 devastating for CAM, obviously, because isn't
13 it true, after you realized that Marialice was
14 not going to be part of your package, that CAM
15 was in serious trouble and needed to attract
16 additional capital to carry its program
17 forward?
18       MR. GRIFFITH:
19 Objection.
20       THE WITNESS:
21 I think it's twofold. The Bay
22 View portfolio did not close, and it -- after
23 CAM had spent ten months on that and had
24 incurred a lot of -- a lot of costs of
25 underwriting the loans out at Bay View, all of

20 (Pages 74 to 77)

Robert G. Jones

Page 78

1   the structuring of the -- getting the approval
2   of the portfolio from AIG. Richard Lawch had
3   signed the binder accepting the coverage for
4   Fannie Mae, and then the -- while the
5   mortgages were in the process of being
6   delivered to Fannie Mae, there was a
7   substantial amount of what CAM had spent and
8   didn't collect a dime on, and then Marialice,
9   in the same process, leaves Fannie Mae at the
10  very same time during the same time period,
11  because -- and like I had mentioned, Mr. Lawch
12  refused to let Ms. Williams work on the Bay
13  View transaction, so CAM was in much need of
14  attracting an equity partner.
15  EXAMINATION BY MR. DANIELS:
16  Q.     How did you find out that Richard
17  Lawch had refused to let Marialice work on the
18  transaction?
19  A.     Can that question be repeated?
20  (Court reporter reads back previous question)
21      THE WITNESS:
22  It was my personal involvement
23  with Bay View Capital. They did not have an
24  investment banker, and CAM was the
25  intermediary between Bay View and Fannie Mae,

Page 79

1   and I specifically asked Richard for Marialice
2   to stay on that -- to stay on that
3   transaction, and he refused, and he put two
4   subordinates on the transaction, and to quote
5   Bay View, that -- Bay View Capital, Bay View
6   Savings Bank, they -- Lawrence Schwartz, their
7   director of secondary marketing says, "Fannie
8   Mae has just beat this to death. We are
9   stopping the transaction," and that was in the
10  middle of mortgages being delivered to Fannie
11  Mae.
12  EXAMINATION BY MR. DANIELS:
13  Q.     And what -- Mr. Jones, do you
14  remember exactly when that occurred, or
15  essentially when that occurred?
16  A.     We started working on it in --
17  CAM started working on it at Richard Lawch and
18  Marialice's direction in the fall of '97,
19  right after the Metropolitan transaction
20  closed, which was a milestone for Fannie Mae,
21  and it went until August of 1998, July -- July
22  of 1998, before Bay View pulled out.
23  Q.     And please explain to -- why
24  Marialice Williams' involvement was so
25  critical to moving forward on your original

Page 80

1   ideas with Fannie Mae.
2   A.     She's -- Ms. Williams was, in my
3   opinion, critical to making those transactions
4   work, because she understood the efficiency of
5   the execution and was the point person on the
6   insurance product for Fannie Mae. Nobody
7   else -- this Green -- Alan Greenwald had no
8   clue how that transaction should work and had
9   no idea about the execution, and Richard Lawch
10  put him in charge of it.
11  Q.     Now, you worked with
12  Marialice from approximately 1992, '93 to 2000
13  into the 21st century; is that correct?
14  A.     1994, early 1994 to at least
15  2001.
16  Q.     Did you form any opinions as to
17  the quality of the work she was doing in
18  working with you on this Fannie Mae?
19  A.     The quality of her work was very
20  good. She understood the insurance execution.
21  Now, she learned a lot more about the
22  insurance side. As time went on, she went
23  through every one of those drafts of
24  40-some-odd insurance drafts to -- before the
25  first transaction was closed with Metropolitan

Page 81

1   Savings Bank, and her knowledge was -- there
2   was no -- I don't think there was anybody else
3   that understood small loans, the small loan
4   program for multi-family for Fannie Mae at
5   Fannie Mae. Nobody had any higher level of
6   expertise on the small loan programs that --
7   in my opinion anyway. Now, that's just my
8   opinion.
9   Q.     Now, after she left Fannie Mae,
10  you had an opportunity to observe her work
11  with triple A insurance companies, didn't you?
12      MR. GRIFFITH:
13  Objection.
14      THE WITNESS:
15  With -- after she left Fannie
16  Mae, she worked with CAM on the Zurich program
17  and was -- that was for the Fannie Mae DUS,
18  and then she wrote her own policies, to my
19  knowledge. She and probably -- she may have
20  had some assistance from Eric and John at
21  First Atlantic on the certificate policies,
22  but what I saw was good quality work.
23  EXAMINATION BY MR. DANIELS:
24  Q.     Now, are you familiar with
25  Mr. Craig Ott?

21 (Pages 78 to 81)

Robert G.  Jones

Page 82

1      THE WITNESS:
2   I can't hear the question.
3   (Court reporter reads back previous question)
4      THE WITNESS:
5   Much more so than I would like to
6   be.
7   EXAMINATION BY MR. DANIELS:
8   Q.     Now, were you familiar with
9   Mr. Ott's qualifications to broker this
10   business with Fannie Mae?
11      THE WITNESS:
12   I don't understand the question.
13      MR. GRIFFITH:
14   Could you read back the question?
15   (Court reporter reads back prior question)
16      THE WITNESS:
17   "Familiar" bothers me.  When
18   Crump first introduced CAM to Craig Ott, he
19   knew nothing about this particular insurance
20   product.  He had no knowledge, in my opinion,
21   of the insurance product that we developed,
22   and in turn tried to change it on his own to
23   go around CAM to -- on several transactions.
24   EXAMINATION BY MR. DANIELS:
25   Q.     Now, earlier in your testimony

Page 83

1   you stated that you believed you had an
2   exclusive agreement with Fannie Mae to do
3   credit enhancement using your insurance
4   product; is that correct?
5   A.     That is correct.
6   Q.     Now, did that belief prove to be
7   true?
8   A.     In my opinion, we still have the
9   exclusivity based on the agreements with
10   Richard Lawch, but the tweaking of MOUs at
11   Fannie Mae, and then the pressure from
12   Mr. Lawch for us to sign the MOU -- "Either,
13   sign it, or we are not going to do business
14   with you."  There was the exclusivity in that
15   MOU, and reduced it to the specific insurance
16   companies that were in the MOU, and then
17   Mr. Lawch refused to do future MOUs with us.
18   Q.     In other words, in your opinion
19   at least, Mr. Lawch breached his commitments
20   to CAM to do this business?
21   A.     In my opinion, yes.
22   Q.     And, in fact, you -- CAM sued
23   Craig Ott, as a party, and sued Fannie Mae; is
24   that correct?
25   A.     That is correct.

Page 84

1   Q.     And what were the fundamental
2   allegations in your complaint against Fannie
3   Mae?  What was the basis, in sort of laymen's
4   terms --
5   A.     That Fannie Mae was not honoring
6   the terms of the exclusive that had been
7   promised us and was taking this insurance
8   company to other insurance carriers.  This
9   insurance coverage to other insurance
10   carriers.
11   Q.     So that if Fannie Mae at some
12   point said that the reason they didn't do
13   business with Marialice was because you had an
14   exclusive on this product, you would have to
15   say that that would not be true; is that
16   right?
17      MR. GRIFFITH:
18   Objection.
19      THE WITNESS:
20   I'm not following that.
21      MR. DANIELS:
22   Read the question back.  If it
23   doesn't work, I'll ask it again.
24   (Court reporter reads back previous question)
25      THE WITNESS:

Page 85

1   I don't feel I am qualified to
2   answer your question.
3   EXAMINATION BY MR. DANIELS:
4   Q.     Well, I mean, at some point, they
5   actually gave the business that you thought
6   you were entitled to to others; isn't that
7   correct?
8   A.     That is correct.  They gave it to
9   Craig Ott.
10   Q.     Now, can you tell us, for the
11   record, the amount of commission you received
12   from Fannie Mae pursuing the business that
13   Marialice was not a part of?
14   A.     I think that's probably in CAM's
15   litigation and in documents that are
16   disclosed, but I couldn't answer that
17   question.
18   Q.     Would it be more or less than
19   three million dollars?
20   A.     I am sure it's less than that.
21   It's in expert reports.
22   Q.     Now --
23   A.     Or I am reasonably sure it's less
24   than that.  It would be in CAM's expert
25   reports.

22  (Pages 82 to 85)

Robert G. Jones

Page 86

1  Q.    Do you think it was more than two
2  million dollars?
3  A.    I would have to refer to the
4  reports.
5  Q.    Wouldn't you agree that Marialice
6  was unaware of the level of commissions that
7  you received from Fannie Mae?
8  A.    Probably so, yes.
9  Q.    And --
10    MS. GOLDFRANK:
11  Harley, he wasn't finished with
12  his answer.
13    MR. DANIELS:
14  I'm sorry.
15    THE WITNESS:
16  I think I said probably so,
17  because she was not familiar with the volume
18  of business in the aggregate -- that was being
19  done under aggregation that Grace Huebscher
20  and Richard Lawch had strategized and insured.
21  EXAMINATION BY MR. DANIELS:
22  Q.    And isn't it true that she only
23  became aware of this sometime this summer,
24  summer of 2006?
25    MR. GRIFFITH:

Page 87

1  Objection.
2    THE WITNESS:
3  I don't know.
4  EXAMINATION BY MR. DANIELS:
5  Q.    Did she call you? Did you
6  receive a telephone call from her after she
7  began to review the CAM litigation files
8  raising the issue with you?
9  A.    I don't recall a telephone call.
10  There -- I believe -- there was an e-mail
11  sometime that -- something about the -- either
12  commissions or something in the litigation
13  with CAM, yes. That would have been --
14  something in the CAM litigation documents that
15  I am assuming that you-all had.
16  Q.    And during the course of one of
17  those conversations, didn't you say to
18  Marialice, "Marialice, I know you are going to
19  have a problem with what you see," or, "This
20  is going to surprise you," or, "I know you are
21  going to have feelings about it"? Something
22  to that effect?
23  A.    I don't think that was 2006. She
24  and I had a conversation not too long --
25  probably in 2000 or 2001 when she and I -- she

Page 88

1  was appalled to learn that there were -- was
2  the number of aggregation transactions that
3  had -- that had been closed. I don't think
4  there was anything other than maybe something
5  that was -- you-all picked up in the CAM -- in
6  the CAM litigation.
7  Q.    Perhaps you said what I suggested
8  to Conway Downing.
9  Is that possible?
10    THE WITNESS:
11  I didn't hear the question.
12    MR. GRIFFITH:
13  Can you repeat the question?
14    MR. DANIELS:
15  Yes.
16  EXAMINATION BY MR. DANIELS:
17  Q.    You recall that I was trying to
18  bring -- sort of refresh your memory on a
19  conversation with Marialice held in the summer
20  of 2006.
21  Do you recall a conversation with
22  Conway Downing in the late summer of 2006
23  where you expressed similar sentiments
24  about --
25  A.    In the -- Conway Downing was in

Page 89

1  Gulfport to -- and he -- I am not -- that must
2  be where the CAM litigation files came up, and
3  that's -- perhaps that's where the numbers
4  were generated, and because he went through
5  the federal courthouse documents in 2006, and
6  that may be where that information came from.
7  Q.    I mean, your comment or your -- I
8  am trying to get at the comment you made to
9  Conway about Marialice not being happy about
10  what she's going to see in the CAM litigation
11  file.
12    MR. GRIFFITH:
13  Objection.
14    THE WITNESS:
15  I think Conway may have already
16  had gotten those documents, or when we spoke.
17  I don't recall exactly how that happened. I
18  did have breakfast with Conway one morning
19  when he was in Gulfport, but the conversation
20  I had with Ms. Williams was before the CAM
21  lawsuit and our -- after she -- the CAM
22  lawsuit litigation was going on, but it was --
23  it was either 2001 or 2002, and she and I had
24  the conversation about how much -- how many
25  aggregation transactions had been done, and

23 (Pages 86 to 89)

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 90

1 she was just not -- she was not aware of
2 those. She thought we had only done the MBS
3 with "Met."
4 EXAMINATION BY MR. DANIELS:
5 Q. Now, were you present at the
6 fourth day of Marialice's deposition in
7 Washington in November of 2003?
8 A. Yes, I was.
9 Q. And do you recall Marialice's
10 testimony with regard to Richard Ross'
11 attitude toward you?
12 A. Yes, I do.
13 Q. And what was that, to the extent
14 that you remember?
15 A. Well, the attitude that -- which
16 I couldn't -- had some difficulty believing,
17 Mr. Lawch referred to the -- to me as a
18 "redneck" from Mississippi, and that
19 apparently it was common knowledge around
20 Fannie Mae.
21 Q. That that's how he regarded you?
22 A. That is correct.
23 MR. GRIFFITH:
24 Harley, it's John Griffith here
25 for a second. How much longer do you have?

