# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| CAM FINANCIAL SERVICES INC. | **PLAINTIFF** |
| VS. | **No. 1:01cv314BrR** |
| GENERAL STAR NATIONAL INSURANCE COMPANY; GENERAL STAR INDEMNITY COMPANY; GENERAL STAR MANAGEMENT COMPANY; GENERAL RE CORPORATION; GENERAL REINSURANCE CORPORATION; CRUMP INSURANCE SERVICES OF MEMPHIS INC.; CRAIG OTT, INDIVIDUALLY AND IN HIS REPRESENTATIVE CAPACITY AS VICE PRESIDENT OF GENERAL STAR MANAGEMENT COMPANY FEDERAL NATIONAL MORTGAGE ASSOCIATION (FANNIE MAE) | **DEFENDANTS** |

**JURY TRIAL DEMANDED**

**FIRST AMENDED COMPLAINT**

COMES NOW, CAM Financial Services Inc., Plaintiff herein, by and through the

undersigned counsel of record, and would respectfully show unto the Court, its claims for relief

against General Star National Insurance Company; General Star Indemnity Company; General

Star Management Company; General Re Corporation; General Reinsurance Corporation; Crump

Insurance Services of Memphis Inc.; Craig Ott, Individually and in his Representative Capacity

as Vice President of General Star Management Company and the Federal National Mortgage

Association (Fannie Mae), Defendants, herein, and in support thereof would show unto the Court

the following to-wit:

**MW00158**

FNMA.MBW.008436
CONFIDENTIAL

## PARTIES

1.      CAM Financial Services, Inc., (hereinafter "CAM")  is a corporation organized and existing under the laws of the State of Mississippi, having its principal place of business located at 1542 East Beach Boulevard, Gulfport, Mississippi.

2.      General Star National Insurance Company (hereinafter "GenStar") is a stock insurance company, wholly owned and operating as a subsidiary of General Re Corporation, organized and existing under the State of Connecticut; and having its principal place of business at Financial Centre; P.O. Box 10354, Stamford, CT 06904.

3.      General Star Indemnity Company, is a wholly- owned subsidiary of General Re Corporation, Corporation, organized and existing under laws of the State of Connecticut; and having its principal place of business at Financial Centre; P.O. Box 10354, Stamford, CT 06904.

4.      General Star Management Company is a  wholly owned and operated subsidiary of General Re Corporation, organized and existing under the laws of the State of Connecticut; and having its principal place of business at Financial Centre; P.O. Box 10354, Stamford, CT 06904.

5.      General Reinsurance Corporation is a wholly owned and operated subsidiary of General Re Corporation, and is organized and existing under the laws of the State of Connecticut having its principal place of business at Financial Centre; P.O. Box 10354, Stamford, CT 06904. Defendants in Paragraphs 2 through 5, being wholly-owned subsidiaries of General Re Corporation are collectively referred to as "GenStar."

6.      General Re Corporation ( "GenRe") is a wholly owned subsidiary of Berkshire-Hathaway, Inc., organized and existing under the laws of the State of Connecticut; and having its

**MW00159**

**FNMA.MBW.008437**
**CONFIDENTIAL**

principal place of business at Financial Centre; P.O. Box 10354, Stamford, CT 06904. Crump

Insurance Services of Memphis, Inc., is a corporation organized and existing under the laws of

the State of Tennessee, and having its principal place of business at 1000 Ridgeway Loop Road,

Memphis, Tennessee.

7.      Craig Ott (hereinafter "Ott") is a resident of the State of New Jersey, residing at 263

Hobart Avenue Short Hills, N.J. 07078-2206. Ott has committed breaches of contract and

tortious acts in whole or in part in the State of Mississippi, thereby establishing such minimum

contacts in the State of Mississippi so as to reasonably anticipate being haled into court in this

State.

8.      The Federal National Mortgage Association a/k/a (and hereinafter) "Fannie Mae" is a

federally chartered corporation, created by the United States pursuant to 12 U.S.C. §1717, having

its principal place of business in the District of Columbia, but who has entered into contracts to

be performed in whole or in part in the State of Mississippi, and has committed tortious acts in

whole or in part in the State of Mississippi, so as to reasonably anticipate being haled into court

in this State. Fannie Mae has the power to sue and be sued in the courts of the United States

pursuant to 12 U.S.C. §1723a(a).


### JURISDICTION

9.      Your Plaintiff would show that this Court has jurisdiction of the matter pursuant to 28

U.S.C. §1332 in that there is complete diversity of citizenship between the parties, and the

amount in genuine controversy is in excess of $75,000.00. Venue is proper in the Southern

District of Mississippi as the contracts were entered into in whole or in part within the Southern

FNMA.MBW.008438
CONFIDENTIAL

District of Mississippi and the torts alleged herein were likewise committed in whole or in part in the Southern District of Mississippi.

### FACTS

10.  From 1992-1995 CAM specialized in the origination of multifamily loans brokered to Fannie Mae DUS Lenders (approved Delegated Underwriting Servicers for Fannie Mae). In 1995 CAM began a special project to develop a multifamily loan credit enhancement to be underwritten and issued by "Single A" or higher rated insurance companies. In April or May of 1995, CAM was approached by one of the Fannie Mae DUS Lenders (Eichler Fayne) to take its multifamily loan credit enhancement proposal to Fannie Mae Capital Markets in Washington, D.C.

11.  CAM's initial proposal to Fannie Mae involving the use of a policy issued and underwritten by a "Single A" rated insurer was not acceptable as presented.  Nevertheless, Fannie Mae was intrigued by this new and unique concept and encouraged CAM to seek higher quality potential insurers having AAA ratings.

12.  Accordingly, CAM Financial met with American International Group (AIG) at Fannie Mae in the fall of 1995.  AIG showed some preliminary interest in CAM's concept for coverage for Fannie Mae.

13.  The first product development meeting between CAM, Fannie Mae and AIG took place on February 1, 1996, at Fannie Mae in Washington. DC. This meeting concluded with a verbal agreement between Fannie Mae and CAM that CAM was to begin work on the development of a draft insurance policy for AIG's review. Fannie Mae and CAM started with CAM's specimen

**MW00161**

FNMA.MBW.008439
CONFIDENTIAL

policy, modifying it to incorporate secondary market securitization documentation, risk-based capital transfer, and collateral credit support for approval by Fannie Mae Credit Policy. CAM would be the keeper of each policy draft update.

14.    After over twenty-five draft policy updates and revisions over a period of at least the next ten months, Fannie Mae lawyers were reasonably satisfied with the policy form and content. Fannie Mae approved the proposed policy in January of 1997 and CAM sent the finalized draft to AIG for review.

