# EXHIBIT K

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARIALICE BATHRUS WILLIAMS, | : | Civil Action No. 1:05CV01483 |
| Plaintiff, | : | Judge John D. Bates |
| vs. | : | |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.* | : | **PLAINTIFF MARIALICE BATHRUS WILLIAMS ANSWER TO INTERROGATORIES** |
| Defendants. | : | |

### PLAINTIFF'S ANSWERS TO DEFENDANTS' INTERROGATORIES

**INTERROGATORY NO. 1:**    Describe in detail each and every fact or statement made by any Defendant that supports your allegation that Defendants denied you the opportunity to make and enforce a contract on the basis of race with respect to the May 2001 Proposal.

**ANSWER TO INTERROGATORY NO. 1:**    *This answer is based on a search of my own memory and on documents in my possession. I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered. Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

No statements were made other than one by Defendant Richard Lawch. Mr. Lawch made the statement in the doorway of his office after Plaintiff was in a meeting with the Senior Vice President Lou Hoyes and Bert Lee, Charlotte Holloman, and others to discuss business opportunities. Mr. Lawch stated that he was working with an "international broker" for doing some insurance business for the MBS pools.

It was the actions, not the statements that made me aware that Fannie Mae was excluding me from the pool of insurance brokers who were doing business with

Fannie Mae at the time. Fannie Mae and these brokers were doing business in accordance to concepts that I had developed while at Fannie Mae and was promised that I would be allowed to develop once I left Fannie Mae.

**INTERROGATORY NO. 2:**    Describe in detail each and every fact or

statement made by any Defendant that supports your allegation that Defendants

tortiously interfered with your Joint Venture or Co-Brokerage Agreement or any

other business relationship with CAM Financial.

**ANSWER TO INTERROGATORY NO. 2:**  *This answer is based on a search of my own memory and on documents in my possession. I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered. Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

The facts supporting my allegation that Defendants tortiously interfered with my Joint Venture or Co-Brokerage Agreement with CAM is the letter that I was asked to write by Grace Huebscher and Rhoda Newman. I was told to write a letter to Fannie Mae indicating that I was not in business with CAM Financial. I was told that until that letter was forthcoming, I would have no more meetings with Fannie Mae regarding business development.

**INTERROGATORY NO. 3:**    Describe in detail the May 2001

Proposal, including any expected financial arrangement and benefits to you

associated with that Proposal.

**ANSWER TO INTERROGATORY NO. 3:**  *This answer is based on a search of my own memory and on documents in my possession. I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered. Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

The May 2001 Proposal entailed the laying off of risk associated with the Delegated Underwriting and Servicing Program. Many of the lenders in this prestigious program were having problems with their balance sheet because they were carrying a substantial amount of risk on the loans that they were selling or securitizing with Fannie Mae. The idea was that while the first 1% of the risk was

carried by the lender, the next level of risk was shared on a parri passu basis by Fannie Mae and the lender, up to 20% of the amount of the loan. I contacted numerous insurance companies, came up with alternative proposals including the use of a captive insurance company in order to lay off that risk for both Fannie Mae and the lender.

We obtained quotes from the insurance companies indicating that the insurance would range up to 25 basis points per annum for the lender but that if Fannie Mae were to opt in to the insurance; the cost would be reduced to the lender. The commission on that insurance cost would be approximately 10% or 2.5 basis points on the amount of the loan. At that time Fannie Mae had approximately $9 billion of DUS loans and if the program had been okayed by Fannie Mae we would have earned $22 million.

**INTERROGATORY NO. 4:**     Describe in detail each and every

meeting (including, but not limited to, the time, place, attendees, and topics

discussed), correspondence, or communication you had with Defendants

concerning the May 2001 Proposal.

**ANSWER TO INTERROGATORY NO. 4:**  *This answer is based on a search of my own memory and on documents in my possession.* I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered. *Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

I did not meet regularly with the Defendant regarding the May 2001 proposal. We talked on the phone and wrote e-mails. The point is that my job was to secure the insurance and the DUS lenders as clients and bring the deal back to Fannie Mae. We worked with Washington Mortgage, Lend Lease, Red Capital Mortgage, and others. We only contacted Fannie Mae for information requested by the insurance companies or the lenders.

