# EXHIBIT N

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARIALICE BATHRUS WILLIAMS,<br>Plaintiff | ) <br>) <br>) <br>) |
| v. | )  Civil Action No. _____ <br>)  Judge _____ |
| FANNIE MAE, | ) <br>) |
| and | ) <br>) |
| RICHARD LAWCH, | ) <br>) |
| and | ) <br>) |
| GRACE HUEBSCHER<br>Defendants | ) <br>) |

*Confidential Subject to Protective Order and Confidentiality ...*

## VERIFIED COMPLAINT FOR DAMAGES AND FOR INJUNCTIVE RELIEF

### JURISDICTION

The jurisdiction of this Court is founded on Title 28, Section 1331 of the United States Code (question arising under Federal law). Defendant Fannie Mae is "an instrumentality of the Federal Government"; and on Sec. 42 U.S.C. 1981(a) denial of right to contract based on race.

### PARTIES

Plaintiff, Williams, Marialice Bathrus Williams (hereafter "Ms. Williams"), an African-American woman, is a resident of the District of Columbia and was employed as an attorney from 1989 to 1990, Assistant Director from 1990 to 1993 and then Director of Capital Markets from 1993 to 1998 in the Multifamily Division of Defendant Fannie Mae.

Defendant Fannie Mae is an instrumentality of the Federal Government and its main place of operations is Washington, D.C.

Defendant Richard Lawch (hereafter "Mr. Lawch"), a white male, was Vice-President for Multifamily and her direct supervisor at Fannie Mae. Mr. Lawch is now a Senior Vice-President at Fannie Mae in the Multifamily Division.

FM42680

FNMA.MBW.008176

Defendant Grace Huebscher, a white female, is a Vice-President in the Multifamily Division at Fannie Mae.

## COUNT I   DENIAL OF RIGHT TO CONTRACT BASED ON RACE

42 USC 1981(a) "All persons... shall have the same right ... to make and enforce contracts... as enjoyed by white citizens....”; (b) "make and enforce" defined "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.”

1.      Ms. Williams worked in the Multifamily Division at Fannie Mae from January of 1990 to June 1998. In June 1998, she left Fannie Mae with the written and oral promise of doing business with Fannie Mae on transactions for which she had developed the tools that permitted Fannie Mae to carry out those transactions.

2.      Ms. Williams was responsible for the development of products for Defendant Fannie Mae's customers that could provide cheaper and more cost-effective structures for selling or securitizing pools of mortgage loans. She established a high level of expertise in these products, a detailed knowledge of the financial institutions which did business in the secondary mortgage market, and great capacity to work within Fannie Mae and without with its clients in successful product development.

3.      Ms. Williams, while at Fannie Mae, developed and put into place products that opened up the secondary market for Fannie Mae's multifamily mortgage-backed securities at a moment when change in lending rules *would have cost Fannie Mae that market, or a substantial portion thereof.* That product line was named ACES℠ and is now the benchmark on Wall Street for similar asset-backed securities.

4.      In 1997, Ms. Williams closed the first mortgage-backed securities transaction in the country whereby Fannie Mae was able, for the first time, to transfer all of the risk of loss (as opposed to insuring the loss) to a third party insurer, AIG, and thus to

Subject to Protective Order and Confidentiality

Confidential and Confidentiality Order

FM42681

FNMA.MBW.008177

**Confidential**
**Subject to Protective Order**
**and Confidentiality Order**

move that risk from the portfolio and financials of Fannie Mae and to stay in compliance with the new lending rules.

5.    Fannie Mae, Richard Lawch, (her immediate supervisor), and Grace Huebscher all participated with Ms. Williams in the development of the risk transfer mechanism and intimately knew of her talent, her skills, her experience and effectiveness in developing the tools and in closing mortgage backed securities for Fannie Mae, which effectively transferred risk off its portfolio and facilitated, in particular, its remaining in the small multifamily market, a market of the order of $10 billion a year.

6.    On June 30 of 1998, Ms. Williams ended her employment with Fannie Mae. Defendants Fannie Mae, Richard Lawch, and Grace Huebscher  all were aware of significant prospective opportunities available to Ms. Williams, by reason of her expertise and experience, and in fact led Ms. Williams to believe that she would be permitted to participate in these business opportunities, as such opportunities were normally and customarily afforded by Fannie Mae to former officials who are white citizens.

