IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARIALICE BATHRUS WILLIAMS, | : | |
| | : | Civil Action No. 1:05CV01483 |
| Plaintiff, | : | |
| | : | |
| vs. | : | Judge John D. Bates |
| | : | |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al*. | : | |
| | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS FEDERAL NATIONAL MORTGAGE ASSOCIATION,
RICHARD LAWCH, AND GRACE HUEBSCHER'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants'[1] motion for summary judgment is based on the following undisputed material facts:

1. Plaintiff Marialice Bathrus Williams ("plaintiff") was employed by Fannie Mae as a director in its multifamily unit from January 1990 through June 1998, when she voluntarily left to join CAM Financial Services, Inc. ("CAM"). (Am. Compl. ¶¶ 11; March 28, 2007 Williams Dep. at 73:19-22.)

2. In 1997, Fannie Mae and CAM entered into a memorandum of understanding concerning multifamily credit risk insurance. (*See* CAM Amended Complaint ¶ 16.)

3. From 1997 through 1999, Fannie Mae used CAM as an insurance broker for the procurement of non-DUS multifamily credit risk insurance. (*See* CAM Amended Complaint.)

4. After plaintiff resigned from Fannie Mae, she was unable to reach a mutually-acceptable agreement with CAM. (*See* March 21, 2003 Williams Dep. at 226:5-10.)

5. In October 1998, plaintiff formed Risk Mitigation Strategists, LLC ("RMS"), a limited liability company, wholly-owned by plaintiff, to "pursue the business [plaintiff] had been doing at Fannie Mae prior to [her] departure." (Amended Compl. ¶¶ 31-32; March 28, 2007 Williams Dep. at 20:17-20; May 7, 2007 Williams Dep. at 300:19-20; District of Columbia Certificate of Revocation.)

6. Although CAM and plaintiff talked about a joint venture, they never actually entered into an agreement. (*See* Jones Dep. at 31:2-25.)

7. RMS and CAM did not have "any connection with respect to ownership and no one from CAM or RMS has an interest in the other's business ventures." (Jones Dep. Exh. 2, at FNMA.MBW.008003.)

8. CAM's president Bob Jones could only recall two Fannie Mae-related projects or presentations that RMS or plaintiff worked on with CAM: The May 2001 Delegated Underwriting and Servicing ("DUS") proposal and a presentation on captive insurance. (*See* Jones Dep. at 58-59.)

9. In May 2001, RMS made a proposal to Fannie Mae to "lay[] off risk associated with [Fannie Mae's] [DUS] Program," (Williams Interrog. Resp. No. 3) and "secure the insurance and the DUS lenders as clients and bring the deal back to Fannie Mae" (hereinafter, "May 2001 Proposal"). (Williams Interrog. Resp. No. 4; *see also* March 28, 2007 Williams Dep. at 36:13-20; May 7, 2007 Williams Dep. at 154:10-14; Jones Dep. Exh. 2.)

10. On May 15, 2001, Jones copied plaintiff on an e-mail to Stephen Noble from Zurich Insurance concerning RMS' "Proposal to Provide Insurance Coverage for . . . Fannie Mae's Delegated Underwriting Servicing Program." (March 28, 2007 Williams Dep. Exh. 1.)

---

[1]    Collectively, Federal National Mortgage Association ("Fannie Mae"), Richard Lawch ("Lawch"), and Grace Huebscher ("Huebscher").

This e-mail outlined RMS' May 2001 proposal, and indicated that plaintiff and CAM president Jones hoped to be able to share performance data "based on your interest in a potential transaction." (*Id.*)

11.     Fannie Mae's DUS program involves a small group of multifamily lenders who have the right to commit Fannie Mae, on a loan-by-loan basis, to purchase multifamily loans. (*See* March 25, 2003 Huebscher Dep. at 14:7-15.) In exchange, these DUS lenders share the risk of loss with Fannie Mae. (*See id.*; March 28, 2003 Williams Dep. at 27:4-13.)

12.     On May 31, 2001, Ms. Huebscher forwarded an e-mail from plaintiff indicating RMS's interest in pursuing insurance for the DUS program to her supervisor, Mr. Lawch. (*See* Jones Dep. Exh. 7, at FNMA.MBW.006230.)

13.     In May 2001, the Office of Federal Housing Enterprise Oversight (OFHEO) was in the midst of finalizing a new, risk-based capital rule, and Fannie Mae was concerned about the regulation's potential impact on its DUS program. (*See* March 26, 2003 Huebscher Dep. at 463:7-14.)