Page 91

1 MR. DANIELS:
2 If I could put you on mute so I
3 could confer with my colleague, I may be
4 toward one, two, or three questions.
5 MR. GRIFFITH:
6 Can we go off for five minutes?
7 I just have to step out for two seconds.
8 MR. DANIELS:
9 Why don't you re-call us, and
10 we'll be ready to go.
11 THE VIDEOGRAPHER:
12 Going off of the record. It's
13 12:06. This is videotape No. 3.
14 (Brief Recess.)
15 THE VIDEOGRAPHER:
16 We are back on the record. It's
17 12:13. This is videotape No. 3.
18 EXAMINATION BY MR. DANIELS:
19 Q. Mr. Jones, you've -- between, I
20 would say 1993 and 2002, you sent off in an
21 effort to secure business from Fannie Mae; is
22 that not correct?
23 A. That is correct.
24 Q. Now, would you describe for us
25 the process that you observed for how Fannie

Page 92

1 Mae entered into these contracts for the
2 products that you and Marialice were offering?
3 MR. GRIFFITH:
4 Objection.
5 THE WITNESS:
6 To my knowledge, Fannie Mae had
7 never entered into a contract like the
8 CAM/Fannie Mae MOU. They never -- it had
9 never been done before. I can't specifically
10 say how Fannie Mae otherwise entered into
11 those type of contracts that had never been
12 done.
13 EXAMINATION BY MR. DANIELS:
14 Q. Now, it's true that Fannie Mae
15 did not issue a request for proposals for your
16 product; is that right? That you were aware
17 of.
18 A. They did not specifically. No,
19 they did not.
20 Q. And when was the first time you
21 approached Fannie Mae to make -- proposing
22 that business be done in this area of
23 credit-enhancement?
24 A. You are going to have to repeat
25 the question.

Page 93

1 Q. When was the first time that CAM
2 made a proposal to Fannie Mae for
3 credit-enhancement products?
4 A. In May of -- either February or
5 May of 1994 when I met with Marialice
6 Williams, Bill Batts from credit policy, and I
7 think several people from Eichler-Fein, one of
8 the DUS lenders.
9 Q. Did Fannie Mae, at that time,
10 accept your proposal?
11 A. They -- the credit -- Marialice
12 Williams brought credit policy, a member of
13 credit policy, who had been a mortgage banker,
14 or investment banker in New York, Bill
15 Batts -- Bill Batts from Fannie Mae credit
16 policy says, "I like the proposal. Bring me a
17 triple A -- bring Fannie Mae a triple-A-rated
18 insurance carrier, and then -- and develop
19 that policy with Fannie Mae and the insurance
20 companies, and I think we've got an
21 execution."
22 Q. When?
23 A. Three years later.
24 Q. So they didn't -- the process was
25 different from you making a proposal and their

24 (Pages 90 to 93)

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

Page 94

1  accepting your proposal?
2  A.    That is correct.  That was all
3  product development.
4  Q.    And during that process, in fact,
5  you made many, many proposals to Fannie Mae on
6  this product; is that correct?
7  A.    There were many drafts of the
8  policy.  If each one of those is a proposal,
9  it was -- it was all part of product
10 development with AIG, Fannie Mae, and CAM.
11 Q.    But you would agree it's not a
12 simple -- you know, a simple contract proposal
13 where there is an offer and an acceptance, and
14 then you have a contract?
15 A.    That's correct.  CAM was working
16 with Fannie Mae as a partner, and that's the
17 jargon, or how Richard Lawch identified CAM
18 as -- that it was a partner.  It was a
19 partnership.
20 Q.    And Marialice was not part of
21 your partnership between Fannie Mae and CAM on
22 the MCRI business; is that correct?
23 A.    No, Marialice Williams was an
24 integral part of the development.
25 Q.    After she left Fannie Mae?

Page 95

1  A.    Oh, not after she left Fannie
2  Mae, no.
3  Q.    Now, you used the term "MWOB"
4  earlier in your testimony.
5  Do you know what those initials
6  stand for?
7  A.    A woman --
8  Q.    Let me give it a try, and you
9  tell me whether --
10 A.    No.  MWOB is a minority
11 woman-owned business.
12 Q.    Minority business program?
13 A.    Well, in this, MWOB would have a
14 woman.
15 Q.    Owned business?
16 A.    Yes.
17 Q.    And was it your understanding
18 that part of the reason that Fannie Mae --
19 that Lou Hoyes was proposing that Marialice be
20 set up as an MWOB?
21    MR. GRIFFITH:
22 Objection.
23    THE WITNESS:
24 I was aware of conversations that
25 Marialice had with Lou Hoyes, and that was

Page 96

1  the -- in fact, there are some e-mails.  I
2  don't know where they are.  They were in
3  disclosed documents, that discloses either a
4  joint venture or an MWOB-owned business for
5  Marialice Williams.
6  EXAMINATION BY MR. DANIELS:
7  Q.    Did you understand that that
8  would enhance your ability to do business with
9  Fannie Mae?
10 A.    I believe that was an important
11 part of it, yes.
12 Q.    And do you know whether Marialice
13 was ever designated an MWOB?
14 A.    I do not know.  I do not know.
15 Q.    After Marialice left Fannie Mae,
16 did you, after that, hear any discussion of
17 the MWOB process in connection with what you
18 were trying to accomplish with Marialice?
19 A.    I can't answer that, because I
20 don't recall, but I am sure that, in general
21 terms, that we all were thinking that this
22 would enhance her business, and I don't think
23 she had any stockholders initially, so she
24 would have been a solely-owned MWOB business.
25    MR. DANIELS:

Page 97

1  Mr. Jones, I want to thank you
2  for your transparent and truthful testimony
3  today, and no further questions.
4     MR. HUNTER:
5  I've got a couple of questions,
6  if that's all right, or if you-all would
7  rather me wait till you-all get finished.
8     MR. GRIFFITH:
9  No, I think we're done.
10    MR. HUNTER:
11 I have two questions to ask
12 Mr. Jones.
13    MR. DANIELS:
14 Who is speaking now?  I am sorry.
15    MR. HUNTER:
16 This is Seth Hunter, counsel for
17 Mr. Jones.
18    MR. DANIELS:
19 Thank you, Mr. Hunter.
20 EXAMINATION BY MR. HUNTER:
21 Q.    I just want to clarify a couple
22 of things.
23 Mr. Jones, when you left CAM
24 Financial Services as president and CEO, was
25 that voluntary?

25 (Pages 94 to 97)

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G.  Jones

Page 98

1  A.    No.
2  Q.    And when you were speaking
3  earlier of product development, and you were
4  working with Marialice Williams, was that
5  product development as a -- were you working
6  for CAM Financial Services, Incorporated
7  developing the product?
8  A.    Was I working for CAM Financial
9  Services?
10  Q.    Yes.
11  A.    Absolutely.
12     MR. HUNTER:
13  That's all I have.
14
15    *   *   *
16
17
18
19
20
21
22
23
24
25

Page 99

1       REPORTER'S CERTIFICATE
2
3
4     I, NANCY LAPORTE, Certified Court
5  Reporter, State of Louisiana, do hereby
6  certify that the above-mentioned witness,
7  after having been first duly sworn by me to
8  testify to the truth, did testify as
9  hereinabove set forth;
10     That the testimony was reported by me in
11  shorthand transcribed under my personal
12  direction and supervision, and is a true and
13  correct transcript, to the best of my ability
14  and understanding;
15     That I am not of counsel, not related to
16  counsel or the parties hereto, and not in any
17  way interested in the outcome of this matter.
18
19
20
21
22
       NANCY LAPORTE
23     Certified Court Reporter
       State of Louisiana
24
25

26 (Pages 98 to 99)

0ae31a4e-e891-4cb9-849f-fd525208370c

Robert G. Jones

## A

**ability** 68:11 96:8 99:13
**able** 12:2 22:12 30:21 67:17 77:6
**above-mentioned** 99:6
**absolute** 20:3
**Absolutely** 70:2 98:11
**accept** 93:10
**acceptance** 94:13
**accepting** 78:3 94:1
**accomplish** 67:5 96:18
**accounting** 68:24 69:14
**accurate** 12:9,14 26:3 27:3,17,22 31:13
**accurately** 50:1
**acronym** 18:18
**ACTION** 1:3
**active** 10:11
**actual** 34:22,25
**acumen** 44:9
**addition** 56:17
**additional** 77:16
**address** 6:8
**administering** 4:23
**affordable** 69:20
**aforementioned** 4:5
**afterward** 42:16
**Agencies** 10:4
**agency** 10:25 11:12
**agent** 17:25 18:5,12 19:18 55:13
**aggregate** 86:18
**aggregation** 19:3,6 38:8,10,11 39:23 72:14 86:19 88:2 89:25
**ago** 20:2 60:22

**agree** 66:16 67:19 72:11,23 73:1,2,8 86:5 94:11
**agreed** 4:3 55:11 58:4 70:25
**agreement** 18:4 23:6 24:5,7,17,20 25:3,8 26:4,12,19 26:21 27:5,9 28:1 28:15,16 29:3,6,6 29:12,14 30:9,14 30:16 31:6,8,19 35:3,7,11 55:9 76:3 83:2
**agreements** 25:21 25:25 26:11 28:4 28:23 29:21 31:11 35:21 58:2 83:9
**agrees** 24:9
**ahead** 7:13 70:19
**AIG** 12:5,9 14:1,11 14:12,21,22 15:20 28:10 52:5 54:11 56:17 78:2 94:10
**AIG's** 14:19
**al** 1:6
**Alan** 80:7
**Alexander** 1:23
**allegations** 19:25 20:7,21,21 84:2
**alleged** 19:16
**alleges** 11:22
**allow** 18:5 19:17
**amended** 2:18 16:18,22
**America** 67:10
**American** 40:4 52:4
**amount** 33:4 73:11 78:7 85:11
**annual** 41:7
**answer** 4:16 7:13 20:4 29:8 31:4 35:19 63:8 68:21 70:21 75:20 85:2

85:16 86:12 96:19
**answered** 46:13 72:19
**anybody** 46:22 81:2
**anymore** 35:14
**anyway** 81:7
**appalled** 88:1
**apparently** 39:11 90:19
**appear** 32:17
**APPEARANCES** 1:13 2:1
**appears** 38:24 39:10,13
**applicable** 72:13 72:24 73:3
**application** 36:17
**apply** 71:8 73:10
**appointed** 12:16
**appointment** 30:5 30:19
**appreciate** 66:6
**approached** 92:21
**appropriate** 14:18
**approval** 78:1
**approved** 38:15
**approximately** 65:2 80:12
**April** 1:11 5:5
**area** 45:25 65:19 66:12,23 92:22
**areas** 68:12
**arena** 10:10
**asked** 22:7 26:17 30:20 32:9 34:3 36:14 41:23 54:22 74:15 77:6 79:1
**asking** 25:12 32:5 63:13 75:23
**ASLICK** 14:20
**asset** 40:6,11
**assistance** 81:20
**associated** 49:8
**Associates** 23:10

24:18
**ASSOCIATION** 1:6
**assume** 11:16
**assuming** 25:8,9 47:21 87:15
**assurance** 76:25 77:2
**Atlantic** 33:11 36:18 37:19 73:12 81:21
**attached** 23:24 61:25
**attachment** 23:17
**attitude** 90:11,15
**attorney** 2:3,4 13:7 13:12 20:14
**attorneys** 1:17,21 1:24 13:10
**attract** 77:15
**attracting** 78:14
**August** 33:25 34:1 37:14,14 54:15 55:5,6 79:21
**author** 14:16
**automobile** 27:1,14
**available** 69:13
**Avenue** 1:20
**aware** 9:1 12:21 20:25 25:1 30:4 35:9 55:20 59:2 61:7 86:23 90:1 92:16 95:24
**a.m** 1:11

## B

**B** 5:23
**back** 9:9 10:5 22:10 22:12 31:2 33:4 36:9 40:13 42:16 45:17 58:19 61:19 66:7 67:24 68:1 69:18 70:16 72:8 75:1 78:20 82:3 82:14,15 84:22,24

91:16
**background** 9:16 10:22 67:1
**Bacon** 39:10 41:17 42:13,14 46:9
**Bank** 15:25 32:25 79:6 81:1
**banker** 78:24 93:13 93:14
**bankers** 40:22
**banking** 67:1,1
**banks** 67:10,16 69:1,9
**based** 83:9
**basically** 66:23
**basis** 84:3
**Bates** 1:5 2:17,19 2:24 3:2,4,6 16:22 17:11 23:21 38:23 48:19 49:19 61:24 62:1
**Bates-stamped** 6:22
**Bathrus** 1:3,18
**Batts** 93:6,15,15
**Bay** 15:24,24 16:3 16:7 77:21,25 78:12,23,25 79:5 79:5,5,22
**beat** 79:8
**began** 9:11 64:25 87:7
**Beginning** 36:10
**belief** 83:6
**believe** 6:17 10:19 16:16 17:5,9 21:22 22:24 24:22 30:17 34:16 36:18 37:6 39:8 40:6 43:5 50:4,4 64:20 73:13 87:10 96:10
**believed** 57:1 83:1
**believing** 90:16
**best** 31:9 37:14 99:13