15.    From January through July 1997 CAM and Fannie Mae worked through more than ten additional drafts of policies with AIG to ensure the policy would not be construed by New York insurance regulators as a "financial guarantee" and to eliminate other technical concerns, including Fannie Mae's Credit Support Agreement.    Finally, AIG's chairman of the board gave his approval for American International Specialty Lines Insurance Company (AISLIC) to write this unique type of insurance for Fannie Mae.  A premium pricing grid was finalized and acceptable to AIG and Fannie Mae.  AIG built a credit model to capture Fannie Mae historic multifamily loan performance and CAM began working on underwriting criteria and due diligence procedures separate from Fannie Mae for future loan portfolios to be covered by this new and unique type of insurance product.

16.    CAM executed a Memorandum of Understanding (MOU) with Fannie Mae on April 4, 1997 to provide Multifamily Credit Risk Insurance ( MCRI) coverage specifically for Fannie Mae. The purpose of this insurance coverage would be to provide loss coverage protection for the subordinate level of risk on certain multifamily loans sold to or securitized by Fannie Mae. Fannie Mae would be the insured and AIG would be the insurer.  Fannie Mae would have the

**MW00162**

**FNMA.MBW.008440**
**CONFIDENTIAL**

exclusive rights to use this coverage and CAM would be AIG's broker with the exclusive brokerage rights to represent Fannie Mae.   CAM and Fannie Mae would jointly retain all copyrights to MCRI products written by AIG.   (This ownership was in addition to the broad ownership rights as to the MCRI itself pursuant to the filed copyrights). The term of this agreement would be seven years from date of execution, with Fannie Mae having the  right to extend the MOU for two  successive five year terms at the end of the initial seven year term. (See Exhibit # 1 retained by Plaintiff's counsel under seal).

17.     In May 1997,  Fannie Mae filed a joint copyright registration for Fannie Mae and CAM Financial as the joint copyright owners for the generic version of the Multifamily Credit Risk Insurance Policy (MCRI) with the United States Copyright Office.  (See Exhibit #2 retained by Plaintiff's counsel under seal).

18.     From May through July 1997, CAM developed insurance brokerage due diligence underwriting and operating procedures to be used for transacting a pilot transaction with Fannie Mae and AIG. During  this time,  Fannie Mae selected a pilot proposed transaction with Metropolitan Bank and Trust for delivery of a seasoned multifamily whole loan portfolio swap with Fannie Mae in exchange for a Fannie Mae MBS using MCRI insurance coverage for subordinated first loss security. Fannie Mae worked with the Office of Thrift Supervision for assurance the AAA insurance policy would be acceptable credit support for Thrift Institution risk-based capital transfer.

19.     Fannie Mae Credit Policy approved the Metropolitan Bank & Trust transaction the first week of Aug 1997, with MCRI insurance as acceptable collateral for first loss recourse.  This

**MW00163**

FNMA.MBW.008441
CONFIDENTIAL

transaction closed on August 20, 1997 for approximately $92,000,000, with insurance coverage of $8,134,000 issued by AIG.

20.     This was the first time this type of insurance was used in a secondary market, Fannie Mae securitized transaction as referenced in a Fannie Mae letter dated September 16, 1997. (See Exhibit #3 retained by Plaintiff's counsel under seal).

21.     Several months after the closing of the Metropolitan Bank & Trust transaction, AIG asked CAM and Fannie Mae to change the name on future policies from Multifamily Credit Risk Insurance to Multifamily Collateral Risk Insurance. There would be no need to change the MCRI acronym.  A second joint copyright recording was made by Fannie Mae in February 1998 to record a generic policy that included final changes used in the Metropolitan Bank transaction.

22.     A second transaction was closed with AIG issuing MCRI coverage through CAM for Fannie Mae Multifamily Aggregation (seasoned conduit whole loans sold to Fannie Mae for cash) totaling approximately $100,000,000 on September 30, 1998 with coverage by AIG of $11,159,786. During the course of underwriting this transaction, disputes arose between Fannie Mae and AIG.  Fannie Mae and AIG soon became at odds with each other with no new coverage proposals submitted by Fannie Mae to CAM for price quotes by AIG following this second transaction.

23.     Prior to the conflict arising between AIG and Fannie Mae, (in fact only several weeks after execution of the April 4, 1997, MOU entered into between Fannie Mae and CAM), Fannie Mae verbally asked CAM to begin efforts to identify and contact additional AAA rated insurance companies that might be  interested in writing MCRI for Fannie Mae.

**MW00164**

FNMA.MBW.008442
CONFIDENTIAL

24.    On May 28, 1997, CAM executed a corporate Confidentiality Agreement with Crump Insurance Services of Memphis, Inc., ("Crump") to represent CAM, as its wholesale broker, for the procurement of additional AAA rated insurers having an interest in writing MCRI coverage for Fannie Mae. (See Exhibit #4 retained by Plaintiff's counsel under seal).

25.    On May 28, 1997, Craig Ott, Vice President of General Star Indemnity Co. Inc. and General Star Management Company executed CAM Financial's Confidentiality Agreement for MCRI. The confidentiality agreement was executed via fax transmittal prior to CAM's and Crump's first meeting with GenStar. (See Exhibit #5 retained by Plaintiff's counsel under seal).

26.    CAM's confidentiality agreement for MCRI clearly states that the signatory of the Agreement agrees, understands and acknowledges that all MCRI product information is confidential and proprietary to CAM and Fannie Mae. Ott executed the CAM agreement with "full knowledge and understanding of any unauthorized disclosure or dissemination of the form, terms, or provisions of the MCRI Policy, or any other information regarding MCRI is likely to cause irreparable harm to CAM Financial and Fannie Mae".

27.    Crump set up an introductory meeting with representatives of GenStar and GenRe in CAM's offices in Gulfport, Mississippi, in early June 1997. By letter of June 2, 1997, CAM authorized Crump to release to GenStar and GenRe a copy of CAM's Confidential Term Sheet /Confidentiality of Multifamily Credit Risk Insurance dated May 31, 1997. (See Exhibit #6 retained by Plaintiff's counsel under seal). At this meeting, GenStar, through Craig Ott and Mike Denton, represented that they were communicating with and representing GenRe and all necessary subsidiaries. They stated that Gen Re would be reinsuring any policies issued by GenStar or GenStar Management, and that Gen Re's financial wherewithal would provide the

**MW00165**

FNMA.MBW.008443
CONFIDENTIAL

necessary "Triple A" rating required by Fannie Mae. They represented that GenRe, as the parent would be required to approve all aspects of any business plan or agreements that were ultimately entered into between CAM, Crump, Fannie Mae and any GenRe subsidiary.