**INTERROGATORY NO. 5**:     Describe in detail how the business or

contracts proposed by you in the May 2001 Proposal were awarded to Craig Ott,

including exactly what business or contracts were awarded to Craig Ott and how

they were the same or similar to the business or contracts proposed by you.

3

**ANSWER TO INTERROGATORY NO. 5:**  *This answer is based on a search of my own memory and on documents in my possession. I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered. Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

I cannot testify at this time about what business or how much business that Fannie Mae gave to Craig Ott.  This matter is within the knowledge of Fannie Mae and I await Defendants' discovery responses.

**INTERROGATORY NO. 6**:        Describe in detail each and every

correspondence or communication between you and Fannie Mae between 2001

and the present, including date, location, parties to the correspondence or

communication and subject of the correspondence or communication.

**ANSWER TO INTERROGATORY NO. 6:**  *This answer is based on a search of my own memory and on documents in my possession. I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered. Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

 Most of my communication with Fannie Mae was by phone or by e-mail.  I have had two computer crashes since I began working with Fannie Mae in 1998 to bring these opportunities to fruition.

**INTERROGATORY NO. 7:**        Describe in detail the contents and

scope of your Joint Venture or Co-Brokerage Agreement.

**ANSWER TO INTERROGATORY NO. 7:**  *This answer is based on a search of my own memory and on documents in my possession. I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered. Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

4

I had a simple, common co-brokerage agreement with CAM Financial that entailed paying them a commission in the event that they secured the insurance that I needed on any of the proposals that I was working on.  These proposals ranged from insuring pools of automobile loans, charter school loans, captive insurance and reinsurance, etc.

**INTERROGATORY NO. 8**:        Describe in detail each and every

correspondence or communication between you and CAM Financial concerning

the Joint Venture or Co-Brokerage Agreement.

**ANSWER TO INTERROGATORY NO. 8:**   The detail of the co-brokerage with CAM was a co-brokerage agreement.

**INTERROGATORY NO. 9:**        Describe in detail each and every

communication or correspondence evidencing that Defendants "actively

discouraged" CAM Financial from dealing with you, as referenced in Paragraph

61 of your Amended Complaint, including how, when and from whom you

learned of this communication or correspondence.

**ANSWER TO INTERROGATORY NO. 9:**  *This answer is based on a search of my own memory and on documents in my possession. I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered.  . Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

I learned of Defendant actively discouraging CAM Financial from doing business with me as a result of phone conversations from Bob Jones, President of CAM Financial.  I cannot recall the dates of these conversations.

**INTERROGATORY NO. 10**:        Describe in detail each and every

communication or correspondence of "knowingly false and defamatory

5

information" about you by Defendants to CAM Financial, as referenced in

Paragraph 62 of your Amended Complaint, including how, when and from whom

you learned of this communication or correspondence.

**ANSWER TO INTERROGATORY NO. 10:** *This answer is based on a search of my own memory and on documents in my possession. I did not have the benefit of my computer records, because it crashed and none of the documents on it could be recovered. Examination of documents in the possession or under custody and control of Defendants, which were requested by me and which have not yet been produced, I expect should permit me to further elaborate on this answer.*

I learned of false and defamatory information about me being communicated to CAM Financial through telephone conversations with Bob Jones, President of CAM Financial. I cannot recall the dates of these conversations.

**INTERROGATORY NO. 11:** Describe in detail the circumstances

through which the Joint Venture or Co-Brokerage Agreement was terminated

(including, but not limited to, how notification occurred and by whom.)

**ANSWER TO INTERROGATORY NO. 11:**

The Co-Brokerage Agreement expired with CAM.

**INTERROGATORY NO. 12:** Describe in detail the circumstances

through which you learned of CAM Financial's lawsuit against Fannie Mae

(including, but not limited to, how and when you were notified and by whom.)

**ANSWER TO INTERROGATORY NO. 12:** I learned of CAM Financial's lawsuit against Fannie Mae from Bob Jones, President, CAM Financial. Fannie Mae was not originally a defendant in the lawsuit by CAM Financial against the insurance companies. Fannie Mae was added to the lawsuit later by the judge I believe. I cannot recall the dates.