7.    Ms. Williams, after leaving Fannie Mae, established her own firm to broker and provide services for a portion of that mortgage backed securities market of Fannie Mae that she had developed.  She entered into a joint venture with CAM Financial to facilitate her business plan.

8.    Lou Hoyes, Senior Vice President of Defendant Fannie Mae's Multifamily Division where Ms. Williams was employed, prior to her leaving Fannie Mae, gave his word orally and in writing that Fannie Mae would do business with Ms. Williams. In fact, Mr. Hoyes assured in writing that Fannie Mae would do at least $1 billion of

FM42682

FNMA.MBW.008178

Confidential
**Subject to Protective Order
and Confidentiality Order**

insurance-based business in the next year through her, as a broker, and the years following of an approximately $10 billion yearly market. Standard brokerage rates would yield commissions to Ms. Williams on that business of the order of $7 million annually, totaling $35 million over the five years of injury to date.

9.  On May 26, 1998, Louis W. Hoyes, Fannie Mae's Senior Vice-President for Multi-Family Lending and Investment, explained the business opportunities opened by the programs developed by Ms. Williams in association with CAM Financial:

> Fannie Mae currently has several pending transactions totaling nearly $1 billion where multifamily credit risk transfer insurance is the keystone to closing these transactions.

10.  Ms. Williams' business plan was to use the risk transfer products that she had developed during her tenure with Fannie Mae. Richard Lawch and Grace Huebscher knew and approved of that business plan. Such arrangements are normal and customary for white citizens who are former high-level officers of Fannie Mae and who depart from Fannie Mae and continue to conduct business in the area of their employment but on a private sector basis with customary payments, fees and commissions. There was no reason to expect any different contractual and business opportunity for Ms. Williams, an African-American citizen, especially given her talent, experience and demonstrated track record of success at Fannie Mae in product development.

11.  On July 1, 1998, Ms. Williams opened an office at 2600 Virginia Avenue, NW; Washington, DC 20037, Suite 402. On October 19, 1998, Ms. Williams organized a District of Columbia limited liability company named, Risk Mitigation Strategists, LLC (RMS), wholly owned by Ms. Williams.

FM42683

FNMA.MBW.008179

Confidential
Subject to Protective Order
and Confidentiality Order

12.    On November 1, 1998, Ms. Williams obtained an insurance broker's license from the District of Columbia Department of Insurance and Securities Regulation in order that Ms. Williams, individually, as well as through RMS, could provide brokerage services and receive brokers' fees generated by her efforts with Fannie Mae in producing insurance products bought by, on behalf of or for the benefit of Defendant Fannie Mae and its multifamily lenders, including its DUS and Aggregation Program lenders.

13.    Following her departure from Fannie Mae, with the sanction of Fannie Mae, Richard Lawch and Grace Huebscher, Ms Williams proceeded to develop the business – arranging meetings, attending conferences, and making proposals. She worked diligently and in good faith to consummate business with Defendants. Ms. Williams marketed to Fannie Mae and its lender customers a variety of insurance products.

14.    Ms. Williams attended conferences such as those sponsored by the Mortgage Bankers Association where Ms. Williams made presentations to Fannie Mae customers regarding pertinent insurance strategies concerning Fannie Mae and its business.

15.    The strategies were designed to facilitate and to address the following:

      a.) make it easier and less costly for lenders using the then existing Fannie Mae executions to swap mortgages for mortgage-backed securities or sell various loans and mortgages to Defendant Fannie Mae;

FM42684

5

Confidential
Subject to Protective Order
and Confidentialit~ ~~~~

b.) .) minimize Defendant Fannie Mae's exposure to real estate, credit, and market risks associated with its portfolios of mortgages, financial instruments, derivatives and hedging activities; and

c.) .) shorten transaction time through eliminating a number of documents and substituting an insurance policy and making follow up transactions virtually a snap.

16.  Defendant Fannie Mae had representatives at meetings in Chicago, San Francisco, and Orlando, Florida where Ms. Williams made presentations to Fannie Mae customers, attended parties with Fannie Mae customers, and attended Fannie Mae parties to discuss marketing results of the conference.

17.  In May 2001, another specific proposal was discussed, reflecting the exhaustive work in refining the product. Ms. Williams, in association with CAM Financial, having secured the interest of several A+ rated insurance companies, brought the proposal to Fannie Mae for doing business, relying again on the written and oral assurances, by Fannie Mae, its officers and agents.  18.   While Fannie Mae's public discussion continued as stated, privately and secretly, Fannie Mae, was proceeding to blackball, to deny Ms. Williams business opportunities, and to refuse to do business with Ms. Williams, an African-American, in favor of a white male, Mr. Craig Ott.