14.     In July 2001, shortly after Fannie Mae received plaintiff's e-mail, OFHEO issued its final risk-based capital rule. The final rule contained significant revisions from OFHEO's previously proposed rule, including, among other things, cutting in half the capital impact of risk sharing with DUS lenders. (*See* Risk-Based Capital, 66 Fed. Reg. 47730 (September 13, 2001) (codified at 12 C.F.R. part 1750); Risk-Based Capital, 64 Fed. Reg. 18084 (April 13, 1999); Fannie Mae's Interrog. Resp. No. 7.)

15.     The final rule obviated the need for Fannie Mae to obtain insurance for capital purposes and Fannie Mae did not pursue DUS insurance coverage at the time because it was

inconsistent with the risk sharing nature of Fannie Mae's business model.  (*See* March 26, 2003 Huebscher Dep. at 449:12-25; *see, e.g.*, Fannie Mae's Interrog. Resp. No. 7.)

16. Fannie Mae did not pursue the DUS proposal with either RMS or Craig Ott.  (*See* March 26, 2003 Huebscher Dep. at 449:12-25; *see, e.g.*, Fannie Mae's Interrog. Resp. No. 7.)

17. Plaintiff testified that she recognized in mid-2001 that Fannie Mae was not going to consummate the proposed DUS transaction with her.  (*See, e.g.,* March 17, 2003 Williams Dep. at 88, 91, 102, 104, 121.)

18. CAM stopped working on the May 2001 proposal in August 2001 because it heard from plaintiff that Fannie Mae was not pursuing the proposal.  (*See* Jones Dep at 54.)

19. The captive insurance presentation by Kate Westover, at which plaintiff, Kate Westover, and Fannie Mae representatives were present, occurred on August 21, 2001.  (*See* May 6, 2003 Williams Dep. at 128:25-129:13; May 6, 2003 Williams Dep. at 128:25-129:13; Jones Dep. at 54-55; Affidavit of Kathryn Westover; FNMA.MBW.008057.)

20. Plaintiff determined that defendants did not wish to pursue a business relationship or particular contracts with her after they stopped returning her phone calls and e-mails following the captive insurance meeting.  (See Amended Compl. ¶ 53; May 7, 2007 Williams Dep. at 196:19-21; May 5, 2003 Williams Dep. at 32-33.)

21. Fannie Mae and CAM did not enter into any insurance transactions after 1999.  (*See* CAM Amended Complaint ¶¶ 48, 85, 96.)

22. Defendants did not have any business discussions with plaintiff or CAM after CAM filed suit against Fannie Mae in December 2001.  (*See* CAM Amended Complaint; Huebscher Decl. ¶¶ 4, 5; Lawch Decl. ¶¶ 3, 4.)

4

23. Defendants did not promise plaintiff any business or even meet with her after this date. (*See* Huebscher Decl. ¶¶ 3, 4; Lawch Decl. ¶¶ 2, 3.)

24. Plaintiff described her co-brokerage agreement with CAM as "a simple, common co-brokerage agreement with CAM Financial that entailed paying them a commission in the event that they secured the insurance that I needed on any of the proposals that I was working on." (*See* Williams Interrog. Resp. No. 7.)

25. Plaintiff further explained that the co-brokerage agreement "indicates that when CAM locates an insurance company for a project that RMS is working on, RMS agrees to compensate CAM through some form of split commission." (Jones Dep. Exh. 2.)

26. The District of Columbia Department of Consumer and Regulatory Affairs revoked RMS's articles of incorporation after the company "failed and/or refused to file reports and pay all fees and dues owing prior to June 16, 2002 and 2003." (*See* District of Columbia Certificate of Revocation.)

27. Plaintiff's brokerage license expired in April 2003. (*See* District of Columbia Dept. of Insurance, Securities & Banking Licensee Look-up.)

28. Mr. Jones indicated that he did not believe that the co-brokerage agreement formally terminated prior to his departure from the company in 2005. (*See* Jones Dep. at 35:18-19.)

29. Bob Jones has no recollection of any conversations regarding RMS or plaintiff with defendant Huebscher or defendant Lawch. (*See* Jones Dep. at 43, 46.)

30. Bob Jones has no recollection of any instance where defendants discouraged CAM from business relationships with plaintiff, (*see* Jones Dep. at 43, 62), or made disparaging remarks about plaintiff. (*See* Jones Dep. at 44, 62-63.)

31.     Plaintiff testified that in early 2001, she heard Mr. Lawch remark about an "international broker" and that "she knew that that was a discriminatory remark.". (*See* Williams Interrog. Resp. No. 1; May 7, 2007 Williams Dep. at 200; March 17, 2003 Dep. at 107-08.)

32.     Fannie Mae never hired an "international broker" for the multifamily division's securitization and other loan programs. (*See* Fannie Mae's Interrog. Resp. at No. 9.)