Robert G. Jones

Page 2

**Betty** 47:5,13
**bid** 30:11
**Bill** 93:6,14,15
**billion** 51:7,8
**binder** 78:3
**bit** 29:2 37:1 38:9
  48:13 58:13
**Bob** 2:20,25 3:2
  5:19 7:14 23:20
  38:25 39:20 48:18
  67:13 74:2
**boss** 45:3
**bothers** 82:17
**bottom** 39:19 74:8
**Bovis** 50:15
**breach** 35:2,7,10
**breached** 18:3
  83:19
**break** 35:23 37:2
**breakfast** 89:18
**Brian** 1:15 5:22
**Brief** 36:7 58:17
  61:17 91:14
**bring** 56:16 88:18
  93:16,17
**bringing** 28:13
**broad** 19:8,12 21:5
  35:10
**broker** 9:13 24:5
  51:18 76:17 82:9
**brokerage** 7:18,19
  9:17 23:12 24:20
  25:8 26:11 29:21
  35:21 57:21 65:13
**brokers** 25:25
**broker's** 11:11
**brought** 15:5 20:18
  26:13 28:11,19
  34:14 93:12
**building** 8:23
**business** 8:16 9:6
  10:1 11:15 14:11
  14:12,21 24:1,4,6
  25:21 32:7 33:18
  39:22 43:17 44:9

47:19 57:7,9,15
57:15 62:22 65:1
65:5,11 76:10
82:10 83:13,20
84:13 85:5,12
86:18 91:21 92:22
94:22 95:11,12,15
96:4,8,22,24
**buying** 76:18

### C

**call** 22:8 37:16
  69:23,25 71:15
  87:5,6,9
**called** 11:13 15:12
  22:15 40:6,11
  71:3
**calling** 75:6
**calls** 43:9
**CAM** 7:3,6,11,16
  7:23,24 8:2,5,6,12
  8:15,19,23 9:2,5
  9:13 10:18 14:6
  14:14,16,24 15:4
  15:11,20 16:8,11
  17:7,16,23,24
  18:2,5,11 19:17
  19:21 20:13,14
  23:5 24:1,3,5,7,9
  24:11,13 25:1,20
  26:14,21 27:5,9
  28:2,22 29:3,5
  30:6,11,14,20
  31:6,15,22 32:10
  32:13 35:2,6,13
  35:16 36:16,22
  37:5,12,25 43:16
  44:9 53:7,12,14
  54:8 55:12 56:1
  57:1,8,16,18,22
  57:24 58:5 62:22
  64:21,22 65:5,7
  67:13 69:17 76:2
  76:10,13,18 77:12
  77:14,23 78:7,13

78:24 79:17 81:16
82:18,23 83:20,22
87:7,13,14 88:5,6
89:2,10,20,21
93:1 94:10,15,17
94:21 97:23 98:6
98:8
**CAM's** 14:7 19:25
  20:13 24:16 25:10
  33:12 39:22 55:8
  56:4,21 57:13
  85:14,24
**CAM/Fannie** 92:8
**capacity** 33:14
**capital** 15:24 16:3
  39:12 50:14,16
  61:5 68:24 76:14
  77:16 78:23 79:5
**captive** 23:1 27:2
  27:15,18 33:8
  36:20,20 47:23
  54:13,22 55:1,4
  58:25 73:3
**carrier** 93:18
**carriers** 52:16
  58:10 84:8,10
**carry** 77:16
**case** 16:3,4
**cash** 38:16
**cast** 30:8,19
**casualty** 10:9
**categorized** 71:2
**Caucasian** 64:11
  64:13,16,19,23
**caused** 70:5
**caveat** 27:21
**CC-ing** 2:25 38:25
**cell** 22:9
**century** 80:13
**CEO** 97:24
**certain** 33:10 69:7
**Certainly** 66:4
  75:18
**certificate** 22:23
  33:12,16 73:11

81:21 99:1
**certificates** 32:23
  32:24
**certification** 4:12
**certified** 2:10 4:21
  5:7 99:4,23
**certify** 99:6
**change** 82:22
**changes** 14:18
  68:23
**changing** 72:2
**changings** 69:13
**characterization**
  27:4,22
**charge** 80:10
**charter** 27:1,14
  34:14,15,15 37:20
**Chuck** 75:19,22,23
**Civil** 1:3 4:7
**claimed** 19:21
**clarify** 36:13 97:21
**clause** 30:23 76:1,8
**clauses** 77:9
**clean** 31:3
**clear** 32:2
**clients** 53:10
**close** 16:1,8 37:13
  48:4,7 77:22
**closed** 11:25 79:20
  80:25 88:3
**clue** 80:8
**CLVS** 2:7
**Coast** 11:13,15
  22:12
**Coastal** 10:7,8
**colleague** 91:3
**collect** 78:8
**college** 10:2,3
**COLUMBIA** 1:1
**combining** 67:14
**come** 47:6 54:22
**comfort** 76:7 77:7
**coming** 31:19 57:7
**commencing** 1:11
**comment** 89:7,8

**comments** 61:3
**commercial** 32:23
  32:24 33:5 37:11
  67:10,16 69:1
**commission** 24:10
  26:22 27:10 85:11
**commissions** 26:8
  86:6 87:12
**commitment** 18:2
**commitments**
  83:19
**committed** 58:5
**common** 24:6
  26:20 27:8 90:19
**companies** 10:13
  19:14 22:23 34:3
  52:9 53:12 81:11
  83:16 93:20
**company** 7:18 10:9
  13:13 14:21 22:15
  22:22,24 23:25
  24:8 34:24 36:18
  47:23 52:2 54:12
  56:14 84:8
**compensate** 17:16
  17:23 24:9
**complaint** 2:18
  11:18,21 16:18,22
  17:6 19:16,25
  84:2
**complete** 22:20
**completely** 8:24
  23:10
**concern** 39:11
**concerned** 45:2
**concluding** 1:11
**confer** 91:3
**conference** 37:16
  40:23 41:1,7,8,17
  42:2 45:15 46:3,5
  46:7
**confirm** 55:11
**conjunction** 53:23
**connection** 6:15
  24:2 96:17

Robert G. Jones

considering 61:2
consummated
  23:13 26:1 36:15
contacts 69:18
contained 19:25
content 47:3
contents 26:18
continue 32:6
  33:17
continued 2:1 3:1
  33:8
contract 92:7 94:12
  94:14
contracts 92:1,11
controlled 25:5
conversation 21:24
  22:2 40:25 41:19
  41:21 42:4,13,17
  42:19 46:8 52:5,6
  60:7 62:21 87:24
  88:19,21 89:19,24
conversations 41:4
  42:5,9,22 43:2,6
  43:11 45:10,20
  47:2,6,10,12
  55:24 56:10,22
  59:18 60:4 62:24
  63:1 87:17 95:24
Conway 88:8,22,25
  89:9,15,18
copied 55:3
copy 16:25
corporate 76:10
corporately 69:11
correct 7:3 10:20
  16:12,13 18:14
  21:1 30:17 32:3
  41:14 42:20 43:5
  47:14 50:17 56:8
  57:20 58:7,8
  59:13 62:9,14,17
  62:18 64:14,24
  65:6 66:18,20,24
  67:8 68:5 71:3,9
  71:18 73:17 75:10

80:13 83:4,5,24
  83:25 85:7,8
  90:22 91:22,23
  94:2,6,15,22
  99:13
correspondence
  26:9
costs 77:24
counsel 4:4 5:11
  6:17,25 97:16
  99:15,16
COUNSELOR 2:3
couple 48:14 97:5
  97:21
course 87:16
court 1:1 2:10 4:21
  5:8,25 63:19 64:5
  66:1,6,7 67:23
  68:1 70:16 78:20
  82:3,15 84:24
  99:4,23
courthouse 89:5
cover 19:6,8
coverage 18:8
  32:23 33:12,16,22
  34:2 36:20 39:16
  49:23 51:14 53:1
  53:13,17 54:21
  60:21 61:3 65:16
  69:17 78:3 84:9
covering 19:14
  39:12
co-brokerage 23:6
  24:16 25:3 26:19
  26:21 27:9,25
  28:3,15,23 29:6
  29:14 30:16 31:8
  35:3,7,11 53:12
co-brokers 53:8
Craig 19:20 61:2
  64:18 81:25 82:18
  83:23 85:9
created 11:24 12:7
  16:6
creation 12:17

credit 15:7 18:18
  18:19,20 71:3,17
  71:21 83:3 93:6
  93:11,12,13,15
credit-enhancem...
  69:25 70:5 71:22
  72:13 92:23 93:3
CREF 40:23 41:7
  45:14 46:5,7
critical 79:25 80:3
Crump 56:16
  57:19,23 58:4,6,9
  76:16,17 82:18
current 8:11
customer 28:11
customers 24:14
  28:8 33:21 77:6
C.D 6:21

**D**

D 1:5 2:14 74:2
Dance 47:5,13,16
Daniels 1:15 5:21
  5:22 63:12,13,16
  64:2,9 66:3,10
  68:2 69:21 70:12
  70:20 71:14 72:10
  72:18,22 73:9,18
  73:25 74:6,13,19
  75:3 78:15 79:12
  81:23 82:7,24
  84:21 85:3 86:13
  86:21 87:4 88:14
  88:16 90:4 91:1,8
  91:18 92:13 96:6
  96:25 97:13,18
Danny 3:7 23:11
  24:19 25:24 39:20
  40:3 52:5,6 75:9
date 21:17 35:15
dated 2:19,23 3:2
  23:17 29:25 48:18
  74:3
day 1:11 90:6
days 9:10

day-to-day 13:17
DC 1:20
deal 26:13
dealing 68:15
death 21:16,24
  79:8
debacle 19:15
December 16:17,17
  17:8
Defendant 1:21,24
Defendants 1:7
Defendant's 2:16
deficiency 40:6,12
Delegated 49:8
delivered 78:6
  79:10
demise 16:7
departed 60:9,11
depending 61:3,4
deposition 1:8 2:21
  4:5,17 5:2,3 20:17
  25:16 33:10 60:24
  90:6
Depo-Vue 5:8
derivative 18:8
describe 11:3,9
  18:23 26:17 91:24
described 28:1
designated 96:13
designed 18:25
  19:8
determine 70:14
devastating 77:12
develop 12:18
  13:21,22 69:16
  93:18
developed 11:24
  12:8 14:9 33:15
  58:10 72:12 82:21
developing 14:4,8
  36:19 98:7
development 9:9
  9:10,11 10:14
  14:13 19:6 24:12
  33:20 34:8,21

37:4,22 65:15,17
  68:3 94:3,10,24
  98:3,5
developments
  75:12,15 76:21
different 25:25
  46:4 61:1 93:25
difficulty 90:16
dime 78:8
direct 45:3 66:5
direction 13:18
  54:17,19 55:6
  56:12,18 79:18
  99:12
director 79:7
disagree 27:23
disclosed 85:16
  96:3
discloses 96:3
discuss 19:24 44:8
  52:15 55:16
discussed 20:20
  25:24 39:6 52:9
  52:14 57:10 58:22
discussing 48:25
  50:3 60:7
discussion 22:4,6
  40:14 41:15 50:11
  58:24 96:16
discussions 40:15
  40:21 41:24 45:4
  46:15 56:7,19
disparaging 43:21
  44:3 47:16 60:1
  63:2
DISTRICT 1:1,1
document 16:21,24
  17:1 24:15 38:23
  39:2,3,5,5 48:22
  53:3 61:24 62:1,3
  62:4 76:12
documents 6:15,19
  6:21,22 7:1,2 8:24
  25:10 48:14 85:15
  87:14 89:5,16

Robert G.   Jones

96:3
**doing** 8:16 34:20
  65:5,5 80:17
**dollar** 16:4
**dollars** 85:19 86:2
**door** 54:11
**Downing** 88:8,22
  88:25
**draft** 15:14 26:10
**drafts** 14:15,15,17
  14:19 80:23,24
  94:7
**dried** 69:8
**drum** 47:19
**duly** 6:4 99:7
**DUS** 15:5,8 19:9
  21:11 22:25 28:7
  33:20,21 34:2,9
  37:2,7 39:6,16
  41:18 47:20 48:13
  48:24 49:3,16,23
  49:24 50:2,7
  51:13 52:20 53:22
  53:24,25 54:2,6
  58:23 65:4,6,8
  71:9,16,22 81:17
  93:8
**D.C** 1:17,24 24:1

**E**

**E** 2:14
**earlier** 59:17,24
  74:10,12,15 82:25
  95:4 98:3
**early** 10:6,15 11:14
  15:10,23 21:12
  31:5 41:13 60:18
  65:9,16 80:14
**effect** 26:9 35:12,15
  56:10 77:11 87:22
**efficiency** 67:15
  80:4
**efficient** 68:8
**efficiently** 68:12
**effort** 76:9 91:21

**efforts** 17:24
**Eichler-Fein** 15:9
  21:12 93:7
**either** 10:24 16:9
  21:16 23:8 25:3
  32:19 39:12 45:13
  47:15 60:12 65:8
  83:12 87:11 89:23
  93:4 96:3
**elaborate** 48:2
  53:10
**elements** 76:25
**employed** 10:4,12
**employee** 11:1
  44:23
**enabled** 31:20
**encompass** 28:18
  51:9
**enhance** 96:8,22
**enhancement** 71:3
  71:6,8,17 83:2
**entailed** 26:22
  27:10 29:9 48:16
  49:7
**enter** 31:16 32:14
**entered** 26:5 29:14
  92:1,7,10
**entire** 75:16 76:9
**entities** 14:3 18:6
  19:18,20
**entitled** 16:21 85:6
**entity** 25:5
**equity** 76:13 78:14
**Eric** 81:20
**escape** 13:4
**Esq** 1:23
**Esquire** 1:15,15,19
  5:9
**essentially** 79:15
**estate** 50:15 66:14
  et 1:6
**event** 26:22 27:10
**everybody's** 55:21
  55:22
**evidence** 4:19