28.    CAM and Crump next set up an introductory meeting with representatives of GenStar, Gen Re, and NEAM at Fannie Mae in Washington. D.C. This meeting was held on August 1, 1997. This introductory meeting was the first meeting at which were present representatives from all parties involved. The meeting  was very productive and  Fannie Mae agreed to furnish additional data and pricing model information to NEAM (another GenRe wholly-owned subsidiary that was to undertake the due diligence/underwriting tasks related to the approval of aggregation pools), GenRe and GenStar.  CAM agreed to furnish its Premium Pricing Grid and Insurance Due Diligence Underwriting Guidelines and Operating Procedures for Fannie Mae MCRI business to GenStar and to GenRe, as GenRe had represented through Craig Ott and John Toi that the information was necessary for GenRe's underwriting  analysis. This information was and is proprietary to CAM and was developed by CAM and was furnished as a part of the information to be protected by the Confidentiality Agreement executed by GenStar.

29.    A second meeting with Fannie Mae occurred on October 31, 1997 at Fannie Mae. GenStar's Craig Ott and GenRe's  John Toi gave Fannie Mae, CAM and Crump an update on their progress toward obtaining GenRe's approval for GenStar to write MCRI coverage for Fannie Mae. At this meeting and all subsequent meetings that GenRe was "calling the shots" and was making all of the decisions on behalf of any GenRe subsidiaries involved, as to GenStar's role in MCRI and that GenRe would reinsure the risk so as to meed the Fannie Mae

MW00166

FNMA.MBW.008447
CONFIDENTIAL

requirement for a "Triple-A" rated carrier to issue and stand behind the policy. At that meeting,

Fannie Mae, CAM and Crump entered into a seven year exclusive offering by GenStar styled as:

> Provision of Multifamily Credit Risk Insurance (MCRI) by
> General Star Indemnity Company (collectively, "GenStar"), as
> brokered by Crump Insurance Services ("Crump"), and CAM
> Financial Services, Inc. ("CAM"):
>
> Confirmation of Exclusive Offering to Fannie Mae; Non-
> Disclosure of Terms of Negotiations

(See Exhibit #7 retained by Plaintiff's counsel under seal).

30.    A third meeting, on December 17, 1997, was held at Fannie Mae (with representatives

of both GenStar and GenRe in attendance) to announce that GenStar now had corporate

approval of Gen Re and with the blessing and approval of GenRe had made the decision to

support MCRI exclusively for Crump on behalf of Fannie Mae. GenRe, or a subsidiary

company representative, accompanied GenStar to all meetings with CAM and Fannie Mae, and it

was represented that GenStar was the company that would issue the policy, but that GenRe was

making all decisions regarding the product, and was re-insuring the product. GenStar and GenRe

representatives worked directly with CAM (through Crump). At this meeting, GenStar/GenRe

committed to provide Two Billion Dollars ($2,000,000,000) per year of insurance coverage for

MCRI and Fannie Mae. GenStar followed the Fannie Mae meeting with a letter to Crump

announcing the GenStar commitment to offer MCRI coverage for terms up to 30 years on behalf

of Fannie Mae. On December 22, 1997, Crump sent CAM a copy of the GenStar commitment

to write MCRI coverage exclusively through Crump and Crump agreed to exclusively write

MCRI through CAM. (See Exhibits #8 & #9, respectively, retained by Plaintiff's counsel under

seal).

MW00167

FNMA.MBW.008446
CONFIDENTIAL

31.    The GenStar letter of December 16, 1997 indicated there were two key points or issues remaining to resolve, and expressed GenStar's anticipation of being able to write Fannie Mae business beginning in January 1998. Unfortunately, these two issues became rather significant hurdles to overcome. It was approximately twelve more months in resolving these two hurdles, before GenStar was able to write the first MCRI policy for Fannie Mae. Under CAM's MCRI business plan that was ultimately approved by GenRe, CAM was the agent for Fannie Mae and the broker for GenStar. Premiums for MCRI were to be remitted from Fannie Mae to CAM in Gulfport, Mississippi. CAM then deducted its commissions from the gross premium and remitted the net premium to Crump as the wholesale broker for GenStar, pursuant to the brokerage agreement between CAM and Crump, and the letter agreement from Crump agreeing to place such insurance exclusively through CAM. Crump was to deduct its brokerage fees from the net premium, and remit the "net-net" premium to GenStar. GenStar was to have entered into reinsurance agreements with GenRe. Thus CAM, the agent for the policy, received and remitted the premium payments from the insured. For the contract of insurance. During this time, GenStar and GenRe represented to CAM that as GenRe was providing this reinsurance, (to assure the "Triple-A" rating), that Ronald Ferguson (GenRe's CEO), Joe Brandon (GenRe's CFO) and James Gustafson (GenRe's president) must and had approved all aspects of the MCRI business plan.

32.    In the spring of 1998, at a meeting between Crump, CAM, GenRe, GenStar and Fannie Mae, this commitment for $2,000,000,000 per year in coverage was confirmed by GenStar, with the approval of GenRe.

FNMA.MBW.008445
CONFIDENTIAL

33.      Ott and GenStar entered into a Confidentiality Agreement with Boston Portfolio

Advisors on January 14, 1998. On June 2, 1998, Ott notified Fannie Mae of this agreement and

asked that the same terms of the Fannie Mae-CAM-Crump-GenStar Confidentiality Agreement

for MCRI dated October 31, 1997, be applicable to Boston Portfolio by extension. (See Exhibit

#10 retained by Plaintiff's counsel under seal). Fannie Mae accepted this extension of

application of the Confidentiality Agreement in correspondence.

34.      It is CAM's understanding that a similar Confidentiality Agreement had been executed

between Crump, GenStar and Nicholas Didier. CAM was assured that Nicholas Didier executed

Confidentiality Agreements with Crump, prior to Crump's introduction of Nicholas Didier to

CAM, GenStar and Fannie Mae. CAM has not been provided executed copies of any such

Confidentiality Agreements.

35.      During October 1998, when the final approval for GenStar to write MCRI coverage for

Fannie Mae was imminent, CAM and Crump first became concerned that Ott and GenStar were

making an attempt to establish a direct insurance relationship with Fannie Mae, thereby

circumventing the brokerage contracts and relationships of CAM and Crump.