6

**INTERROGATORY NO. 13**:    Describe in detail how you calculate your

losses and damages at the amounts listed in Paragraph 86 of your Amended

Complaint, and specify whether such losses and damages relate to the May

2001 Proposal, or the Joint Venture or Co-Brokerage Agreement, or both.

**ANSWER TO INTERROGATORY NO. 13:**  *This answer is based on a
search of my own memory and on documents in my possession. I did not have
the benefit of my computer records, because it crashed and none of the
documents on it could be recovered. Examination of documents in the
possession or under custody and control of Defendants, which were requested
by me and which have not yet been produced, I expect should permit me to
further elaborate on this answer.*

Losses were calculated based upon the amount of potential business that Fannie
Mae did using structures developed by me. Generally speaking, the fees ranged
about 25 basis points annually for the insurance. In some instances, the fees
were as high as 56 basis points (Metropolitan Savings Bank MBS transaction)
and the broker's fee is approximately 10% of the premium fee. Annual reports
from Fannie Mae reflect that about 2 billion of MBS one off transactions were
closed annually. Substantially more MBS were issued with the DUS portfolio. I
would have no way of knowing exactly what the credit enhancement
arrangements were for all of these transactions and the extent to which
insurance was used. Fannie Mae would know this.

**INTERROGATORY NO. 14**:    List and describe each and every

expense you incurred in reliance on Fannie Mae's alleged promises and

assurances to conduct business with you, and identify for each expense whether

the expense was for the May 2001 Proposal, the Joint Venture or Co-Brokerage

Agreement, both, or neither, and also identify whether each expense was used

solely for the identified project or agreement or for other business purposes as

well, with Fannie Mae or otherwise.

7

**ANSWER TO INTERROGATORY NO. 14:**  I left Fannie Mae after a lengthy discussion with Lou Hoyes, the then Vice President of Multifamily for Fannie Mae.  Based upon discussion and the letter that Mr. Hoyes had sent to CAM Financial, it was expected that nearly $1 billion of multifamily business would be done using the insurance credit enhancement that I developed for Fannie Mae over the next year after I left.  On the strength of those promises, I spent:

- Rent at $1,450.00 per month
- Phone and office equipment at $1,000.00 per month
- Travel to visit DUS lenders, conferences, especially MBA conferences and insurance companies at $1,500.00 per month
- Office assistant at first $2,000.00 and then at $3,000.00 per month


**INTERROGATORY NO. 15:**    List the name, address, and telephone

number of each individual likely to have information that you may use to support

your claims, describing fully for each individual the information they will likely

have.

**ANSWER TO INTERROGATORY NO. 15:**  Names of individuals who can attest to these efforts:

- Harvey Hartsfield, 742 Aspen Street NW; Washington, DC 20011; 202-352-6964
- Conway Downing
- Chris Tawa, Lend Lease, no address
- Bob Jones, President, CAM Financial, Gulfport, Mississippi
- Rhoda Newman, Fannie Mae
- Jane Harrison
- Grace Huebscher, Fannie Mae
- Jeff Webb and others at AIG Insurance
- JK Larsen, Lend Lease Bovis
- Eric Rosenfield
- Stephen Noble, Zurich Re
- Marsh Mac
- Red Mortgage Capital
- Aries Capital
- Swiss Re
- The DC Department of Insurance Securities and Banking
- Richard Lawch, Fannie Mae

All of the companies and individuals above had extensive dealings with me while I was trying to develop credit enhancement and risk reduction techniques using insurance products. The ultimate goal for all of the clients and insurance companies was to lay off the risk to lenders while insuring losses to protect investors including to protect Fannie Mae.

Marialice Balthrus Williams
January 8, 2006


## AFFIRMATION OF PLAINTIFF'S ANSWERS

Subscribed and sworn before a Notary Public in Washington, District of Columbia, this 8th day of January 2007, I, Marialice Bathrus Williams, Plaintiff, state that I believe that the answers stated in response to Defendants' Interrogatories are true and accurate, to the best of my knowledge and information.

Marialice Bathrus Williams

Notary Public

My Commission expires: _July 14, 2011_

9

## **Certificate of Service**

I certify that a copy of Plaintiff's Affirmed Answers to Defendants' Interrogatories was hand delivered on January 8, 2007, to counsel for Defendants, Sarah Goldfrank, Evelyn Becker and Kyra Grundeman, O'Melveny & Myers LLP 1625 Eye Street, NW, Washington, DC 20006-4001.

Brian Lederer

10