19.  Please note that in response to an email dated May 30, 2001 from Ms. Williams, Defendant Grace Huebscher and Defendant Richard Lawch on May 31, 2001 had the following private, written discussion by e-mail:

> Richard, Marialice wants to pursue the credit risk insurance for DUS risk. Do you want to pursue with her? MY GUT IS NO but if you think it is worth continuing discussions, I will focus on her questions?

FM42685

FNMA.MBW.008181

*Confidential*
*Subject to Protective Order*
*and Confidentialit· ⌐.-.⌐..*

Richard S. Lawch wrote back by e-mail:

> If Ofheo [OFFICE OF FEDERAL HOUSING
> ENTERPRISE OVERSIGHT] comes back with bad
> RBC [Risk Based Capital] rules we may be interested.
> Are these different players than Craig [Ott] is showing
> us?

Grace Huebscher replied:

> Probably not so if we want to engage Craig [Ott] on this
> project, that might be a better choice. If you like that
> plan then let's discuss what we want to ask Craig to find
> for us...

Fannie Mae, Richard Lawch and Grace Huebscher never presented Ms. Williams

with their true decision, motive and intention, giving one face in public and another

in secret, in private. Ms. Williams did not discover the existence of Exhibit A until

the spring of 2002, which then made the blackball clear.

20.   At all times, from 1998 to the present, Fannie Mae has intentionally, improperly,

and willfully refused to do business with Ms. Williams, and had no intention of ever

doing any business with Ms. Williams. Fannie Mae through its Vice-President

Richard Lawch (now Senior Vice-President) and Vice-President Grace Huebscher of

the Multifamily Division engaged in an intentional and malicious plan to deprive Ms.

Williams of her right to contract based on her Afro-American identity, on the same

terms as are afforded "white citizens." As officers and directors of Fannie Mae, they

further engaged in a persistent course of conduct designed to interfere with her

prospective economic opportunities. Ms. Williams was blackballed and locked out

by Fannie Mae.

FM42686

FNMA.MBW.008182

**Confidential**
**Subject to Protective Order**
and Confidentiality Order

21.    This plan and scheme was made manifest by the May 31, 2001 e-mail from Huebscher to Lawch, which summarily and explicitly denied Ms. Williams an opportunity to participate in a pending business opportunity.

22.    Further, the line of business for which Ms. Williams was uniquely qualified was given to a white male citizen — one Craig Ott, with credentials and experience inferior to that of Ms. Williams. In fact, he was structuring and closing transactions based upon the business concepts that Ms. Williams had developed at Fannie Mae and *that he had learned under the tutelage of Ms. Williams.*

23.    During the above mentioned period, Ms. Williams engaged in such marketing efforts and made presentations to Defendant Fannie Mae through many of its employees, officers and agents in such a manner that Defendant, by and through these employees, officers and agents, had actual knowledge of Ms. Williams's expectancy of business opportunities.

24.    Defendant Fannie Mae, through its agents and officers Defendants Richard Lawch and Grace Huebscher, discouraged others and its lenders and customers from doing business with Ms. Williams.

25.    Defendants and other agents, employees and officers of Fannie Mae discouraged consultants, brokers, lenders and customers and their representatives from dealing with Ms. Williams—and companies associated with her, such as CAM Financial-- in securing insurance products. They knew, for example, that Ms. Williams, as part of her business plan, intended to work with CAM Financial, the insurance brokerage firm that provided insurance coverage for these transactions under an exclusive agreement with Fannie Mae.

FM42687

8

**Confidential**
**Subject to Protective Order**
**and Confidentiality Order**

26. Fannie Mae thereby deprived Ms. Williams from earning commissions through its co-brokerage agreement with CAM Financial. Their actions are continuing and ongoing to the present while Fannie Mae is continuing to do business in the small multifamily housing market using mortgage backed securities' products developed by Ms. Williams, as stated previously above.

27. Defendants blacklisted and blackballed Ms. Williams. These actions drove Ms. Williams into bankruptcy.

28. Ms. Williams has been damaged as approximate cause of Fannie Mae's illegal and tortious actions in an amount in excess of $35,000,000 as a result of lost co-brokerage commissions with CAM financial commissions attributable to placing insurance for her own insurance commission account and insurance consulting fees with the above referenced customers and prospective customers.