**exactly** 18:22 79:14
  89:17
**EXAMINATION**
  6:6 7:21 36:11
  58:21 61:21 63:12
  64:2,9 66:10 68:2
  69:21 70:20 71:14
  72:10,22 73:9,18
  75:3 78:15 79:12
  81:23 82:7,24
  85:3 86:21 87:4
  88:16 90:4 91:18
  92:13 96:6 97:20
**examined** 6:4
**excerpt** 2:21 16:24
  25:15
**excerpts** 2:17 17:3
**exclusive** 17:25
  18:12 55:12,17
  56:5,21 57:2,4,6
  57:18 58:9 83:2
  84:6,14
**exclusively** 58:4,6
**exclusivity** 83:9,14
**excuse** 17:12
**execution** 68:8
  69:12 80:5,9,20
  93:21
**exhibit** 3:6 16:20
  17:11 23:16 29:23
  38:22 48:17 49:19
  52:22 61:23 62:6
  73:20
**Exhibits** 2:15 3:1
**exit** 31:25
**expand** 57:4 76:10
**expanded** 19:5
  51:18
**expense** 17:24
**experience** 9:20
  11:4,9 65:19
  66:12,22,25 67:2
**experiences** 67:14
**expert** 85:21,24
**expertise** 9:18

17:24 66:17 81:6
**explain** 79:23
**exposure** 38:20
**expressed** 88:23
**extent** 33:10 90:13
**Eye** 1:23
**e-mail** 2:19,24 3:2
  3:4,6 23:16,17,24
  38:24 39:19 48:17
  52:23 60:17,21,23
  62:7 74:2 75:8,16
  76:19 87:10
**e-mails** 26:8 39:18
  42:10 45:12 55:3
  96:1

**F**

**face** 73:11
**fact** 19:10 22:9
  23:13 54:4 56:14
  66:4 68:10,10
  76:23 83:22 94:4
  96:1
**failing** 18:4
**fair** 30:13 31:4,10
  51:20 52:18 67:3
  69:23
**fall** 29:19 79:18
**false** 44:14 63:5
**familiar** 21:3,5
  22:14 23:10 38:2
  44:19 59:9 60:16
  60:16 81:24 82:8
  82:17 86:17
**family** 48:11
**Fannie** 1:19,21,25
  5:14,16 6:23
  10:14 11:19 12:2
  12:10,11,12,14,15
  12:22,25 13:10,22
  13:25,25 14:5,10
  14:25 15:5,8,17
  15:19,20,25 16:2
  16:6,11,15 17:7
  18:1,3,3,5,12 19:1

19:3,11,17,21
  20:15,18,22 21:13
  22:25 23:1,1,2
  25:10 26:16 29:18
  30:4,23 33:2,7,22
  34:5 37:3 38:7,12
  38:15,17 39:9,23
  40:18 41:6,10
  44:23 45:7,14,17
  46:17,23,25 47:9
  53:11,18,23,25
  54:1,5,17,19,21
  54:23 55:9,11,13
  55:18 56:8,20,21
  56:25 57:2,8,11
  57:14,23,24 59:3
  60:10,11,23,25
  62:16,20 63:3,7
  65:1,3,7,7,12,14
  66:15 67:5 68:11
  68:15 69:5,8,11
  69:16 70:4 71:16
  71:19 72:14 75:13
  76:3,6,11,22,24
  77:4,5,10 78:4,6,9
  78:25 79:7,10,20
  80:1,6,18 81:4,5,9
  81:15,17 82:10
  83:2,11,23 84:2,5
  84:11 85:12 86:7
  90:20 91:21,25
  92:6,10,14,21
  93:2,9,15,17,19
  94:5,10,16,21,25
  95:1,18 96:9,15
**far** 34:17 45:1
**Farm** 10:4,6
**February** 2:23
  29:25 30:13 31:5
  31:5 32:1 93:4
**federal** 1:6 4:6 89:5
**fee** 36:17
**feel** 85:1
**feelings** 87:21
**fees** 36:21

Robert G. Jones

Page 5

file 89:11
filed 16:11,15 17:7
  20:14
files 87:7 89:2
filing 4:12 20:7
finally 22:8
financial 7:6,11,16
  7:17,23,25 8:2,5
  8:12,15,19,23 9:2
  9:5 10:18 14:6,24
  16:11 17:7 23:5
  25:2 26:21 27:9
  28:2,22 29:3 30:6
  30:15 31:15,23
  32:10,13 35:6,17
  43:17 44:10 53:13
  53:15 54:8 97:24
  98:6,8
find 33:13 34:3
  78:16
finish 68:21
finished 86:11 97:7
first 2:17 6:4 8:4
  9:11 10:2 11:25
  15:5,6,16,21
  16:18,21,22,23
  18:8 19:10,11,15
  21:10,11 29:14
  33:6,11 36:18
  37:19 39:4,13,14
  49:20 50:21 51:11
  52:6 65:3 71:4,19
  73:12 75:17 80:25
  81:21 82:18 92:20
  93:1 99:7
first-loss 19:7
  38:20
five 39:14 91:6
focus 48:14
folks 17:19
following 11:22
  29:17 84:20
follows 6:5
form 4:15 24:10
  31:21 80:16

formalities 4:9,11
formed 22:22
forth 99:9
forward 76:2,6
  77:17 79:25
foundation 70:18
four 29:17
fourth 52:21 90:6
frame 29:19 37:9
  39:15 41:11,12
  49:16 54:14 55:6
Freddie 66:14
  69:11
free 76:2
freedom 13:21,22
fresh 35:25
friend 48:10,10,11
friends 47:4
fulfilled 18:2
full 6:8 17:19
fully 6:12 18:24
fundamental 84:1
furnish 75:24
furnished 60:22
further 9:22 32:5
  63:11 97:3
future 50:25 83:17

G

G 1:8 2:4 5:3 6:3
Gayle 6:9
general 10:25
  11:12 28:18 67:4
  69:14 71:2 96:20
generally 68:13
generated 89:4
GenRe 56:16 57:16
GenStar 56:16
  57:15,19 58:5
getting 78:1
give 20:3,12 21:17
  37:9 54:17 61:22
  76:24 95:8
given 2:22 13:20
  25:16

giving 13:18
go 7:13 9:22 10:5
  57:23 58:12 61:13
  70:19 82:23 91:6
  91:10
goal 19:12
going 9:9 11:17
  16:19 25:14 29:22
  32:2 36:5 38:21
  38:22 42:10 48:1
  48:16 56:13 58:15
  58:19 60:20 61:15
  61:22 67:23 68:21
  70:23 72:4 74:22
  75:1 76:5 77:14
  83:13 87:18,20,21
  89:10,22 91:12
  92:24
Goldfrank 1:23
  5:15,16 63:24
  64:7 73:22 74:4
  74:11 86:10
good 13:8 24:21
  43:1 47:4 48:10
  80:20 81:22
gotten 51:3 89:16
Grace 1:25 2:20
  5:17 23:19 38:3,6
  41:1 43:4,8 45:13
  46:8 55:7 68:14
  86:19
Great 10:6
Green 80:7
Greenwald 80:7
Griffin 13:8 33:23
Griffith 1:19 5:13
  5:14 6:6 7:21
  36:2,11 58:11,21
  61:12,21 63:10
  65:25 67:22 68:19
  70:7,17 71:10,24
  72:16 73:5,14
  74:17 77:18 81:12
  82:13 84:17 86:25
  88:12 89:12 90:23

90:24 91:5 92:3
  95:21 97:8
group 14:12 23:18
  50:16 76:16
Groves 3:7 9:15
  10:18,21 11:4
  14:13 15:11 23:11
  24:19 25:7,24
  26:10 29:20 35:20
  40:3,7 52:7,11,14
  64:12 65:18,21
  74:2 75:9
guess 10:5 13:17,18
  14:16 45:2 77:7
Gulfport 1:9 6:10
  89:1,19

H

H 2:25 39:1
halfway 17:15
handled 23:11
happen 32:2
happened 89:17
happy 89:9
hard 67:9
Harley 1:15 5:22
  63:13 86:11 90:24
Hartsfield 2:20,25
  23:20 39:1
Harvey 2:20 23:20
Hattiesburg 2:4
heading 38:7
hear 17:20 35:5
  59:23 63:16,23
  64:1,1 82:2 88:11
  96:16
heard 67:25 70:10
held 5:4 88:19
help 32:8
helping 20:16
Hemphill 2:3
hereinabove 99:9
hereto 4:4 99:16
higher 81:5
hit 21:18

Hold 68:20 71:25
holds 38:17
home 22:13
HomeStreet 50:14
honestly 6:12
honoring 84:5
Hook 13:5,11
hotels 45:19
housing 68:4,7
  69:20
Hoyes 2:23 13:20
  29:24 30:21 31:1
  31:20,24 32:22
  33:1 37:16 43:1
  57:3,10 75:24
  76:5 95:19,25
Huebscher 1:25
  2:20 5:17 23:20
  38:3,5,6 40:14,16
  40:24 41:1,24
  42:3,6,18,22 43:5
  43:8,11,16,22
  44:2,6,8,14 46:9
  55:7 59:19,25
  60:13 68:14 86:19
hundred 16:4
Hunter 2:2 5:18,19
  6:24 7:7 97:4,10
  97:15,16,19,20
  98:12
Hurricane 8:18,25
  9:3 21:18,25

I

idea 9:4 80:9
ideas 80:1
identified 52:25
  94:17
identify 52:19,24
impact 8:19,22
important 69:15
  96:10
improve 67:14
  68:11
inaccurate 24:24

Robert G. Jones

**include** 19:2 27:19
**included** 61:25
**including** 23:19
**incoming** 68:7
**incorporated** 7:12
  7:17 8:6 98:6
**incurred** 77:24
**indicated** 5:6 30:22
  49:6 76:18
**indicates** 24:7 51:6
**indication** 24:21
**individual** 29:11
  32:17
**industry** 10:22
  11:10
**information** 89:6
**initially** 96:23
**initials** 95:5
**inner-city** 67:9
  68:6
**insurance** 7:18 9:6
  9:13,16,20 10:1,4
  10:9,10,12,13,22
  11:1,5,9,13 15:13
  15:19 18:2,7,13
  18:16,19,21 19:2
  19:3,14,19,22
  24:6,8 26:23 27:2
  27:11,15 33:9,13
  34:3,6 36:20
  38:19 40:4,12
  41:2 49:22 52:2,9
  52:16 53:1,11,13
  53:17 54:23 55:1
  55:14 56:14 57:25
  58:10,25 65:16
  66:23 67:2,6
  69:18,24 70:6
  71:1,7 73:4 80:6
  80:20,22,24 81:11
  82:19,21 83:3,15
  84:7,8,9,9 93:18
  93:19
**insure** 18:25 38:19
**insured** 86:20

**insurer** 12:4
**insurers** 51:25
**insuring** 12:4 26:25
  27:13 41:18 57:8
  71:4
**integral** 94:24
**interest** 24:4 40:5
  51:13 76:18
**interested** 99:17
**interface** 24:14
**intermediary** 78:25
**interrogatory**
  26:16,17 28:2
  49:4,15
**introduce** 5:11
  14:24
**introduced** 34:15
  82:18
**introduction** 21:11
  65:14
**investment** 78:24
  93:14
**Investments** 50:15
**involve** 50:18
**involved** 12:22
  13:10,15,17 14:3
  14:13,22 15:3,4,6
  34:16 37:25 38:1
  45:12,20 51:4,22
  51:23 52:1 54:24
  55:24 59:1 70:4
  77:1
**involvement** 13:25
  78:22 79:24
**involves** 49:16
**involving** 37:3 39:7
  48:13 57:15 58:23
  65:14 69:24 75:12
  76:21
**issue** 67:21 68:12
  87:8 92:15

_____
J
_____

**January** 2:22 25:17
**jargon** 94:17

**job** 10:2
**jog** 50:11
**jogged** 41:16
**John** 1:5 81:20
  90:24
**join** 76:13
**joined** 32:11
**joint** 26:18 31:17
  32:11,14 96:4
**Jonathan** 1:19 5:14
**Jones** 1:9 2:4,17,19
  2:20,21,22,23,24
  2:25 3:2,2,4,7 5:3
  5:20 6:3,7,9,14
  7:5,10,10,22
  11:17 12:6 13:24
  15:18 16:10,19,20
  17:2 18:9,10
  19:16 21:3 22:14
  23:16,20 25:15,16
  26:2 29:13,22,23
  35:23 36:12 38:2
  38:21,22,25 39:20
  48:17,18,21 54:3
  58:22 59:24 61:22
  61:23 62:6,11
  63:14,17 64:3
  66:5,22 67:13,25
  68:21 70:14 72:11
  74:2 75:4 79:13
  91:19 97:1,12,17
  97:23
**Judge** 1:5
**July** 30:5 34:1
  56:25 79:21,21
**June** 8:10 33:25
  56:24 60:18