36.      In June 1998, CAM had introduced Metropolitan Bank and Trust to GenStar and GenRe

through Crump on a proposed MCRI transaction to insure a commercial and multifamily

portfolio. (Fannie Mae had declined the transaction because of a heavy concentration of

commercial loans.) Over the next several months following Fannie Mae's declination, Ott, on

behalf of GenStar and GenRe took over direct control of the due diligence activities as well as

all negotiation with Metropolitan. Ott deliberately kept Crump and CAM out of all discussions

with Metropolitan regarding this transaction. CAM was advised by Crump that Crump had

MW00169

FNMA.MBW.008444
CONFIDENTIAL

numerous conversations with GenStar and GenRe in protest over being omitted from these discussions and over Ott's circumvention of the agency/brokerage relationship. CAM would show that Crump was required by the terms of 1) the Confidentiality Agreement, 2) the Letter Agreement to write MCRI exclusively through CAM and the Letter Agreement between GenStar and Crump to write MCRI exclusively through Crump (to which CAM was clearly and unequivocally an intended third party beneficiary), and 3) the fiduciary relationship which arose by operation of the brokerage agreement with CAM and the agency relationship which arose therefrom, to use any lawful means necessary to force compliance with the spirit and terms of GenStar and GenRe's commitments. Out of fear of losing additional business from GenStar/GenRe, Crump failed and refused to take such action, and actively conspired to conceal the truth of the transaction from CAM. Crump had full knowledge that Crump's failure to act, and conspiracy to conceal such information was damaging to CAM. CAM relied on the Confidentiality Agreement, the Letter Agreements, the verbal commitments and its agency/brokerage relationships and agreements with Crump to protect its interests in this matter. Crump did not do so, and as a result, GenStar/GenRe unlawfully did misappropriate CAM's copyrighted policy, and the other proprietary information, included but not limited to the Confidential Term Sheet, Premium Pricing Grid and CAM Operating Procedures and Underwriting Guidelines which were the sole property of CAM.

37.    Finally, on September 29, 1998, GenStar did provide Crump with a copy of the coverage quote previously sent to Metropolitan. The quote referenced the offering of CAM's product and coverage for Commercial/ Multifamily Collateral Replacement Insurance. (See

**MW00170**

FNMA.MBW.008453
CONFIDENTIAL

Exhibit #11 retained by Plaintiff's counsel under seal). CAM was not advised of this coverage quote until late October of 1998.

38.      It was then apparent that GenStar and GenRe (who approved all MCRI transaction) were finalizing the $100,000,000 transaction with $10,000,000 coverage in a direct transaction with Metropolitan, in direct violation of the exclusive agency and brokerage relationships between GenStar/GenRe and Crump, and between Crump and CAM.   Ott attempted to downplay this fact and tried to assure Crump that there was no effort being made to cut Crump and CAM out of the deal, assuring Crump that Crump and CAM would be paid on the transaction, however, Crump would have to remain "transparent until the deal closed" and that Crump could deal with CAM as they pleased.   CAM was subsequently advised by Crump for this "need for transparency" after the fact, and despite vigorous protest by CAM, no satisfactory explanation has ever been offered for such a requirement, other than to verify the arguments made by GenStar, GenRe and Ott to Fannie Mae that CAM "was expendable." CAM, to this day, has received no premium payments from Metropolitan, as would have been required by the MCRI business plan, nor has it received any accounting from Crump for payments made directly to either GenStar or Crump as called for in the  Term Sheet and CAM Operating Procedures and Underwriting Guidelines of the business plan that had been presented to and approved by CAM. Crump has intentionally concealed this information from CAM in order to protect its own relationship with GenStar.

39.      After witnessing this conduct by GenStar (through its Vice President, Craig Ott), in the non-Fannie Mae, Metropolitan Bank transaction, CAM and Crump became extremely concerned about the potential for similar wrongful conduct by  Ott in the development of a relationship

**MW00171**

FNMA.MBW.008452
CONFIDENTIAL

between GenStar, himself and Fannie Mae. It is now apparent that GenStar, (through its Vice President, Ott), and Boston Portfolio Advisors were having extensive direct contact with Fannie Mae without knowledge or participation of CAM. Crump has totally failed and refused to take any action to stop this action in spite of the exclusive brokerage and agency relationships between GenStar, Crump and CAM.

40.    CAM wrote Fannie Mae on October 30, 1998, expressing its concern that an insurer was attempting to establish a direct relationship with Fannie Mae on MCRI. CAM did not identify GenStar or GenRe by name in the letter in effort not to jeopardize the final approval status of GenStar, by Fannie Mae. Nevertheless it is now apparent that Ott, GenStar and GenRe were attempting to and succeeding in circumventing CAM's Fannie Mae relationship just as he had with Metropolitan in the previous transaction.

41.    Fannie Mae's Richard Lawch responded to CAM's letter by telephone call on November 4, 1998, stating that "CAM is fully protected with its MOU exclusivity agreement with Fannie Mae and no insurance carrier will be able to go around CAM, but Fannie Mae needs to be able to have a one-on-one dialog to facilitate issues and understanding of mortgage banking terms that insurance carriers don't understand."

42.    In spite of this verbal response from Mr. Lawch on November 4, on November 18, 1998, Mr. Lawch also saw fit to respond in writing to CAM's letter of October 30th, referencing several points not mentioned in his telephone call two weeks earlier, primarily to the effect that Fannie Mae would recognize the exclusive position of CAM as placing agent for MCRI coverage only on potential insurers brought to Fannie Mae by CAM. There was no

MW00172

FNMA.MBW.008451
CONFIDENTIAL

reference made to CAM's request for inclusion of GenStar in the MOU (See Exhibit #13 retained by Plaintiff's counsel under seal).

43.      On December 4, 1998, CAM sent a letter with a proposed memorandum to Fannie Mae requesting a modification to the CAM-Fannie Mae MOU to include GenStar.  (See Exhibit #12 retained by Plaintiff's counsel under seal).

44.      On December 18, 1998, Fannie Mae's Richard Lawch sent a direct letter to Ott and GenStar seeking the "opportunity to share credit risk exposure on certain investments in Fannie Mae's Portfolio" without any reference or copy to CAM Financial.  This action by Fannie Mae was in direct contravention and breach of the entire agreement, contract, understanding and representations from Fannie Mae to CAM.  CAM had relied upon the promises and representations of Fannie Mae that in consideration for CAM's efforts in the development of the business plan, underwriting procedures, due diligence protocols and MCRI insurance policy, CAM would be the exclusive agent for Fannie Mae.  (See Exhibit #14 retained by Plaintiff's counsel under seal).