29. This damage is continuing and growing.

30. Defendants' conduct and actions as set forth induced the breach of prospective business relationships, contracts and economic expectancies between Ms. Williams, an African American, and its customers and prospective customers, and encouraged and promoted the establishment of business relationships, contracts and economic expectancies with white persons, contrary to the protection offered by 42 USC 1981.

## COUNT II  TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

31.     The allegations set forth in Paragraphs 1-30 are repeated and expressly incorporated here.

32.     Defendants' conduct and actions as set forth constitute a tortious interference with a business or prospective business relationship or economic

FM42688

FNMA.MBW.008184

Confidential
Subject to Protective Order
and Confidentiality Order

advantage with Ms. Williams's customers and potential customers, CAM Financial,

and its co-brokerage, commission-sharing relationship with CAM Financial.

Defendants, with knowledge of Ms. Williams's co-brokerage and joint marketing and

sales arrangement with CAM Financial and its efforts to market and sell its insurance

products, insurance consulting and general consulting services to Defendant Fannie

Mae's lenders and customers, has intentionally and without justification or privilege

interfered with such relationships with CAM Financial and Ms. Williams's customers

and potential customers by inducing or causing a breach or termination of such

relationships and expectancy and resultant damage.

### COUNT III   INTENTIONAL INFLICTION OF EMOTIONAL HARM/OUTRAGEOUS CONDUCT

33.  The allegations set forth in Paragraphs 1-30 are repeated and expressly

incorporated here.

34.  Defendants blacklisted and blackballed Ms. Williams.  Those actions caused her

to file bankruptcy, to leave her office at the Watergate in disgrace and to leave her

home at the Watergate despondent and nearly unable to function.  Ms. Williams was

devastated by the shabby and disingenuous way she was treated. All these years Ms.

Williams worked in good faith to attempt to fashion a business relationship with

Fannie Mae based on what she brought to the table.   These actions caused her

shock and humiliation when they revealed all her work to have been in vain.

Defendants crushed her in a way that has cost her untold millions in lost business.

Those actions caused her worst nightmare to come true.

35.  Those actions were intentional/and or were carried out with reckless disregard

for her as a person and as an African-American. Those actions are outrageous, and

FM42689

10

FNMA.MBW.008185

Confidential
Subject to Protective Order
and Confidentiality Order

inflicted on her great emotional distress, namely, fright, horror, grief, shame,

humiliation, embarrassment, anger, disappointment and nausea.

**COUNT IV - REQUEST FOR INJUCTIVE RELIEF TO ORDER DEFENDANTS
TO CONTRACT WITH MS. WILLIAMS ON THE SAME GROUNDS AS WHITE
CITIZENS, AND TO AFFORD HER THE ECONOMIC OPPORTUNITIES
PREVIOUSLY DENIED.**

36.  The allegations set forth in Paragraphs 1-30 are repeated and expressly

incorporated here.

### JURY DEMAND

Ms. Williams requests a trial by jury on all issues allowable by law.

### REQUEST FOR RELIEF

1. DAMAGES: Based on Counts One, Two, and Three, Ms. Williams demands actual

damages in the amount of $50,000,000, which includes compensatory damages, lost

commissions, damage to credit due to bankruptcy, emotional distress and suffering.

Ms. Williams also demands punitive damages in the amount of $100,000,000 for the

malicious, wanton, outrageous conduct of Fannie Mae and its employees.

2. INJUNCTIVE RELIEF: Plaintiff requests this Court to enter injunctive relief

enjoining Fannie Mae and its officers from further interfering with Ms. Williams

business opportunities.

> Respectfully submitted,
>
>
> Harley J. Daniels, Esq.
> Brian Lederer, Esq.
> Michael W. Beasley, Esq.
> Law Offices
> 3003 Van Ness St., NW, Suite #W228
> Washington, D. C. 20008
> (202) 244-1715

FM42690

11

FNMA.MBW.008186

<u>Verification</u>

Subscribed and sworn before a Notary Public in Washington, District of Columbia, I, Marialice Bathrus Williams, Plaintiff, state that I believe that the facts stated in the Complaint for Damages and for Injunctive Relief are true, to the best of my knowledge and information.

_____
Marialice Bathrus Williams

_____
Notary Public

My Commission expires:_____

Confidential
Subject to Protective Order
and Confidentiality Order

FM42691

12

FNMA.MBW.008187