_____
K
_____

**Karl** 2:7 5:7
**Katrina** 8:19,25
  9:3 21:18,25 22:3
**keep** 76:9
**Ken** 39:10 41:17
  42:13 46:9

**kind** 17:15 32:7
  47:9 77:9
**knew** 38:7 44:24
  82:19
**know** 20:4,23 21:6
  22:20,21 23:14
  25:23 26:1,6,9
  30:24 35:10,13,18
  43:3,6,8 52:14,17
  55:2 56:9 59:6,22
  60:19 87:3,18,20
  94:12 95:5 96:2
  96:12,14,14
**knowledge** 31:9
  44:11 57:9 66:9
  81:1,19 82:20
  90:19 92:6
**known** 21:8 68:13
  69:2,7,12

_____
L
_____

**L** 1:19 4:1
**label** 38:23
**labeled** 49:20 61:24
  62:1
**language** 31:11
**Laporte** 2:9 4:21
  5:9 99:4,22
**large** 51:2
**late** 60:18 65:8
  88:22
**law** 1:9 2:3 4:8
**Lawch** 1:25 5:17
  13:14 16:5 44:20
  44:22 45:5,11
  46:15 55:25 56:1
  56:18 60:5,12
  62:13,21 63:1,6
  68:13 69:1,7 78:2
  78:11,17 79:17
  80:9 83:10,12,17
  83:19 86:20 90:17
  94:17
**Lawch's** 56:12 61:3
**Lawrence** 79:6

**lawsuit** 16:11,15
  20:19 21:1 89:21
  89:22
**lawyers** 13:3,4
  14:11,19,20
**lay** 22:22 38:19
  49:23 53:22 67:16
**laying** 49:7,21 67:8
**laymen's** 84:3
**lead** 12:13
**learn** 88:1
**learned** 80:21
**Lease** 50:15
**leaves** 78:9
**leaving** 29:18 30:22
  56:23,25 57:11
  75:13 76:22 77:9
**Lederer** 1:15 5:22
**Lee** 30:10
**left** 30:4 40:18 41:5
  41:10 43:4 45:7,8
  45:11,14,17 46:17
  46:25 56:20 59:4
  62:16,19 63:3,7
  76:5 81:9,15
  94:25 95:1 96:15
  97:23
**legal** 5:7 56:3
**Lend** 50:14
**lender** 15:5,8 21:11
  53:25 54:6 71:22
**lenders** 39:16
  49:17,23 50:7,8
  50:13,19,22 51:5
  51:13,19,22 52:20
  52:20,24 53:22,24
  54:5 57:6 65:4,6,8
  93:8
**lender's** 54:2
**letter** 2:23 23:23
  24:24 29:24 30:3
  30:21,25 31:12
  77:7
**let's** 61:13 70:14
**level** 39:12 71:5,5

76:7 81:5 86:6
**levels** 19:1,9
**license** 11:12 29:10
29:10
**licensed** 23:25
**life** 10:10
**light** 75:11
**line** 25:18
**lines** 11:11 14:21
29:9,10
**listed** 52:21
**litigation** 6:23 7:3
85:15 87:7,12,14
88:6 89:2,10,22
**little** 18:23 29:2
37:1 38:9 48:12
58:13
**LLC** 22:16,19
24:18 25:4 28:6
29:4 31:7,16
34:24 35:4,8
40:17 42:1,7,24
43:13,19,24 44:4
44:16 45:6 46:16
46:24 53:7 62:14
**LLP** 1:22
**loan** 34:15 81:3,6
**loans** 27:1,1,14,14
33:5 38:12,13,14
38:16,17 48:13
58:23 68:12 77:25
81:3
**lobby** 45:19
**locate** 21:19 53:17
**locates** 24:7
**long** 9:5,7 20:2
21:8 33:17 60:22
87:24
**longer** 69:12 90:25
**look** 25:17 39:2
50:10 62:2
**looking** 34:1 40:7
**looks** 39:18
**loss** 12:3,4 18:8
19:10,15 39:13

**lost** 22:9
**lot** 77:24,24 80:21
**Lots** 13:3
**Lou** 2:23 13:19
29:24 30:21 37:16
43:1 57:3 75:24
95:19,25
**loudly** 59:23
**Louisiana** 1:10
2:10 4:23 5:5
99:5,23
**low** 68:6
**low-income** 68:4

_____

## M

**M** 2:2
**Mac** 66:15 69:11
**Mae** 1:19,21,25
5:14,16 6:23
10:14 11:19 12:2
12:10,11,12,14,15
12:22,25 13:10,23
13:25 14:5,10,25
15:5,8,17,19,20
15:25 16:2,7,12
16:15 17:8 18:1,3
18:3,5,12 19:1,11
19:17,21 20:15,18
20:22 21:13 22:25
23:1,2,3 25:10
26:16 29:18 30:5
30:23 32:19 33:2
33:7,22 34:5 37:3
37:8,17 38:12,15
38:17 39:9,23
40:18 41:6,10
44:23 45:7,14,17
46:17,23,25 47:9
53:11,18,24,25
54:1,5,17,19,21
54:23 55:9,11,13
55:18 56:8,20,21
56:25 57:2,8,11
57:14,23,24 59:3
60:10,11,23,25

62:17,20 63:3,7
65:1,4,7,7,12,14
66:15 67:5 68:11
68:15 69:5,11,16
70:4 71:16,19
75:13 76:3,6,11
76:22 77:4,5,10
78:4,6,9,25 79:8
79:11,20 80:1,6
80:18 81:4,5,9,16
81:17 82:10 83:2
83:11,23 84:3,5
84:11 85:12 86:7
90:20 91:21 92:1
92:6,8,10,14,21
93:2,9,15,17,19
94:5,10,16,21,25
95:2,18 96:9,15
**Mae's** 13:25 19:3
38:7 69:8 72:14
**Magazine** 1:10 5:4
**main** 45:19
**major** 66:17
**majority** 51:9
**make-up** 22:20
**making** 55:4 60:1
80:3 93:25
**Mari** 43:2
**Marialice** 1:3,18
2:19,23 5:23
13:20,21 15:25
16:2 21:4 23:9,12
23:18 24:18 25:4
28:23 29:24 30:15
30:20 32:14 33:15
37:12 39:8 40:16
41:5,10,25 42:6
42:13,15,23 43:4
43:7,12 45:3,5,13
45:15 46:6,7,15
46:23 47:4,7,19
48:10 50:22 55:24
56:7 62:13 68:16
71:20 73:12 75:13
75:23,25 76:21

77:5,13 78:8,17
79:1,24 80:12
84:13 85:13 86:5
87:18,18 88:19
89:9 92:2 93:5,11
94:20,23 95:19,25
96:5,12,15,18
98:4
**Marialice's** 67:20
79:18 90:6,9
**mark** 38:22 48:17
**marked** 16:20
29:23 61:23 73:20
75:5
**market** 65:20
66:19 69:25 71:2
**marketing** 31:22
57:5 77:5 79:7
**marketplace** 68:9
69:4,19
**marking** 23:15
25:15
**matter** 6:16 99:17
**MBS** 39:24 90:2
**MBW** 74:8
**McGlinchey** 1:10
**MCRI** 18:1,7,13,15
19:19,22 38:18
40:8 55:14 57:15
58:4,6 94:22
**mean** 24:11 40:1
70:3 75:14 85:4
89:7
**means** 27:17 39:25
51:16
**meeting** 15:7 42:2
65:3
**member** 64:13,16
64:19 93:12
**members** 10:18
64:22
**memo** 74:1
**memory** 13:8 50:9
50:12 88:18
**memory's** 42:25

**mentioned** 10:17
12:19,24 34:19
42:1 57:12 78:11
**merely** 12:3
**merger** 67:5 71:1
**met** 21:10 90:3
93:5
**Metropolitan**
32:25 33:5 37:13
79:19 80:25
**mezzanine** 39:12
53:1 71:5
**mid** 41:13
**middle** 79:10
**mid-city** 68:6
**milestone** 79:20
**million** 16:4 85:19
86:2
**minority** 95:10,12
**minutes** 91:6
**Mississippi** 1:9 2:4
6:10 90:18
**Mitigation** 22:15
22:19,21 23:4,7,8
24:17 25:4 27:4
28:5,21,24 29:4
31:7,16 32:10,20
34:24 35:3,8
36:16,22 37:6
39:7 40:17 41:25
42:7,23 43:12,18
43:23 44:4,15
45:6 46:16,24
53:7,19 60:5
62:14
**mod** 68:7
**modifying** 40:8
**months** 15:24
29:17,17 30:7
77:23
**Moore** 30:10
**morning** 89:18
**mortgage** 1:6 7:19
9:16 13:6,12
22:23 32:25 33:4

Robert G. Jones

40:22 41:2 50:16
65:13,15,20 66:25
67:1,6 69:24 71:1
93:13
**mortgages** 27:20
67:7,17 69:10
78:5 79:10
**mortgage-backed**
11:25
**mother** 21:17,24
**MOU** 83:12,15,16
92:8
**MOUs** 55:19,20
56:13 83:10,17
**move** 76:2,6
**moving** 73:19
79:25
**multi-family** 7:19
13:6 18:17,18,20
38:14 44:25 65:13
65:15 66:14 81:4
**mute** 91:2
**MWOB** 31:21,21
57:12 95:3,10,13
95:20 96:13,17,24
**MWOB-owned**
96:4
**MYERS** 1:22

**N**

**N** 2:14 4:1
**name** 5:6 6:8 10:8
**names** 13:4
**Nancy** 2:9 4:21 5:9
99:4,22
**NATIONAL** 1:6
**Nationwide** 11:1
15:12
**nature** 65:10
**need** 78:13
**needed** 26:23 27:11
77:15
**negotiated** 72:24
**negotiating** 57:3
**negotiations** 30:8

**Ness** 1:16
**never** 25:11 92:7,8
92:9,11
**new** 1:10 5:4 9:1
56:13 93:14
**Newman** 2:20
23:19 43:2,3,7
47:1,3,13,15 55:7
**Noble** 3:3 48:19
51:21
**non-compete** 30:23
76:1,8,24 77:9
**non-Fannie** 32:18
37:8,17
**North** 40:4 52:4
**Nos** 2:19 3:2,4
**note** 72:1
**notes** 55:23 56:1,2
**November** 90:7
**number** 11:1 12:11
14:23 16:22 26:10
74:14,18 88:2
**numbered** 17:12
**numbers** 23:21
48:19 73:21 89:3
**number-two** 44:25
**NW** 1:20,23
**N.W** 1:16

**O**

**O** 4:1
**oath** 4:24
**Objection** 70:8,18
71:11 72:17,17
73:6,15 77:19
81:13 84:18 87:1
89:13 92:4 95:22
**objections** 4:14
**objective** 67:12
**obligation** 49:24
**observe** 81:10
**observed** 91:25
**obvious** 45:21
**obviously** 77:12
**occasion** 21:21

**occurred** 40:21
42:9 47:10 79:14
79:15
**offer** 30:12 94:13
**offered** 30:5
**offering** 92:2
**offhand** 59:16
**offices** 1:9 47:9
**officiated** 4:23
**OFHEO** 61:4
**Oh** 95:1
**okay** 22:7 44:1 62:5
**Once** 55:18
**ones** 51:2 52:15
59:9,11
**open** 54:11 69:18
**operation** 8:24
**opinion** 55:22
56:12 80:3 81:7,8
82:20 83:8,18,21
**opinions** 80:16
**opportunities** 30:6
30:19
**opportunity** 52:25
81:10
**opposed** 12:3 28:24
**order** 17:16,21,23
**organization** 45:1
**original** 46:11
60:23 79:25
**Orleans** 1:10 4:22
5:4
**other's** 24:4
**Ott** 19:20 61:2
64:18 81:25 82:18
83:23 85:9
**Ott's** 82:9
**outcome** 99:17
**outside** 14:5,10
33:7
**overall** 29:12
**owned** 66:14 95:15
**ownership** 24:3
30:6
**O'MELVENY**

1:22

**P**

**P** 4:1
**package** 77:14
**pads** 56:3
**page** 16:21,23
17:11 49:19 51:11
52:22
**paid** 16:9
**pair** 54:4
**Palmer** 1:9 6:9
**paragraph** 11:18
11:21 17:15 23:23
30:2 50:10 51:11
52:21
**Parish** 4:22
**part** 4:18 28:14,17
29:12 31:18 33:9
41:13 60:24 66:17
77:14 85:13 94:9
94:20,24 95:18
96:11
**partially** 74:9
**particular** 33:14
51:22 53:16 67:21
69:2 82:19
**parties** 4:4 99:16
**partner** 76:14
78:14 94:16,18
**partnership** 94:19
94:21
**party** 12:13 13:19
14:9 43:9 49:14
83:23
**passion** 67:20
**Paul** 13:5,11
**pay** 28:12
**paying** 26:22 27:10
**pen-and-ink** 14:18
**people** 14:11,22,23
15:7 23:19 45:21
68:14 71:21 93:7
**percent** 39:14
**period** 78:10