45.      GenStar continued to move forward with Fannie Mae. The first Fannie Mae transaction insured by GenStar closed in February 1999, and the following policies have since been issued by GenStar:

    1st Policy.  GenStar IAG 364502; Final UPB $236,000,000; Aggregate Coverage
         $19,900,000; Effective date of February 1, 1999.


    2nd Policy.  GenStar IAG 366673;  Aggregation II Forward Commitment
         $200,000,000, Aggregate Coverage not to exceed $19,900,000;  Effective

**MW00173**

FNMA.MBW.008450
CONFIDENTIAL

date of October 1, 1999;  Fannie Mae delivery was recently completed at
approximately $191,000,000.

3rd Policy.  GenStar IAG 368917; MBS Swap Metropolitan Bank and Trust
Company Final UPB Approximately $145,000,000; Effective date of
November 23, 1999.

46.    By letter of April 12, 1999, Fannie Mae indicated it now considered itself as having the
right to go direct to insurers to cover "its own property or interest" without a surplus lines broker.
The letter stated that "Fannie Mae believes they can use the joint copyright without joint consent
and also create MCRI derivatives without joint consent."  Fannie Mae refused to modify the
MOU to include GenStar. (See Exhibit #15 retained by Plaintiff's counsel under seal).  This
action of Fannie Mae completely ignored and violated Fannie Mae's fiduciary duty to CAM as a
joint copyright owner and as the sole owner of the intellectual property rights underlying and
supporting the MCRI business plan, as well as the agreement and contract between CAM and
Fannie Mae through which Fannie Mae obtained CAM's services and expertise in the
development of the MCRI business plan.  This action by Fannie Mae was the result of the
willful, malicious and intentional interference by Ott, GenStar, GenRe and Crump with the
business relationship which had existed between CAM and Fannie Mae.

47.    CAM would show unto this Court that GenStar, through Craig Ott, actively and
purposely worked to poison and discredit CAM's relationship with Fannie Mae, and that Ott
had advised Fannie Mae that it didn't need a surplus lines broker and that Fannie Mae could go
direct to GenStar, thereby circumventing the brokerage and agency fees of both CAM and

**MW00174**

FNMA.MBW.008449
CONFIDENTIAL

Crump.

48.    Although the above business transactions have been written with MCRI insurance

issued by GenStar with CAM as Fannie Mae agent and broker to Gen Star, CAM would show

this Court that Ott, as an employee and corporate executive of GenStar, has acted in bad faith

and has willfully, maliciously and intentionally breached CAM's Confidentiality Agreement for

MCRI, thereby causing significant damages over the past 24 months by discrediting and

destroying CAM's MCRI insurance brokerage relationship with Fannie Mae. CAM would

further show unto this Court that shortly before his departure from GenStar,   It is understood

that Ott formed, or was in the process of forming a business partnership with Nicholas Didier (a

reinsurance broker for GenStar) and Scott Calahan, President of Boston Portfolio Advisors.

(Boston Portfolio Advisors had been GenStar's due diligence contractor on Fannie Mae

business).

49.    CAM would show that  Ott represented to Fannie Mae the fact that Nicholas Didier

performed  work for GenStar by providing reinsurers to increase GenStar's capacity for Fannie

Mae business.   In point of fact, it is noteworthy that several of these reinsurance companies

represented as having been brought to GenStar by Didier  had in actuality been introduced to  Ott

by CAM and Crump.

50.    CAM would show that Crump has totally failed to require the compliance with the

Confidentiality Agreement it executed with CAM and failed to protect CAM when acting as

broker for CAM with GenStar. Crump concealed the Metropolitan Bank transaction from CAM

and has refused to account to CAM for premiums received therefrom in violation of the

exclusivity agreement, brokerage agreements, fiduciary relationship and oral promises from and

**MW00175**

**FNMA.MBW.008448**
**CONFIDENTIAL**

between Crump and CAM. Crump's actions and inactions have proximately caused, allowed and facilitated GenStar/GenRe's sabotage of the CAM/Fannie Mae relationship and contract.

51.    CAM would show that GenStar and GenRe have totally failed to comply with the Confidentiality Agreement executed with CAM, through the actions of the Vice President, Ott, and have continued to willfully, wantonly and maliciously breach said agreement in refusing numerous demands by CAM to restrain the actions of Ott since his departure from GenStar.

## COUNT ONE

### TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS BY GENSTAR, GENRE, OTT AND CRUMP

52.    Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

53.    Your Plaintiff would show that the facts as alleged set forth a claim for relief on the grounds that GenStar, Crump, GenRe and their Vice President, Ott (both individually and in his capacity as agent) tortiously, willfully, and intentionally interfered with the contractual relations between CAM and Fannie Mae, thereby damaging them grievously through the following wrongful conduct:

53.1. GenStar, GenRe and Ott initiated direct contacts with Fannie Mae in an attempt to diminish and destroy CAM's business relationship with Fannie Mae. CAM's business relationship with Fannie Mae was multifaceted and consisted of a long history of product and business plan development, joint copyright ownership of the MCRI policy itself, and an agreement that CAM's compensation

MW00176

FNMA.MBW.008454
CONFIDENTIAL

for its years of work in the development of all aspects of MCRI would be for CAM to participate in all MCRI transactions. Crump was aware of these contacts and actively conspired to conceal them from CAM in an attempt to protect and further its own relationship with GenStar and GenRe; also Crump's negligent, intentional and willful acts were calculated to cause damage to CAM's lawful business.

53.2. In the first transaction involving GenStar and GenRe, (in February of 1999), Ott instructed Fannie Mae not to pay CAM's premium invoice and to make direct payments of premium to GenStar. This was apparently his first attempt to cut CAM out of its commission on the Fannie Mae transactions. Ott, although warned on several occasions by Crump, continued his willful, wanton and intentional course of conduct in excluding CAM and Crump from telephone conversations and meetings with Fannie Mae. Crump was aware of these actions but failed to take appropriate and meaningful action to stop the misconduct out of concern for its own relationship with GenStar. GenStar, itself, warned Ott not to practice retail marketing with Fannie Mae but has totally and completely failed to control its own officer and employee and enforce compliance with the Confidentiality Agreement, and Crump has correspondingly failed to enforce its Confidentiality Agreement with GenStar and CAM and its exclusivity agreements with Crump (to which CAM is a direct and intended third party beneficiary) and correspondingly Crump's own exclusivity agreement with CAM, thereby

**MW00177**

FNMA.MBW.008455
CONFIDENTIAL

violating its contractual commitments, its fiduciary responsibilities and its

broker/agent responsibilities to CAM;