**permission** 32:22
33:1
**person** 12:13,16,20
14:14 44:25 63:18
64:4 80:5
**personal** 78:22
99:11
**perspective** 12:10
34:6 69:16 77:3
**phone** 17:19 22:9
**picked** 88:5
**picture** 41:8
**place** 1:9 6:10
36:24 41:4
**Plaintiff** 1:4,17
11:24
**Plaintiff's** 3:5 75:5
**players** 12:12
**plays** 24:11
**please** 5:11,25 6:8
17:22 23:23 42:15
62:3 66:4 70:14
70:22 75:21 79:23
**PLLC** 1:10 2:3
**point** 8:1 12:16,19
14:14 15:2 16:10
20:1 26:2 51:3,14
80:5 84:12 85:4
**policies** 33:14
81:18,21
**policy** 15:7,14,16
33:15 36:20 40:9
40:11 65:16 71:7
71:21 93:6,12,13
93:16,19 94:8
**pools** 26:25 27:13
70:6
**portfolio** 28:8
32:25 33:7 38:18
49:25 77:22 78:2
**portfolios** 34:2
53:23 69:5
**possibility** 50:25
**possible** 88:9
**potential** 20:21

Robert G.   Jones

21:1
**practically** 13:4
**preliminary** 50:21
**presence** 71:20
**present** 41:21
  42:18 43:14 90:5
**presentation** 55:4
**president** 8:2,5,9
  35:16 44:24 97:24
**pressure** 83:11
**pretty** 14:13 22:2
  23:13 24:21
**previous** 62:8 68:1
  70:16 78:20 82:3
  84:24
**previously** 39:6
  62:12
**primary** 13:12
**principals** 9:15
  30:8,20
**prior** 10:25 15:10
  20:7,9,10,18 37:1
  57:10 65:12 66:7
  82:15
**probably** 11:6,14
  13:11 15:10 33:20
  41:11 47:20 51:8
  54:15 74:2 81:19
  85:14 86:8,16
  87:25
**problem** 61:11
  87:19
**problems** 59:21
**Procedure** 4:7
**process** 15:3 56:23
  78:5,9 91:25
  93:24 94:4 96:17
**processes** 11:23
  12:8 14:1,4,8,25
**procure** 19:22
**procurement** 18:1
  18:7,12 19:19
  55:13
**produced** 7:2,4
  25:10

**product** 9:8,10,11
  10:14 12:17 13:22
  14:12 15:16 16:6
  19:6 33:19 34:7
  34:20 37:4,22
  38:19 80:6 82:20
  82:21 83:4 84:14
  92:16 94:3,6,9
  98:3,5,7
**products** 11:23
  12:8 14:1,4,8,25
  69:23 70:1 72:12
  92:2 93:3
**professional** 48:2,3
  48:4,7,11
**program** 19:4
  22:25 23:1 24:12
  34:15 38:8,10,11
  40:8 47:21 49:9
  71:16 72:14,25
  73:4,11 77:16
  81:4,16 95:12
**programs** 22:25
  41:2 70:4 71:9
  81:6
**project** 12:23 24:8
  24:13 34:4,9
**projects** 32:19 34:8
  37:4
**promised** 31:24
  84:7
**properties** 7:20
  68:6
**property** 10:9
  66:20
**proposal** 39:6
  48:13,15,25 49:3
  49:6,7,11 50:2,2
  50:18,23 51:4,21
  52:1,10,18 53:6
  53:16,20 54:9,23
  55:1 58:23 71:19
  93:2,10,16,25
  94:1,8,12
**proposals** 26:24,25

27:12,13 28:9
  59:3 92:15 94:5
**proposing** 71:16
  76:11 92:21 95:19
**prove** 83:6
**provide** 33:3 53:1
**pulled** 79:22
**purchase** 30:11
  33:3
**purchased** 38:12
  38:16 76:13
**purpose** 36:19
  76:19
**purposes** 4:7
**pursue** 33:2 60:20
**pursuing** 33:21
  39:16 54:21 60:25
  77:4 85:12
**pursuit** 54:4
**put** 29:19 67:17
  79:3 80:10 91:2
**p.m** 1:12

**Q**
**qualifications** 9:13
  11:4 82:9
**qualified** 85:1
**quality** 80:17,19
  81:22
**question** 4:15 29:1
  29:5 31:3,4 39:4
  41:22 43:25 46:12
  46:13,14 49:6
  60:6 63:8,9 65:24
  66:7 68:1 70:10
  70:13,16,22 71:13
  74:15 75:20 78:19
  78:20 82:2,3,12
  82:14,15 84:22,24
  85:2,17 88:11,13
  92:25
**questions** 11:19
  63:14 66:5 74:9
  91:4 97:3,5,11
**quick** 35:22

**quote** 26:20 79:4

**R**
**race** 64:6,10,13,16
  64:19,23
**raise** 76:14
**raising** 87:8
**ranged** 26:25 27:13
**reach** 30:9
**reached** 31:12
**read** 11:17 17:14
  17:18 23:22 25:19
  26:15 29:10 30:2
  49:18,20 67:24
  75:16 82:14 84:22
**reading** 4:9
**reads** 39:20 51:12
  66:7 68:1 70:16
  78:20 82:3,15
  84:24
**ready** 91:10
**real** 50:15 66:13
**realized** 77:13
**Really** 63:9
**reason** 6:11 16:5
  24:22 27:23 30:24
  35:18 45:22 84:12
  95:18
**Reasonable** 48:9
**reasonably** 12:14
  27:16 85:23
**rebuffed** 30:12
**recall** 16:14 20:5,6
  20:11 21:23 29:13
  34:25 36:23 40:8
  41:3 42:8,21
  43:15,20,21 44:5
  44:12,13,17 46:2
  46:18,19 47:18
  50:8 59:12,14,18
  59:25 60:3,7
  62:12,21,23,25
  63:4,5 87:9 88:17
  88:21 89:17 90:9
  96:20

**quote** 26:20 79:4
**receive** 6:14 87:6
**received** 85:11 86:7
**receiving** 63:15
**reception** 45:25
**recess** 36:7 58:17
  61:17 91:14
**recognize** 17:1
  48:21
**recollection** 24:16
  25:14 37:15 53:4
**record** 6:8 7:9
  25:19 30:1 36:3,5
  36:9,13 58:12,15
  58:19 61:13,15,19
  63:17 72:4,6,8
  74:22,24 75:1
  85:11 91:12,16
**Red** 50:15
**redneck** 90:18
**reduced** 83:15
**refer** 86:3
**referred** 74:9,14
  90:17
**referring** 27:18
  38:14 51:18 62:7
  75:15,22 76:20,23
**reflect** 48:24 50:1
**reflected** 56:1,15
**refresh** 24:15 25:13
  53:3 88:18
**refused** 19:17
  45:18 78:12,17
  79:3 83:17
**refusing** 18:4
**regard** 90:10
**regarded** 90:21
**regarding** 21:24
  45:5 58:25 59:19
**reinsurance** 27:2
  27:15,18
**related** 12:8 14:1
  47:20 50:24 99:15
**relates** 39:5
**relationship** 7:23
  8:12 39:22,23

47:25 48:3,5,8
55:17 56:21 57:19
**remarks** 43:22
44:3 47:16 60:1
63:2
**remember** 33:23
41:6 42:11 45:15
79:14 90:14
**REO** 66:13,14
**repeat** 27:6 41:22
43:25 63:25 65:23
66:2 70:23 88:13
92:24
**repeated** 78:19
**reported** 2:8 43:4
68:25 99:10
**reporter** 2:10 4:21
5:9,25 63:19 64:5
66:2,6,7 67:24
68:1 70:16 78:20
82:3,15 84:24
99:5,23
**REPORTER'S**
99:1
**Reporting** 5:10
**reports** 85:21,25
86:4
**representative** 7:11
**represented** 12:11
**representing** 5:19
5:23 7:10 53:21
**request** 92:15
**requested** 33:6
**reserved** 4:17
**respect** 11:5 24:2
**responding** 39:18
**response** 26:16,19
49:5
**responses** 28:2
49:5
**responsible** 35:20
53:25
**responsive** 6:20
**responsiveness**
4:16

**return** 46:11
**review** 87:7
**reviews** 39:3 62:4
**re-call** 91:9
**Rhoda** 2:19 23:19
43:1,3,6 47:1,3,13
55:7
**Richard** 1:25 5:17
13:14 44:19 45:10
45:13,16,17 46:8
55:25 56:1 68:13
78:2,16 79:1,17
80:9 83:10 86:20
90:10 94:17
**right** 74:7 75:9
79:19 84:16 92:16
94:16
**risk** 12:3 18:8,19
18:21 19:1,7,9
22:15,18,21,22
23:3,6,8 24:17
25:3 27:4,19 28:5
28:12,20,24 29:4
31:7,16 32:10,19
34:24 35:3,7
36:16,21 37:5
38:20 39:7 40:17
41:18,25 42:6,23
43:12,18,23 44:3
44:15 45:5 46:16
46:23 49:21,24
53:2,7,19,22 54:1
54:2 60:4 62:14
67:9 71:5,6
**risks** 49:8
**risk-based** 39:11
61:4,5 68:24
**RMS** 23:25 24:1,3
24:5,8,9,13,14
28:4,4 30:10,15
33:18 41:20 49:22
60:4
**Robert** 1:8 2:4,22
3:6 5:3 6:3,9
**role** 14:7 24:12

33:13 53:15,20
**Ross** 90:10
**rule** 42:10
**Rules** 4:6
**Rumsey** 9:15 10:19
11:8 64:15 66:11
75:23 76:6
**Rumsey's** 77:3

---

## S

**S** 4:1
**Sarah** 1:23 5:16
**save** 4:14
**Savings** 15:24 79:6
81:1
**saw** 45:24 47:6,7
81:22
**saying** 25:12 65:21
**says** 79:7 93:16
**school** 27:1,14
**schools** 34:16
**Schwartz** 79:6
**scope** 26:18
**Scottsdale** 15:13,13
**screen** 5:6
**sealing** 4:11
**second** 15:22 30:2
51:11,12 68:20
71:25 90:25
**secondary** 65:20
66:19 69:24 71:1
79:7
**seconds** 91:7
**secure** 91:21
**secured** 26:23
27:11
**secure-type** 67:6
**securities** 12:1 13:9
67:18
**see** 66:1 87:19
89:10
**seek** 65:1
**seeking** 49:22
**seen** 25:11 55:23
**sell** 69:10

**seller/servicers**
38:13,15
**send** 14:19
**sent** 37:24 73:23
91:20
**sentence** 17:14
49:21 50:6 51:12
51:16
**sentences** 17:19
40:1
**sentiments** 88:23
**separate** 28:15
29:5 39:22 40:9
40:10
**September** 55:6
74:3
**serious** 77:15
**serve** 18:5 19:17
**services** 7:6,12,16
7:17,23,25 8:2,5
8:12,15,20,23 9:2
9:6 17:7 23:5
25:2 28:3 29:3
30:7,15 31:15,23
32:10,13 35:6
43:17 53:13,15
97:24 98:6,9
**Servicing** 49:9
**set** 66:20 95:20
99:9
**Seth** 2:2 5:19 97:16
**setup** 23:12
**seven** 16:3
**shareholders** 64:22
**sheet** 15:15 37:24
**shorthand** 28:5
99:11
**shortly** 21:18 29:16
**show** 16:19 23:15
25:14 29:22 38:21
48:16
**sic** 13:8
**side** 9:17,21 10:12
14:14 57:25 80:22
**sign** 83:12,13

**signal** 22:9
**signed** 26:4 78:3
**significant** 33:4
**signing** 4:10
**similar** 88:23
**simple** 26:20 27:8
94:12,12
**sitting** 52:13 59:7
**small** 67:16 81:3,3
81:6
**sold** 69:5
**sole** 17:25 18:11
55:12
**solely** 11:24 12:7
**solely-owned** 96:24
**somewhat** 60:16
**sorry** 48:6 59:20
63:20 86:14 97:14
**sort** 74:8 84:3
88:18
**sought** 4:18
**South** 11:13,15
**speak** 45:18 59:23
69:6
**speaking** 62:12
97:14 98:2
**specialist** 5:8
**specific** 42:8,11,12
42:22 50:19,23
52:2,19 56:9
83:15
**specifically** 4:10,12
79:1 92:9,18
**spent** 77:23 78:7
**split** 24:10 26:7,13
36:21
**spoke** 21:14 89:16
**spoken** 21:20
**Stafford** 1:10
**stages** 65:17
**stand** 95:6
**standards** 69:14
**standing** 41:8
**stands** 18:17
**start** 9:24