53.3. On the first Fannie Mae Aggregation forward delivery transaction, Ott

attempted to substitute a GenStar insurance policy in an effort not to use the

CAM/Fannie Mae copyrighted policy. Said policy was a derivative of the CAM

policy and relied upon stolen and converted proprietary intellectual property

belonging to CAM;

53.4. GenStar, GenRe and Ott attempted to cut brokerage commissions to CAM

on the GenStar Fannie Mae Aggregation II transaction, in October of 1999;

53.5. GenStar, GenRe and Ott attempted to cut brokerage commissions due

CAM on the Metropolitan Bank Fannie Mae MBS transaction in November of

1999;

53.6. GenStar, GenRe and Ott initiated direct negotiations with Fannie Mae on

the forward commitment coverage for GenStar Fannie Mae, Aggregation I, II and

III commitments and without including CAM and Crump. This was a direct

violation of the agreement to write MCRI exclusively through Crump, and

Crump's agreement to write MCRI exclusively through CAM. Crump was aware

MW00178

FNMA.MBW.008456
CONFIDENTIAL

of this action by GenStar and GenRe, and failed to take any action and conspired to conceal the actions from CAM;

53.7.   Ott claimed credit with Fannie Mae for reinsurer contacts which were developed and furnished by Crump and CAM, thereby attempting to remove CAM from those transactions.   This was accomplished by bringing these reinsurers to Fannie Mae for a meeting in December of 1999 without telling CAM or Crump of any such meeting, and without disclosing that such reinsurers had in actuality been introduced by CAM to GenStar and Ott;

53.8.   GenStar, GenRe and Ott conducted retail marketing by direct negotiation with Fannie Mae without including CAM or Crump, over the continuous protest of CAM;

53.9.   GenStar and Ott corresponded directly with Fannie Mae without copying CAM or Crump, thereby attempting to create the impression that CAM and Crump were unnecessary;

53.10.   GenStar and Ott held numerous meetings and telephone conversations directly with Fannie Mae without including CAM or Crump;

FNMA.MBW.008457
CONFIDENTIAL

53.11.  GenStar and Ott sent all premium quotes and premium pricing directly to Fannie Mae without copying CAM or Crump.

53.12.  GenStar, GenRe and Ott intentionally interfered with existing CAM contracts by initiating direct discussions with Fannie Mae (the insured) about the feasibility of cutting CAM and Crump brokerage commissions without CAM's or Crump's knowledge or involvement;

53.13.  Ott played a direct role in bringing Nicholas Didier to Fannie Mae in December 1999 again excluding Crump and CAM.

53.14.  GenStar, GenRe and Ott deliberately cut CAM out of the Metropolitan commercial transaction by appropriating CAM's client after CAM made proper introductions through Crump and GenStar.

54.    As a result of the actions of GenStar, GenRe, Ott and Crump, the formerly close business relationship between CAM and Fannie Mae no longer exists, and Fannie Mae is no longer willing to accept insurers brought to it by CAM for future aggregations.

55.    As stated above and elsewhere in the amended complaint, the actions and omissions of GenStar, GenRe, Craig Ott and Crump were negligently, intentionally and willfully done and calculated to cause damage to CAM lawful business.

MW00180

FNMA.MBW.008458
CONFIDENTIAL

56.        The actions and omissions of GenRe, GenStar, Craig Ott and Crump were done with the unlawful purpose of causing damages and loss, without right or justification, and actual damage and loss resulted from their actions and omissions.

57.        As a result of the aforedescribed actions, CAM has been damaged in the amount of Forty-Five Million Seven Hundred Forty-Four Thousand Three Hundred and Twenty Five Dollars ($45,744,325).

## COUNT TWO

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONS BY GENSTAR, GENRE, OTT AND CRUMP

58.        Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

59.        The factual allegations in the preceding paragraphs, and the specific factual allegations contained in Count One constitute a claim for intentional interference with prospective business relationships of CAM.

60.        As a result of these intentional wrongful actions, CAM has been damaged in the amount of Fifty Million Dollars ($50,000,000).

### COUNT THREE

### BREACH OF CONTRACT

61.        Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

MW00181

FNMA.MBW.008459
CONFIDENTIAL

62.    Your Plaintiff would show that the facts alleged above set forth a claim by CAM against GenStar and GenRe for breach of its contractual commitment to provide additional insurance coverage of up to Two Billion Dollars ($2,000,000,000.00), despite the detrimental reliance upon said agreement by CAM. See specifically the facts alleged in paragraphs 30 through 32 above.

63.    As a result of the breach of its contractual commitment to provide this additional insurance capacity, CAM has been damaged in the amount of Seven Million Thirty-Three Thousand and No/100 Dollars ($7,033.000.00).

### COUNT FOUR

### CONVERSION OF INTELLECTUAL PROPERTY AND COPYRIGHT AND INTERFERENCE WITH METROPOLITAN BANK TRANSACTION

64.    Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

65.    GenStar, GenRe, Craig Ott and Crump breached CAM's Confidentiality Agreement, infringed upon CAM's copyright and converted CAM's intellectual property and proprietary information by taking CAM's client (Metropolitan Bank), using CAM proprietary documentation and intellectual property (including but not limited to the CAM Operating Guidelines, underwriting standards, policy grids, underwriting procedures, pricing grids, confidential term sheets and due diligence protocols developed and owned by CAM) , and CAM's jointly copyrighted MCRI policy to create a GenStar policy and insure a $100 million commercial loan transaction. (Metropolitan). CAM had introduced Metropolitan to Crump and GenStar in June 1998. GenStar's Craig Ott then made direct contact with the Metropolitan

**MW00182**

FNMA.MBW.008460
CONFIDENTIAL

Bank and proceeded to cut CAM out of this transaction and commission income. Crump, GenStar, GenRe were aware of Craig Ott's conduct, participated and conspired in this conduct to exercise dominion and control over the intellectual property (including, but not limited to CAM Operating Procedures and Insurance Underwriting Guidelines, pricing grids, confidential termsheets and due diligence protocols developed and owned by CAM) inconsistent with CAM's rights.

66.       Crump totally and wholly failed to take any meaningful action to prevent the loss of the commissions through the actions of its insurers and agents and to protect CAM and conspired with GenStar and GenRe to conceal this.

67.       As a result of the wrongful acts of GenStar, GenRe, Crump and Ott, CAM has been damaged through the loss of commission in the amount of Seven Hundred Twenty-Eight Thousand Dollars ($728,000.00).