Robert G.  Jones

**started** 7:8 10:13
40:14 79:16,17
**starting** 17:15,21
25:18
**state** 2:10 4:22 6:7
10:3,6 99:5,23
**stated** 83:1
**statement** 7:9 12:7
20:13 24:23 27:17
30:18 31:14
**statements** 44:14
63:6
**States** 1:1 12:1
**stay** 79:2,2
**stayed** 10:11
**step** 8:8 91:7
**Stephen** 3:2 48:19
**stepped** 35:16
**Stiegman** 2:7 5:7
**stipulated** 4:3
**stockholder** 7:24
8:13
**stockholders** 96:23
**stopping** 79:9
**strange** 45:23
**strategies** 22:15,19
23:7 24:17 25:4
27:5 28:5,21 29:4
31:16 32:11,20
40:17 42:1 45:6
46:16,24 53:7,20
60:5 61:1 62:14
**Strategists** 23:9
31:7 34:24 35:4,8
37:6 39:7 42:7,24
43:13,18,23 44:4
44:16
**strategized** 86:20
**strategy** 76:10
**Street** 1:10,16,23
2:3 5:4
**strictly** 38:14
**strike** 44:6 46:21
51:24 53:4
**structure** 45:1

**structuring** 78:1
**subject** 67:4
**submitting** 51:21
**subordinates** 79:4
**subpoena** 6:15,20
**subsequent** 55:20
**subsidiary** 15:12
**substantial** 78:7
**success** 19:14
**sued** 77:4 83:22,23
**suggested** 88:7
**suit** 20:8,14
**Suite** 1:16
**suitor** 76:14,15
**summer** 86:23,24
88:19,22
**supervision** 99:12
**supply** 76:23
**supposed** 31:19
**sure** 17:17 23:13
26:3,12 27:7 31:3
34:17 35:25 47:11
48:15 58:3 59:5
61:13 85:20,23
96:20
**surplus** 11:11
14:20 29:9,10
**surprise** 87:20
**swear** 6:1
**sworn** 6:4 20:12
99:7

---

**T**

**T** 4:1,1
**table** 28:13
**take** 35:22 39:2
61:10 62:2,20
**taken** 1:9 4:6 20:17
36:17 41:4
**talk** 22:5 46:22
**talked** 6:24 29:2
34:10,12 37:1,15
39:21 41:17
**talking** 13:24 20:6
28:20 39:9 40:3

47:21 48:12
**talks** 50:6
**tanked** 66:21
**tapes** 72:2
**technical** 59:21
61:11
**technically** 61:11
**telephone** 1:14
63:12 87:6,9
**tell** 7:5 8:4,17,18
9:7,12,19 10:7,21
11:14 13:1 16:24
18:15 22:18 38:9
39:25 41:9 43:16
47:2 51:15,25
53:14 54:25 85:10
95:9
**ten** 15:23 77:23
**ten-page** 56:2
**term** 15:15 21:5
37:24 95:3
**terminated** 35:19
**terms** 84:4,6 96:21
**test** 50:10
**testified** 6:5 37:7
37:18 55:10 59:17
59:24 60:2 62:11
**testify** 6:12 99:8,8
**testimony** 2:21
6:16 25:16 55:15
62:8 82:25 90:10
95:4 97:2 99:10
**thank** 18:9 46:10
62:10 97:1,19
**thereof** 4:18
**thing** 16:25
**things** 22:2 97:22
**think** 11:13 12:24
15:10 23:2,3
24:19,20 27:17,21
28:10 29:10 31:13
32:5 33:9 40:2,10
44:17 45:11 46:1
46:6,12 51:1,17
54:10,13 55:2,9

55:21,22 56:11
57:1 58:1 60:24
61:9 67:25 68:20
69:22 74:8,12,15
77:21 81:2 85:14
86:1,16 87:23
88:3 89:15 93:7
93:20 96:22 97:9
**thinking** 42:25
56:11 59:5 96:21
**third** 23:23 49:19
**third-party** 12:4
**thought** 45:23 76:4
85:5 90:2
**three** 12:18 29:17
39:16 49:23 50:6
50:13,21,24 51:2
51:22,23 52:20
53:21,24 85:19
91:4 93:23
**thrift** 19:15 68:25
**thrifts** 67:10,16
69:9
**tied** 31:22
**till** 97:7
**time** 4:17 5:5 8:1
13:5 15:2 16:10
17:24 19:13 20:1
20:2,22,25 21:14
22:13 25:22 26:2
29:19 32:6 37:9
38:6 39:9,15
41:11,12 44:24
49:16 51:14 54:14
55:5,21 56:24
59:4 60:22 61:8
61:10 65:18 66:17
70:24 78:10,10
80:22 92:20 93:1
93:9
**times** 22:10
**timing** 37:7
**today** 6:12 49:1
52:13 58:23 59:7
59:14,25 97:3

**told** 60:17 62:22
**top** 38:24 39:17,19
**touch** 42:15
**touched** 58:24
**tranche** 19:1,7
27:19 28:12 33:21
34:2 53:2
**tranches** 19:10
**transaction** 12:1,9
14:2 16:8 36:24
37:2,8,11,17,19
37:21 49:10 58:1
67:15 69:3 78:13
78:18 79:3,4,9,19
80:8,25
**transactions** 9:2
15:19 33:20 34:23
35:1 36:15 37:9
69:20 72:25 80:3
82:23 88:2 89:25
**transcribed** 99:11
**transcript** 99:13
**transfer** 12:2
**transparent** 97:2
**treat** 39:20
**treated** 48:9
**tried** 22:10 82:22
**triple** 81:11 93:17
**triple-A-rated** 71:7
93:17
**trouble** 59:21
77:15
**true** 21:2 24:21
63:18 64:3,12,15
64:18,21,25 71:23
77:13 83:7 84:15
86:22 92:14 99:12
**truth** 99:8
**truthful** 97:2
**try** 59:23 95:8
**trying** 21:19 32:6
41:6 45:11 47:19
67:4 69:10 76:4,9
88:17 89:8 96:18
**turn** 17:10 49:19

Robert G.  Jones

51:10 82:22
**turned** 45:17
**tweak** 40:5
**tweaking** 83:10
**two** 10:17 17:19
  39:17 55:23 59:11
  67:14 79:3 86:1
  91:4,7 97:11
**twofold** 77:21
**type** 47:24 60:7
  61:2 69:3,17
  92:11

---

**U**

**U** 4:1
**um** 10:7
**unable** 30:9
**unaware** 86:6
**understand** 12:15
  47:11 48:15 58:3
  63:20 71:13 82:12
  96:7
**understanding**
  18:11 28:25 55:8
  56:4,4 57:14
  95:17 99:14
**understood** 80:4,20
  81:3
**underwriting** 49:9
  77:25
**United** 1:1 12:1
**upside-down** 22:2
**urban** 68:12
**use** 31:11
**utilizing** 11:23
**U.S** 52:3

---

**V**

**vague** 70:8,15
**vagueness** 70:19
**Van** 1:16 13:5,11
**various** 18:25 19:9
  19:10 69:23 70:6
**venture** 26:18
  31:17 32:12,15

33:6 96:4
**ventures** 24:4
**verbal** 26:12
**verbals** 26:6
**VERSUS** 1:5
**vice** 44:24
**video** 5:6,8
**videographer** 2:6
  5:1,24 36:4,8
  58:14,18 61:14,18
  72:1,3,7 74:21,25
  91:11,15
**videotape** 5:2 36:6
  36:10 58:16,20
  61:16,20 72:5,9
  74:23 75:2 91:13
  91:17
**Videotaped** 1:8
**View** 15:24,24 16:3
  16:7 77:22,25
  78:13,23,25 79:5
  79:5,5,22
**violating** 77:8
**void** 67:11 69:3,19
**volume** 69:8 86:17
**voluntary** 97:25

---

**W**

**wait** 68:18,18 97:7
**waiting** 54:16
**waived** 4:10,13
**walking** 45:16,25
**want** 7:9 40:13
  45:22 46:11 49:23
  50:9 77:4 97:1,21
**wanted** 36:13 48:14
  67:13
**wanting** 67:12
**Washington** 1:17
  1:20,24 24:1
  42:16 90:7
**wasn't** 15:15 23:10
  32:24 49:14 54:21
  86:11
**water** 35:25

**way** 24:24 99:17
**ways** 58:9
**Wednesday** 1:11
**week** 47:8
**went** 19:11 26:10
  34:18 55:19 65:7
  65:7 79:21 80:22
  80:22 89:4
**weren't** 22:11 26:3
**we'll** 66:1 91:10
**we're** 97:9
**we've** 28:20 29:2
  48:12,25 50:3
  58:24 71:25 75:4
  93:20
**whatsoever** 30:10
  31:12
**white** 64:6,10,11
**wholesale** 76:17
**wholesaler** 57:22
  57:24
**wife** 22:11
**Williams** 1:3,18
  2:19,23,25 5:23
  11:18,22,25 12:6
  13:21 15:3,18
  20:1,12,22 21:4,6
  21:9,10,15 23:9
  23:12,18 24:23
  25:5,21,23 26:11
  26:15,17 28:1,8
  28:24 29:7,24
  30:25 31:8,20,24
  32:8,14,19 33:1
  33:15,18 34:9,23
  37:5,12,23 38:25
  39:8 40:16,18,24
  41:5,10,16,20,20
  41:25 42:3,6,14
  42:18,23 43:4,7
  43:12,13,18,23
  44:3,9,15 45:3,5,7
  46:7,16,17,23,24
  47:4,7,17,25 49:5
  52:25 53:11,18

54:16,19,20 55:3
55:17,25 56:7,14
56:20 57:3,5 59:1
59:3 60:2,4,8,17
60:21 62:13,16,19
62:22 63:2,7
68:16 69:15 71:20
75:24,25 76:7,15
78:12 79:24 80:2
89:20 93:6,12
94:23 96:5 98:4
**window** 54:15
**wiped** 8:24
**Wisconsin** 1:20
**Wiser** 20:18,24
**witness** 4:5,24 6:1
  7:15 35:24 39:3
  62:4 63:22 66:8
  68:22 70:9,21
  71:12 72:20 73:7
  73:16 77:20 78:21
  81:14 82:1,4,11
  82:16 84:19,25
  86:15 87:2 88:10
  89:14 92:5 95:23
  99:6
**woman** 95:7,14
**woman-owned**
  95:11
**words** 83:18
**work** 16:5 32:18
  33:8 34:19,21
  54:7 78:12,17
  80:4,8,17,19
  81:10,22 84:23
**worked** 10:3,6
  14:10 25:24 32:21
  32:22 33:11 37:5
  37:12 58:8 73:12
  80:11 81:16
**working** 10:14,24
  15:11,23 21:13
  22:24 24:9,13
  26:24 27:12 29:20
  34:4,5,8 37:23

50:22 79:16,17
80:18 94:15 98:4
98:5,8
**wouldn't** 16:5
  67:19 72:11,23
  73:2 76:24 77:8
  86:5
**write** 58:4,5
**write-up** 51:7
**writing** 52:3
**written** 25:2,20
**wrote** 39:20 75:9
  81:18
**W228** 1:16

---

**X**

**X** 2:14

---

**Y**

**yeah** 31:21
**year** 30:11
**years** 9:25 10:23
  11:2 12:18 93:23
**yellow** 56:3
**York** 93:14
**you-all** 87:15 88:5
  97:6,7

---

**Z**

**Zurich** 28:10 40:3
  40:4,10,11 51:22
  52:3,4,6 54:10,11
  81:16

---

**$**

**$10,000** 36:17

---

**0**

**007232** 74:8,20

---

**1**

**1** 2:17 3:6 16:20
  36:6 75:5
**1:05CV01483** 1:4
**10:05** 36:6
**10:13** 36:10

Robert G.  Jones

Page 13

**11th** 1:11 5:5
**11:13** 58:20
**11:17** 61:16
**11:19** 61:20
**11:33** 72:5
**11:36** 72:9
**11:39** 74:23
**11:40** 75:2
**12:06** 91:13
**12:13** 91:17
**12:22** 1:12
**15th** 3:2 48:18
**16** 11:21
**1625** 1:23
**19** 9:8
**1966** 10:5
**1990s** 10:15,16
**1991** 7:17 8:7
**1992** 9:10 65:2
  80:12
**1993** 65:2 91:20
**1994** 21:12 80:14
  80:14 93:5
**1997** 11:22 15:22
**1998** 37:14 74:3
  79:21,22
**1999** 2:23 29:25
  30:14 31:6 32:1

———————
**2**
**2** 2:19 23:16 36:10
  58:16,20 61:16,20
  72:5
**2nd** 2:23 29:25
  30:14 31:5 32:1
**20** 10:23 25:18
**2000** 33:23 80:12
  87:25
**20006-4001** 1:24
**20008** 1:17
**2001** 2:19 3:2 16:17
  17:8 23:18 33:24
  41:13 48:18 49:6
  49:7,12 55:5
  58:23 60:19 80:15

  87:25 89:23
**20016-2892** 1:20
**2002** 89:23 91:20
**2003** 90:7
**2004** 2:22 25:17
**2005** 8:10 9:8
**2006** 86:24 87:23
  88:20,22 89:5
**2007** 1:11 5:5
**21st** 80:13
**25** 10:23
**26** 49:16

———————
**3**
**3** 1:9 2:19,21 6:9
  23:18 25:15 52:22
  72:9 74:23 75:2
  91:13,17
**30** 2:22 25:17
**3003** 1:16
**3900** 1:20
**39401** 2:4

———————
**4**
**4** 2:23 29:23
**40-some-odd** 80:24
**404** 2:3

———————
**5**
**5** 2:24 38:22
**50/50** 26:7,13

———————
**6**
**6** 3:2 48:17
**6230** 61:24
**6230-6232** 3:4
**6232** 61:24
**63** 17:12
**64** 51:8
**643** 1:10 5:4
**65** 51:7
**6907** 2:17 16:23
**6936** 17:12

———————
**7**
**7** 3:4 61:23 62:6

**7th** 74:3
**70s** 10:6
**70130** 1:10
**7232** 3:6 75:7
**7297** 74:5
**7918** 2:24 38:23

———————
**8**
**8002** 23:21
**8002-8004** 2:19
**8004** 23:21
**8015** 48:19
**8015-8017** 3:2
**8017** 48:20 49:20
**8031** 3:4 62:1
**84** 17:15

———————
**9**
**9:16** 1:11 5:6
**90s** 11:14
**93** 9:10 15:9 65:9
  80:12
**94** 15:9,10 65:9
**97** 79:18
**9703** 73:21 74:7
**98** 15:23 29:19

**1**

I hope you get the letter this time.