**COUNT FIVE**

**COPYRIGHT INFRINGEMENT**

68.       Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

69.       That GenStar, GenRe, Crump and Ott have jointly and severally infringed upon the copyright of CAM with respect to the MCRI policy copyrighted by CAM and Fannie Mae, without authorization or approval by CAM or Fannie Mae. CAM has no knowledge of any approval by Fannie Mae for GenStar, GenRe or Crump to use the MCRI business plan, the MCRI insurance policy or any derivative thereof. If such approval was given, then CAM would

Page 26 of 36

**MW00183**

**FNMA.MBW.008461**
**CONFIDENTIAL**

assert the claim for violation of the fiduciary duties owed by Fannie Mae to CAM as a joint copyright owner as set forth in Count Ten below.

70.    That as a result of the actions of the Defendants, CAM has been damaged in an amount not less than Fifty Million Dollars ($50,000,000.00).

## COUNT SIX

## INTENTIONAL BREACH OF CONTRACT (CONFIDENTIALITY AGREEMENT) BY CRAIG OTT

71.    Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

72.    That Ott, since his departure from GenStar has appropriated, used, converted and stolen the copyrighted insurance policy and other intellectual property, ideas, concepts, procedures, etc., (including but not limited to due diligence protocols and policy models), that were acknowledged to be covered by the Confidentiality Agreement executed by himself as Vice President of GenStar. These provisions are binding upon him even following his departure, and CAM has been damaged thereby.

73.    CAM has been damaged by the actions of Ott since his departure from GenStar in an amount not less than Fifty Million Dollars ($50,000,000.00). Additionally, CAM would ask that this Court issue injunctive relief preventing the continued wrongful actions of Ott in violation of the Confidentiality Agreement.

## COUNT SEVEN

## BREACH OF CONFIDENTIALITY AGREEMENT BY GENSTAR/GEN RE

MW00184

FNMA.MBW.008462
CONFIDENTIAL

**FAILURE TO TAKE ACTION TO HALT ACTIONS OF OTT POST DEPARTURE**

74.    Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

75.    CAM would show that GenStar/Gen Re have an affirmative duty to enforce the Confidentiality Agreement it executed with CAM as to its departed Vice President, Ott.

76.    CAM would show that GenStar/Gen Re have totally failed to take any action to enforce said Confidentiality Agreement, and as a result, CAM has been damaged in an amount of not less than Fifty Million Dollars ($50,000,000.00).

**COUNT EIGHT**

**BREACH OF CONFIDENTIALITY AGREEMENT BY CRUMP
FAILURE TO TAKE ACTION TO ENFORCE
CONFIDENTIALITY AGREEMENT AGAINST GENSTAR, GEN RE
AND CRUMP**

77.    Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

78.    CAM would show that Crump had an affirmative duty to enforce the Confidentiality Agreement it executed with CAM as to its insurer, GenStar and GenRe, and to GenStar's departed Vice President, Ott.

79.    CAM would show that Crump has totally failed to take any action to enforce said Confidentiality Agreement, and as a result, CAM has been damaged in an amount of not less than Fifty Million Dollars ($50,000,000.00).

MW00185

FNMA.MBW.008463
CONFIDENTIAL

## COUNT NINE

### ACCOUNTING - AS TO CRUMP

80.    Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

81.    That CAM is entitled to an accounting from Crump of the following:

      76.1.  An immediate accounting for all sums directly or indirectly received from any source on Fannie Mae portfolio's;

      76.2.  An immediate accounting for all sums directly or indirectly received from any source on the Metropolitan Bank/U.S. Trust transaction;

      76.3 An immediate accounting for all premiums from Fannie Mae's "Aggregation 1" which Crump permitted to be transmitted directly to GenStar, in violation of its contract;

## COUNT TEN

### BREACH OF CONTRACT - FANNIE MAE

82.    Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

83.    The allegations set forth above state a claim for relief against Fannie Mae for breach of contract.

84.    Fannie Mae and CAM entered into a contractual relationship whereby CAM agreed to devote substantial time, effort, expertise and expense to the development of a business plan

MW00186

FNMA.MBW.008464
CONFIDENTIAL

whereby Fannie Mae would be able to lay off first loss risk on 1) individual multifamily loans, 2) pools of multifamily mortgages, 3) mixed securitizations containing commercial and multifamily mortgages, 4) securitization of existing pools and to include the Fannie Me Aggregation Facility, Fannie Mae DUS Lender at-risk portfolio and Regional Bank multifamiliy mortgage products through the use of insurance. This business plan included, but was not limited to the following: 1) the development of the MCRI insurance policy; 2) the development of insurance underwriting guidelines, 3) creation and keeper of all policy drafts, 4) creation and development of insurance operating procedures, 5) establishment of pricing grids, and 6) creation and development of due diligence protocols, and 7) locating "Triple-A rated" insurance carriers willing to issue such policies and coordinating efforts with those carriers in the development of the insurance policy. In order to compensate CAM for its time, efforts, expertise and expense, CAM was to be the sole and exclusive agent for Fannie Mae in the procurement of the MCRI insurance. CAM has fulfilled its commitment to Fannie Mae, and Fannie Mae has breached this agreement by failing and refusing to allow CAM to serve as agent for Fannie Mae and instead is using other entities for the procurement of the MCRI insurance and other derivative first loss risk coverage.

85.    As a result of Fannie Mae's breach of its contractual relationship with CAM, CAM has been damaged in the loss of commissions over the remaining life of the 95 year joint copyright in the amount of One Hundred Million Dollars ($100,000,000)

## COUNT ELEVEN

MW00187

FNMA.MBW.008465
CONFIDENTIAL

**BREACH OF FIDUCIARY DUTY BY FANNIE MAE AS TO**

**JOINT COPYRIGHT HOLDER**

86.     Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein

87.     That Fannie Mae and CAM are the joint copyright owners of the MCRI insurance policy developed by CAM.

88.     That as a joint copyright owner, Fannie Mae is alleged to have given permission to others, specifically GenStar, to create a derivative for non-Fannie Mae transactions and use said policy, without accounting to CAM for same and without obtaining CAM's permission.

89.     That as a co-owner of the policy, Fannie Mae is under a fiduciary obligation to its co-owner, CAM, to use the policy to the interests of both CAM and Fannie Mae, and to account to CAM for any and all economic benefit derived from the use of the policy and any and all derivative use of the policy.

90.     Fannie Mae has breached its fiduciary obligations to CAM as the co-owner of the copyright and has used the policy, and derivatives of the policy so as to deprive CAM of any of the benefits thereof.