**Subject: I hope you get the letter this time.**
**Date: Thu, 3 May 2001 14:58:05 -0400**
**From:** "Marialice Williams" <marialice@worldnet.att.net>
**To:** <rhoda_e_newman@fanniemae.com>, <grace_huebscher@fanniemae.com>,
"Bob Jones" <bobjones@cam-financial.com>, "Harvey Hartsfield" <hhartsfield@msn.com>

Here is the attachment that seems to be missing from the from the prior two e-mails. Marialice

**Name: Explanation of CAM and RMS.doc**
**Type: Winword File (application/msword)**
**Encoding: base64**



EXHIBIT
JONES
2

...msn.com'

10482     5/3/01 2:00 PM

FNMA.MBW.008002
CONFIDENTIAL

5482

## RISK MITIGATION STRATEGISTS, LLC.
### The Watergate Office Building
2600 Virginia Ave., N.W., Suite 701
Washington, D.C. 20037

Ms. Grace Huebscher
Vice President, Fannie Mae
Multifamily Capital Markets
3939 Wisconsin Avenue, N.W.
Washington, D.C. 20016

Dear Grace:

First, I want to thank you and Rhoda for the delightful lunch last week. It was good catching up with you two. Second, I want to thank you for the opportunity to pursue a solution for our clients to obtain relief from their mezzanine loss coverage obligation under the DUS program. Therefore, I welcome the opportunity to clearly define the relationship between my company, Risk Mitigation Strategists, LLC ("RMS") and CAM Financial Services, Inc. ("CAM").

I was in Atlanta yesterday and had lunch with Bob Jones, President of CAM. Bob indicated that he had transmitted an e-mail to you and Rhoda indicating that AIG may have an interest in providing insurance coverage for mezzanine levels of risk.

My company, RMS, is licensed to do business in Washington, D.C. CAM and RMS do not have any connection with respect to ownership and no one from CAM or RMS has an interest in the other's business ventures. However, CAM and RMS have a broker agreement that is common in the insurance business. The agreement indicates that when CAM locates an insurance company for a project that RMS is working on, RMS agrees to compensate CAM through some form of split commission. However, it does not mean that CAM plays any role in the development of the program or project that RMS is working on nor does CAM interface with RMS' customers.

My company has relationships with numerous insurance brokers and carriers with whom we have signed confidentiality agreements. Due to the innovative and unique ways that our customers utilize insurance to solve their problems of covering different types of risk, we plan to continue to use our network of resources to assist our customers, many of whom are DUS lenders, in obtaining the best and lowest cost insurance available to meet their needs.

Before I left Fannie Mae, I assisted in negotiating an agreement between CAM and Fannie Mae that provided CAM with the opportunity to seek insurance-based solutions for risk coverage in the securitization program of the Negotiated

FNMA.MBW.008003    10483
CONFIDENTIAL

EXHIBIT
2
3-28-07  euh

Transaction's department.  I do not believe that the agreement between Fannie Mae and CAM contemplated extending CAM's authority to work on any aspect of risk coverage for Fannie Mae's DUS program.

Therefore, unless otherwise instructed by you, RMS will continue to work on behalf of its clients to obtain insurance that will cover the 5-20% risk coverage obligation or mezzanine level or risk coverage as required by Fannie Mae under its DUS program.

Sincerely,

Marialice Williams

10484

FNMA.MBW.008004
CONFIDENTIAL

*2*



*M. Williams & Associates*

Marialice E. Williams, President

February 2, 1999

Louis W. Hoyes
Senior Vice President – Multifamily
   Lending and Investment
Fannie Mae
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016-2892

Dear Lou:

This is to inform you that my company, Risk Mitigation Strategists, L.L.C. ("RMS") has formed a joint venture with my investment partners Bertram M. Lee, Sr. and Vincent Moore.  Risk Mitigation Strategists, which is wholly-owned by me, Marialice B. Williams, is a provider of financial and consulting services for clients interested in structured transactions and credit enhancement.  In addition to being attorney licensed to practice law in D.C., I am also licensed as a property and casualty insurance broker in D.C.

As you are aware, I left Fannie Mae in July after being offered an appointment and ownership opportunities with CAM Financial Services, Inc.; however, after months of negotiations with its cast of principals, I was unable to reach any agreement with them whatsoever.  With Mr. Lee and Mr. Moore, RMS, made a bid last year to purchase CAM, but this offer, too, was rebuffed.

My purpose in writing to you today, is to formally notify you of the status and affiliation of my corporation, and to express an interest in developing new products and services to assist Fannie Mae's Multifamily Division with its capital markets executions involving insurance.

With Mr. Lee and Mr. Moore, I look forward to working with you.  As soon as I have a thorough grasp of your current capital markets objectives, I will provide you with a detailed proposal of those services RMS can provide Fannie Mae and how we most effectively deliver them.

CONFIDENTIAL: SUBJECT TO PROTECTIVE AND CONFIDENTIALITY ORDER

**FM08026**

2600 Virginia Avenue, NW • Suite 701 • Washington, DC 20037
(202) 338-3015 • fax: (202) 338-3017 • marialice@worldnet.att.net

FNMA.MBW.007369
CONFIDENTIAL

REDACTED

Page Two

Let me be perfectly clear that RMS is currently working with several of its clients on a pipeline of structured transactions that cannot be completed with Fannie Mae, due to its charter limitations.

It is my understanding, unless you indicate otherwise, that I will coordinate on this matter with Richard S. Lawch.

Again, thanks for taking the time to meet with me.

Sincerely,

Marialice B. Williams

CONFIDENTIAL: SUBJECT TO
PROTECTIVE AND CONFIDENTIALITY ORDER

FM08027

FNMA.MBW.007370
CONFIDENTIAL

**3**

**Page 1 of 2**

## Main Identity

| | |
|---|---|
| **From:** | "Betty Dance" <betty_dance@fanniemae.com> |
| **To:** | <marialice@worldnet.att.net> |
| **Sent:** | Monday, June 04, 2001 10:41 AM |
| **Subject:** | [Fwd: Re: [Fwd: Fw: A few questions and an update from RMS]] |

-------- Original Message --------
Subject: Re: [Fwd: Fw: A few questions and an update from RMS]
Date: Thu, 31 May 2001 18:41:50 -0400
From: "Grace Huebscher" <grace_huebscher@fanniemae.com>
Organization: Fannie Mae
To: Richard S Lawch <richard_s_lawch@fanniemae.com>
References: <3B163DD7.269B580B@fanniemae.com> <3B16C81B.7DBE3608@fanniemae.com>

Probably not so if we want to engage Craig on this project, that might be a better choice.  If you like that plan then let's discuss what we want to ask Craig to find for us...may be you and I can discuss or put on Agenda for our Team's Weekly Strategic Meeting.

Richard S Lawch wrote:

> If Ofheo comes back with bad RBC rules we may be interested.   Are these different players
> than Craig is showing us?

Grace Huebscher wrote:

>> Richard, Marialice wants to pursue the credit risk insurance for DUS risk.  Do
>> we want to pursue with her?  My gut is no but if you think it is worth
>> continuing discussions,  I will focus on her questions.

-------- Original Message --------
Subject: Fw: A few questions and an update from RMS
Date: Wed, 30 May 2001 10:05:36 -0400
From: "Marialice Williams" <marialice@worldnet.att.net>
Reply-To: "Marialice Williams" <marialice@worldnet.att.net>
To: rhoda_e_newman@fanniemae.com,
grace_huebscher@fanniemae.com

I sent this message literally a week ago and for some reason my computer did not send out several messages.  Then I checked the message and it had an incorrect e-mail address for Rhoda.  I hope I am not sending this to Grace twice!  Marialice
----- Original Message -----
From: Marialice Williams
To: rhoda_s_newman@fanniemae.com ;
grace_huebscher@fanniemae.comCc:hhartsfield@risk-mitigation.comSent:
Wednesday, May 23, 2001 10:16 AMSubject: A few questions and an update from
RMS

Update from RMS-- First the good news--we have the interest of three insurance companies, two of whom are domestic.  All are rated A+ and above.  However, we need to know a couple of things to facilitate our discussions with them: 1. Is there any interest on Fannie Mae's part in

EXHIBIT
Jones
7

EXHIBIT
5

FNMA.MBW.006230
CONFIDENTIAL

8/6/01



FNMA.MBW.006231
CONFIDENTIAL



Bob Jones
3 Palmetto Place
Gulfport Mississippi
39501

33507/2240

----- Original Message -----
**Subject:** Re: [Fwd: Fw: A few questions and an update from RMS]
**Date:** Thu, 31 May 2001 18:41:50 -0400
**From:** "Grace Huebscher" <grace_huebscher@fanniemae.com>
**Organization:** Fannie Mae
**To:** Richard S Lawch <richard_s_lawch@fanniemae.com>
**References:** <3B163DD7.269B580B@fanniemae.com> <3B16C81B.7DBE3608@fanniemae.com>

Probably not so if we want to engage Craig on this project, that might be a better choice. If you like that plan then let's discuss what we want to ask Craig to find for us...may be you and I can discuss or put on Agenda for our Team's Weekly Strategic Meeting.

Richard S Lawch wrote:

> If Ofheo comes back with bad RBC rules we may be interested.   Are these different players than Craig is showing us?

Grace Huebscher wrote:

> Richard, Marialice wants to pursue the credit risk insurance for DUS risk. Do we want to pursue with her?  My gut is no but if you think it is worth continuing discussions, I will focus on her questions.

> ----- Original Message -----
> **Subject:** Fw: A few questions and an update from RMS
> **Date:** Wed, 30 May 2001 10:05:36 -0400
> **From:** "Marialice Williams" <marialice@worldnet.att.net>
> **Reply-To:** "Marialice Williams" <marialice@worldnet.att.net>
> **To:** rhoda_e_newman@fanniemae.com,
>       grace_huebscher@fanniemae.com

> I sent this message literally a week ago and for some reason my computer did not send out several messages. Then I checked the message and it had an incorrect e-mail address for Rhoda. I hope I am not sending this to Grace twice! Marialice
> ----- Original Message -----
> **From:** Marialice Williams
> **To:** rhoda_s_newman@fanniemae.com ;
> grace_huebscher@fanniemae.com Cc:hhartsfield@risk-mitigation.com **Sent:** Wednesday, May 23, 2001 10:16 AM **Subject:** A few questions and an update from RMS
>  Update from RMS-- First the good news--we have the interest of three insurance companies, two of whom are domestic. All are rated A+ and above.  However, we need to know a 9692 of things to facilitate our discussions with them: 1. Is there any interest on Fannie Mae's part in

EXHIBIT

5

tabbies

FNMA.MBW.006232
CONFIDENTIAL

A few questions and an update from RMS

**Subject: A few questions and an update from RMS**
**Date:** Wed, 23 May 2001 10:16:10 -0400
**From:** "Marialice Williams" <marialice@worldnet.att.net>
**To:** <rhoda_s_newman@fanniemae.com>, <grace_huebscher@fanniemae.com>
**CC:** <hhartsfield@risk-mitigation.com>

Update from RMS—

First the good news—we have the interest of three insurance companies, two of whom are domestic. All are rated A+ and above. However, we need to know a couple of things to facilitate our discussions with them:

1. Is there any interest on Fannie Mae's part in insuring her portion of the 5-20% mezzanine level of risk on the DUS portfolio? (This could lead to a lower premium for the lenders).

2. Does Fannie Mae have any objection to the DUS lenders laying off all or part of their first loss obligation on the DUS loans to a "AA" or better rated credit enhancer?

3. Is there any possibility of obtaining data from Fannie Mae regarding the underwriting and performance of the DUS portfolio? The keen interest is in what percentage of the mortgage loans originated meet the various tiers of the DUS program and has there been a distinction in the performance based upon those tiers of l loans?

Sorry that we were unable to get Kate Westover in to see you in June. We only need about and hour and a half. Is there a time in July that will work? Also if you find that there is room because of a cancellation in June we would be happy to fill in.

We don't need all of the answers to our questions at one time. As soon as you have some idea about each question, let us know. Thanks. Marialice

1 of 1

10496    5/23/01 9:53 AM

FNMA.MBW.008031
CONFIDENTIAL