91.     CAM has been damaged by Fannie Mae's breach of its obligations to CAM as a co-owner of the copyrighted policy in the amount of One Hundred Million Dollars ($100,000,000).

**COUNT TWELVE**

**CONVERSION AND MISAPPROPRIATION OF INTELLECTUAL PROPERTY**

**BY FANNIE MAE**

Page 31 of 36

**MW00188**

FNMA.MBW.008466
CONFIDENTIAL

92.     Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

93.     That in addition to the copyrighted policy referenced in the preceding Count, Fannie Mae has converted and misappropriated certain intellectual property and work-product of CAM, including but not limited to the insurance underwriting guidelines, insurance operating procedures, pricing grids, confidential term sheets and due diligence protocols developed by CAM.

94.     That as a result of Fannie Mae's conversion and theft of this confidential and proprietary information, CAM has been damaged in the amount of One Hundred Million Dollars ($100,000,000).

## COUNT THIRTEEN

### PUNITIVE DAMAGES AGAINST ALL DEFENDANTS

95.     Your Plaintiff would re-adopt and re-allege the allegations of the preceding paragraphs as though fully copied herein.

96.     That the above-alleged actions of all of the defendants are intentional, willful and wrongful, and were committed with the intent to damage CAM, both from the intentional breach of the various agreements executed between CAM and the various defendants, as well as the intentional interference with CAM's business and contractual relationships with third parties, in an attempt to convert proprietary information to the Defendants' own use. As a result, your Plaintiff would pray that this Court award punitive damages against each of the Defendants, in an amount to be shown at the trial of this action in an amount reasonably calculated to punish the

MW00189

FNMA.MBW.008467
CONFIDENTIAL

Defendants and to deter such wrongful conduct by them and those similarly situated. Your Plaintiff would pray that this be in an amount equal to no less than ten percent (10%) of the net value of each of the Defendants, but in no event less than One Hundred Million Dollars ($100,000,000.00).

WHEREFORE, PREMISES CONSIDERED, your Plaintiff would pray for the following relief:

1.    A judgment against each of the Defendants GenStar, GenRe, Ott and Crump, for actual damages in the amount of Forty-Five Million Seven Hundred Forty-Four Thousand Three Hundred and Twenty Five Dollars ($45,744,325) for the tortious interference with the existing and contract and in the amount of Fifty Million Dollars ($50,000,000) for actual damages resulting from the intentional interference with future business relationships between CAM and Fannie Mae as set forth in Count One;

2.    A judgment against GenStar and GenRe in the amount of Seven Million Thirty-Three Thousand ($7,033,000) for damages resulting from GenStar/GenRe's breach of contract to provide an additional Two Billion Dollars in insurance coverage.

3.    A judgment against GenStar, GenRe, Ott and Crump in the amount of Seven Hundred Twenty-Eight Thousand Dollars ($728,000.00) for the loss of commissions through the conversion of the policy and intellectual property on the Metropolitan Bank transaction as set forth in Count Three above;

4.    A judgment against GenStar, GenRe, Ott and Crump for copyright infringement as set forth in Count Four above in the amount of Fifty Million Dollars ($50,000,000).

**MW00190**

FNMA.MBW.008468
CONFIDENTIAL

5. A judgment against Craig Ott in the amount of Fifty Million Dollars ($50,000,000) for the breach of the Confidentiality Agreement as set forth in Count Five.

6. A judgment against GenStar and GenRe in the amount of Fifty Million Dollars ($50,000,000) for the breach of the Confidentiality Agreement by GenStar, Gen Re and the failure of same to enforce the terms of the Confidentiality Agreement against Craig Ott upon his departure from Gen Star;

7. A judgment against Crump in the amount of Fifty Million Dollars ($50,000,000), for damages suffered by CAM as a result of Crump's violation of the Confidentiality Agreement, brokerage agreement, exclusivity agreement and agency relationship with CAM and the failure to enforce its exclusivity agreement and confidentiality agreement with GenStar and GenRe;

8. An accounting from Crump as described in Count Eight, above, at the expense of Crump;

9. A judgment against Fannie Mae in the amount of $100,000,000 for the breach of its contractual agreement with CAM to be the sole agent for Fannie Mae in the procurement of MCRI and all derivatives therefrom as set forth in Count Nine;

10. A judgment against Fannie Mae in the amount of $100,000,000 for damages suffered by CAM as a proximate result of Fannie Mae's intentional breach of its duties to CAM as a joint copyright owner and for an accounting as to all economic benefits which Fannie Mae has reaped as a result of its use of the MCRI policy and all derivatives therefrom;

11. A judgment against Fannie Mae in the amount of $100,000,000 for the misappropriation and conversion of intellectual, proprietary property of CAM as described in Count Eleven;

**MW00191**

FNMA.MBW.008469
CONFIDENTIAL

12. A permanent injunction against Craig Ott to prevent him from using or in any way, directly or indirectly appropriating or converting the copyrights and intellectual property of CAM; and

13. Punitive Damages jointly and severally in the amount of Two Hundred Million Dollars or such amount as is calculated to punish the defendants for such wrongful conduct and to deter such conduct in the future from the Defendants and others similarly situated.

For this and such other and general relief as may be just and proper in the premises, does your Plaintiff now and ever pray.

CAM FINANCIAL SERVICES, INC.

BY: BYRD & WISER

BY: NICHOLAS VAN WISER

NICHOLAS VAN WISER
Ms. Bar No. 7339
and
MATTHEW G. MESTAYER
Ms. Bar No. 9646

FNMA.MBW.008470
CONFIDENTIAL

MW00192

Byrd & Wiser, Attorneys at Law
P.O. Box 1939
Biloxi, Ms. 39533
(228) 432-8123 (telephone)
(228) 432-7029 (fax)
nwiser@byrdwiser.com

## C E R T I F I C A T E

I, NICHOLAS VAN WISER, of counsel for Plaintiff do hereby certify that I have this

date mailed a true and correct copy of the above and foregoing Notice, postage prepaid, by

means of United States Mail to John Whitfield, Esq., Attorney for Gen Star, at North Court One,

Suite 300, 1905 23rd Avenue, Gulfport, MS 39501; David Clark, Esq., Attorney for Crump

Insurance, at P.O. Box 1789, Jackson, MS 39215-1789 and Joe Sam Owen, attorney for Craig

Ott, P.O. Drawer 420 Gulfport, Ms. 39501.

DATED, this ___ the day of December 2001.

_____
NICHOLAS VAN WISER, ESQ.

**MW00193**

FNMA.MBW.008471
CONFIDENTIAL